## <u>AFFIDAVIT OF MARK O'DONNELL</u>

**STATE OF MARYLAND**  )
   ) ss.
**COUNTY OF BALTIMORE**  )

The affiant, Mark O'Donnell, being duly sworn, states as follows:

1.  I am over the age of 21 years and am competent to and do state the facts and matters contained in this affidavit are true except where stated upon information and belief and, as to such matters, I believe them to be true.

2.  I was born in 1967 to parents who became Jehovah Witnesses in 1968 and I attended church meetings from the time I was a toddler until 2013 when I left the religion. The Jehovah's Witness Church officially disfellowshipped me immediately following the March 2019 Atlantic article which featured my investigations into child sexual abuse mishandling and cover-ups within the organization.

3.  I was baptized publicly in 1984 at the age of 16 and later served as an appointed Ministerial Servant for approximately ten (10) years.  During the late 1980s and at other times I served as an  appointed Auxilliary Pioneer at various intervals, performing on average 60 hours of field service a month. At all other times I turned in required monthly field service reports documenting both time spent in the ministry each month as well as notations of all literature sold or given to the public.

4.  Through my many years with the church and following my departure, I gained personal knowledge of a large number of child sexual abuse cases and how reports of child abuse were handled both locally and nationally by the Watchtower orgainization. My experience provided personal knowledge of the information set forth herein.

5.    Since as far back as the 1970's Watchtower has implemented several policies and protocols that were used to keep child abuse by church elders and other congregants concealed from law enforcement and general followers of the religion. As a matter of policy congregation elders do not report cases of child sexual abuse to law enforcment except in rare circumstances where Watchtower is unable to legally dodge mandatory reporting requirements.

6.    As a matter of policy Watchtower requires that there be at least two witnesses to acts of child sexual abuse before authorizing elders to take internal disciplinary action against perpetrators.

7.    The first required course of action by elders when a report of child sexual abuse comes to their attention is to telephone the Legal Department at the national headquaters in New York. The Legal Department will review the State laws where the congregation is located and advise elders how to proceed. Typically they are instructed that there is no obligation to report the matter to civil authorities and that the matter should otherwise be handled internally.

8.    In the late 1970's to early 1980's investigations by the elders of a congregation involved confronting both the alleged abuser as well as the alleged victim/s of abuse. If elders determined that abuse allegations had substance, a judicial committee comprising at least three elders was convened.

      During Judicial Committee proceedings, elders would require the victim/s to face the alleged perpetrator, who would then have an opportunity to defend themselves. If the alleged abuser denied the allegations and there was no second witness* to confirm the accusations, that would be the end of the matter. Elders would inform the accusers that the matter would be left "In Jehovah's hands."

      *The church has always adopted the two witness rule that essentially says that barring confession, no member can officially be sanctioned for committing a sin without two credible witnesses to corroborate the accusation.

Affidavit of Mark O'Donnell                          - 2

9.   If a report was substantiated by either a second witness or the accused confessed, a judicial committee of three elders would determine if that person was repentent, and what action would be taken.  If it was deteremined that the person was sufficiently repentent and demonstrated that they just had a moment of weakness, then the abuser was typically placed on either public or private reproof, which amounts to a temporary loss of privileges; i.e. the accused couldn't handle microphones during meetings, engage in attendant duties, or give testimonials during Bible reading sessions, etc.  After a period of time (determined by the elders), if the person was considered sufficiently penitent, their privileges would be reinstated.

If however the judicial committee determined that the sin was premeditated, had been a regular ongoing practice, or if the accused was belived to be unrepentant, they would be disfellowshipped.  Disfellowshipping is always documented by Watchtower form S-77, *Notice of Disfellowshipping or Dissasociation*.

10.  On July 1ˢᵗ,1989, a letter was sent from Watchtower national headquaters in New York (attached as exhibit A) to all 10,883+ congregations in the United States. This six-page letter directed elders to funnel all reports or allegations of child abuse to Watchtower's legal department in New York instead of initiating immediate notification to local law enforcement officials. Elders were also directed to follow counsel from their Awake publication dated January 22ⁿᵈ 1985, in which instructions to contact or cooperate with law enforcement agencies following abuse reports was conspicuously absent.

11.  On March 14, 1997 another letter was sent from the Watchtower national headquaters in New York to all congregations in the United States.The letter became anecdotally known as the "Special Blue Envelope letter." The instructional directive laid out specific rules on how to deal with and document known occurrences of child molestation.

12.    Among others things, congregations were instructed to submit a detailed report answering twelve (12) questions such as:

- Was the incident a one time occurrence?

- Did the accused have a history of child molestation?

- How was the accused viewed within the community?

- Did anyone else know about the abuse?

      Elders were instructed to mail their responses to Watchtower's headquarters in a special blue envelope and keep a copy of the report in the congregation's confidential file and to not share it with anyone.

13.    Information submitted on CSA (Child Sexual Abuse) intake forms is closely guarded within the Watchtower organization and controlled by Watchtower's Governing Body, the organization's ruling council made up of eight men. They are assisted by a large number of support staff, and many individuals are involved in the processing, filing and storage of data pertaining to child sex abuse cases. After the Patterson New York Legal Department determines how to advise elders who report initial allegations of child sex abuse, they transfer inquiring elders to the Service Department, which then advises elders from the reporting congregation on how to adjudicate the allegations within the local congregation of Jehovah's Witnesses.

14.    In 2012 a senior official testified in the civil trial of Jose Lopez vs. Watchtower Bible & Tract Society of New York, Inc (San Diego, CA) that all information pertaining to child sexual molestation on file at the headquarters in New York was scanned and stored in a Microsoft Share Point database.

15.    It has been estimated that this database contains tens of thousands of detailed acts of alleged and established child sexual abuse. In civil litigation, Watchtower has been assessed large daily fines and penalized by default judgments for failure to turn over essential and relevant abuse documents.

In addition to being deemed a recalcitrant litigant in civil matters, Watchtower has likewise obstructed police investigations in multiple States, and has never turned over its child abuse database to law enforcement agents in the United States.

Watchtower is currently under Grand Jury investigation by the office of the Attorney General of the Commonwealth of Pennsylvania in relation to alleged criminal activity related to child abuse.

16.   For the past six years, I have devoted a significant portion of my work and research to the examination and study of Watchtower leaked documents, public documents, civil trial documents obtained through discovery, and a very large number of additional documents which confirm and establish the existence of a large searchable database of confirmed reports of child molestation within the Jehovah's Witness Church.

The aforementioned documents and reports are the result of more than five decades of CSA Intake Forms and other forms and letters scanned into digital format and held at Watchtower's Legal and Service Department Headquarters in New York State.

Documents include detailed information related to all alleged child molesters as well as each of their alleged or confirmed victims.

Based on my personal experience and knowledge, I believe that the Watchtower Bible and Tract Society of New York, the Christian Congregation of Jehovah's Witnesses (CCJW), Watch Tower Bible and Tract Society of Pennsylvania, and other alter-ego corporations and entities used by Jehovah's Witnesses and their Governing Body, are maintaining a highly secured, searchable database which evidences the history of sexual abuse within the Church spanning many decades,

and which exists in digital form at Headquarters locations in Patterson, Wallkill, and Warwick, New York, and other backup locales.

Further your affiant sayeth not.

Mark O'Donnell

Subscribed and sworn to before me this ___15___ day of ___APRIL___, 2020.

Notary Public

**JACOB BEERS**
My Commission Expires **Notary Public**
**Harford County, Maryland**
**My Commission Expires 9/15/2021**

*Exhibit A*

# WATCHTOWER
### BIBLE AND TRACT SOCIETY OF NEW YORK, INC.

25 COLUMBIA HEIGHTS, BROOKLYN, NEW YORK 11201-2483, U.S.A.  PHONE (718) 625-3600

July 1, 1989

TO ALL BODIES OF ELDERS IN THE UNITED STATES

**C O N F I D E N T I A L**

Dear Brothers:

   We are writing to help all of you as individual elders be aware of a growing concern regarding the handling of your duties that may involve legal issues or questions.  Due to its importance, the presiding overseer should arrange for a special meeting of the body of elders to read and consider this letter carefully.

   In spreading the Kingdom message, it is appropriate that we be bold and outspoken.  Jesus commanded that "what you hear whispered, preach from the housetops." (Matthew 10:27)  Even when worldly authorities demand that we keep silent, we reply as did the apostles: "We cannot stop speaking about the things we have seen and heard." (Acts 4:20)  The Christian congregation will continue to declare the Kingdom message boldly until Jehovah says the work is done.

   Elders share the obligation to shepherd the flock.  However, they must be careful not to divulge information about personal matters to unauthorized persons.  There is "a time to keep quiet" when "your words should prove to be few." (Ecclesiastes 3:7; 5:2)  Proverbs 10:19 warns: "In the abundance of words there does not fail to be transgression, but the one keeping his lips in check is acting discreetly."  Problems are created when elders unwisely reveal matters that should be kept confidential.  Elders must give special heed to the counsel: "Do not reveal the confidential talk of another." (Proverbs 25:9)  Often the peace, unity, and spiritual well-being of the congregation are at stake.  Improper use of the tongue by an elder can result in serious legal problems for the individual, the congregation, and even the Society.

   While we as Christians are ready to forgive others who may wrong us, those in the world are not so inclined.  Worldly persons are quick to resort to lawsuits if they feel their "rights" have been violated.  Some who oppose the Kingdom preaching work readily take advantage of any legal provisions to interfere with it or impede its progress.  Thus, elders must especially guard the use of the tongue. Jesus faced opposers who tried to "catch him in speech, so as to turn him over to the government." (Luke 20:20)  He instructed us to be "cautious as serpents and yet innocent as doves" in such situations. (Matthew 10:16)  Where such a threat exists, our position as elders should be in line with David's words:  "I will set a muzzle as a guard to my own mouth, as long as anyone wicked is in front of me."--Psalm 39:1.

Page 1 of 6

pg 181

BENTLEY 000080

TO ALL BODIES OF ELDERS
July 1, 1989
Page 2

In recent years, this matter has come to be a cause for increasing concern. The spirit of the world has sensitized people regarding their legal "rights" and the legal means by which they can exact punishment if such "rights" are violated. Hence, a growing number of vindictive or disgruntled ones, as well as opposers, have initiated lawsuits to inflict financial penalties on the individual, the congregation, or the Society. **Many of these lawsuits are the result of the misuse of the tongue.** As elders, remember that ill-advised statements or actions on your part can sometimes be interpreted legally as violating others' "rights."

The need for elders to maintain strict confidentiality has been repeatedly stressed. Please see *The Watchtower* of April 1, 1971, pages 222-4, and September 1, 1987, pages 12-15. The September 1977 *Our Kingdom Service*, page 6, paragraph 36, and the *ks77* textbook, page 65, also provide helpful direction and counsel. That material strongly emphasized the elders' responsibility to avoid revealing confidential information to those not entitled to it.

The legal consequences of a breach of confidentiality by the elders can be substantial. If the elders fail to follow the Society's direction carefully in handling confidential matters, such mistakes could result in successful litigation by those offended. Substantial monetary damages could be assessed against the elders or congregation. In some cases where the authorities are involved, certain complications could lead to a fine or imprisonment. These possibilities underscore **the need for elders to be discerning and to follow carefully directions provided by the Society.**

## I. WHAT TO DO IN SPECIFIC CASES

### A.   Judicial Committee Matters

Judicial committees must follow carefully the Society's instructions in carrying out their duties. (Note *ks77*, pages 66-70; *ks81*, pages 160-70.) Anything submitted in writing to the committee by the alleged wrongdoer or by witnesses should be kept in strict confidence. If it is necessary to continue at a later committee hearing, the members of the committee should submit to the chairman any personal notes they have taken. The chairman will keep these notes in a secure place to prevent breaches of confidentiality. The notes may be returned to the individual elders when the hearing resumes. Upon conclusion of the case, the chairman should place only necessary notes and documents, a summary of the case, and the S-77 forms in a sealed envelope for the congregation file. Nothing should be preserved outside of this sealed envelope (including unnecessary personal notes) by any elder on the committee. Obviously, no committee will ever allow judicial proceedings to be tape recorded or allow witnesses testifying before the committee to take notes.

Pg 172

BENTLEY 000081

TO ALL BODIES OF ELDERS
July 1, 1989
Page 3

B.  **Child Abuse**

Many states have child abuse reporting laws.  When elders receive reports of physical or sexual abuse of a child, they should contact the Society's Legal Department immediately.  Victims of such abuse need to be protected from further danger.  See "If the Worst Should Happen," *Awake!* January 22, 1985, page 8.

C.  **Search warrants and Subpoenas**

1.  A search warrant is a court order authorizing the police to search premises to locate evidence that may be used in a criminal prosecution.  No elder should ever consent to the search of a Kingdom Hall or any other place where confidential records are stored.  However, armed with a search warrant the police do not need consent and may even use force to accomplish their task.  Likely before obtaining a search warrant, the police or other governmental officials will make inquiries regarding confidential records, make request to obtain the records, or indicate that they will seek a search warrant if the elder(s) involved does not cooperate.  In any such situation, the Society's Legal Department should be called immediately.

At any time an elder is confronted with a search warrant (whether given advance notice or not), the elder should first ask to read the warrant.  After reading it he should ask if he can call for legal guidance and then call the Society's Legal Department.  If for some reason the Legal Department cannot be contacted, the elders involved should make every effort to obtain the assistance of a local attorney for the purpose of protecting the confidentiality of the records.  It may be impossible to stop determined officers from conducting the search authorized by the warrant.  Conscientious elders will want to do all they reasonably and peaceably can to preserve the confidentiality of the congregation in harmony with the principle set out in Acts 5:29.

2.  Subpoenas are demands for records or for the appearance of an individual at a trial or deposition to give testimony.  Subpoenas may be issued by a court or in some cases by a governmental agency or an attorney.  If an elder receives a subpoena, he should contact the Society's Legal Department immediately.  Never turn over records, notes, documents, or reveal any confidential matter sought by subpoena without receiving direction from the Legal Department.

D.  **Crimes and Criminal investigations**

In some cases the elders will form judicial committees to handle alleged wrongdoing that also could constitute a violation of Caesar's criminal laws (e.g., theft, assault, etc.).  Generally, a secular investigation into a matter that is a concern to the congregation should not delay conducting a judicial hearing.  To avoid entanglement with the secular authorities who may be investigating the same matter, the strictest confidentiality (even of the fact that there is a committee) must be maintained.

pg 173

BENTLEY 000082

TO ALL BODIES OF ELDERS
July 1, 1989
Page 4

If the alleged wrongdoer confesses to the sin (crime), no one else should be present besides the members of the committee. When evidence supports the accusation but genuine repentance is not displayed resulting in a decision to disfellowship, this should be handled in the normal course regarding advice of appeal rights and announcements to the congregation. In cases of serious criminal wrongdoing (e.g., murder, rape, etc.), or where the criminal conduct is widely known in the community, the body of elders should contact the Society before proceeding with the judicial committee process.

E.  **When Servants and Publishers Move**

A considerable number of publishers, including **elders and ministerial servants move from one congregation to another.** Sometimes the circumstances surrounding their departure are unsettled. Some appointed brothers may be experiencing problems that have brought their qualifications into question. It is not uncommon for a body of elders to hold back in giving counsel, allowing a brother to move without discussing his problem. Thereafter, they decline to recommend his reappointment in his new congregation. Often such a brother protests, requiring extensive correspondence between the bodies of elders. Much personal, and sometimes embarrassing, information must then be passed on. Such mishandling of things greatly increases the potential for serious repercussions. Problems can be avoided by the body of elders assuming its responsibility to inform a brother that he will not be favorably recommended, fully explaining the reasons why. **Every effort should be made to resolve any difference before he leaves, eliminating any need for controversy involving his new congregation.** The body should assign two elders to meet with him before he moves, letting him know whether they are recommending him to the new congregation.

This would likewise apply to publishers who move at a time when their personal conduct requires investigation by the elders. **If serious accusations of wrongdoing have been made against an individual and he moves to another congregation before matters are finalized, usually it is best for the elders in the original congregation to follow through in handling matters,** if possible and if distance permits. They are acquainted with the individual and the circumstances surrounding the alleged wrongdoing; this ordinarily puts them in the best position to get the facts and to handle the case. Handling matters in this way will eliminate the need to reveal confidential information unnecessarily about the private lives of individuals.

F.  **When Lawsuits Are Threatened**

If the congregation or the elders (in their capacity as elders) are threatened with a lawsuit, the Society's Legal Department should be contacted immediately. No statements should be made by any member of the body of elders about the merits or validity of an actual or threatened lawsuit without authorization from the Society.

Page 4 of 6

pg 174

BENTLEY 000083

TO ALL BODIES OF ELDERS
July 1, 1989
Page 5

### G. Child Custody

Elders may learn that a publisher is facing a dispute over
child custody in a divorce proceeding. If the parental rights
of such is challenged on the basis of our Christian beliefs, or
on the assertion that our beliefs are harmful to a child's best
interests, the elders should immediately write to the Society's
Legal Department. In a rare emergency, a telephone call may be
necessary. The Legal Department will assess the facts and
determine the degree of its involvement, if any. Elders have no
authority to make any promises about the Society's paying legal
fees or handling specific cases. There is no need to contact
the Society if there is no indication that the beliefs and
practices of Jehovah's Witnesses will be attacked in a child
custody dispute.

When you write to the Society's Legal Department about a
specific case, please provide the following information:

1. The names of the parents and their attorneys.

2. The number of children involved and their ages.

3. A brief description of the facts, including the presence
of any apostates.

4. An assessment of the Christian parent's spiritual
condition-Is he or she new in the truth? Active? Inactive?
Balanced?

5. The status of the legal proceedings-Has the matter gone to
trial? Has the trial date been set? If so, when?

### II. POINTS TO REMEMBER

#### A. Appreciate the Importance of Maintaining Confidentiality

Elders must exercise extraordinary caution when it comes to
handling confidential information about the private lives of
others. Do not mistakenly minimize the gravity of a breach of
confidentiality. Unauthorized disclosure of confidential
information can result in costly lawsuits. Even if a lawsuit
turns out favorably, valuable time and energy that could have
been devoted to Kingdom interests will be lost.

#### B. Do Not Make Statements to Secular Authorities Until You Receive Legal Advice from the Society

You are not legally required to make immediate responses to
secular authorities about matters that could involve the
disclosure of confidential information. Voluntarily allowing
the Kingdom Hall or confidential records to be searched, where
no search warrant is produced, could infringe on the legal
rights of the congregation or of others. No statements should
be made until you have an understanding of your legal position
from the Society's Legal Department.

pg 185

Page 5 of 6

BENTLEY 000084

TO ALL BODIES OF ELDERS
July 1, 1989
Page 6

### C.   Be Extremely Careful with Written Material

All material related to judicial matters should be kept in a safe place, accessible only to elders.  Final reports on the handling of judicial matters should be placed in a sealed envelope in the congregation file.  A judicial committee should avoid sending to an individual any kind of correspondence that accuses him of specific wrongdoing.  (Note *ks*77, pages 68-9.) **Nothing should be put in writing to any disfellowshipped person to advise him of his status or the reasons for it without specific direction from the Society.**  The rules and procedures of Jehovah's Witnesses do not require such written disclosures. Anything in writing submitted to a judicial committee should be kept in strict confidence.  If a judicial committee disfellowships an individual, he should be informed **orally** of the action taken and of the right to appeal.  If the wrongdoer refuses to attend the hearing, two members of the judicial committee should attempt to contact the individual at his home and inform him orally of the decision.  If this is not possible, the two elders may be able to inform him by telephone.

### D.   Guard the Use of Your Tongue

Think before you speak.  Do not discuss private and judicial matters with members of your family, including your wives, or with other members of the congregation.  Be extremely careful not to inadvertently disclose private information when others are present, such as when speaking on the telephone with others listening in or nearby.  (Note *ks*77, page 65.)  At times, complicated judicial cases may necessitate consultation with an experienced, mature elder in another congregation or with the circuit overseer.  Unless the circuit overseer is the elder consulted, only the pertinent details should be discussed and names should not be used.

Elders bear a heavy responsibility in ministering to the needs of the Christian congregation, and observing confidentiality as they do so.  (1 Corinthians 16:13)  We trust that the information in this letter will help you carry this burden. Please be assured of our love and prayers, and may Jehovah continue to bless you as you shepherd his flock.-1 Peter 5:1-3.

Your brothers,

*Watchtower B. & J. Society*

OF NEW YORK, INC.

P.S.  Due to the importance of the information that is presented herein it is suggested that the body of elders jointly read and consider this letter as soon as possible after its receipt in the congregation.  Please do not make any copies of this letter, nor should it be read by others.  It should be kept in the congregation's confidential files for any future reference that may be required by the body of elders.

pg 196

BENTLEY 000085