*Exhibit 2*

```
             IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF MONTANA
                     BILLINGS DIVISION
    _____

     TRACY CAEKAERT, and           Case No.
     CAMILLIA MAPLEY,              CV-20-52-BLG-SPW

              Plaintiffs,

        vs.

     WATCHTOWER BIBLE AND
     TRACT SOCIETY OF
     NEW YORK, INC.,
     WATCH TOWER BIBLE AND
     TRACT SOCIETY OF
     PENNSYLVANIA, and BRUCE
     MAPLEY, SR.,                   VIDEOTAPED DEPOSITION
                                    UPON ORAL EXAMINATION
              Defendants.           OF JAMES ROWLAND

     WATCHTOWER BIBLE AND
     TRACT SOCIETY OF
     NEW YORK, INC.,

              Cross Claimant,

     BRUCE MAPLEY, SR.,

              Cross Defendant.


     ARIANE ROWLAND, and           Cause No.
     JAMIE SCHULZE,                CV 20-59-BLG-SPW

              Plaintiffs,

        vs.

     WATCHTOWER BIBLE AND
     TRACT SOCIETY OF
     NEW YORK, INC., and
     WATCH TOWER BIBLE AND
     TRACT SOCIETY OF
     PENNSYLVANIA,

              Defendants.
    _____
```

**Charles Fisher Court Reporting**
**442 East Mendenhall, Bozeman MT  59715, (406) 587-9016**

**James Rowland**

1    that I had to do.  And no work to it.  It was just,

2    you know, it was a pleasure to do it.

3        Q.    Would members come to you with questions

4    about scripture or --

5        A.    Yeah.

6        Q.    "Yes"?

7        A.    Yeah, they started, and --

8        Q.    What kind of things would they seek your

9    help with?

10       A.    Well, they could -- I've had questions on

11   some minor problems.

12       Q.    Like what?

13       A.    Just, like, "My oldest son is somewhat

14   rebellious, he's getting rebellious.  I'd like for

15   you to talk to him."  And we had a number of those.

16            And the other ones are, like, "I'm going

17   to be going out in the field service, and I'd like

18   help, if you'd come out with me and we'd go door to

19   door."  So that kind of stuff.

20       Q.    Okay.  When did you begin hearing about

21   girls being sexually abused in Hardin?

22       A.    It was in -- I think in -- to the best of

23   my recollection, in the later seventies.

24       Q.    Okay, in the seventies.

25       A.    Yeah.  Because I was appointed as an elder

**James Rowland**

1    in 1974 when I got back from college, University of

2    Oklahoma.  And then they do give training then,

3    because you go to --

4         Q.   Who's "they"?  What do you mean?

5         A.   Pardon?

6         Q.   When you say, "they do give training," who

7    gives the training?

8         A.   The Society.  They have a district

9    overseer that meets with all the elders when they

10   have this training annually.  And it's the finer

11   points of ministry, the finer points of, you know,

12   your duties, stuff like that.

13            So in '75, I think in early -- in January,

14   I went to that Kingdom Ministry School.  And that's

15   when that was.  It took a month.

16        Q.   So that training was called the Kingdom

17   Ministry School?

18        A.   Yeah.

19        Q.   Approximately 1975 for you.

20        A.   Yeah.

21        Q.   Do you remember where that was?

22        A.   Billings.

23        Q.   Billings.  "Yes"?  Billings?

24        A.   Yeah, Billings.  Yes.

25        Q.   Do you remember who was there?

66

**James Rowland**

```
 1        A.    No.   There was about 40 elders in the
 2   group, some new ones, some old ones.   And I can't
 3   even remember who the instructor was.   He might
 4   have been from New York.
 5        Q.    Okay.   Someone you hadn't seen before.
 6        A.    Yeah, he was just here to teach that class
 7   and then go back to New York or whatever.
 8        Q.    And in addition to the Bible, were they
 9   using other books as part of your training?
10        A.    Yeah.   Yeah, with the -- like, the
11   teaching book, you know, like, one of the
12   publications is to become a better teacher, you
13   know, and --
14        Q.    Let me show you a document.   This is
15   called "Kingdom Ministry School Course."
16        A.    Yeah.
17        Q.    And it's Bates WTPA 1 is the first page of
18   this document.   It's the document that was given to
19   us by WTPA, the Pennsylvania corporation.
20        A.    Yeah.
21        Q.    And you'll see there -- can you read that
22   okay?
23        A.    Yeah.
24        Q.    It's dated October 1972?
25        A.    Uh-huh.   Yeah, that's the thing that --
```
                                                      67

**James Rowland**

1    that's the publication that was used.

2         Q.   For the training as an elder?

3         A.   Yeah.

4         Q.   Can I go back to that cover page for a

5    second?  So "Watch Tower Bible and Tract Society of

6    Pennsylvania, 1972," does that look like the

7    document that maybe you saw when you were being

8    trained in 1975?

9         A.   Yeah.  Yeah, it's a book about like this

10   (indicating).  It's a red -- it's -- what do they

11   call them now?  A real deep red, burgundy almost.

12        Q.   And you were using your hands to describe

13   a very big book, thick?

14        A.   About like that.

15        Q.   Yeah.

16        A.   And that was the Kingdom Ministry School.

17        Q.   How much time did you spend at that

18   training in Billings?  Do you remember?

19        A.   I think it was a month.  It might have

20   been -- it might have been two weeks.  But it was a

21   number of days involved.

22        Q.   Okay.  So fairly extensive, then.

23        A.   Yeah.

24        Q.   And did you stay in Billings or did you

25   drive back and forth?

                                                    68

**James Rowland**

1      A.    Uh-huh.

2      Q.    That was a "yes"?

3      A.    Uh-huh.

4      Q.    "Yes"?

5      A.    Yes.

6            MR. TAYLOR:   Object to the form.

7  BY MR. SHAFFER:

8      Q.    And that's how -- that training in

9  Billings and this book here, this Exhibit 2, that

10  informed you on how to work as an elder and how to

11  communicate with the other members of the

12  congregation and help them; is that right?

13      A.    Yes.

14      Q.    And would you reference back to this book,

15  this Exhibit No. 2, while you were working as an

16  elder?  Would you look at it from time to time?

17      A.    Yeah, any of the publications, you know,

18  to -- something specific that you don't know

19  exactly how to handle, you go in here and under

20  that title or that subject area, and it was very

21  helpful.

22      Q.    Okay.  So just going back to kind of your

23  evolution -- I'm going to call it your evolution as

24  a member of the church, in 1969, you're baptized,

25  you're a book study conductor.

                                                    72

**James Rowland**

1          MR. TAYLOR:  Object to the form.

2    BY MR. SHAFFER:

3          Q.   Who would tell the members that, "Hey, if

4    you've got a problem, come talk to the elders"?

5    Who would tell the members that?

6          A.   Well, I think at one or the other times,

7    every elder would say that at certain meetings.

8    You know, "If you're having trouble with this, see

9    such and such," you know.

10         Q.   So that could just happen maybe when you

11   were having a Bible study at someone's house?

12         A.   It could.  It could happen there, could

13   happen at regular meetings, and somebody would say,

14   "Well, who do we see about this?"  And then the

15   brother, the elder doing the talk or whatever,

16   presentation, would say to go to this elder or that

17   elder.

18              But towards the end of my tenure there, it

19   started breaking down, and I started getting a lot

20   of complaints from kids and from parents.

21         Q.   Complaints about what?

22         A.   Molestation.

23         Q.   Molestation?

24         A.   Yeah.

25         Q.   Sexual molestation?

                                                        78

**James Rowland**

1      A.   Yeah.  And I went to Gary Baker as time

2   went on, and I tried to enlist him to help me,

3   because he was the only other elder other than

4   Martin.  And he says, "I can't" -- "I can't do

5   anything to help you, Jim."  He said, "That's my

6   father-in-law.  I'm staying totally out of it."

7      Q.   Because a lot of these allegations were

8   against Mr. Svensen, correct?

9      A.   Yeah.  In my opinion, his relationship

10   with his father-in-law was secondary to carrying

11   out Bible principles, so I didn't understand when

12   he just walked away from me.

13      Q.   Who was responsible for communicating with

14   Bethel at the Hardin Congregation while you were an

15   elder?

16      A.   Martin Svensen.

17      Q.   And why was that?  Why was it Martin

18   Svensen who was responsible for it?

19      A.   Well, he took this responsibility, I

20   guess.

21      Q.   As the presiding overseer?

22      A.   Yeah.

23      Q.   And is the chain of command similar

24   amongst the elders as it is in the military?  You

25   don't go around your chain of command?  Is it

79

**James Rowland**

1      A.   And those copies apparently went out, and

2  we as a body of elders never did get a copy of it

3  to see what it was.

4      Q.   When you're saying copies went out, you're

5  saying copies of reports of sexual abuse?

6      A.   Or anything.

7           MR. TAYLOR:   Object to the form.

8  BY MR. SHAFFER:

9      Q.   Or anything.

10     A.   Yeah.

11     Q.   Do you have any knowledge of whether

12 reports of sexual abuse were ever written down and

13 handed to a circuit overseer or not?

14     A.   I don't know.  The way that things were,

15 it was like nonexistent.  I didn't see a report,

16 didn't hear a report, nobody called me in.  There

17 was no investigation, so...

18     Q.   I know from your affidavit, you made

19 face-to-face reports, right?

20     A.   Yeah.  And usually the circuit overseer,

21 he had the agenda, and he covered certain things,

22 and they're outlined in what he covers.  Mainly

23 it's field service, but also problems.  He can note

24 problems.

25     Q.   And so you remember seeing specific

                                                      85

1  documents from New York that outlined what the

2  circuit overseer was to be doing or the kind of

3  reports that that circuit overseer was to take and

4  report back to New York, right?

5      A.   Yeah.

6          MR. TAYLOR:  Object to the form.

7          THE WITNESS:  Yeah, it was supposed to go

8  to the legal department, but unless you could read

9  somebody's mind over here, I don't think -- I never

10 knew if the reports went out or to who.

11 BY MR. SHAFFER:

12     Q.   And when you're talking about a report,

13 you're talking about your verbal reports, your

14 face-to-face reports of sexual --

15     A.   Yeah.  See, my verbal report on a

16 one-on-one with Martin, or after a while, I didn't

17 even do that, but I'd do at least two, and give

18 those reports and give the report at the -- with

19 the circuit overseer.  And never did know, never

20 did see anything, never did -- no follow-up.

21     Q.   Do you remember that circuit overseer's

22 name?

23     A.   Yeah, well, the first one was a substitute

24 circuit overseer.  His name was Loren -- from

25 Laurel.  He was an elder in Laurel.

                                              86

1  when someone's come to you and admitted that

2  they've done something wrong, you talked about a

3  process.  You mentioned that just coming to you as

4  kind of the start of that process.  What did you

5  mean by that?

6      A.    Well, a person that comes to me, and I've

7  had dozens of them over the years, but usually

8  they're sorry they did it.

9      Q.    Right.

10      A.    And they want to come to somebody and tell

11  them, "I did this, and I'm sorry I did it."

12  Sometimes it's not serious enough to go to a

13  committee, but it's serious enough to refer to

14  maybe one of the elders, that he's good at that,

15  you know, he's a good listener and all that, and

16  lives in the district.

17      Q.    So if you felt like you could, you'd try

18  to handle it on your own it sounds like.

19      A.    Yeah, but I found that it's good to

20  confide in that person and then confide also in

21  another elder that this is happening and kind of

22  keep on eye on things, you know, help her, help

23  him.

24      Q.    What did you understand, based on your

25  training and your reading and your time at the

93

**James Rowland**

 1  KM School, what did you understand about your

 2  ability to inform the police about what happened if

 3  somebody committed a crime?

 4     A.   Well --

 5         MR. TAYLOR:  Objection to the form of the

 6  question.

 7  BY MR. SHAFFER:

 8     Q.   Go ahead.

 9     A.   My orientation of those years in the

10  military and those years in the boarding school,

11  there's a hierarchy involved.  And the one that I

12  came to know as a Christian was that it goes into

13  the congregation oversight to the presiding officer

14  and is discussed.

15         And that discussion, if it's serious

16  enough, that would be brought out to the circuit

17  overseer, and it says right in there that this will

18  be reported even by the congregation to the legal

19  desk in New York.

20     Q.   Yeah.  So you understood that was the

21  process.

22     A.   That was it.

23     Q.   That's who you reported to.  That's who

24  the congregation would report to if there was a

25  serious issue, even maybe a crime, you'd report it

                                                    94

**James Rowland**

```
 1   to the circuit overseer and then New York?

 2           MR. TAYLOR:  Objection to the form.

 3           THE WITNESS:  Well, report it to the PO

 4   first, the presiding overseer.  And then if the

 5   circuit -- if they hold onto that problem, when the

 6   circuit overseer comes around and it's reported to

 7   him, and he'll get ahold of the legal desk.

 8           But if there's no circuit overseer coming

 9   around for the next three months, that presiding

10   overseer files a report immediately to the legal

11   department.  That's what it says.

12   BY MR. SHAFFER:

13      Q.   Yeah, right.  And you understood based on

14   your training that was the process, that's how

15   things are reported, correct?

16      A.   Yeah.

17           MR. TAYLOR:  Object again to the form.

18   BY MR. SHAFFER:

19      Q.   During your time as an elder and all your

20   training, did you ever see any instruction in any

21   of these documents and any of the books that you

22   looked at, any of the guidance you used, did you

23   ever see any instruction on when to take something

24   to the police?

25      A.   I didn't think about it.  Because in my
```

95

**James Rowland**

1  secular job, I'd taken those kinds to the police.

2  And then in a Christian congregation, I depended

3  totally on it.

4      Q.   What do you mean?

5      A.   Give it to the presiding overseer if it's

6  serious.   "That girl over there reported, and it

7  looks like it's sexual."  He then gets ahold of the

8  legal department in New York.  That's the way it

9  went.

10     Q.   I understand.  So in your secular job, in

11 your secular life, it seems like there was a

12 distinction in whether you could go to the police

13 or not between your secular duties as a public

14 administration official versus your duties as an

15 elder.  Is that fair?

16     A.   Yeah.

17     Q.   Yeah.

18     A.   And if I didn't believe that -- if I

19 didn't believe that this Jehovah's organization was

20 run by Christian principles in the Bible, you know,

21 I wouldn't have been maybe so inclined not to go

22 outside of that reporting procedure.  But it was my

23 thought as an elder and as a member of the

24 congregation that there's a process that handles

25 it.

                                                96

**James Rowland**

1    Q.   And you trusted that process.

2    A.   I stuck with the process.  I didn't want

3  to -- I didn't want to become identified as an

4  apostate or as a bad guy or whatever, because that

5  would stumble people.  I wanted to follow the

6  process that the organization had, period.

7    Q.   And do you believe you did that?

8    A.   Yes.

9    Q.   So let's go back again.  I want to talk a

10  little bit more about the process of you've got

11  somebody who's done something wrong, and they come

12  to you.  Let's just say it's stealing an apple from

13  the market, like you've described.

14       When is there recovery or that person's

15  repentance, or however you want to characterize

16  that process?  When is it complete?

17    A.   It will take time.  Sometimes it will take

18  weeks.  But you become enjoined with that person

19  being a helper.  If it's a young man that's

20  wavering, you become a friend with them.

21    Q.   Okay.

22    A.   And more than -- make it a point to be

23  with them sometimes and talk about the good things

24  and so he knows he's got someone on his side.

25    Q.   It sounds like you're building a

97

**James Rowland**

```
 1    taking your kids to this home.  Do you remember the
 2    last name of the family?
 3         A.   Haines.
 4         Q.   Okay.  You were taking your girls to the
 5    Haines home.
 6         A.   (Nods.)
 7         Q.   I understand.
 8         A.   See, we didn't know that kind of stuff was
 9    going on in there.
10         Q.   I see.
11              And the young woman who came to you and
12    reported that Gunner was touching her
13    inappropriately, did she live in that home?
14         A.   Yeah, she was the one that seen that.
15    She's the one that seen that thing going on in the
16    living room.
17         Q.   And what did she tell you she saw?
18         A.   She seen him having his mouth between her
19    legs.
20         Q.   Okay.  And were you an elder at that
21    point?
22         A.   Yes.
23         Q.   So I imagine, based on your training and
24    documents you'd been provided as an elder, that's
25    something you knew you needed to take to the
```
                                                    116

```
 1  presiding overseer?
 2      A.   Absolutely.
 3      Q.   And you did that.
 4      A.   Absolutely.
 5      Q.   That was Mr. Svensen you took it to?
 6      A.   Yes -- no, he brought it up himself at a
 7  meeting.
 8      Q.   Okay.
 9      A.   He said there was an incident down at the
10  Haines house with the Mapley girl.  And he said,
11  "It wasn't really nothing."  He said, "I looked
12  into it.  All he did is when he was sitting down,
13  he accidentally hit her leg with his hand."  That
14  was it.
15      Q.   I see.
16      A.   And I knew that it was different.
17      Q.   No judicial committee was formed --
18      A.   Nothing.
19      Q.   -- based on that report?  Okay.  Okay.
20      A.   Yeah.
21      Q.   All right.  Thank you.
22           I do want to go through all the times you
23  were informed about sexual abuse and sexual
24  mistreatment and the reports you made.  But would
25  you mind finishing going through this document in
```

117

**James Rowland**

1      front of you for a moment?

2           A.    Oh, no problem.

3           Q.    Thank you, sir.

4                 Can you flip to page 114.  This section is

5      called "Safeguarding the Cleanness of the

6      Congregation."  And I think you testified a little

7      bit earlier that as an elder, you had kind of two

8      main duties:  overseeing the preaching and keeping

9      the congregation clean.

10          A.    Uh-huh, right.

11          Q.    And so this, what we're looking at here,

12     this section, this would be -- again, this section

13     of Exhibit 2, would this correspond to the training

14     you got as an elder on how to keep the congregation

15     clean?

16          A.    Yes.

17          Q.    If we look on the left-hand side there, it

18     talks about "Hearings Before The Judicial

19     Committee."

20          A.    Uh-huh.

21          Q.    Is that essentially how you were directed

22     by New York, at least, to handle --

23                MR. TAYLOR:  Object to the form.

24     BY MR. SHAFFER:

25          Q.    -- that would handle matters that would

                                                          118

**James Rowland**

1  need to go before the judicial committee if we look

2  at that section?  That's how you -- you knew you

3  needed to look at this section of this manual if

4  there was going to be a judicial committee; is that

5  right?

6      A.   Right.

7      Q.   Now, let's go to the right-hand column

8  there.  I've highlighted, "Must be two or three

9  eyewitnesses, not just persons repeating what they

10 have heard; no action can be taken if only one

11 witness."  Do you see that?

12     A.   Uh-huh.

13     Q.   What did that mean or what does that mean

14 as an elder?

15     A.   Well, it would be different if there were

16 just one person coming forward, but at that time, I

17 had already -- I had already heard some things by

18 other members in the congregation.

19     Q.   Well, let's step back.  Let's just talk in

20 general.

21          Is this what's understood and known as the

22 kind of two or three witness rule?

23     A.   Yeah.

24     Q.   Right?

25     A.   And the way I interpreted it from my

119

**James Rowland**

1    any difference.  Your tires are all flat.

2        Q.   Right.  It doesn't mean it didn't happen.

3        A.   Yeah.

4        Q.   All right.  Let's go to page 116.  And

5    I've highlighted a section there, it says,

6    "Handling Cases That Require Public Reproof."

7    What's "public reproof"?

8        A.   That's where the congregation is put on

9    notice that something happened and it involved this

10   person.  So it's like guarding the cleanliness of

11   the congregation.

12            Like if somebody had weed and was going

13   to -- and you watch that person and notify the

14   young people, you know, "Be careful of this guy."

15       Q.   Okay.  I've highlighted another section

16   down there.  It says, "Announcement made that

17   person named has engaged in 'conduct unbecoming a

18   Christian.'"  And then it says, "Do not mention

19   specific sin, to avoid possible legal

20   difficulties."

21            Do you see that?

22       A.   Uh-huh.

23       Q.   So based on that, it looks like you were

24   trained by the church as an elder that if you

25   determined that someone had done something

                                                    122

**James Rowland**

1   requiring reproof, you would just say, "This person

2   engaged in conduct unbecoming to a Christian"?

3        A.   Right.

4        Q.   And you wouldn't necessarily say the

5   specific sin, right?

6        A.   You wouldn't say, "I just seen him smoking

7   pot out there by the Kingdom Hall."  You'd rather

8   just say, "Unbecoming of Christian behavior."

9        Q.   And same if it was sexual abuse, right?

10  You wouldn't say that so-and-so sexually abused a

11  girl.  You would say, "That person engaged in

12  conduct unbecoming a Christian," right?

13       A.   Uh-huh.

14       Q.   And that's what you were trained to do.

15       A.   Yeah, if it got investigated and it was in

16  fact happening.

17       Q.   Yes.  And in that situation, the rest of

18  the congregation wouldn't be told necessarily that

19  there was a person within their midst who was

20  sexually abusing girls, would it?

21       A.   Uh-uh.

22       Q.   That was a "no"?  You shook your head

23  "no," but I wanted to make sure that was a "no."

24       A.   No.

25       Q.   Thank you.

                                             123

**James Rowland**

1    somebody, even though it was just that one person,

2    no investigation.

3         You have to do something.  They can just

4    say, "Oh, you're lying," or "Well, maybe you'll

5    have a better day next day," or "Maybe he won't

6    throw you down anymore and stick his tongue in

7    you."

8         You've got to investigate it, and because

9    it's written right there.

10   Q.   Yeah.

11   A.   Otherwise, it wouldn't be in there.  If it

12   was me, I would have taken it right to the legal

13   department and got a determination.  Otherwise, you

14   wind up like this, getting sued.

15   Q.   Would you have gone to the police if you

16   felt like you could have?

17   A.   I would have went outside of the

18   organization.  But, see, I believed totally in the

19   footsteps of Jesus Christ.  And on the one hand, I

20   didn't want to drag Jehovah's name in, because I

21   knew there was a process for handling this.

22   Q.   The process in this book here, Exhibit 2?

23   A.   Yeah.

24   Q.   Yeah.

25   A.   And secondly, I knew that if I did, and

130

**James Rowland**

```
 1   pedophiles.
 2          But what used to -- what really got me and
 3   still gets to me this day is that when we come
 4   together as a body of elders, and something
 5   serious -- and I don't know if you're going to ask
 6   me how the circuit overseers treated me.  I'll tell
 7   you.
 8          I said in one, the first meeting,
 9   Brother Polakowski, I said, "There's something
10   serious going on with Martin."  I said, "We've got
11   to talk about it as a body of elders."  He jumped
12   up, and I thought he was going to hit me.  Come
13   running across.  He said, "Don't you ever say
14   anything about Martin Svensen again.  Got it?"
15          And that was the end of any hearing, or --
16   I don't know if they sent those papers to
17   the incident to New York.  That was none of my
18   business, I guess.
19          And the other one, Brother --
20      Q.   Let's go back.  The one where the circuit
21   overseer came and said, "Don't ever talk about
22   Martin Svensen again" --
23      A.   Yeah.
24      Q.   -- and jumped -- you talked about that in
25   your affidavit, right?
```

132

**James Rowland**

1        A.    Yeah.

2        Q.    Do you remember what you told,

3    specifically what you told that circuit overseer?

4        A.    I couldn't say nothing.  He just said,

5    "And that's it."

6        Q.    Tell me what you told him, if you can

7    remember.

8        A.    I just said, "We've got to do something in

9    this congregation.  There are bad things happening

10   to the kids, and it involves one of the elders,

11   Martin Svensen."

12            That's when he jumped up, came over, "If

13   you ever say anything more about Martin Svensen in

14   this matter," and shut me up right there.

15            And he was a circuit overseer.

16       Q.    Right.

17       A.    He was a substitute in Laurel, if he's

18   still alive.

19       Q.    Okay.

20       A.    The same thing happened with

21   Brother Milneck.  He's the one that said, "If you

22   do anything wrong, I'm going to be like a millstone

23   around your neck when they throw you in the water."

24       Q.    What did that mean?

25       A.    Don't ever cross him up.

                                                    133

**James Rowland**

```
1        Q.    Did you tell Brother Milneck the same

2    thing you told the other visiting overseer?

3        A.    Yeah.  He was sitting there --

4        Q.    Where were you?

5        A.    In a circuit overseer's visit with the

6    elders in Hardin.

7        Q.    Were you in the Kingdom Hall, or --

8        A.    Kingdom Hall.  And I said, "There's

9    something going on, Brother Milneck."  I said, "And

10   it can't go on much longer."  I said, "There's

11   pedophilia in this congregation, rampant, and it

12   involves Martin Svensen."

13        He jumped up and come right over to me

14   like he was going to hit me.  And I told my friend

15   later, I said, "Good thing he didn't hit me.  I'd

16   have put all four of them on the floor."  I'm a

17   kung fu man.

18        And I wouldn't have done that, because I

19   was very peaceful after coming into the truth, and

20   somebody could come and hit me, and I wouldn't

21   break their neck, you know, so...

22        Q.    When you brought this to the attention of

23   the circuit overseers, as you've described in your

24   affidavit -- and first, let me just show you your

25   affidavit.  Can you look at paragraph 4?
```
134

**James Rowland**

```
 1              I'm going to hand you another, this is a
 2   thicker one.  It's basically a photocopy of a book.
 3   And the cover's going to be the --
 4        A.   The organization book.
 5        Q.   -- "Organization for Kingdom-Preaching and
 6   Disciple-Making."
 7        A.   Yeah, that was a book we often referred
 8   to.
 9        Q.   Okay.  Let me hand this to you then.  So
10   this is -- first of all, this is
11   Caekaert/Mapley 2834, all the way through 3027.
12   And it's titled "The Organization for
13   Kingdom-Preaching and Disciple-Making."
14              I'll hand this to you, Mr. Rowland.  Let
15   me know if you've ever seen a copy of that book
16   before.
17        A.   Oh, yeah.
18        Q.   Did you see it at the Kingdom Hall in
19   Hardin?
20        A.   Yes.  You'd find one in every book bag, I
21   think, in the organization of brothers.
22        Q.   It was in every book bag?
23        A.   Yeah, it was referred to many times.
24        Q.   What would you refer to this book for?
25        A.   For actually improving your ministry and
```

168

**James Rowland**

1  how you fit into the organization and the stream of

2  responsibilities.

3      Q.   Stream of responsibilities between

4  New York and the local congregation, or between

5  elders and ministerial servants?  What do you mean?

6      A.   Usually the organization is the one that

7  you're in.  When you talk about the organization,

8  nobody talks about New York.

9      Q.   Okay.  Just the local congregation.

10     A.   Yeah, local congregation.

11     Q.   Let's mark this as 3.

12     A.   That's the organization.

13          (Deposition Exhibit No. 3 was marked for

14  identification.)

15 BY MR. SHAFFER:

16     Q.   Is this book here that's been marked as

17 Exhibit 3, is this something that you would refer

18 to as an elder pretty consistently?

19     A.   Yeah, either teaching in the congregation

20 or making sure you're helping people to understand

21 the ministry and how to do it, you know.

22     Q.   Would you consider it an important book in

23 helping you do your job as an elder?

24     A.   Yeah.

25     Q.   Okay.

                                              169