Jon A. Wilson
Brett C. Jensen
BROWN LAW FIRM, P.C.
315 North 24th Street
P.O. Drawer 849
Billings, MT 59103-0849
Tel. (406) 248-2611
Fax (406) 248-3128

Joel M. Taylor, Esq. (appearing *pro hac vice*)
MILLER MCNAMARA & TAYLOR LLP
100 South Bedford Road, Suite 340
Mount Kisco, New York 10549
Tel./E-Fax (845) 288-0844
*Attorneys for Defendant Watchtower Bible and Tract Society of New York, Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## BILLINGS DIVISION

| | |
|---|---|
| TRACY CAEKAERT, and CAMILLIA MAPLEY,<br><br>Plaintiffs,<br><br>vs.<br><br>WATCHTOWER BIBLE AND TRACT SOCIETY OF NEW YORK, INC., WATCH TOWER BIBLE AND TRACT SOCIETY OF PENNSYLVANIA, and BRUCE MAPLEY SR.,<br><br>Defendants. | Cause No. CV 20-52-BLG-SPW<br><br>**DEFENDANT WATCHTOWER BIBLE AND TRACT SOCIETY OF NEW YORK, INC.'S RESPONSE BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL RE: WAIVED PRIVILEGE** |

WATCHTOWER BIBLE AND
TRACT SOCIETY OF NEW YORK,
INC.

                Cross-Claimant,

vs.

BRUCE MAPLEY SR.,

             Cross-Claim Defendant.

)
)
)
)
)
)
)
)
)
)
)

---

COMES NOW Defendant Watchtower Bible and Tract Society of New York, Inc. (hereinafter "WTNY"), by and through its attorneys, and respectfully submits its Response Brief in Opposition to Plaintiffs' Motion to Compel Re: Waived Privilege (hereinafter "Plaintiffs' MTC") (Doc. 132). For the reasons explained herein, Plaintiffs' MTC should be denied, and WTNY respectfully requests such relief.

## FACTUAL BACKGROUND

### A.    Documents at Issue

WTNY has claimed various privileges regarding a total of 49 documents as set forth in its First Supplemental Privilege Log. *See* Doc. 133-3. At issue in Plaintiffs' MTC are the following four documents[1] regarding which WTNY has asserted the clergy-penitent privilege set forth in Mont. Code Ann. § 26-1-804:

---

[1] Plaintiffs also assert that, in regard to depositions of witnesses who may have knowledge about the allegations regarding Bruce Mapley, Sr., and Gunnar Hain, "[t]he Watchtower Defendants

- **Document 29**, which is a letter sent from elders of the Hardin Congregation to the Service Department concerning Gunnar Hain dated April 25, 1997. This document has already been reviewed in camera, and the Court determined it was protected by the clergy-penitent privilege because it "was intended to be a confidential communication that also contains a confession made to a congregation elder acting in his official capacity[.]" *See* Doc. 82, p. 4 (referring to the document in question as Document 1). The penitential statements in question occurred during talks between Mr. Hain and elders of the Hardin Congregation in January and February of 1997.[2]

- **Document 37**, which is a letter sent from elders of the Hardin Congregation to elders of the Congregation in Pacific, WA, providing religious guidance regarding Gunnar Hain, including discussion of the penitential statements discussed in Document 29. A copy of the letter, which appears to have been written sometime between March 1997 and September 1997, was received by elders at Watchtower on September 15, 1997.

- **Document 39**, which is a letter sent from elders at Watchtower to elders of the Hardin Congregation providing religious guidance, admonishment, and

---

will object to all such questions, with instructions not to answer, based on clergy-penitent privilege." *See* Doc. 133, p. 9. While WTNY cannot speculate about possible deposition objections without knowing the questions to be asked, WTNY reserves the right to assert applicable objections and privileges as appropriate in forthcoming depositions. This includes the clergy-penitent privilege, which has not been waived for the reasons explained herein.

[2] WTNY is willing to produce the documents in question to the Court for in camera review.

advice in response to, and requested additional information regarding, Document 29, including the penitential statements discussed therein.

**Document 40,** which is a Notification of Disfellowshipping or Disassociation of Bruce Mapley, Sr., sent from the elders of the Canyon Ferry Congregation in Montana to the Service Department. A copy of the Notification, which references penitential statements made by Mr. Mapley to the ecclesiastical committee that prepared the Notification and indicates the announcement was made on October 14, 1999, was received by elders at Watchtower on October 26, 1999.

In total, these documents involve penitential statements made by Mr. Hain in January and February of 1997, and a penitential statement made by Mr. Mapley to a committee at some point in 1999. Plaintiffs claim the clergy-penitent privilege asserted regarding these documents were waived due to statements made years previously.

**B.** **Plaintiffs' Claimed Basis for Mr. Mapley's Waiver of Clergy-Penitent Privilege**

Plaintiffs claim Mr. Mapley waived the clergy-penitent privilege regarding Document 40 based on the recollections of his former wife, Shirley Gibson. In particular, Ms. Gibson testified as follows:

> Q.    Okay.  So going back here, you're talking about you're in the home, Bruce sits the family down, he asks Tracy to tell the family what happened to her at Gunner's house, is that right, essentially.

A.    Yes.  And then he admitted he did it to -- and he was sorry, he'd never do it again.  Back in those days we didn't know about all this -- terrible things, so we assumed when somebody says you're sorry and they're not going to do it again, they don't, but that was wrong, too.

Q.    And so in 1977 in your home when Bruce has Tracy tell the family what Gunner had done to her, in that same conversation, he told your family, that would be you, Tracy, Camie, and Bruce, Jr., right?

A.    Yes.

Q.    That -- That he had been molesting Tracy as well.

A.    Yes.

*See* Gibson Depo., p. 72, lns. 7-25; p. 73, lns. 1-2.[3]

Ms. Gibson testified she first learned about the alleged abuse from Harold Rimby, who was an elder:[4]

Q.    Okay.  All right.

Let's talk about paragraph 3 of your affidavit.  The first sentence you state that Bruce, Sr. was a pedophile who started molesting Tracy when she was four.  And then you say [As Read]: "This come out in 1977 when we learned that another Ministerial Servant in the Hardin congregation, Gunner Hain, had sexually molested Tracy at his home."

A.    Yes.

Q.    Why do you say 1977?  You fairly -- How do you feel about that number, that year?  Pretty certain about that?

---

[3] Cited portions of the transcript of Ms. Gibson's deposition are attached as Exhibit 1.
[4] *See* Gibson Depo., p. 64, lns. 9-10.

A.     Yes.

Q.     Tell me why.

A.     Because it was brought to my attention all this stuff had happened, and I --

Q.     How -- How was it brought [sic] your attention?

A.     Well, because of Gunner Hain, it came out.  He was reproved, but they didn't do anything to Bruce 'cause he -- Anyway.  I was told what had happened, and then Bruce admitted he had too, so -- but they didn't do anything with Bruce but they did something -- they -- Gunner Hain was reproved is all.

Q.     Who told you that?

A.     Harold Rimby.

Q.     And so when you say this came out in 1977, that -- that Harold Rimby told you personally --

A.     Yes.

Q.     -- about Gunner Hain.

A.     And my ex-husband.

*See* Gibson Depo., p. 60, lns. 17-25; p. 61, lns. 1-24.

Ms. Gibson testified as follows about how Mr. Rimby learned this information:

Q.     How did Mr. Rimby know that?

. . . .

A.     Well, because Gunner told Harold.

Q.     And then Harold told you.

A.     Yes.

Q.     Okay.  Sounds like Harold told you about Gunner.  Did -- In -- In the same conversation he told you that Bruce had done the same thing?

A.     Yes.

Q.     And do you know how Harold knew that -- that Bruce had molested Tracy?

. . . .

A.     Well, Bruce admitted to Harold that he had.

Q.     Okay.  And then Harold told you.

A.     Yes.

*See* Gibson Depo., p. 62, lns. 4-24.

Ms. Gibson testified as follows as to how she learned this information from

Mr. Rimby:

Q.     Yeah.  Where were you when you had this conversation with Mr. Rimby?

A.     In our home at Fort Smith.

Q.     Who else was there?

A.     My ex-husband.

Q.     So just the three of you?

A.     Yeah.  Well, my children were there, too.

Q.      Okay.  And had Mr. Rimby announced he was going to come over to have this conversation with you or did he just show up, or how'd that happen?

A.      I guess just showed up.  I don't remember.  We didn't make announcements; we just came --

Q.      Okay.

A.      -- to each other's homes.

Q.      I take it it was a surprise.  It was shocking.

A.      Yes.

*See* Gibson Depo., p. 63, lns. 7-24.

Based on Ms. Gibson's deposition testimony, she first learned about the alleged abuse by Mr. Mapley from Mr. Rimby, who was an elder, and Ms. Gibson's understanding was that Mr. Rimby had learned about the alleged abuse from Mr. Mapley.  Ms. Gibson recalls Mr. Mapley and their children were present at the home when she had this conversation with Mr. Rimby.  This suggests the conversation with Mr. Rimby may have been at the same time as the meeting at the home with the family where Ms. Gibson testified the admission relied upon by Plaintiffs occurred, particularly since Ms. Gibson further testified that after speaking with Mr. Rimby, "I never had any more conversations with him or anybody else about it after that."  *See* Gibson Depo., p. 65, lns. 16-18.  If Mr. Rimby was present when the meeting in question occurred, it appears Mr. Rimby disclosed the alleged abuse before Mr. Mapley did.

According to an interview of Mr. Mapley taken by investigator Todd Bontecou,[5] the transcript of which has previously been submitted as Doc. 133-2, Mr. Mapley did not remember the family meeting Ms. Gibson testified about:

> INVESTIGATOR BONTECOU:  Okay.  Now, Shirley -- Shirley remembers you, uhm -- everybody sitting in the living room and you coming in and being there, as well.  Do you remember --
>
> BRUCE MAPLEY:  No, I -- no, I don't.
>
> INVESTIGATOR BONTECOU:  Okay.  Is it possible that did happen and you just don't remember at this point?
>
> BRUCE MAPLEY:  It's possible it could have happened, yeah, I just don't remember it.  I've lost a lot of those times -- excuse me.  I've lost a lot of that memory.

See Doc. 133-2, Transcript p. 10, lns. 6-17.  Mr. Mapley has made it clear he has not and will not waive the clergy-penitent privilege.  See Doc. 131, p. 14.[6]

## C.   Plaintiffs' Claimed Basis for Mr. Hain's Waiver of Clergy-Penitent Privilege

Plaintiffs claim Mr. Hain waived the clergy-penitent privilege by apologizing to Mr. Mapley about the alleged molestation.  This claim is based on

---

[5] Mr. Mapley has indicated he did not consent to this interview being recorded.  See Doc. 131, p. 14, and Doc. 133-5, p. 4.

[6] It should not be overlooked that Plaintiffs' counsel has engaged in some pretty sharp practices relative to Mr. Mapley, who was and still is unrepresented in this litigation. It is clear from Mr. Bontecou's interview, which Mr. Mapley did not realize was being recorded, and a December 22, 2020, letter, see Exhibit 2, that Plaintiffs have been less than forthright with Mr. Mapley about their reasons for soliciting information from him. At no point was it brought to Mr. Mapley's attention that his personal liability was being investigated, nor was he advised of his constitutional rights against self-incrimination or the various legal privileges he may have.

the interview of Mr. Mapley taken by Mr. Bontecou, and while it is not clear based

on the transcript exactly when the claimed apology occurred, it appears to have

occurred in the 1970s or 1980s, well before the conversations in January and

February 1997 at issue in Documents 29, 37, and 39:

> INVESTIGATOR BONTECOU:  Okay.  And your memory is that
> was around '76 or '77?
>
> BRUCE MAPLEY:  Somewhere in there, or early -- maybe, later into
> the '80s.  I -- my -- just, I can't -- I honestly just can't remember.  I
> lost a lot of my memory.
>
> INVESTIGATOR BONTECOU: Okay.  And why is that?  Did
> something happen, or --
>
> BRUCE MAPLEY:  Oh, yeah.  I had -- I lost my leg and -- and had --
> had head damage when I got drug on the ground by a horse, and all of
> that stuff.

*See* Doc. 133-2, Transcript p. 5, lns. 5-16.  According to documentation from Mr.

Mapley, this head injury occurred in 1992.  *See* Doc. 131, pp. 1-3.  Mr. Mapley

also explained he previously learned about the alleged abuse from Congregation

elders:

> INVESTIGATOR BONTECOU:  Okay.  And how did -- how did you
> come to that understanding?  Did you get it from Gunner, himself, or
> did you get it from Tracy?
>
> BRUCE MAPLEY:  From the congregation elders.
>
> INVESTIGATOR BONTECOU:  The congregation elders?

BRUCE MAPLEY:  Uh-huh.  And Gunner.  Well, I didn't get it, actually, from Gunner, that I remember, I got it from the congregation elders.

*See* Doc. 133-2, Transcript p. 6, lns. 7-17.  Additionally, Mr. Mapley advised Mr.

Bontecou multiple times that he suffered from memory issues.  *See* Doc. 133-2,

Transcript p. 4, lns. 10-12 ("Uh, I went through a lot of stuff back then, and I lost a

lot of my memory as a result of it"); p. 5, lns. 7-10 (quoted *supra*); p. 10, lns. 14-17

(quoted *supra*).

Plaintiffs additionally note members of the Hardin Congregation knew about

Mr. Hain's conduct, including Joyce Hain and June Rimby, based on the

deposition testimony of Ms. Gibson.  However, as discussed *supra*, Ms. Gibson

testified she learned about the allegations regarding Mr. Hain from Mr. Rimby.

*See* Gibson Depo., p. 62, lns. 4-11.  When asked about how others knew about the

alleged abuse, Ms. Gibson testified:

> Q.    Okay.  Did other people in the congregation knew that Gunner had molested Tracy and Ronda?
>
> A.    Yes.
>
> Q.    How did they find out about it?
>
> A.    Same way I did, I guess.  I never asked them.

*See* Gibson Depo., p. 65, lns. 19-25.  Based on Ms. Gibson's testimony, Mr. Hain

only talked about the alleged abuse with Mr. Rimby, who then shared such

discussions with others.

# **ARGUMENT**

"[I]n a civil case, state law governs privilege regarding a claim or defense

for which state law supplies the rule of decision." *See* Rule 501, Fed.R.Evid.

Montana law provides:

> A member of the clergy or priest may not, without the consent of the
> person making the confession, be examined as to any confession made
> to the individual in the individual's professional character in the
> course of discipline enjoined by the church to which the individual
> belongs.

*See* Mont. Code Ann. § 26-1-804.  As this Court has recognized: "The privilege

restricts itself to protecting confidential communications made between a person

and a clergy member in the clergy member's professional discipline unless the

confessant consents to waiving that protection." *See* Doc. 79, p. 12.  The Montana

Supreme Court has recognized:

> the clergy-penitent privilege must not be so strictly construed as to
> violate the right to the free exercise of religion guaranteed by the First
> Amendment of the United States Constitution as well as Article II,
> Section 5 of the Montana Constitution.

*State v. Gooding*, 1999 MT 249, ¶ 16, 296 Mont. 234, 989 P.2d 304; *see also State*

*v. MacKinnon*, 1998 MT 78, ¶ 24, 288 Mont. 329, 957 P.2d 23 (adopting a broad

view of the clergy-penitent privilege).

In this case, the documents in question involve penitential statements to

elders made by Mr. Hain in 1997 and made by Mr. Mapley in 1999.  These

statements are facially protected by the clergy-penitent privilege because they

contain the contents of confidential communications made between a person and

an elder in the elder's professional discipline.  Plaintiffs nevertheless argue there is

no privilege for documents containing Mr. Mapley's penitential statements because

his statements included the presence of non-clergy members (his family).  *See* Doc.

133, pp. 11-12.  However, Plaintiffs' argument fails to recognize Document 40

references a penitential statement made to elders in 1999, not the statements

alleged by Ms. Gibson that Mr. Mapley told Mr. Bontecou he could not remember

in 1977.  *See* Doc. 133, pp. 11, 16.[7]  Since there is no evidence to suggest Mr.

Mapley's 1999 penitential statements were made in the presence of non-elders,

Plaintiffs fail to point to any reason Mr. Mapley's 1999 statements are not facially

entitled to the clergy-penitent privilege.  Plaintiffs likewise fail to point to any

reason the documents containing Mr. Hain's 1997 penitential statements are not

facially entitled to the clergy-penitent privilege as this Court previously determined

---

[7] Evidence suggests that Mr. Mapley and Mr. Hain may have been entitled to a clergy-penitent privilege in the original statements they made in the 1970s or 1980s regarding sexual assault because the information appears to have originated from conversations each man had with Mr. Rimby, who was an elder at the time.  Because Mr. Rimby was not the penitent, statements Mr. Rimby made to Ms. Gibson or other members of the public revealing the privileged information could not have waived the privilege.  However, the content of both Mr. Mapley's statements and Mr. Hain's apology is somewhat unclear, meaning the extent to which Mr. Mapley's statements and Mr. Hain's apology may have waived privilege to their 1970s or 1980s statements is likewise unclear.  To the extent these privileges were waived by statements made by Mr. Mapley in 1977 and Mr. Hain's apology in the 1970s or 1980s, such waiver has no impact on the privilege each man possesses for penitential statements to elders made by Mr. Hain in 1997 and made by Mr. Mapley in 1999 for the reasons explained herein.

in relation to Document 29.  *See* Doc. 82, p. 4 (referring to the document in question as Document 1).

Plaintiffs next argue the privilege is waived for Document 40 regarding Mr. Mapley's 1999 penitential statements because of alleged statements made by Mr. Mapley to his family in 1977, and for Documents 29, 37, and 39 regarding Mr. Hain's 1997 penitential statements because of Mr. Hain's alleged apology to Mr. Mapley in the 1970s or 1980s.  *See* Doc. 133, pp. 12-16.  In arguing waiver on the part of Mr. Mapley and Mr. Hain, Plaintiffs rely upon Rule 503(a), Mont.R.Evid., which provides in pertinent part: "A person upon whom these rules confer a privilege against disclosure waives the privilege if the person . . . voluntarily discloses or consents to disclosure of any significant part of the privileged matter."[8]  However, Plaintiffs fail to cite any authority for the proposition that statements made years prior to a privileged penitential statement waive that future privilege in perpetuity, and WTNY has been unable to find any authority supporting such proposition.

In every case cited by Plaintiffs, waiver or invalidation of a privilege involved disclosure to a third party made contemporaneously with or after a privileged conversation.  *See Gooding*, ¶ 22 (where statements made

---

[8] This was the only authority cited by Plaintiffs' counsel in response to requests for citations to supporting authority made by WTNY's counsel about the subject of Plaintiffs' MTC prior to the filing of the same.

contemporaneously to a clergy member and the clergy member's wife were not privileged); *State v. Tadewaldt*, 2010 MT 177, ¶ 12, 357 Mont. 208, 237 P.3d 1273 (where the defendant waived privilege to prior attorney-client privileged conversations on cross-examination); *MacKinnon*, ¶ 25 (where communications contemporaneously made in front of clergy members and non-clergy members were not privileged);  *Nussbaumer v. State*, 882 So. 2d 1067, 1079 (Fla. Dist. Ct. App. 2004) (determining defendant's statements to Pastor Nussbaumer were protected by the clergy communications privilege in part because no third persons were contemporaneously present during Pastor Nussbaumer's counseling sessions); and *State v. Patterson,* 294 P.3d 662, 667 (Utah. App. 2013) (where privilege was waived to prior clergy penitent conversations when the conversations were disclosed by the defense to the prosecution in a psychosexual evaluation).  In total, none of the cases cited by Plaintiffs involve an individual waiving a privilege that does not yet exist regarding a communication that has not yet been made.

Public policy also does not support allowing individuals to waive privilege prior to the privilege existing.  This public policy is most obvious with respect to the attorney-client privilege.  If a defendant admits to wrongdoing, it is axiomatic that the contents of subsequent conversations with counsel regarding that wrongdoing are not discoverable despite being about the same subject matter.  This is because the purpose of privilege is to promote the integrity of relationships

which are based on confidentiality. *See Scott v. Hammock*, 870 P.2d 947, 955 (Utah 1994). In comparing the psychotherapist-patient and clergy-penitent privileges with respect to benefits they confer on society, the court in *Scott* agreed: "the beneficial effects [...] cannot be fully achieved, and perhaps cannot be achieved at all, unless there is a trusting relationship [...] which is founded on a sense of complete confidentiality." *Id.* Plaintiffs' essential argument – that a person who discloses wrongdoing has no future right to confidentiality in subsequent communications regarding such wrongdoing with clergy members – is unfounded and contrary to the public policy of allowing individuals to receive forgiveness or spiritual or religious counseling, guidance, admonishment, or advice. *See MacKinnon*, ¶ 25. In total, there is no support for the proposition that an individual can waive future privileges regarding future communications, and it is illogical for Plaintiffs to claim automatic access to all future clergy-penitent communications that would otherwise be privileged based on statements made by Mr. Mapley and Mr. Hain in the 1970s and 1980s.

Additionally, even if statements made by Mr. Mapley and Mr. Hain in the 1970s or 1980s acted as a form of waiver of privilege regarding statements made in 1997 and 1999, Montana caselaw supports limiting waiver to the specific statements or information provided to third parties in those 1970s or 1980s conversations. In *Gooding*, Rocky Gooding began confiding with two members of

the church, Gerald and Tina Glover, about prior acts of sexual molestation with his stepdaughter. *Gooding*, ¶¶ 6-7. Ms. Glover did not hold an official church position. *Id.*, ¶ 6. During the trial, Ms. Glover's deposition regarding the statements Mr. Gooding made was read to the jury. *Id.*, ¶ 10.  The Court noted that even if Mr. Glover met the definition of clergy, "Gooding's statements to Gerald in Tina's presence were not privileged as to Tina" because the statute creates a testimonial privilege for a "clergyman or priest" and Tina was not either. *Id.*, ¶ 22.  Here, unlike in *Gooding*, WTNY does not claim the clergy-penitent privilege exists as to any communications made by Mr. Mapley or Mr. Hain to third parties.  Instead, WTNY is narrowly asserting the clergy-penitent privilege regarding documents containing reference to the 1997 and 1999 penitential statements.  The holding in *Gooding* supports a finding here that Plaintiffs are only entitled to information actually disclosed to third parties (i.e. the 1977 statement to Mr. Mapley's family and the apology from Mr. Hain to Mr. Mapley in the 1970s or 1980s) and not the contents of the 1997 and 1999 statements to elders.

## CONCLUSION

Documents containing Mr. Hain's and Mr. Mapley's penitential statements in 1997 and 1999 are facially protected by the clergy-penitent privilege because these statements were confidential communications made to elders in their professional discipline.  There is no support for the proposition that the clergy-

penitent privilege regarding such penitential statements could be waived by prior statements either Mr. Hain or Mr. Mapley made in the 1970s or 1980s. Furthermore, the public policy regarding the clergy-penitent privilege is contrary to a sweeping rule allowing Plaintiffs automatic access to privileged information in perpetuity simply because of statements allegedly made by Mr. Mapley and Mr. Hain in the 1970s or 1980s.  Finally, Montana law supports limiting Plaintiffs' access to information Mr. Hain and Mr. Mapley actually shared with third parties, such as the actual statements made by either individual in the 1970s and 1980s. For these reasons, Plaintiffs' MTC should be denied, and WTNY respectfully requests such relief.

DATED this 25th day of August, 2022.

By:   /s/ Jon A. Wilson
Jon A. Wilson
BROWN LAW FIRM, P.C.
*Attorneys for Defendant Watchtower Bible and Tract Society of New York, Inc.*

## **CERTIFICATE OF COMPLIANCE**

Pursuant to L.R. 7.1(d)(2)(E), the undersigned hereby certifies this brief complies with L.R. 7.1(d)(2)(A). According to the word-processing unit used to prepare this brief, the word count is 3,830 words excluding caption and certificates of service and compliance.

DATED this 25th day of August, 2022.

By: ___/s/ Jon A. Wilson_____
Jon A. Wilson
BROWN LAW FIRM, P.C.
*Attorneys for Defendants Watchtower Bible and Tract Society of New York, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on August 25, 2022, a copy of the foregoing was served on the following person(s):

1.  U.S. District Court, Billings Division

2.  Robert L. Stepans/Ryan R. Shaffer/James C. Murnion
    MEYER, SHAFFER & STEPANS, PLLP
    430 Ryman Street
    Missoula, MT 59802

3.  Matthew L. Merrill (appearing *pro hac vice*)
    MERRILL LAW, LLC
    1863 Wazee Street, Suite 3A
    Denver, CO 80202

4.  Gerry P. Fagan/Christopher T. Sweeney/Jordan W. FitzGerald
    MOULTON BELLINGHAM PC
    P.O. Box 2559
    Billings, MT 59103-2559

5.  Bruce G. Mapley Sr.
    3905 Caylan Cove
    Birmingham, AL 35215

by the following means:

| | | |
|---|---|---|
| _1-4___ CM/ECF | | _____Fax |
| _____Hand Delivery | | _____E-Mail |
| ___5___U.S. Mail | | _____Overnight Delivery Services |

By: __/s/ Jon A. Wilson_____
Jon A. Wilson
BROWN LAW FIRM, P.C.
*Attorneys for Defendant Watchtower*
*Bible and Tract Society of New York,*
*Inc.*