*Exhibit A*

Robert L. Stepans
Ryan R. Shaffer
James C. Murnion
Meyer, Shaffer & Stepans, PLLP
430 Ryman Street
Missoula, MT  59802
Tel: (406) 543-6929
Fax: (406) 721-1799
rob@mss-lawfirm.com
ryan@mss-lawfirm.com
james@mss-lawfirm.com

Matthew L. Merrill (appearing *pro hac vice*)
Merrill Law, LLC
6631 Mariposa Ct.
Denver, CO  80221
Tel: (303) 947-4453
matthew@merrillwaterlaw.com

*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## BILLINGS DIVISION

| | |
|---|---|
| TRACY CAEKAERT, and CAMILLIA MAPLEY,<br>            Plaintiffs,<br><br>    vs.<br><br>WATCHTOWER BIBLE AND TRACT SOCIETY OF NEW YORK, INC., and WATCH TOWER BIBLE AND TRACT SOCIETY OF PENNSYLVANIA<br>            Defendants.,<br><br>WATCHTOWER BIBLE AND TRACT SOCIETY OF NEW YORK, INC., and WATCH TOWER BIBLE AND TRACT SOCIETY OF PENNSYLVANIA<br><br><br>            Cross Claimants,<br><br>    vs.<br><br>BRUCE MAPLEY, SR.,<br>            Cross Defendant. | Case No. CV-20-52-BLG-SPW<br><br><br>**SECOND AMENDED COMPLAINT AND JURY DEMAND** |

COMES NOW the Plaintiffs, Tracy Caekaert ("Caekaert") and Camillia
Mapley ("Mapley"), by and through undersigned counsel, and for their causes of
action and claims for relief against the Defendants, state and allege as follows:

## I.  PARTIES, JURISDICTION & VENUE

1. Upon initiation of this case, Caekaert was a citizen and resident of Maricopa
   County, Arizona.  Caekaert is now a citizen and resident of White County,
   Arkansas.

2. Mapley is a citizen and resident of Australia.

3. During all times relevant, Defendant Watchtower Bible and Tract Society of
   New York, Inc. ("Watchtower NY") is and was a New York corporation
   conducting business in the State of Montana, with its principal place of
   business in New York.

4. During all times relevant, Defendant Watch Tower Bible and Tract Society
   of Pennsylvania Inc. ("Watchtower PA") is and was a Pennsylvania
   corporation conducting business in the State of Montana, with its principal
   place of business in New York.

5. During all times relevant, the events and claims described in this Complaint
   occurred in Big Horn County, Montana.

6. This Court has original subject matter jurisdiction over this case pursuant to
   28 U.S.C. § 1332 due to the diversity of citizenship of the parties hereto, and

by virtue of the fact that the amount in controversy exceeds the sum of seventy-five thousand dollars ($75,000.00), exclusive of interest and costs.

7. This Court may properly maintain personal jurisdiction over Watchtower NY and Watchtower PA because they are business entities operating in the State of Montana and this judicial district who's acts and omissions resulted in the accrual of the tort actions plead below, were directly involved in the acts and omissions at issue in this case, and their presence in and contacts with the State of Montana and this judicial district are sufficient to support an exercise of jurisdiction that comports with traditional notions of fair play and substantial justice.

8. This Court may properly maintain personal jurisdiction over Mapley Sr. because his acts and omissions within this federal judicial district resulted in the accrual of the tort actions plead below, and his presence in and contacts with the State of Montana and this judicial district are sufficient to support an exercise of jurisdiction that comports with traditional notions of fair play and substantial justice.

9. Venue is proper under 28 U.S.C. § 1391 in that a substantial part of the events or omissions giving rise to these claims occurred in this judicial district.

///

## II. <u>FACTS COMMON TO ALL CLAIMS</u>

At all times relevant to the claims made herein:

10. The Jehovah's Witness Church ("Church") is structured hierarchically.

11. The Church was governed and controlled by a group of men referred to as the Governing Body.

12. New members of the Church are given the title of Unbaptized Publisher.

13. Unbaptized Publishers can be promoted sequentially to Baptized Publisher, Ministerial Servant, and finally, Elder.

14. In each promotion, the local congregation recommends members for promotion, and Watchtower NY ultimately decides whether to promote a member after vetting the member.

15. Baptized Publishers, Ministerial Servants, and Elders are all agents of their local congregation and Watchtower NY and PA.

16. The Church organized Watchtower PA and Watchtower NY to carry out its work in the United States, including Montana.

17. According to the 1977 *Branch Organization Manual,* Watchtower PA was the parent corporate agency of the Jehovah's Witnesses, whose stated purpose was to act as the legal world-wide governing agency for the Church that directed the administrative and religious work of Jehovah's Witnesses worldwide.

18. According to the 1977 *Branch Organization Manual,* to achieve its purposes, Watchtower PA worked in concert with subsidiary legal agencies, including Watchtower NY.

19. The same group of men who governed and controlled the Governing Body, also governed and controlled Watchtower PA, and Watchtower NY.

20. Watchtower PA and Watchtower NY shared offices.

21. Watchtower PA and Watchtower NY shared a legal department.

22. Watchtower PA and Watchtower NY had unified administrative authority.

23. Watchtower PA and Watchtower NY conducted business and transactions that were not at arm's length.

24. Watchtower PA and Watchtower NY share nearly identical trade names.

25. Watchtower PA and Watchtower NY held themselves out to the public in a way that was not distinguishable.

26. Watchtower PA and Watchtower NY shared the same employees and volunteers to carry out their work.

27. Watchtower PA and Watchtower NY represented themselves as a single business.

28. The operations, resources, control, and ownership of Watchtower PA and Watchtower NY were so integrated that they were effectively acting as a

single entity to carry out the common purpose directing the administrative and religious purposes of the Church.

29. Watchtower PA and Watchtower NY worked in concert to create and transmit Church policy and doctrine to local congregations and members.

30. Watchtower PA and Watchtower NY worked in concert to instruct Church members to report wrongdoing to their local Elders, rather than reporting such conduct to law enforcement.

31. Watchtower PA and Watchtower NY worked in concert to control how allegations of child sexual abuse committed by church members were handled.

32. Watchtower PA and Watchtower NY worked in concert to instruct and command the Church's  local congregations to not report child sexual abuse to law enforcement or child protective services.

33. Watchtower PA and Watchtower NY worked in concert to create, adopt and enforce a set of policies and practices for the investigation, prosecution, and punishment of church members that are accused of sexual abuse (the "Watchtower Protocols").

34. Records of Watchtower's Protocols are maintained by both the local congregation and the Church.

35. Pursuant to the Watchtower Protocols, when a local congregation's Elders determine that allegations of sexual abuse are true, they are instructed to not report it to law enforcement and thereby keep it secret.

36. Pursuant to the Watchtower Protocols, when a local congregation's Elders determine that allegations of sexual abuse are true, they institute one of three types of punishment: private reproof, public reproof, or disfellowship.

37. Pursuant to the Watchtower Protocols, when a local congregation's Elders determine that allegations of sexual abuse are true the Elders merely announce to the local congregation that the member is being punished, without telling the local members what the punishment is for or warning its members that the person being punished is a sexual abuser.

38. Pursuant to the Watchtower Protocols, when a local congregation's Elders determine that allegations of sexual abuse are true, Watchtower NY permits the sexual abuser to rejoin the church without restrictions or warnings to others.

39. Watchtower's Protocols have been instituted by Watchtower NY and Watchtower PA to supplant the mandatory reporting requirements of Montana with its own policy of secrecy of, and tolerance for, child sexual abuse.

40. By prohibiting church members from reporting sexual abuse to law enforcement and enacting its own Watchtower Protocols, Watchtower NY and Watchtower PA have accepted the unique and special responsibility of protecting minors from sexual predators.

41. The Watchtower Protocols are intended to protect the reputation of the church rather than protect people from sexual predators.

42. The Watchtower Protocols fail to take any reasonable steps to protect Church members and members of the public, including Plaintiffs, from child sexual abuse.

43. The Watchtower Protocols published materials instructed Church members to not report child abuse to law enforcement effectively protecting sexual predators and fostering an environment within the Church that encouraged childhood sexual abuse without consequence.

44. Watchtower PA and Watchtower NY acted in concert as a single enterprise to achieve a common purpose, including perpetuation of the Watchtower Protocols and asserting control over the manner in which local congregations, including the Hardin congregation, handled allegations of child sex abuse.

45. Watchtower PA and Watchtower NY are the alter egos of each other that have been used as a subterfuge to defeat public convenience, justify wrong, and/or perpetuate fraud, such that piercing the corporate veil is appropriate.

46. To the extent that there was any actual difference between Watchtower PA and Watchtower NY, they acted as agents of each other to achieve their common purpose, including perpetuation of the Watchtower Protocols and asserting control over the manner in which local congregations, including the Hardin congregation, handled allegations of child sex abuse.

47. To the extent that there was any actual difference between Watchtower PA and Watchtower NY, they had an implied or express agreement that created a joint venture to achieve a common purpose, including perpetuation of the Watchtower Protocols and asserting control over the manner in which local congregations, including the Hardin congregation, handled allegations of child sex abuse.

48. Failure to treat the acts of Watchtower PA and Watchtower NY as one enterprise would result in injustice.

49. Watchtower PA and Watchtower NY had an express or implied agreement creating a joint venture, a common purpose, a community of interest, and an equal right to control the venture.

50. Bruce Mapley Sr. ("Mapley Sr.") and his family, including Caekaert and Mapley, joined the Hardin, Montana Congregation of Jehovah Witnesses ("Hardin Congregation") in or around 1973 after being recruited by Gunner Haines ("Haines") and his wife, Joyce Haines.

51. At that time, Mapley Sr. had been sexually abusing Plaintiffs approximately twice a week for several years.  The abuse occurred whenever Shirley Mapley left the house and generally consisted of forced oral sex and fondling the girls' genitals.

52. Mapley Sr. used intimidation, threats, and force to ensure Plaintiffs were both compliant and remained silent about the sexual abuse.

53. Haines sexually abused Plaintiffs in his home sometime in 1976 or 1977.

54. The abuse consisted of forced oral sex on Caekaert who was approximately 11 years old at the time.  Aff. of Shirley Gibson, ¶ 3, March 26, 2020 (attached as **Exhibit A**).

55. Shortly after being sexually abused by Haines, and before 1979, Caekaert informed Mapley Sr. of the sexual abuse inflicted by Haines.

56. Shortly after Caekaert reported Haines' sexual abuse and before 1979, Haines confessed to the Elders of the Hardin Congregation that he had assaulted Caekaert.  **Ex. A** at ¶ 4.

57. At that time or shortly thereafter, Mapley Sr. self-confessed to the Elders of the Hardin Congregation that he had also sexually abused Plaintiffs.

58. At the time of the events set forth herein, Mapley Sr. and Haines were both Ministerial Servants with the Hardin Congregation, and thus agents of the Church, when they were sexually abusing Plaintiffs.

59. Pursuant to the Watchtower Protocols, Elder Martin Svensen ("Svensen") and two other Elders investigated the allegations of sexual abuse against Mapley Sr. and Haines.

60. At the time of the events set forth herein, Svensen was the Senior Elder of the Hardin Congregation and was himself engaged in serial sexual abuse of children.  Aff. of James Rowland, ¶¶ 4, 7, April 14, 2020 (attached as **Exhibit B**).

61. At all times relevant, Svensen, Mapley Sr., and Haines were agents of Watchtower NY and Watchtower PA.

62. Pursuant to the Watchtower Protocols, Mapley Sr.'s and Haines' serial sexual abuse of Plaintiffs was minimized and their punishment was negligible, which merely consisted of the Elders announcing to the Hardin Congregation that the men had committed a wrongdoing, without disclosing any details of the wrongdoing, and temporarily relieving the men of their positions and duties in the Church.

63. Pursuant to the Watchtower Protocols, none of the Defendants, nor Svensen or Haines, reported the sexual abuse to law enforcement or child protective services as required by applicable law at the time.  **Ex. A** at ¶ 4-5.

64. Pursuant to the Watchtower Protocols, and within a year of having admitted to abusing Caekaert, Mapley Sr. and Haines were permitted to rejoin the Church in positions of authority, and as agents and representatives of the church.  **Ex. A** at ¶ 6.

65. Thereafter, and because the Watchtower Protocols protects sexual predators, Mapley Sr. continued to sexually abuse Caekaert and Mapley throughout their childhood.

66. By prohibiting disclosure of sexual abuse within the church to law enforcement, Watchtower NY and Watchtower PA failed to take reasonable steps to protect children in the community, including Plaintiffs, from continued and repeated sexual abuse.

67. By failing to adequately investigate and punish admitted instances of sexual abuse within the church, Watchtower NY and Watchtower PA failed to take reasonable steps to protect children in the community, including Plaintiffs, from continued and repeated sexual abuse.

68. The Watchtower Protocols failed to enact and implement any reasonable steps to prevent the continued sexual abuse of Caekaert and Mapley, and thereby effectively permitted and sanctioned such abuse to continue.

69. As a result of the sexual abuse perpetrated by Mapley Sr. and Haines that went unreported and unhindered by Svensen and the Church, Caekaert and Mapley have suffered severe, debilitating, lifelong emotional and psychological damage.

70. Mapley Sr. admitted to the commission of the act of childhood sexual abuse against Plaintiffs and Defendant Watchtower NY or Defendant Watchtower PA has a record of this admission in its possession.

71. Plaintiffs can establish that officers, directors, officials, volunteers, representatives, and/or agents of Defendant Watchtower NY knew, had reason to know, or were otherwise on notice of widespread unlawful childhood sexual abuse by employees, officers, directors, officials, volunteers, representatives, and/or agents of the Church and Watchtower NY failed to take reasonable steps to prevent future acts of such unlawful sexual abuse.

72. Plaintiffs can establish that officers, directors, officials, volunteers, representatives, and/or agents of Defendant Watchtower PA knew, had reason to know, or were otherwise on notice of sexual abuse against

Plaintiffs by employees, officers, directors, officials, volunteers, representatives, and/or agents and failed to take reasonable steps to prevent future acts of such unlawful sexual abuse.

73. In 1997, the Church, through Watchtower NY and Watchtower PA, instructed elders to send a report to Watchtower NY of anyone who is currently serving or who formerly served in a Watchtower appointed position that is known to have engaged in childhood sexual abuse.  Aff. Of Mark O'Donnell, ¶¶ 11-12, April 15, 2020 (attached as **Exhibit C**).

74. The Church maintains a complete file of these reports (the "Watchtower Sexual Abuse Database").  **Ex. C** at ¶ 13.

75. The Church keeps the Watchtower Sexual Abuse Database secret.  **Ex. C** at ¶ 13.

76. Upon information and belief, the Church is in possession of the Watchtower Sexual Abuse Database and other documents that contain evidence that Mapley Sr. and Haines admitted to sexually abusing Plaintiffs.

77. Recently, in other child sexual abuse cases, Watchtower NY has refused to produce in discovery the Watchtower Sexual Abuse Database and other documents in its possession that document admissions of childhood sexual abuse by church agents and representatives. *E.g. Padron v. Watchtower Bible & Tract Socy. of New York, Inc.,* 225 Cal. Rptr. 3d 81, 86 (Cal. App.

4th Dist. 2017); J.*W. v. Watchtower Bible and Tract Socy. of New York, Inc.*, 241 Cal. Rptr. 3d 62, 67 (Cal. App. 4th Dist. 2018), *reh'g denied* (Dec. 31, 2018), *review denied* (Mar. 27, 2019), *cert. denied*, 140 S. Ct. 217 (2019).

## III.  CLAIMS

### First Claim: Negligence
(All Defendants)

78. All of the allegations contained in the preceding paragraphs of this Complaint are incorporated by reference herein as if the same were set forth in full.

79. Defendants owed Plaintiffs the duty to act with the care that a reasonable person would exercise.

80. Without limitation, Defendants Watchtower NY and Watchtower PA, acting in concert, breached such duty by: implementing the Watchtower Protocols; failing to take reasonable steps to prevent known and unknown sexual predators from sexually abusing children in the Church's community; publishing material and directives that protected sexual predators within the Church and failed to protect victims of sexual abuse committed by agents and representatives of the Church; failing to report known sexual abuse committed by agents and representatives of the Church; ignoring mandatory reporting laws and keeping known child sex abuse secret; failing to train its

employees and agents to prevent, identify, investigate, respond to, or report

to the proper authorities the sexual abuse of children; failing to properly and

thoroughly investigate, respond to, and report the sexual abuse of Plaintiffs;

employing, promoting, and allowing Svensen to continue to act as Senior

Elder despite being a known child abuser; fostering an environment where

sexual predators like Mapley Sr., Svenson, and Haines could abuse children,

including the Plaintiffs, without consequence.

81. Defendants Watchtower NY and Watchtower PA are vicariously liable for

the acts and omissions of each other and their agents that caused Plaintiffs'

damages, including elders and ministerial servants of the Hardin

Congregation, Circuit Overseers, and each other.

82. As a direct and proximate cause of Defendants' breaches, and the breaches

of their agents, Plaintiffs have suffered damages which cannot with

reasonable certainty be divided among several causes.

### Second Claim: Negligence Per Se
(All Defendants)

83. All of the allegations contained in the preceding paragraphs of this

Complaint are incorporated by reference herein as if the same were set forth

in full.

84. Defendants violated Montana's mandatory reporting statute as it existed at all times relevant to this case, including all years before 1979, by not reporting the sexual abuse of Plaintiffs as required by the mandatory reporting statute.  R.C.M. 10-1304 (attached as **Exhibit D**).

85. Montana's mandatory reporting statute in effect at the time that Defendants became aware of such abuse was enacted to protect a specific class of people: children who are victims of abuse or neglect.

86. Plaintiffs were members of such class.

87. Plaintiffs' injuries are the sort that the statute was enacted to prevent.

88. The statute was intended to regulate members of Defendants' class.

89. As a direct and proximate cause of Defendants' violation of the statute, Plaintiffs have suffered damages which cannot with reasonable certainty be divided among several causes.

## Punitive Damages
(All Defendants)

90. All of the allegations contained in the preceding paragraphs of this Complaint are incorporated by reference herein as if the same were set forth in full.

91. Defendants are guilty of actual malice.

92. Defendants had knowledge of facts or intentionally disregards facts that created a high probability of injury to Plaintiffs and: (1) deliberately proceeded to act in conscious or intentional disregard of the high probability of injury to Plaintiffs; and/or (2) deliberately proceeded to act with indifference to the high probability of injury to Plaintiffs.

## IV.  Prayer for Relief

WHEREFORE, Plaintiffs claim relief against Defendants, jointly and severally, as follows:

a.  Judgment against Defendants for general damages in amounts consistent with the allegations contained herein and to be established by the evidence at trial.

b.  Judgment against Defendants for special damages in amounts consistent with the allegations contained herein and to be established by the evidence at trial, including the continuing and ongoing harm Plaintiffs suffer to this day not only from the abuse itself, but the subsequent coverup.

c.  Judgment against Defendants for the costs incurred in prosecuting these claims, including reasonable attorneys' fees.

d.  Punitive damages in amounts consistent with the allegations contained herein and to be established by the evidence at trial.

e.  Pre-judgment and post-judgment interest.

f.  Such other and further relief as the Court deems just and equitable.

## V.    <u>Jury Demand</u>

Plaintiffs hereby demand a jury trial on all issues allowed by applicable law.

DATED this 6th day of January, 2023.

/s/ Ryan Shaffer
Robert L. Stepans
Ryan R. Shaffer
James C. Murnion
*Attorneys for Plaintiff*

*Exhibit A*

## AFFIDAVIT OF SHIRLEY GIBSON

| | |
|---|---|
| **STATE OF MONTANA** | ) |
| | ) **ss.** |
| **COUNTY OF LEWIS AND CLARK** | ) |

The affiant, Shirley Gibson, being duly sworn, states as follows:

1.  I am over the age of 21 years and am competent to and do state the facts and matters contained in this affidavit are true and based upon my personal knowledge.

2.  I married Bruce Mapley Sr in 1965. We had three children, Tracey Caekert, Camilia Mapley and Bruce Mapley Jr. In 1975 Bruce Sr and I joined the Jehovah Witness church and some time thereafter Bruce Sr. rose to the rank of Ministerial Servant and I became an active volunteer doing service work. We divorced in 2001. I am currently an active member of the church, continue to do volunteer service work and it is my understanding and belief that Bruce Sr. continues to be an active member of the church as well.

3.  Bruce Mapley Sr was a typical pediphile who started molesting Tracy when she was 4 years old. This came out in 1977 when we learned that another Ministerial Servant in the Hardin, MT congregation, Gunner Hain, had sexually molested Tracy at his home in Hardin, MT. Tracy was 11 or 12 at the time.

4.  Also in or around 1977 Gunner Hain confessed to an elder that he had molested his step daughter Rhonda and my daughter, Tracy, and the word got back to Bruce Sr. who then confronted Tracy about what happened. Tracy told her father who then gathered our family together at the house and asked Tracy to tell her story again. During that meeting Bruce Sr. confessed in the presence of our entire family that it was his fault because of what he had been doing to Tracy. He admitted that he had been molesting Tracy and that he was really good at hiding it.

5.      Shortly after this meeting I personally spoke with elder Harold Rimby at the Hardin, MT congregation about what Bruce Sr had been doing to Tracy and what Gunner Hain had done to Tracy.  During that conversation I asked elder Harold Rimby if we should report the matter to the authorities and he said no, that the church will handle the matter internally.  I was new to the congregation so I did what I was told and didn't question Harold Rimby's decision.

6.      Shortly thereafter I was present when Gunner Hain was put on public reprove at the Hardin, MT congregation.  As far as I know no disciplinary action was taken against Bruce Sr.  Approximately 6-8 months later Gunner Hain was reinstated with full privileges.

7.      Further your affiant sayeth not.

**Shirley Gibson**

Subscribed and sworn to before me this ___2ce___ day of ___March___, 2020.

Notary Public

My Commission Expires: 03/22/2021

KALENA T. BRUNO
NOTARY PUBLIC for the
State of Montana
Residing at Helena, Montana
My Commission Expires
March 22, 2021

*Exhibit B*

## AFFIDAVIT OF JAMES ROWLAND

STATE OF MONTANA          )
                                      ) ss.

COUNTY OF ROSEBUD          )

The affiant, James Rowland, being duly sworn, states as follows:

1. I am over the age of 21 years and am competent to and do state the facts and matters contained in this affidavit are true and based upon my personal knowledge.

2. In 1969 I was living in Billings, Montana when I joined the Jehovah Witness church. I was baptized in 1969 and on or about 1970, after moving to Hardin, Montana I became a ministerial servant. In 1974 I was appointed to the position of elder or overseer and on or about 1995 I became a Pioneer.

3. Around 1974 I first started hearing rumors that Gunner Hain, a member of our congregation at the time, was sexually abusing children in the congregation. I brought the subject up with other elders, including Martin Svensen, who was presiding elder at the time, but nothing was done.

4. In the late 1970's I heard rumors from church members that elder Harold Rimby, Bruce Mapley Sr as well as Martin Svensen himself were sexually abusing children in the congregation. In early 1984 our congregation was visted by a substitute overseer whose name I can't recall. One day at the Kingdom Hall in Hardin, MT I tried to tell the visiting overseer about the problems with child molestation and sexual abuse that we had within the congregation in general and specifically as it pertained to Martin Svensen and Gunner Hain. Upon hearing what I said the overseer jumped up out of his chair, walked up to me and told me in a very angry voice not to ever mention the subject of pediphilia again. No further action was taken about my complaints. A few months later we had another visiting overseer by the name of Milneck. During an elders meeting I brought up to him the problem of pediphilia on the part of elders in the congregation including Martin Svensen and he too yelled at me and instructed me to never

mention that word in connection with Martin Svensen again.  No further action was taken on the part of the church.

5.  On or about 1984 the three elders of the Hardin, Montana congregation were Martin Svensen, Jerry Baker (Martin Svensen's son in law) and myself.  At that time Martin Svensen was a very powerful person in the congregation.  It was his resposibility to report cases of child molestation to the police and to investigate and discipline members accused of child molestation and sexual abuse but instead used his position to down play or cover up allegations including those against Gunner Hain, Bruce Mapley and others.  When I personally brought up to my fellow elder Jerry Baker the fact that his father in law, Martin Svensen, was doing horrible things to children and that we had to do something about it Jerry Baker told me that because of who his father in law was he couldn't and wouldn't do anything about it.

6.  On or about 1988 or 1989 another overseer whose name I can't recall came to the congregation.  I met with this overseer at the Kingdom Hall in Hardin, MT and informed him about the reports of child molestation and sexual abuse at the hands of elders Martin Svensen and members Gunner Hain, Bruce Mapley Sr., and others that I had heard from members of the congregation.  A few days later this same overseer drove to my house in Lame Deer, MT and informed me that he had a meeting with the brothers in the Hardin congregation and it was decided that I should resign as elder and to move out of the congregation.  Shortly thereafter I left the church.

7.  In the late 1980s or early 1990 I came to learn that all three of my daughters had been severely and repeatedly sexually abused and assaulted at the hands of Martin Svenensen and Gunner Hain as well as others who performed deviant sexual acts at their direction.  Had the Jehovah Witness orgainization taken appropriate and immediate steps to removed Martin Svensen and Gunner Hain from the congregation and report the matter to the police when they were first put on notice by me in the late 1970's and early 1980's then my daughters would never had been subjected to the horrors they were subjected to.  As my faith dictated I told the truth and reported what I knew to be true and I was kicked out for it.

8.     Further your affiant sayeth not.

_James Rowland_

Subscribed and sworn to before me this ___14___ day of ___April___, 2020.

_Notary Public_

My Commission Expires: ___6·13-20___

JEANNIE O KINZEL
NOTARY PUBLIC for the
State of Montana
Residing at Lame Deer, Montana
My Commission Expires
June 13, 2020
SEAL

*Exhibit C*

<u>**AFFIDAVIT OF MARK O'DONNELL**</u>

| | |
|---|---|
| **STATE OF MARYLAND** | ) |
| | ) ss. |
| **COUNTY OF BALTIMORE** | ) |

The affiant, Mark O'Donnell, being duly sworn, states as follows:

1.    I am over the age of 21 years and am competent to and do state the facts and matters contained in this affidavit are true except where stated upon information and belief and, as to such matters, I believe them to be true.

2.    I was born in 1967 to parents who became Jehovah Witnesses in 1968 and I attended church meetings from the time I was a toddler until 2013 when I left the religion. The Jehovah's Witness Church officially disfellowshipped me immediately following the March 2019 Atlantic article which featured my investigations into child sexual abuse mishandling and cover-ups within the organization.

3.    I was baptized publicly in 1984 at the age of 16 and later served as an appointed Ministerial Servant for approximately ten (10) years.  During the late 1980s and at other times I served as an  appointed Auxilliary Pioneer at various intervals, performing on average 60 hours of field service a month. At all other times I turned in required monthly field service reports documenting both time spent in the ministry each month as well as notations of all literature sold or given to the public.

4.    Through my many years with the church and following my departure, I gained personal knowledge of a large number of child sexual abuse cases and how reports of child abuse were handled both locally and nationally by the Watchtower orgainization. My experience provided personal knowledge of the information set forth herein.

5.  Since as far back as the 1970's Watchtower has implemented several policies and protocols that were used to keep child abuse by church elders and other congregants concealed from law enforcement and general followers of the religion.  As a matter of policy congregation elders do not report cases of child sexual abuse to law enforcment except in rare circumstances where Watchtower is unable to legally dodge mandatory reporting requirements.

6.  As a matter of policy Watchtower requires that there be at least two witnesses to acts of child sexual abuse before authorizing elders to take internal disciplinary action against perpetrators.

7.  The first required course of action by elders when a report of child sexual abuse comes to their attention is to telephone the Legal Department at the national headquaters in New York.  The Legal Department will review the State laws where the congreation is located and advise elders how to proceed.  Typically they are instructed that there is no obligation to report the matter to civil authorities and that the matter should otherwise be handled internally.

8.  In the late 1970's to early 1980's investigations by the elders of a congregation involved confronting both the alleged abuser as well as the alleged victim/s of abuse.  If elders determined that abuse allegations had substance, a judicial committee comprising at least three elders was convened.

    During Judicial Committee proceedings, elders would require the victim/s to face the alleged perpetrator, who would then have an opportunity to defend themselves.  If the alleged abuser denied the allegations and there was no second witness* to confirm the accusations, that would be the end of the matter. Elders would inform the accusers that the matter would be left "In Jehovah's hands."

    *The church has always adopted the two witness rule that essentially says that barring confession, no member can officially be sanctioned for committing a sin without two credible witnesses to corroborate the accusation.

Affidavit of Mark O'Donnell               - 2

9.    If a report was substantiated by either a second witness or the accused confessed, a judicial committee of three elders would determine if that person was repentent, and what action would be taken.  If it was deteremined that the person was sufficiently repentent and demonstrated that they just had a moment of weakness, then the abuser was typically placed on either public or private reproof, which amounts to a temporary loss of privileges; i.e. the accused couldn't handle microphones during meetings, engage in attendant duties, or give testimonials during Bible reading sessions, etc.  After a period of time (determined by the elders), if the person was considered sufficiently penitent, their privileges would be reinstated.

If however the judicial committee determined that the sin was premeditated, had been a regular ongoing practice, or if the accused was belived to be unrepentant, they would be disfellowshipped.  Disfellowshipping is always documented by Watchtower form S-77, *Notice of Disfellowshipping or Dissasociation*.

10.   On July 1st,1989, a letter was sent from Watchtower national headquaters in New York (attached as exhibit A) to all 10,883+ congregations in the United States. This six-page letter directed elders to funnel all reports or allegations of child abuse to Watchtower's legal department in New York instead of initiating immediate notification to local law enforcement officials. Elders were also directed to follow counsel from their Awake publication dated January 22nd 1985, in which instructions to contact or cooperate with law enforcement agencies following abuse reports was conspicuously absent.

11.   On March 14, 1997 another letter was sent from the Watchtower national headquaters in New York to all congregations in the United States.The letter became anecdotally known as the "Special Blue Envelope letter." The instructional directive laid out specific rules on how to deal with and document known occurrences of child molestation.

12.    Among others things, congregations were instructed to submit a detailed report answering twelve (12) questions such as:

- Was the incident a one time occurrence?

- Did the accused have a history of child molestation?

- How was the accused viewed within the community?

- Did anyone else know about the abuse?

Elders were instructed to mail their responses to Watchtower's headquarters in a special blue envelope and keep a copy of the report in the congregation's confidential file and to not share it with anyone.

13.    Information submitted on CSA (Child Sexual Abuse) intake forms is closely guarded within the Watchtower organization and controlled by Watchtower's Governing Body, the organization's ruling council made up of eight men. They are assisted by a large number of support staff, and many individuals are involved in the processing, filing and storage of data pertaining to child sex abuse cases. After the Patterson New York Legal Department determines how to advise elders who report initial allegations of child sex abuse, they transfer inquiring elders to the Service Department, which then advises elders from the reporting congregation on how to adjudicate the allegations within the local congregation of Jehovah's Witnesses.

14.    In 2012 a senior official testified in the civil trial of Jose Lopez vs. Watchtower Bible & Tract Society of New York, Inc (San Diego, CA) that all information pertaining to child sexual molestation on file at the headquarters in New York was scanned and stored in a Microsoft Share Point database.

15.    It has been estimated that this database contains tens of thousands of detailed acts of alleged and established child sexual abuse. In civil litigation, Watchtower has been assessed large daily fines and penalized by default judgments for failure to turn over essential and relevant abuse documents.

Affidavit of Mark O'Donnell                    - 4

In addition to being deemed a recalcitrant litigant in civil matters, Watchtower has likewise obstructed police investigations in multiple States, and has never turned over its child abuse database to law enforcement agents in the United States.

Watchtower is currently under Grand Jury investigation by the office of the Attorney General of the Commonwealth of Pennsylvania in relation to alleged criminal activity related to child abuse.

16.   For the past six years, I have devoted a significant portion of my work and research to the examination and study of Watchtower leaked documents, public documents, civil trial documents obtained through discovery, and a very large number of additional documents which confirm and establish the existence of a large searchable database of confirmed reports of child molestation within the Jehovah's Witness Church.

The aforementioned documents and reports are the result of more than five decades of CSA Intake Forms and other forms and letters scanned into digital format and held at Watchtower's Legal and Service Department Headquarters in New York State.

Documents include detailed information related to all alleged child molesters as well as each of their alleged or confirmed victims.

Based on my personal experience and knowledge, I believe that the Watchtower Bible and Tract Society of New York, the Christian Congregation of Jehovah's Witnesses (CCJW), Watch Tower Bible and Tract Society of Pennsylvania, and other alter-ego corporations and entities used by Jehovah's Witnesses and their Governing Body, are maintaining a highly secured, searchable database which evidences the history of sexual abuse within the Church spanning many decades,

and which exists in digital form at Headquarters locations in Patterson, Wallkill, and Warwick, New York, and other backup locales.

Further your affiant sayeth not.

_____
Mark O'Donnell

Subscribed and sworn to before me this ____15____ day of ____APRIL____, 2020.

_____
Notary Public

JACOB BEERS
My Commission Expires Notary Public
Harford County, Maryland
My Commission Expires 9/15/2021

*Exhibit A*

# WATCHTOWER
### BIBLE AND TRACT SOCIETY OF NEW YORK, INC.

25 COLUMBIA HEIGHTS, BROOKLYN, NEW YORK 11201-2483, U.S.A.   PHONE (718) 625-3600

July 1, 1989

TO ALL BODIES OF ELDERS IN THE UNITED STATES

**CONFIDENTIAL**

Dear Brothers:

We are writing to help all of you as individual elders be aware of a growing concern regarding the handling of your duties that may involve legal issues or questions. Due to its importance, the presiding overseer should arrange for a special meeting of the body of elders to read and consider this letter carefully.

In spreading the Kingdom message, it is appropriate that we be bold and outspoken. Jesus commanded that "what you hear whispered, preach from the housetops." (Matthew 10:27) Even when worldly authorities demand that we keep silent, we reply as did the apostles: "We cannot stop speaking about the things we have seen and heard." (Acts 4:20) The Christian congregation will continue to declare the Kingdom message boldly until Jehovah says the work is done.

Elders share the obligation to shepherd the flock. However, they must be careful not to divulge information about personal matters to unauthorized persons. There is "a time to keep quiet" when "your words should prove to be few." (Ecclesiastes 3:7; 5:2) Proverbs 10:19 warns: "In the abundance of words there does not fail to be transgression, but the one keeping his lips in check is acting discreetly." Problems are created when elders unwisely reveal matters that should be kept confidential. Elders must give special heed to the counsel: "Do not reveal the confidential talk of another." (Proverbs 25:9) Often the peace, unity, and spiritual well-being of the congregation are at stake. Improper use of the tongue by an elder can result in serious legal problems for the individual, the congregation, and even the Society.

While we as Christians are ready to forgive others who may wrong us, those in the world are not so inclined. Worldly persons are quick to resort to lawsuits if they feel their "rights" have been violated. Some who oppose the Kingdom preaching work readily take advantage of any legal provisions to interfere with it or impede its progress. Thus, elders must especially guard the use of the tongue. Jesus faced opposers who tried to "catch him in speech, so as to turn him over to the government." (Luke 20:20) He instructed us to be "cautious as serpents and yet innocent as doves" in such situations. (Matthew 10:16) Where such a threat exists, our position as elders should be in line with David's words: "I will set a muzzle as a guard to my own mouth, as long as anyone wicked is in front of me."--Psalm 39:1.

Page 1 of 6

TO ALL BODIES OF ELDERS
July 1, 1989
Page 2

In recent years, this matter has come to be a cause for increasing concern.  The spirit of the world has sensitized people regarding their legal "rights" and the legal means by which they can exact punishment if such "rights" are violated. Hence, a growing number of vindictive or disgruntled ones, as well as opposers, have initiated lawsuits to inflict financial penalties on the individual, the congregation, or the Society. **Many of these lawsuits are the result of the misuse of the tongue.**  As elders, remember that ill-advised statements or actions on your part can sometimes be interpreted legally as violating others' "rights."

The need for elders to maintain strict confidentiality has been repeatedly stressed.  Please see *The Watchtower* of April 1, 1971, pages 222-4, and September 1, 1987, pages 12-15.  The September 1977 *Our Kingdom Service*, page 6, paragraph 36, and the *ks77* textbook, page 65, also provide helpful direction and counsel.  That material strongly emphasized the elders' responsibility to avoid revealing confidential information to those not entitled to it.

The legal consequences of a breach of confidentiality by the elders can be substantial.  If the elders fail to follow the Society's direction carefully in handling confidential matters, such mistakes could result in successful litigation by those offended. Substantial monetary damages could be assessed against the elders or congregation.  In some cases where the authorities are involved, certain complications could lead to a fine or imprisonment.  These possibilities underscore **the need for elders to be discerning and to follow carefully directions provided by the Society.**

## I.  WHAT TO DO IN SPECIFIC CASES

### A.   Judicial Committee Matters

Judicial committees must follow carefully the Society's instructions in carrying out their duties.  (Note *ks77*, pages 66-70; *ks81*, pages 160-70.)  Anything submitted in writing to the committee by the alleged wrongdoer or by witnesses should be kept in strict confidence.  If it is necessary to continue at a later time a committee hearing, the members of the committee should submit to the chairman any personal notes they have taken.  The chairman will keep these notes in a secure place to prevent breaches of confidentiality.  The notes may be returned to the individual elders when the hearing resumes.  Upon conclusion of the case, the chairman should place only necessary notes and documents, a summary of the case, and the S-77 forms in a sealed envelope for the congregation file.  Nothing should be preserved outside of this sealed envelope (including unnecessary personal notes) by any elder on the committee. Obviously, no committee will ever allow judicial proceedings to be tape recorded or allow witnesses testifying before the committee to take notes.

Pg 172

BENTLEY 000081

TO ALL BODIES OF ELDERS
July 1, 1989
Page 3

### B. Child Abuse

Many states have child abuse reporting laws. When elders receive reports of physical or sexual abuse of a child, they should contact the Society's Legal Department immediately. Victims of such abuse need to be protected from further danger. See "If the Worst Should Happen," *Awake!* January 22, 1985, page 8.

### C. Search warrants and Subpoenas

1. A search warrant is a court order authorizing the police to search premises to locate evidence that may be used in a criminal prosecution. No elder should ever consent to the search of a Kingdom Hall or any other place where confidential records are stored. However, armed with a search warrant the police do not need consent and may even use force to accomplish their task. Likely before obtaining a search warrant, the police or other governmental officials will make inquiries regarding confidential records, make request to obtain the records, or indicate that they will seek a search warrant if the elder(s) involved does not cooperate. In any such situation, the Society's Legal Department should be called immediately.

At any time an elder is confronted with a search warrant (whether given advance notice or not), the elder should first ask to read the warrant. After reading it he should ask if he can call for legal guidance and then call the Society's Legal Department. If for some reason the Legal Department cannot be contacted, the elders involved should make every effort to obtain the assistance of a local attorney for the purpose of protecting the confidentiality of the records. It may be impossible to stop determined officers from conducting the search authorized by the warrant. Conscientious elders will want to do all they reasonably and peaceably can to preserve the confidentiality of the congregation in harmony with the principle set out in Acts 5:29.

2. Subpoenas are demands for records or for the appearance of an individual at a trial or deposition to give testimony. Subpoenas may be issued by a court or in some cases by a governmental agency or an attorney. If an elder receives a subpoena, he should contact the Society's Legal Department immediately. Never turn over records, notes, documents, or reveal any confidential matter sought by subpoena without receiving direction from the Legal Department.

### D. Crimes and Criminal investigations

In some cases the elders will form judicial committees to handle alleged wrongdoing that also could constitute a violation of Caesar's criminal laws (e.g., theft, assault, etc.). Generally, a secular investigation into a matter that is a concern to the congregation should not delay conducting a judicial hearing. To avoid entanglement with the secular authorities who may be investigating the same matter, the strictest confidentiality (even of the fact that there is a committee) must be maintained.

*pg 173*

BENTLEY 000082

TO ALL BODIES OF ELDERS
July 1, 1989
Page. 4

If the alleged wrongdoer confesses to the sin (crime), no one else should be present besides the members of the committee. When evidence supports the accusation but genuine repentance is not displayed resulting in a decision to disfellowship, this should be handled in the normal course regarding advice of appeal rights and announcements to the congregation. In cases of serious criminal wrongdoing (e.g., murder, rape, etc.), or where the criminal conduct is widely known in the community, the body of elders should contact the Society before proceeding with the judicial committee process.

**E.   When Servants and Publishers Move**

A considerable number of publishers, including **elders and ministerial servants move from one congregation to another.** Sometimes the circumstances surrounding their departure are unsettled.  Some appointed brothers may be experiencing problems that have brought their qualifications into question.  It is not uncommon for a body of elders to hold back in giving counsel, allowing a brother to move without discussing his problem. Thereafter, they decline to recommend his reappointment in his new congregation. Often such a brother protests, requiring extensive correspondence between the bodies of elders.  Much personal, and sometimes embarrassing, information must then be passed on.  Such mishandling of things greatly increases the potential for serious repercussions. Problems can be avoided by the body of elders assuming its responsibility to inform a brother that he will not be favorably recommended, fully explaining the reasons why.  **Every effort should be made to resolve any difference before he leaves, eliminating any need for controversy involving his new congregation.**  The body should assign two elders to meet with him before he moves, letting him know whether they are recommending him to the new congregation.

This would likewise apply to publishers who move at a time when their personal conduct requires investigation by the elders.  **If serious accusations of wrongdoing have been made against an individual and he moves to another congregation before matters are finalized, usually it is best for the elders in the original congregation to follow through in handling matters,** if possible and if distance permits.  They are acquainted with the individual and the circumstances surrounding the alleged wrongdoing; this ordinarily puts them in the best position to get the facts and to handle the case.  Handling matters in this way will eliminate the need to reveal confidential information unnecessarily about the private lives of individuals.

**F.   When Lawsuits Are Threatened**

If the congregation or the elders (in their capacity as elders) are threatened with a lawsuit, the Society's Legal Department should be contacted immediately.  No statements should be made by any member of the body of elders about the merits or validity of an actual or threatened lawsuit without authorization from the Society.

Pg 174

Page 4 of 6

BENTLEY 000083

TO ALL BODIES OF ELDERS
July 1, 1989
Page 5

### G.  Child Custody

Elders may learn that a publisher is facing a dispute over child custody in a divorce proceeding.  If the parental rights of such is challenged on the basis of our Christian beliefs, or on the assertion that our beliefs are harmful to a child's best interests, the elders should immediately write to the Society's Legal Department.  In a rare emergency, a telephone call may be necessary.  The Legal Department will assess the facts and determine the degree of its involvement, if any.  Elders have no authority to make any promises about the Society's paying legal fees or handling specific cases.  There is no need to contact the Society if there is no indication that the beliefs and practices of Jehovah's Witnesses will be attacked in a child custody dispute.

When you write to the Society's Legal Department about a specific case, please provide the following information:

1.  The names of the parents and their attorneys.

2.  The number of children involved and their ages.

3.  A brief description of the facts, including the presence of any apostates.

4.  An assessment of the Christian parent's spiritual condition–Is he or she new in the truth?  Active?  Inactive? Balanced?

5.  The status of the legal proceedings–Has the matter gone to trial?  Has the trial date been set?  If so, when?

### II.   POINTS TO REMEMBER

### A.  Appreciate the Importance of Maintaining Confidentiality

Elders must exercise extraordinary caution when it comes to handling confidential information about the private lives of others.  Do not mistakenly minimize the gravity of a breach of confidentiality.  Unauthorized disclosure of confidential information can result in costly lawsuits.  Even if a lawsuit turns out favorably, valuable time and energy that could have been devoted to Kingdom interests will be lost.

### B.  Do Not Make Statements to Secular Authorities Until You Receive Legal Advice from the Society

You are not legally required to make immediate responses to secular authorities about matters that could involve the disclosure of confidential information.  Voluntarily allowing the Kingdom Hall or confidential records to be searched, where no search warrant is produced, could infringe on the legal rights of the congregation or of others.  No statements should be made until you have an understanding of your legal position from the Society's Legal Department.

BENTLEY 000084

TO ALL BODIES OF ELDERS
July 1, 1989
Page 6

### C.   Be Extremely Careful with Written Material

All material related to judicial matters should be kept in a safe place, accessible only to elders.  Final reports on the handling of judicial matters should be placed in a sealed envelope in the congregation file.  A judicial committee should avoid sending to an individual any kind of correspondence that accuses him of specific wrongdoing.  (Note *ks*77, pages 68-9.)  **Nothing should be put in writing to any disfellowshipped person to advise him of his status or the reasons for it without specific direction from the Society.**  The rules and procedures of Jehovah's Witnesses do not require such written disclosures.  Anything in writing submitted to a judicial committee should be kept in strict confidence.  If a judicial committee disfellowships an individual, he should be informed **orally** of the action taken and of the right to appeal.  If the wrongdoer refuses to attend the hearing, two members of the judicial committee should attempt to contact the individual at his home and inform him orally of the decision.  If this is not possible, the two elders may be able to inform him by telephone.

### D.   Guard the Use of Your Tongue

Think before you speak.  Do not discuss private and judicial matters with members of your family, including your wives, or with other members of the congregation.  Be extremely careful not to inadvertently disclose private information when others are present, such as when speaking on the telephone with others listening in or nearby.  (Note *ks*77, page 65.)  At times, complicated judicial cases may necessitate consultation with an experienced, mature elder in another congregation or with the circuit overseer.  Unless the circuit overseer is the elder consulted, only the pertinent details should be discussed and names should not be used.

Elders bear a heavy responsibility in ministering to the needs of the Christian congregation, and observing confidentiality as they do so.  (1 Corinthians 16:13)  We trust that the information in this letter will help you carry this burden.  Please be assured of our love and prayers, and may Jehovah continue to bless you as you shepherd his flock.-1 Peter 5:1-3.

Your brothers,

*Watchtower B. & T. Society*

OF NEW YORK, INC.

P.S.  Due to the importance of the information that is presented herein it is suggested that the body of elders jointly read and consider this letter as soon as possible after its receipt in the congregation.  Please do not make any copies of this letter, nor should it be read by others.  It should be kept in the congregation's confidential files for any future reference that may be required by the body of elders.

*pg 196*

BENTLEY 000085

*Exhibit D*

MONTANA
STATE LAW LIBRARY

# REVISED CODES

## OF

# MONTANA

### VOLUME 1

### Part 1

### 1974 Cumulative Pocket Supplement

*Containing*

IE 1972 CONSTITUTION OF THE STATE OF MONTANA AND
AMENDMENTS TO PROVISIONS AND NEW PROVISIONS
APPROVED SINCE PUBLICATION OF REPLACEMENT
VOLUME 1 (PART 1) OF THE 1947 REVISED CODES

INOTATIONS SUPPLEMENTING REPLACEMENT VOLUME 1
(PART 1) THROUGH VOLUME 518, PACIFIC
REPORTER (2ND SERIES)

AND

PARALLEL REFERENCE TABLES SUPPLEMENTING
REPLACEMENT VOLUME 1 (PART 1)

*Edited by*

MALCOLM K. McCLINTICK, A.B., J.D.

and

THE PUBLISHERS' EDITORIAL STAFF

*Editorial Supervisor*

WESLEY W. WERTZ

**THE ALLEN SMITH COMPANY**
Publishers
Indianapolis, Indiana 46202



CAEKAERT/MAPLEY 000316

warranted a finding that the children were neglected and the entry of an order committing them to custody of the state. In re Corneliusen, — M —, 494 P 2d 908.

A child was properly found dependent and neglected based on mother's declaration in waiver and the consent to adoption that she could not provide care and guidance and could not perform duties of a parent. Application of Hendrickson, — M —, 496 P 2d 1115.

Minor children were dependent and neglected within meaning of the statutory definition, notwithstanding possible fitness of natural mother for their custody, where she had acquiesced and permitted them to remain in care and custody of welfare department. In re Bad Yellow Hair, — M —, 509 P 2d 9, 12.

**10-1302.   Jurisdiction and venue.**   (1)   In all matters arising under this act, the youth court shall have concurrent jurisdiction with the district courts over all youths who are within the state of Montana for any purpose, or any youth or other person subject to this act who under a temporary or permanent order of the court has voluntarily or involuntarily removed himself from the state or the jurisdiction of the court, or any person who is alleged to have abused, neglected or caused the dependency of a youth who is in the state of Montana for any purpose.

(2)   Venue shall be determined pursuant to section 10-1207, R. C. M. 1947.

History: En. 10-1302 by Sec. 3, Ch. 328, L. 1974.

**10-1303.   Declaration of policy.**   It is the policy of this state to provide for the protection of children whose health and welfare are adversely affected and further threatened by the conduct of those responsible for their care and protection. It is intended that the mandatory reporting of such cases by professional people and other community members to the appropriate authority will cause the protective services of the state to seek to prevent further abuses, protect and enhance the welfare of these children, and preserve family life wherever possible.

History: En. Sec. 1, Ch. 178, L. 1965; amd. Sec. 1, Ch. 292, L. 1973; Sec. 10-901, R. C. M. 1947; redes. 10-1303 by Sec. 14, Ch. 328, L. 1974.

Amendments
The 1973 amendment rewrote this section which read: "It is the policy of this state to provide for the protection of children who have had physical injury or willful neglect inflicted upon them and who, in the absence of appropriate reports concerning their condition and circumstances, may be further threatened by the conduct of those responsible for their care and protection."

**10-1304.   Reports.**   Any physician who examines, attends or treats a person under the age of majority, or any nurse, teacher, social worker, attorney or law enforcement officer or any other person who has reason to believe that a child has had serious injury or injuries inflicted upon him or her as a result of abuse or neglect, or has been willfully neglected, shall report the matter promptly to the department of social and rehabilitation services, its local affiliate, and the county attorney of the county where the child resides. This report shall contain the names and addresses of the child and his or her parents or other persons responsible for his or her care; to the extent known, the child's age, the nature and extent of the child's injuries, including any evidence of previous injuries, and any other information that the maker of the report believes might be helpful in establishing the cause of the injuries or showing the willful neglect and the identity of person or persons responsible therefor; and the facts which led the per-

CAEKAERT/MAPLEY 000317

son reporting to believe that the child has suffered injury or injuries, or willful neglect, within the meaning of this act.

History: En. Sec. 2, Ch. 178, L. 1965; amd. Sec. 2, Ch. 292, L. 1973; Sec. 10-902, R. C. M. 1947; redes. 10-1304 by Sec. 14, Ch. 328, L. 1974.

Amendments
The 1973 amendment substituted "physician" at the beginning of the section for "licensed physician and surgeon, resident or intern"; substituted "any nurse, teacher, social worker, attorney or law enforcement officer or any other person" in the first sentence for "any registered nurse, practical nurse, any visiting nurse, any schoolteacher, or any social worker acting in his or her official capacity"; inserted "the department of social and rehabilitation services, its local affiliate, and" before "the county attorney" near the end of the first sentence; substituted "where the child resides" at the end of the first sentence for "where such examination is made or such child is located"; deleted from the end of the first sentence a proviso relating to reports through the head of an institution; deleted from the beginning of the second sentence a clause requiring reduction to writing of reports initially made verbally; and made minor changes in phraseology.

**10-1305. Action on reporting.** If from said report it shall appear that the child suffered such injury or injuries or willful neglect, the social worker shall conduct a thorough investigation into the home of the child involved and into the circumstances surrounding the injury of the child and into all other matters which, in the discretion of the social worker, shall be relevant and material to the investigation. If from the investigation it shall appear that the child suffered such injury or injuries or willful neglect, the department shall provide protective services to protect the child and preserve the family. The department will advise the county attorney of its investigation.

The investigating social worker shall also furnish a written report to the department of social and rehabilitation services who shall have the responsibility of maintaining a central registry on child abuse or willful neglect cases.

History: En. Sec. 3, Ch. 178, L. 1965; amd. Sec. 3, Ch. 292, L. 1973; Sec. 10-903, R. C. M. 1947; redes. 10-1305 by Sec. 14, Ch. 328, L. 1974.

Amendments
The 1973 amendment rewrote this section to provide for investigation by the social worker and protective services by the department rather than investigation by the county attorney.

**10-1306, 10-1307.   [Transferred from Chapter 9.]**

Compiler's Notes
These sections were originally numbered 10-904 and 10-905. Section 14, Ch. 328, Laws of 1974 renumbered them to appear here. Because there has been no change in text, the sections are not reprinted here but may be found in bound Volume 1, part 2, as secs. 10-904 and 10-905.

**10-1308. Confidentiality.** The case records of the department of social and rehabilitation services, its local affiliate, the county welfare department, the county attorney and the court concerning actions taken under this act shall be kept confidential unless the court determines that they should be released.

History: En. 10-1308 by Sec. 4, Ch. 328, L. 1974.

**10-1309. Emergency protective service.** Any social worker of the department of social and rehabilitation services, the county welfare department, peace officer or county attorney who has reason to believe any youth is in immediate or apparent danger of violence or serious injury shall

CAEKAERT/MAPLEY 000318

MONTANA
STATE LAW LIBRARY

# REVISED CODES

## OF

# MONTANA

## VOLUME 1

### Part 1

### 1975 Cumulative Pocket Supplement

*Containing*

THE 1972 CONSTITUTION OF THE STATE OF MONTANA AND
AMENDMENTS TO PROVISIONS AND NEW PROVISIONS
APPROVED SINCE PUBLICATION OF REPLACEMENT
VOLUME 1 (PART 1) OF THE 1947 REVISED CODES

ANNOTATIONS SUPPLEMENTING REPLACEMENT VOLUME 1
(PART 1) THROUGH VOLUME 535, PACIFIC
REPORTER (2ND SERIES)

AND

PARALLEL REFERENCE TABLES SUPPLEMENTING
REPLACEMENT VOLUME 1 (PART 1)

*Edited by*
THE PUBLISHERS' EDITORIAL STAFF

*Editorial Supervisor*
WESLEY W. WERTZ

**THE ALLEN SMITH COMPANY**
Publishers
Indianapolis, Indiana 46202



CAEKAERT/MAPLEY 000319

fected and further threatened by the conduct of those responsible for their care and protection. It is intended that the mandatory reporting of such cases by professional people and other community members to the appropriate authority will cause the protective services of the state to seek to prevent further abuses, protect and enhance the welfare of these children, and preserve family life wherever possible.

History: En. Sec. 1, Ch. 178, L. 1965; amd. Sec. 1, Ch. 292, L. 1973; Sec. 10-901, R. C. M. 1947; redes. 10-1303 by Sec. 14, Ch. 328, L. 1974.

Amendments
The 1973 amendment rewrote this section which read: "It is the policy of this

state to provide for the protection of children who have had physical injury or willful neglect inflicted upon them and who, in the absence of appropriate reports concerning their condition and circumstances, may be further threatened by the conduct of those responsible for their care and protection."

**10-1304. Reports.** Any physician who examines, attends or treats a person under the age of majority, or any nurse, teacher, social worker, attorney or law enforcement officer or any other person who has reason to believe that a child has had serious injury or injuries inflicted upon him or her as a result of abuse or neglect, or has been willfully neglected, shall report the matter promptly to the department of social and rehabilitation services, its local affiliate, and the county attorney of the county where the child resides. This report shall contain the names and addresses of the child and his or her parents or other persons responsible for his or her care; to the extent known, the child's age, the nature and extent of the child's injuries, including any evidence of previous injuries, and any other information that the maker of the report believes might be helpful in establishing the cause of the injuries or showing the willful neglect and the identity of person or persons responsible therefor; and the facts which led the person reporting to believe that the child has suffered injury or injuries, or willful neglect, within the meaning of this act.

History: En. Sec. 2, Ch. 178, L. 1965; amd. Sec. 2, Ch. 292, L. 1973; Sec. 10-902, R. C. M. 1947; redes. 10-1304 by Sec. 14, Ch. 328, L. 1974.

Amendments
The 1973 amendment substituted "physician" at the beginning of the section for "licensed physician and surgeon, resident or intern"; substituted "any nurse, teacher, social worker, attorney or law enforcement officer or any other person" in the first sentence for "any registered nurse, practical nurse, any visiting nurse, any schoolteacher, or any social worker

acting in his or her official capacity"; inserted "the department of social and rehabilitation services, its local affiliate, and" before "the county attorney" near the end of the first sentence; substituted "where the child resides" at the end of the first sentence for "where such examination is made or such child is located"; deleted from the end of the first sentence a proviso relating to reports through the head of an institution; deleted from the beginning of the second sentence a clause requiring reduction to writing of reports initially made verbally; and made minor changes in phraseology.

**10-1305. Action on reporting.** If from said report it shall appear that the child suffered such injury or injuries or willful neglect, the social worker shall conduct a thorough investigation into the home of the child involved and into the circumstances surrounding the injury of the child and into all other matters which, in the discretion of the social worker, shall be relevant and material to the investigation. If from the investigation it shall appear that the child suffered such injury or injuries or willful neglect, the department shall provide protective services to protect the child and

CAEKAERT/MAPLEY 000320