*Exhibit N*

## DECLARATION OF DOUGLAS CHAPPEL

I, Douglas Chappel, declare as follows:

1. I am over 21 years of age, of sound mind, and competent to make this Declaration. I have personal knowledge of the matters contained herein and they are all true and correct. If called to testify I could and would testify as follows:

2. I reside in Patterson, New York, and have served as an elder in the faith of Jehovah's Witnesses since 1984.

3. On January 29, 1975, I began serving at the U.S. branch offices of Jehovah's Witnesses in New York and I have been serving in the Service Department of the U.S. branch offices ("Service Department") since October 15, 1980. I, along with a few other qualified elders, provide spiritual assistance and guidance to elders in congregations of Jehovah's Witnesses across the United States who call or write to the Service Department. The elders in the Service Department also monitor the functioning and organization of congregations of Jehovah's Witnesses in the United States.

4. In the Service Department I oversee the spiritual advice and counsel given to congregation elders who call or write to Service Department elders for assistance, including but not limited to assistance regarding persons who have been disfellowshipped (expelled) from congregations of Jehovah's Witnesses.

5. I am thoroughly familiar with the religious beliefs, policies, and practices of Jehovah's Witnesses and with the Scriptural basis for those religious beliefs, policies, and practices

6. In accord with the beliefs and practices of Jehovah's Witnesses, elders serving in the Service Department are ordained ministers and who have also been appointed as congregation elders.

7. Local congregations of Jehovah's Witnesses receive spiritual oversight and pastoral care from a small group of ordained ministers who serve as appointed congregation elders (hereinafter referred to as "elders"). (Philippians 1:1; 1 Timothy 4:14; Titus 1:5.) Before being appointed as an elder, an individual must meet the qualifications for such service as outlined in the Bible, 1 Timothy 3:1-7; Titus 1:5-9, and must be recommended by the body of

elders in his congregation, and approved by the circuit overseer (i.e., traveling elder) serving his congregation. ("Questions from Readers—How Are Elders and Ministerial Servants Appointed in Each Congregation?" The Watchtower 28-29 (Nov. 15, 2014); "Overseers and Ministerial Servants Theocratically Appointed," *The Watchtower* 12 (Jan. 15, 2001).) Once an individual has been appointed to serve as an elder, an announcement is made to the congregation and the individual is officially vested with ministerial authority as an elder. All elders of the Bellows Falls Congregation, Vermont, are and were at all times relevant to this case ordained ministers and spiritual shepherds of the congregation. Similarly, elders in the Service Department are ministers who provide spiritual assistance and guidance to and answer questions from elders throughout the United States. As of September 1, 2014, the Service Department no longer appoints elders; now, special overseers called "Circuit Overseers" make these appointments.

8.  Congregation elders care for spiritual welfare and instruction of congregation members. (1 Peter 5:1-3; "Shepherds, Imitate the Greatest Shepherds," The Watchtower 26 (Nov. 15, 2013); "'Shepherd the Flock of God in Your Care,'" The Watchtower 20 (June 15, 2011).) In caring for their pastoral responsibilities, elders frequently provide spiritual counsel and advice to congregation members concerning highly confidential personal matters. For example, elders hear confessions and receive other private, confidential communications so that they may provide appropriate guidance and counsel based on the Holy Scriptures. (Proverbs 28:13; Galatians 6:1; James 5:13-20.) According to the beliefs and practices of Jehovah's Witnesses, congregation elders keep confessions and other confidential spiritual communications confidential. (Proverbs 10:19; 11:13; 25:9; "'An Overseer Must Be ... Self-Controlled,'" *The Watchtower* 19, 23 (Nov. 15, 1991); "Overseers—Be Fine Examples to 'the Flock,'" The Watchtower 21, 24 (Sept. 1, 1980); "Where Can You Turn with Confidence?" The Watchtower 764, 766 (Dec. 15, 1975).)

9.  Congregation elders regularly communicate with each other and occasionally communicate with Branch Office elders on matters of doctrine, spiritual counsel, pastoral care, and organizational procedure. (Proverbs 11:14; 15:22; "Congregation Elders—'Preside in a Fine Way'!" *The Watchtower* 153, 154 (Mar. 1, 1977).) All such spiritual communications are strictly confidential in accordance with the Scripturally-based beliefs and practices of Jehovah's Witnesses.

10. According to longstanding policies, whenever a member of Jehovah's Witnesses moves from one congregation to another, a letter of introduction is sent from the former congregation elders to the new congregation elders. This letter allows the Body of Elders in the new congregation to assess the member's spiritual condition and possible need for pastoral care. Additionally, if the member served in an appointed position in the former congregation, the letter of introduction contains a recommendation whether the member should continue to serve in the new congregation.

11. Congregation elders also investigate reports and confessions of wrongdoing (sin) by congregation members. The investigations are handled by two elders and, in cases of serious wrongdoing, a judicial committee (usually of three elders) will provide pastoral counsel and administer any needed spiritual discipline to the erring one. ("Elders, Judge with Righteousness," *The Watchtower* 14 (Jul. 1, 1992).) The purpose of such investigations and judicial action is to help those who have erred regain their spiritual health and repair their relationship with God and to ensure that the congregation remains spiritually and morally clean. ("Appreciating the Purpose of Discipline," *The Watchtower* 20 (Oct. 1, 2003).) The elders on a judicial committee will give the erring one spiritual counsel and appropriate spiritual discipline based on Jehovah's Witnesses' understanding of the Bible. Jehovah's Witnesses believe that investigations by at least two elders and judicial committees of at least three elders provide better, more complete spiritual counsel and advice based on the greater experience and knowledge of multiple elders. Pursuant to the beliefs and practices of Jehovah's Witnesses, all communications during investigations and judicial committee proceedings are considered private and are kept strictly confidential by all present, including the accused congregant and elders.

12. When an investigation establishes that a serious sin has been committed, the elders on the judicial committee may decide to reprove privately or reprove and make a public announcement or disfellowship (expel) the erring one, depending on the facts and, most important, the individual's repentance. If the erring one is reproved and it is decided that an announcement is to be made or the erring one is disfellowshipped, an announcement is made to the congregation that "[name] has been reproved" or "[name] is no longer one of Jehovah's Witnesses." (1 Timothy 5:20; "Always Accept Jehovah's Discipline," The Watchtower 26, 30 (Nov. 15, 2006); "Repentance Leading Back to God," *The Watchtower* 22, 26 (Sept. 1, 1981); "Giving Reproof 'Before All Onlookers,'" The Watchtower 731 (Dec. 1, 1977).) In cases of

disfellowshipping, the judicial committee elders notify Branch Office elders to ensure that their decision was Scripturally-based and well-founded. The notice of disfellowshipping includes the name of the disfellowshipped person, the date the disfellowshipping was announced, and the Scriptural basis for disfellowshipping.

13. The confidentiality of spiritual communication between congregation members and congregation elders is fundamental to the religious beliefs and teachings of Jehovah's Witnesses. Proverbs 20:19; Proverbs 25:9. Jehovah's Witnesses accept the Bible's admonition to confess one's sins to God (Psalm 32:5; James 5:16; 1 John 1:9) and they believe that there is a great benefit in speaking to congregation elders about confidential spiritual matters. Accordingly, Jehovah's Witnesses encourage those who are distressed or spiritually weak to approach the congregation elders, confide in them, and receive spiritual assistance.

14. Because free and open communication between congregation members and elders is essential to the spiritual welfare of congregation members, the importance of privacy and confidentiality is hard to overstate. The confidentiality of spiritual communications has been discussed often in publications of Jehovah's Witnesses, such as those I referred to in Paragraph 8 above. Congregants expect that spiritual communications with congregation elders will remain confidential. If an elder were to be compelled to disclose confidential information, his credibility and effectiveness as an elder—and the credibility and effectiveness of all elders in the congregation—would be severely compromised. Congregants would be hesitant to reveal their personal, spiritual problems if such private information could be disclosed in legal proceedings.

15. On the basis of Scriptures such as those referred to above, Jehovah's Witnesses believe that the confidentiality of private spiritual communications with elders is not limited to confessions only. All private communications of a spiritual nature, including those made in the course of investigations or judicial committee proceedings, are confidential. Additionally, based upon the Holy Scriptures and the religious beliefs and practices of Jehovah's Witnesses, such confidentiality extends to congregation files, notes, papers, reports, minutes or other documents prepared in conjunction with, or as a result of, private spiritual communications. If the disclosure of such documents were to be compelled, the credibility and effectiveness of those entrusted with the spiritual welfare of the congregation would be compromised.

16. I have reviewed copies of Plaintiff's First Set of Requests for Production of Documents to Defendant Watchtower Bible and Tract Society of New York, Inc. ("Plaintiff's

RFP"), (collectively "Plaintiff's Requests"), including Request No. 65 seeking all documents received by Watchtower in response to the Body of Elders letter dated March 14, 1997 ("the March 1997 Letter") and No. 67 seeking all documents concerning any report of abuse of a child who is associated with a Jehovah's Witnesses congregation.

17. Request No. 65 of Plaintiff's RFPs seeks confidential documents sent to Service Department elders by hundreds of the bodies of elders that serve in nearly 14,000 congregations of Jehovah's Witnesses in the United States. A review of all congregation files would be required to respond to the request.

18. The March 1997 Letter sought to ensure that the congregations of Jehovah's Witnesses in the United States were in compliance with the Holy Scriptures and with the Witnesses' religious beliefs and practices regarding matters pertaining to child sexual abuse. In addition, the March 1997 Letter asked each body of elders to write a confidential letter to the Service Department elders reporting the details, if any, of anyone currently serving or who formerly served in a position of responsibility and authority in the congregation who was known to have committed child abuse. These reports would allow Service Department elders to evaluate whether an individual, if he was then serving or might later be recommended to serve in a position of responsibility and authority, should be removed or not approved based on the facts and circumstances. The March 1997 Letter also reminded congregation elders of the policy of the Jehovah's Witnesses to inform another body of elders when someone who had been determined to be guilty of child molestation moved to that congregation.

19. The reports sent to the Service Department in response to the March 1997 Letter are kept in individual confidential files maintained by the Service Department for each of the nearly 14,000 congregations. Each congregation file contains documents addressing a variety of spiritual matters including the functioning and organization of congregations of Jehovah's Witnesses and reviews of the qualifications of individuals recommended for appointment as elders and ministerial servants in congregations of Jehovah's Witnesses in the United States. Although a typical congregation Service Department file contains hundreds of pages of documents, the vast majority of the nearly 14,000 congregation Service Department files contain no documents related to the subject of child abuse.

20. At present, a Watchtower Legal Department paralegal is physically examining each file to locate any correspondence in response to the March 1997 Letter or related to the

subject of child abuse. Although these files are in electronic as well as a hard-copy format, physical examination of each file has been found necessary because a search for the terms "child abuse" or "child sexual abuse" did not find all documents responsive to plaintiff's Requests. This is because the sin of child abuse is often described by elders by the Scriptural description of the specific sinful act, such as "porneia," "fornication," "loose conduct," or "uncleanness." In addition, a search for these Scriptural terms often used by the elders has pulled up documents unrelated to child abuse because "porneia," "fornication," "loose conduct," or "uncleanness" include consensual sexual conduct between adults or similar age teenagers. Furthermore, a search of the terms "child abuse" or "child sexual abuse" pulled up documents for individuals accused of child abuse who were never in an appointed congregation position and which therefore are not related to the March 1997 Letter or Plaintiff's request.

21. I have reviewed many of the response letters to the Service Department from the local congregation bodies of elders and I am familiar with their content.

22. Each letter is a confidential spiritual communication between Service Department elders and local elder bodies for the purpose of seeking spiritual advice and guidance in accordance with the Holy Scriptures. This correspondence was sent with the expectation that the content thereof would remain private in accordance with the religious beliefs and practices of Jehovah's Witnesses. Among other things, the letters contain identifying information about each of the accused, victims, reporting individuals and elders involved.

23. Most of the responses to the March 1997 letter were received in 1997 and 1998. When anyone was reported as still serving in an appointed capacity, his situation was reviewed by elders in the Service Department to determine which men still serving were to be removed.

24. The request for all documents pertaining to the abuse of any child associated with Jehovah's Witnesses since 1960 is practically impossible to fulfill. Each of the 100 branches of Jehovah's Witnesses around the world maintains its own files and the U.S. Branch Service Department does not have access to documents not in the U.S.

25. The same privacy, confidentiality and privilege issues exist with any responsive documents as exist with the responses to the 1997 letter to all bodies of elders. Also, the same search constraints as described above exist for this inquiry. No specific search has been undertaken for such documents. I know of no one who has consented to his or her name or

situation being disclosed to anyone outside his or her present or former religious organization, Jehovah's Witnesses.

I declare under penalty of perjury of the laws of the State of New York that the foregoing is true and correct.

Executed on October 12, 2015 at Patterson, New York.

A. HERNAN STEELE
Notary Public, State of New York
Registration #01ST6108293
Qualified in Putnam County
Commission Expires Mar. 1, 2016

_____
Douglas Chappel, Declarant

Subscribed and sworn to before me this 12 day of October, 2015.

_____
Notary Public
Commission Expires: