Jon A. Wilson
Brett C. Jensen
BROWN LAW FIRM, P.C.
315 North 24th Street
P.O. Drawer 849
Billings, MT 59103-0849
Tel. (406) 248-2611
Fax (406) 248-3128

Joel M. Taylor, Esq. (appearing *pro hac vice*)
MILLER MCNAMARA & TAYLOR LLP
100 South Bedford Road, Suite 340
Mount Kisco, New York 10549
Tel./E-Fax (845) 288-0844
*Attorneys for Defendant Watchtower Bible and Tract Society of New York, Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## BILLINGS DIVISION

| | |
|---|---|
| TRACY CAEKAERT, and CAMILLIA MAPLEY,<br><br>Plaintiffs,<br><br>vs.<br><br>WATCHTOWER BIBLE AND TRACT SOCIETY OF NEW YORK, INC., WATCH TOWER BIBLE AND TRACT SOCIETY OF PENNSYLVANIA, and BRUCE MAPLEY SR.,<br><br>Defendants. | Cause No. CV 20-52-BLG-SPW<br><br>**DEFENDANT WATCHTOWER BIBLE AND TRACT SOCIETY OF NEW YORK, INC.'S RESPONSE BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL (DOC. 187)** |

WATCHTOWER BIBLE AND )
TRACT SOCIETY OF NEW YORK, )
INC. )
)
        Cross-Claimant, )
)
vs. )
)
BRUCE MAPLEY SR., )
)
        Cross-Claim Defendant.

## TABLE OF CONTENTS

Page

**TABLE OF CONTENTS**................................................................2

**TABLE OF AUTHORITIES**..........................................................4

**EXHIBIT INDEX** .........................................................................5

**INTRODUCTION**..........................................................................6

**BACKGROUND**............................................................................6

    **A.**   **Jehovah's Witnesses**...........................................................6

    **B.**   **Plaintiffs' Allegations**.......................................................9

    **C.**   **Plaintiffs' Motion to Compel**.............................................9

**ARGUMENT**...............................................................................10

    **A.**   **The Clergy-Penitent Privilege**........................................10

    **B.**   **The Documents at Issue Are All Privileged**...................15

        **1.**    **Documents 27-36: Clergy-to-Clergy Reports of Known Child Molesters**................................................................15

2.  **Document 37: Letter from Hardin Congregation to Pacific Washington Congregation Regarding Gunnar Hain**........21

3.  **Document 38: Letter from Hardin Congregation to WTNY Regarding Martin Svenson**......................................21

4.  **Document 39: Letter from WTNY to the Hardin Congregation Regarding Hain**........................................21

5.  **Bruce Mapley, Sr., Disfellowship Form**.......................22

C.   **The Disputed Documents Are Also Irrelevant**...................26

**CONCLUSION**.................................................................27

**CERTIFICATE OF COMPLIANCE**...........................................28

**CERTIFICATE OF SERVICE**.................................................29

# TABLE OF AUTHORITIES

<u>**Cases**</u>                                                                                                  <u>**Page**</u>

*Brookings v. State*, 495 So.2d 135 (Fla. 1986)……………………………………….25

*Corp. of the President of the Church of Jesus Christ of Latter-day Saints v. Cardinal*, 2022 WL 17727582 (Ariz. App. 2022)……………..……………...25, 26

*Ellis v. United States*, 922 F.Supp. 539 (D. Utah 1996)…………….....................13

*Hadnot v. Shaw*, 826 P.2d 978 (Okla. 1992)……………….…….............................14

*Hosanna-Tabor Evangelical Lutheran Church  Sch. v. EEOC*, 565 U.S. 171 (2012)…………………………………………………………………………....13

*Jane Doe v. Corp. of President of Church of Jesus Christ of Latter-Day Saints*, 90 P.3d 1147 (Wash. App. 2004)………………………………………………………...22

*Kruglikov v. Kruglikov*, 217 N.Y.S.2d 845 (N.Y. Sup. Ct. 1961)……………...11, 12

*Lewis & Clark Co. v. State, Dept. of Commerce*, 728 P.2d 1348 (Mont. 1986)….10

*Nunez v. Watchtower Bible & Tract Soc'y of N.Y., Inc.*, 455 P.3d 829 (Mont. 2020)…………....…………………………………………….7, 12-15, 18, 20, 23-24

*Our Lady of Guadalupe Sch. v. Morrison-Berru*, 140 S.Ct. 2049 (2020)…….13, 14

*People v. Bragg*, 824 N.W.2d 170 (Mich. App. 2012)…..................................11, 14

*People v. Nieves*, 485 P.3d 457 (Cal. 2021)…..…………………………….……..25

*Scott v. Hammock*, 133 F.R.D. 610 (D. Utah 1990)……………………………....13

*Scott v. Hammock*, 870 P.2d 947 (Utah 1994)…………......................................10-12

*Seattle's Union Gospel Mission v. Woods*, 142 S.Ct. 1094 (2022)……………..13

*Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696 (1976)……………..14

*State v. Glenn*, 62 P.3d 921 (Wash. App. 2004)……………………………………..13

*State v. Gooding*, 989 P.2d 304 (Mont. 1999)……………………………………10-11

*State v. MacKinnon*, 957 P.2d 23 (Mont. 1998)…………………….....10-12, 20, 23

*State v. Payne*, 496 P.3d 546 (Mont. 2021)……………………………………….24

*State v. Statczar*, 743 P.2d 606 (Mont. 1987)……………………………………..26

*State v. Sucharew*, 66 P.3d 59 (Ariz. 2003)………………………………………..25

*Upjohn Co. v. United States*, 449 U.S. 383 (1981)………………………………...25

*Waters v. O'Connor*, 103 P.3d 292 (Ariz. App. 2004)…………………….....11

## *Statutes and Treatises*

Mont. Code Ann. § 1-2-103…………………………………………………………10

Mont. Code Ann. § 27-2-216……………..……......................................6, 26, 27

Restatement (Third) of the Law Governing Lawyers § 79 (2000)……………24, 25

## **EXHIBIT INDEX**

**Exhibit A**   *Let Us Abhor What Is Wicked* (Jan. 1, 1997)…....…….15-17, 22

**Exhibit B**   All-Elders Letter (March 14, 1997)...……..................16-17, 20

**Exhibit C**   All-Elders Letter (July 20, 1998)…………………..………17

## INTRODUCTION

Plaintiffs ask the Court to compel production of the 14 documents on Watchtower Bible and Tract Society of New York, Inc.'s (hereinafter "WTNY") privilege log for which the clergy-penitent privilege is asserted.    Each is a confidential clergy-to-clergy communication.    All seek spiritual guidance and advice.  Many contain privileged confessions.  The fact they involve clergy seeking advice from their spiritual overseers does not deny the privilege.  Clergy have as much a right as other parishioners to speak to their clergy in confidence. Accordingly, all 14 documents are privileged.  Also, most of the documents have no relevance.  Most involve abuse with no connection to Jehovah's Witnesses—*e.g.*, a father abusing a stepdaughter.  Nearly all involve abuse occurring years *after* the abuse in question and thus have no bearing on the present matter.  Such documents are not relevant under Mont. Code Ann. § 27-2-216 or for any other reason.

## BACKGROUND

### A.    Jehovah's Witnesses

Congregations of Jehovah's Witnesses are composed of individuals and families who gather to worship.  *See* Affidavit of Thomas Jefferson, Jr. ("Jefferson Affidavit"), ¶ 10. A "body of elders" oversees the spiritual activities of the congregation.  *Id.,* ¶ 14.  Elders must meet qualifications outlined in the Bible (*see* 1 Timothy 3:1-7; Titus 1:5-9).  *Id.,* ¶ 16.   They do not receive compensation.  *Id.,* ¶ 15.

Elders are clergy under Montana law.[1] They hear confessions, officiate at weddings and funerals, and provide spiritual shepherding, which includes encouragement, counsel, and guidance concerning personal and spiritual matters (Acts 20:28). *Id.,* ¶¶ 14, 18.

Because open and free communication between congregation members and elders is essential to providing spiritual encouragement, counsel, and guidance the religious beliefs and practices of Jehovah's Witnesses place an emphasis on privacy and confidentiality. (Proverbs 25:9). "What you discuss with an elder will remain strictly confidential." (*The Watchtower,* March 1, 1997, page 28.) *Id.,* ¶ 22.

At the time in question, congregation elders communicated with experienced elders at WTNY, who provided spiritual counsel and guidance about the application of Bible principles to issues concerning the congregation and its members. *Id.,* ¶ 24. Such communications are strictly confidential in accordance with the Scriptural beliefs and practices of Jehovah's Witnesses. *Id.,* ¶ 24.

As part of their responsibility to maintain the spiritual and moral cleanliness of the congregation, elders can conduct ecclesiastical "investigations" when they receive information that a congregation member has committed a gross sin and damaged his or her relationship with God. *Id.,* ¶¶ 26-29. Scripture requires at least

---

[1] *See Nunez v. Watchtower Bible & Tract Soc'y of N.Y., Inc.,* 455 P.3d 829, 832 (Mont. 2020) ("The parties agree that elders are 'clergy' under Montana law.").

two elders to conduct such an investigation or to take and confirm a confession of such sin. *Id.,* ¶ 30. If those two elders confirm that the member has in fact committed a serious sin, the congregation's body of elders will appoint three or more elders to form a "judicial committee" (Deuteronomy 17:6; Deuteronomy 19:15; Matthew 18:15-17; 2 Corinthians 13:1; 1 Timothy 5:19). *Id.,* ¶ 30.

The judicial committee hears the basic facts about the sinful conduct, often including a confession, and decides whether the sinner is repentant before God (Psalm 51: 17; Psalm 86:5; Acts 26:20). *Id.,* ¶ 32.    All spiritual communications taking place during an investigation or a judicial committee proceeding, or in furtherance of the congregation's ongoing spiritual assistance to a wrongdoer, are considered private and confidential under church doctrine and practice. *Id.,* ¶ 33. Any records created in connection with these matters are also considered confidential, are kept under lock and key at the Kingdom Hall (place of worship), and are accessible only to the elders, who each have a duty of confidentiality. *Id.,* ¶ 33.

During all relevant times to this lawsuit, when a member was disfellowshipped, the elders on the judicial committee forwarded a confidential notice of disfellowshipping to WTNY. *Id.,* ¶ 37.  The notice is reviewed by an experienced elder in New York, and only for ecclesiastical purposes, such as ensuring that congregation elders acted according to Scripture. *Id.,* ¶ 37  An elder

announces the disfellowshipping at a congregation meeting  *Id.,* ¶ 38  Pursuant to Scripture, Jehovah's Witnesses avoid spiritual association (or fellowship) with someone who has been disfellowshipped.  *Id.,* ¶ 38

### B.  Plaintiffs' Allegations

Plaintiffs Tracy Caekaert and Camillia Mapley allege that their father, Bruce Mapley Sr., sexually abused them.  *See* Doc. 22.  Plaintiffs and their father were not Jehovah's Witnesses when the abuse began.   Their family joined the Hardin Congregation in 1973. *Id.,* ¶¶ 33-34. "The abuse occurred whenever [their mother] Shirly Mapley left the house …." *Id.,* ¶ 34.

In 1976 or 1977, Gunner Hain, another member of the Hardin Congregation, allegedly abused Plaintiffs in his home. *Id.,* ¶ 36.  Plaintiffs told their father.  Hain was confronted and confessed to the elders. *Id.,* ¶¶ 38-39.  Hain never abused them again.  Plaintiff's father also self-confessed.  *Id.,* ¶ 40.  Plaintiffs allege that their father continued to abuse them. *Id.,* ¶ 48.

### C.  Plaintiffs' Motion to Compel

Plaintiffs' move to compel production of 14 documents (items 27-40 on WTNY's privilege log). Each is a clergy-to-clergy communication seeking spiritual guidance and advice regarding sin, repentance, the protection of God's children, and the purity of the congregation.  Several contain privileged confessions.

## ARGUMENT

### A.    The Clergy-Penitent Privilege

Plaintiffs point to "the fundamental principle that 'the public … has a right to every man's evidence'" and that privileges, therefore, are "strictly construed …." *State v. MacKinnon*, 957 P.2d 23, 27 (Mont. 1998). But this "is subject to the overriding rule that a statute should be construed in accordance with its object or purpose." *Scott v. Hammock*, 870 P.2d 947, 950 n.3 (Utah 1994). "A statute will not be interpreted to defeat its evident object or purpose; the objects sought to be achieved by the legislation are prime consideration in interpreting statutes." *Lewis & Clark Co. v. State, Dept. of Commerce*, 728 P.2d 1348, 1351 (Mont. 1986). *See also* Mont. Code Ann. § 1-2-103 (All statutes "are to be liberally construed with a view to effect their objects and to promote justice.").

Moreover, the clergy-penitent privilege is different from other privileges because of its constitutional roots. "Notwithstanding that testimonial exclusionary rules and privileges are strictly construed … under the federal First Amendment and under Article II, Section 5 of the Montana Constitution, all persons are guaranteed the free exercise of their religious beliefs and all religions are guaranteed governmental neutrality," and thus the clergy-penitent privilege must be interpreted to "minimize the risk" of violating these constitutional guarantees. *MacKinnon*, 957 P.2d at 28. "[T]he clergy-penitent privilege must not be so strictly construed as to

violate the right to the free exercise of religion guaranteed by the First Amendment of the United States Constitution …." *State v. Gooding*, 989 P.2d 304, 307 (Mont. 1999).

Thus, the privilege is interpreted broadly.  The privilege "depends on a sense of complete confidentiality …." *Scott*, 870 P.2d at 955.  Confidentiality is "essential to the free exercise of a religion" including the ordinance of "penance." *People v. Bragg*, 824 N.W.2d 170, 178-79 (Mich. App. 2012).

First, the privilege is interpreted broadly to protect all *confidential*—not just *penitential*—communications.  That is the holding of *MacKinnon*, where the court "broadly interpreted" the privilege to apply to "non-penitential communications … 'made in confidence and for the purpose of seeking or receiving religious guidance, admonishment, or advice ….'" *MacKinnon*, 957 P.2d at 27-28 (quoting *Scott*, 870 P.2d at 956). "[A] narrow construction of the confession requirement so that only penitential communications would be protected would raise First Amendment concerns." *Waters v. O'Connor*, 103 P.3d 292, 294 n.2 (Ariz. App. 2004).

Second, the breadth of the privilege does not depend on whether the member or the clergyman initiates the conversation. *See Scott*, 870 P.2d at 953 ("'[I]t matters not how and by whom the meeting was initiated…. The fact is that they consulted a representative of their faith in the privacy of his study in the Synagogue with a view

to reconciliation and restoring their marriage.'") (quoting *Kruglikov v. Kruglikov*, 217 N.Y.S.2d 845, 847 (N.Y. Sup. Ct. 1961)).

Third, courts broadly apply the *confidentiality* requirement to "minimize the risk" that the privilege "might be discriminatorily applied because of differing judicial perceptions of a given church's practices or religious doctrine, and in order to least interfere with ... constitutional protections of religious freedom ...." *MacKinnon*, 957 P.2d at 28.

> [A] narrow definition of confidentiality impermissibly could discriminate between different religious beliefs and practices, protecting confidentiality of reports made in a confession from a parishioner to a priest, like the traditional Catholic practice, while offering no protection to a congregant's disclosures to a committee of elders using a process like that followed by Jehovah's Witnesses.

*Nunez v. Watchtower Bible & Tract Soc'y of N.Y., Inc.*, 455 P.3d 829, 836 (Mont. 2020). *See also Scott*, 870 P.2d at 954 (narrow interpretation "would create the risk that the law would be discriminatorily applied against religious practices of churches on the basis of theological differences").

Fourth, courts generously protect the confidential internal transmission of confidential communications when that is part of the church's practice. As this Court previously noted: "[a]lthough the elders who received the confession then repeated the information to members of the Watchtower New York organization, the Montana Supreme Court has found that this kind of internal dissemination of

information does not dispel confidentiality within the Jehovah's Witnesses' faith."
(Doc. 82 at 4 (citing *Nunez*, 455 P.3d at 835)).

In *Scott v. Hammock*, 133 F.R.D. 610 (D. Utah 1990), a confidential communication "was passed vertically from one religious authority up to another within the church hierarchy" as part of "carrying out church discipline." *Id.* at 619. This did not destroy the privilege.

> The need for the privilege to follow the communication in such circumstances is obvious and appropriate. Otherwise, the privilege would be destroyed and the confidence abridged. Therefore, the repeating of the defendant's statement and its communication to superior religious authorities must be deemed cloaked with confidentiality and privileged from forced disclosure.

*Id. See also Ellis v. United States*, 922 F.Supp. 539, 541 (D. Utah 1996) ("[A] subsequent transmittal of a communication may still be confidential if that was intended as part of the purposes of the communication."); *State v. Glenn*, 62 P.3d 921, 926 (Wash. App. 2004) (clergy-to-clergy transmission of confession did not waive privilege).

Fifth, "[t]he First Amendment gives 'special solicitude to the rights of religious organizations' to operate according to their faith without government interference." *Seattle's Union Gospel Mission v. Woods*, 142 S.Ct. 1094, 1094 (2022) (quoting *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 189 (2012)). Churches have a right "to decide matters of faith and

doctrine" and "church government" without government intrusion. *Our Lady of Guadalupe Sch. v. Morrison-Berru*, 140 S.Ct. 2049, 2060 (2020).

One area where churches have sweeping autonomy is religious discipline, sometimes called "church judicature." "[C]ivil courts exercise no jurisdiction" over "a matter which concerns ... church discipline ...." *Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 713-14 (1976). This includes the right to maintain the confidentiality of church discipline. "The church's immunity from disclosure rests neither on a statute nor a code of evidence. Rather its shield is of a constitutional dimension." *Hadnot v. Shaw*, 826 P.2d 978, 989 (Okla. 1992). "Church judicature exercised within proper bounds of cognizance is not discoverable." *Id.* at 990.

Finally, courts must defer to churches when determining what communications are considered confidential under their doctrine. "[W]hen considering whether a communication would be considered confidential under the discipline or practices of a specific religion, we are bound to accept the guidance provided by the clerical witness without embarking on a fact-finding mission." *Bragg*, 824 N.W.2d at 185.

Thus, in *Nunez*, 455 P.3d 829, the Montana Supreme Court accepted WTNY's explanation regarding the confidentiality of confessions and reports from victims of sexual abuse. "[W]e decline to conduct further inquiry into the validity of Jehovah's

Witnesses' tenets and doctrines, including its canon and practice for adherence to a requirement of confidentiality in handling child abuse reports." *Id.* at 836.

## B.   The Documents at Issue Are All Privileged

### 1.   Documents 27-36: Clergy-to-Clergy Reports of Known Child Molesters

Documents 27 to 36 are confidential letters sent by clergy to WTNY seeking spiritual guidance and advice.   WTNY believes they are all privileged.   Their background is important.

On January 1, 1997, WTNY published an article, *Let Us Abhor What Is Wicked*, setting forth Scriptural principles regarding repentance by those who have been guilty of child molestation ("Watchtower Article"), attached as Exhibit A. "Jehovah forgave repentant David for murder and adultery," the article explains. *Id.* "We can be truly grateful that He is prepared to forgive us too if we repent and approach him in sincerity and humility." *Id.* But "while Jehovah forgives repentant sinners, there may be consequences of their actions that cannot be avoided." *Id.*

Even if an abuser sincerely repents, "[t]his does not mean … that he will qualify to serve in a position of responsibility in the congregation." *Id.*   The letter gives "the Scriptural reasons for this." *Id.*

> For one thing, an elder must be "self-controlled." (Titus 1:8) True, none of us have perfect self-control. (Romans 7:21-25)  But a dedicated adult Christian who falls into the sin of child sexual abuse reveals an unnatural fleshly weakness.  Experience has shown that such

an adult may well molest other children. True, not every child molester repeats the sin, but many do. And the congregation cannot read hearts to tell who is and who is not liable to molest children again. (Jeremiah 17:9) …. For the protection of our children, a man known to have been a child molester does not qualify for a responsible position in the congregation.

*Id.*

The Watchtower Article laid the Scriptural foundation for the religious guidance sent "TO ALL BODIES OF ELDERS" on March 14, 1997 ("All-Elders letter"), attached as Exhibit B. Citing the Watchtower Article, the All-Elders letter explained: "We wish to take necessary steps that will help protect the congregation, especially our children, from the unwholesome practices that are constantly worsening in the world." *Id.* The letter reaffirmed that "a man known to have been a child molester *does not qualify for a responsible position in the congregation*" and "*cannot be a pioneer or serve in any other special full-time service.*" *Id.* at 2. It instructed Congregation elders to provide a report on any congregants that ever served as an elder or ministerial servant in a congregation "who is known to have been guilty of child molestation in the past." *Id.*

The Watchtower Article and the All-Elders letter were part of a Scriptural mandate to maintain the spiritual cleanness of congregations of Jehovah's

Witnesses. *Id.* at 1.  This was not secular risk-management.[2]  The All-Elders letter concluded:

> A meeting of the body of elders should be arranged to read and discuss this letter together.  This letter is confidential and should not be copied but should be kept in the congregation's confidential file.  Elders should not discuss this information with others.  ***It is provided so that you can appropriately apply the spirit of the Scriptural information in the January 1, 1997, Watchtower article "Let Us Abhor What Is Wicked."***

*Id.* at 3 (emphasis added).

With this background, WTNY provides an overview of each of the ten responses to the All-Elders letter at issue.

**Document 27**.  This April 19, 1997, letter is from the elders in a non-party congregation to elders at WTNY regarding accusations of abuse that occurred in 1986.  This letter is privileged for two reasons.  First, the local Body of Elders is seeking confidential spiritual guidance and advice from their own clergy about how the Scriptural principles in the Watchtower Article apply to such accusations.  Second, it contains clergy-penitent privileged communications with the alleged perpetrator.

---

[2] In a subsequent communication to All Bodies of Elders, WTNY acknowledged that there are indeed "legal considerations" involved in making sure those guilty of child molestation are not appointed to responsible positions in the congregation.  *See* July 20, 1998, letter to All Bodies of Elders, attached as Exhibit C.  But as the Watchtower Article and the All-Elders letter make clear, the primary concern was Scriptural, not legal.

**Document 28.**  This April 24, 1997, letter is from the Body of Elders in a non-Party congregation to elders at WTNY regarding a confession of abuse that occurred 13 years earlier as part of the process of "church judicature," resulting in ecclesiastical discipline.  (This is the very process the Montana Supreme Court deemed confidential in *Nunez*.)  This document is privileged for two reasons.  First, the Body of Elders is seeking spiritual guidance and advice from clergy.  Second, it contains a privileged confession from the penitent.

**Document 29.**  This April 25, 1997, letter is from the Body of Elders of the Hardin Congregation to clergy at WTNY.  It reports accusations made against Gunnar Hain, Martin Svenson, and Bruce Mapley, and contains reference to a penitential statement made by Hain.  This document is privileged for two reasons.  First, the Body of Elders is seeking spiritual guidance and advice from their clergy.  Second, it contains clergy-privileged communications with parishioners.

**Document 30.**  This May 14, 1997, letter is from the Body of Elders in a non-Party congregation to elders at WTNY regarding a man accused of abuse approximately nine years earlier.  It reports that the accusations were address scripturally.  This document is privileged for two reasons.  First, the Body of Elders is seeking spiritual guidance and advice from their clergy.  Second, it is based on clergy-penitent privileged communications with the perpetrator.

**Document 31.**  This May 29, 1997, letter is from the Body of Elders in a non-Party congregation to elders at WTNY, and is based entirely on a penitential from the perpetrator. This document is privileged for two reasons.  First, the Body of Elders is seeking spiritual guidance and advice from their clergy.  Second, it conveys a privileged confession from the perpetrator.

**Document 32.**  This August 6, 1997, letter is from the Body of Elders in a non-Party congregation to elders at WTNY.  It identifies someone who was involved in serious sin/abuse who had since moved.  It gives no details regarding the abuse or how it came to light.

**Document 33.**  This letter (date illegible) is from a Body of Elders in a non-Party congregation regarding familial abuse in 1996.  This document is privileged for two reasons.  First, the Body of Elders is seeking spiritual guidance and advice from their clergy.  Second, it is based on privileged communications.

**Document 34.**  This February 2, 1999, letter is from the Body of Elders in a non-Party congregation.  The contents are based entirely on a privileged confession by the perpetrator.  This document is privileged for two reasons.  First, the Body of Elders is seeking spiritual guidance and advice from their clergy.  Second, it conveys a privileged confession from the perpetrator.

**Document 35.**  This February 7, 2000, letter is from the Body of Elders in the Belgrade Congregation.  It reports a case in which a man abused his stepdaughter

about 14 years earlier—before he became a Jehovah's Witness. It is based, at least in part, on privileged communications with the perpetrator. Thus, this document is privileged for two reasons. First, the Body of Elders is seeking spiritual guidance and advice from their clergy. They expressly ask, "[P]lease provide us with any additional guidelines that would help us in determining how we might use a brother such as [the perpetrator] within the congregation." Second, it conveys privileged communications with the perpetrator.

**Document 36.** This April 6, 2000, letter is from the Body of Elders in a non-Party congregation regarding abuse that occurred 32 years earlier. This document is privileged for two reasons. First, the Body of Elders is seeking spiritual guidance and advice from their clergy. Second, it is based on privileged communications.

In short, these ten documents, all clergy-to-clergy communications in response to the All-Elders letter, are confidential communications for the purpose of "seeking or receiving religious guidance, admonishment, or advice ...." *MacKinnon*, 957 P.2d at 27-28 (quotation marks omitted). Most of them also contain clergy-penitent privileged confessions from perpetrators. In a prior ruling, the Court recognized that "this kind of internal dissemination of information does not dispel confidentiality within the Jehovah's Witnesses' faith." (Doc. 82 at 4 (citing *Nunez*, 455 P.3d at 835)).

## 2.   Document 37: Letter from Hardin Congregation to Pacific Washington Congregation Regarding Gunnar Hain

Document 37 is an elder-to-elder letter from the Hardin Congregation to the Body of Elders in the Pacific Washington Congregation introducing the Hains. It is an internal clergy communication regarding matters of sin and repentance. It is based, in part, on confidential communications between Hain and elders in the Hardin Congregation. One purpose of this letter is to give spiritual guidance to clergy in Hain's new congregation so they can minister to him and protect the flock. This is akin to an attorney passing a confidential file to a client's new attorney, or a physician giving the patient's medical information to his new physician. For that reason, this letter is privileged.

## 3.   Document 38: Letter from Hardin Congregation to WTNY Regarding Martin Svenson

Document 38 is an elder-to-elder letter, dated June 29, 1998, from an elder in the Hardin Congregation (Tom Meyers) detailing accusations regarding Martin Svenson. The letter serves no purpose other than being a communication seeking spiritual guidance and advice about how to handle a difficult situation. It is therefore privileged.

## 4.   Document 39: Letter from WTNY to the Hardin Congregation Regarding Hain

Document 39 is an elder-to-elder letter from WTNY to the Body of Elders in the Hardin Congregation, dated September 27, 1999.   After "prayerful

consideration" of the matter, and based on the Scriptural teachings in the Watchtower Article, the letter offers spiritual guidance and advice to the Hardin Congregation elders regarding Gunnar Hain.   Because this is a letter from clergy giving spiritual advice and guidance, and because it contains a privileged confession, it is privileged.

### 5.     Bruce Mapley, Sr., Disfellowship Form

Document 40 is a one-page Notification of Disfellowshipping or Disassociation from the Body of Elders in Canyon Ferry Congregation in Helena to WTNY.   It reports that Bruce Mapley, Sr. was disfellowshipped on October 14, 1999, based on sins he confessed.  It is plainly privileged.

This is very similar to the "Report of Church Disciplinary Action" the Washington Court of Appeals said was privileged in *Jane Doe v. Corp. of President of Church of Jesus Christ of Latter-Day Saints*, 90 P.3d 1147 (Wash. App. 2004). There, the perpetrator confessed to a council of clergy that he had abused his stepdaughter.  His clergy excommunicated him and submitted a Report of Church Disciplinary Action ("RCDA") to senior church leaders.  The court held that the RCDA was privileged and that "the confidential recording and transmission of the RCDA" to senior church leaders "was not a waiver" because "Church procedures require preparation of a RCDA to Church headquarters and maintains its confidentiality." *Id.* at 1154.

Plaintiffs have a blank form and argue that there is "nothing on the form indicating that it has anything to do with a penitent seeking or receiving spiritual advice from a cleric." (Doc. 188 at 15.) To the contrary, the only reason a person confesses sins to clergy is "for the purpose of seeking or receiving religious guidance, admonishment, or advice ...." *MacKinnon*, 957 P.2d at 27-28 (quotation marks omitted).

Plaintiffs argue that WTNY "has not provided any evidence establishing that the form, or any information on the form, was obtained during a legitimately confidential clergy-penitent process." (Doc. 188 at 15.) WTNY has submitted an affidavit with this opposition that establishes that everything said in connection with a judicial committee, and also records created by a judicial committee, are considered confidential under Jehovah's Witnesses' doctrines and beliefs. *See* Jefferson Affidavit ¶¶ 1-44. Further, in *Nunez*, the Montana Supreme Court acknowledged that the "judicial process" is confidential. *Nunez*, 455 P.3d at 834.

> The summary judgment record demonstrates that Jehovah's Witnesses have an established process for receiving and investigating reports of child abuse within their congregations; that they consider this process confidential; and that the process necessarily involves multiple elders and congregation members, including the accused, CCJW elders who provide spiritual guidance, and local elders who conduct the investigation. This process "does not affect the elders' confidentiality obligations." ... [W]e conclude that the undisputed material facts demonstrate the Jehovah's Witnesses maintain confidentiality pursuant

to church doctrine, canon, and/or established practice when they receive and internally address reports of child sexual abuse.

*Id.* at 835.

Plaintiffs argue that "Mr. Mapley chose to share the fact that he molested Plaintiffs outside of the Jehovah's Witness clergy-penitent process, thereby eliminating the confidentiality of any confession made to a cleric for that conduct." (Doc. 188 at 16.)   But Plaintiffs do not know what is in the Notification of Disfellowshipping.   They can only speculate that Mr. Mapley has disclosed its contents.

More important, Plaintiffs misunderstand waiver.   Disclosing *facts* does not waive the privilege, whereas disclosing *communications* does.   *See State v. Payne*, 496 P.3d 546, 552 (Mont. 2021) (client waived privileged when he "chose to testify regarding his privileged communications").   This is black-letter law, and common sense.   "The attorney-client privilege is waived if the client ... voluntarily discloses *the communication* in a nonprivileged communication."   Restatement (Third) of the Law Governing Lawyers § 79 (2000) (emphasis added).   "***Public disclosure of facts that were discussed in confidence with a lawyer does not waive the privilege if the disclosure does***

*not also reveal that they were communicated to the lawyer*." *Id.* comment e (emphasis added).[3]

> A fact is one thing and a communication concerning that fact is an entirely different thing.  The client cannot be compelled to answer the question, "What did you say or write to the attorney?" but may not refuse to disclose any relevant fact within his knowledge merely because he incorporated a statement of such fact into his communication to his attorney.

*Upjohn Co. v. United States*, 449 U.S. 383, 395-96 (1981).

The Arizona Court of Appeals just rejected Plaintiffs' argument under similar circumstances.  In *Corp. of the President of the Church of Jesus Christ of Latter-day Saints v. Cardinal*, 2022 WL 17727582 (Ariz. App. 2022), Paul Adams confessed to church clergy that he had sexually abused his daughters. He subsequently "posted on the internet numerous videos of him sexually abusing his children," and when he was arrested in 2017, he "confessed his crimes to law enforcement ...." *Id.* at *1.  The trial court held that "Adams had waived the priest-penitent privilege by his 'subsequent, overtly public admission of his sexual abuse of his children.'" *Id.*  The Court of Appeals disagreed and reversed.

---

[3] *See also State v. Sucharew*, 66 P.3d 59, 65 (Ariz. 2003) (client "waives the privilege by disclosing the confidential communications to a third party"); *People v. Nieves*, 485 P.3d 457, 484 (Cal. 2021) ("Waiver ... occurs when the holder of the privilege has disclosed a significant part of the communication ...."); *Brookings v. State*, 495 So.2d 135, 139 (Fla. 1986) ("[T]he mere fact that a witness-defendant testifies to facts which were the subject of consultation with counsel is no waiver of the privilege.  It is the communication with counsel that is privileged, not the facts.").

> It is not enough to publicly admit the "facts" involving the same conduct that may have been previously disclosed in confidence. The communicant must also reveal the substance of the confession itself. That is, here, waiver could exist had Adams not only revealed that he had committed these offenses but also what he had communicated in confession to [church clergy].

*Id.* at *2. Because "Adams publicly disclosed only his crimes, not the content of his confession to the church," his confession remained privileged. *Id.* at *3.

"The burden of establishing waiver of the privilege is on the party seeking to overcome the privilege." *State v. Statczar*, 743 P.2d 606, 610 (Mont. 1987). Plaintiffs have not met that burden. Document 40 is privileged.

## C.    The Disputed Documents Are Also Irrelevant

Except for documents 29 and 37-40, the disputed documents have no conceivable relevance to the facts of this case. Plaintiffs filed suit under Mont. Code § 27-2-216(5)(a), which revives certain claims "that would otherwise be barred," but only

> if the court concludes that the entity against whom the action is commenced ... knew, had reason to know, or was otherwise on notice of any unlawful sexual conduct *by an employee, officer, director, official, volunteer, representative, or agent and failed to take reasonable steps to prevent future acts of unlawful sexual conduct*.

Thus, this statute requires prior knowledge of abuse by the perpetrator in question. In other words, a claim is revived if the plaintiff shows that the defendant "knew, had reason to know, or was otherwise on notice" that "an employee, officer,"

etc. was guilty of unlawful sexual conduct and "failed to take reasonable steps" to stop further abuse *by that employee—e.g.*, a church knows its priest is a pedophile and transfers him to another congregation without any warning where he continues abusing children. It does *not* revive all claims of abuse if the defendant knew that *any* employee, officer, etc. was guilty of unlawful sexual conduct and failed to act. Knowing that an unrelated perpetrator was once guilty of abuse does not revive claims based on the crimes of a different perpetrator. What if the defendant took proper action in some cases, but not others? What if the defendant was aware of only a single isolated and unrelated act of abuse years earlier? Such a reading would effectively revive *all* claims against a religious organization of any size, something the statute clearly does not contemplate.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion to compel should be denied.

DATED this 17th day of January, 2023.

By:   /s/ Jon A. Wilson
Jon A. Wilson
BROWN LAW FIRM, P.C.
*Attorneys for Defendant Watchtower Bible and Tract Society of New York, Inc.*

## **CERTIFICATE OF COMPLIANCE**

Pursuant to L.R. 7.1(d)(2)(E), the undersigned hereby certifies this brief complies with L.R. 7.1(d)(2)(A). According to the word-processing unit used to prepare this brief, the word count is 4,966 words excluding caption, table of contents and authorities, exhibit index, and certificates of service and compliance.

DATED this 17th day of January, 2023.

By:  /s/ Jon A. Wilson
Jon A. Wilson
BROWN LAW FIRM, P.C.
*Attorneys for Defendants Watchtower Bible and Tract Society of New York, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that, on January 17, 2023, a copy of the foregoing was served on the following person(s):

1.   U.S. District Court, Billings Division

2.   Robert L. Stepans/Ryan R. Shaffer/James C. Murnion
     MEYER, SHAFFER & STEPANS, PLLP
     430 Ryman Street
     Missoula, MT 59802

3.   Matthew L. Merrill (appearing *pro hac vice*)
     MERRILL LAW, LLC
     1863 Wazee Street, Suite 3A
     Denver, CO 80202

4.   Gerry P. Fagan/Christopher T. Sweeney/Jordan W. FitzGerald
     MOULTON BELLINGHAM PC
     P.O. Box 2559
     Billings, MT 59103-2559

5.   Bruce G. Mapley Sr.
     3905 Caylan Cove
     Birmingham, AL 35215

by the following means:

| | | | |
|---|---|---|---|
| 1-4 | CM/ECF | _____ | Fax |
| _____ | Hand Delivery | _____ | E-Mail |
| 5 | U.S. Mail | _____ | Overnight Delivery Services |

By:   /s/ Jon A. Wilson
      Jon A. Wilson
      BROWN LAW FIRM, P.C.
      *Attorneys for Defendant Watchtower*
      *Bible and Tract Society of New York,*
      *Inc.*