*Exhibit A*

1          SUPERIOR COURT OF THE STATE OF CALIFORNIA

2                  FOR THE COUNTY OF SAN DIEGO

3

4

5   JOHN DORMAN, Individually, and  )
    JOEL GAMBOA, Individually,       )
6                                    )
                     Plaintiffs,     ) No. 37-2010-00092450-
7                                    )      CU-PO-CTL
    vs.                              )
8                                    )
    DEFENDANT DOE 1, LA JOLLA        )
9   CHURCH; DEFENDANT DOE 2, LINDA   )
    VISTA CHURCH; DEFENDANT DOE 3,   )
10  SUPERVISORY ORGANIZATION;        )
    DEFENDANT DOE 4, PERPETRATOR;    )
11  AND DOES 5 through 100,          )
                                     )
12                   Defendants.     )
    ─────────────────────────────────)
13

14

15

16

17                   DEPOSITION OF

18                   ALLEN SHUSTER

19               SAN DIEGO, CALIFORNIA

20                  MARCH 27, 2012

21
    ATKINSON-BAKER, INC.
22  COURT REPORTERS
    (800) 288-3376
23  www.depo.com

24  REPORTED BY:   GRACIELA WARNER, CSR NO. 9502
    FILE NO.:      A602E89
25

1

1      Q.    Okay.  Have you held positions -- other than

2   as an elder in a Kingdom Hall or someone working within

3   the Service Department, have you had other positions

4   within the Jehovah's Witnesses?

5      A.    At the headquarters?

6      Q.    Anywhere.  Have you been a traveling

7   overseer?  Worked in some other capacity?

8      A.    Yeah.  Not in the traveling work, as we call

9   it, or traveling minister visiting congregations in

10   circuits.  I have been a pioneer, regular pioneer for

11   about four and a half years.  I, during that time,

12   served as ministerial servant for a few years and was

13   appointed as an elder, as I mentioned, in 1979.

14          There are other positions that I have

15   occupied:  A special Sunday-speaker visiting circuits

16   and giving Bible instructional talks.  I have been a

17   Kingdom -- it's called a "Kingdom Ministry School

18   instructor" -- visiting circuits and instructing elders

19   as to our policies and Bible principles.

20          Is that what you are looking for?

21      Q.    Yeah, those are the kinds of things I'm

22   trying to get at.

23          By "Kingdom Ministry School," there isn't a

24   separate physical school, is there?

25      A.    No.

16

WTNY001407

1    about child abuse, but it didn't talk about child

2    sexual abuse.

3              So while we are on the topic -- we have

4    diverted a little bit and maybe we are in your PMQ

5    capacity here, person most knowledgeable and qualified

6    capacity -- are you aware of any literature within the

7    Jehovah's Witnesses earlier than 1981 that deals with

8    the subject specifically of child sexual abuse?

9         A.   Not to my knowledge.

10        Q.   Are you aware if there were any particular

11   policies or procedures in place prior to 1981 within

12   the Jehovah's Witnesses that dealt specifically with

13   the subject of child sexual abuse?

14        A.   Other than the policy that we would have

15   always had in that whenever it has come to the

16   attention of elders, or even to the office where I

17   work, the Service Department, even back in the early

18   '70s and early '80s, we would deal with them -- that

19   is, the victim -- in harmony with Bible principles in

20   caring for them, helping then.

21             The prevalence of child abuse has -- I'm sure

22   you are very well aware -- didn't really become a

23   national issue until, you know, the '90s -- or '80s,

24   '90s.  And as society began to recognize the problem

25   more and more, then our organization made adjustments

WTNY001444

1    in its policies, trying to strengthen our policies that

2    we already in place to a minimal or -- not "minimal,"

3    but a relative sense, probably in harmony with many

4    other religious organizations, maybe a little bit

5    better than most, but we have constantly tried to

6    improve our policies so as to protect our young people.

7         Q.   When you say the prevalence wasn't known,

8    have you looked at any of the literature, or for that

9    matter, contacted any of the federal governmental

10   agencies that were in existence in the early '70s that

11   were dealing with the issue of child sexual abuse on a

12   national level?

13        A.   I personally have not, but our publications

14   have frequently quoted these sources.

15        Q.   And is it correct that your publications, as

16   early as 1981 and '82, were quoting the sources

17   addressing the prevalence of child sexual abuse in the

18   general community?

19        A.   Yes.

20        Q.   While we are still on this subject, let's

21   kind of drill down on what we are talking about.

22             Is there in the Jehovah's Witnesses' policies

23   and procedures anywhere a definition of child sexual

24   abuse that you are aware of?

25        A.   We do have some definitions.  There's a March

WTNY001445

1    percent of those who were child abusers come within

2    either the family or close friendships.  So it was

3    alerting parents to the fact that it could be a

4    neighbor; it could be an uncle; it could be a cousin;

5    it could be a grandfather; it could be a father.  So it

6    was alerting parents to the dangers.

7           The last article in that series of articles

8    had to do with "You Can Protect Your Child," and it

9    offers some scenarios that parents can use with their

10   children in teaching them about their body and where

11   individuals should not touch them.

12          It had some "what if" scenarios, what if a

13   babysitter wanted -- said to you, "You can stay up late

14   and watch a movie if you get in the bathtub with me and

15   let me wash you," or what if someone said, "I would

16   like to undress you," that type of scenario.  It's

17   educational and for the purpose of training our

18   membership, as well as the public, as to the dangers

19   and what can be done to help.

20      Q.   And was it also to train your elders as

21   ministerial servants?

22      A.   Primarily the elders, yes.

23          MR. ZALKIN:  And, I'm sorry, Rocky, we kept

24   going without you.  I didn't see you leave.

25          MR. COPLEY:  Go ahead.

63

1           MR. COPLEY:  Objection; vague.

2           THE WITNESS:  We would have had procedures in

3     place, even in the early '80s, as to how to address

4     certain allegations made that an individual did abuse a

5     child.

6           Q.   BY MR. ZALKIN:  And where are those policies

7     contained?

8           A.   They are contained in general letters that

9     have been issued by the Branch Office.  They are in

10    principle outlined in the Bible in addressing issues of

11    that nature where there's an accusation made against

12    another individual.  Then there's a process that is set

13    up within the congregation to address those issues.

14          Q.   You said there were letters.  Did you include

15    any such letters in your production here today?

16          A.   Well, letters -- we are talking about what

17    time period again?

18          Q.   Again, prior to 1985 is what I'm talking

19    about.

20          A.   Prior to 1985?  I'm not certain of any

21    letters prior to 1985.  But just in a general procedure

22    we have outlined in the textbooks -- and I think you

23    have a copy there -- of addressing accusations, whether

24    it be child abuse, whether it be slander, whether it be

25    adultery, whether it be thievery.  We have that process

66

WTNY001457

1    to follow.

2         Q.   Okay.  And I'm not trying to put any words in

3    your mouth.  I just want to make sure I understand.

4              Is it fair for me to say that prior to 1985

5    there were no policies instructing elders on

6    specifically how to respond to an allegation of

7    childhood sexual abuse, while there were policies on

8    how to respond to an allegation of wrongdoing

9    generally?

10             MR. COPLEY:  Objection; vague, misstates his

11   testimony.

12             MR. MORENO:  I'll join in that.

13        Q.   BY MR. ZALKIN:  Did I misstate something?  Am

14   I saying -- am I correct in that?

15        A.   You are correct.  I'm just trying to think of

16   any specifics.  I think we would have dealt with the

17   issue of child abuse in that time period the same as we

18   would have dealt with any other type of wrongdoing.

19             MR. McCABE:  Is this a good place for a

20   break?

21             MR. ZALKIN:  If you give me two seconds to

22   follow up.

23        Q.   BY MR. ZALKIN:  How was child abuse defined

24   prior to 1985?

25             MR. COPLEY:  Objection; vague.

WTNY001458

1   is alert and conscious of what is going on in the

2   congregations would be cognizant of individuals, male

3   or female, that would be, in effect, grooming others

4   for the purpose of having sexual relations or

5   inappropriate conduct with a child.  So I don't know

6   that we, from my perspective, would need a definition.

7        We would be alert to individuals that would

8   be engaging in conduct that would be inappropriate for

9   an adult to be having with a child.

10   Q.   And the expectation was that in the '70s,

11   early '80s, people understood that, correct?

12        MR. COPLEY:  Objection; vague.

13   Q.   BY MR. ZALKIN:  Elders would have understood

14   that?

15        MR. COPLEY:  Objection; speculation.

16        THE WITNESS:  Some elders would be very alert

17   to that.

18   Q.   BY MR. ZALKIN:  But not all?

19   A.   Some elders would be very alert to that,

20   others may not be as cognizant as others, but that's

21   part of the qualifications of an elder is to be sound

22   in mind and reasonable.

23        Have some elders made mistakes?  Yes.  Jesus

24   appointed twelve apostles.  Judas turned traitorous.

25        So there have been individuals that have made

70

1    mistakes, but the qualifications of an elder would be

2    to be alert to those things.

3         Q.   That would be the expectation?

4         A.   That would be the expectation.

5         Q.   And that was the expectation in the '70s and

6    in the '80s?

7         A.   Yes.

8              MR. ZALKIN:  Thank you.  We can take a

9    break.

10             (Lunch break was taken from

11             12:40 P.M. - 1:50 P.M.)

12             MR. ZALKIN:  So we are back on the record.

13        Q.   BY MR. ZALKIN:  I would like to ask you -- I

14   want to follow up.  We were talking just before the

15   break a little bit about grooming behaviors and what

16   might have been known about that or not known about

17   that.

18             What I would like to talk about with you now

19   is sort of how -- what the response to a complaint

20   would be or would have been back in that same time

21   period that we were focused on a little earlier, the

22   late '70s and early'80s.

23             If it came to the attention of an elder that

24   there was an allegation by someone that a child had

25   been sexually abused by a publisher or someone

71

1        Q.   Sure.  This is from the "Pay Attention to

2   Yourselves and All the Flock," page 113.  This is from

3   the 1991 edition, and I'm looking at six paragraphs

4   down.

5        MR. MORENO:  I'm going to make a general

6   objection:  That he continue to answer questions on

7   this subject to this whole line of questioning about

8   repentance, et cetera, as being inadmissible based on

9   the First Amendment.  It's dealing with internal church

10  disciplinary proceedings which a court has no

11  authority, based on the First Amendment, to get into in

12  this case or any other case.

13       THE WITNESS:  Do I agree with the statement?

14       Q.   BY MR. ZALKIN:  Yes.

15       A.   Yes.  And the key expression is "sincere

16  repentance," and that is the responsibility of the

17  judicial committee in determining whether his

18  expressions are sincere and weighing that with the

19  gravity of sin.  I don't think even that statement

20  disregards that there may be some sins that are

21  egregious, and the extent of the sin is certainly a

22  determining factor.

23       Q.   You said that there were some changes that

24  came about at some time in the process of how victims

25  are questioned or how the accused are questioned.  When

89

WTNY001480

1    did those changes come about?

2           And then I'll ask you some follow-up, if you

3    recall.

4        A.    Changes in regard to the victims and how we

5    treat the victims?

6        Q.    I believe your testimony, unless I didn't

7    catch it right, I think I was asking you about how you

8    respond and how you investigate, and you said that

9    there had been changes made over time on how you

10   question victims or how you question the accused.

11          I'm just trying to get a sense of when those

12   changes first came about, and then we'll talk about

13   what they were.

14       A.    Yeah.  In December of 1985 we encouraged

15   our -- I say "encouraged" -- we wrote to our traveling

16   overseers/traveling ministers and mentioned to them

17   that if they -- if some elders inquire about child

18   abuse issues, then have them contact the Branch

19   Office.  That was one change as we became more aware of

20   it being an issue and a concern.

21          In July, 1989, we wrote specifically to our

22   Bodies of Elders and mentioned to them specifically

23   that they could contact a Branch Office if they become

24   aware of a child being abused.  Those are the types of

25   changes.

**CONFIDENTIAL INFORMATION**

WTNY001481

1    wanted to make sure that we complied with the laws of

2    the states and see whether the -- because I think about

3    that time some states were enacting laws that required

4    ministers to report these abuses to the authorities, so

5    we wanted to ensure that we complied with the law.

6        Q.   Do you know why -- was it the position --

7    strike that.

8            Was it the position of the Jehovah's

9    Witnesses the policy -- strike that.

10           Was it the policy of the Jehovah's Witnesses

11   not to report to law enforcement unless they were

12   mandated to report to law enforcement --

13           MR. COPLEY:  Objection; vague.

14       Q.   BY MR. ZALKIN:  -- in the time frame, say, of

15   1980 to 1990?

16           MR. MORENO:  Objection; vague and ambiguous

17   as to what you mean by policies of Jehovah's

18   Witnesses.  Are you talking about individual members?

19   Are you talking about elders reporting?  Who are you

20   talking about?

21           MR. ZALKIN:  About elders reporting.  I'm

22   sorry.

23       Q.   BY MR. ZALKIN:  Was there a policy within the

24   Jehovah's Witnesses' organization that elders were not

25   to report to law enforcement an allegation of child

92

WTNY001483

1  sexual abuse unless they were mandated reporters or

2  mandatory reporters in the jurisdiction where the abuse

3  occurred?

4      A.   Not to my knowledge.

5      Q.   To your knowledge, was it common for elders

6  to report to law enforcement if they received a

7  complaint of child sexual abuse in that time frame, in

8  the 1980s, early '90s?

9      A.   I don't know that I can answer that.  I

10 really don't know.  Some, perhaps, did.  If there

11 weren't laws that required such at the time, I can't

12 imagine elders feeling the need to report that.  Unless

13 they felt there was a real threat or danger to a child,

14 they might report it, but that's supposition on my

15 part.

16          MR. COPLEY:  Just so I'm clear, we are

17 talking about -- when you are talking about complaints

18 of child sexual abuse, you are talking about a

19 situation where the perpetrator denies doing it, so all

20 you have is just a simple accusation?  Is that what you

21 mean by "complaints"?

22          MR. ZALKIN:  Either way.

23      Q.   BY MR. ZALKIN:  Whether you have an

24 accusation that has been confessed to or denied, are

25 you aware of any practice by elders of contacting law

93

WTNY001484

1   enforcement to report it to law enforcement and allow

2   them to conduct an investigation?

3        A.   I'm not aware of a practice.  What

4   individuals would do based on their own conscious and

5   the need to protect children, they perhaps could have.

6        Q.   And similarly, there was not a policy that

7   they should not contact law enforcement?

8        A.   Not to my knowledge.

9        Q.   You have brought some documents here.  I

10  would like to get some understanding of what you

11  brought here to us.

12            I see a chart.  There's a notebook entitled

13  "Historical Development of Jehovah's Witnesses' Child

14  Abuse Policy."

15            Can you tell me generally what this notebook

16  is intended to represent?

17       A.   It is a document that shows the evolution or

18  the development of the policies from, I think, back in

19  the '60s until the current time, how we have endeavored

20  to improve on our child abuse policies in order to

21  protect our children and to help parents, to educate

22  parents on the dangers of child abuse and how to deal

23  with situations where the reality is that it happens.

24  So how do they help their children, how do they educate

25  their children, that's the purpose of this -- educating

WTNY001485

1    the public, educating the membership.

2           There are documents that show that we put

3    forth effort to educate our elders and what they can do

4    to provide solace and consolation to somebody who has

5    been abused, what they can do to be alert to those who

6    are child abusers and to, when they are in the

7    congregation, monitor their activities.

8       Q.   What were the policies of how to monitor the

9    activities of someone who is a confessed child sexual

10   abuser?

11          MR. MORENO:  I'm sorry, I didn't catch it.

12          MR. COPLEY:  Objection; vague.

13      Q.   BY MR. ZALKIN:  What was the policy for

14   monitoring someone who is a member of the congregation

15   who was a confessed child abuser repentant -- not

16   disfellowshipped, reproved and continuing to be a

17   member, what was the policy for monitoring that

18   individual?

19          MR. MORENO:  What time period?

20      Q.   BY MR. ZALKIN:  In the late '70s, early

21   '80s.

22      A.   I don't know that we had a policy.

23      Q.   At sometime was there a policy initiated to

24   monitor a --

25      A.   Yes.

95

WTNY001486

1     Q.    "Yes"?

2     A.    Sorry.

3     Q.    Let me finish the question.

4     A.    Sorry about that.

5     Q.    At some point was there a policy initiated

6  for monitoring a confessed child abuser who was not

7  disfellowshipped?

8     A.    Yes.

9     Q.    What was that?  When was that and what was

10  it?

11     A.    There are several letters in that

12  documentation, one of which is this document here

13  (indicating).

14     Q.    Which one is that?

15     A.    March 14.

16     Q.    '97?

17     A.    1997.

18     Q.    Okay.  Can you point specifically to me what

19  they have to do?

20     A.    You want me to read to you the pertinent

21  information?

22     Q.    Yeah.

23     A.    So this is the March 14, 1997 letter to the

24  Bodies of Elders.  On page 2, paragraph 3, it says:

25          "What should elders do when a former child

96

1      molester moves to another congregation?  As

2      outlined in the February 1991 Our Kingdom

3      Ministry 'Question Box' and the August 1,

4      1995, letter to all Bodies of Elders, our

5      policy is always to send a letter of

6      introduction when a publisher moves to

7      another congregation.  It is imperative" --

8      and this is in italics -- "it is imperative

9      that this be done when one who is known to

10     have been a child molester moves.  The

11     secretary should write on behalf of the

12     elders to the new congregation's body of

13     elders and outline this publisher's

14     background and what the elders in the old

15     congregation have been doing to assist him.

16     Any needed cautions should be provided to the

17     new congregation's body of elders.  This

18     letter should not be read to or discussed

19     with the congregation.  This information

20     should be kept in the congregation's

21     confidential files where it can be reviewed

22     by any elder.  The elders should send a copy

23     of this letter to the Watchtower Bible and

24     Tract Society in one of the 'Special Blue'

25     envelopes."

97

WTNY001488

1      Q.   So that's what happened and what should be

2   done if the perpetrator moves to a different

3   congregation?

4      A.   Correct.

5      Q.   What happens and what should be done if he

6   doesn't move and stays in the congregation in which the

7   abuse occurred?

8      A.   Could I refer to this publication?

9      Q.   You can refer to anything you like.

10      A.   Even prior to the March 14, 1997 letter, this

11   was a letter "To All Bodies of Elders," August 1,

12   1995.

13           And it says:  "It would be appropriate to

14   talk" --

15           MR. MORENO:  Could you identify the

16   paragraph, please, and page.

17           THE WITNESS:  Sorry.  This would be page 1,

18   paragraph 4:

19              "It would be appropriate to talk very

20              frankly to a former child abuser, strongly

21              cautioning him as to the dangers of hugging

22              or holding children on his lap and that he

23              should never be in the presence of a child

24              without another adult being present.  This

25              may prevent putting that one in the way of

98

1     temptation or unfounded accusation.  At the

2     same time, it is good to remember that the

3     Bible, at Mathews 12:31 and 1 Corinthians

4     6:9-11, shows it is possible for a person to

5     stop his or her wrongful course, repent, and

6     thereafter live in harmony with God's

7     righteous standards.  This is true of all

8     wrongdoers - even a former child abuser."

9          The majority of the letter is dealing with

10    what could be done to protect children from a brother

11    or a sister in the congregation who had been guilty of

12    child abuse in the past.

13         I can see you have a copy of it.

14         Q.   Yeah.  So "talk frankly" to that perpetrator,

15    make sure they don't hold a child, correct?

16         A.   Correct.

17         Q.   Make sure they are not alone with the child,

18    correct?

19         A.   Yes.

20         Q.   Recognize that they might be repentant and

21    not repeat offense; is that correct?

22         A.   Yes.

23         Q.   And if you go to the next page, on page 2, at

24    the end of that first paragraph it says, "Considerable

25    time should always pass before a former child abuser is

**CONFIDENTIAL INFORMATION**

WTNY001490

1    used, if ever."

2              Do you see that?

3         A.    Yes.

4         Q.    Why is that?  Why should they wait?  Why do

5    they have to wait before they could use a former child

6    abuser?

7         A.    Because it's an organizational policy that

8    has been established, that anyone who has abused a

9    child, you want to be very, very cautious about

10   extending privileges to that one again.

11        Q.    Why?

12        A.    Because there may be a tendency or there may

13   not be a tendency to abuse again, but the idea is to be

14   very careful.  You have a variety of different types of

15   individuals.

16             You have a situation where, for example, a

17   17-year-old had consensual sex with a 16-year-old.

18   From a legal perspective, that's still regarded as

19   child abuse, but the situation is quite different than

20   a man who is 25 and has sex with a nonconsenting child,

21   a 10-year-old.  So you want to be very careful about

22   putting them in a position of being used again.

23             The latter example is certainly not as

24   egregious as the first example.

25        Q.    If the elders in a congregation had an

WTNY001491