1

```
 1          IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF MONTANA
 2                  BILLINGS DIVISION

 3    Cackaert, et al.
                             ) No. CV-20-52-Blg-SPW
 4                           ) No. CV-20-59-Blg-SPW
          Plaintiffs,        )
 5                           )        TRANSCRIPT
                             )
 6    v.                     )           OF
                             )
 7    Watchtower Bible and   )        PROCEEDINGS
      Tract Society,and      )
 8    Watch Tower Bible and  )
      Tract Society of       )
 9    Pennsylvania,          )
                             )
10    Defendants.            )
                             )
11

12    The above-entitled matter came on for hearing
      before the Hon. Susan P. Watters, United States
13    District Judge, on June 23, 2021.

14
                      APPEARANCES
15
      For the Plaintiffs:      MR. ROBERT L. STEPANS
16                             MR. RYAN R. SHAFFER
                               MS. KATY GANNON
17                             Meyer Shaffer &
                               Stepans,
18                             PLLP
                               430 Ryman Street
19                             Missoula, MT 59802
                               406 543 6929
20                             Rob@mss-lawfirm.com

21

22

23              RICHARD L. MATTSON
              CERTIFIED COURT REPORTER
24                816 Avenue F
                Billings, MT 59102
25                (406) 698-3163
```

```
 1              APPEARANCES (Cont'd).

 2    For Defendants:        MR. JON A. WILSON
                             MR. AARON M. DUNN
 3                           Brown Law Firm
                             PO Box 849
 4                           Billings, MT 59103
                             406 248 2611
 5                           Jwilson@brownfirm.com

 6                           MR. JOEL M. TAYLOR
                             (By Phone.)
 7                           MILLER McNAMARA & TAYLOR
                             PLLP
 8                           100 South Bedford Road
                             Suite 340
 9                           Mount Kisco, NY 10549
                             845 288 0844
10                           Jtaylor@mmt-law.com

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

# C O N T E N T S

By Mr. Stepans................................5

By Mr. Wilson.............................26

By Mr. Stepans...........................47

1          (Open court.)

2          DEPUTY CLERK:  The court has set aside

3    this time to hear the matter of CV-20-52-BLG-SPW,

4    Caekaert versus Watchtower Bible and Tract

5    Society of New York, and Cause CV-20-59-BLG-SPW,

6    Rowland versus Watchtower Bible and Tract Society

7    of New York.  This is time set for motion hearing

8          THE COURT:  And if counsel for the

9    plaintiffs could identify themselves for the

10   record.

11         MR. STEPANS:  Good morning, Your Honor.

12   If it pleases the court, Rob Stepans on behalf of

13   all plaintiffs.

14         THE COURT:  Thank you.  And for

15   defense.

16         MR. WILSON:  Your Honor, Jon Wilson and

17   Aaron Dunn on behalf of defendants Watchtower

18   Bible and Tract Society of New York and Watch

19   Tower Bible and Tract Society of Pennsylvania.

20   And we have pro hoc vice counsel, Joel Taylor,

21   appearing by telephone as well.

22         THE COURT:  Thank you.  So we are here

23   today on the plaintiffs' motion to compel

24   jurisdictional discovery.  So, Mr. Stepans, I'll

25   let you proceed.

1          MR. STEPANS:  Thank you, Your Honor.

2     Do you prefer that I speak from the podium?

3          THE COURT:  You don't have to.  You can

4     speak from counsel table there.

5          MR. STEPANS:  If it's okay, I would

6     like to go to the podium.

7          THE COURT:  That's fine, too.

8          MR. STEPANS:  I apologize, I didn't

9     intro co-counsel, Ryan Shaffer, who, I believe,

10    has already appeared before the court in this

11    matter.

12         THE COURT:  Yes.

13         MR. STEPANS:  And Katy Gannon with us

14    at counsel table.  She is a law student at the

15    University of Montana Law School, and works for

16    us.

17         THE COURT:  Okay.  Obviously, I have

18    read the briefing, so maybe you could hit the

19    high points, Mr. Stepans.

20         MR. STEPANS:  Absolutely, Your Honor,

21    I'll do my best.  I was looking at this last

22    night, trying to figure out how to explain what I

23    would consider the different categories that fall

24    within this motion to compel.  Because the last

25    thing I want to do is be here in front of the

1    court arguing a motion to compel and dragging the

2    court into our discovery disputes, but as the

3    briefing indicates, and as these categories of

4    discovery indicate, really, plaintiffs, really,

5    were given no other alternative other than to

6    come to the court to a seek assistance in order

7    to proceed with the discovery that's been ongoing

8    for six months here in the jurisdictional phase.

9           The first category, Your Honor, I would

10   put this into general discovery rules.  And what

11   we are asking the court to do in this regard is

12   to order that the defendants comply with the

13   rules of discovery as it pertains to answering

14   and producing documents in accordance with those

15   rules.

16          In particular, on that front, Your

17   Honor, the RFAs, we briefed this extensively,

18   it's not okay to rewrite the RFA and then choose

19   your own, I guess, answer, as it pertains to

20   that.  The RFAs are crafted in a particular way,

21   as the court knows, the rules are designed to try

22   and allow the person asking the RFA to glean

23   information from that.  And, really, that's the

24   purpose of all this discovery.  But as it stands

25   now, it's been almost impossible to understand

1    why the defendants believe that they are subject

2    to a different set of discovery rules as it

3    pertains to the RFAs and the objections.

4          On that front, Your Honor, I would point

5    the court's attention to plaintiffs' initial

6    brief.  So those are a phase and the general

7    objections that are stated from the defendants,

8    and then the method in which they go through and

9    answer to internally reference those other

10   objections.  It becomes a compounding problem in

11   order to understand exactly what they are saying.

12   So we are asking for clarity on that point.

13         The time period, Your Honor, I'm

14   going -- I'm excited to hear counsel for the

15   defendant explain why the time period objection

16   stands, because we have demonstrated, I guess --

17   excuse me.  The deposition of James Rowland was

18   taken, and Mr. Rowland was an elder in Hardin.

19   He indicated a document that he used and referred

20   to in the '70s, and it was published in 1972.  So

21   as a practical matter, obviously something

22   couldn't be read, used, relied upon or in effect

23   until the date that it was published.  So just

24   like in the law, if we have a law passed in 1972

25   that's still in effect in '76, we don't say,

1   well, the law doesn't matter, it matters in 1976.

2   We have to look back to understand what's guiding

3   us in 1976 if the '72 law is still in place.

4          I think defendants' briefing even

5   acknowledges that by virtue of the way they cite

6   their case.  But what I would say, Your Honor,

7   and I'm happy to go into more detail, but the way

8   that this is set up is that we have said the

9   general abuse -- excuse me, the general dates

10  that this abuse took place are '73 to '95.  We

11  are not trying to hamstring ourselves

12  inappropriately.  What we are trying to do is

13  economize discovery in a meaningful way.  What

14  we've learned is that the 1972 Branch Manual was

15  the manual that was being used in Hardin by the

16  elders throughout the '70s.  So the suggestion

17  that a publication from 1972 is not relevant

18  during those years simply because we agreed to

19  the 1973 date, it defies logic, it doesn't go

20  along with what we are trying to do here in terms

21  of discovery, which is that we discovered certain

22  things, and then we ask certain questions based

23  upon that.  The time period is reasonable.

24  Discovery is not bound by those dates as it

25  pertains to publication, particularly when we are

1    relying on it going forward.

2              THE COURT:  What do you think, talking

3    about that time frame, what do you think about

4    the defendants' argument that documents prepared

5    or published after 1995 couldn't be relevant to

6    the time frame of 1973 to 1992?   Doesn't that

7    seem logical?

8              MR. STEPANS:  That part does seem

9    logical.  The reason we've asked the questions

10   the way we have, I'm not sure how familiar the

11   court is with the documents that we are working

12   through, but they reference one another often.

13             So, for example, there's a quote from

14   this 1972 -- I actually wanted to share this with

15   the court, because it is a fair point to say

16   those documents that are published afterwards

17   probably do not have the specific relevance that

18   we are talking about.  But are they discoverable?

19   Could they lead to discoverable information?   I

20   think absolutely that's true, because you have an

21   evolution of the publications but they always

22   refer back.  So things that are changed over time

23   matter.  For example, if in 1995 they publish a

24   new manual that just drops off some of the things

25   that were going on before, or it provides a new

1   explanation, we feel that's very important.  And

2   part of the reason that's important, Your Honor,

3   is that there is an evolution of vernacular that

4   the defendant corporations have used over time.

5   They will use words interchangeably.  For

6   example, the society, or Watchtower Tract and

7   Bible Society, without including which parent

8   company it's referring to.  There are references

9   to the governing body.  Over time those

10  definitions and those committees, whatever they

11  are, take different forms throughout the

12  publications.

13          So what we are trying to understand is

14  what is the message from these, where did it drop

15  off, what was in play during the relevant time.

16  And I'm not suggesting that everything -- that

17  there would be much after the 1995 period that

18  would be relevant, but I do believe where we have

19  continuation of publications, which are providing

20  guidance to the local congregations, my position

21  is that that should be discoverable.

22          And in part the defendants have brought

23  this into play by submitting multiple affidavits

24  at the beginning to encourage the court to

25  dismiss the case, and those affidavits suggest

different things. They also suggest that if we
parse it out, it's difficult to say temporally
what Mr. Bromley was talking about.  Are these
things always in play?  Is he using this moment
in time right now to say?  Because the documents
don't line up with what that affidavit says.

So that's why we are asking for those
things is we feel like we are on our own, in
terms of pulling this information together and
understanding what it means.

I don't know if that's a very -- does
that answer your question?

THE COURT:  Well, for example, I guess
what you're saying is a document that was
published in 1996 could reference a document that
was published in 1975, for example.  But if you
had the document that was published in 1975,
because it's within the time frame that the
defendants think your discovery is governed by,
why would you need the 1995 or '6 document,
whatever he said?

MR. STEPANS:  Understood, Your Honor.
Once, again, I think it is -- it's trying to
understand the vernacular and the vocabulary.
Because it does change.  The 1977 document for

1    sure -- let me give the court an example.

2              THE COURT:  Okay.

3              MR. STEPANS:  And I have to say I

4    understand the court's question.  I think it's a

5    little bit problematic in order to answer it

6    because our position is that this is discoverable

7    information because it refers back, it fills in

8    gaps, and that is our reading of the way that

9    these documents have evolved over time.  So, for

10   example, I give the court this example.  This is

11   from the WTPA0002 is the bates. I'm sorry, I

12   can't pull that up.

13              But at any rate, the first two full

14   paragraphs of this publication from WTPA say

15   explicitly, and I thought this was interesting

16   because it sort of explains --

17              THE COURT:  What is the document you're

18   looking at?

19              MR. STEPANS:  57-3.

20              THE COURT:  57-3.  Okay.

21              MR. STEPANS:  And otherwise identified

22   as WTPA0002.  So this --

23              THE COURT:  Is it entitled, Kingdom

24   Ministry School Course?

25              MR. STEPANS:  Entitled Kingdom Ministry

School Course.  Here's an example, Your Honor, the first two paragraphs.  You take the ministry school courses that have been arranged by the Watchtower Bible and Tract Society to help overseers become better equipped.

The second paragraph.  This textbook does not present any new instructions or information, but it does provide a careful compilation of materials printed in the Society's publication and presented at assemblies in recent years.

Okay.  So this 1972 document indicates that the materials have been used in recent years, meaning prior to 1972.

Now, it's not up to me to interpret their language so much, but it just says what it says.  So when I read that, certainly something published in 1996 that has the same admonition at the beginning saying this isn't new information, but this is stuff that's been compiled, it's been used, and it's been in the mix in the last -- in recent years.

So what that is telling us this is a retroactive book, basically, of what's been in play and what appears to be instruction going

1    forward from the defendant corporations.

2          Does that make more sense, Your Honor,

3    in terms of how we are looking going beyond the

4    time period on the back end?  .

5          THE COURT:  Right.  You can understand

6    the defendants' position, perhaps, that it would

7    certainly be very burdensome for us to have

8    produce every document that's ever been

9    published, for example, playing devil's advocate.

10   So what would the plaintiffs think would be the

11   cut-off date for these sorts of publications?

12         MR. STEPANS:  And this is where

13   plaintiffs' counsel hates to get pinned down.

14   Your Honor, my hope is that we have come to the

15   court demonstrating that we have tried to be

16   pretty reasonable in this process to try to

17   gather materials that are reasonably calculated

18   to lead to discoverable material.  That's why we

19   are putting it within that range.  I can't say --

20         THE COURT:  I'm asking you what range.

21         MR. STEPANS:  Based on what I have

22   seen, I think it would make sense to just a

23   couple years past the '95, because it appears

24   that the documents that would be printed '95,

25   '96, '97 would all have been in play in the years

1    preceding that, which would fall within our time

2    frame.  I can't answer for sure, but based on

3    everything we've seen, it seems like a couple

4    years would be more than adequate.

5           And I don't anticipate that's the kind

6    of discovery that's going to lead to a bunch of

7    other discovery.  That really is plaintiffs doing

8    their diligence to understand the full range of

9    what was happening within the time period when

10   the abuse occurred, and what direction was being

11   given by the defendant corporations during that

12   time period.  So our position is that

13   necessitates definitely looking back.

14          And for example --

15          THE COURT:  If I could interrupt, so we

16   are talking just about the jurisdictional

17   discovery.  So it wouldn't be necessarily what

18   direction, for example, WTPA was given to Hardin

19   congregation, but simply whether or not they were

20   giving them direction, would that be more

21   accurate in order to determine whether there is

22   jurisdiction?

23          MR. STEPANS:  I think -- yes, that's

24   correct, Your Honor.  There's also the question

25   of alter ego, I think.  So from our perspective,

1    I guess I am lumping all these together.  But

2    agreed, Your Honor.

3             THE COURT:  I think -- we don't always,

4    maybe not even often, kind of bifurcate discovery

5    like this, where we have a jurisdictional

6    discovery period and then just general discovery.

7    So I think it's easy to kind of get caught up in

8    what do I need for the jurisdictional issue and

9    what do I need for my case in general.  Certainly

10   those things will overlap ultimately, but it is a

11   little narrower scope at this juncture.

12            MR. STEPANS:  Agreed, Your Honor.  Yes,

13   absolutely.

14            THE COURT:  Okay.

15            MR. STEPANS:  I think, I would say out

16   of necessity because the alter ego we believe

17   that is a legitimate basis for personal

18   jurisdiction on WTPA, and the documents we have,

19   it certainly does lead us down a path that looks

20   a lot like general discovery because we are

21   trying to discover the nature of the

22   relationships, what are they doing independently,

23   what are they doing together, and it does take us

24   further down that road.  But absolutely we agree

25   that we should be narrow.

1          THE COURT:   Right.   By my question I

2     didn't mean to imply that I have basically

3     determined that your alter ego argument doesn't

4     have any merit.   I was just thinking simply about

5     the Pennsylvania organization.   But I understand

6     your alter ego argument, too.

7          MR. STEPANS:   Thank you, Your Honor.

8     I answer that way because my law partner tells me

9     I am not specific enough.   So I agree with that

10    and I do need to be particular.

11         The other two categories, Your Honor,

12    that I am kind of conceding of this, the next one

13    is interrogatories.   I hate coming to the court

14    asking to have an order to clarify the

15    interrogatories, but what I would ask the court

16    to do in this regard, I point the court to

17    Document 57-6, this is a pleading -- excuse me,

18    this is discovery, defendant Watchtower Bible and

19    Tract Society of New York's responses to

20    plaintiffs' second set of jurisdictional

21    discovery.

22         THE COURT:   Okay.   I have that pulled

23    up.

24         MR. STEPANS:   Your Honor, I would just

25    ask the court -- when I see these

1   interrogatories, and a big part of the reason
2   that we are here is we have to rely on these
3   defendant corporations to give us this
4   information.  They have it, and some of it we
5   have been able to obtain in other places.  But in
6   terms of the interrogatories, when I look at
7   these answers to the interrogatories, and just,
8   for example, this is Interrogatory No. 7 on page
9   5 of 7 on Document 57-6, the question is,
10   identify each person who worked in the church's
11   legal department between 1960 and 1990.
12   Objection.  Please refer to the general objection
13   above for an explanation as to why the time
14   period requested in this interrogatory is
15   improper.  Also, vague.  Further, overbroad.  Not
16   reasonably calculated.  Infringes on the privacy
17   rights to third parties.
18           So it goes back to my first request,
19   that the defendants be ordered to answer in
20   accordance with the rules.  But as I read`all
21   those discovery responses, in spite of the
22   representations by counsel of all the efforts
23   that have been made, this does not appear to me
24   to be a defendant that wants to be forthcoming in
25   the discovery process, that is eager to get the

1 ball rolling and is eager to answer in

2 interrogatory form the questions that are asked.

3          Every single one of these creates a

4 morass of boilerplate objections and dodgy

5 answers.

6          THE COURT:  So with regard to

7 Interrogatory No. 7, of course, their first

8 general objection is that you're talking about a

9 time frame that exceeds the scope of 1973 to

10 1992.  And then they list their other objections.

11          So did they provide anything in

12 response to this Interrogatory No. 7, do you

13 know, off the top of your head?

14          MR. STEPANS:  There was a

15 supplementation at some point but I don't think

16 that it was to this.  We did get a few names.

17 Your Honor, it goes on, Interrogatory No. 8

18 refers us to other documents, which -- it's

19 hampering our ability to proceed in a meaningful

20 way where we can ask an interrogatory and follow

21 up with other discovery questions in order to

22 move this along.

23          THE COURT:  So going back to

24 Interrogatory No. 7, your argument is, okay, the

25 defense has listed all of these objections as to

1   why they shouldn't have to answer this question

2   or provide these -- this information, and then if

3   I understand your brief, they are supposed to say

4   whether or not they are withholding information

5   based on these; that they actually have some

6   information that's pertinent to your

7   interrogatory but they are not providing it

8   because of these objections, correct?

9            MR. STEPANS:  That is correct.  And we

10  don't know which one it is.  They say it's just

11  time period.  But they could answer within the

12  relevant time period if they wanted to.

13           THE COURT:  Right.

14           MR. STEPANS:  But they don't appear to

15  want to do that.  They go further.  The

16  representation to the court is defendant

17  corporations are only withholding information and

18  material pursuant to a time period objection.

19  Our position is that does not bear out in what

20  they have sent to us, or submitted to the court.

21  It highlights, Your Honor, and I understand the

22  difficulties in the court trying to order someone

23  to answer an interrogatory appropriately because

24  this is information that they have, the problem

25  is it doesn't appear they are making an effort to

1   do so, and as opposed to hoping to provide this

2   information, are hoping to keep it from us.  As a

3   result of that, the interrogatory piece of this,

4   we are asking the court to order that the

5   defendants, these defendant corporations,

6   participate meaningfully in that part of the

7   discovery process.

8           That rolls in, I guess, what I would

9   say just a general category of our complaint

10  here, and that's the duty upon the defendants to

11  do a diligent search in response to these

12  discovery requests.  And our reply brief, Your

13  Honor, kind of highlights the biggest -- the

14  place where we become cynical, because we have

15  to, if we are going to represent our clients and

16  prosecute this case effectively, this 1972

17  Kingdom Ministry School Course that James Rowland

18  in his deposition identified as kind of the thing

19  that he relied on as it pertains to direction in

20  handling allegations of sexual abuse, it's a big

21  deal.  It's pretty important.  It is relevant to

22  this case in basically every way.  And if we

23  hadn't been able to secure it by other means,

24  defendant corporations would be completely happy

25  to hide it from us.  And that's why we are here.

1           So as a result of that back and forth,

2    and certainly I don't know how much the court

3    wants to inquire with defendants about that, but

4    I will leave our briefing where it's at as it

5    pertains to that piece of it.  And it goes --

6           THE COURT:  So can you tell me kind of

7    generally, did you submit an interrogatory to the

8    defendants, the answer to which would have been a

9    disclosure of this 1972 WTPA document, the

10   Organization of Kingdom Preaching and Disciple

11   Making?

12          MR. STEPANS:  I believe there was an

13   RFP that was, and it was very specific

14   identifying this document.

15          THE COURT:  By name.

16          MR. STEPANS:  They had it.  And they

17   hadn't given it to us.  We knew it existed.  We

18   asked for it by name.  And they turned it over

19   after -- I don't know if it was after we filed

20   our motion but it was after Mr. Rowland's

21   deposition.

22          THE COURT:  Do you recall what their

23   response was to your request for that document?

24          MR. STEPANS:  I do not, but I will have

25   someone find it so I can tell you.

1          Co-counsel indicates that the time

2    period objection, I think that's right, and we'll

3    run it down.

4          THE COURT:  Okay.

5          MR. STEPANS:  Your Honor, in terms

6    of -- there are two things on this last point in

7    terms -- did you want to inquire more on that?

8          THE COURT:  No.  No, thank you.

9          MR. STEPANS:  The duty upon the

10   defendants to diligently search -- okay --

11   Document 67, Your Honor, both corporate

12   defendants' response brief, and I'd point the

13   court to, let's see, page 33 of 38, and page 26,

14   Mr. Wilson's pagination, I believe.

15         THE COURT:  Okay.  I'm on page 38, or

16   33, I beg your pardon.

17         MR. STEPANS:  Okay.  WTPA and WTNY

18   should not have to undergo the burdensome task

19   describing efforts for searching requested

20   documents.

21         We would request that they explain why

22   that would be burdensome in terms of describing

23   the efforts one made.  There's different ways to

24   search for things, and I think in the course of

25   our legal careers we've all had cases where

1    things were hard to find or they disappeared or

2    there was a flood or a lot of time has passed.

3    It's entirely appropriate for plaintiff to

4    inquire as to what the nature of the search was

5    when, for example, other documents come to us

6    from other places and defendant corporations say

7    that they don't have it, can't find it, but they

8    don't describe what they did to look for it.

9    That would be one thing if they provided us with

10    a detailed list of folks with knowledge or

11    information.  If they would have answered these

12    interrogatories, it's sort of a different story

13    because we could do these depositions and ask all

14    the questions.  But as it pertains to us asking

15    them to verify how hard they looked for some of

16    this stuff, we don't want to have to be here, but

17    when such like the 1972 document comes forward,

18    it's impossible not to feel that way.

19          And then the last paragraph on page 33

20    of defendant corporations' briefing, this is a

21    quote.  If plaintiffs believe some documents or

22    information exist that has not been produced,

23    plaintiffs are welcome to argue as much.

24          I think in spite of defendant

25    corporations real efforts to put this on

1    plaintiffs as it pertains to what we need to do

2    to try and find their documents outside in the

3    world, I disagree that's our responsibility.  If

4    the defendants do not participate meaningfully in

5    discovery, then, in a case like this, without the

6    court's help, just by sitting on it they could

7    get out of all of it because they hold almost all

8    the documents.  It's a piece of -- it miraculous

9    that we would be able to get some of these

10   documents.  I mean, if the court can imagine the

11   different kind of a case where the plaintiff

12   would have to go find its own, like,

13   organizational manuals of a company or a

14   corporation, go and discover on our own who the

15   body of elders were, go and discover on our own

16   find all these documents outside in the world,

17   that just doesn't happen.  We have to rely on

18   them.  They haven't done it.  So we are here

19   asking you to hold them to it.

20          Subject to any other questions, Your

21   Honor, I think I do need -- oh, if could reserve

22   the rest of my time to reply subject to any

23   questions by the court.

24          THE COURT:  Sure, I will give you an

25   opportunity to rebut or reply.

1          MR. STEPANS:  I'll be very, very brief.

2     Thank you, Your Honor.

3          THE COURT:  Mr. Wilson, are you arguing

4     on behalf of the defendants?

5          MR. WILSON:  I am, Your Honor.  Thank

6     you.  May it please the court, and counsel, Your

7     Honor, for brevity purposes I will be referring

8     to Watch Tower Bible and Tract Society of

9     Pennsylvania as WTPA, and Watchtower Bible and

10    Tract Society of New York as WTNY.

11         So, Your Honor, there are three general

12    objections that have been raised in the course of

13    discovery.  And those three general objections

14    are efforts by WTPA, the first one to make clear,

15    it was not waiving its claim that is not subject

16    to personal jurisdiction by providing discovery

17    responses generally.  The second was that WTPA

18    was not waiving its claim that it's not subject

19    to personal jurisdiction by providing answers and

20    responses going beyond the scope of

21    jurisdictional discovery.  And the third, that

22    the request seeking information beyond the scope

23    of the relevant time limitation is improper.

24         Now, Your Honor, I think you hit the

25    nail on the head earlier when you brought up the

distinction here that we are not currently in
general discovery, we are in jurisdictional
discovery.  So the only focus of discovery at
this point is TWPA's motion to be dismissed for
lack of personal jurisdiction over it.

Now, plaintiffs' argument, contrary to
that, is the WTPA is subject to specific personal
jurisdiction.  Specifically, they've identified
subpart 4B1(b) of the Montana Rules of Civil
Procedure, Montana's long arm statute arguing the
commission of any act resulting in accrual within
Montana of a tort action.  If they can satisfy
that prong, they must show exercise of due
process -- the exercise of personal jurisdiction
would comport with due process under the
three-part test of purposeful direction of
activity, consummation of a transaction within
the forum for purposeful availment of the
privilege of conducting activities in the forum,
the claim must arise out of out or result from
forum-related activity, and the exercise of
jurisdiction must be reasonable.

Additionally, they've argued alter ego,
which means they must make a prima facie showing
of such unity of interest and ownership that

1   separate entities no longer exist, and failure to

2   disregard the separateness would result in fraud

3   or injustice.

4          So, Your Honor, that is the universe of

5   items that this jurisdictional discovery is meant

6   to be, basically meant to be looking at.  And the

7   parties spoke and reached a joint jurisdictional

8   discovery plan where we agreed for the most part

9   on what the scope of this jurisdictional

10  discovery should be.

11         The three items which the parties were

12  able to agree on were, number one, TWPA's

13  contacts and communications with the local

14  Jehovah Witness congregations in Montana, if any,

15  during the relevant time period.  Number two,

16  TWPA's activities and conduct in Montana, if any,

17  during the relevant time period.  And number

18  three, the Hardin, Montana, Jehovah Witness

19  congregations' contacts with WTPA, if any, during

20  the relevant time period.

21         Now, the fourth item that the parties

22  could not agree on was the scope of discovery as

23  to corporate relationship between WTPA and WTNY,

24  and per this court's order in that regard, the

25  court allowed such discovery during the time

1    period of 1973 to 1992.

2          So those are the only four areas that
3    this discovery in the jurisdictional phase is
4    supposed to be addressing.

5          Now, as to the relevant time period,
6    the plaintiffs themselves, in putting together
7    the joint jurisdictional discovery, argued it was
8    1970 to 1995.  Our position is it should have
9    been 1973 to 1990.  Then, Your Honor, in your
10   order as to the scope, you noted the relevant
11   time period for corporate purposes would be 1973
12   to 1990.  Defendants then used that guidance of
13   1973 to 1990 as the time period the
14   jurisdictional discovery should occur.

15         Plaintiffs' argument here, going well
16   beyond the scope of what they themselves argued
17   for in their joint jurisdictional discovery plan,
18   would basically result in no limitation
19   whatsoever.  And as I'll discuss, Your Honor,
20   some of the specific documents they've asked for
21   range in dates from 1885, which would be 85 years
22   before the beginning of the time frame they came
23   up, all the way to the year 2001.  So they've
24   basically asked for no limit in time whatsoever
25   on jurisdictional discovery.  And as we'll go

1    through some of these, basically they've asked

2    for a number of items that go well beyond the

3    scope of the subject of jurisdictional discovery.

4         So these three general objections were

5    important for WTPA to assert, that, look, we're

6    working with plaintiffs here.  As Your Honor can

7    see from the exhibits to our response brief to

8    the motion to compel, we've exchanged much

9    correspondence, we've spoken a number of times

10   with plaintiffs' counsel, we've provided many

11   supplementations, we've been trying very hard to

12   avoid having to do this and trying to provide the

13   information they've requested that is relevant to

14   jurisdictional discovery.  But we needed to

15   assert those general objections so that we are

16   not waiving anything.  And also, Your Honor, the

17   big thing, jurisdictional discovery such as this

18   needs to be limited to these areas and time

19   periods, otherwise it's basically a fishing

20   expedition, which is what it has become.

21        Now, a few of the specific items that

22   they've referred to, for example, they talk about

23   the RFAs, as a general rule, we've been reporting

24   late in those.  I think the main one they are

25   talking about in that regard was there is Request

1    for Admissions 4 and 6 to WTPA, and also Request

2    for Admission No. 7, asking WTPA to admit, quote,

3    that it notified persons endeavoring to donate to

4    the Jehovah Witness Church to make their

5    contributions payable to WTPA.  And there are

6    RFAs for the various time periods.

7           There was no reformulation of the RFAs.

8    We relied on the language they used, that the

9    WTPA notified persons.  Well, the response is we

10   denied there was ever any such notification of

11   persons, but admitted that voluntary donations

12   were accepted.

13          Now, the Requests for Admission 26,

14   asked WTPA to admit, quote, collected money from

15   Montana for the purchase of insurance policies.

16   Now, as an initial point, Your Honor, I fail to

17   see how that possibly could have a tie to

18   personal jurisdiction.  They are not arguing

19   under Montana's long arm statute 4(b)1D regarding

20   contracting to ensure any person.  But the

21   initial response was answered in context of other

22   requests where the plaintiffs were asking about

23   the Kingdom Hall assistance arrangements, which

24   was a program that was begun in 1989 for the

25   voluntary pooling of assets to provide funds for

1    property damage, care for liability claims, and

2    Kingdom Hall operations when there is no

3    insurance coverage, and purchase coverage where

4    necessary.  Well, once it was confirmed that the

5    plaintiffs were actually asking about any

6    insurance, not the Kingdom Hall assistance

7    arrangements specifically, we supplemented, and

8    there's basically no records one way or another

9    if any donations from Montana were used to

10   purchase insurance policies.  That's just not the

11   kind of record keeping that WTPA has, so we

12   supplemented to indicate that we have no

13   responsive information and were unable to affirm

14   or deny based on reasonable inquiry.  There just

15   simply isn't the documentation showing what

16   specific donations from specific locations were

17   used to purchase what specific products over

18   time.

19            Now, they also asked for Request for

20   Admission about the governing body.  And that

21   would be the Request for Admission No. 14.  They

22   are asking whether WTPA acts under the direction

23   of the governing body.

24            Well, as we've explained to plaintiffs

25   through correspondence, the governing body, which

1    has not been named in the law enforcement, is a

2    small group of spiritually mature Christians who

3    provide spiritual guidance to Jehovah Witnesses

4    worldwide.  They are not leaders of Jehovah

5    Witnesses that provide ecclesiastic guidance.  So

6    the example we provided in our correspondence,

7    was whether WTPA or WTNY had a Christmas party.

8    Well, based on the guidance from the governing

9    body, the Jehovah Witness followers don't

10   recognize Christmas as a holiday.  So by doing

11   that there would not be -- WTPA and WTNY would

12   not then have a Christmas party to have a party

13   for a holiday that is not recognized by the

14   religion.

15            But that's not providing legal

16   direction or oversight, and that's what we tried

17   to explain that, well, their use of "under the

18   direction of" is ambiguous; any direction isn't

19   legal as to oversight or direction, it's

20   basically ecclesiastic guidance.  Generally

21   people in WTPA and WTNY are Jehovah Witnesses,

22   the governing body is where they get the

23   information how the religion should appropriately

24   be practiced.

25            So in No. 7, Your Honor, about the

1    request for individuals who worked at the legal

2    department.  First off, 1960 to 1990 was the time

3    frame used.  No explanation why that particular

4    time frame, which is different than what was in

5    the joint jurisdictional discovery plan.

6    Basically, WTNY has no list of employees that

7    were there between 31 and 61 years ago.

8           Now, in the efforts to try to meet and

9    confer on this, we've identified the three people

10   that have the most knowledge that we are aware of

11   the time periods, they can ask questions of those

12   people, and we've also provided the lists of the

13   board of directors for the years in question

14   here.  This is from the 1973 to 1992.  So they

15   have people that they can talk to.

16          And the other -- you know, they are

17   asking that this to help try and determine what

18   the scope of the corporate overlap is.  I'm not

19   sure what they could possibly get from a general

20   list of everyone who may have worked there beyond

21   what's in the board of directors, and they have

22   people they can ask those questions about in the

23   deposition process.

24          Your Honor, these issues about stuff

25   outside the time frame, again, plaintiffs haven't

1  been able to identify what they consider a

2  reasonable time frame would be.  The stories

3  change when we put the joint jurisdictional

4  discovery plan together, and as they stand here

5  today they apparently can't say what they think

6  the appropriate time period should be.

7          So the documents they've relied on for

8  this argument, first off is a letter dated

9  November 1, 1995, addressed to all bodies of

10  elders in Britain.  The plaintiffs have been

11  informed that such letters were only sent

12  congregations in England, not the US, and such

13  communications in the U.S. were sent by WTNY, not

14  WTPA.

15          Now, Request for Production 73 through

16  78 are basically various documents.  RFA 73,

17  Preaching and Teaching and Peace and Unity.  The

18  plaintiffs already have the only version of that

19  document from 1960, since that was outside the

20  time frame, that's why it was not produced.  But

21  Mr. Rowland during his deposition testified he

22  had never seen it before anyway.

23          Request for Production No. 74, Council

24  on Theocratic Organization for Jehovah Witnesses.

25  Plaintiffs already have the only version which is

from 1949.  Again, outside the time scope.  Mr.
Rowland testified he had never seen that document
before.

Request for Production No. 75, the
Organization for Kingdom Preaching and Disciple
Making.  Again, plaintiffs already have the 1972
version, not produced because it was outside of
the time frame.  Mr. Rowland was asked about that
during his deposition, and he did say that he had
seen that document.  And after the deposition we
supplemented discovery to provide that, even
though plaintiffs already had it.

Now, Request for Production 76 and 78,
that's the listing of 31 specific documents from
January 1885 to January 2001.  And after
initially objecting, in an effort to try and meet
and confer, we produced every one all of those
specific documents that WTNY and WTPA have been
able to find.  Now, there are some they have not
been able to.  The search is ongoing.  If we do
find it, we will further supplement, But,
basically, Your Honor, for every specific
document that's been requested outside of the
1973 to 1992 time period, they either already
have it, or we've produced it if we have it in

1  our possession, custody, or control.  So anything

2  beyond this would be going into the fishing

3  expedition of basically every publication that

4  WTNY or WTPA has ever made.

5         Now, the efforts made in support of

6  responses, you know, they cited to some cases in

7  the Hymen (phonetic) case out of Nevada, in that

8  case there was a requirement to provide more

9  information than just e-mails and Facebook.  That

10  case has no case law cited in the decision, and

11  no citing references. The Marty case out of

12  California, that case required to confirm

13  reasonable inquiry and exercise due diligence;

14  stated if you don't have possession of the

15  documents in your control.  Here we have been

16  working with our pro hoc vice counsel, who is in

17  New York, to respond to these requests.  And I

18  think it's important for the court to note the

19  date that WTPA in this jurisdictional phase has

20  responded to 45 interrogatories, 81 requests for

21  production, 30 requests for admission, and has

22  produced 63,469 pages of documents.  WTNY has

23  responded to an additional 24 interrogatories, 16

24  requests for production, 4 requests for

25  admissions, and produced additional 210 pages of

1    documents.

2            We've produced what we have within the
3    time period and scope.  We've explained the basis
4    for our objections as to why we haven't.  These
5    are not boilerplate objections.  They are
6    different objections to different requests.  It's
7    specific.  For example, every employee over a
8    30-year time period, there are privacy concerns
9    to that.  It is overbroad.  It is not
10   proportional to the needs of this case.  And it's
11   not same objections to every request, except for
12   those three general objections which, again, were
13   necessary to avoid waiving any jurisdictional
14   scope argument or time period argument.

15           Plaintiffs ask for relief as to
16   upcoming 30(b)(6) depositions.  At this point no
17   final notice or list of topics have been
18   produced, so there is no justiciable controversy
19   at this point.  Plaintiffs counsel have provided
20   drafts of topics.  We responded with concerns
21   again regarding scope and timing.   And we
22   reserve the right to assert such objections
23   during 30(b)(6) depositions to avoid a fishing
24   expedition, but we are not there yet.

25           Mr. Rowland's deposition testimony,

1   plaintiffs make some discussion about that in

2   their reply brief.  And I'll be brief here, Your

3   Honor.  I don't want to read the transcript to

4   the court but are willing to provide a sur reply

5   brief with the entire transcript or portions.

6   But plaintiffs' reply brief kind of focuses on

7   the fact Mr. Rowland is not getting any relief or

8   was not getting communication from Jehovah

9   Witnesses officials.  I think it is important for

10  the court to know, and I'm going to read a few

11  portions here to show Mr. Rowland's concerns in

12  that regard are with the local folks in the

13  Hardin congregation and local overseers, not

14  anyone with WTNY or WTPA.

15          So question here, Mr. Rowland, when we

16  are talking reports, are you talking about

17  reports you would fill out as an elder.

18          Yeah, I wouldn't do that as an elder

19  myself but I'd have him put into the congregation

20  response something with four or five elders.

21          Question.  And you're talking about the

22  Hardin congregation as this point?

23          Answer.  Yes.

24          Question.  Did you ever talk to anybody

25  during your time at the Hardin congregation, did

1    you ever talk to anybody in Bethel in New York?

2            No.

3            Question.  Mr. Rowland, were you

4    instructed and trained if you had an issue you

5    were to provide an overseer with it?

6            Answer.  Yes.

7            Question.  Were you ever instructed and

8    trained to go to Bethel with the problem?

9            Bethel is the New York area where the

10   WTNY and WTPA are located.

11           Question.  Were you ever instructed and

12   trained to go to Bethel with the problem?

13           Answer.  No, there were no

14   communication with them.

15           Question.  While you were an elder,

16   were you able to get a sense on how the reporting

17   from Hardin, from the Hardin congregation,

18   reporting things like donations, new members, did

19   you get a sense of how that stuff was recorded

20   back to New York?

21           Answer.  No.

22           After an objection, Mr. Rowland

23   continued.

24           No.  As an elder and living out here in

25   the country, even going in two times a week,

1   sometimes four or five times a week, but the

2   judicial issue, and that was taken care of in

3   Hardin.

4           Question.  Do you have any knowledge of

5   whether reports of sexual abuse were ever written

6   down and handed to a circuit overseer or not?

7           Answer.  I don't know.  The way that

8   things were, it was, like, nonexistent.  I didn't

9   see a report, didn't hear a report, nobody called

10   me in.

11           Question.  Did anyone from New York

12   train you how to handle victims who had been

13   sexually abused to take care of victims.

14           Answer.  No, not specifically.  Never

15   see anybody from New York.

16           All right.

17           After some discussion by Mr. Rowland

18   about how things fit into the organization and

19   the stream of responsibility, he was asked,

20   question, Stream of responsibilities between New

21   York and the local congregation or between elders

22   and ministerial servants, what do you mean?

23           Answer.  Usually the organization is

24   the one that you're in.  When you talk about the

25   organization, nobody talks about New York.

1          Question.  Have you ever read a

2   publication by Watchtower Bible and Tract Society

3   of New York or Watch Tower Bible and Tract

4   Society of Pennsylvania that said you could not

5   report abuse to the authorities?

6          Answer.  Not that I know of.

7          Again, answering a question about

8   reporting, answer, I was not responsible for any

9   paperwork going to New York.  It's the presiding

10  elders that did that.

11          Question.  Are you aware of any

12  communication to Watchtower Bible and Tract

13  Society of New York or Pennsylvania regarding any

14  of your allegations?

15          Answer.  I have no knowledge of that.

16          Question.  Okay.  So Hardin doesn't

17  follow the directions from Watchtower?

18          Answer.  No.

19          So as you can glean from those

20  transcript portions, Your Honor, a lot of Mr.

21  Rowland's deposition went beyond jurisdictional

22  discovery as well, and I wanted to clarify to

23  provide some context for the citations to that

24  that were provided by plaintiffs counsel in their

25  reply brief.

1          And, again, if Your Honor would like a

2     sur reply brief explaining more of that or

3     providing more excerpts of the transcripts, I

4     would be happy to so provide.

5          In closing, Your Honor, our position is

6     there is no entitlement to an award of fees and

7     costs.  The actions taken by WTNY and WTPA in

8     responding to discovery have been proper.  The

9     letters and supplements show we have gone to

10    great lengths to work through issues raised by

11    plaintiffs regarding issues regarding scope and

12    time.  You know, again, frankly to us it is

13    unclear what they are asking for in their relief,

14    but to the extent there has been any shortfall in

15    the discovery process, Your Honor, it would not

16    be just for there to be an award of fees and

17    costs due to the efforts that have been made.

18         Your Honor, unless you have some

19    questions for me, that's all the argument I have.

20         THE COURT:  Well, for the sake of

21    example, this document that Mr. Rowland was

22    talking about in his deposition, that the

23    defendants discuss on page 3 of their reply

24    brief, this Organization for Kingdom Preaching

25    and Disciple Making, that was published in 1972,

1    I mean, I understand in my order with regard to

2    the scope of jurisdictional discovery, I said

3    that plaintiffs shall be permitted to conduct

4    discovery into TWPA's and WTNY's corporate

5    relationship from 1973 to 1992.  But with regard

6    to plaintiffs' arguments, specifically as to that

7    publication, the fact that it was published in

8    1972, I mean in some ways '73 is a little bit of

9    an arbitrary cutoff in that this 1972 document,

10   for example, would have been in effect in 1973,

11   and maybe even farther into that time period as

12   far as documents that the Hardin congregation

13   might have relied on that came from the

14   Pennsylvania organization.  What are your

15   thoughts about that?

16          MR. WILSON:  Well, I mean, that's the

17   problem, Your Honor, when you have a time period,

18   what do you define as the parameters.  At some

19   point there have to be parameters, otherwise it's

20   basically unencumbered.  Here it was published

21   1972, which was outside that time frame.

22   Plaintiffs had that document.  It was something

23   they produced in their initial disclosures

24   relatively early on.  Once it was confirmed that

25   someone in the congregation in Hardin had

1    actually seen it, we did supplement to produce

2    it.  And, again, that goes back we have been

3    trying to produce now, in an effort to try and

4    meet and confer, any specific document they've

5    asked for that goes outside those time periods.

6         But, again, Your Honor, we are doing

7    the best we can with what the time period it is.

8    You know, it was 1973 to 1992, this particular

9    document was in 1972.

10        THE COURT:  Right, but can't you

11   understand the difficulty the plaintiffs are

12   having being kind of hamstrung by that scope.

13        MR. WILSON:  That's, why, Your Honor,

14   in meeting and conferring we have been trying to

15   supplement to provide those documents outside

16   that scope of time and materials that they don't

17   already have that we still have in our

18   possession, custody, or control.  That's where we

19   go back to that list of documents from January

20   '85 to 2001, we've been trying to track those

21   down, and to the extent we've been able to find

22   them, we have supplemented to provide those to

23   plaintiffs' counsel.

24        THE COURT:  I mean, you have to agree

25   basically the statement you just made and the

1     statement made in your brief, if plaintiffs know

2     of something specific, they just need to ask us.

3     Well, the purpose of discovery is because they

4     don't necessarily know what exists, so how can

5     you ask for something that you don't necessarily

6     know what it's called or whether it exists.

7                    MR. WILSON: Well, for the

8     jurisdictional discovery we are in, Your Honor,

9     the understanding was they were going to ask for

10    questions of the Hardin congregation as to what

11    documents the Hardin congregation had.  And

12    basically our position was, unless there is some

13    showing that the Hardin congregation had it, and

14    it was used by them in Montana, it would be

15    outside the scope and irrelevant to basically,

16    the jurisdictional discovery in this case.  And

17    they did ultimately subpoena the Hardin

18    congregation and then the documents were

19    identified there and then through the meet and

20    confer as well we've been trying to identify the

21    specific documents they asked for.  But we have

22    no way of knowing what was provided to the Hardin

23    congregation in 1973 to 1992.

24                    THE COURT:  Right.  Of course, we have

25    some of that issue before the court because the

1    Hardin congregation has also claimed some

2    privileges and so forth that would prevent them

3    disclosing various things.

4         Okay.  I think that's all I have, Mr.

5    Wilson.

6         MR. WILSON: Thank you, Your Honor.

7         THE COURT:  Thank you.  Your response,

8    Mr. Stepans.

9         MR. STEPANS:  Thank you, Your Honor.

10   Your Honor, I want to assure the court, and

11   counsel for the defendants as well, I do not want

12   to every publication they have ever made, I

13   really don't, just the ones we've asked for.  And

14   I want to talk about documents that plaintiffs

15   have been able to get elsewhere.  Defendants have

16   refused to authenticate those documents, and in

17   part because there are notations in them or they

18   say they don't know where it came from.  So even

19   though we are able to go and find some of these

20   things on our own, the next step of that, which

21   would be to authenticate it, defendants don't

22   want to do that either.

23        So they don't want to give it to us and

24   they also don't want to authenticate it, and I

25   would say that that probably means they don't

1      want it to be part of the case and would prefer

2      that it not be shown to the jury.  But what we

3      are trying to do is prosecute this case in a

4      meaningful way.  I'm glad that counsel brought up

5      two things, Your Honor, and these will be very

6      brief, but they are the most precise highlights

7      of the difficulty that plaintiffs have been

8      facing so far and why we are here on this motion

9      to compel.

10             The notice issue regarding donations of

11     money, the way that that RFA was answered,

12     defendant corporations, they deny that they put

13     anyone on notice.  This is a document that is

14     referred to, I don't believe it's part of the

15     briefing, but it is a page from the Branch

16     Organization Manual, which is Document 57-7 in

17     the ETF.  This is page 22-1 on the pagination of

18     the manual, otherwise identified as plaintiffs'

19     bates 002025.  Here's what it says.  This is

20     their document from 1977.

21             THE COURT:  This is Exhibit 57-7?

22             MR. STEPANS:  Your Honor, Document 57-7

23     is a couple of pages from this branch

24     organization.  These are different pages that

25     have not been submitted to the court.  I don't

1    know if you want to hear this, but the reason

2    that this is important is because this paragraph

3    guided the RFA that we asked about donations of

4    money and putting people on notice.  This

5    document from WTPA published by WTPA, it says

6    effective December 15, 1977.

7              I will quote here.  Donations of money

8    may be made to the society in the form of

9    contributions payable to Watch Tower Bible and

10   Tract Society of Pennsylvania in the United

11   States, or if from a donor located in a country

12   outside the United States, then donations may be

13   mailed to the branch office for that country and

14   made payable to the local corporation.

15             So the answer is they are denying that

16   they put anyone on notice that donations could be

17   made to WTPA.  And what it says is, donations of

18   money may be made to the society.  It's their

19   publication.  They give no other explanation,

20   they just say, no, we didn't notify any anybody

21   that they could make those donations.

22             THE COURT:  Seeming to take issue with

23   the word "notify."

24             MR. STEPANS:  I believe that we are in

25   a semantic quest here to find the right term that

1    they would like us to use as it pertains to what

2    -- I guess I would say that qualifies as notice,

3    but I agree it looks like they are parsing out

4    "notify."  That doesn't seem --

5              THE COURT:  We didn't notify anyone.

6    We might have informed but we didn't notify.

7              MR. STEPANS:  Or alluded to it or

8    suggested.

9              But it would be good if they did pick

10   one of those verbs to let us know which one they

11   had done as it pertains to this.

12             On the governing body argument, Your

13   Honor, I'm glad counsel brought this up, and I

14   think this is maybe the best illustration, I will

15   point the court to two documents that I would

16   like to compare here.  57-8 and page 9 of

17   Document 57-8.  That is the answer to

18   interrogatory No. 15.  And I'll quote.  This is

19   from defendant corporations in discovery.  The

20   governing body of Jehovah Witnesses is an

21   ecclesiastical group of men who care for the

22   spiritual interests of Jehovah Witnesses

23   worldwide.  It has no legal or corporate control

24   over any entity used by Jehovah Witnesses.

25             That's a present day recitation.  It

1    says that's what they are now.  I point the court

2    to Document 57-7, page 3 of 3, and here's what it

3    says.

4                 THE COURT:  57-7?

5                 MR. STEPANS:  Yes, Your Honor.  And

6    page 3 of 3.

7                 First full paragraph.  This is from

8    1977, once again published by Watch Tower Bible

9    and Tract Society of Pennsylvania.  Governing

10   body.  The governing body is made up of brothers

11   who are anointed servants, et cetera, et cetera.

12   They act as representatives which has the

13   responsibility for giving direction and impetus

14   to kingdom work.  While the governing body

15   delegates certain details and responsibilities to

16   committees made up of its own members, or

17   committees made up of other dedicated servants of

18   God, or to the instruments such as corporations

19   and legal agencies, and I quote directly, it

20   always takes the lead for the smooth functioning

21   of the organization and the unity of all of God's

22   people as the governing body has the prerogative

23   to use its discretion and look into matters it

24   deems necessary to examine with regard to the

25   work.  To oversee various aspects of the works,

1    committees have been established as follows.

2         So representation at this point is, I

3    think the quote was, they don't lead anything,

4    this is what I heard counsel say, and what their

5    document says is that they lead, it always takes

6    the lead.

7         Now, the difference between what the

8    documents say and the interpretation of those

9    documents, it's certainly important, but the

10   documents say what they say, and that is the

11   basis for what we are trying to uncover here.

12   Those two items, Your Honor, I think, highlight

13   the difficulty that we are having.  So I want to

14   be very clear that we have made a lot of effort

15   to try and resolve this.  You know, the

16   conferring back and forth, and counsel indicated

17   how many things they responded to, but if all of

18   those interrogatories, you could read every

19   single interrogatory, it doesn't matter if

20   they've answered 45 or 300, it's the same.

21        In order to get this moving, Your

22   Honor, we had to file this motion.  We thought we

23   could resolve it because a lot of it seemed to be

24   fairly straight forward as it pertained to --

25   originally we asked for 1970, and defendants

1    suggested 1973, or later.  So we ended up there.

2    These critical documents that fall within that

3    category of time that were referred to, that now

4    in the deposition of James Rowland obviously are

5    relevant, suggest that there's other things out

6    there.  And we are ready to put this piece of the

7    case to bed and move forward.  So subject to any

8    other questions, Your Honor, I think what we are

9    asking for is really truly to stay within the

10   relevant time period as it pertains to the sexual

11   abuse.  We understand that it took place

12   basically within this time frame.  But if we

13   start closing discovery arbitrarily because we

14   agreed to 1973 and now defendants say, well,

15   you're stuck with it, that doesn't lead us to the

16   place where we are uncovering the truth,

17   discovering the facts, that we are going to be

18   able to put this case together.  I'm asking the

19   court to issue an order in accordance with the

20   rules.  And subject to any other questions, I'm

21   done, Your Honor.

22            THE COURT:  Thank you.  Well, you all

23   know how much courts love discovery disputes.

24   But thank you, counsel.  The motion to compel is

25   taken under advisement.

1          I just want to remind counsel in our

2     scheduling order, that paragraph 9 does talk

3     about if you're going to file something that's

4     more than 20 pages, you have to provide the court

5     with physical copy of that.  Of course, we've got

6     lots of pages with regard to these exhibits and

7     it's not that I want to kill a bunch of trees,

8     but maybe I'm just old school, but it's easier

9     for me to look through a binder of documents.  I

10    just remind you of that, and also of the local

11    rule with regard to the length of briefs.

12         So the matter is deemed submitted.  We

13    are adjourned.

14              (Court adjourned.)

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5              CERTIFICATE OF REPORTER.

6

7         I, Richard L. Mattson, Official Court

8    Reporter for the United States District Court,

9    hereby certified the foregoing to be a true and

10   correct transcript of the proceedings contained

11   therein.

12                       /ss Richard L. Mattson

13                    _____

14

15

16

17

18

19

20

21

22

23

24

25