# BR⌀WN LAW FIRM, PC

315 N. 24th Street | PO Drawer 849 | Billings, Montana 59103-0849
Phone: 406.248.2611 | Fax: 406.248.3128

Michael P. Heringer
Guy W. Rogers
Scott G. Gratton
Kelly J.C. Gallinger*
Jon A. Wilson
Seth A. Cunningham
Shane A. MacIntyre
Brett C. Jensen*
Nathan A. Burke
Alex J. Ames
Zachary A. Hixson
Michael P. Sarabia
John R. Knisely
Kai B. Thorsgard*

Of Counsel
Robert L. Sterup

Retired
Rockwood Brown
John Walker Ross
Margy Bonner
John J. Russell

*also licensed in
North Dakota

Jon A. Wilson
jwilson@brownfirm.com

Brett C. Jensen
bjensen@brownfirm.com

Michael P. Sarabia
msarabia@brownfirm.com

July 27, 2023

**VIA EMAIL AND U.S. MAIL**
Robert L. Stepans / rob@mss-lawfirm.com
Ryan R. Shaffer / ryan@mss-lawfirm.com
James C. Murnion p/ james@mss-lawfirm.com
Victoria K.M. Gannon / katy@mss-lawfirm.com
MEYER SHAFFER & STEPANS PLLP
430 Ryman Street
Missoula, MT 59802

Matthew L. Merrill / matthew@merrillwaterlaw.com
MERRILL LAW, LLC
6631 Mariposa Court
Denver, CO 80221

Re: *Tracy Caekaert and Camillia Mapley v. Watchtower Bible and Tract Society of New York, Inc., et al.*
USDC Billings Division 20-CV-52-SPW-TJC
File No. 78280.001

*Ariane Rowland and Jamie Schulze v. Watchtower Bible and Tract Society of New York, Inc., et al.*
USDC Billings Division 20-CV-59-SPW-TJC
File No. 78280.002

Counsel:

Thank you for your continued efforts in regards to arranging the Rule 35, Fed. R. Civ. P., mental examinations by Michael Bütz, PhD. In response to Ms. Gannon's letter from June 30, 2023, and the proposed revised Memorandum of Agreement, we believe we

**EXHIBIT**

**11**

Brown Law Firm, P.C.
July 27, 2023
Page 2 of 2

have unfortunately reached an impasse and will need to request the assistance of the Court. I have enclosed Dr. Bütz's July 17, 2023, letter providing his estimate of travel costs and responding to your requested revisions to the Memorandum of Agreement. In our opinion, the conditions you are attempting to place on Dr. Bütz do not provide him with a reasonable level of deference considering his clinical expertise, and in many respects the conditions are contrary to the law and ethics rules of practicing psychologists.

We are prepared to file a Motion for Order Directing Rule 35 Exams. After you review Dr. Bütz's letter and supporting materials, please let us know by next Wednesday August 2nd at noon whether you believe there are additional areas upon which we can agree. Otherwise, I will assume Plaintiffs object to the Motion and will advise the Court accordingly. I would also appreciate if you would let me know we are at least in agreement regarding the travel costs Plaintiffs have agreed to cover for Dr. Bütz's proposed travel to Australia and Arkansas.

Sincerely,

Brett C. Jensen

BCJ

cc:   Joel M. Taylor (via e-mail);
      Gerry Fagan, Christopher Sweeney, Jordan Fitzgerald (via e-mail)

# Aspen Practice P.C.
dba, Michael R. Bütz, Ph.D.

July 17, 2023

Brett C. Jensen, Esq.
Brown Law Firm, P.C.
315 North 24th Street
P.O. Drawer 849
Billings, Montana 59103-0849

RE: Correspondence regarding request for evaluations of Plaintiffs, Rule 35, *Caekaert & Mapley v. Watchtower Bible and Tract Society of New York, Inc., et al.* and *Rowland & Schulze v. Watchtower Bible and Tract Society of New York, Inc., et al.* (Letter 6.30.23 with MOA Red-Lined, Email 7.11.23).

Dear Mr. Jensen:

We have been in correspondence since May 8th on these matters, as you are no doubt aware. Responding to the recent correspondence above took an extra measure of time given the realistic complications of more specific descriptions of practice and travel to another state and another country. I have done my best to address these matters in an orderly, reasonably comprehendible fashion. Regarding practice and travel, I believe you have our *Standard Forensic Financial Policy*, but to assure clear communication I have included it with this letter (see attached). Working through the letter penned by Ms. Gannon, I will address her comments paragraph by paragraph, and this begins with the locations of Ms. Mapley and Ms. Caekaert.

As you are aware Ms. Mapley lives in Mansfield, Victoria, Australia and plainly practice and travel considerations are far from customary and have required thoughtful consideration and review. Also, travel to Searcy, Arkansas is not as straightforward as one might think, in fact flights to the location are exorbitant. So, these two aspects of the examination process will be provided headers to set them apart for each plaintiff.

## Mansfield, Victoria, Australia

According to the research I have done, there are a number of costs involved and case work to be done in order to be able to practice in, and travel to, Mansfield. My research suggests that I would be able to be licensed to practice in Australia after reading through their processes, and the straightforward costs associated with this for fees and licensure will be approximately $750 USD noting the exchange rate when I worked this up was AUD (0.68) to USD (1.0).[1] In addition, it would take approximately a day of work to assemble all the paperwork ($1600) and correspond with the Psychology Board of Australia to achieve this. Preliminary research suggests that I will not need a visa for the short duration of work there. It is estimated that this process may take between two

---

[1] For Board of Psychologist Australia's instructions to overseas applicants see:
https://www.psychologyboard.gov.au/registration/overseas-applications.aspx#text=To%20work%20as%20a%20psychologist,work%20and%20live%20in%20Australia.

and three months to accomplish based on prior experience with being licensed in other states here in the United States, and then adding several weeks given the unique nature of the situation. So, the cost of licensing will be roughly $2350.

As for time there, and travel, it essentially takes a day or more to travel to Australia, *and flying there you also lose a day*. Thus, while the flight would leave on the 10th, Tuesday, it would not 'arrive' until the 12th, Thursday (see Appendix A). My office would charge for a standard business day for this travel each way as well as whatever part of another day is involved ($3200 +) per our *Standard Forensic Financial Policy*. Then, adjusting for complications that may occur during travel, assuring that arrangements were in place for a conference room, etc. and jet lag, a minimum of three days on-site would be required. How long those days would be is unknown at this point in time, but I regularly work ten, twelve, or more hours a day when involved in the direct service of remotely conducting examinations, scoring, interpreting and writing reports. I am assuming that one day will be resting up from the journey there and organizing myself (Thursday, the 12th), and two days will be long (Friday and Saturday, the 13th and 14th), so perhaps an eight-hour day and two ten-hour days ($5600).

The time frame assumed for travel is mid-October, flights on the 10th and the 15th, and then stay in Mansfield October 12-14, and these dates have been used to calculate costs. The closest large city is Melbourne, and flights there noting the duration of travel with business class run approximately $10,000 to $11,000 (see Appendix A) - and note that with transporting testing equipment there may be additional baggage fees. Rental cars run between $75 and $100 a day, and use would be for three and a half days.

Hotels run roughly $100 a night for October 12-14 (Alzberg Hotel or the Mansfield Hotel), but each of these accommodations has one or two conference rooms and the cost of one of these rooms is unclear but presumed to be equivalent to a hotel room at $100 a night. If neither will work due to the conference room or hotel room not being available there is another site within thirty minutes of Mansfield too (Sebel Pinnacle Valley @ roughly $150 per night, etc.). Then, of course, meals and other typical travel expenses would be involved from day one through day five.

All tolled the estimated cost of practice in Australia, and travel there, would run $23,000 +/-.

*Searcy, Arkansas*
As for practice in Arkansas, I have applied to a reciprocal licensing service through the Association of State and Provincial Psychology Boards and expect to hear from them any day about the status of my application. Since this would prove useful in other cases, and is not associated solely with this case, I have viewed this application and case work as a cost of doing business.

It is anticipated that this journey will have similar assumptions for travel and work costs, and despite being here in the United States it will still take four days, given the two days needed for the examination. Two for travel given the oddity of arrival times and the logistical situation that will be described momentarily, and two for the examination. Logistics proved more complicated in getting to Searcy than anticipated, and while Little Rock, Arkansas is geographically closer as

the crow flies (50 miles away), the cost to fly into it is stunningly over double what it costs to fly into Memphis, Tennessee (106 miles away). So, the flight proposed is for Memphis at roughly $1400, and again note that with transporting testing equipment there may be additional baggage fees (see Appendix B). Since Little Rock is forty-five minutes away from Searcy, rather than an hour and a half, it is proposed that I stay in Little Rock where I will be able to obtain a hotel with an adequate number of potential conference rooms so that obtaining one will not be a problem. Hotel costs in Little Rock are $150-200, and it is assumed that renting out a conference room will be a similar cost. Rental cars out of Memphis are roughly $50 to $100 a day. Then, of course, meals and other typical travel expenses would be involved from day one through day four.

All tolled the estimated cost of professional time and travel to Searcy would run $8,600 +/-.

*Ms. Gannon's #3*
Given the considerations above, this paragraph now turns to the decision of whether or not Ms. Caekaert choses to travel to Billings and be assessed or prefers to be assessed in Searcy. Plainly, there is little to remark on here other than notice of her intentions well in advance of the proposed dates for the assessment to take place.

*There is no #4, and Ms. Gannon's comments move on to #5 on Page 2 of her letter.*

*Ms. Gannon's #5*
It is hoped the responses above to #1 and #2 in her letter has sufficiently described: "...out of pocket costs associated with the examinations."

*Ms. Gannon's #6*
These will be academic, cognitive and personality assessment instruments. I did take note of the red line second sentence of the #6 in the MOA, and I would advise that the examination and testing not be imposed upon, nor suggested, by plaintiff's attorneys. Instead, in my opinion the examination ought to be conducted in accordance with what was provided before:

> "...the subject examinations will be to determine the existence, nature, and extent of the psychological conditions Plaintiffs have placed at issue in the above causes of action by claiming injuries and damages secondary to various instances of childhood sexual abuse."

*Ms. Gannon's #7*
Here, simply I would suggest holding firm to what has been stated in the MOA and rely upon Kaufmann and Morel's guidance on these matters. Further, I am not willing to release test raw data to those who do not have the appropriate level of training, supervision and experience to interpret it in the scientific manner intended by instruments/tests' - developers/publishers. This would be an ethical breach on my part as specifically spoken to by the American Psychological Association's *Ethical principles of psychologists and code of conduct*[2] and the laws of the state of

---

[2] American Psychological Association. (2017). *Ethical principles of psychologists and code of conduct*. American Psychological Association.

Montana as specified by Administrative Rules of Montana (ARM) under Unprofessional Conduct, and the Practice of Psychology (ARM § 24.189.2305 (9)). What is more, in this case specifically 'basic capacities' to perform psychological assessment would not suffice[3], since this case involves a specific area of expertise, and for the fact that this is, by its very definition, a forensic case. Each area requires years of additional, focused, training, supervision, and experience to accurately interpret, and analyze, the test raw data that may emerge if these assessments are conducted.

Later in this paragraph, but set apart in the MOA under #8, there is a request for the name and version of each instrument/test that will be administered. This is standard practice and will, as per custom and scientific convention, be included in the report. It is also customary that breaks in an assessment process are marked by an evaluator in their notes. Accommodating the additional request of start and stop times for each measure administered would not be any trouble and is agreeable.

### Ms. Gannon's #8

She revisits the prospect of not only recordation, but also of having an observer in the room. So, first of all, let's be clear on the American Psychological Association's stand on this matter under the aforementioned *Ethics Code* (2017) as revisited by the National Academy of Neuropsychology ((NAN) 2003[4]).

> "According to Code 9.04:
> *Test data* 'refers to raw and scaled scores, client/patient responses to test questions or stimuli, and psychologists' *notes and recordings concerning client/patient statements and behavior during the examination.*[5] Those portions of test materials that include client/patient responses are included in the definition of test data.'"

Also, let me offer an excerpt from a manuscript in the final revision process for publication[6] in order to address this matter in the most straightforward manner possible.

> "Both the American Board of Professional Neuropsychology (ABN) and the NAN have made clear statements against such practices [audio and video recording of assessments] (Axelrod, et al., 2000; Lewandowski, et al., 2016). As such, if this remedy is pressed, the video recording should be proactively delineated under a protective order limiting either the scope of the recording to aspects of the assessment that do not involve test raw data or protocol queries. Or, another possibility is that access should be limited to a duly

---

[3] Society for Personality Assessment. (2006). Standards for education and training in psychological assessment: Position of the Society for Personality Assessment. *Journal of Personality Assessment, 87* (3), 355–357. https://doi.org/10.1207/s15327752jpa8703_17

[4] National Academy of Neuropsychology, Policy and Planning Committee (2003). *Test security: An update, official statement of the National Academy of Neuropsychology.* National Academy of Neuropsychology.

[5] Italics added for emphasis.

[6] Bütz, M. R., English, J. V., Meyers, J. E., & Cohen, L. J. (in revision). *Threats to the Integrity of Psychological Assessment: The Misuse of Test Raw Data and Materials.* Unpublished manuscript.

4

Bütz Response – Correspondence 'Request for Evaluations'

credentialed evaluator, and specifying that the recording be returned to the original evaluator and/or destroyed. Again, this path is fraught (Morel, 2009), and we recommend following the advisories of the ABN and the NAN (Axelrod, et al., 2000; Lewandowski, et al., 2016)."

I, therefore, stand by my earlier proposals generally. Though, I do see that my earlier intentions were not so clear in terms of providing for audio recording of the informed consent process, the plaintiff's general understanding the nature of the case (why they are being assessed), the social history, and mental status interview. These are the portions of the assessment that an audio recording, in my view, would be permissible. At the same time, I am also of the opinion that the process my colleagues and I have outlined above be put in place in this case: wherein this audio recording is treated as test raw data, the recording put under a protective order, and only to be accessed by a duly credential evaluator (as spoken to above).

As described in earlier correspondence, Ms. Gannon's assertions about unintentional/inadvertent disclosures remain puzzling, particularly in light of her statement: "...the possibility of unintentional/inadvertent disclosures of privileged communication by Plaintiffs, who are not trained in understanding what may or may not be privileged." The apparent solution is to counsel and/or train plaintiffs rather than proposing the capacity to redact statements from the completed assessment report.

Last, while it is agreeable to note breaks and when instruments/tests are started and stopped, time-stamping the recording does offer one more intrusion into the assessment process which is not agreeable. An evaluator's job is to conduct an assessment, not serve as a time monitor unless it serves a clinical purpose.

*Ms. Gannon's #9*
Please see above.

*Further Comments on Red-Lined MOA*
On Page 1, for apparent reasons per the comments above, I would not advise agreeing to the red-line through Paragraph #2.

Page 2

Paragraph #3
No comment on insertions generally, other than the assessment will be months in planning. Therefore, there is a need for a definitive answer and then dates of examination provided months in advance.

Paragraph #4
Understood, and noted.

5

Bütz Response – Correspondence 'Request for Evaluations'

Paragraph #5
Here, it is evident that a small practice such as my own would be unduly burdened by $31,600 paid out with the potential of the bill being argued/debated in Court over weeks or months. It is proposed that if these costs are unacceptable with the 'upon receipt' suggestion, then these costs should be paid in advance in accordance with the arrangements that have been described earlier and our *Standard Forensic Financial Policy*.

Paragraph #6
See earlier comments.

Page 3

Paragraph #7
See earlier comments.

Paragraph #8
See earlier comments.

Paragraph #9
See earlier comments.

Paragraph #10
See earlier comments.

It is my hope that this letter addresses the matters raised previously, the attached letter on the 30th of June from Ms. Gannon, and your email on the 11th of July As always, if there are any needed clarifications and/or questions, please feel free to contact our office.

Sincerely yours,

Michael R. Bütz, Ph.D.
Fellow, American Psychological Association
Licensed Psychologist
Montana #355
Wyoming #818

att:   *Standard Forensic Financial Policy.*

xc:    File.

6

Bütz Response – Correspondence 'Request for Evaluations'

## Appendix A
## Flight to Melbourne, Victoria, Australia



## Appendix B
## Flight to Searcy, Arkansas by Way of Memphis, Tennessee

