*Exhibit G*

Filed 11/9/17

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| OSBALDO PADRON,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>WATCHTOWER BIBLE AND TRACT<br>SOCIETY OF NEW YORK, INC.,<br><br>    Defendant and Appellant. | D070723<br><br><br>(Super. Ct. No. 37-2013-00067529-<br> CU-PO-CTL) |

   APPEAL from an order of the Superior Court of San Diego County, Richard E. L. Strauss, Judge.  Affirmed.

   Morris Polich & Purdy, Pamela A. Palmer, Beth A. Kahn, Dean A. Olson, Ryan McKim; and Francis J. McNamara for Defendant and Appellant.

   The Zalkin Law Firm, Irwin M. Zalkin, Devin M. Storey; Pine Freeman Tillett, Norman Pine and Scott Tillett, for Plaintiff and Respondent.

   This case presents the issue whether a superior court can impose a hefty daily monetary sanction on a party who steadfastly refuses to comply with a discovery order. Here, the court ordered Watchtower Bible and Tract Society of New York, Inc. (Watchtower) to produce documents responsive to a specific request for production.  Per

the court's order, the documents would be redacted to protect certain third parties' privacy interests and produced subject to a strict confidentiality and nondisclosure order negotiated by Watchtower.  In addition, the court ordered Watchtower to look for documents in files it represented, on multiple occasions, to be in its possession, custody, and/or control.  Watchtower informed the court that it would not comply with the order.  As such, plaintiff Osbaldo Padron brought a motion for monetary sanctions against Watchtower for its discovery abuses.  The court awarded sanctions in the amount of $4,000 per day for noncompliance with the order, and Watchtower appeals that order.

However, this is not the first time we have been asked to review a superior court's sanctions against Watchtower for discovery abuses.  In *Lopez v. Watchtower Bible and Tract Society of New York, Inc.* (2016) 246 Cal.App.4th 566 (*Lopez*), we reversed the superior court's order imposing terminating sanctions for Watchtower's refusal to produce documents in response to a request for production identical to the one at issue here.  (*Id*. at p. 606.)  Although we concluded terminating sanctions in the first instance were unwarranted in that case, we specifically noted that a court had wide discretion to penalize a party who refuses to comply with a discovery order, including imposing "a significant monetary penalty for every day [a party] did not search for the documents or for each day the responsive documents were not produced."  (*Id*. at p. 605.)  Indeed, in its opening brief in *Lopez*, Watchtower asserted the superior court should not have imposed terminating sanctions, but could have issued monetary sanctions that increased incrementally over the passage of time or with Watchtower's failure to comply with the underlying order by certain procedural benchmarks.

2

Following *Lopez*, *supra*, 246 Cal.App.4th 566, the court granted Padron's motion, sanctioning Watchtower $2,000 per day for every day Watchtower did not produce responsive documents and $2,000 per day for every day Watchtower did not search for responsive documents.

On appeal, Watchtower challenges the validity of the sanctions order.  It asserts the superior court exceeded its authority in sanctioning Watchtower $4,000 per day.  In support of its argument, Watchtower attacks the underlying order requiring it to produce certain documents with limited redactions.  It claims Watchtower does not have possession and/or control of responsive documents after March 2001, the court's order improperly addressed issues of religious polity and administration, and Watchtower acted with substantial justification in refusing to remove some redactions in its documents because production of documents without those redactions would violate constitutionally protected privacy rights.  We reject these contentions.

Initially, we are troubled that Watchtower has taken two inconsistent positions before us.  In *Lopez*, *supra*, 246 Cal.App.4th 566, Watchtower argued monetary sanctions, untethered to the plaintiff's reasonable expenses, were an appropriate sanction for discovery abuse.  We agreed on this point in *Lopez* at page 605.  Here, after the superior court imposed a daily monetary sanction for noncompliance, Watchtower now argues such a sanction is not authorized.  We cannot rectify these diametrically opposed positions.  Accordingly, we find judicial estoppel prevents Watchtower from arguing the superior court lacked the authority to issue the subject monetary sanctions.

3

In addition, even if we did not apply judicial estoppel, we nevertheless would conclude the superior court appropriately sanctioned Watchtower in the instant matter. A superior court is vested with considerable discretion to manage discovery. (See *Pomona Valley Hospital Medical Center v. Superior Court* (2012) 209 Cal.App.4th 687, 692.) The superior court effectively managed a particularly acrimonious discovery process here, taking the additional measure of appointing a discovery referee. The court ultimately determined that the requested documents were discoverable subject to limited redactions as well as a confidentiality and nondisclosure order. Nevertheless, Watchtower has obstinately refused to comply with the order, consistently attempting to reargue the very discovery issues the court already decided. As such, we determine, under these extreme circumstances, where a party has been given ample opportunity to argue its position, a discovery referee and the court have thoroughly considered the party's arguments and rejected those arguments (considering pleadings, evidence, and oral argument), and the party willfully refuses to comply with the court's order, a court may "impose[] a significant monetary penalty" on the party. (*Lopez*, *supra*, 246 Cal.App.4th at p. 605.) Accordingly, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### Allegations

Padron sued Watchtower and the Playa Pacifica Spanish Congregation of Jehovah's Witnesses (Pacifica Congregation) for negligence; negligent supervision/failure to warn; negligent hiring/retention; negligent failure to warn, train, or educate; sexual battery; and sexual harassment. In addition to general damages, Padron also seeks

punitive damages.  Padron's claims were based on his allegation that Gonzalo Campos had molested him when he was a child.

Around September 27, 1980, Campos became an agent of Watchtower.  In 1982, Campos molested a minor boy.  Watchtower was aware of Campos's actions, but did not report him to the police or take any action to prevent further abuse.

In 1986, Campos molested another minor boy.  Watchtower was informed of Campos's acts, but did not report him to the police or take any action to prevent further abuse.

In early 1997, Campos became associated with the Pacifica Congregation.  The Pacifica Congregation was a subsidiary or subdivision of Watchtower.  Two of Watchtower's agents, who knew about Campos's molestation of children, were appointed leaders of the Pacifica Congregation.  Both Pacifica Congregation and Watchtower were aware of Campos's past acts of molestation.

In April of 1994, Watchtower received a letter from a parent who claimed Campos molested his child and asked for Campos to be investigated.  Watchtower forwarded the letter to Pacifica Congregation and instructed it to investigate the matter.  Pacifica Congregation did so and confirmed that Campos had molested the child and that Watchtower was aware Campos had molested a child before January 1, 1987.

Padron and his family were associated with the Pacifica Congregation.  Campos frequently spoke at religious services for the Pacifica Congregation and had a leadership position with that group.  Padron and his family met Campos through their involvement

with the Pacifica Congregation, and Campos was able to "ingratiate himself" with Padron's family.

In 1994 or 1995, Campos molested Padron on multiple occasions when Padron was seven or eight years old.

Discovery Issues

On January 16, 2015, Padron served a deposition notice for the taking of the deposition of Watchtower's person most qualified (PMQ) to testify regarding a number of topics.  Included with the PMQ deposition notice was a request for production of documents.  Although that request consisted of 29 separate requests, the request critical to the underlying dispute is request number 12.  That request sought:  "All letters, emails, facsimiles, or other documentary, tangible, or electronically stored information of any kind Watchtower Bible and Tract Society New York, Inc. received in response to the Body of Elder Letter dated March 14, 1997."[1]

"The March 14, 1997 letter instructed elders to send a written report to Watchtower about 'anyone who is currently serving or who formerly served in a [Watchtower]-appointed position in your congregation who is known to have been guilty of child molestation in the past.'  Watchtower said this information should be kept confidential, and instructed elders to place the reports in a " 'Special Blue' " envelope. The March 14 letter also reminded elders of prior letters stating that when a known 'child

---

[1]     This was the same request number 12 that was at issue in *Lopez, supra*, 246 Cal.App.4th 566.  (See *id.* at p. 576.)

molester' moves to another congregation, a letter of introduction should be sent to the new congregation and copies of the letter should be sent to Watchtower in the " 'Special Blue envelopes.' "  (*Lopez*, *supra*, 246 Cal.App.4th at p. 576, fn. 4.)

Watchtower served objections and responses to the PMQ deposition notice including the requests for production.   Regarding request for production number 12, Watchtower only objected and did not agree to provide any responsive documents. Watchtower also filed a motion for protective order, seeking, among other things, an order declaring that it did not have to produce any documents responsive to request number 12.  In support of its motion for protective order, Watchtower characterized the March 14, 1997 letter's primary purpose as "to ensure each of the congregations of Jehovah's Witnesses in the United States were in compliance with Jehovah's Witnesses understanding of the Holy Scriptures and their religious practices and beliefs." Watchtower thus argued that any response to the March 14, 1997 letter would be protected by the clergy-penitent and attorney-client privileges.  Also, Watchtower asserted the requested documents would contain information that would infringe upon third party privacy rights.  Watchtower additionally claimed that the subject requests, including request number 12, sought information relating to religious faith, custom, belief, practice, and internal church governance, which is protected under the First Amendment to the United States Constitution as well as the California Constitution.

Further, Watchtower emphasized that the requests were overbroad and oppressive. Supporting its position, Watchtower submitted the declaration of Richard Ashe, Jr. (Ashe).  Ashe had been a Jehovah's Witnesses elder since 1982.  In 1999, he began

serving at the United States branch offices of Jehovah's Witnesses in New York as well as the service department of the United States branch offices (Service Department). Ashe reviewed the requests for production and stated that the requests sought "confidential spiritual documents sent to Service Department elders by bodies of elders in congregations of Jehovah's Witnesses from throughout the United States."

Ashe explained that responses to the March 14, 1997 letter from local congregation bodies of elders were filed in individual congregation files maintained by Service Department elders for each congregation of Jehovah's Witnesses in the United States. As of the date of Ashe's declaration (February 23, 2015), there were about 14,400 congregations. Ashe claimed that "[t]o accurately and completely respond to [the subject] request[] would require the review of records from all of these 14,400 congregations." Ashe estimated that it would take one elder working 40 hours a week without vacation between 20.77 to 27.69 years to search all the files of the 14,400 congregations to find responsive documents.

Padron opposed Watchtower's motion for protective order. In addition to challenging Watchtower's arguments that the requested documents were not privileged or implicated any constitutionally protected rights, Padron maintained that Watchtower's characterization of the March 14, 1997 letter was not accurate. To this end, Padron submitted a letter dated July 20, 1998, drafted on Watchtower letterhead, that discussed the March 14, 1997 letter. The July 20, 1998 letter explained under what circumstances an elder should report a known child molester. In so explaining, the July 20, 1998 letter discussed the "legal considerations" of dealing with known child molesters:

8

"Those who are appointed to privileges of service, such as elders and ministerial servants, are put in a position of trust. One who is extended privileges in the congregation is judged by others as being worthy of trust. This includes being more liberal in leaving children in their care and oversight. The congregation would be left unprotected if we prematurely appointed someone who was a child abuser as a ministerial servant or an elder. In addition, court officials and lawyers will hold responsible any organization that knowingly appoints former child abusers to positions of trust, if one of these, thereafter commits a further act of child abuse. This could result in costly lawsuits, involving dedicated funds that should be used to further the Kingdom work. So, legal considerations must also be weighed along with the degree of notoriety, the extent of the misconduct, how many years ago the sin occurred, and how the brother is now viewed by the congregation and people in the community including those he victimized."

After considering the pleadings and evidence regarding the motion for protective order as well as entertaining oral argument, the court denied, in part, the motion for protective order in a minute order dated March 13, 2015. In doing so, the court explained:

"The Court finds that the information sought in Request No. 12 (aka 'Molestation Files') is directly relevant to Plaintiff's claims as alleged in this action. Further, Defendant failed to establish that the clergy-penitent privilege is applicable to each responsive document, and if the privilege did apply that it was not vitiated once the information was shared and/or communicated to others. (*Roman Catholic Archbishop of Los Angeles v. Superior Court* (2005) 131 Cal.App.4th 417, 444-445.) In addition, Defendant failed to establish that the information is protected by the attorney-client privilege and/or is work product. Further, all personal, identifying information pertaining to any third party/victim should be redacted from the documents to address any privacy concerns. Nor is the Court persuaded that compliance with the production would be unduly burdensome. (See Declarations of Richard Ashe, Jr.) The records are stored electronically and it appears that the requested information could be obtained with a search term of March 14, 1997, and/or some other written code that would reduce the time/expense involved. (Declaration of Rafiq Wayani) Therefore, Defendant's

9

> motion for a protective order is denied with respect to Request No.
> 12.  However, as both parties primarily focus on Request No. 12, as
> opposed to addressing each of the remaining requests at issue
> (Requests Nos. 4-7; 24-25), the Court is not persuaded that the
> information sought in these Requests should be produced at this
> time.  Although the information may be relevant in some respects,
> the Requests also appear overly broad in both time and scope."

The parties subsequently appeared at a status conference on March 27, 2015 to discuss the progress of the production of documents in response to request number 12. Watchtower again argued the burden of the production was overwhelming and tried to convince the court to limit the production just to congregations in California.  The court rejected Watchtower's argument and reiterated that the document production was not limited to California.  Watchtower then agreed to make a rolling production of documents within 30 days, subject to a confidentiality and nondisclosure order that the parties would negotiate.

On May 13, 2015, the court entered the confidentiality and nondisclosure order agreed to by the parties.  Per that order, responsive documents could only be used by Padron's attorneys for preparation of depositions, oppositions and replies to motions, and at trial of the instant action.  For documents being submitted to the superior court, the confidentiality and nondisclosure order set forth a procedure by which such documents would be lodged under seal.  Responsive documents could only be shown to Padron's attorneys, the attorneys' staff, and any retained experts or consultants.  Finally, the confidentiality and protective order required responsive documents and copies of responsive documents to be returned to Watchtower and/or destroyed.

Although Watchtower produced some documents, Padron believed that Watchtower had not complied with the March 13, 2015 order.  As such, the parties met and conferred, but did not resolve their dispute.  Padron ultimately moved to compel production of documents consistent with the March 13, 2015 order.  Padron claimed Watchtower's production was inadequate because:  (1) Watchtower refused to produce any documents that it received after March 2001; and (2) Watchtower redacted information from the documents far beyond what the court permitted in the March 13, 2015 order.[2]  In support of his motion, Padron submitted the declaration of counsel Devin M. Storey as well as 33 exhibits.

Watchtower opposed Padron's motion to compel and supported its opposition with numerous declarations and exhibits.  Among other arguments, Watchtower explained that the Service Department oversaw the spiritual activities of congregations of Jehovah's Witnesses in the United States.  Before March 2001, Watchtower was the corporation through which the Service Department functioned and communicated with congregations.  Beginning in March 2001, the Service Department began using the Christian Congregation of Jehovah's Witnesses (CCJW) as the corporate entity through which it functioned and communicated with congregations.  CCJW and Watchtower are separate corporations with their own respective board of directors and bank accounts.  Thus, Watchtower asserted that documents responsive to request number 12 would have been

---

2      Padron also objected to Watchtower's alleged refusal to produce documents in any language other than English or Spanish.  This issue is not before us.

sent to Watchtower before March 2001 and CCJW after that date. Because request number 12 only pertained to Watchtower and Watchtower had no control over CCJW, Watchtower argued it only was required to produce responsive documents up until March 2001.

Watchtower also insisted it had properly redacted the responsive documents per the March 13, 2015 order. It noted the order called for the redaction of "all personal, identifying information pertaining to any third party/victim from the documents to address any privacy concerns." Therefore, Watchtower contended it could redact all third party information from the documents.

In reply, Padron claimed the distinction between Watchtower and CCJW was unimportant. Padron emphasized that Watchtower has access to all documents located in the Service Department and the ability to direct Service Department personnel to search for responsive documents. In addition, he pointed out that Watchtower "indisputably operates" a legal department and that legal department has possession of all responses to the March 14, 1997 letter. Therefore, Padron insisted Watchtower had to produce documents after March 2001.

Regarding the redaction of the documents, Padron disputed Watchtower's interpretation of the March 13, 2015 order, contending only the names and personal identifying information of third party victims could be redacted. Padron maintained that any additional privacy concerns beyond the identity of third party victims would be protected by the confidentiality and nondisclosure order governing the production and

use of responsive documents.  Finally, Padron asserted the responsive documents were

useless because they were so heavily redacted.

The discovery referee considered the pleadings and evidence filed by the parties

and held a hearing where the parties had the opportunity to argue their respective

positions at length.  He ultimately produced a written recommendation.  In that

recommendation, the referee explained:

> "The structure of the Jehovah's Witnesses is complicated, and at the
> risk of oversimplification, based on the evidence presented in this
> motion, an entity known as the United States Branch oversees the
> Jehovah's Witnesses in the United States through a committee
> known as the U.S. Branch Committee.  The various activities of the
> United States Branch are carried out through corporations or
> departments.  Watchtower is one of the corporations and the service
> department is one of the departments.  The service department
> communicates with various Jehovah's Witnesses congregations and
> bodies of elders in the United States, and up until March 2001, when
> CCJW was formed, the service department operated through
> Watchtower.  In March 2001, after the formation of CCJW, the
> service department began operating through CCJW.  The evidence
> indicates that the creation of CCJW was primarily to reinforce the
> concept that the Jehovah's Witnesses are a religion as opposed to
> simply a printing corporation, as Watchtower was apparently being
> perceived, but there was no substantive change in the purpose or
> operation of the service department after March 2001.  The service
> department has received responses to the March 14, 1997 Body of
> Elders letter since 1997 and continuing to the present."

With this basic structure in mind, the discovery referee found that Watchtower has

a legal department that provides legal services to Watchtower and CCJW.  The referee

observed that Douglas Chappel, who has been in the Service Department since 1980,

stated in a declaration dated October 12, 2015 that the Watchtower legal department was

physically examining each file to locate correspondence in response to the March 14,

1997 letter.  In addition, Richard Chilton, who has been in the Service Department since 1998, also declared that the Watchtower legal department was physically examining each file to locate responsive documents.

The referee noted Chappel's and Chilton's declarations were consistent with other representations made by Watchtower.  For example, when Watchtower sought a protective order, it argued it would be burdensome and expensive for the Service Department to search for all responsive documents from the many Jehovah's Witnesses congregations.  In addition, at a hearing on March 13, 2015, in arguing for the protective order, Watchtower's counsel represented to the court that Watchtower had to search through records of 14,400 congregations over the past 20 years and that it was not practical to produce that quantity of documents in such a short period.

The discovery referee stated that Watchtower had not filed any declarations or evidence refuting that it does not have access to the Service Department files either directly or through its legal department.  The referee thus concluded that Watchtower had "access to and control of" responsive documents, even after March 2001, and recommended that Watchtower be required to produce those documents.

Regarding the redaction issue, the discovery referee found that the superior court intended that Watchtower produce documents responsive to the March 14, 1997 letter, redacting only the names and personal identifying information of victims of molestation and the names of the elders in the congregation who authored the responses.  The referee concluded this approach "would not impose a serious invasion of any privacy interests, particularly with a confidentiality protective order in place, such as the one in this case."

14

Watchtower filed objections to the discovery referee's recommendation and proposed order. It asserted the referee's recommendation regarding the redaction of the responsive documents was contrary to the court's March 13, 2015 order wherein the court ruled that "all personal, identifying information pertaining to any third party/victim should be redacted from the documents to address any privacy concerns." Watchtower also claimed the discovery referee's recommendation disregarded privacy rights of other people mentioned in the responsive documents.

Additionally, Watchtower argued that the discovery referee incorrectly determined that Watchtower had to produce responsive documents after March 2001. Watchtower again emphasized that CCJW and Watchtower are separate entities, the document request is aimed only at Watchtower, and that the referee's recommendation was a tacit finding that Watchtower and CCJW are alter egos.

After hearing oral argument and considering the objections, the superior court agreed with the discovery referee's recommendation and entered an order, dated March 25, 2016, adopting that recommendation.

On April 8, 2016, Watchtower's counsel "unequivocally informed" the superior court that it would not comply with the March 25, 2016 order. Padron then asked to reinstate its motion for terminating sanctions, and the court set a hearing on that motion for April 29, 2016.[3] However, on April 14, 2016, we issued our opinion in *Lopez*, *supra*,

---

3    Padron previously filed a motion for terminating sanctions in early 2015, which the court denied as premature.

246 Cal.App.4th 566.  In that case, among other things, we reversed a superior court order imposing terminating sanctions in the first instance and directed that on remand the superior court must begin with a lesser sanction before progressing to terminating sanctions.[4]  (*Id*. at p. 606.)

In light of *Lopez, supra*, 246 Cal.App.4th 566, Watchtower filed a petition for writ of mandate and request for immediate stay, seeking to avoid complying with the superior court's March 25, 2016 order.  We denied the petition.  Padron then filed a motion for monetary sanctions based on Watchtower's refusal to comply with the March 25, 2016 order.

Watchtower opposed the motion for sanctions.  It argued the March 25, 2016 order was invalid because it violated the privacy rights of nonparties.  In addition, Watchtower maintained the motion should be denied because the award of sanctions hinged on an "improper discovery order."  More specifically, Watchtower asserted the court could not order it to produce documents received by CCJW.  It also insisted the superior court lacked subject matter jurisdiction to resolve "questions about the internal structure and operations of a religion" and did so by determining that Watchtower had to produce documents after March 2001.  Finally, Watchtower argued Padron could not show it willfully refused to produce CCJW's documents and the requested "harsh" sanctions were improper.

---

[4]    In *Lopez*, *supra,* 246 Cal.App.4th 566, Watchtower, among other things, refused to produce any documents responsive to request number 12 despite being ordered to do so. (*Id.* at p. 587.)

After entertaining oral argument, the superior court granted Padron's motion for monetary sanctions.  The court explained:

> "In this case, there is a clear failure to comply with a discovery order on the part of Watchtower.  First, Watchtower failed to properly comply with the court's March 13, 2015 [order] and produced documents with excessive redactions.  After the court adopted the Discovery Referee's Recommendation as an order, Watchtower has unequivocally stated it will not comply.  By the time of the hearing on the motion for sanctions, it will have been over a year since the initial order and almost three months since the Recommendation was adopted.  In the period since the Recommendation was adopted, Watchtower has shown no effort or willingness to comply with the discovery order.
>
> "Based upon the history in this case and Watchtower's statements at the April 8, 2016 [hearing], the court finds that Watchtower's failure to comply is willful.  Watchtower argues that its failure is not willful because it has no control over CCJW documents.  However, Watchtower clearly has control over the documents it has already produced and could revise the redactions with regard to those documents.  This is obviously and clearly within the scope of Watchtower's powers which it chooses not to exercise.  Continuing to repeat its prior unsuccessful arguments in opposition to the discovery order further illustrates Watchtower's obstinacy in compliance.  Further, based upon the unambiguous statements made by Watchtower's counsel, there is no reasonable dispute that Watchtower is simply refusing even to attempt to comply with the court's order."

The court also noted that much of Watchtower's opposition was akin to a motion to reconsider the court's previous discovery order and thus improper.  The court declined to consider any new or further arguments on the merits of the discovery order.  Following *Lopez*, *supr*a, 246 Cal.App.4th at page 605, the court found that the "imposition of a significant monetary penalty for everyday Watchtower does not search for documents or fails to produce documents is an appropriate first step in issuing discovery sanctions."

17

The court therefore sanctioned Watchtower $2,000 per day for every day Watchtower did not produce responsive documents and $2,000 per day for every day Watchtower did not search for responsive documents.  The court further explained, "[i]n view of the acknowledged substantial net worth of [Watchtower[5]], the court determines that the total daily amount of sanctions of $4,000 per day should be sufficient to determine if [Watchtower] will comply with the discovery order and is not overly harsh."

Watchtower timely appealed.

## DISCUSSION

### I

### *MONETARY SANCTIONS FOR DISCOVERY ABUSE*

#### A.  Standard of Review

"The trial court has broad discretion in selecting discovery sanctions, subject to reversal only for abuse.  [Citations.]  The trial court should consider both the conduct being sanctioned and its effect on the party seeking discovery and, in choosing a sanction, should ' "attempt[ ] to tailor the sanction to the harm caused by the withheld discovery." ' [Citation.]  The trial court cannot impose sanctions for misuse of the discovery process as a punishment.  [Citation.]  [¶] The discovery statutes evince an incremental approach to discovery sanctions, starting with monetary sanctions and ending with the ultimate sanction of termination.  'Discovery sanctions "should be appropriate to the dereliction,

---

[5]      There is evidence in the record that Watchtower owns real property valued at $1.3 billion.

and should not exceed that which is required to protect the interests of the party entitled

to but denied discovery." '  [Citation.]  If a lesser sanction fails to curb misuse, a greater

sanction is warranted:  continuing misuses of the discovery process warrant incrementally

harsher sanctions until the sanction is reached that will curb the abuse.  'A decision to

order terminating sanctions should not be made lightly.  But where a violation is willful,

preceded by a history of abuse, and the evidence shows that less severe sanctions would

not produce compliance with the discovery rules, the trial court is justified in imposing

the ultimate sanction.' "  (*Doppes v. Bentley Motors, Inc.* (2008) 174 Cal.App.4th 967,

992 (*Doppes*).)  "Discovery sanctions are intended to remedy discovery abuse, not to

punish the offending party.  Accordingly, sanctions should be tailored to serve that

remedial purpose, should not put the moving party in a better position than he would

otherwise have been had he obtained the requested discovery, and should be

proportionate to the offending party's misconduct."  (*Williams v. Russ* (2008) 167

Cal.App.4th 1215, 1223.)

     "We review the trial court's order under the abuse of discretion standard and

resolve all evidentiary conflicts most favorably to the trial court's ruling.  We will reverse

only if the trial court's order was arbitrary, capricious, or whimsical.  It is appellant's

burden to affirmatively demonstrate error and where the evidence is in conflict, we will

affirm the trial court's findings.  [Citation.]  We presume the trial court's order was

correct and indulge all presumptions and intendments in its favor on matters as to which

it is silent."  (*Williams v. Russ*, *supra*, 167 Cal.App.4th at p. 1224; see *Liberty Mutual*

*Fire Ins. Co. v. LcL Administrators, Inc.* (2008) 163 Cal.App.4th 1093, 1102 ["[s]anction

orders are 'subject to reversal only for arbitrary, capricious or whimsical action' "];

*Miranda v. 21st Century Ins. Co.* (2004) 117 Cal.App.4th 913, 928 [" '[i]n choosing

among its various options for imposing a discovery sanction, a trial court exercises

discretion, subject to reversal only for manifest abuse exceeding the bounds of reason' "].)

The question on appeal "is not whether the trial court should have imposed a lesser

sanction; rather, the question is whether the trial court abused its discretion by imposing

the sanction it chose." (*Do It Urself Moving & Storage, Inc. v. Brown, Leifer, Slatkin &

Berns* (1992) 7 Cal.App.4th 27, 36-37.)

### B.  Watchtower's Contentions

Watchtower's challenge to the order levying monetary sanctions is multifaceted.

As a threshold matter, it contends the court lacked the authority to impose a $4,000 per

day sanction for discovery abuse.  Watchtower also maintains that the court could not

impose any sanction with respect to documents possessed by CCJW because CCJW is

not a party and has not been served with any subpoena for the production of documents in

this matter.  Additionally, Watchtower asserts the court, in imposing sanctions, exceeded

its jurisdiction by addressing issues of religious polity and administration.  Finally,

Watchtower insists it acted with substantial justification in refusing to comply with the

March 25, 2016 order.

### C.  The Superior Court's Authority to Issue Monetary Sanctions

Watchtower maintains that the superior court lacked the authority to levy

monetary sanctions in the amount of $4,000 per day.  It asserts the court could only order

Watchtower to pay Padron's costs and expenses in seeking to enforce the discovery order.

Watchtower characterizes the sanctions as punitive and harsh.  In addition, it claims that the sanction is for potential future conduct, and thus, is invalid.  We reject these contentions.

Below, the superior court followed *Lopez*, *supra*, 246 Cal.App.4th 566 when it issued the $4,000 per day monetary sanctions.  In that case, the superior court entered an order (the Lopez order) adopting the discovery referee's recommendation, requiring Watchtower to produce documents in response to a request identical to request number 12 here.[6]  (*Id.* at pp. 576, 583.)  After Watchtower refused to produce responsive documents, the plaintiff's attorney brought a motion for terminating sanctions.  In granting the motion, the superior court noted that Watchtower had willfully and repeatedly refused to comply with the court's discovery order.  (*Id.* at p. 586.)  The court further noted that in opposing the motion for sanctions, Watchtower attempted to reargue and challenge several underlying discovery orders.  (*Id.* at p. 587.)

Among other issues on appeal, Watchtower challenged the court's imposition of terminating sanctions.  (*Lopez*, *supra*, 246 Cal.App.4th at p. 603.)  Despite acknowledging a superior court's broad discretion to sanction a party for discovery abuses, we noted that terminating sanctions is a drastic penalty that should be used sparingly.  (*Id.* at p. 604.)  We observed:  "The discovery statutes thus 'evince an incremental approach to discovery sanctions, starting with monetary sanctions and ending

---

6     The Lopez order also required Watchtower to produce a certain individual for a PMQ deposition as well as produce documents to an additional request for production. We do not discuss portions of the *Lopez* opinion addressing those two requirements.

21

with the ultimate sanction of termination.' [Citation.] Although in extreme cases a court

has the authority to order a terminating sanction as a first measure [citations], a

terminating sanction should generally not be imposed until the court has attempted less

severe alternatives and found them to be unsuccessful and/or the record clearly shows

lesser sanctions would be ineffective." (*Id*. at pp. 604-605; italics omitted.) We agreed

with the superior court that Watchtower willfully failed to comply with the Lopez order,

but we were concerned that terminating sanctions were the first and only sanction the

court levied. (*Id*. at p. 605.) As such, we determined the court erred in imposing

terminating sanctions, reasoning:

> "The fundamental flaw with the court's approach is that there is no
> basis in the record showing the court could not have obtained
> Watchtower's compliance with lesser sanctions or that another
> sanction could not effectively remedy the discovery violation. To
> the contrary, the record supports that the court had numerous tools at
> its disposal to compel compliance before imposing the ultimate
> sanction. For example, the court could have imposed a significant
> monetary penalty for every day Watchtower did not search for the
> documents or for each day the responsive documents were not
> produced. Alternatively, the court could have imposed evidentiary
> or issue sanctions to replace the information that would or could be
> included within those documents. When a party does not produce
> ordered documents, the court is entitled to infer the documents
> would contain evidence damaging to that party's case and instruct
> the jury accordingly. [Citation.] Thus, as Watchtower now proposes
> 'the trial court could have . . . ordered an issue sanction that would
> have precluded Watchtower from disputing certain aspects of
> liability at trial.' Or—if the case proceeded to the punitive damage
> stage—the court could have considered instructing the jury that
> Watchtower refused to produce documents concerning subsequent
> child sexual abuse incidents, and from that the jury could infer
> Watchtower had engaged in a pattern and practice of ignoring and/or
> ratifying sexual abuse by its agents." (*Id*. at pp. 605-606.)

22

This case is similar to *Lopez, supra*, 246 Cal.App.4th 566.  Like in *Lopez*, the superior court has ordered Watchtower to produce documents in response to request number 12.  As it did in *Lopez*, Watchtower is refusing to comply with a discovery order.  Watchtower is yet again arguing against the underlying discovery orders, repeating the very same arguments that the superior court repeatedly rejected (i.e., the documents are irrelevant, the burden to produce the documents is too great, the documents are privileged, third party privacy rights are implicated, and the production of documents would violate Watchtower's First Amendment rights).  (See *id*. at pp. 590-599.)  Here, like in *Lopez,* Watchtower willfully refuses to comply with a discovery order, claiming the underlying discovery order is incorrect.  And there is no indication that Watchtower will comply with the March 25, 2016 order.  Indeed, here, it makes many of the same arguments about the discoverability of the documents that we rejected in *Lopez* and the superior court rejected below.  As we discuss later in this opinion, we too discard Watchtower's challenges to the discoverability of documents responsive to request number 12.

Against this backdrop, we reiterate that a superior court possesses certain tools to encourage a party to comply with a discovery order.  As we concluded in *Lopez*, *supra*, 246 Cal.App.4th 566, terminating sanctions *might b*e too severe as a first measure.  However, because a court has broad discretion to manage discovery (see *Pomona Valley Hospital Medical Center v. Superior Court, supra,* 209 Cal.App.4th at p. 692), including selecting an appropriate penalty for a party's refusal to obey a discovery order (see *Lopez, supra*, at p. 604), a court could take an incremental approach, appropriate to the

23

dereliction and tailored to the harm caused by the withheld discovery, and impose a considerable monetary sanction to compel compliance with a discovery order (*id*. at pp. 604-605).  Not surprisingly, Watchtower disagrees.  Instead, it insists a court's authority to impose monetary sanctions is limited by the Civil Discovery Act (Code Civ. Proc., § 2016.010 et seq.)  As such, Watchtower claims the court could only sanction it in an amount no greater than Padron's reasonable expenses (including attorney fees) incurred as a result of Watchtower's discovery misuse.  (See Code. Civ. Proc., § 2023.030, subd. (a).)

We find Watchtower's argument on this issue peculiar.  In *Lopez*, *supra*, 246 Cal.App.4th 566, in arguing terminating sanctions were inappropriate, Watchtower insisted, in its opening brief, the superior court "had many other options at its disposal."  Watchtower then provided us with an example of one of those options:  "[T]he trial court could have issued monetary sanctions in an amount which increased incrementally with the passage of time, or with Watchtower's concomitant failure to produce the documents in question by certain procedural landmarks."[7]  So when faced with terminating sanctions, Watchtower asserted the superior court was obligated to first impose lesser sanctions, like monetary sanctions.  It did not argue that the monetary sanctions could only be in the amount of the plaintiff's reasonable costs.  In fact, it argued, as an

---

[7]     In connection with his respondent's brief, Padron submitted a request for judicial notice regarding portions of Watchtower's opening brief in *Lopez*, *supra*, 246 Cal.App.4th 566.  We grant the request for judicial notice and consider the submitted portion of Watchtower's opening brief as a part of the record before us.

appropriate sanction, an increasing monetary sanction for noncompliance over a period of time or for failing to comply with the order by certain procedural benchmarks.  We agreed with this argument and even incorporated it in our opinion when we echoed Watchtower's assertion, "For example, the court could have imposed a significant monetary penalty for every day Watchtower did not search for the documents or for each day the responsive documents were not produced."  (See *id.* at p. 605.)  Alternatively stated, we adopted Watchtower's position and used it to explain our determination that terminating sanctions were improper without utilizing lesser sanctions.

Based on its arguments in *Lopez, supra*, 246 Cal.App.4th 566, Padron maintains that Watchtower should be judicially estopped from arguing the monetary sanctions here were unauthorized.  We agree.

" ' " 'Judicial estoppel precludes a party from gaining an advantage by taking one position, and then seeking a second advantage by taking an incompatible position. [Citations.]  The doctrine's dual goals are to maintain the integrity of the judicial system and to protect parties from opponents' unfair strategies.  [Citation.] . . .' "  [Citation.]  The doctrine applies when "(1) the same party has taken two positions; (2) the positions were taken in judicial or quasi-judicial administrative proceedings; (3) the party was successful in asserting the first position (i.e., the tribunal adopted the position or accepted it as true); (4) the two positions are totally inconsistent; and (5) the first position was not taken as a result of ignorance, fraud, or mistake." ' "  (*People v. Castillo* (2010) 49 Cal.4th 145, 155; italics omitted.)  "[J]udicial estoppel is an equitable doctrine, and its application, even where all necessary elements are present, is discretionary."  (*MW Erectors, Inc. v.*

25

*Niederhauser Ornamental & Metal Works Co., Inc.* (2005) 36 Cal.4th 412, 422; italics omitted.)

Here, we find all the elements of judicial estoppel present.  Watchtower has taken two positions.  In *Lopez, supra*, 266 Cal.App.4th 566, it argued monetary sanctions, untethered to the plaintiff's reasonable costs, were appropriate.  In the instant matter, Watchtower now claims the superior court was not authorized to issue such sanctions.  Watchtower has taken these contrary positions in two separate cases before this court.  Watchtower was successful in asserting its first position in *Lopez*.  Indeed, we included Watchtower's example of monetary sanctions in our opinion in *Lopez*.  (*Id*. at p. 605.)  Watchtower's argument here that such monetary sanctions are not authorized is totally inconsistent with its position in *Lopez*.  Finally, there is no indication in the record that Watchtower took its first position based on ignorance, fraud, or mistake.

Watchtower argues that *Lopez, supra,* 246 Cal.App.4th 566 and the instant matter are too different for the application of judicial estoppel.  We are not persuaded.  Both *Lopez a*nd the instant matter concern Watchtower's refusal to comply with a discovery order regarding the production of documents in response to request number 12.  The fact that the sanctions the superior court ordered in the two cases were different is not of the moment.  In response to terminating sanctions in *Lopez*, Watchtower argued monetary sanctions, including increasing monetary sanctions for noncompliance with a court order, were appropriate.  However, in the instant action, where the superior court imposed a monetary sanction, Watchtower now argues such monetary sanctions are not authorized.  We cannot contemplate a more apt circumstance in which to apply judicial estoppel.

26

Nevertheless, even if we were not to apply judicial estoppel, we would conclude the superior court was authorized to issue the monetary sanctions below. "California courts . . . retain flexibility to exercise historic inherent authority in modern circumstances, fashioning procedures and remedies as necessary to protect litigants' rights." (*Stephen Slesinger, Inc. v. Walt Disney Co.* (2007) 155 Cal.App.4th 736, 762.) "[T[he power to impose sanctions under the Civil Discovery Act [citation] supplements, but does not supplant, a court's inherent power to deal with litigation abuse." (*Id*. at p. 763.) Here, it is beyond debate that Watchtower has abused the litigation process and has shown little respect for the superior court's authority.

Watchtower objected and would not agree to produce any documents responsive to request number 12. It sought a protective order that it did not have to produce any documents in response to request number 12. It was unsuccessful, and the court ordered it to produce responsive documents in a limited redacted form. Before producing any documents, Watchtower attempted to reargue its motion for protective order and argued that the responsive documents should be limited to California only. The court rejected Watchtower's argument. Watchtower then represented that it would produce documents subject to a confidentiality and nondisclosure order it would negotiate with Padron. The court entered that confidentiality and nondisclosure order. Watchtower finally produced documents, but they were heavily redacted. In addition, Watchtower produced no documents dated after March 2001.

After meet and confer efforts proved unsuccessful, Padron filed a motion to compel. Watchtower opposed it. The discovery referee considered the motion and

27

issued a recommendation in favor of granting the motion.  Watchtower objected to the discovery referee's recommendation, repeating many of its previous arguments against the production of documents in the first instance.  The court adopted the discovery referee's recommendation and entered a corresponding order.  Watchtower then informed the court that it would not comply with that order.  Padron then moved for monetary sanctions.  Watchtower again reverted to challenging the underlying discovery order, arguing that it should not have to produce additional or less redacted documents.  It lost that argument as well.

In all, Watchtower has argued that it should not have to produce documents in response to request number 12 no fewer than five times.  Each time, it has been unsuccessful.  The court has allowed Watchtower to make certain redactions in the documents and entered a confidentiality and nondisclosure order to protect sensitive information in the produced documents.  Nonetheless, Watchtower refuses to comply with the court order and maintains the court was just wrong.  In this sense, it refuses to acknowledge the authority of the court and repudiates the procedures and rules all litigants are supposed to follow in superior court.  In these extreme circumstances, we conclude the superior court was authorized to issue the monetary sanctions below.  Also, we see nothing in the Civil Discovery Act that expressly prohibits the superior court from imposing monetary sanctions like the ones issued here.  Indeed, we find Watchtower's

conduct so egregious that if it continues to defy the March 25, 2016 order, terminating

sanctions appear to be warranted and necessary.[8]

## D.  Responsive Documents After March 2001

Watchtower also argues the order imposing monetary sanctions is invalid because

the court could not order Watchtower to produce documents in the custody or control of

CCJW.  CCJW was created in 2001 and the Service Department began to operate through

CCJW in March 2001.  Thus, Watchtower argues that it only has possession of

documents responsive to request number 12 up to March 2001 and any responsive

documents created after that date are in the possession of CCJW.  Watchtower points out

that CCJW and Watchtower are separate entities; thus, Watchtower concludes the court

lacked jurisdiction to compel it to produce a third party's documents.  As such,

Watchtower claims that the superior court could not sanction it $2,000 for each day it

fails to look for responsive documents dated after March 2001.

However, Watchtower's argument here is off the mark.  Watchtower presented

evidence that CCJW and it were separate entities.  The discovery referee and the court

accepted this fact.  Padron presented evidence that this distinction was unimportant as

---

[8]      Having determined that the superior court had the authority to issue the subject
monetary sanctions, we summarily reject Watchtower's other attacks on the court's
authority.  Considering Watchtower's stipulated net worth, we do not conclude the
amount of the sanctions was harsh or intended to punish Watchtower.  To the contrary, it
appears the court tried to select an amount that would successfully motivate Watchtower.
Additionally, we are not persuaded that the sanctions were improper because they
concern some future potential conduct.  The sanctions properly apply to Watchtower's
current conduct, i.e., refusing to comply with a valid discovery order.

Watchtower had access to responsive documents created after March 2001. The discovery referee agreed with Padron, finding that Watchtower had "custody and control of" responsive documents after March 2001. Accordingly, the discovery referee recommended that Watchtower produce "all documents in its possession, custody or control that are responsive to the March 14, 1997 Body of Elders letter regardless of whether addressed to Watchtower or CCJW[.]" The court adopted the referee's findings when it entered the March 25, 2015 order.

When the facts asserted in support of and in opposition to the motion are in conflict, the trial court's factual findings will be upheld if they are supported by substantial evidence. (*HLC Properties, Ltd. v. Superior Court* (2005) 35 Cal.4th 54, 60; *D.I. Chadbourne, Inc. v. Superior Court* (1964) 60 Cal.2d 723, 729.) In its opening brief, Watchtower does not explain why substantial evidence does not support the court's conclusion that Watchtower had custody and control of responsive documents after March 2001. Instead, it merely points to facts supporting its position and argues that the superior court did not properly consider that evidence. Put differently, it is asking us to reweigh the evidence. This we cannot do. (See *Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 630-631.)

In its reply brief, Watchtower, for the first time, addresses the substantial evidence issue. Yet, we need to consider arguments introduced in the reply brief. Any new substantive arguments raised by Watchtower in its reply brief are deemed forfeited. (See *REO Broadcasting Consultants v. Martin* (1999) 69 Cal.App.4th 489, 500 [refusing to entertain argument raised for the first time in reply brief]; *American Drug Stores, Inv. v.*

*Stroh* (1992) 10 Cal.App.4th 1446, 1453 [noting arguments "raised for the first time in a reply brief will ordinarily not be considered, because such consideration would deprive the respondent of any opportunity to counter the argument"].)

Nonetheless, even if we were to address this issue on the merits, we would conclude the discovery referee's factual finding, adopted by the court when it entered the March 25, 2016 order, is supported by substantial evidence.  Initially, we observe that the Watchtower/CCJW distinction as well as the March 2001 cut off was never raised before Watchtower's production of documents responsive to request number 12.  Watchtower does not point to any response or objection to request number 12 that indicated that Watchtower could only produce documents created and/or sent before March 2001.  In fact, the record is clear that Watchtower made no temporal distinction, but instead, emphasized the tremendous burden of responding to request number 12 because it would require it to search for documents from 1997 to the present.  For example, at the March 13, 2015 hearing where Watchtower argued in support of its motion for a protective order declaring that it did not have to produce any documents in response to request number 12, its attorney made the following representation to the court:

> "There's 14,000 congregations.  The organization has five paralegals.
> In order to comply with your tentative, Your Honor, each paralegal
> would receive 3,000 congregations to go through the records, and
> then attorneys have to go through the records that are pulled.  This is
> a monumental request, 14,000 congregations over a period from
> 1997 *to the present.*"  (Italics added.)

At the same hearing, in explaining to the court why it was unreasonable to produce documents within two weeks, Watchtower further confirmed that there was no March

2001 cutoff for responsive documents.  "As a practical matter, this search for the records, which have never [been] produced, through 14,400 congregations over the past 20 years, a production date in two weeks is just not practical."

      Watchtower's attorney's representations to the court when arguing about the burden associated with producing documents was clear.  Watchtower would need to look for documents from 1997 to present.  There was no mention whatsoever of Watchtower not possessing responsive documents after March 2001.  Moreover, Watchtower's counsel's representations were consistent with party declarations.  For example, Service Department members, Chappel and Chilton, both declared that the Watchtower legal department was physically examining each congregation file to locate correspondence in response to the March 14, 1997 letter.  In fact, Chappel explained that to respond to a request "seeking all documents received by Watchtower in response to the Body of Elders Letter dated March 14, 1997" would require [a] review of all congregation files[.]"  Similarly, in one of Ashe's declarations dated February 23, 2015, he stated that, "[a]t present, there are more than 14,400 congregations of Jehovah's Witnesses in the United States.  To accurately and completely respond to plaintiff's request would review the review of the records from 14,400 congregations."  Ashe further explained that undertaking such a task would require 43,200 to 57,600 hours to review the files for all 14,400 congregations.  The representations of Watchtower's counsel as well as the declarations of Watchtower agents clearly indicate that Watchtower has access to responsive documents from 1997 to present.  We thus conclude substantial evidence supports the discovery referee's finding, adopted by the court, that Watchtower was in

"custody and control" of responsive documents beyond the March 2001 creation of CCJW.

### E.  Issues of Religious Polity and Administration

Watchtower next argues that the order for monetary sanctions was improper because it hinges on the validity of the March 25, 2016 order, which Watchtower claims purports to resolve questions about the internal structure and operations of a religion thus violating the First Amendment of the United States Constitution.  To this end, Watchtower maintains the March 25, 2016 order depends on the discovery referee's finding that the "evidence indicates that the creation of CCJW was primarily to reinforce the concept that Jehovah's Witnesses are a religion as opposed to simply a printing corporation, as Watchtower was apparently being perceived, but there was no substantive change in the purpose of the service department after March 2001."  Watchtower insists this finding is in excess of a secular court's subject matter jurisdiction because it interferes with the free development of religious doctrine.  (Cf. *Presbyterian Church in United States v. Marcy Elizabeth Bull Hull Memorial Presbyterian Church* (1969) 393 U.S. 440, 449, 451; *Central Coast Baptist Assn. v. First Baptist Church of Las Lomas* (2007) 171 Cal.App.4th 822, 841.)  We find this argument almost specious.

This discovery dispute did not require the discovery referee to intrude into ecclesiastical matters.  (See *Presbyterian Church in United States v. Marcy Elizabeth Bull Hull Memorial Presbyterian Church, supra,* 393 U.S. at p. 449.)  To the contrary, Watchtower's counsel and its agents consistently represented to the court that Watchtower would have to look through files from 1997 to present to find responsive

documents.  In other words, Watchtower stated numerous times that it had access to and possession of responsive documents created after March 2001.[9]  The discovery referee noted that Watchtower did not file any declarations or evidence refuting that representation.  The discovery referee did not need to delve any further into the issue and certainly did not have to improperly resolve questions about the internal structure and operations of a religion.  Watchtower's argument is without merit.

F.  Watchtower's Claim of Substantial Justification

The party subject to sanctions bears the burden to establish it acted with substantial justification or other circumstances make the imposition of the sanction unjust.  (See *Doe v. United States Swimming, Inc.* (2011) 200 Cal.App.4th 1424, 1434.)  Substantial justification means clearly reasonable justification that is well grounded in both law and fact.  (*Diepenbrock v. Brown* (2012) 208 Cal.App.4th 743, 747; *Doe, supra,* at p. 1434.)  The losing party has the burden of proving substantial justification on appeal.  (*Id*. at p. 1435; *Ellis v. Toshiba America Information Systems, Inc.* (2013) 218 Cal.App.4th 853, 878.)

Here, Watchtower maintains it was substantially justified to refuse to comply with the March 25, 2016 order wherein it was ordered to produce documents and only redact

---

[9]     We find it curious that the existence of CCJW and the March 2001 cut off only became an issue after Watchtower produced documents and Padron complained that the production was not sufficient.  It appears Watchtower argued that it had access to the documents after March 2001 when it was to its benefit to support its burden argument, but only after losing that argument, it claimed to not have access to documents after a certain point of time to justify its limited production.  Such gamesmanship has no place in civil discovery.

the names and personal identifying information of victims of molestation and the names

of the elders in the congregation who authored the responses to the March 14, 1997 letter.

In support of its position, Watchtower argues that complying with the order would have

required it to violate third party privacy rights, the right of Jehovah's Witnesses to freely

exercise religion, and the right of Jehovah's Witnesses to associational anonymity.

Essentially, Watchtower argues it was substantially justified to ignore the March 25, 2016

order because it was wrong.  We do not agree.[10]

Watchtower's arguments here were previously raised and rejected by both the

superior court and the discovery referee.  Although we acknowledge that there was some

confusion regarding the scope of the permitted redactions following the March 13, 2015

order, any uncertainty was resolved by the discovery referee's clear recommendation and

the court's adoption of that recommendation in its March 25, 2016 order.  At that point,

both the discovery referee and the superior court had carefully considered Watchtower's

privacy arguments and rejected them.  Here, Watchtower offers no persuasive argument

showing why the superior court was incorrect.

Watchtower acknowledges that California law requires a court to balance

constitutional privacy rights against the need for discovery.  (See *Pioneer Electronics*

*(USA), Inc. v. Superior Court* (2007) 40 Cal.4th 360, 370-371; *Hill v. National Collegiate*

---

10      Absent from Watchtower's arguments here is a clear understanding that a superior
court has wide discretion to manage discovery.  (*Pomona Valley Hospital Medical Center
v. Superior Court*, *supra*, 209 Cal.App.4th at p. 692.)  In claiming that the underlying
discovery orders are incorrect, Watchtower attempts to argue the issues anew, instead of
explaining how the court abused its discretion.

*Athletic Association* (1994) 7 Cal.4th 1, 37.)  Instead of clearly explaining this balancing as it relates to the issues here, Watchtower asserts that the superior court violated the safeguards for third party privacy protections set forth in *Lopez*, *supra*, 246 Cal.App.4th 566.  We do not share Watchtower's expansive reading of *Lopez*.

In *Lopez*, we were not presented with a novel privacy issue in the context of a discovery dispute.  Instead, we addressed a fact specific question regarding the production of documents under a certain order.  In that case, Watchtower argued the Lopez order was invalid because it would violate the privacy rights of others, and the court " 'failed to adequately take the rights of those third parties into consideration.' " (*Lopez*, *supra*, 246 Cal.App.4th at p. 598.)  We observed that the discovery referee and the superior court rejected these arguments because the order specifically permitted Watchtower to redact names, birth dates, and Social Security numbers from the documents.  Watchtower claimed these redactions would not prevent the violation of privacy rights " 'where the circumstances surrounding such reports would nonetheless make them readily identifiable to anyone with a modicum of familiarity with those individuals.' " (*Ibid.*)  We concluded this argument was not supported by the record.  We also noted that if Watchtower was concerned about this issue, it could have sought some form of protection.  (*Ibid.*)  Thus, we did not conclude in *Lopez* that all documents produced in response to request number 12 had to be redacted a certain way.  Nor did we determine that production of responsive documents would violate third party privacy rights unless all third party information was redacted.  In short, *Lopez* is not helpful to Watchtower's position here.

In the instant matter, the superior court instituted certain privacy protections in the production of documents in response to request number 12.  It required names and personal identifying information for any victim of molestation to be redacted from the documents.  The same privacy protections applied to the elder or elders drafting any response to the March 14, 1997 letter.  Also, all documents produced in response to request number 12 were subject to a strict confidentiality and nondisclosure order negotiated by Watchtower.  That order prevents Padron from publicly disclosing the responsive documents, limits to whom the documents can be shown, requires documents to be filed under seal, and mandates the return and/or destruction of the responsive documents at the conclusion of the litigation.

Watchtower does not explain why these protections are inadequate.  It simply lists various privacy rights it claims exist and asserts the production of less redacted documents would violate these privacy rights.  And, tellingly, Watchtower does not claim the confidentiality and nondisclosure order it negotiated does not protect these privacy rights.  Instead, it asserts that Padron's counsel will not comply with that order.  To this end, Watchtower claims that Padron's counsel has requested to use documents responsive to request number 12 in other cases and represents that Padron's counsel stated that it is "likely" " 'these documents are going to be used and made public.' "  Watchtower's arguments are not supported by the record.  Further, if Padron's counsel violates the confidentiality and nondisclosure order, Watchtower can seek certain sanctions and remedies under that order.

In summary, we agree with the superior court that third party privacy rights are adequately protected by the procedures in place.  And Watchtower has not shown us otherwise.

Also, we are not persuaded by Watchtower's argument that the production of the redacted documents under the confidentiality and nondisclosure order would violate its and its members' First Amendment rights.  The record supports the superior court's finding that the production of the responses to the March 14, 1997 letter does not infringe upon Watchtower's First Amendment rights.  It is clear that those responses, at least in part, were in consideration of future litigation and liability that could arise from the placement of known child molesters in positions of leadership and authority within the Jehovah's Witnesses organization.  Watchtower has provided us with no authority under which such documents would enjoy First Amendment protection.  Its argument appears to be that these documents are not discoverable because it is a religious affiliated organization.  There is no authority for this proposition.  We therefore determine that the First Amendment is not violated by the production of documents responsive to request number 12.

### G.  Conclusion

Here, Watchtower has abused the discovery process.  It has zealously advocated its position and lost multiple times.  Yet, it cavalierly refuses to acknowledge the consequences of these losses and the validity of the court's orders requiring it to produce documents in response to request number 12.  And, in a further act of defiance, Watchtower informed the court that it would not comply with the March 25, 2016 order

38

requiring it to produce documents responsive to request number 12.  The court, following

*Lopez*, *supra*, 246 Cal.App.4th 566, as an incremental step toward terminating sanctions

if Watchtower persists in its unjustified conduct, imposed monetary sanctions.  On the

record before us, we are satisfied that the superior court's order was not arbitrary,

capricious, or whimsical.  To the contrary, the superior court has shown great patience

and flexibility in dealing with a recalcitrant litigant who refuses to follow valid orders

and merely reiterates losing arguments.  We therefore affirm.

DISPOSITION

The order is affirmed.  Padron is awarded his costs of appeal.

HUFFMAN, Acting P. J.

WE CONCUR:


IRION, J.


DATO, J.