IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| TRACY CAEKAERT and CAMILLIA MAPLEY, <br><br> Plaintiffs, <br><br> vs. <br><br> WATCHTOWER BIBLE AND TRACT SOCIETY OF NEW YORK, INC., and WATCH TOWER BIBLE AND TRACT SOCIERY OF PENNSYLVANIA, INC. <br><br> Defendants. | CV 20-52-BLG-SPW <br><br> ORDER |

Before the Court is Defendant Watchtower Bible and Tract Society of New York, Inc.'s ("WTNY") Motion for Order Directing Rule 35 Examinations. (Doc. 266). The parties have agreed that Rule 35 mental exams of Plaintiffs Tracy Caekaert and Camillia Mapley are justified, and that WTNY's expert, Dr. Michael Bütz, is qualified to conduct such exams. However, the parties disagree on various conditions on the exams. Those conditions to which they stipulate and on which they disagree are outlined in Docs. 267-1 and 267-2. The Court will not disturb the stipulated conditions.

I.  **Legal Standard**

Federal Rule of Civil Procedure 35 allows a court, on a motion for good cause, to order a mental exam by a suitably licensed or certified examiner of a party whose

1

mental condition is "in controversy." Fed. R. Civ. P. 35(a)(1); *Schlagenhauf v. Holder*, 379 U.S. 104, 106 (1964). The prerequisites for an exam "are not met by mere conclusory allegations of the pleadings—nor by mere relevance to the case—but require an affirmative showing by the movant that each condition as to which the examination is sought is really and genuinely in controversy and that good cause exists for ordering each particular examination." *Schlagenhauf*, 379 U.S. at 118. The parties here do not dispute that Plaintiffs' mental and emotional conditions are in controversy and that mental exams are justified. (Docs. 267-1, 267-2).

## II. Analysis

WTNY asks the Court to order that: (1) the exams occur in the manner specified by Dr. Bütz and pursuant to his authorization form; (2) the exams take place in person, and Plaintiffs pay for all costs of travel; (3) Dr. Bütz's raw test data not be disclosed to Plaintiffs' counsel and any unqualified experts; and (4) the Court will reserve judgment on any potential waiver of attorney-client privilege during the exams until a dispute arises. (Doc. 267).

As to whether the exams should conform to the manner of testing specified by Dr. Bütz, Plaintiffs retort that Dr. Bütz must disclose whether he intends to conduct general neuropsychological testing, and that any neuropsychological testing is inappropriate because Plaintiffs do not allege neuropsychological injuries. (Doc. 280 at 10–13). Plaintiffs also take issue with certain language in Dr. Bütz's

2

authorization form. (*Id.* at 8). As for the location of the exams, Plaintiffs assert that Dr. Bütz should conduct his exam of Mapley, who lives in Australia, remotely. (*Id.* at 13–17). Additionally, Plaintiffs refuse to pay for any of Dr. Bütz's airline upgrades or in-transit professional fees for Mapley's or Caekaert's exam. (*Id.*). Last, Plaintiffs argue that Dr. Bütz must provide Plaintiffs' counsel the entirety of his file—including reports and raw test data—and anything Plaintiffs disclose during the exam that is protected by attorney-client privilege should be automatically stricken from the record. (*Id.* at 5–8).

The Court will address each of these arguments in turn.

A.  *Manner of Testing*

WTNY first asks the Court to order Plaintiffs' examinations in the manner specified by Dr. Bütz, as outlined in WTNY's Proposed Memorandum (Doc. 267-1). (Doc. 267 at 18). In support, WTNY cites to a decision from this district that held that "the scope of the proposed neuropsychological examination 'will be the same as is typical for a neuropsychological examination' and the Court would not 'otherwise limit the scope of the examinations.'" (*Id.* (citing *Copenhaver v. Cavagna Grp. S.p.a. Omega Div.*, CV 19-71-BLG, 2021 WL 3171787, at *7 (D. Mont. July 27, 2021))). WTNY notes that *Copenhaver*'s holding aligns with the U.S. and Montana supreme courts' writings on the scope of Rule 35 exams, which is to determine "the existence and extent" of the claimed injuries. (*Id.* (citing

3

*Winslow v. Mont. Rail Link, Inc.*, 38 P.3d 148, 152 (Mont. 2001); *Schlagenhauf*, 379 U.S. at 119))).

Plaintiffs respond that *Copenhaver* is not applicable because the issue there was whether the examiner needed to provide a list of questions and protocols in advance of testing. (Doc. 280 at 11). Plaintiffs here are seeking only a list of the general type of testing. Thus far, Dr. Bütz only has stated that he will employ "academic, cognitive, and personality assessment instruments." (Doc. 267-11 at 5). According to Plaintiffs, this is insufficient because a "general statement that 'psychological testing' will be conducted is not sufficient to define the scope of a proposed Rule 35 exam." (Doc. 280 at 10 (citing *Marroni v. Matey*, 82 F.R.D. 371, 372 (E.D. Pa. 1979)). Rather, Plaintiffs argue he must also disclose if Dr. Bütz will conduct any neuropsychological testing. Plaintiffs further contend such testing is irrelevant and must be prohibited because Plaintiffs have not alleged neuropsychological injuries.

On reply, WTNY contends that Dr. Bütz has disclosed sufficient information about the testing and its scope under the Federal Rules of Civil Procedure. (Doc. 289 at 6–8). A request for any "more specific information—including the actual questions that will be administered—" should be denied. (*Id.* at 8). At the same time, though, WTNY seems to assert that Dr. Bütz will not conduct a neuropsychological evaluation, writing that, "[w]hile the academic, cognitive, and

4

personality assessments Dr. Bütz intends to administer could be considered part of a neuropsychological evaluation, he does not intend to conduct a neuropsychological evaluation." (*Id.* at 7 (citing Doc. 289-1 at 20–24)).

The Court finds Dr. Bütz must disclose if he intends to conduct a neuropsychological examination because Plaintiffs must be able to challenge whether good cause exists for "each particular examination." *Schlagenhauf*, 379 U.S. at 118. The Court interprets the framework of a mental exam as such: Dr. Bütz's exam may assess the academic, cognitive, and personality profile of the Plaintiffs, while the lens through which Dr. Bütz would assess those characteristics is, for instance, neuropsychology. The lens through which an assessment is made dictates the type of tests the examiner administers and the type of results. The Court also understands that a "[n]europsychological evaluation covers the same general functions as are assessed by tests that are commonly employed in other contexts and fields," including psychological testing. Monique Leahy, 2 *Attorneys Medical Advisor* § 23:7 (Aug. 2023). At the same time, "neuropsychological testing is more comprehensive and more detailed, and the results are more strictly quantified." *Id.* See also Martin Blinder, M.D., *Psychiatry in the Everyday Practice of Law* § 3:4 (5th ed. Oct. 2023) (describing a neuropsychological examination as a type of psychological exam).

5

So though some of the tests used in a neuropsychological exam may overlap with tests not objected to by Plaintiffs, it appears that other types of neuropsychological tests are distinct. Plaintiffs must have the opportunity to object, particularly because the exam risks re-traumatizing Plaintiffs. As advocates for their clients, Plaintiffs' counsel have a right to minimize that re-traumatization if the proposed examination goes beyond the alleged injuries. Importantly, Plaintiffs do not have a right (nor did they assert one) to the identification of the specific tests that will be conducted. *Accord Sheridan v. Providence Health & Servs.-Ore.*, 3:10-cv-00775, 2012 WL 13051111, at *1 (D. Ore. Jan. 3, 2012) (denying the plaintiff access to a list of the specific kinds of neuropsychological tests the defendant's expert sought to administer).

WTNY's admission on reply that Dr. Bütz "does not intend to conduct a neuropsychological evaluation" raises the question of why the parties are fighting over Dr. Bütz's disclosure requirements. (Doc. 289 at 7). Plaintiffs asked WTNY on August 30, 2023, if Dr. Bütz intended to conduct neuropsychological testing generally, yet WTNY did not answer. (Doc. 267-24). Further, Dr. Bütz also indicated in an affidavit that he intends to conduct neuropsychological testing because, according to him, PTSD can impact a person's neuropsychology. (Doc. 289-1 at 22–24). WTNY's failure to address the issue during meet and confer and

the internal contradictions between Dr. Bütz and WTNY's statements further justify the need for explicit clarification from Dr. Bütz and WTNY on the issue.

As to whether good cause exists for such testing, the Court finds that it does not. The Court's analysis of good cause is not a "formality," like it is with other discovery rules. *Daum v. Allstate Fire and Cas. Ins. Co.*, CV 13-64-BU, 2014 WL 12600126, at *2 (D. Mont. Oct. 28, 2014). Rather, the analysis "requires discriminating application by the trial judge, who must decide, as an initial matter in every case, whether the party requesting a mental or physical examination or examinations has adequately demonstrated the existence of the Rule's requirements[.]" *Id.* (quoting *Schlagenhauf*, 379 U.S. at 118). "To establish 'good cause,' the moving party generally must offer specific facts showing the examination is necessary and relevant to the case." *Robinson v. HD Supply, Inc.*, No. 2:12-cv-604, 2013 WL 3815987, at *6 (E.D. Cal. July 19, 2013). The relevant factors in assessing whether good cause exists include but are not limited to: (1) "the possibility of obtaining desired information by other means;" (2) "whether plaintiff plans to prove her claim through testimony of expert witnesses;" (3) "whether the desired materials are relevant;" and (4) "whether plaintiff is claiming ongoing emotional distress." *Id.* (internal citation omitted). "Regardless of whether the 'good cause' requirement is met, it is within the court's discretion to determine whether to order an examination. *Id.*

To the extent the intended neuropsychological tests are distinct from those other psychological tests that Plaintiffs have agreed to, the Court finds WTNY has not met its burden to show good cause because Plaintiffs are not asserting neuropsychological harm as a result of their trauma. Thus, the results of those tests would be irrelevant. This irrelevancy is highlighted by the fact that Plaintiffs' experts did not conduct neuropsychological testing. Additionally, though Dr. Bütz cited to a handful of studies concerning the connection between PTSD and neuropsychology, he did not cite to anything related to neuropsychology and the other mental disorders in dispute (Dissociative Identity Disorder and Multiple Personality Disorder). Accordingly, Dr. Bütz cannot conduct a neuropsychological examination, except to the degree the tests he seeks to conduct are the same as those psychological tests to which Plaintiffs agreed.

  *B. Authorization Form*

The parties next disagree on the appropriateness of certain language in authorization form that WTNY and Dr. Bütz have asked Plaintiffs to sign ahead of the exams. (*See* Doc. 280-2). Plaintiffs object to four portions of the form.

First, Plaintiffs argue that Dr. Bütz should delete the language in the first sentence requiring that Plaintiffs certify they were "referred" to Dr. Bütz. (Doc. 280 at 8 (citing Doc. 280-2 at 2)). WTNY does not address this argument.

The Court agrees this language is inapplicable to a court-ordered mental exam. The first sentence shall be re-written to indicate that Plaintiffs were ordered by the Court to undergo a mental exam, and that WTNY selected Dr. Bütz as the qualified individual to conduct it.

Second, Plaintiffs assert the Court should strike the language in the third paragraph that Dr. Bütz is a "neutral, objective evaluator" because Dr. Bütz was hired by WTNY and is therefore adverse to Plaintiffs' interests. (*Id.*). WTNY maintains that Dr. Bütz has represented that he is a neutral evaluator. (Doc. 289 at 12). WTNY would agree to stipulate that the forms cannot be used to impeach Plaintiffs at trial and that Plaintiffs would maintain their right to challenge Dr. Bütz's objectivity. (*Id.*).

The Court finds that striking the "neutral and objective evaluator" language is appropriate to avoid any implication that Dr. Bütz is not working for any party. The Court appreciates WTNY's offer to stipulate to the aforementioned conditions; however, its willingness to stipulate to those conditions also demonstrates the relative insignificance of the language in the first place and its dispensability.

Third, Plaintiffs assert that the form improperly requires Plaintiffs to waive their rights to obtain reports, information, raw test data, and other material Dr. Bütz is required to provide Plaintiffs under Rules 26 and 35. (Doc. 280 at 8). WTNY only addresses the issue of the disclosure of raw testing data, arguing that since Dr.

Bütz and WTNY have agreed to provide such data to Plaintiffs' expert, Dr. Jonathan Bone, Plaintiffs are not agreeing to waive all rights to the raw test data. WTNY reiterates its position that no other unqualified individual—namely Plaintiffs' counsel and Plaintiffs' other expert, Dr. Trent Holmberg—is authorized under law to obtain such data.

The Court grants Plaintiffs' request for the form to be amended to clarify that Plaintiffs are entitled Dr. Bütz's expert report and the information required under Rule 26(2)(B). The report must include Dr. Bütz's diagnoses, conclusions, and the results of any test under Rule 35(b)(2). Dr. Bütz's form currently states that Dr. Bütz "is under no obligation" to provide the report he prepares for WTNY. (Doc. 280-2 at 2). This clearly contradicts Dr. Bütz's legal requirements and must be rewritten to be consistent with the rules and the parties' agreement.

With respect to the raw testing data, the Court finds the form is adequate, but, for clarity, should be amended to reflect that Dr. Bütz must only disclose the raw testing data to Dr. Bone. Dr. Bone may discuss his assessment of and conclusions based off the data with Plaintiffs' counsel and Dr. Holmberg, but he may not discuss the raw testing data itself. Courts mostly commonly have reached the same conclusion in threading the needle between the disclosure requirements in Rules 26 and 35 and the ethical obligations imposed by the American Psychological Association ("APA"). *See Collins v. TIAA-CREF*, No. 3:06CV304-C, 2008 WL

10

3981462, at **4–5 (W.D.N.C. Aug. 22, 2008) (requiring the subpoenaed doctor to release test data only to qualified professionals in order to conform with APA guidelines and copyright laws); *Taylor v. Erna*, No. 08-10534, 2009 WL 2425839, at *3 (D. Mass. Aug. 3, 2009) (allowing the defendants, "through their expert," to have a right to review the raw data and test materials, pursuant to a protective order).

Last, Plaintiffs ask the Court to strike the part of the form that states Dr. Bütz is under no obligation to discuss the results of the report with anyone other than WTNY. WTNY does not address this argument. The Court agrees that this portion of the form should be revised to indicate that Plaintiffs are entitled to depose Dr. Bütz and cross-examine him at trial.

C.  *In-Person Exams and Associated Costs*

The parties next disagree over whether Dr. Bütz can conduct Mapley's exam remotely, and whether Plaintiffs must pay for Dr. Bütz's in-transit professional fees to travel to Mapley's exam (if held in-person) and to Caekaert's exam in Arkansas. The Court will address each issue in turn.

1.  *Travel for Mapley's Exam*

As to the location of Mapley's exam, WTNY argues that Mapley must either travel to Billings (where Dr. Bütz is located), or Plaintiffs must pay to send Dr. Bütz to Australia to ensure the exam's validity and because plaintiffs generally must make themselves available for Rule 35 examinations in the district in which they filed their

litigation. (Doc. 267 at 19–20). Plaintiffs retort that an in-person exam would impose an undue burden on Mapley because she is a single mother of an 11-year-old boy whose father is abusive and has no contact with him. (Doc. 280 at 14). Her son also does not have a passport, and Mapley cannot afford childcare. (*Id.*). Further, as stated by Plaintiffs' experts, remote exams have little or not impact on the exam's scientific validity. (*Id.* at 15).

The Court agrees with WTNY that an in-person exam is necessary to ensure the reliability of the results. The Daffern article cited to by Dr. Bütz and WTNY does not find that remote exams are either per se reliable or unreliable. (Doc. 267-7 at 9–24). Rather, the article painted a complex picture of the empirical data on the reliability of such exams. (*Id.* at 21) ("the evidence *is inconclusive* about how much [the limitations of tele-service contact] genuinely impair effective practice.") (emphasis added). As for the perception of reliability for remote testing, the study found that there was a "consensus" of clinician participants who believed remote testing had certain limitations. (*Id.*). Notably, the authors found that 99% of participants identified at least one limitation associated with using remote technologies. (*Id.* at 17). Among the limitations identified for psychological examinations were performing physical tasks, limited or impaired observation of the client, difficulty sending clients actual questionnaires, reduced privacy, increased socially desirable responding if others are present or the client is required to speak

rather than write, increased testing times, limited client or clinician technological proficiency, and reduced or unknown test validity with adapted procedures. (*Id.* at 19). Further, "it is likely that communications strategies that are useful during in-person sessions (e.g., pointing or gesturing, observing client body language) might be difficult or impossible when relying on AV conferencing." (*Id.* at 21). Though the study also noted the empirical and perceived benefits of remote testing, the lack of a finding of reliability compels the Court to act conservatively and require an in-person exam.

As for who must travel, it is most appropriate for Dr. Bütz to travel to Australia. It is undisputed that Mapley cannot feasibly travel to the United States without imposing a significant financial burden on her and potentially placing her son in physical danger. Dr. Bütz has communicated that he is amenable to traveling, so sending him to Australia best balances the burden on Mapley with her obligation to make herself available for a Rule 35 exam.

2.     *In-Transit Professional Fees*

With respect to who must pay Dr. Bütz's in-transit professional fees for Mapley and Caekaert's exams, the parties point the finger at one another. WTNY maintains that a plaintiff generally has to pay for their travel fees when the plaintiff travels to an exam, so it would follow that Plaintiffs here should have to pay the fee to secure Dr. Bütz's presence when they refuse to travel themselves. (Doc. 289 at

9–10). Plaintiffs assert that Dr. Bütz's fees could be avoided altogether if he conducts the exam remotely. (Doc. 280 at 13 n.6; Doc. 267-12 at 2).

The Court agrees with WTNY that the general principle that the examinee pay for their own travel costs justifies Plaintiffs paying for Dr. Bütz's in-transit professional fees, limited to a full eight-hour day, as Dr. Bütz's agreed to. (*See* Doc. 267-17 at 4). As WTNY describes in its conferral with Plaintiffs, Dr. Bütz already is agreeing to fly halfway around the world for Mapley's exam and to Arkansas for Caekaert's exam, in lieu of Mapley and Caekaert coming to Billings, which they are generally required to do. (Doc. 267-15 at 1). Mapley and Caekaert could avoid the in-transit fee by traveling themselves, so it follows they should have to pay the applicable fees to avoid traveling. However, Plaintiffs are not required to pay for Dr. Bütz's airline upgrades, which is an additional amenity, not a requirement for travel.

D.   *Attorney-Client Privilege*

The parties last disagree on whether any unintentional waiver of attorney-client privilege during the exams should be automatically stricken. Plaintiffs ask the Court to automatically strike any inadvertent disclosures because Plaintiffs' counsel is not allowed to be present to prevent Plaintiffs from disclosing privileged information to Dr. Bütz, who they claim is technically an agent of WTNY. (Doc. 280 at 16). WTNY maintains that the usual rules for inadvertent disclosure under

14

Federal Rule of Evidence 502(b) should apply because there is "no apparent authority" for Plaintiffs' request. (Doc. 267 at 23). WTNY notes that district courts have repeatedly forbidden counsel from attending examinations, which WTNY seems to imply indicates that courts usually refuse to impose a safeguard against inadvertent disclosures other than the Federal Rules of Evidence. (*Id.*). WTNY did not cite to any cases which agreed or declined to automatically strike unintentionally disclosed privileged information.

The Court found one court that has addressed this question. In *Hill v. Jetblue Airways Corporation*, the court ruled that any inadvertent disclosures of privileged information during a Rule 35 exam are inadmissible and do not constitute a waiver of the attorney-client privilege. Nos. 2:17-cv-1604, 2:18-cv-0081, 2021 WL 3164527, at *4 (E.D. Cal. July 27, 2021). The Court agrees with *Hill*'s logic because it balances the examiner's need to elicit wholly truthful answers from the examinee with Plaintiffs' desire not to disclose privileged information. As such, the Court orders that any inadvertent disclosures of privileged information during the Rule 35 exams are inadmissible and do not constitute a waiver of the attorney-client privilege.

### III. Conclusion

IT IS SO ORDERED that Defendant Watchtower Bible and Tract Society of New York, Inc.'s ("WTNY") Motion for Order Directing Rule 35 Examinations

15

(Doc. 266) is GRANTED IN PART and DENIED IN PART. In addition to those conditions agreed upon by the parties, the following conditions will govern the Rule 35 mental exams of Plaintiffs:

1. Dr. Bütz is required to disclose if he intends to conduct any neuropsychological testing;

2. To the degree that Dr. Bütz intended to conduct neuropsychological tests that are different from those psychological tests to which Plaintiffs agreed, Dr. Bütz cannot conduct such tests;

3. WTNY and Dr. Bütz must make the following amendments to the Authorization Form:

   a. Delete sentence one in paragraph one, and replace it with language indicating that Plaintiffs are undergoing a psychological assessment pursuant to WTNY's motion and the Court's order;

   b. Delete any references to Dr. Bütz being a "neutral and objective evaluator," including the references in paragraph three;

   c. Revise paragraph four to reflect that Dr. Bütz is obligated to produce a report to Plaintiffs and that he must make himself available for deposition by Plaintiffs and participate in any cross-examination at trial; and

    d. Revise paragraph five to reflect that, pursuant to the parties' agreement and the Court's order, Dr. Bütz will disclose the raw testing data only to Plaintiffs' expert, Dr. Jonathan Bone, and that Dr. Bone may discuss with Plaintiffs and Plaintiffs' other expert, Dr. Trent Holmberg, his assessment of and conclusions based off of the data, without discussing the data itself;

4. Camillia Mapley must be deposed in-person, and Plaintiffs will pay for Dr. Bütz's reasonable travel costs to Australia, including coach-class airfare, hotels, in-transit professional fees for an eight-hour day, and other expenses the parties agreed to in their conferral. Plaintiffs also must pay for Dr. Bütz's travel costs to Arkansas for Tracy Caekaert's deposition, including coach-class airfare, hotels, in-transit professional fees for up to an eight-hour day, and other expenses the parties agreed to in their conferral; and

5. Any privileged information that Plaintiffs inadvertently disclose during their exams shall be inadmissible and do not constitute a waiver of the attorney-client privilege.

DATED the 20th day of November, 2023.

*Susan P. Watters*
SUSAN P. WATTERS
UNITED STATES DISTRICT JUDGE