IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| TRACY CAEKAERT and CAMILLIA MAPLEY, <br><br> Plaintiffs, <br><br> vs. <br><br> WATCHTOWER BIBLE AND TRACT SOCIETY OF NEW YORK, INC., and WATCH TOWER BIBLE AND TRACT SOCIERY OF PENNSYLVANIA, INC. <br><br> Defendants. | CV 20-52-BLG-SPW <br><br><br> ORDER |

Before the Court is Plaintiffs Tracy Caekaert and Camillia Mapley's Motion for Sanctions. (Doc. 287). Plaintiffs seek sanctions against Watchtower Bible and Tract Society of New York, Inc. ("WTNY") pursuant to Federal Rule of Civil Procedure 37(b)(2)(A) for allegedly violating the Court's August 24, 2021 Order Granting Plaintiffs' Motion to Compel Jurisdictional Discovery Responses (Doc. 85, hereinafter "Order"). (Doc. 287). Plaintiffs contend WTNY violated the Order's requirement that WTNY "fully and completely" respond to Interrogatories 9 and 15 because WTNY omitted substantial information concerning the Jehovah's Witnesses Governing Body and the relationships among several of the organization's entities that Plaintiffs later discovered on their own. (Doc. 288 at 1–10). As for the appropriate remedy if sanctions are warranted, Plaintiffs ask the

1

Court to prohibit WTNY from presenting certain defenses and evidence. (*Id.* at 16–17).

WTNY filed a response opposing the motion on various procedural grounds and because it claims its answers complied with the Order. (Doc. 290). It also objects to the proposed sanctions as unsupported by the evidence and "disproportionate to any perceived inconsistencies in the descriptions of [the] religious entities." (*Id.* at 26).

With the permission of the Court, Defendant Watch Tower Bible & Tract Society of Pennsylvania, Inc. ("WTPA") also filed a response. (Doc. 294). WTPA did not take a position on the merits of the sanctions but opposed the imposition of Plaintiffs' proposed remedies that implicate WTPA. (*Id.* at 2). WTPA argues such sanctions would improperly restrict WTPA's defenses because WTPA is a non-party to the sanctions motion. (*Id.* at 3–4). If the Court imposes the requested sanctions, WTPA urges the Court to remove any references to WTPA. (*Id.*).

For the following reasons, the Court grants Plaintiffs' motion as to the allegation that WTNY failed to comply with the Order and denies Plaintiffs' motion as to the requested remedy. Instead of prohibiting WTNY from presenting certain defenses and evidence, the Court will order certain designated facts as established and impose monetary sanctions.

//

2

## I.    Background

The origin of the parties' dispute over WTNY's answers to Interrogatories 9 and 15 is outlined in detail in the Background section of the Order. (Doc. 85). The Court adopts the Order's recitation of the facts and will reiterate only those relevant details.

On June 22, 2020, WTPA filed a Motion to Dismiss for Lack of Jurisdiction alleging that the Court lacked personal jurisdiction over it. (Doc. 13). The Court found the facts bearing on the question of jurisdiction were controverted and ordered jurisdictional discovery. (Doc. 32). WTPA withdrew its motion to dismiss on November 5, 2021. (Doc. 94).

During the jurisdictional discovery and before WTPA withdrew its motion, Plaintiffs served a number of interrogatories on WTNY and WTPA, including Interrogatories 9 and 15. Interrogatory 9 asked: "Identify what the governing body does, where it is located, what it is responsible for, how it makes decisions, etc.?" (Doc. 288-1 at 4). In its original set of answers, WTNY objected to Interrogatory 9, then, without waiving its objection, responded:

> The Governing Body is a small group of spiritually-mature Christians who provide spiritual guidance to Jehovah's Witnesses worldwide. The Governing Body follows the pattern set by "the apostles and elders in Jerusalem" in the first century, who made important decisions on behalf of the entire Christian congregation. (Acts 15:2) Like those faithful men, the members of the Governing Body are not leaders of Jehovah's Witnesses. The Governing Body serves in Warwick, New York, U.S.A.

(*Id.* at 4–5).

Interrogatory 15 asked: "Please set forth your description of the relationships between the following: Governing Body, WTPA, WTNY, United States Branch Office, United States District Offices, United States Circuit Offices, and local Kingdom Halls/congregations (including whether any of these bodies oversee or direct, in any way, the activities of any other of these bodies.)" (*Id.* at 6). In its original set of answers, WTNY objected to Interrogatory 15, then, without waiving its objection, responded:

> WTNY is a not-for-profit corporation formed in 1909 under the laws of State of New York, U.S.A. It is used by Jehovah's Witnesses in the United States to print Bibles and Bible-based literature. Some of that literature is used in connection with ministry done by Jehovah's Witnesses, again in connection with Jesus' commission in Matthew 28:19, 20. WTPA is a nonprofit corporation formed in 1884 under the laws of the Commonwealth of Pennsylvania, U.S.A. It is used by Jehovah's Witnesses to support their worldwide work, which includes publishing Bibles and Bible-based literature. Congregations form for the purpose of allowing Jehovah's Witnesses and others interested in attending their meetings to gather together to worship God. At their own choice, congregations may form corporations or trusteeships to own property used as Kingdom Halls (meeting places). Those that do not form a corporation or trusteeship typically remain unincorporated associations. Each legal entity is distinct from one another.
>
> The United States Branch Office of Jehovah's Witnesses is a religious construct that cares for the spiritual interests of Jehovah's Witnesses in the United States. It has no legal or corporate control over any entity used by Jehovah's Witnesses.
>
> The Governing Body of Jehovah's Witnesses is an ecclesiastical group of men who care for the spiritual interests of Jehovah's Witnesses worldwide. It has no legal or corporate control over any entity used by

Jehovah's Witnesses. WTNY is unaware of any "United States District Offices" or "United States Circuit Offices" associated with the faith of Jehovah's Witnesses.

(*Id.* at 6–7)

Plaintiffs filed a motion to compel arguing that WTNY's answers were non-responsive. (Doc. 56). The Court found, in part, that WTNY's initial answers to Interrogatories 9 and 15 were "vague to the point of non-responsive" and ordered WTNY to "fully and completely respond." (Doc. 85 at 11–12). The Court awarded Plaintiffs $22,631.80 in attorneys fees and costs, in part because of WTNY's failure to adequately respond to Interrogatories 9 and 15. (*Id.* at 18; Doc. 93).

WTNY served its supplemental answers on September 21, 2021. (Doc. 288-1). As to Interrogatory 9, WTNY reiterated its objection and, without waiving the objection, responded:

> WTNY further responds that it is not the Governing Body of Jehovah's Witnesses, but upon information and belief, the Governing Body provides spiritual guidance and direction to all Jehovah's Witnesses, including, but not limited to, setting forth the scriptural beliefs and practices of the faith in conformance with the model set by first century Christians as recorded in the Bible. The Governing Body does not direct the day-to-day affairs of any congregation of Jehovah's Witnesses but, during the time period in question, experienced elders in New York (members of the religious order) acknowledged the appointment of congregation elders and ministerial servants. Acknowledgement of these appointments was communicated to congregations by WTNY.

(*Id.* at 5).

As to Interrogatory 15, WTNY reiterated its objection and, without waiving the objection, responded:

> WTNY further responds that it is not the Governing Body of Jehovah's Witnesses, but upon information and belief, the Governing Body provides spiritual guidance and direction to all Jehovah's Witnesses, including, but not limited to, setting forth the scriptural beliefs and practices of the faith in conformance with the model set by first century Christians as recorded in the Bible. The Governing Body does not direct the day-to-day affairs of any congregation of Jehovah's Witnesses, but, during the time period in question, experienced elders in New York (members of the religious order) acknowledged the appointment of congregation elders and ministerial servants. Acknowledgement of these appointments was communicated to congregations by WTNY.

(*Id.* at 7–8).

The first correspondence between the parties concerning the supplemental answers in the record was a letter from Plaintiffs to WTNY dated October 13, 2022. (Doc. 290-2). Plaintiffs did not complain of WTNY's supplemental answer to Interrogatory 9, but alleged the answer to Interrogatory 15 was nonresponsive for reasons not at issue in the present motion. (*Id.* at 3). WTNY responded on October 28, 2022, and the parties exchanged two more letters thereafter. (Docs. 290-3, 290-4, 290-5).

On October 9, 2023, Plaintiffs sent a letter to WTNY arguing that WTNY still had "never provided a full and thorough answer to the interrogatories." (Doc. 288-11 at 2). WTNY responded on October 23, 2023, stating that WTNY's supplemental

answers were full and thorough. (Doc. 288-12 at 2–3). Plaintiffs filed the instant motion on November 6, 2023. (Doc. 287).

## II.   Analysis

Plaintiffs assert sanctions against WTNY are warranted because its supplemental responses to Interrogatories 9 and 15 are not full and complete, in violation of the Order. WTNY denies this. WTNY also argues the Court should deny the motion on various procedural grounds. The Court will address WTNY's procedural defenses first, then the merits of Plaintiffs' motion.

### A.   *Meet and Confer*

WTNY first urges the Court to deny Plaintiffs' motion on the grounds that Plaintiffs failed to adequately meet and confer in violation of Local Rules 7.1(c)(1) and 26.3(c)(1).[1] (Doc. 290 at 8–9). WTNY asserts that Plaintiffs' initial "demand for a 'full and thorough' response" was perfunctory and insufficient under this Court's previous rulings. (*Id.* at 9 (citing *Osborne v. Billings Clinic*, CV 14-126-BLG, 2015 WL 150252, at *1 (D. Mont. Jan. 12, 2015))).

Plaintiffs disagree, arguing that WTNY's assertion is "contradicted by the facts, is disingenuous, and should be rejected." (Doc. 299 at 6). Plaintiffs detail the entirety of their meet and conferral efforts since they served Interrogatories 9 and 15

---

[1] WTNY cites to Local Rule 26(c)(1) in making its meet and confer argument. (Doc. 290 at 8). The Local Rules do not contain a Rule 26(c)(1). Based on the substance of WTNY's argument, the Court assumes it meant Rule 26.3(c)(1).

on WTNY.  (*Id.* at 6–8).  Throughout that time, "WTNY [had] been consistently notified by both Plaintiffs and the Court that vague, non-responsive answers which intentionally omit material information are not acceptable." (*Id.* at 7).  Yet, according to Plaintiffs, WTNY has defended non-responsive answers, including in the October 23, 2023 letter.  (*Id.*).  Plaintiffs also note that WTNY did not assert in the letter any of its present defenses—that the interrogatories are moot, Plaintiffs' concerns are untimely, and Plaintiffs should take a deposition to challenge any inconsistencies—or ask why Plaintiffs believed the answers were not full and thorough.  (*Id.* at 7–8).

Under Local Rule 26.3(c)(1), "[t]he court will deny any discovery motion unless the parties have conferred concerning all disputed issues before the motion is filed."  The parties' conferral must be either "a direct dialogue and discussion in a face-to-face meeting, in a telephone conversation, or in detailed, comprehensive correspondence."  D. Mont. L.R. 26.3(c)(1).  The "mere sending of a written … communication" is insufficient.  *Id.*  Additionally, under Local Rule 7.1(c)(1), all non-dispositive motions must state that the other parties have been contacted and whether any party objects to the motion.

At the same time, Federal Rule of Civil Procedure 37(b) does not contain a meet and confer requirement for motions for sanctions for failure to comply with a court order.  *Acosta v. Austin Elec. Servs. LLC*, 325 F.R.D. 322, 324–25 (D. Ariz.

2018).  "The rationale for this exception is that the parties would have already met and conferred before obtaining the first discovery order—which the opposing party has then [allegedly] violated—and that a second meet and confer is therefore not warranted."  Steven Baicker-Mckee & William M. Janssen, *Federal Civil Rules Handbook* 929 (2024).

The Court finds the rationale for the absence of a meet and confer requirement in Rule 37(b) justifies not imposing a meet and confer requirement on this motion. Plaintiffs here satisfied the meet and confer requirement for the motion to compel (Doc. 56)that resulted in the Order (Doc. 85) and received confirmation from WTNY that it believed its answers complied with the Order (Doc. 288-12 at 2–3).  This is sufficient for Plaintiffs to move for sanctions without further conferral.

Even if the Local Rules require more conferral than Rule 37(b), given the circumstances of this case, the Court waives the requirement and evaluates the merits of the motion.  A court can deny a motion to compel solely because of a party's failure to meet and confer before filing the motion.  (*See* Doc. 222); *Rogers v. Giurbino*, 288 F.R.D. 469, 477 (S.D. Cal. 2012).  But a court also can "decide a motion on the merits despite a failure to meet and confer."  *Rogers*, 288 F.R.D. at 477.

The Court waives the Local Rule's meet and confer requirement here for two reasons.  First, the Court is cognizant of the pretrial deadlines and trial date in this

case, which the parties have indicated to the Court they do not want to extend. To ensure the Court can maintain the current deadlines and trial date, the Court finds the expeditious resolution of the present motion is warranted. Additionally, given WTNY's position that its answers complied with the Court's order, the Court does not find that a meet and confer would resolve any substantive conflicts and instead would result in the same motion being filed in a couple of weeks.

Second, the Court views the absence of any thorough conferral in light of the antagonistic relationship between Plaintiffs and WTNY throughout this litigation. The parties rarely seem to be able to resolve anything in conferral and instead have come to the Court with a litany of discovery disputes, ranging from inane spats to serious breaches of the discovery rules. Though this history on its own does not justify waiving the meet and conferral requirement for every motion, it bolsters the Court's primary reasons for doing so here.

B.    *Timeliness*

WTNY next argues the Court should deny Plaintiffs' motion as untimely. Federal Rule of Civil Procedure 37 does not contain a time limit for a sanctions motion, but "unreasonable delay may render such a motion untimely." *Jarrell v. Wal-Mart Stores, Inc.*, 2:18-cv-01219, 2021 WL 1169889, at *2 (D. Nev. Mar. 26, 2021). "'The timeliness of a motion for sanctions for discovery violations depends on such factors as when the movant learned of the violation, how long he waited

before bringing it to the court's attention, and whether discovery has been completed.'" *Id.* (quoting *Long v. Howard Univ.*, 561 F. Supp. 2d 85, 91 (D.D.C. 2008)).

WTNY asserts Plaintiffs have known of the purported deficiencies of its supplemental answers to Interrogatories 9 and 15 for more than two years, since WTNY served the supplemental answers on September 21, 2021. (Doc. 290 at 11). WTNY also notes that the deadlines for written discovery and depositions related to jurisdiction were February 26 and April 30, 2021, respectively. (*Id.*).

Plaintiffs disagree that their motion was untimely given the time and effort required for Plaintiffs to discover the evidence showing the supplemental answers were deficient. (Doc. 299 at 10). Plaintiffs also note that neither the discovery nor dispositive motions deadlines have passed, and WTNY has not alleged prejudice to the timing of the motion. (*Id.* at 11).

The Court agrees with Plaintiffs that their motion is not untimely. WTNY incorrectly contends that Plaintiffs must have learned that its supplemental answers were potentially deficient when WTNY served them. Instead, Plaintiffs only could have learned that the answers were potentially deficient once they had amassed the exhibits attached to the motion, reviewed them, and determined their meaning within the context of the other evidence they had collected and WTNY's arguments. This undoubtedly was not a simple or quick process, and WTNY makes no showing

11

otherwise. Thus, it appears Plaintiffs only could have known, as they put it, "the full magnitude" of WTNY's alleged violation of the Order as early as August 2023. (Doc. 299 at 10). This motion was filed at the beginning of November 2023, so, at most, Plaintiffs waited three months to file the motion from their discovery of the violations. Given the time it takes to prepare a motion, particularly one as detailed as this, the Court does not find three months an unreasonable delay.

Further, though jurisdictional discovery has closed, general discovery in this case has not. Interrogatories 9 and 15 directly relate to Plaintiffs' primary allegations, as well as multiple affirmative defenses and denials by WTNY, so the closing of jurisdictional discovery does not render the interrogatories irrelevant.

Accordingly, Plaintiffs' motion is timely.

C.     *Mootness*

WTNY next contends the motion is untimely because the jurisdictional discovery to which it relates was mooted when WTPA withdrew its motion to dismiss. (Doc. 290 at 11). WTNY also argues that to the extent Interrogatories 9 and 15 relate to Plaintiffs' case-in-chief, WTNY's answers to a different set of interrogatories cure any deficiencies in its answers to Interrogatories 9 and 15. (*Id.* (referencing Doc. 290-7)).

Plaintiffs do not address the mootness question, but maintain that WTNY's answer to Interrogatory 20, which is one of WTNY's answers in Doc. 290-7, "only

serves to highlight [WTNY's] refusal to provide candid, complete answers to discovery" and is "just as vague and non-responsive" as WTNY's answer to Interrogatory 9. (Doc. 299 at 5).

For the reasons stated in the Court's discussion of timeliness, the Court rejects WTNY's mootness argument. The answers are relevant to Plaintiffs' and WTNY's cases-in-chief, not just the jurisdictional issue at the beginning of this litigation.

As for the answers in Doc. 290-7, the Court will discuss their sufficiency in the next section of this order.

### D.   Compliance with the Order

Having determined that Plaintiffs' motion is not barred by any of the procedural hurdles raised by WTNY, the Court will next address whether WTNY complied with the Order and sanctions are warranted. Under Federal Rule of Civil Procedure 37(b)(2)(A), a court in which an action is pending may issue sanctions against a party who "fails to obey an order to provide or permit discovery." In deciding whether to grant sanctions, the Court may "properly consider all of a party's discovery misconduct ... including conduct which has been the subject of earlier sanctions." *Payne v. Exxon Corp.*, 121 F.3d 503, 508 (9th Cir. 1997).

Here, Plaintiffs contend that WTNY failed to respond "fully and completely" to Interrogatories 9 and 15, in violation of the Order. (Doc. 288 at 1–10). In support of this argument, Plaintiffs attach 13 exhibits—most of which they obtained from

13

sources other than WTNY—that they allege prove that WTNY withheld key information in WTNY's answers to Interrogatories 9 and 15.

WTNY disagrees. WTNY avers that its answers are full and complete, particularly in light of the "broad and general question[s]" Plaintiffs asked. (Doc. 290 at 14). WTNY also notes that its answers to Plaintiffs' Fourth Set of Interrogatories, Requests for Production and Requests for Admission make up for any alleged deficiencies. (*Id.* at 16–17). With respect to Plaintiffs' exhibits, WTNY maintains that Plaintiffs misconstrue or misrepresent the content of the exhibits or that the content is irrelevant to the issues in the case. (*Id.* at 18–20). WTNY last asserts that Plaintiffs could have addressed the alleged deficiencies in its answers through a 30(b)(6) deposition but instead were "more interested in manufacturing a discovery dispute than in getting information." (*Id.* at 15).

Reading WTNY's supplemental answers to Interrogatories 9 and 15 in isolation, neither appear to remedy the deficiencies with the original responses. Read alongside Plaintiffs' exhibits, WTNY's failure to adequately respond becomes even more apparent. The Court will address each interrogatory.

    *1.     Interrogatory 9*

As to Interrogatory 9, the first half of the supplemental answer repeats the substance of the original answer, meaning it too is vague to the point of non-responsive. The second half of the supplemental answer is admittedly more specific,

explaining that the Governing Body does not direct the day-to-day affairs of Jehovah's Witnesses congregations but "acknowledged the appointment of congregation elders and ministerial servants" during the relevant time period. (Doc. 288-1 at 5). However, as recounted in the Order, Plaintiffs and the Court already knew that the Governing Body approved local elders as part of their general responsibility to provide ecclesiastical guidance; WTNY had told Plaintiffs as much in a phone call after WTNY served its original answers. (Doc. 85 at 12). The Order went on to explain that WTNY's admission demonstrated that WTNY was aware of more specific tasks for which the Governing Body was responsible within the realm of ecclesiastical guidance that WTNY excluded from its interrogatory answers. (*Id.*).

The purpose of the Court's discussion of Plaintiffs' discovery of the Governing Body's involvement in the appointment of elders was not to point out that a single administrative task was missing from the answer. Rather, the Court intended its discussion of the omission to show that a proper answer would include the specific tasks the Governing Body undertakes to provide ecclesiastical guidance, like the appointment of elders. In reading WTNY's supplemental answer, WTNY seems to either not have understood this or chosen to ignore it.

Plaintiffs' exhibits support the Court's conclusion that WTNY's responses are inadequate. The Court will address the facts about the Governing Body that each exhibit establishes and that were excluded from WTNY's answer to Interrogatory 9.

        a.     Campbell Declaration

First, Plaintiffs cite to a 2006 affidavit of Merton V. Campbell—an elder who served in the Service Department at the U.S. Branch Office in New York—as demonstrating that the Governing Body adopts guidelines for the qualifications for the appointment of local congregation elders. (Doc. 288-2). WTNY asserts that "Plaintiffs misrepresent the content of the Declaration and intentionally omit the many references to the Bible to secularize an ecclesiastical process." (Doc. 290 at 18). WTNY also maintains that its answer to Interrogatory 9 is consistent with Campbell's declaration because both indicate that spiritual oversight is vested in the Governing Body. (*Id.*).

The Court agrees with Plaintiffs' reading. Campbell testified that the Governing Body adopted guidelines for the appointment of elders based on the Holy Scriptures. (Doc. 288-2 at 3). That the guidelines are taken from the Holy Scriptures does not negate the role that Campbell represented the Governing Body played in their adoption. This fact is absent from WTNY's answer to Interrogatory 9.

WTNY does not explain how Campbell's testimony can be read to show that the Governing Body does not adopt the guidelines for the appointment of elders. Without such an explanation, the Court is left with the plain text of the testimony.

As to WTNY's contention that its answer to Interrogatory 9 is consistent with the Campbell declaration, WTNY ignores the directions from the Order for WTNY to provide the specific tasks the Governing Body is responsible for, not just that the Governing Body is responsible for the broad umbrella of "spiritual guidance." Given the Order's mandate, WTNY's argument is not well taken.

Campbell also testified that the Governing Body authorizes elders to hear confessions.  (*Id.* at 4).  Campbell specifies that an elder's authority to hear confessions comes from the Holy Scriptures, but his reference to the Holy Scriptures does not negate the role he indicated the Governing Body plays.  WTNY does not specifically address this portion of Campbell's testimony.  The Court accepts this fact as true and finds WTNY omitted it from its answer to Interrogatory 9.

WTNY last argues Plaintiffs improperly "impugns WTNY's evidence" based on the content of Campbell's declaration "without cross-examining any witness to explain their perceived contradictions which are wholly rooted in Plaintiffs' willful blindness." (Doc. 290 at 18).  WTNY repeats this argument throughout its analysis of Plaintiffs' exhibits.  This argument fails, though, because it misunderstands the purpose of Plaintiffs' motion.   Plaintiffs   seek   complete   answers   to   their

interrogatories and argue that the Campbell declaration and other exhibits show that WTNY's answers are incomplete and thus in violation of the Order. WTNY's response brief does not provide specific evidence or argument proving that Plaintiffs are incorrect and thus its interrogatory answers are full and complete. For instance, WTNY could have included an affidavit from its 30(b)(6) witness explaining why Plaintiffs' reading of the exhibits was incorrect. Instead, WTNY relies on bare assertions that Plaintiffs misconstrue the exhibits' true meanings. Without evidence to the contrary, the Court will not accept WTNY's word.

Accordingly, Campbell's declaration demonstrates that the Governing Body had the aforementioned responsibilities and that those facts were omitted from WTNY's answer to Interrogatory 9.

### b. Ashe Deposition

Next, Plaintiffs cite to the transcript of a 2014 deposition of Richard Ashe as demonstrating that the Governing Body approves the content of letters sent to all Jehovah's Witnesses congregations that contain matters of policy. (Doc. 288-3). WTNY first retorts that it produced this entire transcript in discovery. (Doc. 290 at 19). WTNY next asserts Plaintiffs take Ashe's statements out of context and misrepresent his response to a hypothetical and incomplete question. (*Id.*). Last, WTNY notes that Ashe states that the Governing Body does not approve every letter containing directions to congregations. (*Id.*).

WTNY is correct that Ashe did not testify that the Governing Body approved all letters containing directions to congregations. However, Plaintiffs did not contend that the deposition indicated such a fact. Rather, Plaintiffs argue, and the Court agrees, that Ashe testified that the Governing Body approves letters to congregations concerning *matters of policy*. (Doc. 288-3 at 4 ("If [a letter] is a matter of policy, the [G]overning [B]ody would approve it.")). WTNY does not provide evidence or argument showing why this contention is false, and so the Court accepts it as true. Additionally, that WTNY produced this transcript in discovery is irrelevant. The issue in front of the Court is why WTNY did not include the fact that the Governing Body approves letters to congregations concerning matters of policy in its answer to Interrogatory 9.

Accordingly, the exhibit demonstrates that the Governing Body had the aforementioned responsibilities and that those responsibilities were omitted from WTNY's answer to Interrogatory 9.

           c.    WTNY and Otello Spanish Congregation of Jehovah's Witnesses' Answer in an Eastern District of Washington Lawsuit

Plaintiffs last cite to WTNY and Otello Spanish Congregation of Jehovah's Witnesses' Answer in an Eastern District of Washington lawsuit to support the following facts: the Governing Body "oversees the promulgation of policies and procedures" for "all persons associated with the Jehovah's Witnesses"; the

Governing Body has the ultimate authority to bar a person from serving in positions of responsibility with the Jehovah's Witnesses Organization; and the Governing Body establishes policies and procedures for local congregation elders to investigate and respond to allegations of serious sin, including child sex abuse. (Doc. 288-4, hereinafter "Answer"). WTNY asserts that this document "must be understood in a spiritual context (e.g. the Good News of God must be preached 'in the entire inhabited earth') and Matthew 28:19-20 ('make disciples of people in all nations.')." (Doc. 290 at 19). WTNY maintains that the Answer is consistent with WTNY's answer to Interrogatory 9 that the Governing Body provides spiritual guidance and should not be read to mean that the Governing Body is personally involved in the spiritual oversight of every person or in the appointment of every elder in every congregation. (*Id.*).

The Court agrees with Plaintiffs' reading of the Answer and has not been presented with evidence from WTNY to the contrary. WTNY does not state or offer evidence that the Governing Body does not "oversee the promulgation of policies and procedures for the spiritual, physical, and emotion welfare of all persons associating with Jehovah's Witnesses, as well as for all mankind in general[.]" (Doc. 288-4 at 5–6). WTNY argues that such promulgation is a more hands-off process than the Answer would seem to imply, but it provides no support for that notion nor clarify what it actually entails. WTNY also does not rebut that the Governing Body

has the ultimate authority to bar a person from serving in a position of responsibility or establishes policies and procedures for local congregation elders to investigate and respond to allegations of serious sin, including child sex abuse. Further, the Court does not see how either of these statements could be read differently if looked at from a non-secular perspective.

Accordingly, the exhibit demonstrates that the Governing Body had the aforementioned responsibilities and that those responsibilities were omitted from WTNY's answer to Interrogatory 9.

### 2.       *Interrogatory 15*

With respect to Interrogatory 15, the first half of the supplemental answer repeats the substance of WTNY's original answer to Interrogatory 9, while the second half of the supplemental answer recites WTNY's supplemental answer to Interrogatory 9. Again, though the second half of the supplemental answer is technically responsive, since it shed some light on the relationship (or lack thereof) between the Governing Body and congregations, it is still vague and incomplete. WTNY does not explain what activities are included in its understanding of the "day-to-day affairs" of a congregation. Further, Interrogatory 15 asked about the relationships between and among a myriad of entities, not just the Governing Body and the congregations. Without any mention of other entities, the supplemental answer is unresponsive.

Again, Plaintiffs' exhibits further demonstrate the incompleteness of WTNY's supplemental responses. The Court will address each in turn.

      a.    Facts about the U.S. Branch Office: Lovett Deposition and Jefferson Affidavit

Plaintiffs cite to two documents they assert contain facts about the U.S. Branch Office that WTNY omitted from its answer to Interrogatory 15. Plaintiffs first cite to a deposition of Bradley Lovett, a Jehovah's Witnesses elder, taken in this case on August 11, 2023, as proving the following facts about the relationship between the U.S. Branch Office and local congregations: (1) the U.S. Branch Office puts on training conventions to teach local elders how to do their jobs; (2) elders direct questions on how to follow Jehovah's Witnesses policies to the "branch"; (3) Jehovah's Witnesses circuit overseers visit local congregations and report on their activities to the "branch office"; and (4) reports of known child abusers, like the 1978 reports about known child abuser Gunnar Hain in Hardin, were sent to the U.S. Branch Office. (Doc. 288-5). Plaintiffs also cite to a 2016 affidavit from Thomas Jefferson—an elder and WTNY's 30(b)(6) designee—taken in another case as showing that, from the 1970s to 2001, the U.S. Branch Office "worked in concert with" WTNY to inform local congregations of the appointment and removal of elders. (Doc. 288-6).

Plaintiffs contend this evidence, taken together, demonstrates that "the U.S. Branch Office is the United States division of the Jehovah's Witnesses Organization

where central control over U.S. Congregations is based." (Doc. 288 at 8–9).

Plaintiffs argue their conclusion is consistent with the findings of a California

discovery referee in a similar case, *Padron v. Watchtower Bible & Tract Society of*

*New York, Inc.*, 225 Cal. Reptr. 3d 81 (Cal. Ct. App. 2017). (Doc. 288 at 8–9) (citing

Doc. 288-7 at 14)). Despite this evidence, WTNY only stated in its answer to

Interrogatory 15 that the U.S. Branch Office is "a religious construct that cares for

the spiritual interests of Jehovah's Witnesses in the United States." (*Id.* at 9 (citing

Doc. 288-1 at 7)).

WTNY rejects Plaintiffs' conclusions. As to the Lovett deposition, WTNY

primarily asserts that Lovett does not speak for WTNY, so his representations are

unreliable. (Doc. 290 at 20). WTNY also asserts that Plaintiffs misrepresent

Lovett's testimony by extrapolating from it that Lovett reported Hain and his abuse

to the U.S. Branch Office. (*Id.*). As to the Jefferson affidavit, WTNY argues that

the affidavit is irrelevant because it is from a different time period than this case,

that WTNY provided the affidavit to Plaintiffs in discovery, and that the affidavit is

consistent with the responses it provided. (*Id.* at 20–21).

The Court finds the Lovett deposition reveals facts about the relationship

among the U.S. Branch, local congregations, and WTNY that are responsive to

Interrogatory 15 but were not disclosed by WTNY. As an initial matter, the fact that

Lovett is not a designated witness for WTNY is inconsequential because he purports

23

to have personal knowledge of what he is testifying to. WTNY also does not dispute the first three facts that Plaintiffs allege Lovett's deposition establishes. The Court accepts them as true.

The Court also agrees with Plaintiffs that the Jefferson affidavit demonstrates that the U.S. Branch Office worked with WTNY to communicate the appointment and removal of elders and others within the Jehovah's Witnesses, and that WTNY omitted this information from Interrogatory 15. Again, the Court directed WTNY to specify the responsibilities that fell under its broad description of various entities, which WTNY did not do.

However, the Court does not agree with Plaintiffs' implication that the circuit overseer reports, like the 1978 report, documented child sex abuse and that by sending them to the U.S. Branch Office, the U.S. Branch Office was on notice of the abuse. Lovett testified that he listed Hain as "restricted" on his report but, at the time, did not know why he was restricted. (Doc. 288-5 at 15). He testified, "That was at a period of time when they told us leave it to local elders, don't inquire, don't report on it, but take – just take note of it ... I didn't learn about [Hain's sexual abuse of children], I don't think, until the end of the week[.]" (*Id.*). Lovett's deposition testimony establishes that he sent a report to the U.S. Branch Office indicating that Hain was restricted for an unknown and unexplained reason. The report itself does not reveal any additional information. (Doc. 299-1). Plaintiffs have not shown that

24

an elder only can be restricted for child sex abuse, so the implication that Lovett's report notified the U.S. Branch Office that Hain was restricted for child sex abuse is unfounded.

The exhibits attached to Plaintiffs' reply, which Plaintiffs contend establish that the 1978 problem with Hain was that he sexually molested four children in Hardin, do not remedy the gaps in Plaintiffs' evidence. The first exhibit, a 1997 letter from an elder at one congregation to another body of elders introducing Hain and stating that he is a known child molester, only establishes that two congregations knew of Hain's conduct. (Doc. 296). That two congregations had discussed the specifics of Hain's conduct does not establish that a report like Lovett's would notify the U.S. Branch Office that Hain was a known child molester. Additionally, the letter is from 1997—two decades after the 1978 report.

The other exhibit is a summary of the child molestation allegations against Hain produced in 2016. (Doc. 297). Again, though this report details the allegations, it does not show that circuit overseer reports always would have indicated that persons were restricted due to child molestation allegations, particularly given this report was produced nearly 40 years after the 1978 report.

As to the Jefferson affidavit, the Court finds that the affidavit establishes that the U.S. Branch Office "worked in concert with" WTNY to inform local congregations of the appointment and removal of elders. Though the affidavit is

from 2016, Jefferson testified specifically to the time period between the 1970s and 2001, which is the relevant time period in this case. That WTNY produced the affidavit during discovery is inconsequential because it must be read in the context of all the evidence collected by Plaintiffs. And WTNY's answer is not sufficient to encompass this fact because the Court ordered WTNY to be specific as to the responsibilities of the Jehovah's Witnesses entities.

Last, as to Plaintiffs' global conclusion about the U.S. Branch Office, the Court agrees that the Lovett deposition, Jefferson affidavit, and *Padron* establish that fact. The Lovett deposition demonstrates that the U.S. Branch trains elders, answers questions from elders on how to follow Jehovah's Witnesses policies, and receives reports from circuit overseers on how the local congregations are doing in terms of attendance, interpersonal conflicts, disassociated and restricted members, and other activities. The Jefferson affidavit further sheds light on the U.S. Branch Office's involvement in the appointment and removal of elders. *Padron* affirms these facts, with the discovery referee finding that "the United States Branch oversees the Jehovah's Witnesses in the United States[.]" (Doc. 288-7 at 14).[2] Collectively, these responsibilities demonstrate significant oversight of the

---

[2] The fact that the *Padron* order concerned attorney-client and clergy-penitent privilege is immaterial, contrary to WTNY's argument. (Doc. 290 at 21). The quoted portion of the order outlines the discovery referee's findings about the relationship between various entities in the Jehovah's Witnesses. These findings were then used to determine questions of privilege, but they were not applicable only to privilege claims.

congregations by the U.S. Branch Office, the specifics of which were omitted from the answer to Interrogatory 15.

> b.  Facts about How Local Congregations are Controlled: Adams Affidavit, Letter from WTNY to the Hardin Congregation, and 1977 Branch Letter

Plaintiffs next cite to three documents they assert contain facts about how local congregations are controlled that WTNY omitted from its answer to Interrogatory 15. Plaintiffs assert the exhibits collectively demonstrate that local congregations could not exist without the express permission of the U.S. Branch Office, including WTNY and the Governing Body. (Doc. 288 at 9–10).

First, Plaintiffs cite to a 1985 affidavit from Don Adams—the then-assistant secretary-treasurer of WTNY—to show: WTNY is the "parent organization" of all congregations in the U.S.; the operation of a local congregation's kingdom hall is done "'under the direction of the theocratic organization,' *i.e.* the Governing Body, WTNY, and the U.S. Branch"; and local congregations "operate 'under the direction of the Governing Body.'" (Doc. 288 at 9–10 (citing Doc. 288-8)).

WTNY rebuts that Plaintiffs have had the Adams Affidavit since March 2022 and that the term "parent" is used in religious rather than legal sense. (Doc. 290 at 22). WTNY further notes that it "has produced hundreds of pages of corporate and financial records, demonstrating its corporate activities" and, presumably, that there is no legal relationship between WTNY and the congregations. (*Id.* at 22).

As an initial matter, that the affidavit has been in Plaintiffs' possession since at least March 2022 is inconsequential, as discussed. Plaintiffs' evidence of WTNY's failure to comply with the Order must be looked at collectively, not in isolation. As to the substance of the exhibit, WTNY does not rebut that a local congregation's operation of its kingdom hall is done under the direction of "the theocratic organization, *i.e.* the Governing Body, WTNY, and the U.S. Branch," and that local congregations "operate under the direction of the Governing Body." Thus, the Court accepts these facts as true and finds they were omitted from WTNY's answer to Interrogatory 15.

With respect to whether WTNY is the "parent organization" of all congregations in the U.S., WTNY again has provided no explanation of what "parent organization" could mean in a religious sense. It also is perplexing to the Court that a legal term like parent organization would be used in reference to a legal entity in a legal document but actually be meant to have a religious connotation.

In other portions of the affidavit where Adams is describing religious practices, the religious context is obvious. For instance, in the paragraph after the reference to the parent organization, Adams declares, "It is the teaching and practice of Jehovah's Witnesses to follow the example of first century Christians. A Governing Body, at present comprised of thirteen men, direct all teaching, preaching, disciple-making and congregational activities of Jehovah's Witnesses

throughout the world." (Doc. 288-8 at 2–3). In contrast, the "parent organization" paragraph simply reads, WTNY "is the parent organization of all congregations of Jehovah's Witnesses in the United States, including the Bonham Congregation of Jehovah's Witnesses located in Bonham, Texas." (*Id.* at 2). Absent any evidence from WTNY or context clues from the declaration demonstrating Adams used "parent organization" in a religious context, the Court accepts Plaintiffs' reading and finds that such a fact was absent from WTNY's discovery responses.

Next, Plaintiffs cite to a letter from WTNY notifying the Hardin congregation that its application to become a congregation in the Jehovah's Witnesses faith was approved. (Doc. 288-9). Plaintiffs infer from this letter that a prospective local congregation must apply to WTNY or the U.S. Branch Office to be approved as an entity within the organization. (Doc. 288 at 10). WTNY does not rebut this contention but argues that it is irrelevant because it says nothing about oversight or control by WTNY and is consistent with WTNY's interrogatory answers. (Doc. 290 at 22).

Given WTNY does not contest the veracity of Plaintiffs' inference, the Court will accept it as true. As to its relevancy, WTNY presents an overly narrow version of the issues pertinent to discovery in this case. Plaintiffs are seeking to show oversight and control by WTNY of local congregations. To do so, Plaintiffs believe they also must decipher the structure of the Jehovah's Witnesses Organization. Last,

as discussed, the Court rejects WTNY's consistency argument because WTNY's vague responses will inevitably encompass the specific facts Plaintiffs have discovered.   This is particularly the case here, since WTNY's answer to Interrogatory 15 only speaks to WTNY's involvement in printing Bibles and Bible-based literature, not its role—no matter how insubstantial—in approving local congregations.

Plaintiffs then cite to a 1977 letter about the Branch Organization to support a similar contention—that prospective congregations must apply to WTNY or the Branch Office to be approved as an organizational entity—as well as the idea that local congregations operate under the direction of the Governing Body, which the Adams affidavit also discussed.  For the same reasons as discussed with respect to the Adams affidavit and the 1977 letter, the Court will accept those facts as true and finds that such facts were absent from WTNY's answer to Interrogatory 15.

Plaintiffs last cite to the Jefferson affidavit, discussed above, to support the notion that from the 1970s to 2001, the U.S. Branch Office assisted local elders in administering discipline to local congregation members who committed serious sins. (Doc. 288-6).  WTNY does not address this specific contention, and therefore the Court accepts it as true.  The Court further finds that this fact was absent from WTNY's answer to Interrogatory 15.

As to Plaintiffs' broader conclusion that local congregations could not exist without the express permission of the U.S. Branch Office, including WTNY and the Governing Body, the Court finds this fact is conclusively established and was absent from WTNY's answer to Interrogatory 15.

### 3.    Adequacy of Other Discovery

WTNY generally argues its responses to Plaintiffs' Fourth Set of Combined Interrogatories, Requests for Production, and Requests for Admission provide Plaintiffs with the information sought in Interrogatories 9 and 15, and therefore any deficiencies of the answers to Interrogatories 9 and 15 are immaterial. (Doc. 290 at 15–17 (citing Doc. 290-7)). Plaintiffs retort that WTNY's fourth set of answers, specifically its answer to Interrogatory 20, are just as incomplete and insincere. (Doc. 299 at 5).

The Court agrees with Plaintiffs that WTNY's answers to the fourth set of interrogatories do not make up for the deficiencies of the original and supplemental answers to Interrogatories 9 and 15. Absent from the answers are any of the facts Plaintiffs proved through their exhibits or any facts meeting the specificity requirements of the Order.

WTNY also argues that Plaintiffs can address any supposed discrepancies or gaps in information through a 30(b)(6) deposition. As the Court has stated, whether Plaintiffs can test the veracity of certain information during a 30(b)(6) deposition is

irrelevant to the fact that the answers to Interrogatories 9 and 15 were not full and complete, as demonstrated by the information Plaintiffs obtained, in violation of the Order. Had Plaintiffs not gone to the lengths they did to discover the facts discussed above, Plaintiffs never would know to even raise those issues in a 30(b)(6) deposition. This highlights the impracticality of WTNY's argument that the remedy for vague and non-responsive interrogatory answers is a deposition.

For these reasons, the Court finds that WTNY failed to respond "fully and completely" to Plaintiffs' Interrogatories 9 and 15 in violation of the Order. Sanctions under Rule 37(b)(2)(A) are warranted. WTNY's violation of the Order is particularly egregious given the violations are nearly identical to the issue identified by the Court in the Order—answers that are vague to the point of non-responsive. *See Payne*, 121 F.3d at 508 (allowing the court to consider all of a party's discovery misconduct, including earlier-sanctioned conduct). The Court also notes that WTNY's initial responses were so unresponsive that the Court ordered WTNY to pay part of Plaintiffs' expenses and fees for the original motion to compel. (Doc. 85 at 18).

### E.    *Appropriate Remedy*

Having determined sanctions are warranted for WTNY's failure to comply with the Order, the Court next will decide the appropriate sanctions. Under Federal Rule of Civil Procedure 37(b)(2)(A), the Court may make such sanction orders as

are "just" when a party has failed to comply with a discovery order. *Valley Eng'rs, Inc. v. Elec. Eng'g Co.*, 158 F.3d 1051, 1056 (9th Cir. 1998) (justice is the central factor in a sanctions order under Rule 37(b)). "Rule 37 sanctions must be applied diligently both 'to penalize those whose conduct may be deemed to warrant such a sanction, [and] to deter those who might be tempted to such conduct in the absence of such a deterrent.'" *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 763–64 (1980) (quoting *Nat'l Hockey League v. Metro. Hockey Club*, 427 U.S. 639, 643 (1976)).

The type of sanction ordered is within the discretion of the district court. *Von Brimer v. Whirlpool Corp.*, 536 F.2d 838, 844 (9th Cir. 1976). Rule 37(b)(2)(A) contains an non-exhaustive list of potential sanctions:

> (i) directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;
> (ii) prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;
> (iii) striking pleadings in whole or in part;
> (iv) staying further proceedings until the order is obeyed;
> (v) dismissing the action or proceeding in whole or in part;
> (vi) rendering a default judgment against the disobedient party; or
> (vii) treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination.

Instead of or in addition to Rule 37(b)(2)(A)'s enumerated sanctions, "the court must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure [to obey

the court's order], unless the failure was substantially justified or other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(b)(2)(C).

Plaintiffs ask the Court to impose the following sanctions:

(1) An order prohibiting WTNY from defending against Plaintiffs' claims by introducing evidence or arguing that the acts, omissions, knowledge, policies, and conduct of WTNY, WTPA, the Branch Office, the Governing Body, and local congregations are not attributable to WTNY. Fed. R. Civ. P. 37(b)(2)(A)(ii).

(2) An order prohibiting WTNY from defending against Plaintiffs' claims by introducing evidence or arguing asserting [sic] that the acts, omissions, knowledge, policies, and conduct of the Governing Body are distinct from the acts, knowledge, policies, and conduct of the WTNY. Fed. R. Civ. P. 37(b)(2)(A)(ii), (iii).

(3) Striking all WTNY Affirmative Defenses that rely on the assertion that WTNY is not responsible for the acts and conduct of other Jehovah's Witnesses entities, including the Governing Body, WTPA, the U.S. Branch Office, and the Hardin Congregation. Fed. R. Civ. P. 37(b)(2)(A)(iii).

(4) A ruling that WTNY, WTPA, the U.S. Branch Office, the Governing Body, and local congregations are all alter egos of each other and are (1) vicariously liable for each other's actions during the time period at issue in this case; and (2) notice of the child sexual abuse occurring in Hardin to one of these entities constituted notice to all. Fed. R. Civ. P. 37(b)(2)(A)(i).

(Doc. 288 at 16–17).

Plaintiffs' proposed remedies amount to an order precluding certain evidence and arguments. "Preclusionary orders ensure that a party will not be able to profit from its own failure to comply." *United States v. Sumitomo Marine & Fire Ins. Co., Ltd.*, 617 F.2d 1365, 1369 (9th Cir. 1980) (internal citation omitted). When a

preclusionary order is tantamount to dismissal or default, the movant must show the disobedient party acted with willfulness, bad faith, or fault in failing to comply with a court order. *Id.*; *Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 482 F.3d 1091, 1096 (9th Cir. 2007) (internal citation omitted).   Lesser sanctions do not require a showing of willfulness, bad faith, or fault, and are appropriate when the failure to comply is "due to circumstances within the disobedient party's control." *Sumitomo Marine & Fire Ins.*, 617 F.2d at 1369.

If the Court finds willfulness, bad faith, or fault, the Court considers five factors, with three subparts to the fifth factor, to decide whether a case-terminating sanction is proper: 1) the public's interest in expeditious resolution of litigation; 2) the court's need to manage its docket; 3) the risk of prejudice to the party seeking sanctions; 4) the public policy favoring disposition of cases on their merits; and 5) the availability of less drastic sanctions. *Conn. Gen. Life Ins.*, 482 F.3d at 1096  The subparts of the fifth factor are whether the court has considered lesser sanctions, whether it tried them, and whether it warned the recalcitrant party about the possibility of case-dispositive sanctions. *Id.*  This test is not "mechanical," or a "set of conditions precedent for sanctions" but instead "provides the court with a way to think about what to do." *Id.*  The most important factors are "truth" and whether "a party's discovery violations make it impossible for a court to be confident that the parties will ever have access to the true facts." *Id.*

The Court finds Plaintiffs' requested sanctions are tantamount to default judgment because they would force WTNY to abandon its primary defenses. As to the willfulness, bad faith, or fault of WTNY's actions, the parties did not directly address the issue. That said, given the clarity of the Order requiring WTNY to provide more specific responses, WTNY's subsequent refusal to provide more specific responses, and the lack of any factors outside of WTNY's control that caused its refusal, the Court finds that the record indicates, at minimum, fault.

Looking to the five-factor test, the Court does not find Plaintiffs' proposed sanctions are warranted. This case was filed four years ago, and the parties have expressed a desire to resolve it before the end of 2024. Additionally, this case already has been difficult for the Court to manage, given the number of discovery motions. Further, the prejudice to Plaintiffs here is great because they had to spend presumably a lot of time, effort, and money tracking down documents and understanding the picture the evidence collectively painted. At the same time, the public's interest to resolve this case on the merits weighs heavily against default-equivalent sanctions, since the case presents serious allegations of a worldwide religious organization systematically hiding sexual abuse of children and protecting the abusers. Lesser sanctions, which will be discussed below, also are available.

Further convincing the Court to refrain from imposing Plaintiffs' proposed sanctions is the consideration of "truth" expressed in *Connecticut General Life*

*Insurance*.   The inferences the proposed sanctions would suggest are not conclusively established by the record in front of the Court.  Though Plaintiffs may have additional evidence that fills in the gaps, that evidence has not been presented in the instant motion.  The Court refuses to make the logical leaps Plaintiffs request just to ensure WTNY does not profit from its failure to comply.

The Court still is dismayed at WTNY's conduct, and it would be unjust to allow WTNY's egregious conduct to escape sanction.  Refusing to impose sanctions would impede Plaintiffs' access to the truth and condone WTNY's disregard of its discovery obligations and the Order.  *See Conn. Gen. Life Ins.*, 482 F.3d at 1097.

Accordingly, the Court will direct that the facts the Court deemed as true in the Analysis section will be taken as established.  Such facts are listed below and will be included in a jury instruction at trial.  Additionally, the Court finds it appropriate for Plaintiffs to recover the reasonable expenses and attorney's fees incurred to bring the instant motion and discover the exhibits not previously disclosed that are attached to the motion.

Since the Court declines to impose Plaintiffs' proposed sanctions and the facts established as true by the sanctions do not implicate WTPA, WTPA's arguments are moot.

## III.   Conclusion

IT IS SO ORDERED:

(1) Plaintiffs Tracey Caekaert and Camillia Mapley's Motion for Sanctions (Doc. 287) is GRANTED as to WTNY's failure to comply with the Order and the need for a remedy, and DENIED as to Plaintiffs' requested remedy.

(2) The following facts are deemed established:

(a) The Governing Body adopts guidelines for the qualifications for the appointment of local elders based on the Holy Scriptures;

(b) The Governing Body approves all letters to congregations concerning matters of policy;

(c) The Governing Body oversees the promulgation of policies and procedures for all persons associated with the Jehovah's Witnesses;

(d) The Governing Body has the ultimate authority to bar a person from serving in positions of responsibility with the Jehovah's Witnesses Organization;

(e) The Governing Body establishes policies and procedures for local congregation elders to investigate and respond to allegations of serious sin, including child sex abuse;

(f) The U.S. Branch Office puts on training conventions to teach local elders how to do their jobs;

(g) Elders direct questions on how to follow Jehovah's Witnesses policies to the U.S. Branch Office;

(h) Jehovah's Witnesses circuit overseers visit local congregations and report on their activities to the U.S. Branch Office;

(i) From the 1970s to 2001, the U.S. Branch Office worked in concert with WTNY to inform local congregations of the appointment and removal of elders;

(j) The U.S. Branch Office is the U.S. division of the Jehovah's Witnesses Organization where central control over U.S. Congregations is based;

(k) WTNY is the legal parent organization of all congregations in the U.S.;

(l) The operation of a local congregation's Kingdom Hall is done under the direction of the theocratic organization, *i.e.* the Governing Body, WTNY, and the U.S. Branch Office;

(m) Local congregations operate under the direction of the Governing Body;

(n) A prospective local congregation must apply to WTNY or the U.S. Branch Office to be approved as an entity with the Organization;

(o) From the 1970s to 2001, the U.S. Branch Office assisted local elders in administering discipline to local congregation members who committed serious sin; and

(p) Local congregations could not exist without the express permission of the U.S. Branch Office, which includes WTNY and the Governing Body.

(3) Within 30 days of this order, Plaintiffs' counsel shall file a pleading setting forth the amount of expenses and attorney's fees recoverable for their work finding the attached exhibits not disclosed to them in discovery and preparing the instant motion. Plaintiffs' counsel also shall file an affidavit itemizing those expenses and fees within 30 days of this order. WTNY shall have 14 days thereafter to respond. The Court will then issue a second order, specifying the amount of the sanctions award and setting the time of payment.

DATED the _6th_ day of February, 2024.

_Susan P. Watters_
SUSAN P. WATTERS
UNITED STATES DISTRICT JUDGE