*Exhibit M*

```
         IN THE UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF MONTANA
                 BILLINGS DIVISION
```
_____

```
TRACY CAEKAERT, and           Case No.
CAMILLIA MAPLEY,              CV-20-52-BLG-SPW

         Plaintiffs,

    vs.

WATCHTOWER BIBLE AND
TRACT SOCIETY OF
NEW YORK, INC.,
WATCH TOWER BIBLE AND
TRACT SOCIETY OF
PENNSYLVANIA, and BRUCE
MAPLEY, SR.,                   VIDEOTAPED DEPOSITION
                               UPON ORAL EXAMINATION
         Defendants.           OF JAMES ROWLAND

WATCHTOWER BIBLE AND
TRACT SOCIETY OF
NEW YORK, INC.,

         Cross Claimant,

BRUCE MAPLEY, SR.,

         Cross Defendant.


ARIANE ROWLAND, and           Cause No.
JAMIE SCHULZE,                CV 20-59-BLG-SPW

         Plaintiffs,

    vs.

WATCHTOWER BIBLE AND
TRACT SOCIETY OF
NEW YORK, INC., and
WATCH TOWER BIBLE AND
TRACT SOCIETY OF
PENNSYLVANIA,

         Defendants.
```
_____

**Charles Fisher Court Reporting**
**442 East Mendenhall, Bozeman MT  59715, (406) 587-9016**

**James Rowland**

1  in 1974 when I got back from college, University of

2  Oklahoma.  And then they do give training then,

3  because you go to --

4      Q.   Who's "they"?  What do you mean?

5      A.   Pardon?

6      Q.   When you say, "they do give training," who

7  gives the training?

8      A.   The Society.  They have a district

9  overseer that meets with all the elders when they

10 have this training annually.  And it's the finer

11 points of ministry, the finer points of, you know,

12 your duties, stuff like that.

13          So in '75, I think in early -- in January,

14 I went to that Kingdom Ministry School.  And that's

15 when that was.  It took a month.

16     Q.   So that training was called the Kingdom

17 Ministry School?

18     A.   Yeah.

19     Q.   Approximately 1975 for you.

20     A.   Yeah.

21     Q.   Do you remember where that was?

22     A.   Billings.

23     Q.   Billings.  "Yes"?  Billings?

24     A.   Yeah, Billings.  Yes.

25     Q.   Do you remember who was there?

66

**James Rowland**

1    A.    No.   There was about 40 elders in the

2  group, some new ones, some old ones.   And I can't

3  even remember who the instructor was.   He might

4  have been from New York.

5    Q.    Okay.   Someone you hadn't seen before.

6    A.    Yeah, he was just here to teach that class

7  and then go back to New York or whatever.

8    Q.    And in addition to the Bible, were they

9  using other books as part of your training?

10   A.    Yeah.   Yeah, with the -- like, the

11 teaching book, you know, like, one of the

12 publications is to become a better teacher, you

13 know, and --

14   Q.    Let me show you a document.   This is

15 called "Kingdom Ministry School Course."

16   A.    Yeah.

17   Q.    And it's Bates WTPA 1 is the first page of

18 this document.   It's the document that was given to

19 us by WTPA, the Pennsylvania corporation.

20   A.    Yeah.

21   Q.    And you'll see there -- can you read that

22 okay?

23   A.    Yeah.

24   Q.    It's dated October 1972?

25   A.    Uh-huh.   Yeah, that's the thing that --

67

**James Rowland**

```
 1    that's the publication that was used.
 2         Q.   For the training as an elder?
 3         A.   Yeah.
 4         Q.   Can I go back to that cover page for a
 5    second?  So "Watch Tower Bible and Tract Society of
 6    Pennsylvania, 1972," does that look like the
 7    document that maybe you saw when you were being
 8    trained in 1975?
 9         A.   Yeah.  Yeah, it's a book about like this
10    (indicating).  It's a red -- it's -- what do they
11    call them now?  A real deep red, burgundy almost.
12         Q.   And you were using your hands to describe
13    a very big book, thick?
14         A.   About like that.
15         Q.   Yeah.
16         A.   And that was the Kingdom Ministry School.
17         Q.   How much time did you spend at that
18    training in Billings?  Do you remember?
19         A.   I think it was a month.  It might have
20    been -- it might have been two weeks.  But it was a
21    number of days involved.
22         Q.   Okay.  So fairly extensive, then.
23         A.   Yeah.
24         Q.   And did you stay in Billings or did you
25    drive back and forth?
```

                                                          68

**James Rowland**

```
 1       A.   I had to stay in Billings.

 2       Q.   And did they pay for that for you?

 3       A.   No.

 4       Q.   You had to pay for it on your own?

 5       A.   Yeah.

 6       Q.   Okay.  Let's maybe mark -- can we mark

 7   this and keep it in the binder as No. 2?

 8            (Deposition Exhibit No. 2 was marked for

 9   identification.)

10   BY MR. SHAFFER:

11       Q.   We'll come back to that document later,

12   all right?

13       A.   Okay.

14       Q.   Did the other elders from the Hardin

15   Congregation come with you for that training in

16   1975, or --

17       A.   No.  They had been through that I guess

18   the year before.  And being that I was new at the

19   job, so to speak, they invest the time and effort

20   into this so you're a better teacher and a better

21   overseer.

22       Q.   When you say that, you mean the people

23   from New York who are doing the training in

24   Billings?

25       A.   Yeah.
```

                                                          69

**James Rowland**

1    Q.    Okay.  And do you recall, were there other

2    books besides this Kingdom Ministry School Course

3    book that they used to help train you?  Were

4    there --

5    A.    Well, they used the Bible, of course, all

6    the time.  But I think there was enough in there to

7    keep you busy.  And that's why, you know, I refer

8    to that, and I still remember it.

9    Q.    Yeah.  And so describe to me what your

10   days were like in Billings during that training.

11   A.    It was just a training, period, and not

12   much of anything else.

13   Q.    Was everybody in the same room?

14   A.    Yeah.  It was in one of the Kingdom Halls.

15   I can't remember.

16   Q.    And is there someone at the front of the

17   room talking to everybody else?

18   A.    Yeah, uh-huh.  Yeah.  Lecture series, you

19   know, lecture style.

20   Q.    And everybody's got their own copy of the

21   book?

22   A.    Uh-huh.

23   Q.    This Kingdom Ministry School Course book?

24   A.    Yeah, plus their own notebook.

25   Q.    And are you just going through it, working

70

**James Rowland**

1   your way through it day by day?

2       A.   Yeah.  And there was, you know, like a lot

3   of questions on it, and --

4       Q.   So you just raise your hand if you have a

5   question?

6       A.   Yeah.  And it was a fairly good teaching

7   event, learning.

8       Q.   Okay.  Was it helpful to you in helping --

9       A.   It was, yeah.

10      Q.   And tell me how.  Tell me how it helped

11  you.

12      A.   Well, you know, you have questions as to,

13  you know, the responsibility you have in talking to

14  people, and what happens if you're rejected or

15  physically assaulted or whatever, you know, how to

16  handle situations like that, and just all kinds of

17  stuff that helped you as a minister, I guess.

18      Q.   And so as an example, right, if someone

19  came to you as an elder and said, "Yeah, I was

20  physically assaulted," right, "Somebody punched me

21  in the face.  Mr. Rowland, Brother Rowland,

22  so-and-so punched me in the face.  What do I do,"

23  would your training in Billings and your reference

24  of this Kingdom Ministry School Course, would that

25  have helped you understand how to help that person? 71

**James Rowland**

1      A.    Uh-huh.

2      Q.    That was a "yes"?

3      A.    Uh-huh.

4      Q.    "Yes"?

5      A.    Yes.

6            MR. TAYLOR:   Object to the form.

7   BY MR. SHAFFER:

8      Q.    And that's how -- that training in

9   Billings and this book here, this Exhibit 2, that

10  informed you on how to work as an elder and how to

11  communicate with the other members of the

12  congregation and help them; is that right?

13     A.    Yes.

14     Q.    And would you reference back to this book,

15  this Exhibit No. 2, while you were working as an

16  elder?  Would you look at it from time to time?

17     A.    Yeah, any of the publications, you know,

18  to -- something specific that you don't know

19  exactly how to handle, you go in here and under

20  that title or that subject area, and it was very

21  helpful.

22     Q.    Okay.  So just going back to kind of your

23  evolution -- I'm going to call it your evolution as

24  a member of the church, in 1969, you're baptized,

25  you're a book study conductor.

                                                    72

**James Rowland**

1        A.    Yeah, so...

2        Q.    What was the title of the book you're

3    referring to?  Do you remember?

4        A.    Well, the first -- chapter 19, and pages

5    52, 53.

6

7        Q.    Maybe we can take a break.  Can you grab

8    that?

9        A.    Yeah.

10       Q.    Would that work?

11       A.    What's that?

12       Q.    If we take a break, can you grab that from

13   your car?  Would you mind?

14            MR. SHAFFER:  All right.  Let's take a

15   quick break, and we'll get that document from

16   Mr. Rowland and come back.  Hopefully, it will take

17   about five minutes or so.

18            THE VIDEOGRAPHER:  We're going off the

19   record.  The time is 11:50 a.m.

20            (Proceedings were in recess from

21   11:50 a.m. until 12:22 p.m.)

22            THE VIDEOGRAPHER:  We're back on the

23   record.  The time is 12:22 p.m.

24   BY MR. SHAFFER:

25       Q.    All right, Mr. Rowland.  When we took a

                                              104

1   break, you were going to go look for some

2   documents, but I want to try to simplify it.  So

3   I'm going to go ahead and just use what's already

4   been marked as Exhibit 2.  It's the Kingdom

5   Ministry School Course book.  Again, this begins

6   WTPA 1, so Bates-stamped WTPA 1, and it ends, just

7   for the purpose of the record, at 136.

8          So Mr. Rowland, this is that book you

9   described, the Kingdom Ministry book.  It's the

10  1972 version.  And I've put it in this three-ring

11  binder so that hopefully you can flip through it

12  without getting the pages discombobulated.  I'll

13  put this in front of you here.

14          When we left, we were just talking in

15  general.  You don't have to look at it now, but

16  just to remind you, you were kind of speaking in

17  general the process that you were trained to use as

18  an elder to help somebody who had come to you with

19  a sin or something they felt they had not followed

20  the word of the Lord properly and they wanted to

21  make it right.

22     A.   Yes.

23     Q.   Remember that?  Okay.

24          Can you flip to page -- let's go to

25  page 72.  Do you see the page numbers on the top of

**James Rowland**

1    those pages?

2        A.    Uh-huh.

3        Q.    And there's a section in the middle of

4    that page that says, "How Bible Laws Are

5    Administered."

6        A.    Uh-huh.

7        Q.    Do you see that?  That's a "yes"?

8        A.    Yes.

9        Q.    Thank you.

10           Does that trigger your memory at all on

11   kind of this topic we're talking about in terms of

12   how the elders are to administer the law within the

13   congregation?

14       A.    Uh-huh, yes.

15       Q.    "Yes"?  Okay.

16           Let's go down -- let's go to the bottom of

17   that page on the left-hand column.  Again, we're on

18   page 72.

19       A.    Uh-huh.

20       Q.    The last section there -- and I didn't

21   highlight this.  Can I take see that, take that

22   from you for a moment?  I'm going to highlight a

23   section.

24           MR. SHAFFER:  I've made highlights in this

25   document that I'm going to ask the witness to

106

**James Rowland**

1  review, and those will be reflected in the record.

2  BY MR. SHAFFER:

3      Q.   I've highlighted some things in yellow,

4  Mr. Rowland.  Can you read that okay, what I've

5  highlighted?

6      A.   "Bible law embraces the regulations,

7  principles, decisions, judgments and decrees that

8  are found in the Bible.  They constitute divine

9  law, God's written law.  Man's laws may or may not

10  be contrary to Bible laws."

11     Q.   And what does that section mean to you,

12  Mr. Rowland?

13     A.   Well, it means that as we consider, you

14  know, wrongdoing or possible serious wrongdoing,

15  whatever, there's a -- they're compared -- they're

16  contrasted with what the Bible says.

17     Q.   Okay.

18     A.   And like you asked earlier, you know,

19  serious or minor, whatever, they're handled

20  differently, but basically, it's to help the

21  person.

22     Q.   Okay.  Let's flip to the next page.  And

23  I've highlighted, on page 73 -- can I see that for

24  a moment so I make sure I've got the right part

25  highlighted?

                                                    107

**James Rowland**

```
1        A.    Okay.

2        Q.    Add this to it.

3              So we're on page 73 of that same document.

4   On the right-hand column there, Mr. Rowland, I've

5   highlighted something that says, "Elders empowered

6   as judges within the congregation to render

7   decisions based on Bible laws."  Do you see that?

8        A.    Yes.

9        Q.    And as we've been talking about -- just in

10  general, we've been talking about how it was the

11  elders' responsibility in the congregation to

12  counsel wrongdoers.  Is that what this statement

13  means in your view?

14       A.    Yes, uh-huh.

15       Q.    Okay.  Let's go to the next page, page 74.

16       A.    On 73, there's some stuff left.

17       Q.    Yeah, it's okay.  Flip past that.  Thank

18  you.

19             At the top of 74, there should be

20  something highlighted there that begins with, "If

21  serious wrongdoing..."  Do you see that?

22       A.    Uh-huh.

23       Q.    Just read that to yourself.

24       A.    Uh-huh.

25       Q.    Let me know when you're done.
```
                                                        108

**James Rowland**

```
 1              (Pause.)
 2              Have you gotten to finish the part that I
 3  highlighted?
 4      A.    Yes.
 5      Q.    And that section of highlight, does that
 6  reflect what you were trained as an elder at the
 7  course in Billings in terms of how you would handle
 8  a situation if someone had come to you with
 9  problems admitting wrongdoing?
10      A.    Uh-huh, yes.
11      Q.    "Yes"?
12              There's a part that says, "If serious
13  wrongdoing affecting the congregation is reported,
14  a hearing before the judicial committee is held."
15              Are you familiar with what a judicial
16  committee is?
17      A.    Uh-huh.
18      Q.    That's a "yes"?
19      A.    Yes.
20      Q.    Were you ever on a judicial committee at
21  the Hardin Congregation?
22      A.    Yes.
23      Q.    Let's flip, if you will, Mr. Rowland, to
24  page 85.  Are you there?  I've highlighted a couple
25  sections there in the left-hand column.
                                              109
```

**James Rowland**

```
1              The first one reads, "If accusation is
2   well founded" --  well, first, let me back up.  I'm
3   sorry.
4              At the top of that section is called
5   "Ascertaining Where The Error Lies When Accusations
6   Are Made."
7        A.   Uh-huh.
8        Q.   Do you see that, Mr. Rowland?
9        A.   Yes.
10       Q.   It looks like this is a situation maybe
11  you'd described earlier where one person would come
12  to you as an elder and say, "Hey, someone else did
13  something to me."
14       A.   Right.
15       Q.   Right?  It's a little bit different than
16  when the wrongdoer actually comes to you.  This is
17  where someone else is reporting that someone else
18  has done something wrong.
19       A.   Right.
20       Q.   So person A comes to you and says,
21  "Person B did something to me," right?
22       A.   Yes.
23       Q.   Yeah.  "If accusation is well founded and
24  requires attention of committee, follow through
25  accordingly."
                                              110
```

**James Rowland**

```
1              I want to ask you about that.  Based on
2    your training and the documents that you were
3    provided, does that mean if you determine that the
4    accusation that person A has made are well-founded,
5    that then the judicial committee needs to follow
6    through and investigate it?
7         A.   Yes.
8         Q.   Okay.  And then the next line there, "If
9    accusation involves minor matter or cannot be
10   backed up, no need to take the matter further, but
11   help accusing one get right view of matters."  Do
12   you see that?
13        A.   Yes.
14        Q.   And is that consistent with -- tell me
15   what that means to you, first of all, that last
16   part.
17        A.   Well, when a person comes -- you know, an
18   elder is well-versed in, you know, problems and
19   continues study of the Bible.  And when things are
20   well-founded, that person will come and tell you
21   something, that's really -- just one person, one
22   young lady came to me and said, "I went out" -- "I
23   went out and looked for my friend, who was going to
24   come visit, and Gunner Haines had her bottoms
25   removed and he was orally sexually assaulting her."
```
111

**James Rowland**

1    That girl came to me.

2        Q.    This is actually something that happened?

3        A.    Yeah, she seen it happen.  It was reported

4    to the elders with Martin involved, and he said he

5    had already handled it.  And he told the committee,

6    he says -- what he did is he said, "Gunner actually

7    just" -- "actually put his hand on her leg by

8    accident."

9        Q.    I see.  So you're describing an actual

10   situation where something went to the judicial

11   committee.

12       A.    Yeah.  Well, rather than the PO, presiding

13   overseer, going out and doing that, coming back

14   with bogus information on that incident, it should

15   have come to the committee and we should have

16   talked about it.

17       Q.    Oh, I see.  I see.

18       A.    This is a serious matter.

19       Q.    Yeah, okay.

20       A.    But that's one of those deals where you

21   don't know where that information goes or reports

22   or wherever.

23       Q.    Right.  Now, if we go back to page 85 here

24   where it says, "If accusation involves minor matter

25   or cannot be backed up, no need to take matter

                                                    112

**James Rowland**

1    further," I assume that's more of a situation where

2    somebody says, "Hey, I saw so-and-so take an apple

3    from the market."  Is that what that means by

4    "minor matter"?

5        A.    Uh-huh.

6        Q.    And in that case, you don't need to take

7    it to a judicial committee, right?  Is that how you

8    understood it?

9        A.    Might mention it to a fellow elder that

10   would help adjust that person.

11       Q.    And that's what you described earlier

12   before we took the break.

13       A.    Yeah, right.

14       Q.    All right.  I just want to put this

15   document in context with what you described

16   earlier.

17       A.    Uh-huh.

18       Q.    Okay.  Can you flip to page 114 for me.

19       A.    If I could just say one thing on this.

20       Q.    Sure.

21       A.    That when that girl came to me, she was

22   about 16 years old, and told me what her friend was

23   undergoing, I thought that was extremely important,

24   seriously important.

25       Q.    Okay.

                                                    113

**James Rowland**

1    somebody, even though it was just that one person,

2    no investigation.

3          You have to do something.  They can just

4    say, "Oh, you're lying," or "Well, maybe you'll

5    have a better day next day," or "Maybe he won't

6    throw you down anymore and stick his tongue in

7    you."

8          You've got to investigate it, and because

9    it's written right there.

10   Q.   Yeah.

11   A.   Otherwise, it wouldn't be in there.  If it

12   was me, I would have taken it right to the legal

13   department and got a determination.  Otherwise, you

14   wind up like this, getting sued.

15   Q.   Would you have gone to the police if you

16   felt like you could have?

17   A.   I would have went outside of the

18   organization.  But, see, I believed totally in the

19   footsteps of Jesus Christ.  And on the one hand, I

20   didn't want to drag Jehovah's name in, because I

21   knew there was a process for handling this.

22   Q.   The process in this book here, Exhibit 2?

23   A.   Yeah.

24   Q.   Yeah.

25   A.   And secondly, I knew that if I did, and

130

**James Rowland**

1   they did it to me anyhow, I'd have been like an

2   apostate.  But as it was, I was removed from

3   responsibility and kicked out of the congregation

4   anyway, without a hearing, without "Boo."  The

5   circuit overseers came out there, and

6   Brother Miller, "You have to sign this.  They

7   decided against you."

8        Q.   It was when you were disfellowshipped?

9        A.   Kicked out of the congregation and my

10  responsibilities taken.

11       Q.   Yeah.

12       A.   It was the exact opposite of what I was

13  trying to do, protect these kids.  And a lot of

14  them are hurt.

15            We've got ex-Witnesses out there in

16  Lame Deer that are a case in point.  One -- both of

17  them are drug addicts.  One was like a whore, and

18  the other one's in and out of treatment, brother

19  and sister.

20            The people that abused these kids, they

21  don't know why it's called death of the soul.  It's

22  because those -- and even my family, they broke us

23  all up.  We had to recover from it.  We're still

24  recovering.  They don't know that.  Plus they

25  probably don't give a damn, you know, the

                                                    131

**James Rowland**

```
 1        A.    Yes.
 2        Q.    Okay.  And during those phone calls, were
 3   you just honestly and truthfully telling
 4   Mr. Bontecou what you knew and what had happened?
 5        A.    Yes.
 6        Q.    Okay.
 7        A.    It was a brief kind of a summary.
 8        Q.    Okay.  And is it possible that based on
 9   those conversations with Mr. Bontecou, that he
10   prepared this affidavit?
11        A.    Yeah, it -- I think that I did.  Maybe
12   Ariane.  Mr. Bontecou wanted it, and I prepared it
13   and had it notarized and everything.
14        Q.    And I assume that you reviewed it before
15   you signed it.  Looks like you signed it on --
16   well, just a little over a year ago, April 14th,
17   2020.
18        A.    Uh-huh.
19        Q.    Did you look at it carefully before you
20   signed it?
21        A.    Did I -- yeah.
22        Q.    And is everything here accurate to the
23   best of your memory?
24        A.    To the best of my memory.
25        Q.    Yeah, okay.  So if we look at paragraph 3,
```

150

**James Rowland**

1   it says around 1974 you first started hearing

2   rumors that Gunner Haines, who was a member of the

3   congregation, was sexually abusing girls.

4           What do you mean when you say you heard

5   rumors?  What did you hear?

6       A.   I heard that from my family that Gunner

7   had games that he played with them.

8       Q.   Okay.

9       A.   And it was hide-and-seek.  And when he'd

10  find whoever, he'd molest them.

11      Q.   And how sure are you in this 1974 date

12  you've got here on paragraph 3?

13      A.   Yeah, I'd start hearing different things

14  about then, but it could have even been a little

15  later than that.

16      Q.   Okay.

17      A.   And '74 was a date that I was appointed as

18  an elder, and people started coming and telling me

19  things, you know.

20      Q.   I see.

21      A.   Because they trusted me, I guess.

22      Q.   Yeah.  Okay.

23      A.   And I don't know if they went to any of

24  the -- any other elders, but they would tell me,

25  and then on the occasion where I have written up

                                               151

**James Rowland**

1    their -- at elders' meetings, I would bring this

2    up, and it didn't go anywhere.

3        Q.   You say on paragraph 3 -- and I think

4    everybody understands, just so you know, that it's

5    so long ago that we're not going to hold you to

6    specific dates, you know, right?  It could be '75

7    perhaps.  Who knows.

8        A.   Right.

9        Q.   You say here again on paragraph 3 that you

10   brought the subject up with the elders.  What you

11   heard about Gunner Haines, you brought that up with

12   the elders sometime around 1974.

13       A.   Uh-huh.

14       Q.   Does that seem right to you as you sit

15   here today?  Does that seem accurate?

16       A.   Seemed pretty accurate.

17       Q.   And what did you tell the elders,

18   specifically, if you can recall, at that time in

19   1974?

20       A.   What did I tell the elders?

21       Q.   What did you tell them?

22       A.   It was probably sometime after that.  And

23   I knew Ariane wasn't lying to me.  And when she

24   told me about that, we discontinued going there to

25   their house and discontinued any babysitting

152

**Charles Fisher Court Reporting**
**442 East Mendenhall, Bozeman MT  59715, (406) 587-9016**

**James Rowland**

1    guardian of your children?

2        A.    No.

3        Q.    You've always continuously from age --

4    from birth to age 18 been their legal guardian?

5        A.    Yes.

6        Q.    And how would your children get to the

7    Svensen home?  Would you take them?  Would your

8    wife take -- how would they get there?

9        A.    What children?

10       Q.    Your children, Jamie and Ariane.

11       A.    Oh, yeah, I and my wife took care of them.

12       Q.    And would you transport them over to the

13   Svensens' house for babysitting?

14       A.    We both did.  And sometimes my oldest

15   daughter would help out.

16       Q.    Before we go further in the complaint,

17   when did you first become aware that Bruce Mapley

18   had been accused of misconduct involving children?

19       A.    It was probably in the late seventies.

20       Q.    In the late seventies.  Okay.

21             And when did you first become aware that

22   Harold Rimby had been abusing children?  Was that

23   also in the late seventies?

24       A.    Yes.

25       Q.    Let me ask you some basic questions,

                                                        185