*Exhibit O*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

ANNESSA LEWIS,                      )
          Plaintiff,                )
                                    )          Civil Action No. 1:14-cv-205
     v.                             )
                                    )
BELLOWS FALLS CONGREGATION OF )
JEHOVAH'S WITNESSES, BELLOWS        )
FALLS, VERMONT, INC.,               )
WATCHTOWER BIBLE AND TRACT          )
SOCIETY OF NEW YORK, INC., and      )
NORTON TRUE,                        )
          Defendants.               )

## DEFENDANTS BELLOWS FALLS CONGREGATION'S AND DEFENDANT WATCHTOWER BIBLE AND TRACT SOCIETY OF NEW YORK, INC.'S JOINT STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56(a),

Defendants Bellows Falls Congregation (the "Congregation") and Watchtower Bible and Tract

Society of New York, Inc. ("Watchtower") (collectively the "Movants"), submit the following

Undisputed Material Facts as to which they contend there is no genuine issue to be tried.  These

Undisputed Facts reflect the sworn deposition testimony of several witnesses, primarily Plaintiff

Annessa Lewis.

1.      Plaintiff Annessa Lewis was born on January 9, 1987.  She is 29 years old and

lives in Round Rock, Texas.  Plaintiff's Response to Defendants Bellows Falls Congregation of

Jehovah's Witnesses, Bellows Falls, Vermont, Inc. and Watchtower Bible and Tract Society of

New York, Inc.'s First Set of Interrogatories, 10/21/2015 (hereafter "Answers to the

Congregation's Interrogatories") Answer No. 1, at p. 1 (Exhibit 3 to Deposition of Annessa

Downs
Rachlin
Martin PLLC

1

Lewis, May 27, 2016) (a copy of the Answers to the Congregation's Interrogatories is attached hereto as Exhibit A).

2.      Plaintiff and her husband, Martin Bushway, have been in a committed relationship for fifteen (15) years.  They have been married since 2007 and have one child. Deposition of Annessa Lewis, 5/27/2016 (hereinafter "A. Lewis Dep.") at 45:2-8 (copies of relevant pages of A. Lewis' deposition transcript are attached hereto as Exhibit B).

3.      Plaintiff attended Smith College in Northampton, Massachusetts from 2005-2009. In 2009, Plaintiff graduated from Smith with a bachelor of arts and a major in sociology.  Since that time, Plaintiff has worked in government or non-profit jobs, most recently for Any Baby Can, a non-profit organization in Texas assisting families and children.  A. Lewis Dep., 5:25-6:1, 7:1-5.

4.      Defendant Congregation is an unincorporated association that has formed a corporation that owns the Kingdom Hall in Bellows Falls, Vermont.  The corporation has three executive officers who are typically three of the elders of the Congregation.  Affidavit of Matthew Reimann, 8/10/16, ¶ 3 (attached hereto as Exhibit C).

5.      Defendant Watchtower is a New York religious corporation located in Brooklyn, New York.  At the time of the alleged abuse of Plaintiff, Watchtower was the entity used by the U.S. Branch Office of Jehovah's Witnesses, at the national level, to communicate with and disseminate information to congregations of Jehovah's Witnesses.  Affidavit of Douglas Chappel, 8/10/16, ¶¶ 3, 26 (attached hereto as Exhibit D).

6.      Defendant Norton True lives in Beverly Hills, Florida with his second wife, Margaret Webber-True.  As of the date of this filing, he is 71 years old.  Deposition of Norton

Downs
Rachlin
Martin PLLC

True, 5/2/ 2016 (hereinafter "N. True Dep.") at 5:11, 13:8-11, 18:1-4, 19:19-22 (copies of relevant pages of N. True's deposition transcript are attached hereto as Exhibit E).

7.      Mr. True moved to Vermont in 1976 with his first wife, Charleen True, and three children, Stephanie, Stacy, and Seth.  N. True Dep., 8:16-21.

8.      Charleen True passed away in December 2011.  N. True Dep., 19:25-20:1.

9.      Mr. True began studying the Bible with Jehovah's Witnesses in 1971.  He was baptized as one of Jehovah's Witnesses in 1974.  N. True Dep., 21:15, 24:8-11.

10.      Mr. True was a baptized member of the Congregation from 1976 to 2012.  N. True Dep., 39:13-14; Confidential Deposition of Norton True, 5/2/2016, (hereinafter "N. True Conf. Dep." at 106:8-10; 133:11-13 (copies of relevant pages of N. True Conf. deposition transcript are attached hereto as Exhibit F).[1]

11.      Mr. True served as a ministerial servant of the Congregation from 1976-1986, and from 1995 to 2012.  N. True Dep., 39:13-14; N. True Conf. Dep. 50:19-23; 106:8-10; 133:11-13.

12.      Mr. True has never served as an elder in any congregation of Jehovah's Witnesses.  Affidavit of Douglas Chappel, ¶ 28; Affidavit of Matthew Reimann, ¶ 6.

13.      Mr. True was not a ministerial servant at any time in 1990, 1991, 1992, 1993, or 1994.  See N. True Dep., 39:13-14; N. True Conf. Dep. 50:19-23; 106:8-10; 133:11-13; Affidavit of Douglas Chappel, ¶ 28.

14.      Mr. True was not a ministerial servant at the time of the abuse alleged in this case.  See N. True Dep., 39:13-14; N. True Conf. Dep. 50:19-23; 106:8-10; 133:11-13; Affidavit of Douglas Chappel, ¶ 28.

---

[1] A section of Mr. True's deposition was designated as "confidential."

Downs
Rachlin
Martin PLLC

15.     The spiritual leaders of a congregation of Jehovah's Witnesses are known as "elders."  They are responsible for, among other things, conducting meetings of worship; shepherding; caring for the spiritual needs of the congregation; and applying biblical principles to address allegations of sin and wrongdoing within the congregation.  Typically, a congregation of Jehovah's Witnesses will have 4-6 elders.  Affidavit of Matthew Reimann, ¶ 4; Affidavit of Douglas Chappel, ¶¶ 14, 15, 17-18.

16.     Elders are recommended by the existing body of elders of a congregation and, at all times relevant to this lawsuit, appointed by the Service Department of the United States Branch of Jehovah's Witnesses.  Affidavit of Matthew Reimann, ¶ 5; Affidavit of Douglas Chappel, ¶ 16.

17.     Ministerial Servants are baptized male members of the congregation who care for the routine organizational tasks of the congregation such as serving as welcome attendants at the Kingdom Hall, handling the sound equipment, and distributing literature.  Deposition of Matthew Reimann, 4/5/2016 (hereinafter "M. Reimann Dep.") at 51:5-15 (copies of relevant pages of Matthew Reimann's deposition transcript are attached hereto as Exhibit G); Affidavit of Matthew Reimann, ¶ 7; Affidavit of Douglas Chappel, ¶¶ 21-23.

18.     At all times relevant to this lawsuit, Ministerial Servants are recommended by the body of elders of a congregation and appointed by the Service Department of the United States Branch of Jehovah's Witnesses.  M. Reimann Dep., 53:1-6; Affidavit of Douglas Chappel, ¶ 21.

19.     Baptized members of a congregation of Jehovah's Witnesses who participate in field service and actively share the message of the Bible are known as "baptized publishers."  M. Reimann Dep., 20:16-23; Affidavit of Douglas Chappel, ¶ 11.

20.     There is no appointment process for baptized publishers.  However, before they are baptized, they are quizzed by the congregation elders to see that they possess a basic understanding of the contents of the Bible and they express a desire to be one of Jehovah's Witnesses.  Affidavit of Matthew Reimann, ¶ 8; Affidavit of Douglas Chappel, ¶¶ 11-12.

21.     The Movants do not have a policy of monitoring private citizens in their homes to protect other members of a congregation of Jehovah's Witnesses from harm.  Affidavit of Matthew Reimann, ¶ 26; Affidavit of Douglas Chappel, ¶ 20.

22.     The Movants do not have a policy of monitoring the personal lives of Jehovah's Witnesses who have been accused of committing sexual molestation.  Affidavit of Matthew Reimann, ¶ 27; Affidavit of Douglas Chappel, ¶ 20.

23.     The Movants do not have a policy of monitoring children of congregation members in private homes in order to protect them from sexual molestation.  Affidavit of Matthew Reimann, ¶ 28; Affidavit of Douglas Chappel, ¶ 20.

24.     Plaintiff's mother and father were baptized publishers at the time of the incident alleged in this case.  Deposition of Marina Mavroleon (formerly, Lewis) Folsom, 4/21/2016 (hereinafter "M. Mavroleon-Folsom Dep."), at 43:18-20[2] (copies of relevant pages of Marina Mavroleon-Folsom's deposition transcript are attached hereto as Exhibit H); Affidavit of Matthew Reimann, ¶ 14.

25.     Defendant True was a baptized publisher at the time of the incident alleged in this case but was neither an elder nor a ministerial servant.  Affidavit of Matthew Reimann, ¶ 15.

26.     Plaintiff moved to Vermont in 1987 with her parents, Marina and Keith Lewis, and two older siblings, Jennifer and Keith, Jr.  Plaintiff has a younger sister, Miranda Lewis, who

---

[2] Marina Mavroleon Folsom is Plaintiff's mother.

Downs
Rachlin
Martin PLLC

was born in Vermont in 1991.  A. Lewis Dep., 17:10-15.  Plaintiff's parents were already

Jehovah's Witnesses when they moved to Vermont.  M. Mavroleon-Folsom Dep., 39:23-40:6.

27.     The Lewis family began attending Jehovah's Witness meetings at the Kingdom

Hall in Bellows Falls in late 1987 or 1988.  Affidavit of Matthew Reimann, ¶ 10.

28.     Mr. True's daughter, Stacy, married Thomas Bathrick.  Mr. Bathrick has a

daughter, Rebecca, from a previous marriage.  Affidavit of Matthew Reimann, ¶ 9.

29.     In 1990, Rebecca Bathrick accused her father, Thomas Bathrick, of sexual

molestation.  Affidavit of Matthew Reimann, ¶ 11

30.     At that same time (1990), Rebecca Bathrick also  accused her her step-

grandfather, Norton True of sexual molestation.  Affidavit of Matthew Reimann, ¶ 11.

31.     Norton True denied that he had sexually molested Rebecca Bathrick.  Affidavit of

Matthew Reimann, ¶ 12.

32.     Matthew Reimann was an elder in the Congregation at the time Rebecca Bathrick

made these allegations.  Affidavit of Matthew Reimann, ¶ 11.

33.     Mr. Reimann was informed and believed that Rebecca Bathrick later withdrew

her allegation against Mr. True.  Affidavit of Matthew Reimann, ¶ 13.

34.     Mrs. Lewis, Plaintiff's mother, did not believe that Mr. True had molested

Rebecca Bathrick.  M. Mavroleon-Folsom Dep., 77:17-25.

35.     Mrs. Lewis understood that Rebecca Bathrick had withdrawn her allegation

against Mr. True.  M. Mavroleon-Folsom Dep., 78:12-14.

36.     At the time of the allegation of molestation in this case, Stacy Bathrick was Mrs.

Lewis's best friend.  M. Mavroleon-Folsom Dep., 78:3-4.

Downs
Rachlin
Martin PLLC

37.     Mrs. Lewis was not aware of any information that should have put the Congregation elders on notice that Mr. True might have posed a risk to children before he allegedly molested Plaintiff.  M. Mavroleon-Folsom Dep., 78-79.

38.     Stacy Bathrick regularly babysat Plaintiff and her siblings in the early 1990s and at the time of the molestation alleged in this case.  A. Lewis Dep., 94:18-21; M. Mavroleon-Folsom Dep., 80.

39.     The Movants were not aware that Ms. Bathrick was Plaintiff's regular babysitter. Affidavit of Matthew Reimann, ¶ 20; Affidavit of Douglas Chappel, ¶ 31.

40.     The Movants do not sponsor a babysitting or daycare program within the Congregation or between members of the congregation.  Affidavit of Matthew Reimann, ¶ 22; Affidavit of Douglas Chappel, ¶¶ 13, 30.

41.     The Movants do not oversee childcare arrangements between members of the Congregation.  Affidavit of Matthew Reimann, ¶ 23; Affidavit of Douglas Chappel, ¶¶ 13, 30.

42.     The Movants did not refer Stacy Bathrick to Mrs. Lewis as a babysitter for her children.  Affidavit of Matthew Reimann, ¶ 24; Affidavit of Douglas Chappel, ¶¶ 13, 30.

43.     Mrs. Lewis trusted Stacy Bathrick "implicitly" during the time that Ms. Bathrick babysat the Lewis children.  M. Mavroleon-Folsom Dep., 80:8-9.

44.     Plaintiff recalls only one incident of alleged molestation by Mr. True.  A. Lewis Dep., 121:25-122:1-6.

45.     Plaintiff does not recall the exact date of the alleged incident of sexual molestation in this case, but believes it occurred when she was roughly five (5) years old or in preschool in 1991, 1992, or 1993.  A. Lewis Dep., 122:7-25.

Downs
Rachlin
Martin PLLC

46.     Stacy Bathrick was babysitting Plaintiff on the day of the alleged incident of molestation.  A. Lewis Dep., 119:11-17, 120:8-12; M. Mavroleon-Folsom Dep., 79:23-25-80:1-5.

47.     At the time of the alleged molestation, Mrs. Lewis believed that Plaintiff was in Stacy Bathrick's care.  M. Mavroleon-Folsom Dep., 79:23-25-80:1-10.

48.     Ms. Bathrick took Plaintiff to Mr. True's home on the day of the incident.  A. Lewis Dep., 120: 16-17, M. Mavroleon-Folsom Dep., 79:23-25-80:1-10.

49.     Mrs. Lewis claimed that she was not aware that Ms. Bathrick sometimes took the Lewis children to Mr. True's home.  M. Mavroleon-Folsom Dep., 79:23-25-80:1-10.

50.     Mrs. Lewis claimed that she was not aware that Ms. Bathrick took Plaintiff to Mr. True's home on the day of the incident.  M. Mavroleon-Folsom Dep., 79:23-25-80:1-10.

51.     At the time of the incident, the Movants were not aware that Ms. Bathrick sometimes took Plaintiff to Mr. True's home or that she was there on the day of the incident. Affidavit of Matthew Reimann, ¶ 2; Affidavit of Douglas Chappel, ¶¶ 31, 34.

52.     On the day of the alleged incident, Mr. True took Plaintiff to the barn on his property to see the horses.  A. Lewis Dep., 123:7-11.

53.     Stacy Bathrick was not with Plaintiff and Mr. True at the time of the alleged incident of molestation.  A. Lewis Dep., 123:21-23.

54.     Ms. Bathrick was still at the True home at the time of the alleged molestation.  A. Lewis Dep., 120: 16-17, M. Mavroleon-Folsom Dep., 79:23-25-80:1-10.

55.     Plaintiff testified that the alleged molestation occurred when Mr. True picked her up to look at a horse over the stall door.  A. Lewis Dep., 124:1-5.

Downs
Rachlin
Martin PLLC

56.     Plaintiff testified that the alleged molestation involved Mr. True reaching down her overalls and touching her vagina.  A. Lewis Dep., 124:1-5, 130:8-10.

57.     Plaintiff does not recall how long the alleged incident lasted.  A. Lewis Dep., 131:8-10.

58.     Plaintiff does not recall how she felt during the alleged incident.  A. Lewis Dep., 133:22-25-134:1.

59.     Plaintiff does not recall how she felt immediately after the alleged incident.  A. Lewis Dep., 133:22-25-134:1.

60.     Plaintiff does not recall what caused Mr. True to stop touching her.  A. Lewis Dep., 131:2-7.

61.     Plaintiff claims that Mr. True instructed her not tell anyone, including his wife, Charleen True.  A. Lewis Dep., 133:6-14.

62.     At the time of the alleged incident, Mr. True was not occupying any appointed role within the Congregation.  N. True Dep., 39:13-14; N. True Conf. Dep. 50:19-23; 106:8-10; 133:11-13.

63.     At the time of the alleged incident, Mr. True was not employed by and did not receive any compensation from the Movants.  Affidavit of Matthew Reimann, ¶¶ 16-17; Affidavit of Douglas Chappel, ¶¶ 12, 33.

64.     Mr. True was not acting on behalf of the Congregation at the time of the alleged incident.  Affidavit of Matthew Reimann, ¶ 18.

65.     Mr. True was not acting on behalf of Watchtower at the time of the alleged incident.  Affidavit of Douglas Chappel, ¶¶ 33-34.

Downs
Rachlin
Martin PLLC

66.     Stacy Bathrick, the babysitter, was not acting on behalf of either the Congregation or Watchtower at the time of the alleged incident.  Affidavit of Matthew Reimann, ¶ 19.

67.     The alleged incident in Mr. True's barn is the only alleged incident of abuse by Plaintiff.  A. Lewis Dep., 110:6-7; Vermont State Police Report at Watchtower0012 (Exh. 8 to A. Lewis Dep.; Exh. 1 to M. Mavroleon-Folsom Dep.) (a copy of the Vermont State Police Report is attached hereto as Exhibit I).

68.     There is no evidence that Plaintiff was ever molested by Mr. True or anyone in the Kingdom Hall at the Congregation.  Affidavit of Matthew Reimann, ¶ 21.

69.     Plaintiff did not tell anyone about the alleged incident until 1996.  A. Lewis Dep., 135:2-5; Vermont State Police Report, Watchtower 0010.

70.     As a child, Plaintiff believed that Mr. True was an elder in the Congregation at the time of the alleged molestation.  A. Lewis Dep., 92:5-14.

71.     At the time of her deposition in this case, Plaintiff still believed that Mr. True was an elder in the Congregation at the time of the alleged incident, but she was incorrect.  A. Lewis Dep., 91:25-92:5.

72.     In July or August of 1996, Plaintiff and her family attended a party at Mr. True's house.  A. Lewis Dep., 137-138; Vermont State Police Report, Watchtower 0013.

73.     This party in July or August of 1996 at Mr. True's house was a "going-away" party for a family in the Congregation that was moving to Florida.  A. Lewis Dep., 138:2-3.

74.     Plaintiff does not recall specifics or the circumstances about her family's attendance at the going-away party, just that they were there.  A. Lewis Dep., 142:22-24.

Downs
Rachlin
Martin PLLC

75.     Plaintiff recalls that she was in her family's mini-van about to leave the party when her younger sister Miranda Lewis stated that she had been touched by Mr. True.  A. Lewis Dep.,143:3-8.

76.     Plaintiff does not recall Miranda's exact words or the nature of the touching Miranda was referring to, only that Miranda did not appear to be upset or angry.  A. Lewis Dep., 143:6, 13-15; 144:9-13.

77.     Because it did not appear to Plaintiff that her mother was taking Miranda's statement seriously, Plaintiff at that time told her mother that she, also, had been touched by Mr. True.  A. Lewis Dep., 144:17-145:1-10.

78.     At the time she disclosed the alleged molestation to her family, some 3-5 years after it had allegedly occurred, Plaintiff knew that what Mr. True had done was "wrong."  A. Lewis Dep., 281:23-25.

79.     Mrs. Lewis did not initially believe her daughters' accusations against Mr. True. Mrs. Lewis did not believe that Mr. True was capable of molesting Plaintiff.  M. Mavroleon-Folsom Dep., 98:8-14.

80.     Mrs. Lewis testified that Plaintiff told her that Mr. True's wife, Charleen, had walked into the barn during the alleged molestation, and that Mr. True had told his wife that he was trying to remove a bee from Plaintiff's pants.  M. Mavroleon-Folsom Dep., 99:7-10; Vermont State Police Report at Watchtower 0018.

81.     Plaintiff, however, now claims not to recall that Mrs. True walked into the barn during the alleged incident of molestation.  A. Lewis Dep., 131:6-7.

Downs
Rachlin
Martin PLLC

82.     Mrs. Lewis telephoned Stacy Bathrick the day after the going-away party to ask if she knew whether her father had improperly touched Plaintiff.  M. Mavroleon-Folsom Dep., 105:21-25-106:1-3.

83.     According to Mrs. Lewis, Ms. Bathrick denied that her father could ever have sexually molested Plaintiff.  M. Mavroleon-Folsom Dep., 106:4-6.

84.     Mrs. Lewis testified that she was angry during her phone call with Ms. Bathrick, because "it was Stacy [Bathrick] who had given Norton . . . access to Annessa . . ."  M. Mavroleon-Folsom Dep., 106:13-15.

85.     Mrs. Lewis also called Mr. True the day after the going-away party to confront him with her daughters' allegations, which Mr. True denied.  M. Mavroleon-Folsom Dep., 107:1-18.

86.     Mrs. Lewis did not immediately alert secular authorities to Plaintiff's claim of abuse by Mr. True.  M. Mavroleon-Folsom Dep., 112.

87.     Mrs. Lewis wanted Plaintiff's allegation to be handled within the Congregation pursuant to Jehovah's Witnesses religious practices and beliefs as opposed to being investigated by secular authorities.  M. Mavroleon-Folsom Dep., 111:23-25-112:1-25, 116:2-10.

88.     According to Jehovah's Witnesses' practices and beliefs, if the elders of a congregation learn of sinful conduct, such as sexual abuse, on the part of a baptized member, the elders will first call the Legal Department of Jehovah's Witnesses located in U.S. Branch headquarters to learn whether the law of their state requires that they call the authorities to report the suspected abuse; then, the elders meet and appoint two  elders to investigate the matter.  The two elders attempt to discern the truthfulness of the allegations by following a Bible-based policy

Downs
Rachlin
Martin PLLC

derived from Deuteronomy 19:15 and reaffirmed in Matthew 18:15-17.  It requires that the congregant either confess to the alleged wrongdoing, or that there be two (2) witnesses to it.  The Bible's "two-witness" requirement is satisfied by two (2) separate accusers to the same or different incidents, or one (1) accuser plus strong corroborating evidence that is considered equivalent to a second witness.  If the scriptural two-witness requirement is not met, the elders cannot go beyond the Scriptures to convene a judicial committee to take disciplinary action within the congregation.  Affidavit of Matthew Reimann, ¶ 29.

89.     Mrs. Lewis reported her daughters' allegation of molestation by Mr. True to Matthew Reimann, an elder in the Congregation.  M. Mavroleon-Folsom Dep., 111-112.

90.     Mrs. Lewis specifically selected Mr. Reimann to report the allegation to because she knew that he was not a mandated reporter under Vermont law at that time.  In other words, she knew that he would not be required to report the allegations to the civil authorities.  M. Mavroleon-Folsom Dep., 111:19-112:21.

91.     The Congregation never instructed Mrs. Lewis not to call the police or report Plaintiff's allegation of molestation to social services.  M. Mavroleon-Folsom Dep., 115:21-116:10.

92.     Mr. Reimann arranged for a meeting between the Lewises and Mr. True at Mr. True's house to discuss Plaintiff's allegation of molestation.  Mrs. Lewis, Mr. True, Mrs. True, Mr. Reimann, and Roger Scheffer, an elder in the South Claremont Congregation of Jehovah's Witnesses, were in attendance at this meeting.  M. Mavroleon-Folsom Dep., 117:23-119, 121:25-122:2-5; Deposition of Roger Scheffer, 6/9/2016 (hereinafter "R. Scheffer Dep.") at 56:22-57:9

Downs
Rachlin
Martin PLLC

(copies of relevant pages of Roger Scheffer's deposition transcript are attached hereto as Exhibit J).

93.     The purpose of this meeting was for the elders to ascertain whether there was a Scriptural basis to convene a religious judicial committee concerning Plaintiff's allegation of molestation by Mr. True.  R. Scheffer Dep., 65:13-21; M. Reimann Dep., 74:23-75:21.

94.     Plaintiff and her siblings did not attend this meeting.  M. Mavroleon-Folsom Dep., 121:25-122:2-5.

95.     The meeting lasted well over an hour during which time Mr. True denied the allegations that he had improperly touched Plaintiff or her sister.  M. Mavroleon-Folsom Dep., 123:16-124:1.

96.     Mrs. Lewis testified that she recalls that at this meeting Mrs. True (Charleen) explained that she had walked into the barn at the time of the alleged molestation and that Mr. True was simply trying to remove a bee from inside Plaintiff's overalls.  M. Mavroleon-Folsom Dep., 126:15-19.

97.     Mrs. Lewis did not allow the elders to meet with Plaintiff or Plaintiff's sister Miranda concerning the allegations of molestation.  M. Mavroleon-Folsom Dep., 151:1-5. Affidavit of Matthew Reimann, ¶ 30.

98.     Because there was no confession from Mr. True, and because Mrs. Lewis refused to allow the elders to speak with her daughters, there was insufficient Scriptural basis to form a religious judicial committee concerning the allegations of molestation.  Affidavit of Matthew Reimann, ¶ 31.

99.     Mrs. Lewis acknowledged that if the elders had taken action against Mr. True, they could have been subject to legal action by Mr. True in light of:  a) the findings by the State Police that there were insufficient grounds to charge Mr. True, and b) the insufficient Scriptural grounds to form a religious judicial committee.  M. Mavroleon-Folsom Dep., 200-01.

100.     Mrs. Lewis took Plaintiff to therapist Daniel LaFleur, Ph.D. for observation concerning the alleged molestation.  Dr. LaFleur concluded that Plaintiff was doing fine and did not recommend any further mental health care for Plaintiff.  M. Mavroleon-Folsom Dep., 132:16-22, 133:13-22.

101.     Around this time, Mrs. Lewis also sought advice from Barbara Belcher-Timme, Psy.D. concerning her daughters' allegations of molestation by Mr. True.  M. Mavroleon-Folsom Dep., 205:22-206:2.

102.     Dr. Belcher-Timme advised Mrs. Lewis to allow her daughters to discuss their allegations of molestation, but to avoid retraumatizing them by "over-talking" about it.  M. Mavroleon-Folsom Dep., 56:4-13.

103.     Dr. Belcher-Timme also informed Mrs. Lewis at this time that she was a mandated reporter and would have to report the abuse allegations to the Department of Social and Rehabilitation Services ("SRS") Social Services Division.  M. Mavroleon-Folsom Dep., 59:4-13.

104.     On September 17, 1996, social services investigator Susan Palmer notified the Vermont State Police of Plaintiff's and her sister's allegations of molestation by Mr. True.  Vermont State Police Report, Watchtower 0012.

Downs
Rachlin
Martin PLLC

105.    Later that day, Mrs. Lewis contacted Det. Sgt. David J. Tetrault of the Vermont State Police and agreed to allow Plaintiff and her sister to meet with Det. Sgt. Tetrault and Ms. Palmer at the police station.  Vermont State Police Report, Watchtower 0012.

106.    The only reason Mrs. Lewis agreed to allow her daughters to be interviewed by the secular authorities is because SRS threatened to take temporary custody of the girls in order to question them.  M. Mavroleon-Folsom Dep., 132:6-10.

107.    On September 18, 1996, Plaintiff and her sister Miranda met with Det. Sgt. Tetrault and Ms. Palmer.  Vermont State Police Report, Watchtower 0012.

108.    Plaintiff told Det. Sgt. Tetrault and Ms. Palmer that the molestation stopped when Ms. Bathrick called Plaintiff out of the barn.  Vermont State Police Report, Watchtower 0015.

109.    On September 23, 1996, Det. Sgt. Tetrault met with Mr. True.  Vermont State Police Report, Watchtower 0017.

110.    Mr. True denied the Lewis girls' allegations and agreed to take a polygraph examination.  Vermont State Police Report at Watchtower 0017-19, 26.

111.    Mr. True told Det. Sgt. Tetrault that the incident involving Plaintiff occurred because Plaintiff had said "ow" and he was checking to see if she had a bee in her overalls.  Vermont State Police Report, Watchtower 0018.

112.    Mr. True also told Det. Sgt. Tetrault that Mrs. True observed Mr. True checking to see if Plaintiff had a bee in her overalls.  Vermont State Police Report, Watchtower 0018.

113.    On October 10, 1996, Mr. True sat for a private polygraph examination administered by Leroy Prior.  Mr. Prior determined that Mr. True was truthful in his denial of the allegations of molestation.  Vermont State Police Report, Watchtower 0028.

114.    On October 31, 1996, Det. Sgt. Kevin Anderson conducted a polygraph examination of Mr. True concerning the allegations.  Det. Sgt. Anderson concluded that Mr. True was truthful in his denial of the allegations.  Vermont State Police Report at Watchtower 0026-27.

115.    On November 1, 1996, Det. Sgt. Tetrault advised Mrs. Lewis and SRS of the results of the two (2) polygraph examinations and that Mr. True would not be charged.  Vermont State Police Report, Watchtower 0027.

116.    On July 15, 1997, SRS notified Mr. True's attorney that it had officially changed the Lewis' abuse allegations to "unsubstantiated."  July 15, 1997 Letter (Exh. 7 to M. Mavroleon-Folsom Dep.) (a copy of the July 15, 1997 letter is attached hereto as Exhibit K).

117.    Keith Lewis, Sr., Plaintiff's father, never believed that Mr. True had molested either of his daughters.  M. Mavroleon-Folsom Dep., 215:12; A. Lewis Dep., 210-11; Deposition of Keith Lewis, Sr., 4/28/2016 (hereafter "K. Lewis, Sr., Dep.") at 22-23 (copies of relevant pages of Keith Lewis, Sr.'s deposition transcript are attached hereto as Exhibit L).

118.    The Lewis family stopped attending meetings at the Bellows Falls Congregation in late 1996 or early 1997 as a result of the alleged molestation involving Mr. True.  At that time, the Lewis family joined the South Claremont, New Hampshire Congregation of Jehovah's Witnesses.  M. Mavroleon-Folsom Dep., 148:14-22.

119.    Plaintiff was baptized in the Jehovah's Witness religion in 1998—two (2) years after disclosing the alleged molestation by Mr. True.  M. Mavroleon-Folsom Dep., 256; A. Lewis Dep., 269; Affidavit of Douglas Chappel, ¶ 36.

120.    Despite the allegations involving Mr. True, Mrs. Lewis and her children remained active in the Jehovah's Witness religion until the year 2000 or so.  A. Lewis Dep., 79:16-24.

121.    The alleged incident involving Mr. True, and an allegedly degrading relationship with the Congregation and the Jehovah's Witness religion as a result of the alleged incident involving Mr. True, are the primary reasons why Plaintiff and her family stopped attending meetings and stopped considering themselves members of the Jehovah's Witness religion in 2000.  A. Lewis Dep.,79:25-81:25, 287-88.

122.    Plaintiff has known for most of her life that she was emotionally affected by the sexual molestation that she alleges Mr. True perpetrated on her.  A. Lewis Dep., 298:3-12, 300:25-301:13; M. Mavroleon-Folsom Dep., 155:24-156:3; 159:4-10.

123.    Plaintiff has known for most of her life that her depression was caused by the alleged sexual molestation.  A. Lewis Dep., 298:3-12, 300:25-301:13; Deposition of Jennifer Lewis, 5/3/2016 (hereafter "J. Lewis Dep.") at 52:2-14[3] (copies of relevant pages of Jennifer Lewis' deposition transcript are attached hereto as Exhibit M).

124.    Plaintiff has known since at least high school that she was negatively impacted by the alleged sexual molestation.  A. Lewis Dep., 298:3-12, 300:25-301:13; J. Lewis Dep., 52.

125.    The alleged molestation and Plaintiff's experience in the Congregation was a frequent topic of discussion within the Lewis family since Plaintiff's childhood.  A. Lewis Dep., 136:12-24, 285; J. Lewis Dep., 47-49, 106-07, 196-98.

126.    Plaintiff and her older sister Jennifer Lewis discussed the alleged molestation on many occasions during Plaintiff's teenage years.  A. Lewis Dep., 285:6-9.

_____
[3] Jennifer Lewis is Plaintiff's older sister.

Downs
Rachlin
Martin PLLC

127.    Jennifer Lewis, who is four (4) years older than Plaintiff, believes that Plaintiff's depression throughout her childhood and teen years was caused by the molestation.  J. Lewis Dep., 49.

128.    During high school, Plaintiff experienced emotional conditions of numbness, emptiness, and loss of innocence, which she attributed to the alleged molestation.  A. Lewis Dep., 292:14-293:5.

129.    During high school, Plaintiff posted about the alleged molestation online; talked about it with her boyfriend; and discussed it with close high school friends.  A. Lewis Dep., 286:11-14.

130.    Plaintiff and her family discussed the abuse so frequently during her high school years that her brother Keith Jr. became frustrated by Plaintiff and the family's continued discussion of the alleged incident, asking her why she talked about it so much.  A. Lewis Dep., 290:1-15.

131.    Plaintiff knew that she was affected by the alleged molestation in a negative way by the time she was nine (9) years old.  A. Lewis Dep., 300:4-11.

132.    Plaintiff has known that she was harmed by the alleged sexual molestation for "a good chunk of [her] life…definitely around [her] depression and everything."  A. Lewis Dep., 298:6-9.

133.    In 2001, when she was fourteen (14), Plaintiff's mother took her again to Dr. Belcher-Timme for treatment of issues related to the alleged sexual abuse.  Plaintiff attended one session.  M. Mavroleon-Folsom Dep., 204:17-22;  A. Lewis Dep., 164:9-12, 255:19-22;  Deposition of Barbara Belcher-Timme, 3/18/2016 (hereinafter "Belcher-Timme Dep.") at 20-21,

Downs
Rachlin
Martin PLLC

22-24, 67, 70-71 (copies of relevant pages of Barbara Belcher-Timme's deposition transcript are attached hereto as Exhibit N); Answers to the Congregation's Interrogatories, Answer No. 18 at p. 11.

134.   Dr. Belcher-Timme destroyed her records of Plaintiff's treatment in 2014, before the lawsuit was filed on October 1, 2014.  November 20, 2015 note of Dr. Belcher-Timme (Exh. B to Belcher-Timme Dep.) (a copy of Dr. Belcher-Timme's November 20, 2015 note is attached hereto as Exhibit O); Belcher-Timme Dep., 15-16.

135.   At age 14-15, Plaintiff was aware that her molestation-related depression and anxiety were triggered by intimate encounters that reminded her of the alleged molestation.  A. Lewis Dep., 104:16-22, 105:15-22, 185-87.

136.   Plaintiff began to experience "flashbacks" of the alleged abuse during sexual encounters beginning around age fifteen (15) or earlier.  As a result of these flashbacks, Plaintiff claims she would become nauseated and withdraw from the intimate experience.  She continued to experience flashbacks of the abuse occasionally during sexual encounters thereafter.  A. Lewis Dep., 185-87.

137.   At age fifteen (15), Plaintiff received a "heartbreaking" letter from a former childhood friend in the Congregation in which the alleged molestation by Mr. True, and Plaintiff's decision to disassociate herself from the Jehovah's Witness religion, came up.  A. Lewis Dep., 87-88.

138.   At age seventeen (17), Plaintiff maintained handwritten and electronic journals about her daily life.  A. Lewis Dep., 228-29.

139.    At age seventeen (17), ten (10) years before filing this lawsuit, Plaintiff wrote about the alleged molestation and her feelings towards the Congregation in the following journal entry: "Bad, bad memories of childhood.  My concerns with the man who molested Miranda and I being disregarded by the congregation . . .  No more blocking out.  There was too much of that and now there's no other half of my childhood."  A. Lewis Dep., 230-231; July 7, 2004 Journal Entry (Exh. 9 to A. Lewis Dep.) at AL383-384 (hereinafter "7/7/2004 Journal Entry") (a copy of the July 7, 2004 Journal Entry is attached hereto as Exhibit P).

140.    At the time Plaintiff wrote this journal entry at age 17, Plaintiff knew that her "bad memories" from childhood were caused by her alleged molestation.  A. Lewis Dep., 231:1-7.

141.    This same journal entry written by Plaintiff at age 17 specifically referred to "this old and trusted man's hand down my pants."  7/7/2004 Journal Entry, AL384.

142.    Plaintiff's July 7, 2004 journal entry ends with a draft movie script about the aftermath of Plaintiff's alleged molestation by Mr. True.  The script refers to the Congregation allegedly covering up allegations of sexual molestation.  7/7/2004 Journal Entry, AL386.

143.    Plaintiff wrote in this draft movie script in 2004 that "the Congregation is like a dead person to me."  7/7/2004 Journal Entry, AL386.

144.    In an August 16, 2004 journal entry Plaintiff writes about not wanting her boyfriend (now husband) to go near her "bad zone," because that is where Mr. True allegedly touched her as a child.  Collection of Annessa's Journal Entries (Exh. 10 to A. Lewis Dep.) (hereinafter "Annessa's Journal") at p. 4 (a copy of the August 16, 2004 Journal Entry is attached hereto as Exhibit Q).

145.    At the end of this August 16, 2004 journal entry, Plaintiff writes about "[her] sexual abuser, [her] spiritual oppressors, and [her] abusive father."  A. Lewis Dep., 237; Annessa's Journal, p.4.

146.    The "sexual abuser" referenced in this journal entry is Mr. True.  The "spiritual oppressors" is a reference to the Jehovah's Witnesses.  A. Lewis Dep., 237.

147.    In an August 17, 2004 journal entry, Plaintiff wrote that she was "abused sexually, spiritually, physically, and verbally by different men."  A. Lewis Dep., 237; Annessa's Journal, p.3.

148.    Plaintiff discussed the abuse with her father when she was in college around 2005. A. Lewis Dep., 211-12.

149.    Plaintiff discussed the alleged abuse and the Congregation in Facebook messages written in 2011, when Plaintiff was twenty-four (24) years old.  She wrote: "All I can think about is my ex-congregation, and it is creeping me out to no end.  Living the nightmare all over again." A. Lewis Dep., 240:1-13.

150.    On January 7, 2014, Plaintiff's older sister Jennifer Lewis received a Facebook friend request and message from Stacy Bathrick.  J. Lewis Dep., 42:24-43:4; A. Lewis Dep., 193:7.

151.    Jennifer Lewis sent a copy of Ms. Bathrick's Facebook message to her mother and to her sister Miranda Lewis.  M. Mavroleon-Folsom Dep., 54:20-23; Deposition of Miranda Lewis, 6/8/2016 at 74:18-25 (copies of relevant pages of Miranda Lewis' deposition transcript are attached hereto as Exhibit R).

152.     Plaintiff and Jennifer and Miranda Lewis were very angry that Ms. Bathrick had contacted Jennifer Lewis in light of their long-standing hard feelings towards Ms. Bathrick's father, Norton True.  A. Lewis Dep., 12-14; J. Lewis Dep., 151, 153.

153.     As a result of this Facebook message from Ms. Bathrick, Plaintiff, Miranda, Jenifer and Marina had conversations that resulted in Plaintiff and her sister Miranda suing the Congregation and Watchtower.  A. Lewis Dep., 204:8-20; J. Lewis Dep., 44.

154.     At the time this Facebook message was received, the Lewis family had not spoken with the True/Bathrick family in almost twenty (20) years.  J. Lewis Dep., 46.

155.     Although Jenifer Lewis responded to this Facebook message from Ms. Bathrick by telling her that Norton True "ruined her sisters' lives," neither Plaintiff nor her sister Miranda, nor Jennifer, believed that their lives were ruined, and Jennifer only said that to Ms. Bathrick for "dramatic effect."  A. Lewis Dep., 216-17; J. Lewis Dep., 174-75.

156.     Before filing suit on October 1, 2014, Plaintiff communicated with both of her sisters (Miranda and Jenifer) about her concerns that she had waited too long to file suit and that the statute of limitations on childhood sexual abuse would bar her claims.  A. Lewis Dep., 247-48; J. Lewis Dep., 176-77.

157.     Before deciding to file suit, Plaintiff told her sister Jennifer Lewis that she was too old to sue, so the case would not go far.  A. Lewis Dep., 201:18-20.

158.     Plaintiff's suit was filed in federal court, as opposed to state court, in part because of concerns regarding the statute of limitations.  A. Lewis Dep., 247-48.

159.     Plaintiff had always blamed what she describes as the "insular" nature of the

Congregation and the Jehovah's Witness religion for providing Mr. True access to her.  Answers

to the Congregation's Interrogatories, Answer No. 8, at p. 5.

160.     Plaintiff did not have any personal contact with Watchtower during her time as a

member of a congregation of Jehovah's Witnesses.  Affidavit of Douglas Chappel, ¶ 36.

161.     Mr. True did not have any personal contact with Watchtower at the time of the

alleged incident of molestation in this case or at any other relevant time period.  Affidavit of

Douglas Chappel, ¶ 37.


Burlington, Vermont.                              August 10, 2016

                                                  DOWNS RACHLIN MARTIN PLLC

                                                  By:    /s/ Walter E. Judge, Jr.
                                                         Walter E. Judge, Jr.
                                                         Jennifer E. McDonald
                                                         199 Main Street
                                                         P.O. Box 190
                                                         Burlington, VT 05402-0190
                                                         Telephone:  802-863-2375
                                                         Fax:  802-862-7512

                                                         ATTORNEYS FOR DEFENDANTS
                                                         BELLOWS FALLS CONGREGATION
                                                         OF JEHOVAH'S WITNESSES,
                                                         BELLOWS FALLS, VERMONT, INC.

Downs
Rachlin
Martin PLLC

Burlington, Vermont.                              August 10, 2016

                                    LYNN, LYNN, BLACKMAN & MANITSKY P.C.

                                    By:   /s/ Pietro J. Lynn
                                          Pietro J. Lynn
                                          Barbara R. Blackman
                                          76 St. Paul Street
                                          Suite 400
                                          Burlington, VT 05401
                                          Telephone:  802-860-1500
                                          Fax:  802-860-1580

                                          and

                                          John O. Miller, *Pro Hac Vice*
                                          100 Watchtower Drive
                                          Patterson, NY 12563
                                          Telephone:  845-306-1000
                                          Fax:  845-306-0709

                                          ATTORNEYS FOR DEFENDANTS
                                          WATCHTOWER BIBLE AND TRACT
                                          SOCIETY OF NEW YORK, INC.

16872637.1

Downs
Rachlin
Martin PLLC

# EXHIBIT D

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

ANNESSA LEWIS,                                  )
     Plaintiff,                               )
                                  )          Civil Action No. 1:14-cv-205
     v.                                      )
                                    )
BELLOWS FALLS CONGREGATION OF )
JEHOVAH'S WITNESSES, BELLOWS    )
FALLS, VERMONT, INC.,                    )
WATCHTOWER BIBLE AND TRACT      )
SOCIETY OF NEW YORK, INC., and   )
NORTON TRUE,                             )
     Defendants.                              )

## AFFIDAVIT OF DOUGLAS CHAPPEL

     I, Douglas Chappel, declare as follows:

     1.     I am over 21 years of age, of sound mind, and competent to make this Declaration. I have personal knowledge of the matters contained herein except for the knowledge I have gained from my review of documents, as indicated herein. The facts recited herein are all true and correct. If called to testify I would testify as follows:

     2.     I am familiar with the operations of Watchtower Bible and Tract Society of New York, Inc., ("Watchtower") and have been authorized by Watchtower's Board of Directors to explain the relationship between Watchtower and the faith of Jehovah's Witnesses.

     3.     Watchtower is a 501(c)(3) not-for-profit corporation organized under the laws of the State of New York with offices in Patterson, New York. Its primary purpose is religious. In addition to a board of directors that manages its business, Watchtower has a limited membership of approximately 50 persons. Watchtower has no employees. Watchtower is not the faith of Jehovah's Witnesses, nor is it the organizational head of the faith. Its corporate purpose includes

supporting the faith of Jehovah's Witnesses.   One way Watchtower supports the faith is by providing housing and office facilities for individuals in the United States who belong to the Worldwide Order of Special Full-Time Servants of Jehovah's Witnesses, an unincorporated religious order whose members serve under a vow of poverty and obedience (hereinafter "Order").  I am a member of the Order.

4.      The Governing Body of Jehovah's Witnesses directs the faith of Jehovah's Witnesses whose membership exceeds 8,000,000 worldwide.   The Governing Body is an ecclesiastical body with offices in Brooklyn, New York.   The Governing Body is not incorporated.

5.      The United States Branch Committee (hereinafter "U.S. Branch Committee) provides organizational assistance to the faith of Jehovah's Witnesses in the United States.  The U. S. Branch Committee is not incorporated.  About 4,000 members of the Order support the activities of the U.S. Branch Committee and operate out of the U.S. branch office in New York.

6.      The U.S. Branch Committee provides spiritual assistance to over 14,000 congregations of Jehovah's Witnesses in the United States (and a few surrounding islands) through the Service Department.

7.      As an elder in the faith of Jehovah's Witnesses since 1984, I am familiar with the religious beliefs, policies and practices of Jehovah's Witnesses and with the Scriptural basis for those religious beliefs, policies and practices.

8.      I have served in the United States branch since 1975, and I have worked in its Service Department since 1980.

9.      I presently serve in the Service Department of the United States Branch of Jehovah's Witnesses where I provide spiritual guidance and assistance to elders in congregations of Jehovah's Witnesses in the United States.

10.      Congregations of Jehovah's Witnesses are composed of individuals and families who gather together to worship in buildings called "Kingdom Halls."  Congregations typically have between 75 and 125 members.

11.      A rank-and-file congregation member is called a "publisher."  There are baptized and unbaptized publishers, but only a baptized publisher is considered a congregation member and one of Jehovah's Witnesses.  In accord with the beliefs and practices of Jehovah's Witnesses, any person baptized as one of Jehovah's Witnesses is considered an ordained minister (regardless of age or gender), in that they individually accept Jesus' command to preach to others (Matthew 28:19-20) as a personal obligation.

12.      Congregation members are not approved to represent the congregation or any corporation when they engage in their personal ministry.  Congregation members volunteer their time for their personal ministry and do not receive any compensation for their efforts.

13.      Jehovah's Witnesses do not sponsor any programs that separate children from their parents (e.g. Sunday schools, vacation Bible study, summer camps, or daycare).

14.      Each congregation has a body (group) of elders that oversees the spiritual activities of the congregation and provides spiritual oversight. Among other responsibilities, elders are authorized to hear confessions, render spiritual assistance to congregation members, and officiate at weddings.

15.      Elders offer their time in caring for all of their spiritual responsibilities and do not receive any compensation for their efforts.

16.     Before elders are appointed, they must meet the Scriptural qualifications outlined in the Bible.  (1 Timothy 3:1-7; Titus 1:5-9)  At all times prior to March 2001 when the body of elders serving a congregation believed that a congregation member met those Scriptural standards to a reasonable degree, the elders recommended to the circuit overseer (a traveling elder who visits the congregation semi-annually to provide spiritual assistance) that the individual be appointed as a fellow elder.  If the circuit overseer agreed with the elders' recommendation, he notified the Service Department of the U.S. Branch.  If the Service Department concurred, then the appointment was made and communicated to the congregation by means of a letter on Watchtower letterhead.

17.     Elders oversee congregation meetings that are held to strengthen the faith of congregation members and others in attendance.  (Acts 15:32.)  Elders also provide pastoral care for local congregation members, referred to as "shepherding.'—Acts 20:28.

18.     In accord with the religious beliefs and practices of Jehovah's Witnesses, elders frequently provide spiritual encouragement, counsel and guidance to congregation members concerning highly confidential personal and spiritual matters.

19.     Similarly, as part of their responsibility to maintain the spiritual and moral cleanliness of the congregation, elders at times conduct what are referred to as "judicial investigations" and may form "judicial committees" when a congregation member is accused of or confesses to committing a serious sin.

20.     Watchtower has never authorized elders or others to monitor persons in their homes.

21.     "Ministerial servants" are congregation members who meet the qualifications outlined in the Holy Scriptures.  (1 Timothy 3:8-10, 12, 13)  At all times prior to March 2001,

when elders in a congregation believed a congregation member met those Scriptural standards to a reasonable degree, they recommended to the circuit overseer that the individual be appointed as a ministerial servant.  If the circuit overseer agreed with the elders' recommendation, he notified the Service Department of the U.S. Branch.  If the Service Department concurred, then the appointment was made and communicated to the congregation by means of a letter on Watchtower letterhead.

22.     Ministerial servants do not receive any compensation for their efforts.

23.     Ministerial servants have a non-supervisory and non-pastoral role, caring for necessary but often routine tasks in their congregation.

24.     Some ministerial servants serve as attendants to welcome persons arriving at congregation meetings and help any needing assistance find seats.  Others assist with sound equipment, distribution of literature, congregation accounts, or keep track of territories (typically small sections of neighborhoods) covered by congregation members in their field ministry. Ministerial servants also assist in cleaning the Kingdom Hall.

25.     Because ministerial servants care for the necessary matters described above, elders can focus on spiritual instruction and caring for their pastoral responsibilities.

26.     Until about mid-March, 2001, the Service Department communicated with and received communications from congregations of Jehovah's Witnesses in the U.S. branch territory through Watchtower. The Service Department ceased its relationship with Watchtower around March 15, 2001.

27.     Thereafter, the Service Department communicated with and received communication from congregations through the religious, not-for-profit corporation known as Christian Congregation of Jehovah's Witnesses ("CCJW"), which is not a party to this case.

28.     I have reviewed Watchtower's records in the Service Department which show that Norton True was appointed as a ministerial servant in the Bellows Falls Congregation on May 22, 1976, was removed as a ministerial servant in March of 1986, was re-appointed as a ministerial servant in Bellows Falls in February of 1995. He remained in that capacity throughout the time the U.S. Service Department communicated by and through Watchtower, March 15, 2001.  According to Watchtower's records, he never served any congregation of Jehovah's Witnesses as an elder.

29.     I have been informed that the daughter of Norton True acted as a babysitter for the Lewis children.

30.     Watchtower has never sponsored or provided any daycare or babysitting; or overseen childcare arrangements by or between members of congregations. Nor has it ever referred or recommended anyone as a babysitter.

31.     Watchtower never knew about the babysitting arrangement between Stacy Bathrick and Mrs. Lewis; nor did it know that Mrs. Bathrick ever took the Lewis children to the home of Norton True or to any other place, at any time.

32.     Jehovah's Witnesses (including elders, ministerial servants and baptized publishers) do not receive any compensation from Watchtower or from the faith of Jehovah's Witnesses.

33.     Norton True is not and never has been employed by Watchtower.

34.     Anything Mr. True did in connection with Annessa Lewis at his home was done without knowledge of or benefit to Watchtower. Thus, if, as it is alleged, he improperly touched Ms. Lewis in his barn on his property, that sort of wrongdoing would have been without

knowledge of or benefit to Watchtower. Nothing Mr. True did in connection with allegedly touching Plaintiff at his home was done for or on behalf of Watchtower.

35.    Anything Stacy Bathrick did in connection with babysitting the Lewis children was done without knowledge of or benefit to Watchtower. She did not do anything as a babysitter for or on behalf of Watchtower.

36.    I am informed that Annessa Lewis was baptized as one of Jehovah's Witnesses at some time in 1998. Watchtower's records at the Service Department contain nothing that would indicate that she had any personal contact with Watchtower at any time.

37.    Watchtower's records at the Service Department show that Norton True's only personal contact with Watchtower during the 1990's was an unsolicited letter he and his wife Charleen True wrote to Watchtower in January of 1993 about their son-in-law, Tom Bathrick, and Mr. Bathrick's daughter, Rebecca.

I declare under penalty of perjury of the laws of the State of New York that the foregoing is true and correct.

Executed on August 10, 2016, at Wallkill, New York.

Douglas Chappel, Declarant

Subscribed and sworn to before me this 9th day of August, 2016.

A. HERNAN STEELE
Notary Public, State of New York
Registration #01ST6106293
Qualified in Putnam County
Commission Expires March 1, 2020

Notary Public, State of New York
Commission expires:

16874245.1