*Exhibit M*

Kathleen L. DeSoto
Tessa A. Keller
GARLINGTON, LOHN & ROBINSON, PLLP
350 Ryman Street • P. O. Box 7909
Missoula, MT  59807-7909
Telephone (406) 523-2500
Telefax (406) 523-2595
kldesoto@garlington.com
takeller@garlington.com

Joel M. Taylor (*Pro Hac Vice*)
Associate General Counsel
Watchtower Bible and Tract Society of New York, Inc.
100 Watchtower Drive
Patterson, NY  12563
Telephone (845) 306-1000
jmtaylor@jw.org

FILED __Aug. 7__ 20 _18_
Candace Fisher
SANDERS COUNTY CLERK OF DISTRICT COURT
BY_____
DEPUTY

Attorneys for Defendants/Third-Party Plaintiffs Watchtower Bible and Tract Society of New York, Inc., Christian Congregation of Jehovah's Witnesses, and Thompson Falls Congregation of Jehovah's Witnesses

## MONTANA TWENTIETH JUDICIAL DISTRICT COURT, SANDERS COUNTY

| | |
|---|---|
| ALEXIS NUNEZ and HOLLY McGOWAN,<br><br>Plaintiffs,<br><br>v.<br><br>WATCHTOWER BIBLE AND TRACT SOCIETY OF NEW YORK, INC.; WATCHTOWER BIBLE AND TRACT SOCIETY OF PENNSYLVANIA, INC.; CHRISTIAN CONGREGATION OF JEHOVAH'S WITNESSES and THOMPSON FALLS CONGREGATION OF JEHOVAH'S WITNESSES,<br><br>Defendants. | Hon. James A. Manley<br>Cause No. DV 16-84<br><br><br><br>NOTICE OF FILING PROPOSED FINAL PRETRIAL ORDER |

96

WATCHTOWER BIBLE AND TRACT
SOCIETY OF NEW YORK, INC.;
CHRISTIAN CONGREGATION OF
JEHOVAH'S WITNESSES and
THOMPSON FALLS CONGREGATION
OF JEHOVAH'S WITNESSES,

        Third-Party Plaintiffs,

    v.

MAXIMO NAVA REYES, MARCO
NUNEZ, IVY McGOWAN-
CASTLEBERRY,

        Third-Party Defendants.

At the request of the Court and pursuant to Montana Rule of Civil Procedure 16,

Defendants/Third-Party Plaintiffs Watchtower Bible and Tract Society of New York, Inc.

("Watchtower NY"), Christian Congregation of Jehovah's Witnesses ("CCJW") and the

Thompson Falls Congregation of Jehovah's Witnesses ("Thompson Falls Congregation")

submit the attached proposed Final Pretrial Order approved by all parties as to form and

content.

    DATED this 6th day of August, 2018.

                    Attorneys for Religious Defendants/Third-Party
                    Plaintiffs:

                    GARLINGTON, LOHN & ROBINSON, PLLP

                    By _____
                      Kathleen L. DeSoto

## CERTIFICATE OF SERVICE

I hereby certify that on August 6, 2018, a copy of the foregoing document was served on the following persons by the following means:

| | |
|---|---|
| __5__ | Hand Delivery |
| __3__ | Mail |
| _____ | Overnight Delivery Service |
| _____ | Fax (include fax number in address) |
| __1-2, 4__ | E-Mail (include email in address) |

1.  James P. Molloy
    Gallik, Bremer & Molloy, P.C.
    P.O. Box 70
    Bozeman, MT 59771-0070
    jim@galliklawfirm.com
    Corrie@galliklawfirm.com
    *Attorneys for Plaintiffs*

2.  D. Neil Smith
    Nix, Patterson & Roach, LLP
    1845 Woodall Rodgers Fwy., Ste. 1050
    Dallas, TX 75201
    dneilsmith@me.com

    Ross Leonoudakis
    Nix, Patterson & Roach, LLP
    3600 N. Capital of Texas Hwy., Ste. B350
    Austin, TX 78746
    rossl@nixlaw.com
    *Attorneys for Plaintiffs*

3.  **PERSONAL & CONFIDENTIAL**
    Maximo Reyes
    P.O. Box 566
    Plains, MT 59859

4.  Matthew A. McKeon
    McKeon Law Firm, PLLC
    257 W. Front St., Ste. A
    Missoula, MT 59802
    matthew@mckeonlawoffice.com
    *Attorneys for Third-Party Defendant Ivy McGowan-Castleberry*

5.      **COURTESY COPY TO:**
        Hon. James A. Manley
        20th Judicial District Court
        106 Fourth Ave. E.
        Polson, MT 59860

_Jackie Laumer_

James P. Molloy
**GALLIK, BREMER &MOLLOY, P.C.**
777 E. Main Street, Suite 203
PO Box 70
Bozeman, MT 59771-0070
Ph: (406) 404-1728
Fax: (406) 404-1730
jim@galliklawfirm.com

D. Neil Smith - *(Pro Hac Vice)*
Ross Leonoudakis - *(Pro Hac Vice)*
**NIX, PATTERSON &ROACH, LLP**
1845 Woodall Rodgers Fwy., Suite 1050
Dallas, Texas 75201
Ph: (972) 831-1188
Fax: (972) 444-0716
dneilsmith@me.com
RossL@nixlaw.com
*Attorneys for Plaintiffs*

## MONTANA TWENTIETH JUDICIAL DISTRICT COURT
## SANDERS COUNTY

ALEXIS NUNEZ and
HOLLY McGOWAN,

        Plaintiffs,

vs.

WATCHTOWER BIBLE AND TRACT SOCIETY
OF NEW YORK, INC.; WATCHTOWER BIBLE
AND TRACT SOCIETY OF PENNSYLVANIA,
INC.; CHRISTIAN CONGREGATION OF
JEHOVAH'S WITNESSES, and THOMPSON
FALLS CONGREGATION OF JEHOVAH'S
WITNESSES,

        Defendants/Third-Party Plaintiffs,

vs.

MAXIMO NAVA REYES,

        Third-Party Defendant.

Cause No. DV 16-84
Hon James A. Manley

**FINAL PRETRIAL ORDER**

WATCHTOWER BIBLE AND TRACT
SOCIETY OF NEW YORK, INC.;
CHRISTIAN CONGREGATION OF
JEHOVAH'S WITNESSES and THOMPSON
FALLS CONGREGATION OF JEHOVAH'S
WITNESSES,

   Third-Party Plaintiffs,

vs.

MAXIMO NAVA REYES, MARCO NUNEZ,
IVY McGOWAN-CASTLEBERRY,

   Third-Party Defendants.

---

  Pursuant to Rule 16 of the Montana Rules of Civil Procedure, a pretrial conference was held in the above-entitled cause on the 14th day of August, 2018 at 10:00 a.m.

  Neil Smith, Ross Leonoudakis, and James Molloy represent the Plaintiffs Alexis Nunez and Holly McGowan.

  Kathleen DeSoto and Joel Taylor represent the Defendants/Third-Party Plaintiffs, Watchtower Bible and Tract Society of New York, Inc. ("Watchtower NY"), Christian Congregation of Jehovah's Witnesses ("CCJW") and the Thompson Falls Congregation of Jehovah's Witnesses ("Thompson Falls Congregation") (collectively "Religious Defendants").

### AGREED FACTS

  The following facts are admitted, agreed to be true, and require no proof:

1)  Alexis Nunez date of birth is 12-9-1996.
2)  Holly McGowan date of birth is 10-16-1984.
3)  Peter McGowan date of birth is 4-19-1986.
4)  There are 8.5 million Jehovah's Witnesses worldwide.

5) There are approximately 120,000 congregations of Jehovah's Witnesses.
6) The United States Branch office is located in New York.
7) Thompson Falls Congregation elders meet Montana's definition of clergy.
8) In 2004, CCJW received written notice that Max Reyes had committed gross sin involving the sexual abuse of Holly McGowan and Peter McGowan.
9) Thompson Falls Congregation elders revoked Max Reyes' membership in the congregation by disfellowshipping him in 2004.
10) Thompson Falls Congregation elders reinstated Max Reyes' membership in 2005.
11) In 2004, Max Reyes admitted that he sexually abused Peter McGowan.[1]
12) Both Watchtower NY (prior to 2001) and CCJW (post-2001) have directed elders in congregations of Jehovah's Witnesses to call the Legal Department at the U.S. branch office when elders learn of allegations involving child sexual abuse.
13) It is the opinion of Religious Defendants' expert Dr. Alan Newman that no single event or alleged perpetrator was solely responsible for Plaintiffs' posttraumatic stress symptoms.
14) CCJW's net worth is $49,991,000.
15) Watchtower NY's net worth is $1,590,239,000.
16) Max Reyes' alleged abuse of Holly McGowan ended by 1999.
*17) The facts of all stipulations (see below) are agreed facts.*

## PLAINTIFFS' CONTENTIONS

1) Alexis Nunez date of birth is 12-9-1996.
2) Holly McGowan date of birth is 10-16-1984.
3) Peter McGowan date of birth is 4-19-1986.
4) The Jehovah's Witnesses have 8.5 million members worldwide.
5) The Jehovah's Witnesses have 120,000 local congregations.
6) The Governing Body is a group of 8 elders located in New York that oversees the entire Jehovah's Witnesses organization throughout the world.
7) The Jehovah's Witnesses have over 90 branch offices all over the world.
8) The United States Branch office is located in New York and is the national office for Jehovah's Witnesses in the United States.
9) The Jehovah's Witnesses have a policy that is referred to as the two witness rule.
10) According to the two-witness rule, the Jehovah's Witnesses will take no action against a church member unless there is testimony from at least two witnesses.
11) Elders are instructed that they will answer to Jehovah if they reveal information told to them by church members when they are not permitted to reveal the information in accordance with Jehovah's Witness policies.
12) It is Jehovah's Witness policy that elders must first call the legal department when they receive a report of child abuse.
13) If the Legal Department tells the elders they are not required to report the abuse, the elders do not to inform law enforcement, the Department of Public Health and Human Services, or any other authorities.
14) All Jehovah's Witnesses elders are clergy.

---

[1] Subject to the Court's ruling on confession.

15) Clergy are mandatory reporters under to the Montana Mandatory Reporter Statute.
16) The Governing Body has ultimate authority to create policies for Jehovah's Witnesses.
17) The Governing Body is the ultimate authority over Jehovah's Witnesses all over the world.
18) Watchtower establishes and communicates the policies of the Jehovah's Witnesses.
19) After March 2001, CCJW began communicating Jehovah's Witness policies.
20) Elders must follow Jehovah's Witness policies.
21) In 1998, Holly McGowan told Thompson Falls elders that she was being sexually abused by Max Reyes.
22) When Thompson Falls elders received the 1998 report, they were acting as agents for Watchtower.
23) In 1998, Thompson Falls elders were required to report Max Reyes' sexual abuse of children under the Montana Mandatory Reporter Statute.
24) In 1998 Thompson Falls elders failed to acknowledge Holly McGowan's report of abuse because she only had a single witness to the abuse.
25) When Holly McGowan met with elders in 1998 to report the abuse, the elders began reading scriptures to Holly about the need to have two witnesses and began counseling her about dressing provocatively.
26) In 2004, Thompson Falls elders received oral and written notice that Max Reyes had sexually abused children.
27) In 2004, CCJW elders received oral and written notice that Max Reyes had sexually abused children.
28) In 2004, Watchtower elders received oral and written notice that Max Reyes had sexually abused children.
29) In 2004, Max Reyes admitted to Thompson Falls elders that he sexually abused his step-son, Peter McGowan.
30) In 2004, Max Reyes was disfellowshipped from the Thompson Falls Congregation because he was an admitted pedophile.
31) In 2005, Max Reyes was reinstated at the Thompson Falls Congregation after admitting that he was a pedophile.
32) After the Thompson Falls Congregation received oral notice, written notice, and a confession that Max Reyes was a pedophile, Thompson Falls Congregation did not notify any of the following: law enforcement, Department of Public Health and Human Services, or other members of the congregation.
33) In 2004, Thompson Falls Congregation knew that Alexis Nunez attended Thompson Falls Congregation with her step-grandfather Max Reyes.
34) In 2004, Thompson Falls Congregation knew that Alexis Nunez stayed in the home of Max Reyes.
35) Holly McGowan was sexually abused by Max Reyes from 1994-2000.
36) Alexis Nunez was sexually abused by Max Reyes from 2002-2007/8.
37) After Holly McGowan notified elders of her abuse in 1998, Holly McGowan continued to be abused by Max Reyes.
38) After Holly McGowan notified elders of her abuse in 1998, Max Reyes began abusing Alexis Nunez.

39) After Holly McGowan notified elders of her abuse in 2004, Max Reyes continued abusing Alexis Nunez.

40) When Max Reyes was disfellowshipped in 2004, he continued abusing Alexis Nunez.

41) After Max Reyes was reinstated in 2005, he continued abusing Alexis Nunez.

42) Max Reyes sexually abused Holly McGowan by fondling Holly, engaging in oral sex, and sexual intercourse. The abuse occurred on a regular basis.

43) Max Reyes sexually abused Alexis Nunez by fondling her, engaging in oral sex, and by having her touch him.

44) Max is the step-father of Holly McGowan and the step-grandfather of Alexis Nunez.

45) According to Jehovah's Witness policy, the Legal Department instruct elders whether they are to notify authorities after receiving a report of child abuse.

46) Prior to March 2001, Jehovah's Witness policies were conveyed to Jehovah's Witness elders by Watchtower.

47) After March 2001, Jehovah's Witness policies were conveyed to Jehovah's Witness elders by CCJW.

48) The Legal Department is part of Watchtower, acts on its behalf, and Watchtower has ratified all of its conduct.

49) Prior to March 2001, the Service Department was part of Watchtower, acted on its behalf, and Watchtower has ratified all of its conduct.

50) After March 2001, the Service Department was part of CCJW, acts on its behalf, and CCJW has ratified all of its conduct.

51) After receiving the 2004 report of child sex abuse, the Thompson Falls elders followed all Jehovah Witness policies.

52) After receiving the 2004 report of child sex abuse, the Thompsons Falls elders contacted the legal department.

53) In 2004, the Legal Department told Thompson Falls elders that they were not required to report the child sex abuse to any authorities.

54) After receiving the 2004 report of child sex abuse, the Thompson Falls elders notified the abuser Max Reyes about the report.

55) In 2015, Holly McGowan learned that Alexis Nunez had been abused as well. Holly McGowan started seeing a therapist and began to link her injuries to the abuse that she suffered.

56) Thompson Falls elders are agents of both Watchtower and CCJW.

57) Jehovah's Witnesses are taught to distrust secular authorities.

58) Jehovah's Witnesses are taught to handle problems with other members internally within the church.

59) Jehovah's Witnesses avoid actions that criticize church members because it is damaging to the name and reputation of Jehovah.

60) Corporations act through their employees and agents.

61) Jehovah's Witnesses use judicial committees to resolve issues raised by church members.

62) Jehovah's Witnesses use judicial committees to investigate and respond to allegations of child abuse.

63) Thompson Falls elders are not trained to investigate child sex abuse allegations.

64) Watchtower and CCJW do not properly train elders to deal with reports of child sex abuse.

65) In 2004, the Legal Department provided incorrect information to Thompson Falls elders about whether they were required by law to report child sex abuse by Max Reyes.

66) Elders at Thompson Falls were negligent in failing to properly respond to and report the abuse by Max Reyes.

67) Elders at Watchtower were negligent in failing to properly respond to and report the abuse by Max Reyes.

68) Elders at CCJW were negligent in failing to properly respond to and report the abuse by Max Reyes.

69) Elders at Thompson Falls, Watchtower and CCJW violated the Montana Mandatory Reporter Statute.

70) Plaintiffs' injuries are not divisible.

71) Defendants are jointly and severally liable for Plaintiffs' injuries.

## DEFENDANTS/THIRD-PARTY PLAINTIFFS' CONTENTIONS

1) Jehovah's Witnesses are a Christian faith.

2) There are 1.4 million Jehovah's Witnesses in the United States.

3) There are approximately 13,500 congregations of Jehovah's Witnesses in the United States.

4) The Governing Body is an ecclesiastical (religious) group of 8 elders located in New York that provide spiritual guidance and Bible-based direction to Jehovah's Witnesses throughout the world.

5) There are approximately 90 branch (national) offices of Jehovah's Witnesses throughout the world.

6) The United States Branch office is located in New York.

7) The United States Branch office works with Watchtower Bible and Tract Society of New York, Inc., and Christian Congregation of Jehovah's Witnesses to provide spiritual guidance and Bible-based direction to Jehovah's Witnesses in the United States.

8) Both Watchtower NY and CCJW are 501(c)(3) not-for-profit corporations organized under the religious corporation laws of the State of New York.

9) The corporate purpose of both Watchtower and CCJW includes supporting the faith of Jehovah's Witnesses in the United States as they carry out Jesus' commands at Matthew 24:14 and Matthew 28:19-20, to preach the good news of God's Kingdom.

10) Watchtower supports the faith of Jehovah's Witnesses by printing Bible-based literature and by owning real estate to provide housing and office facilities for members of the Worldwide Order of Special Full-Time Servants of Jehovah's Witnesses in the United States. The Order is an unincorporated Scriptural order whose members serve under vows of poverty and obedience.

11) CCJW supports the faith of Jehovah's Witnesses by entering into contracts to rent facilities for Jehovah's Witnesses to hold conventions and by providing services to facilitate communications between the branch office of Jehovah's Witnesses and congregations of Jehovah's Witnesses throughout the United States.

12) From the 1970's through February 2001 Watchtower NY authorized the U.S. Branch to communicate with congregations of Jehovah's Witnesses on its letterhead regarding matters related to the operation and spiritual oversight of congregations, including matters relative to sin and repentance. Beginning March 16, 2001, the U.S. Branch ceased communicating through Watchtower NY in this capacity. At that time, CCJW began providing services to facilitate communications between the U.S. Branch and congregations.

13) Jehovah's Witnesses believe that confession of sin is essential to one's eternal salvation.

14) In the absence of confession of serious sin (including child abuse), the Bible allows elders to evaluate a congregation member's membership status on the basis of the testimony of two witnesses. This Scriptural evidentiary principle governs handling of the sin; it is not a factor in determining whether elders have a duty to report child abuse under the law.

15) The Thompson Falls Congregation (like other congregations of Jehovah's Witnesses) is composed of individuals and families who gather together to worship in a building called a "Kingdom Hall."

16) Congregations in the United States are usually named after the city or town where they hold meetings, and typically have between 75 and 125 members.

17) Each congregation has a group of men called a "body of elders" that oversees the spiritual activities of the congregation. Among other responsibilities, elders are authorized to hear confessions, render spiritual assistance to congregation members, and officiate at weddings and funerals.

18) Congregations of Jehovah's Witnesses are small so that elders can assist each congregation member to keep his or her faith in Jehovah God strong.

19) A rank-and-file congregation member is called a "publisher." Congregations usually have both baptized and unbaptized publishers.

20) Congregation members use personal time for their personal ministry and do not receive any compensation for their efforts.

21) The Thompson Falls Congregation (like other congregations) does not sponsor any programs that separate children from their parents (e.g. Sunday schools, vacation Bible study, summer camps, or daycare).

22) Elders offer their time in caring for all of their spiritual responsibilities and do not receive any compensation for their efforts.[2]

23) Before elders are appointed, they must meet the Scriptural qualifications outlined in the Bible.

24) Elders also provide pastoral care for local congregation members.

25) Elders frequently provide spiritual shepherding, which includes encouragement, counsel, and guidance to congregation members concerning personal and spiritual matters.

26) Elders receive training in handling matters involving serious sin, repentance, and mercy.

---

[2] The majority of Defendants' Contentions numbered 23 through 50 may prove unnecessary should this Court grant Defendants' motion in limine to exclude evidence regarding a standard of care and religious doctrine and policy, dated June 26, 2018.

27) Jehovah's Witnesses endeavor to comply with all governmental laws, so long as those laws do not conflict with the Bible.

28) Elders follow mandatory child abuse reporting laws (and their exceptions) without regard for the number of individuals who confess or bring forward an allegation of child abuse. One witness or accusation is sufficient to warrant compliance with mandatory reporting laws.

29) As part of their responsibility to maintain the spiritual and moral cleanliness of the congregation, elders at times conduct what are referred to as ecclesiastical "investigations" when they receive information that a congregation member committed a gross sin and has thereby damaged his or her relationship with God.

30) Jehovah's Witnesses believe in the universal principle of Christianity, that "all sorts of people" have the moral right and human need to turn to God and be saved by repenting from a past sinful course. They believe that anything not in harmony with God's personality, standards, ways and will constitutes a sin, and that "there is no man who does not sin." But since many people want to improve their conduct and be approved by God, elders stand ready to help congregation members understand the application of Bible principles to their conduct.

31) Jehovah's Witnesses believe that when a person is spiritually sick and has difficulty praying, elders can provide comfort by praying with that person and helping him or her see how Bible principles apply. To obtain comfort and assistance in regaining spiritual health, congregation members commonly seek Scriptural counsel and disclose private information, some of it highly sensitive, that allows the elders to make personalized petitions to God in prayer on their behalf.

32) Because open and free communication between congregation members and elders is essential to providing spiritual encouragement, counsel, and guidance, the Scriptural beliefs and practices of Jehovah's Witnesses place an emphasis on privacy and confidentiality.

33) According to the Scriptural beliefs and practices of Jehovah's Witnesses, information an elder receives from a congregation member who requests or needs spiritual encouragement, counsel and guidance is confidential. Elders do not unnecessarily discuss with others a congregation member's private requests for assistance in applying Bible principles, a congregation member's confession of sin, or any spiritual encouragement, counsel or guidance an elder believes the congregation member needs.

34) From time to time, congregation elders communicate with experienced elders at the U.S. Branch office in New York to receive spiritual counsel and guidance about the application of Bible principles to issues concerning the congregation and its members. All such spiritual communications are kept private and strictly confidential in accordance with the Scriptural beliefs and practices of Jehovah's Witnesses.

35) A congregation member's struggle to make needed changes in life in accordance with his understanding of Bible principles would be made more difficult or compromised altogether by the absence of such privacy and strict confidentiality needed for communication about troubling thoughts and feelings of guilt, a frank and open confession or discussion of sinful conduct.

36) Based on the Scriptural beliefs and practices of Jehovah's Witnesses, *serious* sins are *gross* deviations from Bible standards. A person may fall into the *practice* of serious sin.

37) Christianity stands for the Christ-like principle that anybody, including those who practice serious sin, can be helped to repent and find salvation.

38) Thus, the ability to confidentially divulge serious sin, even the practice of such sin, to elders to begin the process of repentance and of regaining one's good standing before Almighty God, is crucial to such person's eternal salvation.

39) Based on the Scriptural beliefs and practices of Jehovah's Witnesses, elders act as spiritual shepherds when they meet with congregation members who either confess or are alleged to have committed a "serious sin," as defined in the Bible.

40) Based on the Scriptural beliefs and practices of Jehovah's Witnesses, the elders who meet with a congregation member as a judicial committee hear the basic facts about the sinful conduct, determine its extent and whether there were any mitigating factors, and decide whether the sinner is repentant before God. In short, elders serving on a judicial committee try to help a person who has committed a serious sin begin the process of recovering spiritual health and help the congregation to remain spiritually and morally clean.

41) Based on the beliefs and practices of Jehovah's Witnesses, all spiritual communications taking place during an investigation or a judicial committee proceeding, or in furtherance of the congregation's ongoing spiritual assistance to a wrongdoer, are considered private and confidential. The presence or participation of two or more elders in an investigation or judicial committee does not affect the elders' confidentiality obligations.

42) If a congregation member who committed a serious sin is unrepentant despite the elders' efforts to help the wrongdoer, the judicial committee prayerfully determines whether it is necessary to expel the unrepentant wrongdoer from the congregation in compliance with the Scriptures. Based on the beliefs and practices of Jehovah's Witnesses, the decision to "disfellowship" is the strongest form of Scriptural discipline authorized by the Bible.

43) In all cases of disfellowshipping, the elders on the judicial committee create a confidential spiritual record of their action and forward a notice of disfellowshipping (S-77) to Watchtower NY (now CCJW); the sealed envelope would be delivered to an elder at the U.S. Branch office for confidential review.

44) When a congregation member is disfellowshipped, an elder makes an announcement at a congregation meeting. Based on the beliefs and practices of Jehovah's Witnesses, such an announcement puts congregation members on notice to stop any spiritual association with that person. The type of wrongdoing committed by the disfellowshipped person is not divulged.

45) The requirement that elders keep information and spiritual communications confidential is based on Scripture and has been explained in the official publications of Jehovah's Witnesses.—Proverbs 25:9; *The Watchtower*, April 1, 1971, pages 222-224; *Our Kingdom Ministry*, July 1975, page 3; *The Watchtower*, December 15, 1975, pages 764-766; *The Watchtower*, September 1, 1983, pages 21-26; *The Watchtower*, September 15, 1989, pages 10-15; *The Watchtower*, September 1, 1991, pages 22-24; *The Watchtower*, November 15, 1991, pages 19-23.

46) Congregation members trust elders to keep all spiritual communications strictly confidential. This applies to all members, not just those accused of or confessing serious sin.

47) Revealing confidential communications to those not entitled to hear them could call into question an elder's qualifications.

48) While not every breach of confidentiality by an elder will result in his removal, each elder is accountable before God, the ultimate Judge, for his adherence to the Bible's command to maintain confidentiality.

49) If an elder disclosed confidential information, his credibility and effectiveness as an elder would be compromised and it could have a chilling effect on the congregation members seeking spiritual encouragement, counsel and guidance from elders. Because free and open communication between congregation members and their elders is essential to the spiritual welfare of the members and of the congregation as a whole, the importance of privacy and confidentiality is difficult to overstate.

50) Because congregations are relatively small, each person in a congregation knows each other person in the congregation by name and family. An elder's disclosure of confidential information could readily embarrass a member, cause severe emotional distress, and even damage the reputations of the member and others in the family. In turn, an elder's own relationship with God would be harmed by his causing embarrassment, distress or damage to a member.

51) Thompson Falls Congregation elders meet Montana's definition of clergy.

52) Max Reyes' sexual abuse of Peter McGowan ended several years before Peter confided in a Thompson Falls Congregation elder in 2004.

53) In 2004, Peter McGowan was seventeen years old and was living with his mother, Joni Reyes and Max Reyes before he spoke with Thompson Falls Congregation elders about the abuse.

54) After Peter McGowan confided in the elders about the abuse, Max Reyes moved out of the family home and Peter McGowan moved in with another family and thereafter moved in with his sister, Ivy McGowan-Castleberry.

55) In 2004, in connection with a spiritual inquiry into allegations of Max Reyes' gross wrongdoing, Holly McGowan submitted a letter testifying that she had also been sexually abused by Max Reyes.

56) At that time, Holly McGowan, then age 20, was married, a mother of two children, and living in Nebraska.

57) In 2004, CCJW received written notice that Max Reyes had committed gross sin involving the sexual abuse of Holly McGowan and Peter McGowan.

58) In 2004, the Thompson Falls Congregation elders sought spiritual direction by contacting elders assisting CCJW concerning Max Reyes' serious sin involving his sexual abuse of Holly McGowan and Peter McGowan. The elders assisting CCJW were acting on behalf of Defendant CCJW.

59) In 2004, the Thompson Falls Congregation elders sought legal direction on their reporting obligation by contacting attorneys in the Legal Department at the United States Branch office concerning Max Reyes' sexual abuse of Holly McGowan and Peter McGowan. The attorneys were acting on behalf of Defendant Watchtower NY.

60) In 2004, Max Reyes admitted that he sexually abused Peter McGowan.[3]

61) Thompson Falls Congregation elders revoked Max Reyes' membership in the congregation by disfellowshipping him in 2004.

62) Thompson Falls Congregation elders reinstated Max Reyes' membership in 2005.

63) After Peter McGowan confided in the elders and Holly McGowan provided written testimony regarding their allegations of past sexual abuse in 2004, the Thompson Falls Congregation elders confronted Max Reyes with the accusations of gross sin.

64) Peter McGowan expected the Thompson Falls Congregation elders to maintain his confidence and treat his conversations with them as confidential, for use only in connection with intra-faith purposes consistent with his understanding of the beliefs and practices of Jehovah's Witnesses.

65) Peter McGowan did not ask or expect the elders with whom he spoke to report his allegations of past child abuse to the authorities.

66) Relying on Montana's exception in the reporting statute for confidential communications, the Thompson Falls Congregation elders did not notify law enforcement or Department of Public Health and Human services.

67) Based on the beliefs and practices of Jehovah's Witnesses the Thompson Falls Congregation elders maintained the confidences of Peter McGowan, Holly McGowan and Max Reyes and did not disclose any of the details of the allegations of serious sin to other members of the congregation.

68) Both Watchtower NY (prior to 2001) and CCJW (post-2001) have directed elders in congregations of Jehovah's Witnesses to call the Legal Department at the U.S. Branch office when elders learn of allegations involving child sexual abuse to determine the elders' obligations under any child abuse reporting laws.

69) Alexis Nunez was never a member of the Thompson Falls Congregation.

70) On occasion, between 2002 and 2007, when in the custody, care and control of her mother, Ivy McGowan-Castleberry, or her grandmother, Joni Nava-Reyes, Alexis Nunez would visit religious services at the Thompson Falls Congregation.

71) In 2015, Max Reyes confided in one of elders in the Thompson Falls Congregation that his then 19/20 year old step-granddaughter, Alexis Nunez, was now accusing him of past child sexual abuse when she was a preteen.

72) In 2015, the Thompson Falls elders sought spiritual direction by contacting elders assisting CCJW regarding Max Reyes' concern about an accusation serious sin involving Alexis Nunez.

73) In 2015, the Thompson Falls Congregation elders sought legal direction on their reporting obligation by contacting attorneys in the Legal Department at the United States Branch office regarding Max Reyes' concern about an accusation by Alexis Nunez that he had sexually abused her.

74) Relying on Montana's exception in the reporting statute for confidential communications, the Thompson Falls Congregation elders did not notify law enforcement or Department of Public Health and Human services.

75) Based on the beliefs and practices of Jehovah's Witnesses the Thompson Falls Congregation elders maintained the confidences of Peter McGowan, Holly

---

[3] Subject to the Court's ruling on the admissibility of Max Reyes' confession.

McGowan and Max Reyes and did not disclose any of the details of the allegations of serious sin to other members of the congregation.

76) Alexis Nunez has never spoken to any elder in the Thompson Falls Congregation regarding any allegations of child sexual abuse on the part of Max Reyes.

77) Alexis Nunez has never spoken to anyone at the national offices of Jehovah's Witnesses, Watchtower NY, or CCJW regarding any allegations of child sexual abuse on the part of Max Reyes.

78) Holly McGowan has never spoken to anyone at the national offices of Jehovah's Witnesses, Watchtower NY, or CCJW regarding any allegations of child sexual abuse on the part of Max Reyes.

79) Defendants' expert Dr. Alan Newman diagnosed Alexis Nunez with PTSD caused by years of repeated acts of childhood sexual abuse by multiple individuals.

80) Defendants' expert Dr. Alan Newman diagnosed Holly McGowan with Post-Traumatic Stress Disorder ("PTSD") caused by years of repeated acts of childhood sexual abuse by multiple individuals.

81) Holly has suffered depression since the age of three.

82) In 2000, Holly was suffering from depression, anxiety, suicidal thoughts, and even attempted suicide due to her alleged abuse by Max Reyes.

83) In 2000, Holly asked her mother to take her to the doctor for treatment in connection with her anxiety and suicidal thoughts.

84) In 2000, Holly's doctor initially prescribed 10 mg of Prozac and later increased the dosage to 20 mg. She took Prozac for several years.

85) In 2000, during Holly's visit, she concealed the cause of her anxiety and suicidal thoughts from her doctor because her mother was present and she did not want to disclose the sexual abuse by Max in front of her mother.

86) In 2003, Holly began therapy for symptoms related to the sexual abuse by Max.

87) During her first marriage to Michael Benavides, Holly reports that there was a cycle of physical and psychological abuse and that on one occasion when she was pregnant with her second child and the first child was present, Michael pushed her down a flight of stairs, went to retrieve his handgun, pointed it at her, and then at his own head and threatened suicide and then left the home for many hours. She feared he had committed suicide.

88) On other occasions during her marriage to Michael, Holly reports that he struck her, choked her, was very controlling and more than once, left her with bruises on her face and elsewhere on her body. She never reported any of the abuse to the authorities.

89) It is the opinion of Defendants' expert Dr. Alan Newman that no single event or alleged perpetrator was solely responsible for Plaintiffs' PTSD.

90) Max Reyes' alleged abuse of Holly McGowan ended by 1999.

91) Holly McGowan was abused by her then-brother-in-law, Marco Nunez, before, during, and after the time-period she alleges abuse by Max Reyes.

92) Marco Nunez became a registered sex offender in 1998.

93) Holly McGowan pressed criminal charges against Marco Nunez for rape in 2000.

94) Holly McGowan alleges she was sexually assaulted between 1995 and 1997 at her home and her grandmother's home on multiple occasions by an individual whose name she no longer recalls.

95) Holly McGowan alleges she was sexually assaulted in 2009 at her then-in-law's home by her former father-in-law.

96) Holly McGowan alleges she was physically and sexually assaulted in at her own home by her then-estranged second husband, Ryan Spier.

97) During all times relative to the alleged abuse by Max Reyes, Alexis Nunez was under the legal custody of Ivy McGowan-Castleberry.

98) During all times relative to the alleged abuse by her step-grandfather, Max Reyes, Alexis Nunez was under the physical custody of Joni Reyes.

99) Alexis Nunez was abused by her father, Marco Nunez, before any alleged abuse by her step-grandfather, Max Reyes.

100) Alexis Nunez was sexually abused by her uncle, Peter McGowan, during and after the time of any alleged sexual abuse by her step-grandfather, Max Reyes.

101) In 1998, Ivy McGowan-Castleberry knew that Marco Nunez had been convicted of abusing another child.

102) In 1998, Ivy McGowan-Castleberry knew that Marco Nunez was a registered sex-offender.

103) In 1998, and all times thereafter relative to the allegations in the Complaint, Ivy McGowan-Castleberry granted Marco Nunez access to her minor daughter, Alexis Nunez.

104) In 2000 Ivy McGowan-Castleberry invited her minor sister, Holly McGowan, to live in her home, granting Marco Nunez access to Holly.

105) In 1998, Ivy McGowan-Castleberry knew that Max had been accused of sexually abusing her minor sister, Holly.

106) In 1998, after learning that Max had been accused of sexually abusing her minor sister, Holly, Ivy took Holly back to Max's home, granting Max further access to Holly.

107) In 1998, after learning that Max had been accused of sexually abusing Holly, Ivy did not notify law enforcement or Department of Public Health and Human services.

108) Ivy McGowan-Castleberry has never spoken to any elder in any congregation of Jehovah's Witnesses, nor anyone at the national offices of Jehovah's Witnesses, Watchtower NY, or CCJW regarding any allegations of child sexual abuse on the part of Max Reyes.

109) At no time was Holly McGowan or Alexis Nunez under the legal or physical custody of Thompson Falls Congregation, Watchtower NY, or CCJW.

110) At no time, did Ivy McGowan-Castleberry or Joni Reyes inform any elders at Thompson Falls Congregation, CCJW, or Watchtower NY of any babysitting arrangement for Alexis Nunez.

111) Holly McGowan and Peter McGowan never had sexual contact.

112) In 2007, Holly McGowan contacted Peter McGowan about filing a lawsuit regarding the allegations of sexual abuse involving Max Reyes.

113) Since 1998, Holly McGowan has known of the connection between her psychological damages and the sexual abuse at the hands of Max Reyes.

114) In 2004, Peter McGowan's expectation was that his communication with the Thompson Falls Congregation elders regarding his abuse at the hands of Max Reyes would remain confidential.

115) Holly has a reputation of untruthfulness.

116) Peter felt that the disfellowshipping of Max Reyes was the appropriate result.
117) Joni Reyes introduced Max Reyes to the faith of Jehovah's Witnesses.
118) Joni Reyes denies knowledge of any allegation of abuse involving Max and Holly until 2003.
119) In 1998, the Thompson Falls Congregation elders did not meet with Holly McGowan regarding allegations of sexual abuse involving Max Reyes.
120) The Thompson Falls Congregation elders first learned of allegations of sexual abuse involving Max Reyes and Holly McGowan in 2004.
121) In 1998, Ivy McGowan-Castleberry knew of allegations of abuse involving Max and Holly and negligently undertook the responsibility to protect her by returning her to the home of Max Reyes after removing her from the home.
122) Since, 1998 Ivy McGowan-Castleberry has known of allegations of abuse involving Max's abuse of Holly and she has negligently and knowingly transferred care, custody and control over Alexis Nunez to Joni and Max Reyes thereby facilitating Max's abuse of Alexis.
123) CCJW's net worth is $49,991,000.
124) Watchtower NY's net worth is $1,590,239,000.
125) Alexis Nunez is not claiming any economic loss.
126) Holly McGowan is not claiming any economic loss.

## EXHIBITS

Plaintiffs – See attached list of Plaintiffs' Exhibits.

Plaintiffs may use the following exhibits for impeachment without offering into evidence:
  Letter from Joni to Holly
  Chappel Declaration
  Prior Corporate Representative Depositions
  Any other statements of witnesses

Defendants/Third-Party Plaintiffs – See attached list of Defendants/Third-Party Plaintiffs' Exhibits.

Defendants/Third-Party Plaintiffs may use prior statements of the Plaintiffs and witnesses for impeachment without offering them into evidence.

## WITNESSES

The following witnesses and no others will be called to testify except on rebuttal:

Plaintiffs:
1. Alexis Nunez
2. Holly McGowan
3. Ivy McGowan-Castleberry
4. Dr. David Corwin
5. Douglas Chappel

6. Don Herberger
7. Glenn Wilson (unless called in Defendants' case)
8. Ken Riech (unless called in Defendants' case)

Defendants/Third-Party Plaintiffs:
1. Alexis Nunez
2. Holly McGowan
3. Ivy McGowan-Castleberry
4. Joni Reyes (subject to trial subpoena)
5. Peter McGowan (subject to trial subpoena)
6. Iris Whitney - **opposed by Plaintiffs, not identified as witness by Defendant**
7. Michael Benavides - **opposed by Plaintiffs, not identified as witness by Defendant**
8. Rodger Meyer - **opposed by Plaintiffs, not identified as witness by Defendant**
9. Dr. Alan Newman
10. Douglas Chappel
11. Don Herberger
12. Glenn Wilson
13. Ken Riech
14. Steve Pieper

## ISSUES OF FACT

The following issues of fact, and no others, remain to be litigated upon the trial:

1. Did the negligence of those named below proximately cause injury to **Holly McGowan**:
   a. Watchtower NY
   b. CCJW
   c. Thompson Falls Congregation
   d. Max Reyes – **opposed by Plaintiffs based on pending motions**
   e. Ivy McGowan-Castleberry - **opposed by Plaintiffs based on pending motions**
   f. Marco Nunez - **opposed by Plaintiffs based on pending motions**

2. Did the negligence of those named below proximately cause injury to **Alexis Nunez**:
   a. Watchtower NY
   b. CCJW
   c. Thompson Falls Congregation
   d. Max Reyes – **opposed by Plaintiffs based on pending motions**
   e. Ivy McGowan-Castleberry - **opposed by Plaintiffs based on pending motions**
   f. Marco Nunez - **opposed by Plaintiffs based on pending motions**

3. Did Defendants (including their agents) violate Montana's Mandatory Reporting law?
    a. Watchtower NY
    b. CCJW
    c. Thompson Falls Congregation

4. What percentage of responsibility for **Holly McGowan's** injuries do you assign to the following (if found to be negligent)?
    a. Watchtower NY
    b. CCJW
    c. Thompson Falls Congregation
    d. Max Reyes – **opposed by Plaintiffs based on pending motions**
    e. Ivy McGowan-Castleberry - **opposed by Plaintiffs based on pending motions**
    f. Marco Nunez - **opposed by Plaintiffs based on pending motions**

5. What percentage of responsibility for **Alexis Nunez** injuries do you assign to the following (if found to be negligent)?
    a. Watchtower NY
    b. CCJW
    c. Thompson Falls Congregation
    d. Ivy McGowan-Castleberry
    e. Max Reyes – **opposed by Plaintiffs based on pending motions**
    f. Marco Nunez - **opposed by Plaintiffs based on pending motions**

6. What sum of money, if paid now in cash, would fairly and reasonably compensate **Holly McGowan** for her injuries that resulted from the occurrence in question?
    a. Physical pain and mental anguish in the past
    b. Physical pain and mental anguish in the future
    c. Loss of enjoyment and quality of life in the past
    d. Loss of enjoyment and quality of life in the future
    e. Loss of established course of life

7. What sum of money, if paid now in cash, would fairly and reasonably compensate **Alexis Nunez** for her injuries that resulted from the occurrence in question?
    a. Physical pain and mental anguish in the past
    b. Physical pain and mental anguish in the future
    c. Loss of enjoyment and quality of life in the past
    d. Loss of enjoyment and quality of life in the future
    e. Loss of established course of life

8. Should punitive damages be awarded against any of the following and, if so, how much:
    a. Watchtower NY
    b. CCJW

9. Did Holly McGowan bring her lawsuit within 3 years after she discovered or reasonably should have discovered that her injuries were caused by childhood sexual abuse?

10. Did the Thompson Falls Congregation or its elders act as agent for Watchtower NY and/or CCJW when it was informed that Max Reyes was accused of sexual abuse?

11. Did the Thompson Falls Congregation or its elders act as agent for Watchtower NY and/or CCJW when it failed to report Max Reyes' sexual abuse of children to authorities?

## ISSUES OF LAW

The following issues of law, and no others, remain to be litigated upon the trial:

1) Can Montana's Mandatory Reporter Law apply to corporations or unincorporated associations as mandatory reporters?
2) Are lawyers at Watchtower NY mandatory reporters under the Mandatory Reporter Law?
3) Does the Clergy Exception to the Mandatory Reporter Law apply to Defendants?
4) Do any of the Defendants owe a duty to Alexis Nunez?
5) Are Max Reyes and Marco Nunez proper third party Defendants?
6) Have Defendants offered proof that Plaintiffs' injuries are divisible?  And, if not, is evidence of other abuse relevant and admissible?
7) Did Max Reyes owe a duty to Holly McGowan and Alexis Nunez?
8) Did Marco Nunez owe a duty to Holly McGowan and Alexis Nunez?
9) Did Ivy McGowan-Castleberry owe a duty to Holly McGowan and Alexis Nunez?
10) Does Ivy McGowan-Castleberry owe any duty to Holly McGowan?
11) Was the abuse by Max Reyes of Holly McGowan in mid-1998 to 1999 foreseeable or was the abuse an intervening or superseding cause?
12) Was the abuse by Max Reyes of Alexis Nunez in 2002 to 2007 foreseeable or was the abuse an intervening or superseding cause?

Outstanding motions where these issues are raised:

Plaintiffs' Motions:

1. Plaintiffs' Motion for Summary Judgment as to Defendants' Third-Party Claims as to Ivy McGowan-Castleberry
2. Alexis Nunez's Motion for Partial Summary Judgment as to Defendants' Fourth Affirmative Defense and Cross Motion for Summary Judgment as to Foreseeability of Max Reye's Abuse (Intervening Cause)
3. Plaintiffs' Motion For Partial Summary Judgment as to Defendants' Third-Party Claims Against Max Reyes and Marco Nunez and Defendants' Third Affirmative Defense

4. Plaintiffs' Motion to Strike Defendants' First Amended Third-Party Complaint Against Marco Nunez
5. Plaintiffs' Motion for Partial Summary Judgment Re: Defendants' Sixth Affirmative Defense
6. Plaintiffs' Motion in Limine

Defendants/Third-Party Plaintiffs' Motions:

1. Cross Motion for Summary Judgment on mandatory reporting and negligence per se, dated June 7, 2018
2. Motion for Summary Judgment as to the Claims Brought by Alexis Nunez Or, in the Alternative, Motion for Summary Adjudication of Individual Claims, dated June 25, 2018
3. Cross Motion for Summary Judgment as to Foreseeability of Max Reyes' Abuse, dated July 20, 2018
4. Defendants' Motions in Limine

## DISCOVERY

Discovery that Plaintiffs intend to introduce into evidence:

None.

Discovery that Defendants/Third-Party Plaintiffs intends to introduce into evidence.

None.

## ADDITIONAL PRE-TRIAL DISCOVERY

The parties do not contemplate any additional discovery, except that Defendants await: (a) the Court's ruling on their Motion to Compel Production of Documents dated April 30, 2018, and (b) supplemental reports from Dr. Alan Newman based on recently produced (July 30, 2018) videotapes and interview notes from Plaintiffs' mental health expert. **(Plaintiffs oppose any supplement by Dr. Newman because no new information has been disclosed and the discovery period has ended.)**

## STIPULATIONS
### (for purposes of this litigation only)

1) CCJW stipulates that actions taken by the U.S. Branch (and its Service Department) since March 2001 on its behalf or on its letterhead are ratified by CCJW.
2) Since March of 2001, CCJW stipulates that any actions taken by the service department on its behalf are ratified by CCJW. CCJW does not seek to disclaim any act taken by the service department on its behalf.

3) Watchtower NY stipulates that actions taken by the U.S. Branch (and its Service Department) prior to March 2001 on its behalf or on its letterhead are ratified by Watchtower NY.

4) Watchtower NY, prior to 2001, also had a similar relationship with the service department. And when the service department carried out activities under Watchtower NY letterhead or on behalf of Watchtower NY, Watchtower NY affirms those acts. Watchtower NY ratifies those acts. Watchtower NY does not disclaim any responsibility for those acts.

5) Since March 2001, all communications from the U.S. Branch (and its Service Department) to local congregations about how to handle reports of child abuse were done on behalf of CCJW and were ratified by CCJW.

6) Prior to March 2001, all communications from the U.S. Branch (and its Service Department) to local congregations about how to handle reports of child abuse were done on behalf of Watchtower NY and were ratified by Watchtower NY.

7) Between 2001 and 2014 the appointment of elders in congregations of Jehovah's Witnesses in the United States were ratified by CCJW.

8) Between 2001 and 2014, when elders were appointed, that was done on behalf of CCJW.

9) When the Service Department provided spiritual advice and counsel to congregation elders, the Service Department was acting on behalf of:
   a. Watchtower NY until March 2001
   b. CCJW after March 2001

10) When the Service Department monitored the functioning and organization of local congregations, the Service Department was acting on behalf of:
   a. Watchtower NY until March 2001
   b. CCJW after March 2001

11) At all times, the Legal Department has acted on behalf of Watchtower NY.

12) In 2004, elders at the Thompson Falls Congregation notified the Service Department elders that Max Reyes committed serious sin involving the sexual abuse of Peter and Holly McGowan. When the elders at the Service Department received that notice, the elders were acting on behalf of CCJW.

13) The April 12, 2004 letter to the Body of Elders (TF000005) was written on behalf of CCJW.

14) The August 25, 2005 letter to the Body of Elders (TF000005) was written on behalf of CCJW.

15) The August 1, 1995 letter to all bodies of elders in the United States was written on behalf of Watchtower NY.

16) The Legal Department acts as an agent of Watchtower NY.

17) Alexis Nunez is not claiming any economic loss, only non-economic damages and punitive damages.

18) Holly McGowan is not claiming any economic loss, only non-economic damages and punitive damages.

//

## DETERMINATION OF LEGAL QUESTIONS IN ADVANCE OF TRIAL

It was agreed that the following legal issues should be determined by the Court in advance of the trial:

The items identified in the "Issues of Law" section should be determined by the Court in advance of the trial.

## ADDITIONAL ISSUES

Plaintiffs may utilize the prior depositions of Defendants' corporate representatives for impeachment purposes (in addition to the depositions from this case.) The depositions from the prior cases have been produced to the parties and are identified as WTNY001274-3629.

Ivy McGowan-Castleberry is a Third-Party Defendant and is represented by counsel, Matt McKeon. The parties do not believe his attendance is required at all times during the trial and have no objection to him appearing only when necessary for the representation of his client.

## JURY SELECTION AND PROCESS

Plaintiffs and Defendants agree that 75 minutes per side for jury selection by the attorneys is sufficient.

The parties agree that each side (Plaintiffs and Defendants) should be permitted 4 preemptory strikes.

//

//

## TRIAL

It is estimated that the case will require 4 days for trial.

The case will be tried before the Court with a jury.

DATED this **14** day of **August**, 2018.

_J. Manley_

HON. JAMES A. MANLEY
District Judge

Approved as to form and content:

_JM / By Permission DNS_

James P. Molloy
Attorney for Plaintiff

_D. Neil Smith_

D. Neil Smith
Attorney for Plaintiff

_RL / By Permission DNS_

Ross Leonoudakis
Attorney for Plaintiff

_Kathleen L. DeSoto_

Kathleen L. DeSoto
Attorney for Defendant/Third-Party Plaintiff Thompson
Falls Congregation of Jehovah's Witnesses

_Joel M. Taylor_

Joel M. Taylor
Attorney for Defendants/Third-Party Plaintiffs Watchtower
Bible and Tract Society of New York, Inc., Christian
Congregation of Jehovah's Witnesses

Matthew A. McKeon
Attorney for Third-Party Defendant Ivy McGowan-Castleberry

**PLAINTIFFS' EXHIBIT LIST**

| Exhibit No. | Description | Document No. | Defendants' Objection |
|---|---|---|---|
| | March 19, 2004 Letter from Holly McGowan to Thompson Falls Elders explaining the details of her abuse by Max Reyes | TF001-002 | |
| | March 22, 2004 Thompson Falls' Notes from Judicial Committee Hearing | TF00153 | MT § 26-1-804; 1st Amendment to the U.S. Const. |
| | April 1, 2004 - S-77 Notification of Disfellowship or Disassociation Form - Maximo Reyes | TF00154; TF0076 (backside) | MT § 26-1-804; 1st Amendment to the U.S. Const. |
| | April 12, 2004 Letter from CCJW to Thompson Falls confirming receipt fo S-77 form and asking for additional information from Thompson Falls | TF005 | 1st Amendment to the U.S. Const. |
| | April 21, 2004 Thomson Falls Response to CCJW April 12, 2004 Letter | TF00155-156; CCJW00152 | 1st Amendment to the U.S. Const. |
| | August 25, 2005 Letter from CCJW to Thompson Falls confirming the reinstatement of Maximo Reyes into the Thompson Falls Congregation | TF00151-152 | 1st Amendment to the U.S. Const. |
| | December 18, 2015 Letter from CCJW to Thompson Falls confirming the a phone call notifying CCJW that another child had accused Maximo Reyes of sexual abuse | TF008-009 | 1st Amendment to the U.S. Const. |
| | Financial Disclosure - Watchtower Bible & Tract Society of New York | WTNY001070 | Subject to Protective Order; to be used only in any Punitive Damages Phase |
| | Financial Disclosure - Christian Congregation of Jehovah's Witnesses | CCJW00150 | Subject to Protective Order; to be used only in any Punitive Damages Phase |
| | Publisher Records - Max Reyes | TF0012 | |
| | Photos of Holly McGowan | | |
| | Photos of Alexis Nunez | | |
| | Australian Royal Commission's Report of Case Study 29 - Response of Jehovah's Witnesses to allegations of child sexual abuse | Appendix A to Dr. Corwin's expert report | M.R.E. 402, 403, 802; 1st Amendment to U.S. Const. |
| | July 1, 1989 Letter to the Elders from WTNY | WTNY0086-0091 | M.R.E. 402 & 403; 1st Amendment to U.S. Const. |

| Exhibit No. | Description | Document No. | Defendants' Objection |
|---|---|---|---|
| | March 23, 1992 Letter to the Elders from WTNY | WTNY0092-95 | M.R.E. 402 & 403; 1st Amendment to U.S. Const. |
| | February 3, 1993 Letter to the Elders from WTNY | WTNY0096 | M.R.E. 402 & 403; 1st Amendment to U.S. Const. |
| | August 1, 1995 Letter to the Elders from WTNY | WTNY0097-0098 | M.R.E. 402 & 403; 1st Amendment to U.S. Const. |
| | March 14, 1997 Letter to the Elders from WTNY | WTNY0099-101 | M.R.E. 402 & 403; 1st Amendment to U.S. Const. |
| | July 20, 1998 Letter to the Elders from WTNY | WTNY00102-104 | M.R.E. 402 & 403; 1st Amendment to U.S. Const. |
| | May 24, 2002 Letter to the Elders from CCJW | CCJW0029-30 | M.R.E. 402 & 403; 1st Amendment to U.S. Const. |
| | June 5, 2006 Letter to the Elders from CCJW: Child Maltreatment Offenders in Prison | CCJW0032 | M.R.E. 402 & 403; 1st Amendment to U.S. Const. |
| | May 24, 2010 Letter to the Elders from CCJW: Incidents of "sexting" involving minors | CCJW0033 | M.R.E. 402 & 403; 1st Amendment to U.S. Const. |
| | Ooctober 1, 2012 Letter to the Elders from CCJW: Child Abuse | CCJW0034-39 | M.R.E. 402 & 403; 1st Amendment to U.S. Const. |
| | August 1, 2016 Letter to the Elders from CCJW: Protecting Minors From Abuse | CCJW0073-0078 (TF0071-76) | M.R.E. 402 & 403; 1st Amendment to U.S. Const. |
| | April 9, 2012 Letter to the Elders from CCJW: Procedures When Legal Issues Are Involved | Not Produced | M.R.E. 402 & 403; 1st Amendment to U.S. Const. |
| | October 1, 2014 Letter to the Elders from CCJW: Procedures When Legal Issues Are Involved | Not Produced | M.R.E. 402 & 403; 1st Amendment to U.S. Const. |
| | November 6, 2014 Letter to the Elders from CCJW: Procedures When Legal Issues Are Involved | CCJW0040-48 | M.R.E. 402 & 403; 1st Amendment to U.S. Const. |
| | June 09, 2008 Letter to Elders from CCJW: Appointment and Deletion of Elders and Minsterial Servants | CCJW00137-140 | M.R.E. 402 & 403; 1st Amendment to U.S. Const. |
| | July 13, 2014 Letter to Elders from CCJW: Appointment and Deletion of Elders and Ministerial Servants | CCJW00141-145 | M.R.E. 402 & 403; 1st Amendment to U.S. Const. |
| | December 6, 2010 Letter to the Elders from CCJW: Correspondence from Branch Office and Congregation File | CCJW0061-63 | M.R.E. 402 & 403; 1st Amendment to U.S. Const. |
| | September 7, 2011 Letter: Correspondence from Branch Office and Congregation File | CCJW0064-67 | M.R.E. 402 & 403; 1st Amendment to U.S. Const. |

| Exhibit No. | Description | Document No. | Defendants' Objection |
|---|---|---|---|
| | January 6, 2017 Letter to the Elders from CCJW: Congregation Correspondence and Filing | CCJW0079-82 | M.R.E. 402 & 403; 1st Amendment to U.S. Const. |
| | June 3, 2010 Letter to the Elders from CCJW: Prison Witnessing | CCJW0049-53 | M.R.E. 402 & 403; 1st Amendment to U.S. Const. |
| | August 9, 2010 Letter to the Elders from CCJW: Prison Witnessing | CCJW0054-58 | M.R.E. 402 & 403; 1st Amendment to U.S. Const. |
| | Correspondence Guidelines | Not Produced | M.R.E. 402 & 403; 1st Amendment to U.S. Const. |
| | Shephard the Flock | Not Produced | M.R.E. 402 & 403; 1st Amendment to U.S. Const. |
| | Branch Organization - Dec. 2004 | WTNY00758-935 | M.R.E. 402 & 403; 1st Amendment to U.S. Const. |
| | Organized to Accomplish Our Ministry | WTNY001 - WTNY0010; 990-1018 | M.R.E. 402 & 403; 1st Amendment to U.S. Const. |
| | Pay Attention to Yourselves And to All the Flock | WTNY00105-260 | M.R.E. 402 & 403; 1st Amendment to U.S. Const. |
| | Organized to Do God's Will | WTNY001019-1048 | M.R.E. 402 & 403; 1st Amendment to U.S. Const. |
| | Watchtower Magazine, October 1, 1983 - You Can Enjoy a Paradise, Where? When? | WTNY00523-529 | M.R.E. 402 & 403 |
| | Awakel, January 22, 1985 - Child Molesting, You Can Protect Your Child | WTNY0530 - 0533 | M.R.E. 402 & 403 |
| | Awakel, October 8, 1993 - Protect Your Children | WTNY00534-546 | M.R.E. 402 & 403 |
| | Watchtower Magazine, November 15, 1973 - Questions from Readers | Not Produced | M.R.E. 402 & 403 |
| | Watchtower Magazine, January 1, 1997 - Let Us Abhor the Wicked | WTNY00547-552 | M.R.E. 402 & 403 |
| | Watchtower Magazine, January 15, 2001 - How the Governing Body Differs From a Legal Corporation (Page 28) | Not Produced | M.R.E. 402 & 403 |
| | No. 3(b) Excercising Discernment and Insight As Elders-Addendum | CCJW112-118 | M.R.E. 402 & 403; 1st Amendment to U.S. Const. |
| | No. 5(b) - Use Discernment in Handling Serious Matters | WTNY00261-266 | M.R.E. 402 & 403; 1st Amendment to U.S. Const. |
| | No. 6 - Updated Direction Regarding Judicial Matters - Part 1 | WTNY00936-940 | M.R.E. 402 & 403; 1st Amendment to U.S. Const. |

| Exhibit No. | Description | Document No. | Defendants' Objection |
|---|---|---|---|
| | No. 16 - Assisting Elders to Handle Judicial Matters Properly (9/7/01) | CCJW0089-93 | M.R.E. 402 & 403; 1st Amendment to U.S. Const. |
| | No. 21 - Questions and Answers Relative to Handling Problems | WTNY00947-954 | M.R.E. 402 & 403; 1st Amendment to U.S. Const. |
| | No. 22 - Jehovah Makes Provision For Our Needs (10/21/94) | WTNY00941-946 | M.R.E. 402 & 403; 1st Amendment to U.S. Const. |
| | No. 23 - Assisting Elders to Make Recommendations for Appointment of Elders and Ministerial Servants (9/7/01) | CCJW0083-88 | M.R.E. 402 & 403; 1st Amendment to U.S. Const. |
| | No. 45 - Proper Handling of Judicial Matters (7/23/01) | CCJW0094-97 | M.R.E. 402 & 403; 1st Amendment to U.S. Const. |
| | No. 46 - Giving Attention to Needs in our Field - Part 1 (9/7/01) | CCJW0098-102 | M.R.E. 402 & 403; 1st Amendment to U.S. Const. |
| | No. 51 - The Congregation Book Study Overseer - Shepherding (8/27/01) | CCJW00103-106 | M.R.E. 402 & 403; 1st Amendment to U.S. Const. |
| | No. 53 - Giving Attention to Needs in our Field - Part 2 (10/30/01) | CCJW00107- | M.R.E. 402 & 403; 1st Amendment to U.S. Const. |
| | No. 54 Making Recommendations for Appointment of Elders and Minsterial Servants | CCJW00108-111 | M.R.E. 402 & 403; 1st Amendment to U.S. Const. |
| | No. 57 - Maintain the Peach and Cleanness of the Congregation | CCJW00119-122 | M.R.E. 402 & 403; 1st Amendment to U.S. Const. |
| | May 9, 2002 - Letter to BBC Panorama | WTNY00755-757 | M.R.E. 402, 403 |
| | Letter from the Office of Public Information, World Headquarters of Jehovah's Witnesses in response to A&E television show on Jehovah's Witnesses | Not Produced | M.R.E. 402, 403 & 802 |
| | Child Abuse Telememo | Not Produced | M.R.E. 402 & 403; 1st Amendment to U.S. Const. |
| | Child Abuse Reporting Flowchart | Not Produced | M.R.E. 402, 403 & 802; 1st Amendment to U.S. Const. |
| | Stipulation re: Agency from *John Dorman v. Watchtower et al*, Case No. 37-2010-00092450, San Diego County (Oct. 19, 2011) | Not Produced | M.R.E. 402 & 403 |
| | Stipulation re: Agency from Jose Lopez v. Watchtower et al, Case No. 37-2012-0099849, San Diego County (Feb. 28, 2013) | Not Produced | M.R.E. 402 & 403 |
| | Thompson Falls Formation Documents | TF0026-45 | |

| Exhibit No. | Description | Document No. | Defendants' Objection |
|---|---|---|---|
| | Watchtower Bible & Tract Society of New York Formation Documents | WTNY0012-83 | |
| | Video from JW Broadcasting Where Gary Breaux discusses Jehovah's Witness Two-Witness Rule (November 2017) | Not Produced | M.R.E. 402 & 403 |
| | Photos of Jehovah Witness Facilities | Chappel Depo Ex. 50-55 | M.R.E. 402 & 403 |

## DEFENDANTS/THIRD-PARTY PLAINTIFFS' EXHIBIT LIST

| Exhibit No. | Description | Document No. | Plaintiffs' Objection |
|---|---|---|---|
| D-1 | Holly McGowan's Objections and Responses to Religious Defendants' First and Second Sets of Interrogatories and Requests for Production, dated August 25, 2017 (Dep. Ex. 20) | | Not admissible as an exhibit. Objections and contentions by lawyers are not admissible. Only specific answers are admissible. Pre-Trial order anticipates discovery that parties intend to present as evidence. Documents contains references to inadmissible prior acts under Rule 404; Documents contains references to inadmissible abuse by others |
| D-2 | Letter from Holly J. Benavides "To the body of elders of the Thompson Falls congregation", dated March 19, 2004  (Dep. Ex. 21) | TF 1 and 2 | None |
| D-3 | Affidavit of Sheryl Overbey, dated June 21, 2017, with produced medical records  (Dep. Ex. 22) | HM-MED_1 - 7 | Affidavit is hearsay. Attached medical records are hearsay except for statements made by Plaintiff. |
| D-4 | Sheryl Overby's progress notes for Holly McGowan from October 8, 2015-December 18, 2015  (Dep. Ex. 23) | HM-MED_8 - 1212 | Hearsay except for statements made by Plaintiff. |
| D-5 | Affidavit of Mary Joyce Sasse, dated March 8, 2017, with medical records  (Dep. Ex. 24) | HM-MED_13 - 17 | Affidavit is hearsay. Attached medical records are hearsay except for statements made by Plaintiff. |
| D-6 | OneWorld Community Health Centers office visit report for Holly McGowan, dated September 7, 2016  (Dep. Ex. 25) | | Hearsay except for statements made by Plaintiff. |
| D-7 | Continuation of records from Sasse (Dep. Ex. 26) | HM-MED_22-28 | Hearsay except for statements made by Plaintiff. |
| D-8 | Information in State of Montana v. Holly Joy McGowan (Dep. Ex. 27) | | Objection based on motion in limine. Irrelevant. Prejudicial under Rule 403. Inadmissible character evidence under Rule 404. Inadmissible impeachment evidence under Rule 609. |
| D-9 | Witness and Exhibit List in State of Montana v. Holly Joy McGowan (Dep. Ex. 28) | | Objection based on motion in limine. Irrelevant. Prejudicial under Rule 403. Inadmissible character evidence under Rule 404. Inadmissible impeachment evidence under Rule 609. |
| D-10 | Printout from Silentlambs.org website (Dep. Ex. 29) | | None |
| D-11 | First Amended Complaint (Dep. Ex. 30) | | Irrelevant. Written by lawyers and contentions change through the course of litigation. |
| D-12 | Plaintiff Alexis Nunez's Objections and Answers/Responses to Religious Defendants' First and Second Set of Interrogatories and Requests for Production, dated August 9, 2017 (Dep. Ex. 31) | | Not admissible as an exhibit. Objections by lawyers are not admissible. Only specific answers are admissible. Pre-Trial order anticipates discovery that parties intend to present as evidence. |
| D-13 | Letter from Kathleen DeSoto to David Fall, M.D., dated September 27, 2017, with attached medical records (Dep. Ex. 32) | | Hearsay except for statements made by Plaintiff. |
| D-14 | Letter from Kathleen DeSoto to Amen Clinics Northwest, dated September 27, 2017, with attached medical records  (Dep. Ex. 33) | | Hearsay except for statements made by Plaintiff. |
| D-15 | Timeline of events by Joni Nava-Reyes (Dep. Ex. 34) | | Hearsay |
| D-16 | Facebook message exchanges between Plaintiffs, Ivy McGowan-Castleberry, and Dominque | HM-AN_DOC000064-81 | None |
| D-17 | Corwin video interview of Holly McGowan | | Objection to any parts that may include inadmissible or excluded  topics |

| Exhibit No. | Description | Document No. | Plaintiffs' Objection |
|---|---|---|---|
| D-18 | Corwin video interview of Alexis Nunez | | Objection to any parts that may include inadmissible or excluded topics |
| | All documents listed by Plaintiffs or Third-Party Defendants | | Objection, not specific |
| | All documents produced in response to discovery requests | | Objection, not specific |
| | All documents necessary for rebuttal | | Objection, not specific |
| | All documents necessary for foundation | | Objection, not specific |