*Exhibit Y*

# "PAY ATTENTION TO YOURSELVES AND TO ALL THE FLOCK"

## ACTS 20:28

## Kingdom Ministry School Textbook

A copy of this textbook is issued to each appointed elder, and he may retain it as long as he continues to serve as an elder in any congregation. At such time as he should cease to serve in that capacity, his copy of the book must be handed over to the Congregation Service Committee, since this publication is congregation property. No copies are to be made of any part of this publication.

WTPA000139

© 1991
WATCH TOWER BIBLE AND TRACT SOCIETY OF PENNSYLVANIA
All rights reserved

Publishers
WATCHTOWER BIBLE AND TRACT SOCIETY OF NEW YORK, INC.
INTERNATIONAL BIBLE STUDENTS ASSOCIATION
Brooklyn, New York, U.S.A.
Prior editions in English: 1977, 1979, 1981

Unless otherwise indicated, *New World Translation of the Holy Scriptures—With References* is used.

*"Pay Attention to Yourselves and to All the Flock"*      English (*ks91*-E)      Made in the United States of America

WTPA000140

# Overseers
# 'Ruling for Justice Itself'

Jehovah, as a loving Shepherd, has directed overseers to "rule as princes for justice itself." (Isa. 32:1, 2) Since Jehovah God is holy, he requires that all those who worship him be spiritually and morally clean. (1 Pet. 1:14-16) As appointed overseers, you have a large part in safeguarding the cleanness of the congregation.

Protective care is a basic idea embraced in the word "overseer" (*e·pi'sko·pos*), which carries also the thought of one who watches over, a guardian, a shepherd of the flock. You have the responsibility to cultivate in the hearts of the brothers a love for what is good and a hatred for what is bad, wicked. (Rom. 12:9) By holding to God's Word and by effectively using the art of teaching, you will be able to help your brothers not only to understand what is right and what is wrong but also to have an active part in keeping the congregation clean and chaste for public service to Jehovah.

## How Elders Promote Justice

**All elders are responsible to shepherd the flock, to teach, reprove, reprimand, and exhort as necessary. (Titus 1: 9-14)**

When teaching, state clearly what God requires, and encourage faithful adherence to his righteous principles.

Help fellow believers to appreciate their responsibility to keep the congregation clean.

Assist them to understand that this involves:

Keeping their own personal conduct chaste.

Listening to their Bible-trained conscience.

Relentlessly resisting temptations.

90

WTPA000224

Refusing to feed their minds on immoral ideas; perceiving how wrong thoughts lead to wrong actions.

Parents' instilling moral character in their children.

Younger ones' obeying their parents.

Refusing to imitate the world and its unscriptural ways.

Teaching interested persons the Bible's high moral standards.

**Set a fine example yourself in attitude, conduct, and speech so that the congregation can imitate your faith. (Heb. 13:7)**

Display the traits of a spiritual man; do not give way to unclean practices of a physical man. (1 Cor. 2:14, 15)

Your example will help your brothers to have "the mind of Christ." (1 Cor. 2:16)

**Take the initiative to help anyone in the congregation who has taken some false step; do your best to readjust him. (Gal. 6:1)**

Encourage good associations; warn the brothers to guard against bad associations both inside and outside the congregation. (1 Cor. 15:33)

Yet, do not create ill will toward a weak one in the congregation who is being helped.

Some may not yet have their perceptive powers trained to distinguish right and wrong. (Heb. 5:14)

Keep watch over their souls, since you will render an account for them too. (Heb. 13:17)

Discern the difference between a weak person and a wicked person.

**Deal with your brothers as Jehovah would deal with them. (Eph. 5:1)**

Always give them direction from God's Word; avoid giving your own opinions. (2 Tim. 4:2)

WTPA000225

Be just yet kind in all your dealings. (Mic. 6:8)

Manifest humility by showing empathy, since you are also a mere human made of dust. (Ps. 103:13, 14)

## Act as qualified judges.

Keep the spirit of the world out of the congregation. (1 Cor. 2:12; Eph. 2:1, 2)

Reprove and readjust wrongdoers. (Titus 1:9)

Remove unrepentant wrongdoers. (1 Cor. 5:7, 13)

# Uphold Jehovah's Righteousness

Wrongdoing is increasing in frequency and in depravity; such can infiltrate and affect the Christian congregation. (2 Tim. 3:1-5, 13; Jude 3, 4, 11-13)

The Scriptures clearly show that Jehovah forbids certain conduct among his clean people; brothers need to uphold Jehovah's righteous standards regarding the following:

*Manslaughter.*

A degree of guilt could result from careless driving, careless maintenance of one's automobile, or other careless or thoughtless action that causes injury or death. (Compare Deuteronomy 22:8.)

Being a professional boxer may be viewed in a similar way. (*w*81 7/1 pp. 30-1)

Attempted suicide may be the result of deep despair or major depression; deal carefully and compassionately with such a person. In most cases a judicial hearing is not required. (Ps. 88:3, 17, 18; Prov. 15:13; Eccl. 7:7; *g*90 9/8 pp. 22-3; *w*90 3/15 pp. 26-30; *w*90 3/1 pp. 5-9; *w*83 8/1 pp. 3-11)

*Sexual misconduct, including adultery, fornication, and other forms of "por·nei′a."*

*Uncleanness* includes an intentional momentary touching of sexual parts or caressing of breasts. (1 Thess. 4:7, 8; 1 Tim. 5:1, 2)

WTPA000226

Such minor uncleanness can be handled at the discretion of an elder or two; it does not require a judicial hearing.

There is a need for strong counsel, admonition, and assistance to help the individual to maintain chaste conduct in the future.

If not corrected, such conduct may escalate in gravity and by frequent repetition become loose conduct.

*Loose conduct* is a shocking, flagrant disregard for Jehovah's moral standards. (Gal. 5:19; *w*83 3/15 p. 31; *w*73 9/15 pp. 574-6)

It may include the willful practice of heavy petting or the fondling of breasts.

The nature, circumstances, and actual extent of what has occurred may indicate loose conduct, which would require judicial action.

Such practices can easily lead to *por·nei′a.*

*"Por·nei′a"* involves immoral use of the genitals of at least one human (whether in a natural or a perverted way), and there must have been another party to the immorality—a human of either sex or a beast; willing participation incurs guilt and requires judicial action. It is not a casual touching of the sex organs between persons but involves the manipulation of the genitals. (*w*83 6/1 pp. 23-6; *w*83 3/15 pp. 30-1)

It includes oral and anal sex or mutual masturbation between persons not married to each other, homosexuality, lesbianism, fornication, adultery, incest, and bestiality. (Lev. 20:10, 13, 15, 16; Rom. 1:24, 26, 27, 32; 1 Cor. 6:9, 10)

Also included are sexual abuse of children, including practices involving a catamite (a boy kept for purposes of sexual perversion). (Deut. 23:17, 18, *Ref. Bi.,* ftns.)

Victims of sexual abuse need to be treated with extreme thoughtfulness and kindness. Elders should always do what they reasonably can to protect children from further abuse; follow the Society's directives on such matters. (*g*85 1/22 p. 8)

93

WTPA000227

Self-abuse, or masturbation, is *not "por·nei′a,"* nor would one who was raped be guilty of *por·nei′a.* (*w*83 3/15 p. 30; *w*74 3/1 p. 160; *it*-1 pp. 862-4; *tp* p. 144)

The term *por·nei′a* lays emphasis on both the lewd nature and the intent of the person's conduct, and it embraces all illicit sexual activity characteristic of that found in a house of prostitution.

> Copulation (as in penetration) is not necessary to constitute *por·nei′a,* and neither is sexual climax.

> In borderline cases, it is the responsibility of the judicial committee to weigh carefully the Scriptures and the particular facts in the case to determine whether *por·nei′a* was involved.

> This responsibility should not be taken lightly, especially when Scriptural freedom to remarry is involved. (Mal. 2:16a)

### *Apostasy.*

Apostasy is a standing away from, a falling away, defection, rebellion, abandonment; it involves teaching false doctrines, supporting or promoting false religion and its holidays or interfaith activities. (Deut. 13:13, 15; Josh. 22:22, ftn.; Acts 21:21, ftn.; 2 Cor. 6:14, 15, 17, 18; 2 John 7, 9, 10; Rev. 18:4)

> Those with sincere doubts should be helped, dealt with mercifully. (Jude 22, 23; *w*82 9/1 pp. 20-1; *w*80 8/1 pp. 21-2)

Apostasy includes action taken against true worship of Jehovah or his established order among his dedicated people. (Jer. 17:13; 23:15; 28:15, 16; 2 Thess. 2:9, 10)

Persons who deliberately spread (stubbornly hold to and speak about) teachings contrary to Bible truth as taught by Jehovah's Witnesses are apostates.

If it is learned that a person has taken up association with another religious organization, the matter should be investigated, and if verified, a committee should be formed.

If it is clearly established that the person has joined another religion and intends to remain with it, the

WTPA000228

elders would make a brief announcement to the congregation that such one has disassociated himself. (*w*86 10/15 p. 31)

Working secularly for a false religious organization could put one in a position similar to that of one preaching false doctrine. (2 Cor. 6:14-16)

Celebrating a false religious holiday would be similar to performing any other act of false worship. (Jer. 7:16-19)

The Bible condemns the following:

Causing divisions and promoting sects.

This would be deliberate action disrupting the unity of the congregation or undermining the confidence of the brothers in Jehovah's arrangement.

It may involve or lead to apostasy. (Rom. 16: 17, 18; Titus 3:10, 11)

The practice of spiritism. (Deut. 18:9-13; 1 Cor. 10: 21, 22; Gal. 5:20)

Idolatry. (1 Cor. 6:9, 10; 10:14)

Idolatry includes the possession and use of images and pictures that are employed in false religion.

*Drunkenness.* (1 Cor. 5:11; 6:9, 10; *it*-1 p. 656)

*Stealing, thievery, fraud.* (Lev. 6:2, 4; 1 Cor. 6:9, 10; Eph. 4:28; *it*-1 p. 870)

*Deliberate, malicious lying; bearing false witness.* (Prov. 6: 16, 19; Col. 3:9; Rev. 22:15; *it*-2 pp. 244-5)

*Reviling, slander.* (Lev. 19:16; 1 Cor. 6:10; *it*-1 pp. 989-91; *it*-2 pp. 801-2)

*Obscene speech.* (Eph. 5:3-5; Col. 3:8)

*Failure to abstain from blood.* (Gen. 9:4; Acts 15:20, 28, 29)

*Greed—gambling, extortion.* (1 Cor. 5:10, 11; 6:10; 1 Tim. 3:8; *it*-1 pp. 1005-6)

*Adamant refusal to provide materially for one's own family—leaving wife and children destitute when having the*

WTPA000229

*means to provide.* (1 Tim. 5:8; *w*88 11/1 pp. 22-3; *km* 9/73 p. 8)

*Nonneutral activities.* (Isa. 2:4; John 6:15; 17:16)

*Fits of anger, violence.* (Prov. 22:24, 25; Mal. 2:16; Gal. 5:20)

*Misuse of tobacco or addictive drugs.* (2 Cor. 7:1; Mark 15:23; Rev. 21:8, *Int.;* 22:15, *Int.*)

*Loose conduct.* **Term not restricted to sexual immorality.** (Gal. 5:19, *Ref. Bi.,* ftn.; 2 Pet. 2:7, *Ref. Bi.,* ftn.; *w*83 3/15 p. 31; *w*73 9/15 pp. 574-6; *it*-2 p. 264)

SUMMARY: There are varying degrees of wrongdoing. At times there may have been an overlapping of sins, and this must be discerned in order to determine the proper Scriptural view of a person's conduct. In all cases, elders should carefully weigh each situation or circumstance. They need to find out what actually occurred, the extent and nature of misconduct, intent and motive, frequency or practice, and so forth. Good judgment, reasonableness, and balance are necessary as elders assess conduct in the light of the Scriptures.

## Your Aim Should Be to Help the Person

**We want to help individuals to stay within Jehovah's spiritual paradise.**

When elders are approachable and display a genuine interest in the spiritual welfare of the congregation, they will keep themselves informed and alert to any special needs within the congregation.

In some cases an erring individual will come to the elders voluntarily, seeking aid and confessing his wrongdoing. (Prov. 28:13)

If the person is guilty of serious wrongdoing, it is wise for him to speak to one or more of the elders about the matter. (Jas. 5:16)

For gross sins committed, a judicial committee should be formed.

WTPA000230

In other cases an accusation may be brought against a member of the congregation. (1 Cor. 1:11)

If a person has definite knowledge of wrongdoing that could contaminate the congregation, he is obligated to report the matter in order to keep the congregation clean. (Lev. 5:1; Num. 15:32-34; Prov. 29:24)

**A judicial committee is not automatically formed even when a person is accused of serious sin.**

Some matters may be handled by the elder who hears of the wrongdoing. (Gal. 6:1)

Although you may feel that your counsel will suffice to restore the individual, it is advisable to inform the presiding overseer of the matter; there may be other factors involved.

The matter may have come up before, or there may have been other acts of wrongdoing concerning which he has knowledge.

Some matters may be investigated and handled by two elders assigned by the body of elders.

**There are certain cases that the body of elders is responsible to investigate and, when necessary, appoint a judicial committee to handle:**

Gross sins—either those that have brought the congregation into public disrepute or those of a more private nature. (Rom. 2:21-24; 1 Cor. 5:1; 2 Cor. 7:11)

Any serious sin that constitutes a clear threat of contaminating the congregation. (1 Cor. 5:6, 9-11; Gal. 5:19-21; 1 Tim. 1:9, 10)

When an elder or a ministerial servant commits a gross wrong, he is morally obligated to inform the body of elders of his being reprehensible.

He would not qualify to continue in his appointed position of service.

The same would be true concerning a pioneer who becomes involved in serious sin.

WTPA000231

Elders, ministerial servants, and pioneers should be irreprehensible and serve with a clean conscience. (1 Tim. 3:2, 8, 9; Titus 1:6)

### Baptized minors.

When a baptized minor becomes involved in wrongdoing that threatens the cleanness of the congregation, the assigned committee should meet with such individual just as they would with any other member of the congregation.

It would be best to meet with the youth and his or her Christian parents; the parents have the responsibility to raise him and train him.

Try to restore the individual, if this is possible. (Gal. 6:1, ftn.)

If efforts to restore bring no response, disfellowshipping is in order.

When minors are disfellowshipped, parents are still responsible for raising, training, and teaching them, even studying with them if the minors are in their home. (*w*88 11/15 p. 20)

### Married people.

If the wrongdoer is a married woman, it would be best to meet with her and her believing husband.

He is her head, and his efforts to restore her and direct her can be very helpful.

If there is no response to efforts to bring about repentance, the wrongdoer should be disfellowshipped. (*w*81 9/1 pp. 22-7)

The disfellowshipping of a mate does not end marriage responsibilities.

### Unbaptized publishers.

Unbaptized publishers who engage in serious wrongdoing may be readjusted.

Two elders will talk with the wrongdoer and determine what action should be taken. (*w*88 11/15 pp. 18-20)

WTPA000232

They may instruct him not to share in the public ministry or comment at meetings, and they may restrict him from being in the Theocratic Ministry School until he has made more spiritual progress.

If the wrongdoing is widely known but the person is repentant, the Congregation Service Committee may arrange for an announcement to the congregation as follows: "A matter involving [name of person] has been handled, and he [she] continues to serve as an unbaptized publisher with the congregation." (*w88* 11/15 p. 18)

When the unbaptized publisher who is a wrongdoer is a minor, his or her Christian parents should be consulted to determine what they are doing to correct the wrongdoer. It may also be necessary to meet with the youth together with his parents.

In the case of unbaptized publishers who unrepentantly continue in wrongdoing despite all efforts to help them, an announcement can be made saying: "[Name of person] is no longer a publisher of the good news." (*w88* 11/15 p. 19)

Your goal in dealing with unbaptized publishers, whether youths or adults, is to help them. (1 Thess. 5:14)

### *Baptized persons who have not associated for some time.*

If you learn of serious wrongdoing on the part of such a person, the matter should be investigated if it poses a threat to the congregation's cleanness and welfare or causes a public scandal.

Consider the following:

Does he still profess to be a Witness?

Is he generally recognized as such in the congregation and/or the community?

Does the person have a measure of contact or association with the congregation so that a leavening, or corrupting, influence exists?

How did the matter become known to the elders?

WTPA000233

Is the person willing to meet with a committee, thus admitting accountability to the Christian congregation?

Depending upon length of inactivity and other factors suggested above, elders may determine to hold the matter in abeyance.

In such a case, a record of the person's questionable conduct should be made for the congregation file so that everything noted might be clarified when the person shows interest in becoming active again.

If the sinful conduct is known only to believing family members and no congregation action is taken because of the factors outlined above, believing relatives will likely determine to curtail family association severely, viewing the relative as bad association. (1 Cor. 15:33)

If the individual still professes to be a Witness and is willing to meet with the judicial committee, the matter should be handled in the normal way. However, when factors such as possible legal action exist, it is best to consult the Society before proceeding. (*w*87 9/1 p. 14)

**If individuals persist in *"walking disorderly"* in serious violation of well-established Bible principles, but not yet to a degree warranting judicial action, they may be *"marked"* by members of the congregation. (2 Thess. 3: 6, 14, 15; *w*85 4/15 pp. 30-1; *om* pp. 152-3)**

However, this would occur only after *repeated efforts* to provide authoritative Scriptural counsel and admonition have been ignored and in many cases after a warning talk has been given to the congregation. (*w*85 4/15 pp. 30-1; *w*81 9/1 pp. 19-21)

If a person who has been marked continues his wrongful course in brazen defiance of Christian standards, *adamantly rejecting loving Scriptural counsel,* judicial action may be taken if the situation becomes scandalous loose conduct.

## Propriety of Disfellowshipping

**When making decisions or answering questions about judicial reproof, disfellowshipping, disassociation, or**

WTPA000234

reinstatement, elders should be certain that their decisions and answers are based solidly on the Bible and are in harmony with the most recent statements by the Society. (Compare 1 Corinthians 4:6.)

Before initiating a judicial hearing, elders assigned to serve on the judicial committee should *review* guidelines set out in *Units 5 (a), 5 (b), and 5 (c)* as well as examine pertinent scriptures and references in the Society's publications.

They should also be sure to proceed in harmony with *current information* published in *The Watchtower* and in letters from the Society.

## Purposes served by disfellowshipping:

Upholds Jehovah's name and standard of righteousness. (Acts 15:14; 1 Pet. 1:14-16; compare Isaiah 52:5.)

Protects the purity of the congregation. (1 Cor. 5:1-13; 2 Cor. 7:11)

May correct the unrepentant wrongdoer, bringing him to his senses. (2 Cor. 2:6-8)

# Implications of Disassociation

**Whereas disfellowshipping is an action taken by a judicial committee against unrepentant wrongdoers, disassociation is an action taken by an individual who has decided that he no longer desires to be one of Jehovah's Witnesses. (1 John 2:19)**

God's Word speaks of those who renounce the way of the truth; they may do this either by written notice or by action. (*w*81 9/15 p. 23)

**If an individual takes a course contrary to the neutral position of the Christian congregation, the congregation is compelled to view him as one who has chosen to separate from us. (Isa. 2:4; John 15:17-19)**

A brief announcement should be made to notify the congregation that this individual, by his chosen course, no longer desires to be one of Jehovah's Witnesses. (The Society should be notified using the S-77 and S-79 forms.)

WTPA000235

**If a baptized person insists that he does not want to be part of the congregation and requests that his name be removed from all our records, we should comply with his request.**

Since he takes such an adamant position, encourage him to put his request in writing.

If he refuses to do this but states resolutely before witnesses his decision to disassociate himself and not be known as one of Jehovah's Witnesses, the witnesses to his statement would be asked to put this in writing and sign it.

**In all cases of disassociation, a committee would consider the evidence regarding the matter.**

If the person has definitely terminated his status as a member of the congregation, the elders will make a brief announcement of his disassociation. (*w*86 10/15 p. 31)

The Society should be notified using the S-77 and S-79 forms.

He would be viewed as one who has disassociated himself.

**It will not be necessary for a committee to continue the investigation into alleged wrongdoing if the accused person makes known his decision to disassociate himself. (*w*84 7/1 p. 31)**

However, the committee would prepare a summary of the alleged offense(s) and the evidence of such.

This would be kept along with information regarding the disassociation.

If the person later requests reinstatement, these matters would need to be considered with him at that time.

**Those who disassociate themselves should be viewed and treated the same as disfellowshipped persons. (*w*85 7/15 pp. 30-1)**

If one disassociates himself and later wants to return to the congregation, he must request a hearing for reinstatement, the same as one who has been disfellowshipped.

WTPA000236

# Proper View of
# Disfellowshipped and Disassociated Persons

**If an individual is trying to influence others to take an unscriptural course or is trying to deceive others, all should avoid him; he is described at 2 John 9-11.**

**Disfellowshipped and disassociated ones are shunned by those who wish to have a good relationship with Jehovah.**

Basic Scriptural counsel on the proper view of those who have been expelled from the congregation is set out in the apostle Paul's words at 1 Corinthians 5:11-13.

John counsels against speaking to or associating with a disfellowshipped or disassociated person so as not to be "a sharer in his wicked works." (2 John 11)

Scriptural and historical guidelines on how to view disfellowshipped and disassociated persons are found in *The Watchtower,* September 15, 1981, pages 20-31.

**We need to be especially cautious about contact with disfellowshipped persons who have apostatized and those who continue in their immoral conduct. (Titus 3: 10, 11; 1 John 2:19)**

These can contaminate the congregation like gangrene. (2 Tim. 2:16-18)

**The principle set forth in Jesus' words at Matthew 10: 34-38 has a bearing on situations involving disfellowshipped or disassociated relatives.**

Special and difficult problems may arise in relation to social gatherings.

Loyal worshipers of Jehovah will want to adhere to the inspired counsel at 1 Corinthians 5:11.

Normally, a close relative would not be disfellowshipped for associating with a disfellowshipped person unless there is spiritual association or an effort made to justify or excuse the wrongful course.

WTPA000237

**How funeral arrangements for a disfellowshipped person may be handled:**

If the disfellowshipped person had been giving evidence of repentance, some brother's conscience might allow him to give a Bible talk at the funeral home or grave site. However, the Kingdom Hall should not be used. (*w*81 9/15 p. 31; *w*77 6/1 pp. 347-8)

If the deceased still advocated false teachings or ungodly conduct, it would not be appropriate to give a funeral talk for him. (2 John 9-11)

**Keep in mind that all the related hardships and tests generated in this regard are an outgrowth of the wrong conduct of the disfellowshipped person.**

## Cooperation Between Congregations

**When a case being considered requires the cooperation of two or more congregations, do not hesitate to provide the assistance needed.**

**If a person has moved from one congregation to another, do not make the matter of jurisdiction an issue.**

Do you have the facts? Can you handle the case most effectively?

Then it may be appropriate for you to follow through without delay.

**If the wrongdoing involves persons who attend different congregations, seek assistance from elders in the other congregation(s) and benefit from their observations.**

The judicial committees can interview individuals separately and/or jointly to ascertain the facts and clarify discrepancies. (Prov. 18:13, 17)

If a joint meeting is held, thereafter the judicial committee of each congregation will withdraw and handle the case(s) of the person(s) from its own congregation.

Good communication and cooperation will minimize inconsistencies in the judgments rendered.

Do not let a matter remain unhandled.

WTPA000238

# Confidentiality

**Do not discuss private or judicial matters with members of your family, including your wife, or with others who are not involved. (*w*71 4/1 pp. 222-4)**

Think before you speak.

Be extremely careful that you do not inadvertently disclose private information when speaking on the telephone while others are listening in or when people are nearby where they could possibly hear the conversation.

**At times, complicated judicial cases may necessitate consultation with an experienced mature elder in another congregation or with the circuit overseer.**

Generally, the pertinent details should be discussed, but names should not be used.

However, when the circuit overseer is the elder consulted or when circumstances require that you contact the Society, use of names may be necessary. (*w*87 9/1 pp. 12-15; *km* 9/77 p. 6)

**Be careful to *maintain confidentiality*. (Prov. 11:13; 15:22)**

# Be "Imitators of God"

**Jehovah is a God of justice; he is merciful, kind, loving, and patient. (Ex. 34:6, 7; Ps. 37:28)**

As you deal with your brothers, imitate Jehovah in displaying these qualities, and you will bring honor to him and be a blessing to your brothers. (Eph. 5:1)

WTPA000239

WTPA000240

# Sharing on a Judicial Committee

"When having a hearing between your brothers, you must judge with righteousness." (Deut. 1:16) It is a serious responsibility to judge matters that affect people's lives and relationships with others. Elders must have a reasonably complete picture when judging a matter so that their decisions will not be based on partial knowledge or on personal feelings. They also need heavenly wisdom in order to make proper application of God's Word and to determine how far their showing mercy should extend. (Prov. 28:13; Jas. 2:13) They must treat every person with impartiality at all times and desire that the spiritually ill become well again, since a failure in this regard is unjust and violates the law of love.—1 Tim. 5:21; Jas. 2:1-9; 5:14, 15; *w*77 3/1 pp. 146-52.

## Elders Are Teachers and Judges

**As "Judge of all the earth," Jehovah provides fatherly correction and discipline whenever needed. (Gen. 18: 25; Heb. 12:5, 6)**

He has raised up elders to serve as counselors and judges. (Isa. 1:26)

By judging in righteousness, you may turn others back from a sinful course. (Prov. 14:12; Jer. 10:23, 24)

God's Word is the basis for needed correction. (2 Tim. 3:14-17)

The responsibility of elders involves more than handling judicial matters.

You must also teach, making clear what God requires.

Encourage the rendering of whole-souled service to God and faithful obedience to his righteous principles.

WTPA000241

# Applying Jesus' Counsel on Handling Certain Wrongs

**Some accusations involve minor misunderstandings that should be handled on a personal basis. (Matt. 5:23, 24; 6:12, 14; Eph. 4:25-27)**

**At Matthew 18:15-17 Jesus gave counsel on handling serious wrongs that might be settled on a personal basis. (*w*81 9/15 pp. 17-20; *om* pp. 142-5)**

Jesus' counsel concerns serious sins committed against one personally, such as fraud or slander—sins serious enough to lead to a person's being expelled from the congregation.

The person who believes he has been wronged takes the first step toward resolving the matter; elders may encourage him to do this. (Matt. 18:15)

The second step involves taking one or two persons with him to speak with the individual. (Matt. 18:16)

These should preferably be witnesses of the alleged wrongdoing or respected brothers, usually elders, who can examine the evidence and offer counsel for resolving the matter.

They also become witnesses to the evidence presented in the discussion.

The person who believes he has been wronged takes the third step, bringing the matter to the congregation, as a last resort. (Matt. 18:17)

If the congregation elders are unable to bring a wrongdoer to his senses, he is to be treated "as a man of the nations and as a tax collector."

The unrepentant wrongdoer would be expelled (disfellowshipped) from the congregation.

## The Judicial Committee

**Other cases of serious wrongdoing require special attention by the elders in order to determine what is needed**

WTPA000242

to help the repentant wrongdoer and to preserve the spiritual health of all in the congregation.

These include such sins as adultery, fornication, apostasy, and drunkenness. (See Unit 5 (a), pages 92-6.)

Before forming a committee, elders determine if the accusation has substance.

It must Scripturally be an offense serious enough to result in disfellowshipping.

There must be either two witnesses or a confession of wrongdoing.

If there is not enough evidence to form a committee but serious questions have been raised, two elders may be assigned to investigate the matter.

If a judicial committee is needed, elders who are present at the Kingdom Hall should determine which elders will serve on the committee and which one will be chairman.

The elders will take into consideration which elders are best qualified to handle the particular type of case that has arisen. (*km* 9/77 pp. 5-6)

It is usually best for newer elders to serve first with more experienced ones.

In a complex case, a judicial committee need not be limited to three members; it may warrant having four or even five experienced elders serve.

**More than one judicial committee may be operating at the same time in a congregation, depending on cases that arise.**

**Elders called upon to care for this responsibility must exercise heavenly wisdom, have good judgment, and be impartial. (Deut. 1:13, 16-18)**

A sound knowledge of Jehovah's righteous laws and principles is necessary. (Ps. 19:7-11)

They must weigh matters carefully, realizing that certain factors make situations differ from one another.

WTPA000243

Instead of looking for rigid rules for guidance, elders should think in terms of principles; judge each case on its own merits.

Before handling a judicial case, elders should carefully review Units 5 (a), 5 (b), and 5 (c).

They may also need to do research in the Society's publications and recent correspondence from the Society to find information that may apply or be helpful.

Elders can be confident that with accurate knowledge, with experience and discernment, and with the help of God's spirit, they can judge in righteousness, wisdom, and mercy.

## Handling Judicial Cases

**Do not send an individual any kind of correspondence that directly accuses him of specific wrongdoing.**

It is best for two elders to speak with the individual and invite him to meet with the judicial committee.

Suitable arrangements should be made as to the time and place of the hearing.

State what the person's course of action is supposed to have been.

If it is necessary to send a written invitation, you should simply state what the individual's course is *alleged* to have been, the time and place of the hearing, and how the person can contact the chairman if the arrangements are inconvenient for him.

**If the accused wishes to bring witnesses who can speak in his defense regarding the matter, he may do so.**

However, observers are not permitted.

No tape-recording devices are allowed.

**If the accused repeatedly fails to come to the hearing, the committee will proceed with the hearing but will not**

WTPA000244

make a decision until evidence and any testimony by witnesses are considered.

The committee should not take action against a person unless the evidence clearly proves this necessary.

Failure to appear before the committee is not in itself proof of guilt.

## What kind of evidence is acceptable?

There must be two or three eyewitnesses, not just persons repeating what they have heard; no action can be taken if there is only one witness. (Deut. 19:15; John 8:17)

Confession (admission of wrongdoing), either written or oral, may be accepted as conclusive proof without other corroborating evidence. (Josh. 7:19)

*Strong* circumstantial evidence, such as pregnancy or evidence (testified to by at least two witnesses) that the accused stayed *all night* in the same house with a person of the opposite sex (or in the same house with a known homosexual) under *improper circumstances,* is acceptable.

The testimony of youths may be considered; it is up to the elders to determine if the testimony has the ring of truth.

The testimony of unbelievers may also be considered, but it must be carefully weighed.

If there are two or three witnesses to the same kind of wrongdoing but each one is witness to a separate incident, their testimony can be considered.

Such evidence may be used to establish guilt, but it is preferable to have two witnesses to the same occurrence of wrongdoing.

# Judging With Righteousness, Wisdom, and Mercy

Elders must exercise wisdom in their questioning and godly qualities in their judging.

In giving counsel or rendering decisions, avoid expressing

opinions; be sure to judge in righteousness. (Deut. 1: 16, 17)

You must ask pertinent, discreet questions to isolate main issues and determine how or why a problem developed.

Probing questions should not go into needless details, especially in regard to sexual misconduct, unless this is *absolutely* necessary, such as in determining whether *por·nei´a* had been committed.

Elders need to treat the accused kindly and respectfully, never harshly. (*w*89 9/15 p. 19)

Seek divine wisdom to help you relate Bible laws to the issues raised or the charges being considered. (Jas. 1:5; 3: 17, 18)

You must exercise mercy in matters of judgment, not only by showing compassion in the judgment rendered but also by expressing kind consideration and pity in your efforts both to bring wrongdoers to repentance and to heal and restore those who are repentant. (Rom. 2:4; Jas. 5:14-16; Jude 22, 23)

**In cases where it is established that a serious sin was actually committed, the judicial committee should consider such factors as these:**

Is there evidence of the person's craving wrongful things or courting trouble? Or did the person momentarily succumb to weakness? (Jas. 4:1)

Was he aware of the gravity of his sin? (Gal. 6:1)

Had he been admonished that his course was leading toward danger? (1 Thess. 5:14)

What were the circumstances leading up to the wrongdoing?

Are there extenuating factors, such as emotional or mental disorders or having been a victim of some type of abuse in the past, that should be considered?

Was it a single offense, or was it committed more than once?

WTPA000246

Was his confession voluntary, or did he have to be accused by others before confessing?

Was his reluctance to speak more a result of deep shame than of lack of repentance?

Above all, does he show true repentance and manifest a heartfelt desire to avoid repetition of the wrong?

**Even though the wrongdoer is guilty of a serious offense, elders on the judicial committee realize that their aim is to recover the one who has fallen into a wrong course, whenever this is possible. (Jude 23)**

If he listens to them, showing true repentance, it may be that he can be retained as a brother and thus be spared being disfellowshipped. (Prov. 19:20; compare Matthew 18:15-17.)

**Neither the gravity of the wrong nor bad publicity finally determines whether the person should be disfellowshipped; rather, the determining factor is the individual's sincere repentance or the lack of it.**

Some manifest repentance right after their sin by taking steps immediately to confess; others manifest repentance later, even during the meeting with the judicial committee. (*w*83 1/1 pp. 30-1)

It is in the person's favor if he voluntarily confesses, but the determining factor is: Is he repentant?

There is good reason for you to weigh carefully claims of repentance when the individual has shown himself to be guilty of hypocrisy, lying, or making deliberate efforts to deceive.

Also be cautious when it is apparent that the wrong act was preceded by deliberate scheming, perhaps in a cold, calculating way.

This is quite different from when an individual, under the unexpected pressure of certain tempting circumstances, gives in because of human weakness.

113

WTPA000247

## Judgment Related to Repentance

**Elders must be able to discern genuine repentance on the part of the wrongdoer. (*w*81 9/1 pp. 24-6; *it*-2 pp. 770-4)**

Genuine repentance is vital for wrongdoers because it is the first step leading back to God. (Rom. 2:4)

**It is particularly important to be sure genuine repentance exists in cases of repeated sin, a practice of sin.**

If gross sin extended over a long period of time, particular care should be exercised in determining the genuineness of the repentance. (*w*81 9/1 p. 26)

Is the person cooperative? When questioned, are his answers forthright?

Was fear and weakness the reason he did not come forward and confess, or is he wicked, trying to fool the congregation?

Has he been counseled before for this sin?

**Repentance is generally manifested by works that befit repentance either before or during the committee hearing. (Compare Acts 26:20.)**

How true repentance can be recognized:

Has the individual contritely prayed to Jehovah and sought His forgiveness and mercy?

Caution: Some wrongdoers, though repentant, find it difficult to pray. (Jas. 5:14)

Has he admitted his wrongdoing, either voluntarily to some of the elders before the hearing or when confronted by his accusers?

Caution: Some people are so deeply ashamed that they are reluctant to speak. Or they have difficulty expressing themselves.

Has he made restitution, expressed willingness to do so, or apologized to offended persons, those damaged by his sinful course?

WTPA000248

What seems to motivate the sadness, remorse, and regret he shows? Is it worldly sadness (sorrow over being caught) or heartfelt godly sadness? (2 Cor. 7: 8-11)

Does he have deep regret over a damaged relationship with Jehovah, remorse over the reproach he has brought upon Jehovah's name and people, and sincere longing to come back into God's favor?

Does his attitude include a heart-motivated rejection of the bad course as something repugnant, hated? (Rom. 12:9)

On occasion it may take *more than one meeting* for reproof to reach the wrongdoer's heart and move him to repentance.

> However, the judicial committee is not obliged to meet repeatedly with the wrongdoer or put words in his mouth, trying to force him to repent, if it is obvious that he lacks godly sorrow.

In all cases, the elders on the judicial committee must weigh such factors as the following:

The seriousness of the wrong committed.

The time that has passed since it occurred.

The circumstances that led up to it.

The measure of willfulness shown.

Whether there was *deliberate* failure to heed earlier warning counsel.

**If all reasonable efforts have been made to readjust the one who has committed serious sins and yet he remains unrepentant, he must be disfellowshipped. (1 Cor. 5:1, 9-13)**

You must show respect for Jehovah's standard of righteousness and holiness.

You must also protect the congregation from willful sinners.

**The same principles will govern the judgment on the part of a judicial committee in cases of reinstatement.**

WTPA000249

# The Responsibility of Judgment Is a Weighty One

Judging matters that affect people's lives and relationships is a serious responsibility; it calls for balance, discernment, and understanding. Rely on Jehovah's guiding spirit.

Elders on a judicial committee must weigh carefully both the interests of the individual and those of the congregation as a whole. (Jude 3, 4, 22, 23)

You must feel keenly your obligation before God to prevent wrongdoing from infiltrating the congregation.

At the same time, your manner of dealing with your brothers must always reflect Jehovah's wise and merciful ways.

WTPA000250

117

WTPA000251

# Handling Cases of Wrongdoing With Wisdom and Mercy

When man rebelled in Eden, Jehovah took prompt action. (Gen. 3:8-19, 23, 24) Today, elders must handle cases of wrongdoing and thus safeguard the spiritual environment of the congregation. Hence, they should be well-informed with regard to the application of Bible laws and principles.

When you as elders are assigned to care for a judicial problem, it is beneficial to take the necessary time to do research in the Bible, the Society's publications, and any special letters from the Society that may contain information applicable to the particular case. Prayerful consideration of such information would be appropriate before the committee initiates the hearing itself.

## Before Forming a Judicial Committee

**A person who becomes a witness to a serious sin should encourage the wrongdoer to report the matter to the elders.**

He may encourage the wrongdoer to seek help from the elders and confess; and if the wrongdoer does not do so, the witness will then inform the elders. (*w*85 11/15 pp. 19-21)

If there is no response from the accused, two elders should attempt to discuss the matter with him. If he denies wrongdoing, so that it is only one brother's word against another's, leave the matter in Jehovah's hands. (1 Tim. 5:19, 24, 25)

However, having the witness confront the accused alone may not be advisable in all cases.

For example:

When the witness is party to wrongdoing, such as in cases of fornication or adultery.

WTPA000252

> When the witness is a victim of the wrongdoer as in cases of incest or rape.

> When the witness is extremely timid.

In such cases, or when other extenuating circumstances exist, two elders may discuss the matter with the accused, or an elder may accompany the witness to discuss the matter with the accused.

Of course, if it is determined that a judicial committee should be formed, the witness may need to testify at the hearing if the accused denies wrongdoing.

If there is another witness to the same type of sin on the part of the accused, this would be basis for forming a judicial committee. (See Unit 5 (b), page 111.)

## Judicial Committee Hearing Procedure

**After opening with prayer, the chairman states the reason for the meeting.**

He may offer a Scriptural point at the outset, such as from Proverbs 28:13 or James 5:14, 15.

Elders, by expressing the desire to be helpful, can do much to put the accused at ease. (*w*89 9/15 pp. 19-20)

The chairman invites the accused to make a personal statement.

**Present the witnesses one at a time unless the wrongdoer confesses.**

If the accused does not admit guilt, he should be informed as to the source of the charge(s) made against him.

> Accusers should be willing to assume their responsibility, as was required in Israel. (Deut. 17:6, 7; 19:16-21)

The accused may also present witnesses whose testimony would have a bearing on the case.

The witnesses should not be present for the entire hearing, since they do not need to hear details and testimony that do not affect them.

> However, witnesses to the wrongdoing should be present if it becomes necessary to continue the reproof of the accused "before all onlookers." (1 Tim. 5:20)

WTPA000253

**The committee probes with pertinent questions in an effort to establish facts and ascertain the attitude of the accused.**

Is there sufficient evidence to establish by two witnesses or otherwise that the person is clearly guilty of serious wrongdoing? (Unit 5 (b) p. 111) Isolate specific offenses and available evidence.

While it is not appropriate to make extraordinary efforts or to prolong the case unnecessarily, skillful use of God's Word may reach the person's heart and bring him to repentance.

**Elders should be quick to listen but slow to indicate a preference or a leaning one way or the other.**

Wait until you have heard all the facts before reaching conclusions and making decisions. (Prov. 18:13)

If guilt is established, use God's Word to reprove the wrongdoer, showing the wrongness of the sin and of the steps that may have led to it.

You may need to do so in front of the witnesses of the sin ("onlookers") who have testified.

**After Scriptural discussion and after all evidence has been presented, dismiss the accused and any witnesses, and carefully review evidence and the attitude of the accused.**

If the accusation, or charge, has been proved true, is the wrongdoer repentant? If repentance is manifest, how was it demonstrated? (Unit 5 (b) pp. 112-15)

Depending on whether guilt is established and repentance shown, determine what action, if any, needs to be taken.

In complex cases, defer making a decision if you are not sure of the Bible's direction and the Society's counsel.

However, do not unduly prolong making a decision, as this can have a detrimental effect on the accused and the congregation.

Seek Jehovah's wisdom through prayer.

WTPA000254

If the wrongdoer is guilty of gross sin but gives evidence of godly repentance, even as recently as at the hearing, the judicial reproof given by the committee may suffice; disfellowshipping may not be necessary. (2 Tim. 4:1, 2; Titus 1:9; *w*83 1/1 pp. 30-1)

Some wrongdoers have gone so far into a practice of sin or have been so persistently deceptive that it may be difficult to accept a claim of repentance. (1 Cor. 5: 3-5, 13)

If the person is guilty of a serious sin such as those listed in Unit 5 (a), pages 92-6, and is unrepentant, having a truly bad heart, and/or is determined to pursue a God-dishonoring course, he must be disfellow-shipped, expelled.

## When the decision is made, inform the individual of it orally.

If disfellowshipping is necessary, proceed as outlined under the next heading.

If disfellowshipping is not necessary, yet the accused is guilty of gross sin, see "Matters Regarding Judicial Reproof," pages 123-4.

# If the Decision Is to Disfellowship

**Tell the guilty person the Scriptural reason(s) for the action.**

**Inform the wrongdoer that he may appeal in writing within seven days if he feels a serious error in judgment has occurred. (*om* p. 147; *km* 1/80 p. 4)**

Outline steps necessary for future reinstatement.

Be positive, assuring him that forgiveness is possible if he truly repents; the person may be in a distressed state of mind.

**If an appeal is lodged within the allotted time, no announcement is made pending the outcome of the appeal.**

In the meantime the accused person will be restricted

WTPA000255

from commenting and praying at meetings or enjoying special privileges of service. (*om* pp. 147-8)

If the accused lodges an appeal but then deliberately fails to appear for the appeal hearing, the disfellowshipping action should be announced after reasonable efforts to contact the individual have been made either in person or by telephone.

## If an appeal is not made within seven days, announce the disfellowshipping.

Allow the seven-day appeal period to elapse even if the person states he does not wish to appeal.

The presiding overseer should check the announcement to make sure that it conforms to the guidelines outlined by the Society.

An elder, perhaps the chairman of the judicial committee, should read the announcement.

Disfellowshipping *takes effect when the announcement is made* to the congregation.

## Using the forms provided by the Society, the branch office should be notified of the person's name, the Scriptural reason for the disfellowshipping, and the date of the action. (S-77 and S-79 forms)

A brief review of the evidence that was presented should also be given.

A similar report is made when a person disassociates himself from the organization. (S-77 and S-79 forms)

A written summary of the case should be prepared by the committee and put in a sealed envelope to be placed in the congregation file.

## If a disfellowshipped individual moves to a different area, no announcement of his disfellowshipped status should be made from the platform of the new congregation.

Publishers can be advised individually if they are inadvertently having association with such a one.

WTPA000256

## Matters Regarding Judicial Reproof

**Reproof involves establishing wrongdoing and convincing the wrongdoer of the error.**

Thus, administering judicial reproof includes more than just making a decision or announcing it. (*w*77 11/15 pp. 691-2)

**The aim is to help the person stop doing what is bad and establish himself as a practicer of what is good.**

Help him to understand how there may have been related sins, which were less serious, that led to his serious deflection from Jehovah's law.

**Some wrongdoers may need to be judicially reproved with severity to bring them to repentance. (Titus 1:13)**

**At times it is appropriate to administer judicial reproof "before all onlookers." (1 Tim. 5:20)**

Be sure to adhere to Scriptural and organizational guidelines when this is done. (*w*81 9/1 pp. 24, 26)

The "onlookers" may be those present as witnesses at the committee hearing or those who know of the sin.

If there are *good reasons* for it, an announcement of judicial reproof may be made to the congregation. (*w*88 11/15 p. 18; *w*81 9/1 pp. 26-7)

The degree or seriousness of the sin *is not* the determining factor for an announcement regarding judicial reproof.

In cases where sin is widely known or will no doubt become known, an announcement may be needed to safeguard the reputation of the congregation.

The committee may have *specific reasons* why the congregation needs to be somewhat on guard concerning the repentant wrongdoer. Perhaps he had been counseled several times concerning steps leading to the same wrongdoing.

In some cases the elders may feel it is necessary to warn the congregation about the type of conduct practiced.

If so and if no announcement is made, a talk may be

WTPA000257

given at any time outlining clearly what the Scriptures have to say on the subject.

> If an announcement regarding judicial reproof is made, a few weeks after the announcement such a talk may be given.

Nothing should be said that would connect anyone with the type of sin being discussed. Rather, cover Scriptural principles outlining the seriousness of such sinful conduct and how to avoid it.

## In all cases of judicial reproof, restrictions will be imposed.

If the wrongdoer is an elder, a ministerial servant, or a pioneer, he should be removed. (*w*77 11/15 pp. 697-8)

It is important that the judicial committee monitor the spiritual progress of a person who has been judicially restricted; appropriate counsel and spiritual encouragement should be given periodically. (*w*81 9/1 p. 27; *km* 3/75 p. 4)

Restrictions should be removed in due course as warranted by the individual's observed spiritual recovery.

If a brother who has recently been judicially reproved moves to another congregation, it is necessary to inform the elders of that congregation about any restrictions that may be in effect.

> This will enable the elders in his new congregation to continue supervising the restoration of his privileges and help him toward full spiritual recovery.

> No announcement of such previous judicial reproof is made in the new congregation. (*km* 3/75 p. 4)

## Appealing Judicial Decisions

**If the accused believes that an error in judgment was committed, he should make known in writing his reason for requesting an appeal, doing so within seven days from the time he was notified of the decision of the committee.**

> His written statement should be addressed to the judicial committee that decided the matter.

WTPA000258

The judicial committee chairman will promptly contact the circuit overseer, who will then designate elders to serve on the appeal committee.

If possible, elders selected by the circuit overseer for hearing the appeal should not be from the same congregation as the original committee.

If the basis for the appeal is not clear in the written statement, try to determine which of the following is claimed:

He contends that a disfellowshipping offense was not committed.

He denies committing the alleged wrong.

He admits to wrongdoing but believes he was repentant.

The appeal should be heard even if the basis for it may not appear sound. (*km* 1/80 p. 4)

If the person should appeal after seven days, immediately contact the Society for direction.

**The hearing is conducted in a manner similar to the first judicial committee hearing.**

It may be necessary to rehear all the evidence relevant to the case, including that which was presented originally and any new evidence now available.

The judicial committee that heard the original case should be present at the appeal hearing(s).

Prior to the appeal hearing, the original committee should furnish the appeal committee with the completed S-77 and S-79 forms along with whatever written records it has from the first hearing(s).

If either the original committee or the accused believes that earlier testimony or evidence is being changed, this can be so stated following the presentation of the alleged altered evidence.

Following the presentation of the evidence, the appeal committee should deliberate in private.

The appeal committee may need to question either the original committee or the accused separately.

WTPA000259

The appeal committee is to determine whether there was an error in judgment or the decision was basically sound according to information available; it should also determine the attitude of the accused at the original committee hearing(s).

The appeal committee is to ascertain whether there was a Scriptural basis for the original action taken and whether the individual was repentant *at the time of the hearing by the original judicial committee.*

There may be mitigating circumstances the committee overlooked, such as a history of some type of abuse when a child, emotional or mental disorders, or other.

While these do not justify wrongdoing, understanding the underlying reason or causes of emotional or mental problems can help the committee to reach a balanced and compassionate judgment. (*w*90 2/15 pp. 21-3; *w*83 10/1 pp. 27-31)

The wrongdoer may admit guilt on a disfellowshipping charge but claim that at the time of the original judicial committee hearing, he was repentant. (*w*83 1/1 pp. 30-1)

The appeal committee will examine evidence to see if he had genuinely repented. (Unit 5 (b) pp. 112-15; *w*81 9/1 pp. 25-6)

The appeal committee may find that while the original basis for disfellowshipping was invalid, other valid grounds for disfellowshipping exist.

If this happens, the individual should be given sufficient time, even several days if needed, to present any evidence or witnesses that he feels will disprove the new allegations.

If the new allegations are nonetheless established and if the person does not demonstrate genuine repentance, the appeal committee may decide to disfellowship on these new grounds.

The appeal committee should then inform the accused of its decision to uphold the disfellowshipping and

WTPA000260

should also inform him of the steps he needs to take to gain reinstatement.

New S-77 and S-79 forms should be made out giving the proper information, and these along with the original forms and correspondence related to the case should be sent to the branch office.

**When the disfellowshipping is upheld by the appeal committee, there is no further right to appeal. However, if an individual persists in believing a serious error in judgment has occurred, the appeal committee should inform him that he may submit his allegations in writing to the appeal committee within seven days for transmittal to the branch office.**

The appeal committee will include this statement along with the information being sent to the branch office.

*No announcement of disfellowshipping should be made until observations are received from the branch office.*

If no written claim of a serious error in judgment has been provided to the appeal committee within seven days (as outlined above), the appeal committee should send in the S-77 and S-79 forms and tell the original committee to announce the disfellowshipping.

**If the appeal committee disagrees with the decision to disfellowship, the decision should be discussed with the original judicial committee privately.**

If both committees agree that the person should not be disfellowshipped, the individual should be so advised.

The appeal committee will send the branch office a brief explanation of the mutual conclusion not to disfellowship reached by both committees, which should clearly state that the original judicial committee agrees with the decision.

The original committee will receive a copy of the letter, which will be kept in a sealed envelope in the congregation's confidential file.

WTPA000261

At times the original committee and the appeal committee may hold conflicting opinions.

When this occurs, the individual should not be given any indication of the conclusions of the appeal committee. Simply tell the person that the decision is pending.

The appeal committee should send the S-77 and S-79 forms to the branch office with a letter giving reasons for its decision and should include a letter from the original committee expressing the reason(s) for disagreement.

The appeal committee gives the original committee a copy of its report. Both committees await a reply from the branch office.

It may be that certain important factors are being overlooked by one or both of the committees.

The branch office will be glad to comment on any such factors and offer additional Scriptural assistance as may be needed. Such information will be supplied for the appeal committee.

Further meetings with the accused or between the committees may or may not be necessary to conclude the case.

Once any differences between the committees have been resolved in the light of the Scriptural principles cited by the branch office, the appeal committee should inform the individual of the decision.

If the decision is to disfellowship, the original judicial committee will arrange to make the announcement to the congregation.

## Reinstatement

While there should be no hasty action in reinstating disfellowshipped individuals, consideration should be given to a plea for reinstatement when this is requested.

Once a year the body of elders reviews a list of those in the congregation territory who are disfellowshipped or

WTPA000262

**disassociated. They will call on each one they select in order to see if he wants to return. (*w*91 4/15 pp. 22-3)**

The body will assign two elders to make each call, preferably elders familiar with the case.

During a brief visit or two, the elders can kindly explain what the individual can do to return.

They will report the results to the Congregation Service Committee, and the body will be informed at the next meeting of the elders.

**If someone asks about reinstatement or if by changing his course gives evidence of repentance and a desire to be reinstated, the authorized elders may speak with the individual and kindly explain what he needs to do in order to be reinstated.**

There is an advantage to having the elders who served on the judicial committee that disfellowshipped the individual also serve on the committee for the reinstatement if this is possible and they are still serving as elders in the congregation handling the request for reinstatement.

**In hearing pleas for reinstatement, elders need to be balanced.**

Genuine repentance and a turning away from the wrong course—not the attitude of others or merely the time elapsed—are the chief determining factors in deciding when a person may be reinstated. (1 Cor. 5:1, 11-13; 2 Cor. 2:6, 7)

Elders should be sure that sufficient time has passed for the disfellowshipped person to prove that his profession of repentance is genuine. (*it-2* p. 771)

Consider the *overall pattern* of his life. Does it now show that he is repentant? (*w*77 3/1 p. 152)

If so, elders will guard against going to extremes by exacting a point-by-point admission of sins that may not have been clearly proved.

WTPA000263

Where there is evidence of *conspiracy* between individuals to put away their mates and marry each other, considerable time should elapse before a hearing for reinstatement may be held. (*w*79 11/15 pp. 31-2)

**If it is determined that the wrongdoer is sincerely repentant, has discontinued his former wrong conduct, and is doing works that befit repentance, he can be reinstated. (Compare Acts 26:20.)**

The decision to reinstate is made by a judicial committee of the congregation that took the disfellowshipping action. The secretary should sign and return the S-79b card to the Society immediately. (*om* pp. 149-50)

If the disfellowshipped person has moved, his request for reinstatement may be heard by a local judicial committee where he is now attending meetings. Thereafter, that committee will give the body of elders of the congregation that disfellowshipped the individual its recommendation.

If the two congregations are reasonably close to each other, the judicial committee of the congregation that took the disfellowshipping action should meet with the disfellowshipped individual after receiving the recommendation of the committee of the congregation where he made his plea for reinstatement.

Reinstatement is announced in the congregation where the person was disfellowshipped as well as in the congregation where he now attends.

**When an individual is reinstated, he will still need much spiritual assistance.**

The elders should see that definite arrangements are made to help the person regain spiritual health and strength. (Col. 2:7; Titus 2:1, 2)

They may arrange for a Bible study to be conducted, which would be reported as field service.

WTPA000264

Restrictions should be imposed to help the person see the need of continuing to make 'straight paths for his feet' and also out of consideration for the congregation's conscience. (Heb. 12:13)

The privilege of sharing in the field service is restored when the individual is reinstated.

Other privileges, such as commenting at meetings, handling parts on the program, and offering prayer at meetings, can be restored progressively when it is determined that the individual has progressed spiritually to the point that he is qualified and when it is judged by the elders that the extending of such privileges will not be offensive to the congregation.

It will be up to the elders of the congregation where he now is located to decide when certain privileges may be restored.

**Circumstances of each case govern the length of time that should elapse before** *recommending a reinstated brother* **for additional privileges and responsibility.**

Carefully consider possible effects if the individual were to be appointed. Would it be a *cause for stumbling* among the brothers?

The privilege of serving as ministerial servant or elder can be recommended only after he has had ample time to *prove* himself to be irreprehensible and is again "free from accusation" and has "freeness of speech." (1 Tim. 3:2, 9, 10, 13)

He must live down the reproach and build up a convincing record of righteousness, which may take a number of years.

If wrongdoing occurred in another congregation, the feelings of members of that congregation should be considered.

In cases of scandal, he might not be able to live down his wrongdoing sufficiently to qualify for an appointment to serve as a ministerial servant or an elder for a very long time.

WTPA000265

# Clarifications and
# Guidelines on Handling Certain Matters

**Even though *all lying* is bad, when considering a case of lying, elders should use good judgment, balance, and reasonableness in determining the gravity of the sin and whether it is a practice.**

Some lying may involve either exaggerating the facts or petty, misleading statements of relatively minor consequence.

The person may have lied because of momentary pressure or fear of man. (Matt. 26:69-75)

Unless it is established by witnesses or confession that he has made a practice of flagrant, malicious lying, the elders would endeavor to readjust the person through loving Scriptural admonition without holding a judicial hearing.

**If there is a question about the *mental state* of a baptized individual who commits some deed for which he might be disfellowshipped, a judicial committee should consider the facts of the case.**

Weigh the evidence along with the extent of mental incompetence, and then decide whether some announcement should be made or whether disfellowshipping should occur.

Although there may be a basis for showing more than ordinary consideration and patience, the elders must protect the cleanness and spiritual well-being of the congregation. (1 Thess. 5:14)

***Marriage* is of divine origin. (Mark 10:6-9)**

Engagement is a serious commitment and is normally a personal matter. (Matt. 5:37)

However, unilaterally breaking an engagement may require inquiry if the one doing so has an organizational position of responsibility. (*w*75 6/15 pp. 382-4)

Marrying an *unbeliever* is contrary to Bible principles. (Deut. 7:3, 4; 1 Cor. 7:39; 2 Cor. 6:14, 15)

*"Pay Attention to Yourselves and to All the Flock"*

WTPA000266

If a dedicated, baptized Christian marries an unbeliever, this would result in disqualification from all special privileges for the time being. (1 Tim. 3:2, 4, 5, 12, 13; *w*82 3/15 p. 31)

If the parent is an elder, a ministerial servant, or a pioneer and encourages, allows, or gives tacit approval to the marriage, this raises questions regarding his or her qualifications.

Use of the Kingdom Hall must be in harmony with God's standards.

It would not be used for marriages of unbelievers or the reenactment of marriages, such as on occasions of anniversaries. (*w*84 4/15 pp. 10-15; *km* 12/81 p. 4)

However, on occasion the body of elders may decide to allow two unbaptized publishers, who are regularly associating and awaiting an assembly to get baptized, to be wedded at a Kingdom Hall.

In each case, the body of elders will decide when the Kingdom Hall may be used for a wedding.

The *wedding vows* that were published in the April 15, 1984, issue of *The Watchtower,* page 14, and that appear in the marriage outline, S-41, should be used.

These vows may be modified according to the local law, but privately chosen and worded vows should not be used.

**Divorce and remarriage** was not Jehovah's original purpose for man.

The Scriptures urge married persons to remain together as "one flesh." (Gen. 2:22-24; Matt. 19:4-6; 1 Cor. 7:10-16; *w*83 3/15 p. 29)

Many marital problems can be resolved by following the principle of Matthew 18:15.

The Law of Moses allowed the husband, not the wife, to divorce on broad grounds of "something indecent." (Deut. 24:1)

Jesus Christ strengthened the marriage arrangement for

133

WTPA000267

Christians but gave equal right of divorce to the wife. (Mark 10:11, 12)

In the Christian congregation, divorce is allowed only for "fornication," or *por·nei´a*. (Matt. 5:31, 32; 19:3-9)

The marriage bond is not automatically broken in God's eyes by sex relations outside the marriage union; the innocent mate may forgive. (Hos. 3:1-3; 1 Cor. 13:4-8)

While elders should be informed one way or the other, it is up to the innocent mate to decide whether to divorce or not.

The innocent mate should be informed that *resuming sexual relations* with the adulterous mate would indicate forgiveness and would therefore cancel the Scriptural ground for divorce. (*w*81 3/1 pp. 30-1)

Forgiven adultery cannot be used later as a basis for divorce, but unrevealed instances of adultery, if later brought to light, could be so used. (*w*74 8/15 pp. 511-12)

Forgiveness of adultery involves a willingness on the part of the innocent mate to resume sexual relations with the adulterous mate within a reasonable period of time. (*w*74 11/1 pp. 671-2)

A person guilty of adultery could obtain a legal divorce and be viewed by the congregation as free to remarry if the innocent mate refuses to resume sexual relations for a very prolonged period and yet has not sought a legal divorce.

By withholding the marriage due, the nonadulterous mate would be indicating that no forgiveness has been extended.

The elders would consider evidence from the adulterous mate to determine that there is a definite rejection by the nonadulterous mate.

When divorce is the course decided upon, a divorce freeing a Christian for remarriage should be obtained by the innocent mate if possible or by the guilty mate with the innocent mate's consent; both of them are then free to remarry.

WTPA000268

If the guilty one *unilaterally* obtains a divorce over the objection of the innocent mate, this does not free the guilty one to remarry.

> If he marries someone else while the innocent mate is still willing to forgive his adultery and resume their marital arrangement, his is an *adulterous marriage*. (Luke 16:18)
>
> > This calls for congregation judicial action in addition to any already taken, unless he has already been disfellowshipped.

A *divorced couple* (even if only legally divorced) who have sex relations with each other commit fornication. (Heb. 13:4; *w*82 9/1 p. 31)

> It is a matter for personal decision if a *separated couple* choose to have sexual relations. (Rom. 14:12)

A person who commits adultery after having been divorced by his or her mate on unscriptural grounds would be Scripturally free to remarry, since he or she had already been rejected by the mate that obtained the divorce.

> The case of adultery would be dealt with by a judicial committee.

**Courting or dating** when one party is *not free to marry* is wrong. (*w*80 8/1 pp. 30-1; *w*68 4/15 pp. 255-6)

> Strong counsel and repeated warnings should be given, and if the counsel is ignored, the individual(s) may be marked. (2 Thess. 3:14, 15)

> When such action has escalated to the point where it has become shocking and *repeated efforts* to help adjust the situation have been ignored, there may be basis for taking disfellowshipping action. (Gal. 5:19; *w*83 3/15 p. 31; *w*73 9/15 pp. 574-6)

**If a person who has entered into an *adulterous marriage* is eventually reinstated, it would be a rare case for him to be recommended to serve in a responsible position in the congregation, at least not until after the remarriage or death of the mate he put away without Scriptural basis.**

WTPA000269

In any event, a considerable number of years should have passed. (1 Tim. 3:2, 12, 13; *w*83 3/15 p. 29; *w*80 9/15 p. 31)

## Christians should avoid *gambling* in all its various forms, including lotteries. (Compare Isaiah 65:11; *w*89 7/15 p. 30; *g*82 7/8 pp. 25-7; *g*81 11/22 p. 27.)

Gambling can lead to or incite unchristian traits, such as greediness and covetousness. (Rom. 13:9, 10; 1 Cor. 6: 9, 10; Col. 3:5)

Additional bad results from gambling and association with gamblers give true Christians further reasons for avoiding it. (1 Cor. 15:33; *g*85 8/8 pp. 22-3; *g*82 7/8 pp. 25-7; *w*80 9/1 pp. 29-30; *w*72 10/1 pp. 593-4)

If a person makes a practice of gambling and after repeated counsel unrepentantly pursues a course of greediness, he could be disfellowshipped from the Christian congregation. (*w*80 9/1 pp. 29-30; *w*67 6/15 p. 356)

A person must guard against the view that petty gambling solely for entertainment is harmless. (Gal. 6:7, 8)

However, elders would not want to get involved in what publishers do in this respect unless spirituality is endangered, either that of the individual or that of the congregation.

If a business concern gives out prizes to winners of a contest or to customers whose names were drawn from its customer list, it may not be wrong to accept such a prize if no money has to be paid to participate. (*w*73 2/15 p. 127)

A person needs to be careful that accepting such a prize does not stir up greed.

The language used in advertising a drawing or contest, as well as the kind of sponsors, may involve elements with which a Christian would not want to be identified, either for personal reasons or for fear of stumbling others. (Rom. 14:21; 1 Cor. 10:31-33; *g*75 7/8 p. 28)

Gambling-related employment is not appropriate for a Christian.

WTPA000270

An individual continuing employment directly involved with gambling or employment making him a *clear accomplice* or *promoter* of a wrong practice would be subject to disfellowshipping after being allowed time, usually 90 days, to make the needed adjustment. (*km* 9/76 pp. 3-6)

## God's Word counsels all Christians to be *law-abiding*. (Rom. 13:1; Titus 3:1)

Christians are to pay to Caesar what is Caesar's and should obey the laws of the land in all matters where there is no conflict with God's law. (Matt. 22:21; Rom. 13:1; *w*90 11/1 pp. 10-15, 18-28)

By doing this, they have no need to fear being punished by the authorities as lawbreakers, and each one can maintain a good conscience. (Rom. 13:3-5; 1 Pet. 3:16)

When human laws conflict with God's law, true Christians follow the example of the apostles of Jesus Christ. (Acts 4:19, 20; 5:29-32)

In all business matters, Christians should endeavor to maintain a fine reputation.

They should not be a part of any business that is forbidden by Caesar's law or engage in business practices that are illegal.

It is wise to avoid making purchases from or employing the services of individuals or businesses known to be illegal in their operation.

A person's employment should also be honorable so that it will not become a cause for reproach or stumbling.

Following Scriptural counsel protects a Christian from consequences of lawbreaking and protects his conscience. (Rom. 13:3, 5)

If the elders learn of illegal activity or of some serious crime on the part of a member of the congregation, they may not be obliged by law to report the offender or the offense to secular authorities.

*UNIT 5 (c)*

WTPA000271

Though it is not the responsibility of the Christian congregation to enforce Caesar's laws, yet the very nature of some crimes demands that they be reported to secular authorities.

> It may be necessary to encourage the wrongdoer to turn himself in to secular authorities. Before any steps are taken in this regard, contact the branch office. Of course, review the latest Society directives on such matters before proceeding.

Although not enforcers of Caesar's laws, in cases that also involve the breaking of God's law, elders must give consideration to what has taken place.

> Depending on the wrongdoing committed, a judicial committee hearing may be needed.

As suggested by the apostle Paul's comments regarding Onesimus, a person who was guilty of illegal activities before coming to a knowledge of the truth is not required to settle these things with the authorities prior to baptism. (Philem. 10-18; *w*78 9/15 pp. 30-1)

> A former thief would not be required to make restitution to all from whom he stole before baptism, although in some cases his conscience may move him to do so. (Luke 19:8)

> The blood of Jesus Christ covers the sins of such new ones. They may get baptized. However, it is best to be judicious as to extending additional privileges. (Isa. 1:18; 1 Tim. 2:5, 6; 1 John 1:7)

If a person approaching baptism is an *illegal alien,* he should be urged to do what he can to rectify his status with regard to the law of the land. (*w*77 3/15 pp. 191-2)

> The Christian congregation today follows a course harmonious with the Biblical pattern of the apostle's dealing with the case of Onesimus. (Philem. 8-22)

> Overseers are not to police the lives of the brothers, nor are they obligated to become acquainted with all the details of civil and criminal law so as to enforce these. Just as they do not check to see if someone's home meets every detail of the building

WTPA000272

code, they do not investigate in order to determine whether a person has satisfied every detail as to his legal situation in the country before allowing him to get baptized or to continue in the congregation.

Baptism would not be denied such a person, but he would not be viewed as exemplary and would not be used in any responsible position in the congregation. The same would apply to a person who uses fraudulent or illegal identification.

A brother who has notified the authorities of his illegal status and filed papers to resolve his situation would not be restricted as to representing the congregation in prayer, sharing in teaching, or being appointed as a pioneer, a ministerial servant, or an elder if otherwise qualified.

Such privileges may be extended even though the authorities do not act promptly on his request for permission to remain in the country. He is no longer a fugitive.

**Certain disputes between brothers should not be taken to *secular courts* but should be resolved in harmony with Jesus' counsel at Matthew 18:15-17. (Unit 5 (b) p. 108)**

At 1 Corinthians 6:1-8, the apostle Paul gave strong counsel that Christians should not take other Christians before secular courts to settle personal disputes that should be settled with the help of the congregation elders. (*g*83 2/8 pp. 13-15; *w*77 3/1 p. 147; *w*73 11/15 pp. 703-4)

For some disputes, a neutral brother, or elders, may act as arbitrator.

If an individual ignores God's Word on this matter, it *may* affect his congregation privileges.

However, there are legal matters over which the congregation does not have authority and which may therefore be taken to a secular court for judgment without violating the principle or the spirit of 1 Corinthians 6:1-8. These include:

Getting a divorce decree, child custody and support, alimony.

WTPA000273

Obtaining insurance compensation.

> If a person suffers loss or is injured in or by an automobile owned by a spiritual brother, it might be necessary legally to sue the brother in order to obtain compensation from the brother's insurer.

Being listed among creditors in bankruptcy procedures.

Probating wills.

Certain countersuits. For example:

> If a *worldly creditor* sues a brother, it might be necessary for the brother, for his own protection, to file a countersuit even though spiritual brothers are included in the action.

> If a brother takes legal action against another baptized Witness, it would not be a violation of 1 Corinthians 6:1-8 for the one being sued to defend himself or to countersue. (This is true whether the matter was first taken before the elders or not.)

**Jehovah's Witnesses *maintain neutrality* with regard to the political and military affairs of the nations. (John 17:16; *rs* pp. 269-76)**

They do not interfere with what others do as to voting in political elections, running for or campaigning for political offices, joining nonneutral organizations, shouting political slogans, and so forth. (*w*86 9/1 pp. 19-20; *w*68 6/1 pp. 351-2)

Since true dedicated Christians are "no part of the world," if a member of the congregation unrepentantly pursues a course in violation of his Christian neutrality, he thereby disassociates himself from the neutral Christian congregation. (John 15:19; 17:14-16; *w*82 1/15 p. 31)

> Elders should talk to one known to be contemplating taking such a course, since he may be doing so in ignorance. (Ps. 119:67; Gal. 6:1; 1 Tim. 1:13)

> If he disregards the help proffered and pursues a course in violation of Christian neutrality, a committee should send the facts substantiating the disassociation to the branch office on the S-77 and S-79 forms.

WTPA000274

An announcement is usually made that the individual has disassociated himself from the congregation, and the person should be told *orally* about his position. If for some extenuating reasons no announcement is made, persons in the congregation who might be visited by the disassociated person may be informed privately. The individual should be treated as one who is disfellowshipped. See Unit 5 (a), pages 101-2.

When asked to express an opinion or sign a petition on a community issue, a person must weigh the matter carefully. Such action may or may not be appropriate. Is it a political issue? (*w*83 3/1 pp. 30-1)

If a government requests temporary use of Kingdom Halls or congregation equipment in times of emergency, it would not be a violation of neutrality to comply.

In some lands, all individuals are required to build roads or work in the fields. Where this is not a form of military service but is comparable to a tax, there would be no objection as long as the work itself is not in violation of Bible principles. (Matt. 5:41; 22:21)

**By following balanced Bible counsel, Christians can usually avoid getting into situations that might involve acts of *self-defense*. (Prov. 15:1; 17:14; 26:17)**

If assaulted, a Christian could ward off blows or even escape from the attacker by temporarily incapacitating him.

A Christian woman threatened with rape should resist to the best of her ability. (Deut. 22:23-27; *g*84 2/22 pp. 24-7; *w*83 3/15 p. 30; *g*80 7/8 pp. 9-13; *g*73 4/22 pp. 16-17; *w*68 6/1 pp. 345-50)

Screaming is usually one of the best defenses; however, some individuals are unable to scream out of intense fear. (A male or female who is forcibly raped would not be guilty of *por·nei´a*.)

It is not in harmony with the spirit of 1 Corinthians 13:4-7 or Isaiah 2:4 for a Christian to learn karate, judo, or other martial arts. (Compare John 13:35; *g*75 12/8 pp. 28-9.)

WTPA000275

A brother would be disqualified as an elder, a ministerial servant, or a pioneer if he took up the study of such martial arts and practiced them.

A person publicly advocating such could be dealt with in line with 2 Thessalonians 3:13-15.

As in the case of a person who takes up professional boxing and continues in such a course, he would be expelled from the congregation. (*w*81 7/1 pp. 30-1)

**While the Christian congregation is not in a position to give direction as to all *sexual matters* concerning the marriage bed, individuals may be advised that in their intimate relations, as in all other aspects of Christian life, they need to display kindness, love, and concern for each other. (Eph. 5:28-30; 1 Pet. 3:1, 7)**

Each one should have a hatred for all perverted sexual practices. (Lev. 18:22, 23; Ps. 97:10; Amos 5:15; Rom. 12:9; Eph. 5:3, 10-12; Col. 3:5, 6)

Persons should be urged to act in such a way as to maintain a clean conscience, and the marriage bed should be undefiled. (Heb. 13:4; *w*83 3/15 pp. 27-31)

While perverted practices are wrong, if within a marriage one is involved or has been involved in such, it does not mean that he or she would necessarily lose service privileges.

If such conduct becomes known to the elders, they would need to consider: Is the practice recent or ongoing, or is it something that occurred in the past and is definitely conquered? Is the individual promoting such conduct as a proper life-style? Is his attitude one of remorse? If he is sincerely repentant and the situation is not generally known, it may not be necessary to remove privileges of service.

WTPA000276