*Exhibit DD*

```
                IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF MONTANA
                         BILLINGS DIVISION
    ─────────────────────────────────────────────────────

    TRACY CAEKAERT, and           Case No.
    CAMILLIA MAPLEY,              CV-20-52-BLG-SPW

            Plaintiffs,

       vs.

    WATCHTOWER BIBLE AND
    TRACT SOCIETY OF
    NEW YORK, INC.,
    WATCH TOWER BIBLE AND
    TRACT SOCIETY OF
    PENNSYLVANIA, and BRUCE
    MAPLEY, SR.,                   VIDEOTAPED DEPOSITION
                                   UPON ORAL EXAMINATION
            Defendants.            OF JAMES ROWLAND

    WATCHTOWER BIBLE AND
    TRACT SOCIETY OF
    NEW YORK, INC.,

            Cross Claimant,

    BRUCE MAPLEY, SR.,

            Cross Defendant.


    ARIANE ROWLAND, and           Cause No.
    JAMIE SCHULZE,                CV 20-59-BLG-SPW

            Plaintiffs,

       vs.

    WATCHTOWER BIBLE AND
    TRACT SOCIETY OF
    NEW YORK, INC., and
    WATCH TOWER BIBLE AND
    TRACT SOCIETY OF
    PENNSYLVANIA,

            Defendants.
    ─────────────────────────────────────────────────────
```

**Charles Fisher Court Reporting**
**442 East Mendenhall, Bozeman MT  59715, (406) 587-9016**

**James Rowland**

1    in 1974 when I got back from college, University of

2    Oklahoma.  And then they do give training then,

3    because you go to --

4         Q.   Who's "they"?  What do you mean?

5         A.   Pardon?

6         Q.   When you say, "they do give training," who

7    gives the training?

8         A.   The Society.  They have a district

9    overseer that meets with all the elders when they

10   have this training annually.  And it's the finer

11   points of ministry, the finer points of, you know,

12   your duties, stuff like that.

13            So in '75, I think in early -- in January,

14   I went to that Kingdom Ministry School.  And that's

15   when that was.  It took a month.

16        Q.   So that training was called the Kingdom

17   Ministry School?

18        A.   Yeah.

19        Q.   Approximately 1975 for you.

20        A.   Yeah.

21        Q.   Do you remember where that was?

22        A.   Billings.

23        Q.   Billings.  "Yes"?  Billings?

24        A.   Yeah, Billings.  Yes.

25        Q.   Do you remember who was there?

                                                        66

**James Rowland**

```
 1        A.    No.   There was about 40 elders in the
 2   group, some new ones, some old ones.   And I can't
 3   even remember who the instructor was.   He might
 4   have been from New York.
 5        Q.    Okay.   Someone you hadn't seen before.
 6        A.    Yeah, he was just here to teach that class
 7   and then go back to New York or whatever.
 8        Q.    And in addition to the Bible, were they
 9   using other books as part of your training?
10        A.    Yeah.   Yeah, with the -- like, the
11   teaching book, you know, like, one of the
12   publications is to become a better teacher, you
13   know, and --
14        Q.    Let me show you a document.   This is
15   called "Kingdom Ministry School Course."
16        A.    Yeah.
17        Q.    And it's Bates WTPA 1 is the first page of
18   this document.   It's the document that was given to
19   us by WTPA, the Pennsylvania corporation.
20        A.    Yeah.
21        Q.    And you'll see there -- can you read that
22   okay?
23        A.    Yeah.
24        Q.    It's dated October 1972?
25        A.    Uh-huh.   Yeah, that's the thing that --
```

67

**James Rowland**

1    that's the publication that was used.

2        Q.    For the training as an elder?

3        A.    Yeah.

4        Q.    Can I go back to that cover page for a

5    second?  So "Watch Tower Bible and Tract Society of

6    Pennsylvania, 1972," does that look like the

7    document that maybe you saw when you were being

8    trained in 1975?

9        A.    Yeah.  Yeah, it's a book about like this

10   (indicating).  It's a red -- it's -- what do they

11   call them now?  A real deep red, burgundy almost.

12       Q.    And you were using your hands to describe

13   a very big book, thick?

14       A.    About like that.

15       Q.    Yeah.

16       A.    And that was the Kingdom Ministry School.

17       Q.    How much time did you spend at that

18   training in Billings?  Do you remember?

19       A.    I think it was a month.  It might have

20   been -- it might have been two weeks.  But it was a

21   number of days involved.

22       Q.    Okay.  So fairly extensive, then.

23       A.    Yeah.

24       Q.    And did you stay in Billings or did you

25   drive back and forth?

                                                        68

**James Rowland**

```
 1      A.    I had to stay in Billings.

 2      Q.    And did they pay for that for you?

 3      A.    No.

 4      Q.    You had to pay for it on your own?

 5      A.    Yeah.

 6      Q.    Okay.  Let's maybe mark -- can we mark

 7   this and keep it in the binder as No. 2?

 8            (Deposition Exhibit No. 2 was marked for

 9   identification.)

10   BY MR. SHAFFER:

11      Q.    We'll come back to that document later,

12   all right?

13      A.    Okay.

14      Q.    Did the other elders from the Hardin

15   Congregation come with you for that training in

16   1975, or --

17      A.    No.  They had been through that I guess

18   the year before.  And being that I was new at the

19   job, so to speak, they invest the time and effort

20   into this so you're a better teacher and a better

21   overseer.

22      Q.    When you say that, you mean the people

23   from New York who are doing the training in

24   Billings?

25      A.    Yeah.
                                                    69
```

**James Rowland**

1    Q.   Okay.  And do you recall, were there other

2  books besides this Kingdom Ministry School Course

3  book that they used to help train you?  Were

4  there --

5    A.   Well, they used the Bible, of course, all

6  the time.  But I think there was enough in there to

7  keep you busy.  And that's why, you know, I refer

8  to that, and I still remember it.

9    Q.   Yeah.  And so describe to me what your

10  days were like in Billings during that training.

11    A.   It was just a training, period, and not

12  much of anything else.

13    Q.   Was everybody in the same room?

14    A.   Yeah.  It was in one of the Kingdom Halls.

15  I can't remember.

16    Q.   And is there someone at the front of the

17  room talking to everybody else?

18    A.   Yeah, uh-huh.  Yeah.  Lecture series, you

19  know, lecture style.

20    Q.   And everybody's got their own copy of the

21  book?

22    A.   Uh-huh.

23    Q.   This Kingdom Ministry School Course book?

24    A.   Yeah, plus their own notebook.

25    Q.   And are you just going through it, working

70

**James Rowland**

1    your way through it day by day?

2        A.    Yeah.  And there was, you know, like a lot

3    of questions on it, and --

4        Q.    So you just raise your hand if you have a

5    question?

6        A.    Yeah.  And it was a fairly good teaching

7    event, learning.

8        Q.    Okay.  Was it helpful to you in helping --

9        A.    It was, yeah.

10       Q.    And tell me how.  Tell me how it helped

11   you.

12       A.    Well, you know, you have questions as to,

13   you know, the responsibility you have in talking to

14   people, and what happens if you're rejected or

15   physically assaulted or whatever, you know, how to

16   handle situations like that, and just all kinds of

17   stuff that helped you as a minister, I guess.

18       Q.    And so as an example, right, if someone

19   came to you as an elder and said, "Yeah, I was

20   physically assaulted," right, "Somebody punched me

21   in the face.  Mr. Rowland, Brother Rowland,

22   so-and-so punched me in the face.  What do I do,"

23   would your training in Billings and your reference

24   of this Kingdom Ministry School Course, would that

25   have helped you understand how to help that person?    71

**James Rowland**

```
1      A.    Uh-huh.

2      Q.    That was a "yes"?

3      A.    Uh-huh.

4      Q.    "Yes"?

5      A.    Yes.

6            MR. TAYLOR:   Object to the form.

7  BY MR. SHAFFER:

8      Q.    And that's how -- that training in

9  Billings and this book here, this Exhibit 2, that

10 informed you on how to work as an elder and how to

11 communicate with the other members of the

12 congregation and help them; is that right?

13     A.    Yes.

14     Q.    And would you reference back to this book,

15 this Exhibit No. 2, while you were working as an

16 elder?  Would you look at it from time to time?

17     A.    Yeah, any of the publications, you know,

18 to -- something specific that you don't know

19 exactly how to handle, you go in here and under

20 that title or that subject area, and it was very

21 helpful.

22     Q.    Okay.  So just going back to kind of your

23 evolution -- I'm going to call it your evolution as

24 a member of the church, in 1969, you're baptized,

25 you're a book study conductor.
```
                                                          72

**James Rowland**

1      A.   Yeah.  And I went to Gary Baker as time

2   went on, and I tried to enlist him to help me,

3   because he was the only other elder other than

4   Martin.  And he says, "I can't" -- "I can't do

5   anything to help you, Jim."  He said, "That's my

6   father-in-law.  I'm staying totally out of it."

7      Q.   Because a lot of these allegations were

8   against Mr. Svensen, correct?

9      A.   Yeah.  In my opinion, his relationship

10  with his father-in-law was secondary to carrying

11  out Bible principles, so I didn't understand when

12  he just walked away from me.

13     Q.   Who was responsible for communicating with

14  Bethel at the Hardin Congregation while you were an

15  elder?

16     A.   Martin Svensen.

17     Q.   And why was that?  Why was it Martin

18  Svensen who was responsible for it?

19     A.   Well, he took this responsibility, I

20  guess.

21     Q.   As the presiding overseer?

22     A.   Yeah.

23     Q.   And is the chain of command similar

24  amongst the elders as it is in the military?  You

25  don't go around your chain of command?  Is it

79

**James Rowland**

1    similar with the church?

2         A.    Yeah.

3              MR. TAYLOR:   Object to the form.

4    BY MR. SHAFFER:

5         Q.    And were you instructed and trained that

6    if you had an issue, you went to the presiding

7    overseer with it?

8         A.    Yes.

9         Q.    Were you ever instructed and trained to go

10   to Bethel with a problem?

11        A.    No, there was no communication with them.

12        Q.    You'd go to your presiding overseer?

13        A.    Exactly.   Everything came through those

14   officials channels.

15        Q.    And how did you come to that understanding

16   that it's going to go through that official channel

17   to the presiding overseer?   How did you learn that?

18        A.    I learned it by organizational arrangement

19   and books and stuff.

20        Q.    Yeah.

21        A.    Also in practice, that everybody knew

22   that -- all the elders knew whenever they were

23   there that they'd go through Martin.

24        Q.    Yeah.

25        A.    And that was it, period.

                                                          80

**James Rowland**

```
 1      A.   Yeah, so...
 2      Q.   What was the title of the book you're
 3  referring to?  Do you remember?
 4      A.   Well, the first -- chapter 19, and pages
 5  52, 53.
 6
 7      Q.   Maybe we can take a break.  Can you grab
 8  that?
 9      A.   Yeah.
10      Q.   Would that work?
11      A.   What's that?
12      Q.   If we take a break, can you grab that from
13  your car?  Would you mind?
14          MR. SHAFFER:  All right.  Let's take a
15  quick break, and we'll get that document from
16  Mr. Rowland and come back.  Hopefully, it will take
17  about five minutes or so.
18          THE VIDEOGRAPHER:  We're going off the
19  record.  The time is 11:50 a.m.
20          (Proceedings were in recess from
21  11:50 a.m. until 12:22 p.m.)
22          THE VIDEOGRAPHER:  We're back on the
23  record.  The time is 12:22 p.m.
24  BY MR. SHAFFER:
25      Q.   All right, Mr. Rowland.  When we took a
```

104

**James Rowland**

1    break, you were going to go look for some

2    documents, but I want to try to simplify it.  So

3    I'm going to go ahead and just use what's already

4    been marked as Exhibit 2.  It's the Kingdom

5    Ministry School Course book.  Again, this begins

6    WTPA 1, so Bates-stamped WTPA 1, and it ends, just

7    for the purpose of the record, at 136.

8          So Mr. Rowland, this is that book you

9    described, the Kingdom Ministry book.  It's the

10   1972 version.  And I've put it in this three-ring

11   binder so that hopefully you can flip through it

12   without getting the pages discombobulated.  I'll

13   put this in front of you here.

14         When we left, we were just talking in

15   general.  You don't have to look at it now, but

16   just to remind you, you were kind of speaking in

17   general the process that you were trained to use as

18   an elder to help somebody who had come to you with

19   a sin or something they felt they had not followed

20   the word of the Lord properly and they wanted to

21   make it right.

22       A.   Yes.

23       Q.   Remember that?  Okay.

24         Can you flip to page -- let's go to

25   page 72.  Do you see the page numbers on the top of

105

**James Rowland**

1   those pages?

2        A.    Uh-huh.

3        Q.    And there's a section in the middle of

4   that page that says, "How Bible Laws Are

5   Administered."

6        A.    Uh-huh.

7        Q.    Do you see that?  That's a "yes"?

8        A.    Yes.

9        Q.    Thank you.

10        Does that trigger your memory at all on

11   kind of this topic we're talking about in terms of

12   how the elders are to administer the law within the

13   congregation?

14        A.    Uh-huh, yes.

15        Q.    "Yes"?  Okay.

16        Let's go down -- let's go to the bottom of

17   that page on the left-hand column.  Again, we're on

18   page 72.

19        A.    Uh-huh.

20        Q.    The last section there -- and I didn't

21   highlight this.  Can I take see that, take that

22   from you for a moment?  I'm going to highlight a

23   section.

24        MR. SHAFFER:  I've made highlights in this

25   document that I'm going to ask the witness to

106

**James Rowland**

1    review, and those will be reflected in the record.

2    BY MR. SHAFFER:

3        Q.    I've highlighted some things in yellow,

4    Mr. Rowland.  Can you read that okay, what I've

5    highlighted?

6        A.    "Bible law embraces the regulations,

7    principles, decisions, judgments and decrees that

8    are found in the Bible.  They constitute divine

9    law, God's written law.  Man's laws may or may not

10   be contrary to Bible laws."

11       Q.    And what does that section mean to you,

12   Mr. Rowland?

13       A.    Well, it means that as we consider, you

14   know, wrongdoing or possible serious wrongdoing,

15   whatever, there's a -- they're compared -- they're

16   contrasted with what the Bible says.

17       Q.    Okay.

18       A.    And like you asked earlier, you know,

19   serious or minor, whatever, they're handled

20   differently, but basically, it's to help the

21   person.

22       Q.    Okay.  Let's flip to the next page.  And

23   I've highlighted, on page 73 -- can I see that for

24   a moment so I make sure I've got the right part

25   highlighted?

                                                    107

**James Rowland**

1      A.    Okay.

2      Q.    Add this to it.

3            So we're on page 73 of that same document.

4    On the right-hand column there, Mr. Rowland, I've

5    highlighted something that says, "Elders empowered

6    as judges within the congregation to render

7    decisions based on Bible laws."  Do you see that?

8      A.    Yes.

9      Q.    And as we've been talking about -- just in

10   general, we've been talking about how it was the

11   elders' responsibility in the congregation to

12   counsel wrongdoers.  Is that what this statement

13   means in your view?

14     A.    Yes, uh-huh.

15     Q.    Okay.  Let's go to the next page, page 74.

16     A.    On 73, there's some stuff left.

17     Q.    Yeah, it's okay.  Flip past that.  Thank

18   you.

19           At the top of 74, there should be

20   something highlighted there that begins with, "If

21   serious wrongdoing..."  Do you see that?

22     A.    Uh-huh.

23     Q.    Just read that to yourself.

24     A.    Uh-huh.

25     Q.    Let me know when you're done.

108

**James Rowland**

```
 1              (Pause.)
 2              Have you gotten to finish the part that I
 3    highlighted?
 4         A.   Yes.
 5         Q.   And that section of highlight, does that
 6    reflect what you were trained as an elder at the
 7    course in Billings in terms of how you would handle
 8    a situation if someone had come to you with
 9    problems admitting wrongdoing?
10         A.   Uh-huh, yes.
11         Q.   "Yes"?
12              There's a part that says, "If serious
13    wrongdoing affecting the congregation is reported,
14    a hearing before the judicial committee is held."
15              Are you familiar with what a judicial
16    committee is?
17         A.   Uh-huh.
18         Q.   That's a "yes"?
19         A.   Yes.
20         Q.   Were you ever on a judicial committee at
21    the Hardin Congregation?
22         A.   Yes.
23         Q.   Let's flip, if you will, Mr. Rowland, to
24    page 85.  Are you there?  I've highlighted a couple
25    sections there in the left-hand column.
                                                    109
```

**James Rowland**

1          The first one reads, "If accusation is

2    well founded" --  well, first, let me back up.  I'm

3    sorry.

4          At the top of that section is called

5    "Ascertaining Where The Error Lies When Accusations

6    Are Made."

7       A.    Uh-huh.

8       Q.    Do you see that, Mr. Rowland?

9       A.    Yes.

10      Q.    It looks like this is a situation maybe

11   you'd described earlier where one person would come

12   to you as an elder and say, "Hey, someone else did

13   something to me."

14      A.    Right.

15      Q.    Right?  It's a little bit different than

16   when the wrongdoer actually comes to you.  This is

17   where someone else is reporting that someone else

18   has done something wrong.

19      A.    Right.

20      Q.    So person A comes to you and says,

21   "Person B did something to me," right?

22      A.    Yes.

23      Q.    Yeah.  "If accusation is well founded and

24   requires attention of committee, follow through

25   accordingly."

                                                    110

**James Rowland**

1              I want to ask you about that.  Based on
2      your training and the documents that you were
3      provided, does that mean if you determine that the
4      accusation that person A has made are well-founded,
5      that then the judicial committee needs to follow
6      through and investigate it?
7           A.   Yes.
8           Q.   Okay.  And then the next line there, "If
9      accusation involves minor matter or cannot be
10     backed up, no need to take the matter further, but
11     help accusing one get right view of matters."  Do
12     you see that?
13          A.   Yes.
14          Q.   And is that consistent with -- tell me
15     what that means to you, first of all, that last
16     part.
17          A.   Well, when a person comes -- you know, an
18     elder is well-versed in, you know, problems and
19     continues study of the Bible.  And when things are
20     well-founded, that person will come and tell you
21     something, that's really -- just one person, one
22     young lady came to me and said, "I went out" -- "I
23     went out and looked for my friend, who was going to
24     come visit, and Gunner Haines had her bottoms
25     removed and he was orally sexually assaulting her."
                                                        111

**James Rowland**

1    That girl came to me.

2        Q.   This is actually something that happened?

3        A.   Yeah, she seen it happen.  It was reported

4    to the elders with Martin involved, and he said he

5    had already handled it.  And he told the committee,

6    he says -- what he did is he said, "Gunner actually

7    just" -- "actually put his hand on her leg by

8    accident."

9        Q.   I see.  So you're describing an actual

10   situation where something went to the judicial

11   committee.

12       A.   Yeah.  Well, rather than the PO, presiding

13   overseer, going out and doing that, coming back

14   with bogus information on that incident, it should

15   have come to the committee and we should have

16   talked about it.

17       Q.   Oh, I see.  I see.

18       A.   This is a serious matter.

19       Q.   Yeah, okay.

20       A.   But that's one of those deals where you

21   don't know where that information goes or reports

22   or wherever.

23       Q.   Right.  Now, if we go back to page 85 here

24   where it says, "If accusation involves minor matter

25   or cannot be backed up, no need to take matter

                                                        112

**James Rowland**

```
 1   further," I assume that's more of a situation where
 2   somebody says, "Hey, I saw so-and-so take an apple
 3   from the market."  Is that what that means by
 4   "minor matter"?
 5        A.   Uh-huh.
 6        Q.   And in that case, you don't need to take
 7   it to a judicial committee, right?  Is that how you
 8   understood it?
 9        A.   Might mention it to a fellow elder that
10   would help adjust that person.
11        Q.   And that's what you described earlier
12   before we took the break.
13        A.   Yeah, right.
14        Q.   All right.  I just want to put this
15   document in context with what you described
16   earlier.
17        A.   Uh-huh.
18        Q.   Okay.  Can you flip to page 114 for me.
19        A.   If I could just say one thing on this.
20        Q.   Sure.
21        A.   That when that girl came to me, she was
22   about 16 years old, and told me what her friend was
23   undergoing, I thought that was extremely important,
24   seriously important.
25        Q.   Okay.
```
113