*Exhibit II*

```
         IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF MONTANA
                 BILLINGS DIVISION
_____

 TRACY CAEKAERT, and          Case No.
 CAMILLIA MAPLEY,             CV-20-52-BLG-SPW

         Plaintiffs,

    vs.

 WATCHTOWER BIBLE AND
 TRACT SOCIETY OF
 NEW YORK, INC., et al,

         Defendants,

 WATCHTOWER BIBLE AND         VIDEO-RECORDED
 TRACT SOCIETY OF             DEPOSITION UPON ORAL
 NEW YORK, INC., et al,       EXAMINATION OF THOMAS
                              MEYERS
         Cross Claimants,

    vs.

 BRUCE MAPLEY, SR.,

         Cross Defendant.


 ARIANE ROWLAND, and
 JAMIE SCHULZE,

         Plaintiff,           Cause No.
                              CV 20-59-BLG-SPW
    vs.

 WATCHTOWER BIBLE AND
 TRACT SOCIETY OF
 NEW YORK, INC., et al,

         Defendants.
_____
```

```
 1   ministerial servant could sit on?
 2        A.    Not that I've ever heard of.
 3        Q.    All right.  And what I'm asking, I guess,
 4   is how -- how would you know that, say, Elders can
 5   be on a judicial committee but ministerial servants
 6   should not?  Or would that be up to you guys in
 7   Hardin?
 8        A.    No.  That's -- that's -- that's
 9   organizational information, yeah.
10        Q.    And when you say, "organizational," what
11   do you mean by that?
12        A.    It's something set by the Watchtower
13   organization, the brothers back at the service
14   department, for example.
15        Q.    And how would that information be conveyed
16   to you as an Elder when you're an Elder?
17        A.    It's in print.  We -- we receive letters,
18   not a whole lot of them, but periodic ones,
19   especially if something is changed.
20              There's also an Elder, like, handbook, if
21   you will, that gets updated periodically.
22        Q.    All right.  And is there more than one
23   Elder handbook?  I've seen a few that look like --
24        A.    It's just evolved over time.
25        Q.    And what do you call it?  Do you call it
```

45

```
 1   an Elder handbook, or do you have another name for
 2   it?
 3       A.   Currently it's called the shepherding
 4   book.
 5       Q.   And -- Shepherd the Flock, or is that a
 6   different --
 7       A.   Something like that, yeah.  It changes.
 8   My memory's not good.
 9       Q.   But it sounds like, regardless, it was --
10   those directions were in print and that they came
11   from what you described as the Watchtower Society.
12   Is that --
13       A.   That's correct.
14       Q.   The service department was your
15   understanding?  Is that --
16       A.   Right.  Yes.
17       Q.   Did you ever have input on those policies
18   when you were an Elder?
19       A.   No.  I don't know what you mean, I guess.
20       Q.   Did you -- when you were an Elder, did you
21   ever give input to the circuit overseer about what
22   should be included in the manuals?
23       A.   I don't recall ever doing it.  I don't --
24   may -- might have expressed my opinion here and
25   there, but not -- nothing that I can remember.
```

46

Thomas Meyers

```
 1        Q.   Other than the manuals that -- that you
 2   described, that the names have changed, were there
 3   other places that you -- when you were an Elder,
 4   that you got directions about how to perform your
 5   duties as an Elder?
 6        A.   No.  It was always in print.
 7        Q.   So you didn't have to look anywhere else
 8   other than those periodicals and the printed
 9   materials that laid out the directions for being an
10   Elder?
11        A.   Yes.
12        Q.   And would those materials that you're
13   describing, would each Elder have a copy sent to
14   them, or would there be, like, one reference, or
15   did it vary?
16        A.   We would each have our own copy, yeah.
17        Q.   All right.
18        A.   Currently, it's all digital, so that
19   simplifies everybody having a copy.
20        Q.   For sure.
21        A.   Yeah.
22        Q.   When did that change happen?  Do you
23   remember at all?
24        A.   No, I don't remember.  I know -- I feel
25   like I'm left in the dust, you know, on that one.
```
47

1           And so in that box, where it says, "The
2    governing body has approved the recommendations,"
3    what's your understanding of what the governing
4    body's role was there?
5        A.   Apparently they review this -- and, well,
6    there is something here about what you read earlier
7    that maybe they'd have -- would draw them to ask
8    more questions, perhaps.  I don't know.  But on
9    this form it didn't look like there was any
10   questions that they came up with, so they approved
11   it.
12       Q.   And is it your understanding that the
13   governing body is the one who approves the
14   appointment of others?
15       A.   I suppose so.
16       Q.   And I understand that that's what this
17   says, but I'm asking for was that -- is that your
18   understanding?
19       A.   I don't know personally if they read this
20   themselves.  I don't know.  I have no idea.  But
21   they obviously take responsibility for putting a
22   stamp on it.
23       Q.   And so when you say "they" --
24       A.   The governing body, I was referring to.
25       Q.   And -- okay.  And so the -- do you

74

Thomas Meyers

```
 1  have a reason, so --
 2      Q.   In the nineties?
 3      A.   In the nineties, yeah.  So what we would
 4  tell them -- we -- I mean, I think I only know of
 5  one case, and the one we're dealing with, you know,
 6  period.  I think what we told them was that they're
 7  free to do it, but we wouldn't stop them or get in
 8  their way if they wanted to report it.  But today
 9  we report it.
10      Q.   And when you say, "we," you mean the
11  Elders?
12      A.   The Elders, yeah.
13      Q.   But in the nineties, that was not the
14  case?
15      A.   Correct.
16      Q.   And why was that not the case then?
17      A.   Like I said is -- they may have wanted to
18  keep it to themselves, not involve the authorities.
19      Q.   And I appreciate that explanation.  What I
20  was asking is do you know why the policy changed is
21  what I'm asking?
22      A.   No.
23      Q.   Whose policy was it?  Was it the Hardin
24  congregation policy?
25      A.   No, no, no.  It was the Watchtower Bible
```

88

Thomas Meyers

```
 1  and Tract Society of New York.
 2       Q.   Okay.  That was the -- in the nineties, it
 3  sounds like, the policy as you understood it from
 4  Watchtower was report it if the victim -- or if the
 5  victim wants to report it, they can.
 6       A.   Yeah, and we wouldn't get in their way or
 7  there would be no whatever, repercussions or
 8  anything like that.
 9       Q.   But it would be up to them --
10       A.   It would be up to them, right.
11       Q.   And now the Elders report reports of child
12  abuse.
13       A.   Correct.
14       Q.   Is that right?
15       A.   Correct.
16       Q.   Do you know what the policy was prior to
17  you becoming an Elder?
18       A.   No.
19       Q.   Do you have an understanding of why the
20  policy -- why Watchtower's policy changed?
21       A.   No.  Not in any kind of authoritative way.
22  I would assume it had -- you learn from experience
23  that maybe the other policy didn't work so you
24  adjust it.
25       Q.   And in the nineties, were you as an Elder
```

89

```
 1                  Do you understand what that means?
 2        A.    I believe so.
 3        Q.    And what's your understanding?
 4        A.    Well, whoever the offended would be could
 5   sue you if you, you know, told the public or people
 6   in the public about their personal information.
 7   That's my understanding anyway.
 8        Q.    Okay.  And let's jump to the last sentence
 9   of that paragraph on Exhibit 12.  "These
10   possibilities underscore," and then it's bolded,
11   "the need for Elders to be discerning and to follow
12   carefully directions provided by the Society."
13                  Did I read that right?
14        A.    Yes.
15        Q.    And was that your experience as an Elder?
16        A.    Yes.
17        Q.    Did you follow the Society's directions
18   carefully?
19        A.    Did the best we could.  Or I did the best
20   I could.  I'm answering for myself there, I guess.
21        Q.    I -- yeah, let's keep going with this
22   Exhibit 12.  The last paragraph here, there's a
23   heading that says, "What to Do in Specific Cases,
24   A.  Judicial Committee Matters."
25                  Do you see that?
```

93

```
 1  how to go about this?
 2      A.   Well, because the -- the -- I don't know,
 3  call it a crime, you know, because of the stuff
 4  that happened, was kind of old, you know.  It was
 5  decades old.  We needed to get some direction,
 6  because the direction we had basically was, you
 7  know, if this happened in recent -- last couple,
 8  three years, you know, we're talking a couple,
 9  three decades, so we needed to get some kind of
10  information what to do about it.
11      Q.   And were you ever trained how to talk to
12  victims of -- child victims of sexual abuse?
13      A.   In general terms, yeah.
14      Q.   By whom?
15      A.   We'd go to these Elder schools.  There's
16  things in The Watchtower and Awake! too on that.
17      Q.   So you turned to The Watchtower and Awake!
18  and go to some conferences?
19      A.   Yeah.
20      Q.   And what did you -- what did you learn
21  specifically?
22      A.   To not do all the talking.
23      Q.   Did you learn the process of taking
24  interviews and talking to victims of abuse?
25      A.   Try to draw them out, get the facts, and
```

130