Robert L. Stepans
Ryan R. Shaffer
James C. Murnion
Victoria K.M. Gannon
Meyer, Shaffer & Stepans, PLLP
430 Ryman Street
Missoula, MT  59802
Tel: (406) 543-6929
Fax: (406) 721-1799
rob@mss-lawfirm.com
ryan@mss-lawfirm.com
james@mss-lawfirm.com
katy@mss-lawfirm.com

Matthew L. Merrill (appearing *pro hac vice*)
Merrill Law, LLC
1401 Delgany Street, #404
Denver, CO  80202
Tel: (303) 947-4453
matthew@merrillwaterlaw.com

*Attorneys for Plaintiffs*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## BILLINGS DIVISION

| | |
|---|---|
| TRACY CAEKAERT, and CAMILLIA MAPLEY, | ) Case No. CV-20-52-BLG-SPW |
| Plaintiffs, | ) **PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR SANCTIONS RE: DEPOSITIONS OF GARY BREAUX AND ALLEN SHUSTER** |
| vs. | ) |
| WATCHTOWER BIBLE AND TRACT SOCIETY OF NEW YORK, INC., and WATCH TOWER BIBLE AND TRACT SOCIETY OF PENNSYLVANIA., | ) |
| Defendants, | ) |

///

///

///

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................1

BREAUX AND SHUSTER ...........................................................................2

PRE-DEPOSITION OBSTRUCTION .........................................................5

OBSTRUCTION DURING THE DEPOSITIONS ......................................6

   1.  Obstruction of Evidence About the U.S. Branch Committee ........................6

   2.  Shuster Lies About the Appointment Process for Local Elders....................8

   3.  Obstruction of Evidence About the Organization's Policies for Handling
       Reports of Child Sexual Abuse ...................................................................10

   4.  Obstruction of Evidence Related to WTNY, WTPA, and CCJW................14

   5.  Obstruction of Evidence About the Service Department ............................19

ARGUMENT ..............................................................................................22

   1.  Sanctions for Pre-deposition Conduct ........................................................22

   2.  Sanctions for Obstruction / Deception During the Depositions ..................23

      a.  Breaux and Shuster are dishonest about the U.S. Branch Committee.....23

      b.  Lies and obstruction regarding the Governing Body's role in the
           appointment of elders. ...............................................................................24

      c.  Shuster and Breaux are dishonest about the Organization's policies for
           handling allegations of child sexual abuse..............................................25

      d.  Breaux and Shuster are dishonest about what the Organization's
           corporations do. ........................................................................................26

      e.  Shuster is not candid regarding what the Service Department does........27

WTNY'S CONTROL OVER BREAUX AND SHUSTER ...................................27

SANCTIONS ..............................................................................................28

**Plaintiffs' Brief in Support of Motion for Sanctions re: Depositions of Gary Breaux and Allen Shuster**
*Caekaert and Mapley v. Watchtower Bible Tract of New York, Inc., et. al.*

i

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Alexander v. Caraustar Indus., Inc.,*
  930 F. Supp. 2d 947 (N.D. Ill. 2013).................................................................. 28

*Chamberlain v. Les Schwab Tire Ctr. of California, Inc.,*
  No. 2:11-CV-03105-JAM, 2012 WL 6020103 (E.D. Cal. Dec. 3,
  2012)  .....................................................................................23, 24, 25, 26, 27

*Combs v. Rockwell Int'l Corp.,*
  927 F.2d 486 (9th Cir. 1991)............................................................................. 23

*Da-Silva v. Smith's Food & Drug Centers, Inc.,*
  No. 2:12-CV-00595-GMN, 2013 WL 2558302 (D. Nev. June 8,
  2013) ................................................................................................ 23, 24, 25, 26

*Dotson v. Bravo,*
  202 F.R.D. 559 (N.D. Ill. 2001) ....................................................................... 29

*Pope v. Fed. Exp. Corp.,*
  138 F.R.D. 675 (W.D. Mo. 1990) ...................................................................... 29

*Primus Auto Fin. Serv.s, Inc. v. Batarse,*
  115 F.3d 644 (9th Cir. 1997)............................................................................. 22

*Sell v. Country Life Ins. Co.,*
  189 F. Supp.3d 925 (D. Ariz. 2016)................................................. 23, 26, 27, 28

*U.S. v. Norman,*
  87 F. Supp 3d 737 (E.D. Pa. 2015)............................................................... 23, 27

*United States v. Associated Convalescent Enterprises, Inc.,*
  766 F.2d 1342 (9th Cir. 1985)........................................................................... 22

*United States v. Mandujano,*
  425 U.S. 564 (1976).......................................................................................... 28

## <u>Statutes</u>

28 U.S.C. § 1927.................................................................................................... 22

**Plaintiffs' Brief in Support of Motion for Sanctions re: Depositions of Gary Breaux and Allen Shuster**
*Caekaert and Mapley v. Watchtower Bible Tract of New York, Inc., et. al.*

ii

Plaintiffs, by and through counsel, respectfully submit the following brief in support of their Motion for Sanctions Re: Depositions of Gary Breaux and Allen Shuster.

## INTRODUCTION

Gary Breaux ("Breaux") and Allen Shuster ("Shuster") are two of the most senior, experienced, and knowledgeable figures within the Jehovah's Witnesses' Organization ("Organization").  Both men sit atop the Organization's U.S. operations, work with the Organization's Governing Body, have sat as Directors and Officers of its corporations, and sit on the U.S. Branch Committee.  They have both also been designated by the Defendants to testify about the Organization's policies regarding child sexual abuse.  As WTNY told this Court, "[their] responsibilities in connection with the faith have only increased" in recent years. ECF No. 160 at 18.

Defendants did not want Plaintiffs to depose Breaux or Shuster and acted in bad faith to try and block their depositions.  *See* Ord. at 13-15, ECF No. 268. When that failed, the WTNY Legal Department provided Breaux and Shuster a lawyer who worked in conjunction with WTNY's counsel to ensure that Breaux and Shuster would not provide meaningful information on key topics during their depositions.  By way of example:

➢ Shuster, who by all objective evidence knows the Organization's policies on child sexual abuse better than nearly anyone else - and who previously appeared at a deposition about those policies with a book titled *Historical Development of Jehovah's Witnesses' Child Abuse Policy* - testified in this case that he was "not aware" of any such policies and did not even know what the word "policy" meant.

➢ Breaux, who has served on the Branch Committee for over a decade and was previously an officer and director of WTNY, pretended to know nothing about both and refused to provide meaningful information about how the Organization's entities operate.

The intentional obstruction and obfuscation that occurred both before and during the Shuster and Breaux depositions was premeditated and intended to prevent Plaintiffs from obtaining evidence they are legally entitled to discover.

## BREAUX AND SHUSTER

Breaux and Shuster both have extensive knowledge of the Organization's inner workings and its policies regarding child sexual abuse:

➢ Breaux has been a Jehovah's Witness since 1956, and an elder (clergy) since 1972.  Ex. A, Breaux Dep., 16:21-24, 25:24-26:4.

➢ Breaux was appointed as a Circuit Overseer from 1975 to 1981, and again from 1986 to 1994 and travelled to Montana to take part in a regional convention.  Ex. A at 64:4-22, 161:20-163:8

➢ Breaux moved to the Jehovah's Witness headquarters in approximately 1994 to work in the Service Department.  Ex. B, *Does I-IV* Breaux Aff., ¶ 3.

➢ In 2007, Breaux was appointed as the "Overseer" of the Service Department. Ex. C, *Does I-IV* Breaux Dep. at 7:2-10.

➢ Breaux is a designated "helper" to the Governing Body and meets with them consistently.  Ex. A at 88:18-89:14

➢ Beginning in 2008, Breaux was Director, Assistant Secretary, and Assistant Treasurer of WTNY.  Ex. B at ¶ 6.

➢ Breaux is presently a voting member and the Vice President of the Christian Congregation of Jehovah's Witnesses ("CCJW").  Ex. A at 96:14-16, 96:24-97:12.

➢ Shuster has been an Elder since 1979. Ex. D, *Dorman* Shuster Dep., 9:3-6.

➢ Shuster began working at the U.S. Branch Office in 1976, and in 1981, began working in the Service Department. Ex. E, *Doe* Shuster Dec., ¶ 3.

➢ In approximately 2001, Shuster was appointed the Assistant Overseer of the Service Department. Ex. F, *Doe* Shuster Dep.,13:8.

➢ Shuster is currently serving as the President of the CCJW. Ex. G, Shuster Aff., ¶ 4.

➢ Breaux and Shuster have been instructors at the Kingdom Ministry School, which trains local congregation elders on the Organization's policies and procedures.  Ex. H, *Rodriguez* Breaux Expert Designation, 2; Ex. D at 16:16-19.

➢ Breaux and Shuster are currently voting members of WTNY.  Ex. A at 108:7-13, Ex. I, Shuster Dep., 200:21-201:5.

➢ Breaux and Shuster are currently voting members of WTPA.  Ex. A at 96:17-23, Ex. I at 201:22-202:3.

➢ Breaux and Shuster are currently members of the Branch Committee. Ex. A at 114:23-24, Ex. I at 185:5-7.

➢ In 2005, Breaux was designated by both WTPA and WTNY as the person most knowledgeable ("PMQ") to testify to, *inter alia*, "all policies that the Jehovah's Witnesses organization had for handling accusations and proof of child sexual abuse from 1970 to the present."  Ex. J, *Charissa* Schnack Dec.; Ex. K, *Charissa* PMQ Dep. Notice.

➢ Breaux was a corporate designee for WTNY in a 2006 Washington case concerning child sexual abuse during the 1980s and 1990s.  Ex. L, *Vigue* Disclosure of Witnesses.

➢ Breaux was designated by WTNY as an expert on the procedures that the Organization instructs local congregations to follow regarding allegations of child sexual abuse.  Ex. H.

➢ Shuster was designated by WTNY as the PMQ regarding policies and procedures of the Jehovah's Witnesses, including those regarding child sexual abuse.  Ex. D at 6:7-20.

➢ Shuster was designated by WTNY as an expert on behalf of the Jehovah's Witnesses on their policies and procedures.  Ex. D at 6:7-20, 64:16-19, 116:25-117:19.

➢ In 2012, Shuster was designated as the PMQ by WTNY on certain All Bodies of Elder Letters outlining the Organization's policies for handling accusations of child sexual abuse, the Corporate Administrative Structure and Managerial Staff Functions.  Ex. F at 6:14-11:7.

## PRE-DEPOSITION OBSTRUCTION

Defendants' effort to obstruct the Breaux and Shuster depositions began in October of 2022 when they represented that all communication regarding the deposition should go through Defendants' counsel.  During this time, Defendants moved on Breaux's and Shuster's behalf to try and stop the depositions from happening.  After representing Shuster's and Breaux's interests for nearly a year, Defendants switched course, provided them a new lawyer, and asserted that

Plaintiffs would need to serve subpoenas for the depositions.  As the Court noted, WTNY's "bait and switch" was in bad faith and violated their duty of candor to Plaintiffs and the Court.  *See* Ord. at 13-15, ECF No. 268.[1]

## OBSTRUCTION DURING THE DEPOSITIONS

WTNY's Legal Department hired attorney Margaret Korgul to represent Breaux and Shuster.  Breaux had been instructed to avoid answering questions by stating he did not want to go into certain subjects.  When that failed, he testified that he knew nothing about subjects he was intimately familiar with.[2]  With Shuster, WTNY's lawyers objected to questions they did not want him to answer and he would then give a non-responsive answer, often pretending not to know basic things he has substantial personal knowledge of.[3]

### 1. Obstruction of Evidence About the U.S. Branch Committee

Breaux's testimony about the U.S. Branch Committee - which he has sat on since 2007 - highlights his repeated tactic of attempting not to answer and then pretending to know nothing:

---

[1] Plaintiffs have not previously sought sanctions for this sanctionable conduct that resulted in needless litigation and motions.

[2] Breaux used the tactic of refusing to answer and then claiming he had no knowledge of topics he has substantial personal knowledge of at least 11 times. Ex. A at 18, 20, 47, 61-62, 75, 78-79, 106, 141, 145, and 158.

[3] This pattern happened over thirty times in Shuster's deposition. Ex. M, Index of Nonresponsive Answers.

> Q. And do you have an
> understanding of, based on your person
> knowledge, what the U.S. Branch Committee
> does?
> A. I don't know. Limited
> knowledge.
> Q. Please.
> A. They -- some individuals will
> care for the health of the Bethel family;
> that's basically care for the buildings.
> Q. So it sounds like they have
> decision-making authority about spending
> money to fix the buildings?
> A. Well, I -- I -- I don't know.
> I don't know. I'm not experienced in that.
> I'm not going to go into that area.
> Q. All right. Anything else that
> you have person knowledge about what the
> U.S. Branch Committee does?
> A. No, I don't.
> Q. And do you know -- do you have
> an understanding of to whom the U.S. Branch
> Committee reports?
> A. No, I don't.
> Q. Do you know if they report to
> the Governing Body?
> A. No, I don't. I don't know if
> they report to the Governing Body.
> Q. Do you have an understanding
> whether the Governing Body has authority
> over the Branch Committee?
> A. No, I do not.

Ex. A at 52:5-53:16.

Shuster likewise pretended to know nothing about the relationship between

the Branch Committee and the Governing Body despite serving on the Branch

Committee for the past 11 years:

> Q. What is the relationship
> between the Branch Committee and the
> Governing Body?
> A. I don't think I can define it.
> I don't know.
> Q. Is the Branch Committee a
> subset of the branch?
> MS. KORGUL: Objection to the
> form.
> A. Yeah. I don't know.

Ex. I at 65:14-18, 186:13-17.  Both men serve on the U.S. Branch Committee and

know what the Committee does and who it reports to.

## 2. **Shuster Lies About the Appointment Process for Local Elders**

While much remains unclear about the operation of the Jehovah's

Witnesses' Organization, the documents and testimony from other cases make one

thing clear: the Governing Body acted through WTNY to approve the appointment

of local elders during the 1970s, 1980s, and 1990s.  The Hardin Congregation elder

appointment forms are unambiguous:

> The Governing Body has approved the above
> recommendations as indicated by the Watchtower
> Society stamp below.  The date stamped below
> constitutes the date of appointment.

*See, e.g.,* ECF No. 332-8 at 5-8; *see also* ECF No. 318 at 38-40.  Shuster testified

previously that the appointment of elders was approved by "representatives of the

governing body."  Ex. D at 45:22-47:14.  In that same case, he also swore under

oath that in the 1970s through the 1990s it was the Service Department that

approved the recommendation of elders appointments which was then

communicated by WTNY.  Ex. N, *Dorman* Shuster Aff. at ¶¶ 43-44.

Despite all of this, and in a clear attempt to obstruct Plaintiffs' discovery of

facts in this case, WTNY's lawyers inappropriately coached Shuster and obstructed

his testimony about the elder approval process:

> Q. Well, I think you've previously
> testified, for example, that the Governing
> Body approved the selection of elders
> during certain periods of history in the
> Jehovah's Witness --
> MS. KORGUL: I will object to
> this.
> MR. TAYLOR: Objection.
> MS. KORGUL: I don't even --
> MR. TAYLOR: He didn't say
> that.
> MS. KORGUL: -- know where
> you're saying this from.
> MR. TAYLOR: Where was that at?
> MS. KORGUL: What are you
> talking about?
> Q. You can answer the question.
> MS. KORGUL: No, no.
> MR. TAYLOR: Objection.
> MS. KORGUL: Objection.
> Totally inappropriate.
> Q. You can answer the question.
> A. No.
> MR. SHAFFER: For the record,
> Joel Taylor just looked at the
> witness and shook his head no, and
> the witness answered no.
> A. Well, no from the standpoint
> I -- I don't quite understand the question.
> MR. TAYLOR: Just --

> A. If you could --
> MR. TAYLOR: -- for the record,
> this is Mr. Taylor. I was not
> signalling anything to anyone. I was
> just objecting to his statement,
> which clearly was not a statement
> made on the record at the deposition
> 10 today.
> 11 MS. KORGUL: All right. I will
> 12 direct the witness not to answer this
> 13 question.

Ex. I at 70:11-72:13.  The instruction not to answer by the Shuster's WTNY

lawyer was impermissible and intended to obstruct critical testimony about the

elder appointment process.  Shuster then went on to testify dishonestly and

contrary to his prior testimony about the Governing Body's and Service

Department's role in the approval of local elder appointments.  Ex. I at 74:10-

75:18.

### 3. <u>Obstruction of Evidence About the Organization's Policies for Handling Reports of Child Sexual Abuse</u>

Plaintiffs have alleged that the Defendants instituted policies that local

congregations (including the Hardin Congregation) were required to follow for the

handling of child sexual abuse allegations.  Pls.' First Amend. Comp., ¶¶ 18-27,

ECF No. 22.  Both Shuster and Breaux have testified previously about these

policies.  In two separate cases in 2012, Shuster was designated as the "person

most qualified" on behalf of WTNY regarding the Organization's child sexual

abuse policies.  Ex. D at 6:7-20; Ex. F at 6:14-11:7.  He was also designated as an

expert witness on behalf of WTNY regarding the same.  Ex. D at 6:7-20, 64:16-19,

116:25-117:19.  In the *Dorman* case, Shuster appeared at his deposition with a

document titled the *Jehovah's Witnesses' Child Abuse Policy*, and stated the

following about it:

> It is a document that shows the evolution or the development of the
> policies from, I think, back in the '60's until the current time, how we
> have endeavored to improve on our child abuse policies in order to
> protect our children and to help parents, to educate parents on the
> dangers of child abuse and how to deal with situations where the
> reality is that it happens.

Ex. D at 94:9-95:7.[4]

However, in this case, Shuster pretended to not understand the word

"policy" and would say nothing about the Organization's child sexual abuse

policies:

> Q. Do you have any knowledge of
> specific policies or procedures related to
> handling allegations of child sex abuse
> within the religious organization of
> Jehovah's Witnesses prior to 1981?
> **MS. KORGUL: I will object to
> the form, specifically, policies --
> the word -- use of the word policies.
> You can answer.**
> A. I don't know.
> Q. Do you know what the word
> policies means?
> A. I'd have to have it defined.
> Q. Do you have any personal

---

[4] Plaintiffs have requested all of the Defendants' policies regarding child sexual
abuse in discovery but this notebook has not been produced.

> understanding of what a policy is regarding
> how Jehovah's Witnesses handle an
> allegation?
> MS. KORGUL: Objection to the
> form.
> A. I don't know.
> MR. MERRILL: Can I ask you to
> clarify your objection, please?
> **MS. KORGUL: Yeah. The --**
> **yes. Using the word policy. You**
> **haven't established that they have**
> **any policies. In fact, they don't**
> **have policies. So the use of the**
> **word policy is an inappropriate**
> **objection in an inappropriate form.**
> **That's my objection.**
> **It's a religious institution.**
> **It's not a business. It's not an**
> **employer that has policies like**
> **anti-harassment policy or workers'**
> **compensation policy. It's a**
> **religious organization; right?**
> Q. Mr. Shuster, is it correct that
> the religious organization of Jehovah's
> Witnesses does not have any policies?
> A. I am not aware.

Ex. I at 129-130, 169-170.

In a 2003 child sexual abuse case, WTNY designated Breaux as its expert on the Jehovah's Witnesses' "internal policies, practices, and procedures."  Ex. H.  In 2006, WTNY designated Breaux as the PMQ about "any and all policies that the Jehovah's Witnesses organization had for handling accusations and proof of child sexual abuse from 1970 to the present."  Ex. J; Ex. K.  Yet, in this case, Breaux not

only refused to provide his knowledge of these policies, he claimed he was

unaware of them entirely:

> Q. Do you discuss policies and
> procedures?
> MS. KORGUL: Objection to the
> form.
> A. We discuss what would be
> helpful to the field; what kind of problems
> are -- are they dealing with; what are the
> stresses in life; how can we help; where
> can we send missionaries to assist; how can
> we send other individuals that are
> available to go and support local
> congregations.
> Q. Do you discuss policies?
> MS. KORGUL: Objection to the
> form.
> A. In my knowledge, in my
> understanding, there are no policies.

Ex. A at 129:21-130:13.  Breaux then refused to answer, followed by a stunning

lack of memory of things that he has testified to previously:

> Q. Have you ever had any
> information about the handling of child sex
> abuse claims?
> A. Ever?
> Q. Yes.
> A. Currently, I have some
> information.
> Q. And what is that?
> A. I think someone else should
> explain to you service department
> procedures. I'm not here representing
> service department. I'm here representing
> myself.
> Q. And do you have any knowledge,

> personally, about the handling of child sex
> abuse reports in the 1970s?
> A. No, I do not.
> Q. Did you at any point in time?
> A. I do not remember.

Ex, A, at 141:5-23.

### 4. <u>Obstruction of Evidence Related to WTNY, WTPA, and CCJW</u>

Plaintiffs have alleged that for the purposes of this case there were no

meaningful distinctions between the conduct of WTNY and WTPA and sought

testimony from Shuster and Breaux about the Organization's corporate entities.

Breaux, who is currently a voting member of WTNY, and was recently an officer

and a director of the corporation, was asked what WTNY does.  Breaux first

refused to answer:

> well, let me ask you this. I -- are you
> familiar with the Watchtower Bible and
> Tract Society of New York?
> A. Yes.
> Q. What is that?
> A. A legal entity.
> Q. Embellish upon that. What does
> that mean?
> A. I'm not in a position, really,
> to respond to that.
> Q. Okay. Do you know what they
> do? Do you know what that entity does?
> A. I really don't represent them,
> and I -- I really haven't prepared myself
> to answer what they're involved in.

Ex. A at 18:7-21. When reminded that he was testifying based on his personal experience, he said he could not remember what WTNY does:

> Q. I'm asking based on your personal knowledge. That's what you're here to do today.
> Do you have an understanding of what Watchtower Bible and Tract Society of New York does?
> A. As I sit here now, no. Not completely.
> Q. And when you say not completely, I'm asking if you have any idea what that organization does.
> A. No. I don't remember.

Ex. A at 18:22-19:9. It is simply not credible that a current voting member, and former officer and director, of a corporation cannot remember a single thing the corporation does.

Next, Breaux testified that the only thing he knows about WTPA is that it is "international". Ex. A at 19:10-20. Yet, in 2006, he had no problem explaining the details of what WTPA did when the Organization deployed him to support its motion to dismiss. Ex. O, *Vigue* Breaux Dec., ¶6.[5] When asked what CCJW does, Breaux - who is the current Vice President - again resorted to his coached response of refusing to answer:

---

[5] Plaintiffs requested all of Breaux's former sworn statements regarding "the organization of the various Jehovah's Witness entities, departments, and offices over time." This declaration is responsive to that request and was not produced by WTNY; Plaintiffs obtained it from the Court in which it was filed.

> Q. Okay. How about the Christian
> Congregation of Jehovah's Witnesses? Is
> that a term you're familiar with?
> A. It's a legal entity.
> Q. Okay. And are you familiar
> with what they do?
> A. I'm not in a position to
> explain the Christian Congregation of
> Jehovah's Witnesses.
> Q. And why is that?
> A. I'm not representing them. I'm
> representing myself.

Ex. A at 19:21-20:8.  Plaintiffs' counsel again reminded Breaux that he was only there to testify to his personal knowledge and experience.  In an obvious effort to obstruct the deposition, Breaux then asked that every question include that reminder:

> And so when I ask you a
> question, it is based upon your personal
> knowledge. I'm not asking for you to
> represent any other entity. Do you
> understand that?
> A. Would you make that clear every
> time you ask me a question?

Ex., A, at 20:19-25.

Shuster, who is currently a voting member of WTNY and has worked in the Service Department for decades, was asked about WTNY's relationship with the Service Department.  Shuster testified he knew nothing about whether his Service Department worked with either WTNY or WTPA:

> In the years prior to 2001, did
> the service department work with either
> WTNY or WTPA in carrying out its
> operations?
> MS. KORGUL: Objection to form.
> A. I don't know.

Ex. I at 190:24-191:8.  Yet, in prior cases, Shuster had no problem explaining how

WTNY and the Service Department worked together.  Ex. P, *Doe* Shuster Aff., ¶ 3;

Ex. N at ¶ 3; Ex. E at ¶ 3.

When asked whether WTNY authorized the Service Department to use

WTNY letterhead for communication with local congregations, Shuster followed

attorney Korgul's lead and testified that he did not know:

> Q. Were you authorized by WTNY to
> use the letterhead for the letters we just
> discussed in the prior question?
> MS. KORGUL: Objection to the
> form.
> A. That I don't know.
> Q. Did you previously know whether
> or not you were authorized?
> A. No.

Ex. I at 188:12-189:23. But Shuster does know.  According to an affidavit he

signed in this case: "Starting in 1985, I was authorized by the board of directors of

WTNY to communicate with congregations regarding spiritual matters using

WTNY's letterhead."  Ex. G at ¶5.

Next, Shuster, who is the President of CCJW and is the assistant overseer of

the Service Department, could not say whether they had distinct offices:

> Q. Does CCJW have offices that are
> distinct from the service department or the
> branch?
> A. I don't know.
> Q. You're the president of CCJW;
> correct?
> A. Yes.
> Q. Do you have an office as the
> president of CCJW?
> A. I do not.
> Q. Do you perform your duties as
> president of CCJW from your office that
> you've described earlier to me?
> A. Perform duties? What duties?
> Sign papers, perhaps. That's about it from
> my office.
> Q. What other duties do you have
> as president of CCJW?
> A. Constructing the board of
> director meetings. That's not done in my
> office.

Ex. I at 199:21-200:17.  Breaux's and Shuster's testimony about the Organization's

corporations was anything but candid, forthcoming, or honest.  Instead, they

obstructed by either refusing to answer or pretending they knew nothing about the

corporations they run.[6]

---

[6] It cannot be said that either Shuster or Breaux are now infirm or too disconnected
from the Organization to remember anything about its corporations.  To the
contrary, as WTNY's attorneys told this Court when it was arguing they were apex
witnesses, "[their] responsibilities in connection with the faith have only
increased" in recent years.  ECF No. 160 at 18.

**5.  <u>Obstruction of Evidence About the Service Department</u>**

Plaintiffs have attempted to discern through discovery how the Service

Department is related to the corporate defendants.  Breaux, who has worked in the

Department since 1994 and has been the Overseer (i.e. manager) since 2007,

refused to identify anything specific that the Service Department does and resorted

to the Defendants often used, vague phrase *oversee the preaching work*.  Ex. A at

48:2-20.  When asked to discuss the appointment of Circuit Overseers, Breaux

refused to answer:

> Q. Okay. Now, in your role as the
> overseer of the service department, do you
> have any understanding of how circuit
> overseers are appointed?
>  . . .
> A. Yeah. I -- I do not know. I'm
> not prepared to explain all of -- that's
> not...
> Q. And I -- once again here, this
> is based on your personal knowledge. So
> please, if you can, just answer based upon
> that.
> A. No. I -- I -- I don't know.

Ex. A at 61:10-13, 17-24.  Shuster, who has been the Assistant Overseer of the

Department since 2001, refused to describe how he became appointed to that

position and then pretended he did not know what the word appointed meant.[7]  Ex.

I at 63:20-64:14.[8]

Then, in another moment of dishonesty, Shuster testified he didn't know

whether he reports to anyone in his role in the Service Department.  *Id.* at 80:4-7.

When asked this same question in 2012, he answered:

> Q. To whom do you report as your supervisor?
> A. The overseer of the service department.
> Q. And who is that at present?
> A. His name a Gary Breaux.
> Q. Who in turned does Mr. Breaux report to?
> A. It's called the branch committee.

Ex. F at 13:9-14.  Regarding his Service Department duties, Shuster refused to be

candid:

> Q. What are your duties or
> responsibilities as the service department
> assistant overseer?
> MS. KORGUL: I'll object to the
> form of the question.
> A. I think in the affidavit I
> mentioned -- may I refer to it?
> Q. Yes, please.
> A. Well, I work with Kingdom Halls
> in the United States -- that would be one
> responsibility that I have -- and also work

---

[7] Pretending not to understand the definition of commonly used words like "appointed" and "policies" was one Shuster's tactics to obstruct his deposition.

[8] Shuster was also unwilling to describe the process of how he became an Elder, Ex. I at 52:5-24, despite describing it in granular detail in prior testimony, Ex. N at ¶ 38-45.  *See also;* Ex. D at 10:8-11:1.

> with conventions and assemblies.

Ex. I at 66:4-15.  Shuster previously declared under oath that his duties included:

monitoring the organization, functioning, and staffing of congregations; reviewing

qualifications for the appointment of elders and ministerial servants; and providing

spiritual assistance to congregation elders who call or write to the Service

department.  Ex. N at ¶¶ 3-4.  According to the 2018 Branch Organization manual,

the Service Department directs and manages nearly every component of the

Organization's activities from the local congregation level all the way up to the

branch level.  Ex. Q, 2018 Branch Org., 6.8–6-39.[9]  Shuster refused to testify

---

[9] The Service Department: (1) handles all phone calls and correspondence between headquarters and local congregations; (2) handles correspondence between the U.S. Branch and other Branches; (3) receives and maintains reports from Circuit Overseers who visit and report on activities at local congregations; (4) processes recommendations for the appointments of elders and ministerial servants at local congregations; (5) investigates reasons that a person should not be appointed as an elder (such as a valid accusation of child abuse); (6) organizes special committees to handle unusual and complex cases pertaining to the deletion of elders and ministerial servants; (7) processes judicial reports on disfellowshipping and disassociation; (8) assists local congregations with improper deletions of elders and ministerial servants; (9) manages and approves the formation, dissolution, or merging of local congregations; (10) assigns local congregations to particular territories; (11) assigns speakers and assists in organizing regional conventions and circuit assemblies for congregations; (12) maintains files on all of Jehovah's Witnesses that track their preaching and pioneering hour requirements; (13) processes recommendations and communicates approval for the appointment of substitute circuit overseers, including communicating the instructions for the new assignment; (14) investigating accusations of wrongdoing made against circuit overseers; and (15) maintaining correspondence and files of the activities occurring throughout the Branch and local congregations.

honestly and acknowledge these activities of the Service Department.  Ex. I at 66:16-76:23.

## ARGUMENT

### 1.  Sanctions for Pre-deposition Conduct

The Court is authorized to impose sanctions against Defendants and their attorneys for their bad faith, vexatious conduct.  *Primus Auto Fin. Serv.s, Inc. v. Batarse*, 115 F.3d 644, 648 (9th Cir. 1997) (federal courts have inherent authority to sanction parties that act in bad faith or vexatiously); *see also United States v. Associated Convalescent Enterprises, Inc.*, 766 F.2d 1342, 1346 (9th Cir. 1985) (28 U.S.C. § 1927 authorizes federal courts to sanction attorneys who act in bad faith to vexatiously litigate).

The Court has already determined that Defendants' conduct prior to the Shuster and Breaux depositions was:

1. In bad faith;

2. Amounted to a bait and switch; and

3. Violated their duty of candor to the Court, as well as to Plaintiffs.

Ord. at 13-14, ECF No. 268.  Specifically, Defendants' conduct resulted in vexatious and needless motions practice.  *See* ECF Nos. 153, 222, 234, 268.

2. <u>**Sanctions for Obstruction / Deception During the Depositions**</u>

"Federal courts have long recognized that providing false deposition testimony . . . constitutes perjury and, in effect, constitutes fraud on the court." *Da-Silva v. Smith's Food & Drug Centers, Inc.,* No. 2:12-CV-00595-GMN, 2013 WL 2558302, at *2 (D. Nev. June 8, 2013); *see also Combs v. Rockwell Int'l Corp.*, 927 F.2d 486, 488 (9th Cir. 1991).

"[A] lie of omission is still a lie." *U.S. v. Norman*, 87 F. Supp 3d 737, 745 (E.D. Pa. 2015). Failing to disclose material information can constitute perjury. *See, e.g.*, *Chamberlain v. Les Schwab Tire Ctr. of California, Inc.*, No. 2:11-CV-03105-JAM, 2012 WL 6020103, at *4 (E.D. Cal. Dec. 3, 2012). False testimony may also be inferred when circumstantial evidence suggests a witness made a knowing misrepresentation. *Sell v. Country Life Ins. Co.*, 189 F. Supp.3d 925, 940-42 (D. Ariz. 2016).

a. <u>Breaux and Shuster are dishonest about the U.S. Branch Committee.</u>

Breaux did not testify honestly about the U.S. Branch Committee. He has been a member of that Committee for seventeen (17) years. Yet, when asked what the Committee does, he testified he was "not experienced in that" and had only "limited knowledge." This was a lie meant to obstruct Plaintiffs understanding of the U.S. Branch Committee's role in the Organization. Breaux further lied about whether the U.S. Branch Committee reports to the Governing Body. As the 2018

Branch Organization manual makes clear, the U.S. Branch Committee is appointed by and overseen by the Governing Body.  Ex. Q at 1-1, 2-1–2-6.  That same document sets forth the Branch Committee's duties and responsibilities.  Ex. Q at 1-1, 2-1–2-6.  Breaux knew all of this but chose to be dishonest.   This constitutes perjury.  *Da-Silva*, 2013 WL 2558302, at *2; *Chamberlain*, 2012 WL 6020103, at *4.

> b.   Lies and obstruction regarding the Governing Body's role in the appointment of elders.

The deception and obstruction employed by WTNY and its witnesses is particularly clear in Shuster's testimony regarding the Governing Body's role in the elder appointment process.  As this Court has already noted, the Governing Body has the ultimate authority to bar a person from serving in positions of authority within the Jehovah's Witnesses' Organization.  Ord. at 38, ECF No. 318.  The Hardin Congregation elder appointment documents explicitly state that the elder appointments were "approved" by the Governing Body.  Shuster knows all of this and previously testified that the appointment of local elders was done "[b]y representatives of the governing body."  Ex. D at 47:11-14.

Shuster's lack of candor regarding this topic was astonishing, and the inappropriate coaching by WTNY's lawyers was equally alarming.  First, there was no basis to instruct Shuster not to answer; this was plainly unlawful obstruction by WTNY's lawyers.  Second, Shuster's eventual answer was contrary

to his previous testimony on the topic and was plainly dishonest.  This constitutes

perjury.  *Da-Silva*, 2013 WL 2558302, at *2; *Chamberlain*, 2012 WL 6020103, at

*4.

       c.  <u>Shuster and Breaux are dishonest about the Organization's policies for</u>
<u>handling allegations of child sexual abuse.</u>

Shuster's dishonesty about the Organization's policies for handling child

sexual abuse was also shocking.  The same man who has been designated as an

expert and twice designated as the *person most qualified* to testify to the

Organization's policies for handling child sexual abuse - and who appeared at one

of those depositions with a *Jehovah's Witnesses' Child Abuse Policy* notebook -

testified in this case that he did not know of any Jehovah's Witness policies related

to handling allegations of child sexual abuse.  He went so far as to assert that he

did not understand what the word "policy" meant.

The transcript reveals that Shuster's dishonesty was being directed by the

objections/coaching of his WTNY provided attorney, Ms. Korgul.  Ms. Korgul's

position, i.e. that the Jehovah's Witnesses do not have "policies" is a litigation

position of a lawyer that is in contravention of the facts and Shuster's prior sworn

testimony.  While WTNY and Ms. Korgul are entitled to have a litigation position,

they are not entitled to coach their witnesses to offer false testimony to fit that

position.  Shuster knows what the word "policy" means and he knows what the

Organization's policies for handling allegations of child sexual abuse have been

from the 1970s until the present.  As does Breaux, who was also designated previously by the Defendants as an expert and *person most knowledgeable* on these subjects.  Their decision to testify dishonestly on this topic, aided by WTNY's counsel, constitutes sanctionable perjury.  *Da-Silva*, 2013 WL 2558302, at *2; *Chamberlain*, 2012 WL 6020103, at *4.

   d. Breaux and Shuster are dishonest about what the Organization's corporations do.

Defendants have refused to be forthcoming with facts pertaining to how the corporate Defendants fit into the Organization's operations.  WTNY and WTPA have gone to great lengths to withhold this information from Plaintiffs and doubled down at Shuster's and Breaux's depositions.  For example, the corporate Defendants claimed Shuster and Breaux are so important and busy within the Organization's corporations that they cannot sit for depositions and are Apex Witnesses. Yet, when they were finally deposed, Breaux refused to provide answers, and Shuster conveniently knew nothing.  It is inconceivable that Apex Witnesses, who have effectively operated the Organization's corporations for decades, know nothing about those same corporations.  The Court can certainly conclude that Shuster and Breaux's sudden amnesia about the corporations that they have run was dishonest. *See Sell*, 189 F. Supp.3d at 940-42 ("False testimony may also be inferred when circumstantial evidence suggests a witness made a knowing misrepresentation").  "[A] lie of omission is still a lie" and failing to

disclose material information is perjury. *Norman*, 87 F. Supp 3d at 745;

*Chamberlain*, 2012 WL 6020103, at *4.

      e. <u>Shuster is not candid regarding what the Service Department does.</u>

    Plaintiffs have spent years in discovery attempting to understand the role of the

Service Department, and its relationship with the corporate defendants and local

congregations. At a bare minimum, it would follow, that deposing the Overseer

and the Assistant Overseer of the Service Department would provide some answers

to these questions. Yet, once again, Plaintiffs were stonewalled by the deponents

and WTNY's attorneys. The Department's Overseer (Breaux) refused to identify

any specifics, and the Department's Assistant Overseer (Shuster) said he knew

nothing and could only broadly state two of his duties by reading a former

affidavit. Ex. I at 38:15-39:9. The only possible explanation for their inability to

provide any meaningful testimony on topics that they have extensive knowledge of

is a pre-meditated plan to obstruct and deceive. *Sell*, 189 F. Supp.3d at 940-42.

## WTNY'S CONTROL OVER BREAUX AND SHUSTER

    WTNY asserted control over both Breaux and Shuster when they wanted to

prevent Plaintiffs from speaking with them. Order at 13 (ECF No. 268). WTNY's

lawyers had no problem representing their interests when attempting to block their

depositions. *Id*. This is consistent with the control WTNY exerted over both men

in other cases. In 2012, after Shuster had transitioned to his position with CCJW,

WTNY had no problem exerting control over Shuster when it wanted him to be its corporate designee and expert witness about the Organization's policies on handling child sexual abuse.  In 2003 and 2006, after Breaux also transitioned to his role in CCJW, WTNY exerted control over him to be its expert and PMQ on the Organization's policies regarding child sexual abuse.  The only time WTNY has even purported to not have control over Shuster or Breaux was when it wanted to force Plaintiffs to issue out-of-jurisdiction subpoenas for their depositions in these cases.  At all other times, the record establishes that WTNY has had full control over both Breaux and Shuster for depositions.

## SANCTIONS

When a party has committed perjury or a fraud on the court, sanctions may be severe, because this conduct is an affront to the pursuit of justice. *Sell*, 189 F. Supp.3d at 940-42 (striking defendant's answer and entering default judgment); *United States v. Mandujano*, 425 U.S. 564, 576-77 (1976) (the Supreme Court has "without exception allowed sanctions for false statements or perjury."); *Alexander v. Caraustar Indus., Inc.,* 930 F. Supp. 2d 947, 957 (N.D. Ill. 2013) ("[P]erjury strikes at the heart of the integrity of the judicial system."). As one Court aptly noted:

> Permitting this lawsuit to proceed would be an open invitation to
> abuse the judicial process.  Litigants would infer they have everything
> to gain, and nothing to lose, if manufactured evidence is merely
> excluded while their lawsuit continues. Litigants must know that the

courts are not open to persons who would seek justice by fraudulent means.

*Pope v. Fed. Exp. Corp.*, 138 F.R.D. 675, 683 (W.D. Mo. 1990), *aff'd in relevant part*, 974 F.2d 982 (8th Cir. 1992).  Giving perjurious answers during a deposition will support a Rule 37 sanction of dismissal with prejudice.  *Dotson v. Bravo*, 202 F.R.D. 559, 569 (N.D. Ill. 2001), *aff'd*, 321 F.3d 663 (7th Cir. 2003) (dismissing plaintiff's case for providing false and misleading testimony and discovery responses because it "hindered and impeded the orderly and speedy progression of the case," and permitting him to "profit from his deceit" by going to trial to be impeached by his misconduct was inappropriate).

Here, the record is overwhelming that both Breaux and Shuster came to their depositions with one goal: obstruct and deceive.  Their refusal to testify honestly and candidly about matters that they have unparalelled knowledge of was obvious and was aided by the conduct of WTNY retained lawyers (Korgul and Taylor).  Their obstruction and deception violated the law and impeded Plaintiffs' ability to have a fair trial by depriving them of evidence.

The Court has broad discretion to fashion an appropriate remedy for WTNY's bad faith conduct and discovery obstruction.[10]  Plaintiffs request the following relief:

A. WTNY pays an appropriate monetary fine for the 12-month delay it caused in taking the Shuster and Breaux depositions, as well as all costs and fees related to the vexatious litigation caused by its bad faith conduct;

B. The Court concludes that WTNY controlled both Shuster and Breaux before and during the depositions;

C. WTNY pays all costs and fees incurred in the Shuster and Breaux depositions, including but not limited to costs of travel, court reporter and videographer costs, and attorney fees for all time spent preparing, travelling, and taking the depositions;

D. The Court deems the following facts admitted with corresponding jury instructions:

1) Breaux and Shuster testified dishonestly during their depositions about their knowledge of the Organization's

---

[10] The law of this Circuit authorizes the Court to impose severe, even dispositive, sanctions for the type of conduct at issue herein, i.e. perjury.  Plaintiffs will be requesting such relief as part of a subsequent motion seeking relief for WTNY's four-year pattern of deception and discovery obstruction, which includes perpetuating the dishonest testimony of Shuster and Breaux.

policies for handling child sexual abuse during the relevant time period;

2) Breaux and Shuster testified dishonestly during their depositions about their knowledge of the Defendants' role in the Jehovah's Witness Organization during the relevant time period;

3) Shuster testified dishonestly during his deposition about his knowledge of how local elders were appointed during the relevant time period; and

4) During the relevant time period WTNY and WTPA had corporate policies for handling reports of child sexual abuse at local congregations, including policies that required local elders to keep such reports confidential.

E. Any other relief that the Court deems just to remedy the discovery abuses at issue herein.

DATED this 18th day of April, 2024.

By: /s/ Ryan Shaffer
Ryan R. Shaffer
MEYER, SHAFFER & STEPANS PLLP

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Local Rule 7.3(d)(2), Plaintiff hereby certifies that this brief complies with the length requirement for briefs, and that this brief contains 6,471 words, excluding the caption, certificates of service, and compliance, table of contents, and authorities, and exhibit index.

By: <u>/s/ Ryan Shaffer</u>
  Ryan R. Shaffer
  MEYER, SHAFFER & STEPANS PLLP

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

Pursuant to Local Rule 1.4, this document has been served on all parties via electronic service through the Court's Case Management/Electronic Case Filing (CM/ECF) system.

By: <u>/s/ Ryan Shaffer</u>
  Ryan R. Shaffer
  MEYER, SHAFFER & STEPANS PLLP

*Attorneys for Plaintiffs*