*Exhibit B*

**LIST OF WITHHELD AFFIDAVITS AND DECLARATIONS**

| CASE | DOCUMENT |
|---|---|
| Charissa 26-22191 Napa County Superior Court | 1/26/2004 Second Affidavit of Richard E. Abrahamson Filed on 2/2/2004 with WTPA's Supplemental Memorandums of Points & Authorities in Support of Motion to Quash. |
| Charissa 26-22191 Napa County Superior Court | 3/11/2005 Declaration of Robert J. Schnack in Support of Watch Tower Pennsylvania's Response in Opposition to Motion to Compel Discovery |
| Charissa 26-22191 Napa County Superior Court | 10/14/2005 Declaration of Mario F. Moreno Filed on 10/19/2005 – I think this was filed in Support of the Church Defendants' Motion to Stay Execution of Order to Produce Documents Pending Writ |
| Charissa 26-22191 Napa County Superior Court | 9/27/2006 Declaration of Mario F. Moreno, Esq., in Support of Opposition to Plaintiffs' Motion to Compel PMK Deposition and Document Request Regarding the Watchtower Legal Department |
| Charissa 26-22191 Napa County Superior Court | 9/27/2006 Declaration of Robert Schnack, in Support of Opposition to Plaintiffs' Motion to Compel PMK Deposition and Document Request Regarding the Watchtower Legal Department |
| Charissa 26-22191 Napa County Superior Court | 9/29/2006 Declaration of Arturo Almanza in Support of Defendants' Opposition to Plaintiffs' Motion to Compel Deposition and/or Motion for a Protective Order Regarding the Woodland Elders |
| Charissa 26-22191 Napa County Superior Court | 9/29/2006 Declaration of J. Gary Hayes in Support of Defendants' Opposition to Plaintiffs' Motion to Compel Deposition and/or Motion for a Protective Order Regarding the Woodland Elders |
| Charissa 26-22191 Napa County Superior Court | 9/29/2006 Declaration of Arvid W. Kron Filed on 9/29/2006 with Church Defendants' Memorandum of Points and Authorities in Opposition to Plaintffs' Motion to Compel PMK Deposition and Document Request Regarding General Discovery Matters (Discovery Motion No. 2) |
| Charissa 26-22191 Napa County Superior Court | 9/29/2006 Declaration of David W. Becker Filed on 9/29/2006 with Church Defendants' Memorandum of Points and Authorities in Opposition to Plaintffs' Motion to Compel PMK Deposition and Document Request Regarding General Discovery Matters (Discovery Motion No. 2) |
| Doe (TX) DC-14-12402 Dallas County District Court | 3/6/2015 Affidavit of Hernan Steele Filed on 3/6/2015 with Defendant's Motion to Allow Filing of Affidavit in Support of Claims for Privilege |

## LIST OF WITHHELD AFFIDAVITS AND DECLARATIONS

| | |
|---|---|
| Doe (TX)<br>DC-14-12402<br>Dallas County District Court | 6/26/2015 Affidavit of Records Custodian (Richard Ashe, Jr.)<br>Filed on 6/26/2015 with Defendants' Amended Traditional Motion for Summary Judgment on Jane Doe I's Claims |
| Dorman<br>37-2010-00092450<br>San Diego Superior Court | 5/2/2011 Affidavit of Richard Ashe, Jr.<br>Doc. 49 |
| Grafmyer<br>06C15281<br>Marion County Circuit Court | 11/2/2006 Declaration of Merton V. Campbell<br>Filed 11/2/2006 Hard to tell from the docket report and filings but my guess is that this is filed in Support of Defendant's Opposition to Plaintiff's Motion to Compel Production of Documents |
| Grafmyer<br>06C15281<br>Marion County Circuit Court | 9/24/2006 Declaration of Murray Morris<br>Filed on 10/25/2006 with Defendants' Supplemental Memorandum in Opposition to Plaintiff's Motion to Compel Production of Documents |
| Grafmyer<br>06C15281<br>Marion County Circuit Court | 10/23/2006 Declaration of Merton V. Campbell<br>Filed on 10/25/2006 with Defendants' Supplemental Memorandum in Opposition to Plaintiff's Motion to Compel Production of Documents |
| Haggan<br>HNT-L-000336-19<br>Hunterdon County Superior County | 9/20/2019 Certification of Thomas Jefferson, Jr.<br>Filed 9/23/2019 with CCJW's Notice of Motion to Dismiss Plaintiffs' Complaint |
| Ken L.<br>52594<br>Placer County Superior Court | (Undated) Declaration of William E. Blore |
| Lewis<br>2:14-cv-00205<br>Vermont USDC | 10/12/2015 Declaration of Doulgas Chappel<br>Doc. 70 |
| Lewis<br>2:14-cv-00205<br>Vermont USDC | 10/14/2015 Declaration of Matthew Reimann<br>Doc. 70 |
| N.D. (HI Case)<br>1CCV-20-0000390<br>Hawaii First Circuit Court | 1/10/2022 Declaration of Thomas Jefferson<br>Doc. 263 |
| Tabitha H.<br>26-22191<br>Napa County Superior Court | (Undated) Declaration of Arvid W. Kron (Ministerial Servant)<br>Duplicate of the Charissa Declarations but with different caption. |
| Tabitha H.<br>26-22191<br>Napa County Superior Court | (Undated) Declaration of David W. Becker (Elder)<br>Duplicate of the Charissa Declarations but with different caption. |

**LIST OF WITHHELD AFFIDAVITS AND DECLARATIONS**

| | |
|---|---|
| Vigue<br>04-2-02451-4<br>Spokane County<br>Superior Court | 1/27/2005 Affidavit of Alexander W. Reinmueller<br>Doc. 29 |
| Vigue<br>04-2-02451-4<br>Spokane County<br>Superior Court | 10/28/2005 Affidavit of Alexander W. Reinmueller<br>Doc. 59 |
| Vigue<br>04-2-02451-4<br>Spokane County<br>Superior Court | 2/28/2007 Declaration of Gary N. Breaux<br>Doc. 88 |

**FILED**

**SUPERIOR COURT OF CALIFORNIA**
**COUNTY OF NAPA**

FEB 0 2 2004

Clerk of the Napa Superior Court
By: _____
Deputy

| | |
|---|---|
| CHARISSA W. and<br>NICOLE D., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) |
| | ) |
| WATCHTOWER BIBLE AND TRACT<br>SOCIETY OF NEW YORK, INC., et al., | ) |
| | ) |
| Defendants. | ) |

Case No.: 26-22191

---

## SECOND AFFIDAVIT OF RICHARD E. ABRAHAMSON

STATE OF NEW YORK )
                  ) ss.:
COUNTY OF KINGS   )

     I, Richard E. Abrahamson, after being duly sworn, depose and state as follows:

1.    I am over 18 years of age, of sound mind, and competent to make this Affidavit. I have personal knowledge of the matters contained herein, and they are all true and correct.

2.    I am the secretary and treasurer of Watch Tower Bible and Tract Society of Pennsylvania ("Watch Tower PA"), who is a Defendant in this proceeding.

3.    Watch Tower PA coordinates the worldwide activities of Jehovah's Witnesses by providing copyrighted literature (text and images for various publications) and financial support. Historically, Watch Tower PA has also given powers of attorney to individuals in foreign countries to act on its behalf where the national laws require the appointment of a "chief" religious person. Few, if any, foreign countries now have such requirements.

4.    In most countries where Jehovah's Witnesses are legally recognized, a local corporation has been formed to be legally responsible for the various appointments of individuals and is used to communicate with congregations in that country.

- 1 -

1350

CAEKAERT/MAPLEY 006377

5.  Watch Tower PA has never acted in a supervisory capacity to any congregation in the United States, other than providing infrequent spiritual direction by mail. Additionally, Watch Tower PA has never been responsible for the appointment of individual Elders or others in the United States. Furthermore, Watch Tower PA is not responsible for any assemblies or conventions of Jehovah's Witnesses held in California or in the United States.

6.  Watch Tower PA, as a recognized charity, has received donations from individuals in California. Some of these donations are in the form of real property. In many cases, the individuals have deeded a part of their property to Watch Tower PA, but have retained a life estate in the property donated.

7.  Watch Tower PA administers a fund for the construction of church buildings entitled the Kingdom Hall Fund. Through this fund, Watch Tower PA has provided financial assistance to congregations in the United States and around the world to build their places of worship known as Kingdom Halls and Assembly Halls. In return for the financial assistance, the congregations have executed promissory notes, or some mortgages before 1988, agreeing to pay back the loans.

8.  Watch Tower PA has lent money to congregations in California through its Kingdom Hall Fund to assist in the construction of places of worship and received promissory notes or mortgages in return for the money lent. However, these financing arrangements have been conducted exclusively through the mails and over the telephone.

9.  Watch Tower PA does not hold, and has never held, promissory notes or mortgages from the Napa Congregation of Jehovah's Witnesses in Napa, California, or from the Oak Knoll Congregation of Jehovah's Witnesses in Napa, California.

10. Watch Tower PA administers a fund named the Kingdom Hall Assistance Arrangement ("KHAA"). The KHAA is a fund created from voluntary donations and used for the discretionary purposes of Watch Tower PA. These discretionary purposes include paying for uninsured property damage to Kingdom Halls as well as expenses and liability claims arising from accidents at Kingdom Halls. No premiums have ever been collected for the KHAA. Similarly, the KHAA does not guarantee payment to any person or legal entity that contributes to the fund. Finally, the KHAA has been used by Watch Tower PA in all 50 States in the United States and in many countries around the world.

11. The Watchtower Bible School of Gilead ("School") has been owned and operated by Watchtower Bible and Tract Society of New York, Inc. ("WTNY") since its inception in 1942. The School does not have income, in the classical sense, because students do not pay tuition or other fees. WTNY underwrites all expenses for the School. All invitations to the School have been sent by WTNY to students in the United States and around the world since its inception.

- 2 -

1351

CAEKAERT/MAPLEY 006378

12.    Watch Tower PA maintains its own separate corporate meetings.  Watch Tower PA maintains its own separate corporate books and records.  Members of the Board of Directors and Officers of Watch Tower PA do not sit on any other corporations, including WTNY or Christian Congregation of Jehovah's Witnesses ("CCJW").

13.    Watch Tower PA prepares its own annual financial reports.  These financial reports are prepared separately from all other corporations, including WTNY and CCJW.

14.    Watch Tower PA maintains separate bank accounts from all other corporations.  Watch Tower PA does not commingle funds with any other corporation.

15.    Watch Tower PA has provided funds to other corporations, including WTNY and CCJW.  These funds have been recorded as long-term receivables by Watch Tower PA and long-term payables by the other corporations.  Watch Tower PA has also made gifts to other corporations and recorded them as such.

16.    Watch Tower PA is not held out as liable for the debts of any other corporation, including WTNY or CCJW.

17.    Watch Tower PA occupies WTNY office space under a written lease.  To some extent, some of the same personnel serve all of the corporations in providing legal, accounting, and risk management services.

18.    Watch Tower PA maintains all corporate formalities required by Pennsylvania law.  Watch Tower PA holds annual meetings of members and directors and documents all its meetings (annual, regular, or special), and all significant corporate actions.

SIGNED this the 26th day of January, 2004.

_Richard E. Abrahamson_
Richard E. Abrahamson
Secretary-Treasurer of Watch Tower Bible and Tract Society of Pennsylvania

SUBSCRIBED AND SWORN TO BEFORE ME on the 26th day of January, 2004, to certify which witness my hand and official seal.

_Nanny L. Bland_
Notary Public, State of New York
Nancy L. Bland
Notary Public, State of New York
No. 24-4725296
Qualified in Kings County
Commission Expires February 28, 2027

- 3 -

CAEKAERT/MAPLEY 006379

1

## PROOF OF SERVICE

2      I am a citizen of the United States and am employed in Sacramento County, where this mailing occurs.  My business address is 11335 Gold Express Drive, Suite 105, Gold River, California 95670.  I

3   am over the age of eighteen (18) and not a party to this within cause.

4      On January 30, 2004, the following ordinary business practice., I served the foregoing document(s) described as:

5

6              ## SECOND AFFIDAVIT OF RICHARD E. ABRAHAMSON

7   in the following manner, by placing a true copy(ies) thereof in a sealed envelope(s) addressed as follows:

8   Rudy Nolen
    Nolen Saul Brelsford
9   350 University Ave., Suite 280
    Sacramento, CA  95825

10

11  **XXX**   (BY MAIL)    I caused such envelope(s) with First Class postage thereon fully
            prepaid to be placed in the U.S. Mail in Gold River, California.  I am readily
            familiar with my employer's normal business practice for collection and processing of
12          correspondence and other material for mailing with the U.S. Postal Service, and that practice is
            that said material is deposited with the U.S. Postal Service the same day as the day of collection
13          in the ordinary course of business.

14  ___    (BY FEDERAL EXPRESS)  I caused such envelope(s) to be hand-delivered by
            an authorized Federal Express agent, this date to the office(s) of the addressee(s).
15

16  ___    (BY FACSIMILE)  I caused to be transmitted the aforementioned document,
            via facsimile machine, to each of the above-listed parties' FAX numbers between
17          the hours of 9:00 a.m. and 5:00 p.m. on _____ and received verification of each
            complete transmission.

18
    [ ]    (State)  I declare under penalty of perjury under the laws of the State of California that
19  the above is true and correct.

20  [ ]    (Federal)  I declare that I am employed in the office of a member of the Bar of this Court
    at whose direction the service was made.

21

22      Executed on January 30, 2004, at Gold River, California.

23

24              By   _Michelle A. Tinker_ (signature)
                     Michelle A. Tinker

25

26

27

28

-- 3 --

**SUPPLEMENTAL MEMORANDUM OF POINTS AND AUTHORITIES**
**IN SUPPORT OF MOTION TO QUASH**

1353

CAEKAERT/MAPLEY 006380

| | |
|---|---|
| 1 | Robert J. Schnack, SBN 191987 |
| | BULLIVANT HOUSER BAILEY PC |
| 2 | 11335 Gold Express Drive, Suite 105 |
| | Sacramento, California  95670-4491 |
| 3 | Telephone: 916.852.9100 |
| | Facsimile: 916.852.5777 |
| 4 | E-Mail: bob.schnack@bullivant.com |
| 5 | Attorneys for The Church Defendants |

**FILED**

MAR 1 4 2005

Clerk of the Napa Superior Court

By: _Sara O'Robert_
Deputy

6

7

SUPERIOR COURT OF THE STATE OF CALIFORNIA

8

COUNTY OF NAPA

9

| | |
|---|---|
| 10 | CHARISSA W. and  NICOLE D., |
| | Plaintiffs, |
| 11 | |
| 12 | v. |
| 13 | WATCHTOWER BIBLE AND TRACT SOCIETY OF NEW YORK, INC., et al., |
| 14 | |
| 15 | Defendants. |
| 16 | |
| 17 | |
| 18 | AND COORDINATED CASES |

Case No.: 26-22191 (lead case)

JCCP No. 4374

**DECLARATION OF ROBERT J. SCHNACK IN SUPPORT OF WATCH TOWER PENNSYLVANIA'S RESPONSE IN OPPOSITION TO MOTION TO COMPEL DISCOVERY**

**DATE:       April 8, 2005**
**TIME:        9:30 AM**
**DEPT.:       B**
**TRIAL DATES:  Not yet set**

19

20    I, Robert J. Schnack, declare as follows:

21         1.      I am an attorney licensed to practice law in California and Oregon, a shareholder

22    in the law firm of Bullivant Houser Bailey PC, and one of the attorneys of record for defendant

23    Watch Tower Bible and Tract Society of Pennsylvania ("Watch Tower PA") in these

      coordinated actions.  I make the following statements from personal knowledge.

24
         2.      Attached hereto as Exhibit A is a true copy of defendant Watch Tower PA's
25
      objections and response to plaintiffs' fourth amended notice of PMK deposition.
26
         3.      I personally attended the deposition of Watch Tower PA's designated PMK,
27
      Alexander Reinmueller, on August 25 - 26, 2004. Attached hereto as Exhibit B are true copies
28

– 1 –

DECLARATION OF ROBERT J. SCHNACK

255

CAEKAERT/MAPLEY 006381

1  of excerpts from the transcript of that deposition that are referenced at p.4 of Watch Tower PA's

2  response in opposition to plaintiffs' motion to compel discovery and, subject to the errata sheet

3  submitted by Mr. Reinmueller, I believe those excerpts accurately reflect the testimony given.

4          4.      Attached hereto as Exhibit C are true copies of the documents produced in

5  conjunction with defendant Watch Tower PA's objections and response to plaintiffs' fourth

6  amended notice of PMK deposition (*see* paragraph 2 above) that were identified as Exhibits 39,

7  40, 54, 58, and 59, as referenced in Watch Tower PA's response and opposition papers to

8  plaintiffs' motion to compel discovery. The other documents produced with defendant Watch

9  Tower PA's objections and response to plaintiffs' fourth amended notice of PMK deposition

10  will be made available to court at the hearing or otherwise as may be requested or necessary.

11          5.      I have been personally involved as one of Watch Tower PA's attorney in

12  discovery in these coordinated cases. Through that discovery, plaintiffs have learned the

13  following: Watch Tower PA cooperates with Watch Tower Bible and Tract Society of New

14  York, Inc. and, since the inception of Christian Congregation of Jehovah's Witnesses ("CCJW")

15  in 2000, with CCJW; and Watch Tower PA has provided some funding to Watchtower New

16  York and to CCJW and carries those as long-term receivables.

17          6.      In addition to the discovery noted above in paragraph 5, plaintiffs have

18  "discovered" the following about Watch Tower PA's non-traditional contacts with California:

19  (a) Watch Tower PA holds the copyright to most Jehovah's Witnesses publications.  Those

20  publications are distributed to and used by congregations of Jehovah's Witnesses in the U.S.

21  (including the approximately 1,997 congregations in California) and worldwide, although the

22  actual publishing and distribution is accomplished by other entities; (b) Watch Tower PA

23  administers the Kingdom Hall Assistance Arrangement ("KHAA"), which was started in 1989.

24  KHAA pays some claims on a discretionary basis and provides funds to secure insurance for

25  many congregations of Jehovah's Witnesses in the U.S. (including California).  KHAA is

26  funded by contributions from congregations of Jehovah's Witnesses in the U.S. (including

27  California) and throughout the world. One of the activities of the Risk Management Office is to

28  process claims made to the KHAA; (c) for some period of time prior to the creation of KHAA in

<div align="center">– 2 –</div>

<div align="center">DECLARATION OF ROBERT J. SCHNACK</div>

<div align="center">256</div>

CAEKAERT/MAPLEY 006382

1  1989 and for a few years thereafter, Watch Tower PA purchased insurance policies that

2  provided general liability and certain other insurance coverage to congregations of Jehovah's

3  Witnesses in the U.S. (including California) that chose to participate in the insurance program;

4  (d) Watch Tower PA administers the Kingdom Hall Fund ("KHF"), which was started in 1983

5  and provides loans upon request to congregations of Jehovah's Witnesses in the U.S. (including

6  California) and throughout the world for construction or remodeling of Kingdom Halls (*i.e.*,

7  places of worship for local congregations). There have been about 375 such loans to California

8  congregations since the mid-1980s and, as of the August 2004 PMK deposition, there were 197

9  existing loans to California congregations through KHF.  Congregations of Jehovah's Witnesses

10  in the U.S. (including California) and throughout the world donate funds to the KHF that are

11  used for such Kingdom Hall construction loans; (e)  Watch Tower PA receives monetary

12  donations to its general fund from Jehovah's Witnesses in the U.S. (including California) and

13  worldwide. Watch Tower PA has only received monetary contributions to its general fund from

14  congregations of Jehovah's Witnesses in the U.S. (including the approximately 1,997 California

15  congregations) since September 1, 2001. Prior to that time, U.S. congregations sent monetary

16  contributions to Watchtower New York; (f) Watch Tower PA also receives bequests of real

17  property from Jehovah's Witnesses throughout the U.S., including California. The property

18  bequests from California include burial plots and remainder interests in real property, but Watch

19  Tower PA currently has less than 10 such properties, which include remainder interests in six

20  properties; (g) Watch Tower PA has been used in the past to communicate the Governing

21  Body's spiritual supervision to Branch Committee's of Jehovah's Witnesses throughout the

22  world (there was never a U.S. Branch Committee until about April 2002), but no longer does so

23  and has never done so to the U.S. Branch Committee.  Watch Tower PA has never

24  communicated the appointment of elders and ministerial servants to congregations of Jehovah's

25  Witnesses in the 48 contiguous states of the U.S.

26       I declare under penalty of perjury under the laws of the United States and of the State of

27  California that the foregoing is true and correct upon my knowledge, information and belief.

28

– 3 –

DECLARATION OF ROBERT J. SCHNACK
257

CAEKAERT/MAPLEY 006383

1

Executed this 11th day of March, 2005, at Gold River, California.

2

3

By _____

4

Robert J. Schnack

5

5024601.1

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

– 4 –

DECLARATION OF ROBERT J. SCHNACK

258

CAEKAERT/MAPLEY 006384

1  Robert J. Schnack, SBN 191987
   BULLIVANT HOUSER BAILEY PC
2  11335 Gold Express Drive, Suite 105
   Sacramento, California 95670-4491
3  Telephone: 916.852.9100
   Facsimile: 916.852.5777
4  E-Mail: bob.schnack@bullivant.com

5  Attorneys for The Church Defendants

6

7

**FILED**

OCT 1 9 2005

Clerk of the Napa Superior Court
By: _Nora O'Doherty_
    Deputy

8          SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                         COUNTY OF NAPA

10  CHARISSA W. and  NICOLE D.,          Case No.: 26-22191 (lead case)

11              Plaintiffs,              JCCP No. 4374

12      v.                               **DECLARATION OF MARIO F.**
                                         **MORENO**
13  WATCHTOWER BIBLE AND TRACT
    SOCIETY OF NEW YORK, INC., et
14  al.,

15              Defendants.

16  AND COORDINATED CASES

17

18      I, Mario F. Moreno, declare as follows:

19      1.      I am an attorney and associate general counsel for the Legal Department of

20  Watchtower Bible and Tract Society of New York, Inc. ("Watchtower Legal Department") and

21  in that capacity, from time to time I act and have acted as legal counsel for Watchtower Bible

22  and Tract Society of New York, Inc. ("Watchtower NY") and various congregations of

23  Jehovah's Witnesses, including defendant North Congregation of Jehovah's Witnesses, Red

24  Bluff, California ("North Congregation").  I am legally competent in all respects and make the

25  following statements based on my own personal knowledge.

26      2.      In the coordinated case of *Tim W. v. Watchtower Bible and Tract Society of New*

27  *York, Inc., et al*, the privilege logs attached hereto as Exhibits A and B were earlier served on

28  plaintiff's counsel. With respect to the letters "from Watchtower NY Legal Department to North

RECEIVED

OCT 1 9 2005

Napa Superior Court

                            – 1 –
                    DECLARATION OF MARIO F. MORENO
                                3096

CAEKAERT/MAPLEY 006601

1    Congregation elders" identified in the privilege logs as being dated July 11, 1995, November 3,

2    1995, November 20, 1995, and June 6, 1996, I authored and signed each of those letters in my

3    capacity as an attorney and legal counselor for the North Congregation and Watchtower NY and

4    as associate general counsel for Watchtower Legal Department. Those letters each concerned

5    pre-litigation claims asserted by a California attorney against the North Congregation and

6    others. Both the attorney – client privilege and the attorney work product privilege protect those

7    letters from discovery.

8        3.      The undated handwritten notes prepared by elders in the North Congregation and

9    referenced in the privilege logs concern legal direction provided by me and other attorneys in

10   the Watchtower Legal Department to North Congregation elders during the same time frame as

11   the letters referenced above. The attorney – client privilege and the attorney work product

12   privilege both also protect those notes from discovery.

13       4.      Based on the foregoing, among other reasons, the documents identified in the

14   privilege logs are not subject to discovery in the *Tim W.* case or any other coordinated cases.

15       I declare under penalty of perjury under the laws of the United States and of the State of

16   California that the foregoing is true and correct upon my knowledge, information and belief.

17       Executed on October 14, 2005, at Patterson, New York.

18

19

20                                                    _____
                                                      Mario F. Moreno

21   5033995.1

22

23

24

25

26

27

28

– 2 –

**DECLARATION OF MARIO F. MORENO**
3097

CAEKAERT/MAPLEY 006602

1 | Robert J. Schnack, SBN 191987
2 | BULLIVANT HOUSER BAILEY PC
  | 1415 L Street, Suite 1000
3 | Sacramento, California 95814
  | Telephone: 916.930.2500
4 | Facsimile: 916.930.2501
  | E-mail: bob.schnack@bullivant.com
5 | Attorneys for The Church Defendants
6
7

**FILED**

SEP 2 9 2006

Clerk of the Napa Superior Court
By: _Sora O'Shery_
                    Deputy

8 | SUPERIOR COURT OF THE STATE OF CALIFORNIA
9 | COUNTY OF NAPA

| | |
|---|---|
| CHARISSA W. and NICOLE D., | Case No.: 26-22191 (Lead Case) |
| Plaintiffs, | JCCP No. 4374 |
| v. | **DECLARATION OF MARIO F. MORENO, ESQ., IN SUPPORT OF OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL PMK DEPOSITION AND DOCUMENT REQUEST REGARDING THE WATCHTOWER LEGAL DEPARTMENT** |
| WATCHTOWER BIBLE AND TRACT SOCIETY OF NEW YORK, INC., et al., | |
| Defendants. | |
| | **(DISCOVERY MOTION NO. 3)** |
| | **Hearing Date:** October 13, 2006 |
| | **Time:** 8:30 am |
| | **Dept.:** A |
| | **Before:** Hon. Raymond A. Guadagni |
| AND COORDINATED CASES | |

I, Mario F. Moreno, declare as follows:

1. I am an attorney and associate general counsel for the Legal Department of Watchtower Bible and Tract Society of New York, Inc. ("Watchtower Legal Department"). In that capacity, from time to time I act and have acted as attorney and legal counsel for Watchtower Bible and Tract Society of New York, Inc. ("Watchtower NY") and various

– 1 –

CAEKAERT/MAPLEY 006623

1   congregations of Jehovah's Witnesses, including without limitation the congregation defendant

2   in the Track I cases, North Congregation of Jehovah's Witnesses, Red Bluff, California, and the

3   congregation defendants in the non-Track I cases. I am legally competent in all respects and

4   make the following statements based on my own personal knowledge.

5       2.   Watchtower NY is a not-for-profit religious corporation. The Watchtower Legal

6   Department is and functions as in-house legal counsel for Watchtower NY, similarly to in-house

7   legal departments for private companies and corporations. The Watchtower Legal Department

8   has a number of attorneys who serve as associate general counsel or associate legal counsel in

9   the Legal Department. The Watchtower Legal Department's clients include various corporations

10  of Jehovah's Witnesses in the United States, the Governing Body of Jehovah's Witnesses, the

11  United States Branch Committee, other departments at the United States branch offices in New

12  York, congregations of Jehovah's Witnesses in the United States, including congregations in

13  California, and the elders of those congregations. The Watchtower Legal Department thus has

14  an attorney-client relationship with the United States Service Department and congregations and

15  their elders. The Watchtower Legal Department considers its lawyers' communications from, to,

16  and with the United States Service Department and congregations and their elders to be

17  confidential and privileged under the attorney-client privilege and any other applicable

18  privileges. As a congregation elder and as associate general counsel for the Watchtower Legal

19  Department, it is my understanding and belief that United States Service Department and

20  congregation elders who have communicated with the Watchtower Legal Department attorneys

21  for legal advice consider those communications to be privileged and confidential, and the

22  attorneys in the Legal Department in fact frequently remind the elders that their communications

23  with the Legal Department are privileged and confidential under the attorney-client privilege.

24      3.   There are four blank forms (dated 1989, 1992, 1993, and 1993, respectively)

25  contained in Exhibit 3 to plaintiffs' discovery motion no. 3 concerning the Watchtower Legal

26  Department. Watchtower NY earlier produced each of those forms in discovery, and each was

27  stamped "CONFIDENTIAL" prior to being produced. The Watchtower Legal Department and

28  its attorneys used one of these forms when taking calls from congregation elders who sought

- 2 -

DECLARATION OF MARIO F. MORENO IN SUPPORT OF CHURCH DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION TO COMPEL PMK DEPOSITION AND DOCUMENT REQUEST REGARDING THE LEGAL DEPARTMENT
3504

CAEKAERT/MAPLEY 006624

1  legal advice from the Legal Department on child abuse matters from about July 1989 until about

2  1995. Each of these forms, when used, was completed by attorneys and legal assistants working

3  under the attorneys' legal supervision within the Legal Department after attorneys and their

4  legal assistants obtained information through confidential and privileged communications with

5  congregation elders as clients of the Legal Department. The completed forms are used by

6  attorneys in the Legal Department to assist in providing legal advice to the elders as clients of

7  the Legal Department and document the legal advice given to the congregation elders. Thus, any

8  such completed forms retained in the Legal Department contain confidential and privileged

9  information obtained through confidential and privileged communications between a Legal

10 Department attorney and a client of the Legal Department. As such, disclosure in this litigation

11 or otherwise of any such completed forms or of the information contained in any such

12 completed forms would necessarily result in the disclosure of confidential and privileged

13 communications between a Legal Department attorney and a client of the Legal Department. In

14 addition, disclosure of any summary that might have been prepared by the Legal Department of

15 any of the confidential and privileged information contained in the completed forms would

16 likewise result in the disclosure of confidential and privileged communications between a Legal

17 Department attorney and a client of the Legal Department or potentially of attorney work

18 product information.

19      4.  This Court should not allow plaintiffs to here invade the attorney-client privilege or

20 the work product rule by granting any part of plaintiffs' discovery motion no. 3. To do

21 otherwise would violate and render meaningless the strong public policy considerations

22 underlying the confidential and privileged nature of attorney-client communications, thereby

23 chilling open and frank communications involving legal advice between attorneys in corporate

24 legal departments and their clients, regardless of whether such in-house legal departments are

25 within non-profit religious corporations or within private for-profit companies and corporations.

26 ///

27 ///

28 ///

DECLARATION OF MARIO F. MORENO IN SUPPORT OF CHURCH DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION TO COMPEL PMK DEPOSITION AND DOCUMENT REQUEST REGARDING THE LEGAL DEPARTMENT
3505

CAEKAERT/MAPLEY 006625

1         I declare under penalty of perjury under the laws of the United States and of the State of

2    California that the foregoing is true and correct upon my knowledge, information and belief.

3         Executed on September 27, 2006, at Patterson, New York.

4

5                                Mario F. Moreno

6

7    4227184.1

8                                  *****

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                    – 4 –

CAEKAERT/MAPLEY 006626

1 | Robert J. Schnack, SBN 191987
2 | BULLIVANT HOUSER BAILEY PC
  | 1415 L Street, Suite 1000
3 | Sacramento, California 95814
  | Telephone: 916.930.2500
4 | Facsimile: 916.930.2501
  | E-mail: bob.schnack@bullivant.com

5 | Attorneys for The Church Defendants

**FILED**

SEP 2 9 2006

Clerk of the Napa Superior Court
By: _Sora O'Sherty_
Deputy

8

SUPERIOR COURT OF THE STATE OF CALIFORNIA

9

COUNTY OF NAPA

| | |
|---|---|
| CHARISSA W. and NICOLE D., | Case No.: 26-22191 (Lead Case) |
| Plaintiffs, | JCCP No. 4374 |
| v. | **DECLARATION OF ROBERT J. SCHNACK IN SUPPORT OF CHURCH DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL PMK DEPOSITION AND DOCUMENT REQUEST REGARDING THE WATCHTOWER LEGAL DEPARTMENT** |
| WATCHTOWER BIBLE AND TRACT SOCIETY OF NEW YORK, INC., et al., | |
| Defendants. | |
| | **(DISCOVERY MOTION NO. 3)** |
| | **Hearing Date: October 13, 2006** |
| | **Time: 8:30 am** |
| | **Dept.: A** |
| | **Before: Hon. Raymond A. Guadagni** |
| AND COORDINATED CASES | |

I, Robert J. Schnack, declare as follows:

1. I am an attorney licensed to practice law in California, a shareholder in the law firm of Bullivant Houser Bailey PC, and one of the Church Defendants' attorneys of record in this action. I make the following statements from personal knowledge.

///

-1-

CAEKAERT/MAPLEY 006629

1    2. On behalf of Watchtower Bible and Tract Society of New York, Inc., I

2    prepared and served objections to a notice of 'PMK' deposition that had been served by

3    plaintiffs' counsel. (The designated PMK for that deposition was Gary Breaux, who was

4    deposed on November 15, 2005, as referenced in plaintiffs' supporting memorandum for motion

5    no. 3 at p.2.) The objections asserted included, among others, the attorney - client privilege and

6    the work product privilege, as follows:

7        "[PLAINTIFFS'] REQUEST NO. 4:

8        "A blank or redacted copy of any form(s) used in connection with allegations or proof of

9    child sexual abuse.

10       "[DEFENDANTS'] RESPONSE TO REQUEST NO. 4:

11       "Objection. ... This request ... calls for communications and documents protected by ...

12   the attorney-client and work product privileges.

13       "Subject to and without waiving those objections, ... Defendant Watchtower NY

14   responds as follows: ... and also see attached documents for relevant years.

15   • Redacted Child Abuse Telememo dated 1989.
     • Redacted Child Abuse Telememo dated 1992.
16   • Redacted Child Abuse Telememo dated 1993.
17   • Redacted CM Profile dated 1993."

18       3. The four documents referenced above are the documents included in Exhibit 3 to

19   plaintiffs' discovery motion no. 3 concerning the Watchtower Legal Department. (Those

20   documents are also addressed in the concurrently filed declaration of Mario F. Moreno, Esq.,

21   who is an attorney and associate general counsel with the Watchtower Legal Department.) The

22   Church Defendants thus asserted the attorney-client privilege and the work product privilege in

23   connection with the referenced documents upon their initial production in blank form with a

24   "CONFIDENTIAL" stamp on them. Further, their production in blank form with a

25   "CONFIDENTIAL" stamp on each does not waive, or estop the Church Defendants from

26   asserting, any applicable privileges. E.g., Scripps Health v. Superior Court (2003) 109

27   Cal.App.4th 529.

28       I declare under penalty of perjury under the laws of the State of California that the

CAEKAERT/MAPLEY 006630

1  foregoing is true and correct.  Executed this 27th day of September, 2006, at Sacramento,

2  California.

3                                                   _____

4                                                   ROBERT J. SCHNACK

5

6  4228150.1                                   *****

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

– 3 –

**DECLARATION OF ROBERT J. SCHNACK IN SUPPORT OF CHURCH DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION TO COMPEL PMK DEPOSITION AND DOCUMENT REQUEST REGARDING THE WATCHTOWER LEGAL
DEPARTMENT**

CAEKAERT/MAPLEY 006631

09/29/2006 09:41 FAX @025

1  Robert J. Schnack, SBN 191987
   BULLIVANT HOUSER BAILEY PC
2  1415 L Street, Suite 1000
   Sacramento, California 95814
3  Telephone: 916.930.2500
   Facsimile: 916.930.2501
4  E-mail: bob.schnack@bullivant.com

5  Attorneys for The Church Defendants

# FILED

SEP 2 9 2006

Clerk of the Napa Superior Court
By: _____
Deputy

6

7

8        SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                    COUNTY OF NAPA

10                                          **BY FAX**

11  CHARISSA W. and NICOLE D.,          Case No.: 26-22191 (Lead Case)

12         Plaintiffs,                  JCCP No. 4374

13      v.                              **DECLARATION OF ARTURO
                                        ALMANZA IN SUPPORT OF**
14  WATCHTOWER BIBLE AND TRACT          **DEFENDANTS' OPPOSITION TO**
    SOCIETY OF NEW YORK, INC., et al.,  **PLAINTIFFS' MOTION TO COMPEL
15                                       DEPOSITION AND/OR MOTION FOR A
           Defendants.                   PROTECTIVE ORDER REGARDING
16                                       THE WOODLAND ELDERS**

17                                      **(DISCOVERY MOTION NO. 1)**

18                                      **Hearing Date: October 13, 2006
                                        Time: 8:30 am**
19                                      **Dept.: A**
                                        **Before: Hon. Raymond A. Guadagni**
20

21  AND COORDINATED CASES

22

23      I, Arturo Almanza, after being duly sworn, depose and say:

24

25      1.    That I am over 21 years of age and reside in Woodland, California.

26      2.    That I am a duly ordained minister and elder of the North Congregation of

27  Jehovah's Witnesses, Woodland, California and was formerly an elder in the South

28  Congregation of Jehovah's Witnesses, Woodland, California.

- 1 -
DECLARATION OF ARTURO ALMANZA IN SUPPORT OF CHURCH DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION TO COMPEL DEPOSITION AND/OR MOTION FOR A PROTECTIVE ORDER REGARDING THE WOODLAND
ELDERS

3455

CAEKAERT/MAPLEY 006617

3.      That I am thoroughly familiar with the religious beliefs, teachings, and practices of Jehovah's Witnesses.

4.      That duly ordained ministers of Jehovah's Witnesses responsible for teaching and pastoral care of congregation members are called "elders."

5.      That it is a religious belief and practice of Jehovah's Witnesses based on God's Word, the Bible, that an elder, has a responsibility to provide spiritual counseling to those who seek it, and that any person who needs spiritual help or is aware of another in such need should approach the congregation elders and convey to them whatever information may be needed to provide spiritual assistance to the erring one.—Isaiah 32:2; James 5:14-16; Hebrews 13:17. In addition, for similar reasons, there are times when elders initiate discussions relating to the spiritual condition of congregation members.

6.      That it is the religious belief and practice of Jehovah's Witnesses, based upon Scripture and church tradition, that elders must maintain in strict confidence any church communications with congregants connected with the need for spiritual help or counseling and congregants expect such communications to elders are and will remain confidential—regardless of who initiated the conversation.—Proverbs 15:22; 25:9, 10.

7.      That revealing such confidential communications would call into question an elder's qualifications and could result in his removal as an elder in the congregation.

8.      That if I or any elder is compelled to disclose such confidential information, our credibility and effectiveness as elders would be adversely affected and compromised, since congregants will no longer be able to trust and rely that problems and confidential information they disclose to elders will not be revealed through discovery and used against them in a court action.

-2-

DECLARATION OF ARTURO ALMANZA IN SUPPORT OF CHURCH DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL DEPOSITION AND/OR MOTION FOR A PROTECTIVE ORDER REGARDING THE WOODLAND ELDERS

11115551.tif - 9/29/2006 9:43:36 AM

CAEKAERT/MAPLEY 006618

09/29/2006 09:43 FAX                                                  ⊘027

1       9.     That the requirement of keeping communications to elders confidential is

2   explained in the official publications of Jehovah's Witnesses as follows:

3

4           In each congregation of Jehovah's witnesses there are mature
              ministers appointed to care for various assignments. (1 Tim. 3:2,

5           12) As they discharge their duties they often are told about
              confidential things, and it is essential that they respect this

6           confidence. For instance, James 5:13-16 shows that a member of
              the congregation who has some spiritual problem, perhaps even

7           having committed a sin, should go to the spiritually older men for
              help. Isaiah 32:2 prophetically pictured these men as places of

8           comfort and protection. What a fine thing it is to be able to
              explain one's problem and get balanced spiritual help, and at the

9           same time have full confidence that the matter will not become
              general knowledge in the congregation or community.

10          Those mature ministers will not discuss even with their wives and
             close friends what they thus learn in confidence. They know that

11          if they did so it would undermine respect for their positions; it
             would make individuals hesitant to come to them; yes, in time it

12          might even make it impossible for them to fulfill their role as
             spiritual shepherds.

13   *The Watchtower*, April 1, 1971, p. 223.

14

15       10.    That it is also the religious belief and practice of Jehovah's Witnesses, based

16   upon Scripture and church tradition, to keep congregation files, papers, reports, minutes or other

17   documents prepared in conjunction with, or as a result of, the above-described confidential

18   communications, confidential.

19

20       11.    That if I or any other elder is compelled to produce any papers, reports, minutes

21   or other documents prepared in conjunction with or as a result of the above-described

22   confidential communications, our credibility and effectiveness will be adversely affected and

23   compromised, and the confidentiality of the oral communications will be rendered worthless.

24

25       12.    That I and two other elders from the South Congregation, Woodland, California,

26   met with Tim Silva, a then appointed ministerial servant in the congregation, on or about May 7,

27   1997, so as to provide him spiritual counsel and assistance.  There were no non-clergy or other

28   third persons present during this confidential meeting with Mr. Silva.  Because Tim Silva was

<div align="center">– 3 –</div>

DECLARATION OF ARTURO ALMANZA IN SUPPORT OF CHURCH DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION TO COMPEL DEPOSITION AND/OR MOTION FOR A PROTECTIVE ORDER REGARDING THE WOODLAND
ELDERS

11115551.tif - 9/29/2006 9:43:36 AM

CAEKAERT/MAPLEY 006619

1  an appointed congregation ministerial servant at the time, on or about May 29, 1997, a written

2  and confidential report was sent by the three elders who met with Tim Silva to the elders in the

3  United States Service Department for Jehovah's Witnesses, as required by church practice and

4  procedure, for their review of Tim Silva's spiritual qualifications as a ministerial servant and for

5  any additional spiritual counsel and assistance for Tim Silva or the three elders who met with

6  him.

7

8        I declare under penalty of perjury under the laws of the State of California that the

9  foregoing is true and correct to the best of my information, belief, and knowledge.  Executed

10 this 27 day of September, 2006 at Sacramento, California.

11

12

13                                          Arturo Almanza

14

15

16  4228346.1

17                                    *****

18

19

20

21

22

23

24

25

26

27

28

11115551.tif - 9/29/2006 9:43:36 AM

CAEKAERT/MAPLEY 006620

09/29/2006 09:40 FAX                                                    ☑019

1  Robert J. Schnack, SBN 191987
   BULLIVANT HOUSER BAILEY PC
2  1415 L Street, Suite 1000
   Sacramento, California  95814
3  Telephone: 916.930.2500
   Facsimile: 916.930.2501
4  E-mail: bob.schnack@bullivant.com

5  Attorneys for The Church Defendants

6

7

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                            COUNTY OF NAPA

10                                                            BY FAX

11  CHARISSA W. and NICOLE D.,           Case No.: 26-22191 (Lead Case)

12              Plaintiffs,              JCCP No. 4374

13       v.                             DECLARATION OF J. GARY HAYES IN
                                        SUPPORT OF DEFENDANTS'
14  WATCHTOWER BIBLE AND TRACT          OPPOSITION TO PLAINTIFFS'
    SOCIETY OF NEW YORK, INC., et al.,  MOTION TO COMPEL DEPOSITION
15                                      AND/OR MOTION FOR A
                                        PROTECTIVE ORDER REGARDING
16              Defendants.             THE WOODLAND ELDERS

17                                      (DISCOVERY MOTION NO. 1)

18                                      Hearing Date:  October 13, 2006
                                        Time:  8:30 am
19                                      Dept.: A
                                        Before:  Hon. Raymond A. Guadagni
20

21  ┌─────────────────────────────
    AND COORDINATED CASES
22

23       I, J. Gary Hayes, after being duly sworn, depose and say:

24       1.       That I am over 21 years of age and reside in Esparto, California.

25

26       2.       That I am a duly ordained minister and elder of the South Congregation of

27  Jehovah's Witnesses, Woodland, California.

28       3.       That I am thoroughly familiar with the religious beliefs, teachings, and practices

                                        – 1 –
    DECLARATION OF J. GARY HAYES IN SUPPORT OF CHURCH DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION
    TO COMPEL DEPOSITION AND/OR MOTION FOR A PROTECTIVE ORDER REGARDING THE WOODLAND ELDERS
11115551.tf - 9/29/2006 9:43:36 AM

                                        3449

CAEKAERT/MAPLEY 006611

1   of Jehovah's Witnesses.

2       4.      That duly ordained ministers of Jehovah's Witnesses responsible for teaching

3   and pastoral care of congregation members are called "elders."

4

5       5.      That it is a religious belief and practice of Jehovah's Witnesses based on God's

6   Word, the Bible, that an elder, has a responsibility to provide spiritual counseling to those who

7   seek it, and that any person who needs spiritual help or is aware of another in such need should

8   approach the congregation elders and convey to them whatever information may be needed to

9   provide spiritual assistance to the erring one.—Isaiah 32:2; James 5:14-16; Hebrews 13:17.  In

10  addition, for similar reasons, there are times when elders initiate discussions relating to the

11
12  spiritual condition of congregation members.

13      6.      That it is the religious belief and practice of Jehovah's Witnesses, based upon

14  Scripture and church tradition, that elders must maintain in strict confidence any church

15
16  communications with congregants connected with the need for spiritual help or counseling, and

17  congregants expect such communications to elders are and will remain confidential—regardless

18  of who initiated the conversation.—Proverbs 15:22; 25:9, 10.

19      7.      That revealing such confidential communications would call into question an

20  elder's qualifications and could result in his removal as an elder in the congregation.

21
22      7. .    That if I or any elder is compelled to disclose such confidential information, our

23  credibility and effectiveness as elders would be adversely affected and compromised, since

24  congregants will no longer be able to trust and rely that problems and confidential information

25  they disclose to elders will not be revealed through discovery and used against them in a court

26  action.

27
28      9.      That the requirement of keeping communications to elders confidential is

– 2 –

**DECLARATION OF J. GARY HAYES IN SUPPORT OF CHURCH DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL DEPOSITION AND/OR MOTION FOR A PROTECTIVE ORDER REGARDING THE WOODLAND ELDERS**

CAEKAERT/MAPLEY 006612

1 explained in the official publications of Jehovah's Witnesses as follows:

2

3     In each congregation of Jehovah's witnesses there are mature ministers appointed to care for various assignments. (1 Tim. 3:2, 12) As they discharge their duties they often are told about confidential things, and it is essential that they respect this confidence. For instance, James 5:13-16 shows that a member of the congregation who has some spiritual problem, perhaps even having committed a sin, should go to the spiritually older men for help. Isaiah 32:2 prophetically pictured these men as places of comfort and protection. What a fine thing it is to be able to explain one's problem and get balanced spiritual help, and at the same time have full confidence that the matter will not become general knowledge in the congregation or community.

4

5

6

7

8

9     Those mature ministers will not discuss even with their wives and close friends what they thus learn in confidence. They know that if they did so it would undermine respect for their positions; it would make individuals hesitant to come to them; yes, in time it might even make it impossible for them to fulfill their role as spiritual shepherds.

10

11

12 *The Watchtower*, April 1, 1971, p. 223.

13

14     10.    That it is also the religious belief and practice of Jehovah's Witnesses, based

15 upon Scripture and church tradition, to keep congregation files, papers, reports, minutes or other

16 documents prepared in conjunction with, or as a result of, the above-described confidential

17 communications, confidential.

18

19     11.    That if I or any other elder is compelled to produce any papers, reports, minutes

20 or other documents prepared in conjunction with or as a result of the above-described

21 confidential communications, our credibility and effectiveness will be adversely affected and

22 compromised, and the confidentiality of the oral communications will be rendered worthless.

23

24     12.    That I and another elder from the South Congregation, Woodland, California,

25 met with Tim Silva, then a baptized member of the congregation, in about the early to mid

26 1980's so as to provide him spiritual counsel and assistance. There were no non-clergy or other

27 third persons present during this confidential meeting with Mr. Silva. Further, the specifics of

28 that meeting were not reported to any elders of the United States Service Department for

- 3 -
DECLARATION OF J. GARY HAYES IN SUPPORT OF CHURCH DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL DEPOSITION AND/OR MOTION FOR A PROTECTIVE ORDER REGARDING THE WOODLAND ELDERS

CAEKAERT/MAPLEY 006613

☒022

1   Jehovah's Witnesses.

2       I declare under penalty of perjury under the laws of the State of California that the

3   foregoing is true and correct to the best of my information, belief, and knowledge.  Executed

4   this 29 day of September, 2006 at Woodland, California.

5

6

7                                              J. Gary Hayes

8

9

10  4228344.1

11                                    *****

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

– 4 –

DECLARATION OF J. GARY HAYES IN SUPPORT OF CHURCH DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION
TO COMPEL DEPOSITION AND/OR MOTION FOR A PROTECTIVE ORDER REGARDING THE WOODLAND ELDERS

11115551.fif - 9/29/2006 9:43:36 AM

CAEKAERT/MAPLEY 006614

### IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
### IN AND FOR THE COUNTY OF NAPA

| | |
|---|---|
| TABITHA H. ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| vs.        . ) | CASE NO.:  26-23929 |
| ) | |
| Plaintiff ) | Judicial Council Coordination |
| ) | Proceeding No. 4374 |
| v. ) | |
| WATCHTOWER BIBLE AND TRACT ) | Coordinated with Napa County |
| SOCIETY OF NEW YORK, INC., et al. ) | Superior Court Case No. 26-22191 |
| ) | |
| Defendants. ) | **DECLARATION OF** |
| ——————————————— ) | **ARVID W. KRON** |
| ) | |
| AND COORDINATED ACTIONS. ) | |
| ——————————————— | |

I, Arvid W. Kron, after being duly sworn, depose and say:

1.      That I am over 21 years of age and reside in Napa, California.

2.      That I am a duly ordained minister and ministerial servant in the Oak Knoll Congregation of Jehovah's Witnesses, Napa, California, and that I served as an elder in the West Congregation, Napa, California, (River Park's former name) from approximately 1972 until 1991.

3.      That I am thoroughly familiar with the religious beliefs, teachings, and practices of Jehovah's Witnesses.

4.      That duly ordained ministers of Jehovah's Witnesses responsible for teaching and pastoral care of congregation members are called "elders."

5.      That it is a religious belief and practice of Jehovah's Witnesses based on God's Word, the Bible, that an elder has a responsibility to provides spiritual counseling to those who seek it, and that any person who needs spiritual help or is aware of another in such need should approach the congregation elders and convey to them whatever information may be needed to provide spiritual assistance to the erring one.  (Isaiah 32:2; James 5:14-16; Hebrews 13:17.)  In addition, for similar reasons, there are times when elders initiate discussions relating to the spiritual condition of congregation members.

6.      That it is the religious belief and practice of Jehovah's Witnesses, based upon Scripture and church tradition, that elders must maintain in strict confidence any church communications with congregants connected with the need for spiritual help or counseling, and congregants expect such communications to elders are and will remain confidential—regardless of who initiated the conversation.—Proverbs 15:22; 25:9, 10.

7.      That revealing such confidential communications would call into question an elder's qualifications and could result in his removal as an elder in the congregation.

8.      That if I or any elder is compelled to disclose such confidential information, our credibility and effectiveness as elders would be adversely affected and compromised, since congregants will no longer be able to trust and rely that problems and confidential information they disclose to elders will not be revealed through discovery and used against them in a court action.

9.      That the requirement of keeping communications to elders confidential is explained in the official publications of Jehovah's Witnesses as follows:

> In each congregation of Jehovah's witnesses there are mature ministers appointed to care for various assignments. (1 Tim. 3:2, 12) As they discharge their duties they often are told about confidential things, and it is essential that

09/29/2006 10:52 FAX                                                      ⧄030

they respect this confidence. For instance, James 5:13-16 shows that a member of the congregation who has some spiritual problem, perhaps even having committed a sin, should go to the spiritually older men for help. Isaiah 32:2 prophetically pictured these men as places of comfort and protection. What a fine thing it is to be able to explain one's problem and get balanced spiritual help, and at the same time have full confidence that the matter will not become general knowledge in the congregation or community.

Those mature ministers will not discuss even with their wives and close friends what they thus learn in confidence. They know that if they did so it would undermine respect for their positions; it would make individuals hesitant to come to them; yes, in time it might even make it impossible for them to fulfill their role as spiritual shepherds.

*The Watchtower*, April 1, 1971, p. 223.

10.     That it is also the religious belief and practice of Jehovah's Witnesses, based upon Scripture and church tradition, to keep congregation files, papers, reports, minutes or other documents prepared in conjunction with, or as a result of, the above-described confidential communications, confidential.

11.     That if I or any other elder is compelled to produce any papers, reports, minutes or other documents prepared in conjunction with or as a result of the above-described confidential communications, our credibility and effectiveness will be adversely affected and compromised, and the confidentiality of the oral communications will be rendered worthless.

12.     That I and two other elders from the West Congregation, Napa, California, met with Edward Villegas several times on or about January 1989 so as to provide him with spiritual counsel and assistance. There were no non-clergy or other third persons present during these confidential meetings with Mr. Villegas. Although a report relating to Mr. Villegas' disfellowshipping was sent by the three elders who met with him to the elders in the United States Service Department for Jehovah's Witnesses, as required by church practice and

11115555.tif - 9/29/2006 10:52:23 AM

procedure, the specifics of the conversations that the three elders had with Mr. Villegas were not included in these two reports.

     13.    I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct to the best of my information, belief, and knowledge.

                Respectfully submitted,

                                  Arvid W. Kron

09/29/2006 10:51 FAX                                                    ☑024

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
IN AND FOR THE COUNTY OF NAPA

| | | |
|---|---|---|
| TABITHA H. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs.   . | ) | CASE NO.: 26-23929 |
| | ) | |
| Plaintiff | ) | Judicial Council Coordination |
| | ) | Proceeding No. 4374 |
| v. | ) | |
| WATCHTOWER BIBLE AND TRACT | ) | Coordinated with Napa County |
| SOCIETY OF NEW YORK, INC., et al. | ) | Superior Court Case No. 26-22191 |
| | ) | |
| Defendants. | ) | **DECLARATION OF** |
| | ) | **DAVID W. BECKER** |
| | ) | |
| AND COORDINATED ACTIONS. | ) | |
| | ) | |

I, David W. Becker, after being duly sworn, depose and say:

1.      That I am over 21 years of age and reside in Napa, California.

2.      That I am a duly ordained minister and elder of the River Park Congregation of
Jehovah's Witnesses, Napa, California.

3.      That I am thoroughly familiar with the religious beliefs, teachings, and practices
of Jehovah's Witnesses.

4.      That duly ordained ministers of Jehovah's Witnesses responsible for teaching and
pastoral care of congregation members are called "elders."

5.      That it is a religious belief and practice of Jehovah's Witnesses based on God's
Word, the Bible, that an elder has a responsibility to provides spiritual counseling to those who
seek it, and that any person who needs spiritual help or is aware of another in such need should

1

11115555.tif - 9/29/2006 10:52:23 AM

☒025

approach the congregation elders and convey to them whatever information may be needed to provide spiritual assistance to the erring one. (Isaiah 32:2; James 5:14-16; Hebrews 13:17.) In addition, for similar reasons, there are times when elders initiate discussions relating to the spiritual condition of congregation members.

6.      That it is the religious belief and practice of Jehovah's Witnesses, based upon Scripture and church tradition, that elders must maintain in strict confidence any church communications with congregants connected with the need for spiritual help or counseling, and congregants expect such communications to elders are and will remain confidential—regardless of who initiated the conversation.—Proverbs 15:22; 25:9, 10.

7.      That revealing such confidential communications would call into question an elder's qualifications and could result in his removal as an elder in the congregation.

8.      That if I or any elder is compelled to disclose such confidential information, our credibility and effectiveness as elders would be adversely affected and compromised, since congregants will no longer be able to trust and rely that problems and confidential information they disclose to elders will not be revealed through discovery and used against them in a court action.

9.      That the requirement of keeping communications to elders confidential is explained in the official publications of Jehovah's Witnesses as follows:

> In each congregation of Jehovah's witnesses there are mature ministers appointed to care for various assignments. (1 Tim. 3:2, 12) As they discharge their duties they often are told about confidential things, and it is essential that they respect this confidence. For instance, James 5:13-16 shows that a member of the congregation who has some spiritual problem, perhaps even having committed a sin, should go to the spiritually older men for help. Isaiah 32:2 prophetically pictured these men as places of comfort and protection. What a fine thing it is to be able to explain one's problem and get balanced spiritual help, and at the same time have full confidence that the matter will not become general knowl-

edge in the congregation or community.

Those mature ministers will not discuss even with their wives and close friends what they thus learn in confidence. They know that if they did so it would undermine respect for their positions; it would make individuals hesitant to come to them; yes, in time it might even make it impossible for them to fulfill their role as spiritual shepherds.

*The Watchtower*, April 1, 1971, p. 223.

10.   That it is also the religious belief and practice of Jehovah's Witnesses, based upon Scripture and church tradition, to keep congregation files, papers, reports, minutes or other documents prepared in conjunction with, or as a result of, the above-described confidential communications, confidential.

11.   That if I or any other elder is compelled to produce any papers, reports, minutes or other documents prepared in conjunction with or as a result of the above-described confidential communications, our credibility and effectiveness will be adversely affected and compromised, and the confidentiality of the oral communications will be rendered worthless.

12.   That I and two other elders from the River Park Congregation, Napa, California, met with Edward Villegas several times on or about January 1994 so as to provide him with spiritual counsel and assistance.  There were no non-clergy or other third persons present during these confidential meetings with Mr. Villegas.  Although a report relating to Mr. Villegas' disfellowshipping was sent by the three elders who met with him to the elders in the United States Service Department for Jehovah's Witnesses, as required by church practice and procedure, the specifics of the conversations that the three elders had with Mr. Villegas were not included in these two reports.

13.   I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct to the best of my information, belief, and knowledge.

3

Respectfully submitted,

David W. Becker

4

CAUSE NO. DC-14-12402

| JOHN DOE I, ET AL | : | DISTRICT COURT |
| | : | 14th DISTRICT COURT |
| v. | : | DALLAS COUNTY, TX |
| WATCHTOWER, et al. | : | MARCH 6, 2015 |

### AFFIDAVIT OF A. HERNAN STEELE

I, A. HERNAN STEELE, of my own personal knowledge attest as follows:

I am over 21 years of age, of sound mind, and competent to make this Affidavit. I have personal knowledge of the matters contained herein and they are all true and correct.

1.     I reside in Patterson, New York, have been one of Jehovah's Witnesses since January 5, 1980, and have served as an elder in the faith of Jehovah's Witnesses since October 23, 1990.

2.     Since September 25, 1993, I have served in the Service Department at the U.S. Branch Office of Jehovah's Witnesses which has been located in Patterson, New York since June of 1995 (hereinafter "Service Department").

3.     I, along with other appointed elders in the Service Department provide spiritual advice, assistance, and guidance to elders in congregations of Jehovah's Witnesses throughout the United States who may call or write to the Service Department for spiritual advice and counsel in accordance with the Holy Scriptures and the religious beliefs and practices of Jehovah's Witnesses.

4.     For all times relevant herein, the elders in the Service Department also monitored the functioning and organization of congregations of Jehovah's Witnesses, including reviewing the qualifications for the appointment of elders to congregations of Jehovah's Witnesses in the

1
Affidavit of A. Hernan Steele

CAEKAERT/MAPLEY 007276

United States.  Up until mid-March 2001 the elders in the Service Department communicated through Watchtower.

5.    I am thoroughly familiar with the religious beliefs and practices of Jehovah's Witnesses, and with Scriptural precedents for those religious beliefs and practices.  I also have personal knowledge of the documents at issue in this Motion.  They are confidential spiritual documents that are sent between elders in the Service Department and the bodies of elders from congregations for the purpose of seeking and giving spiritual advice and/or guidance in accordance with the Holy Scriptures.  They are sent with the expectation that the content of the letters to and from congregation elders and reports from circuit overseers (traveling elders who visit congregations periodically) would remain private and confidential pursuant to the Holy Scriptures and the religious beliefs and practices of Jehovah's Witnesses.

6.    In accord with the beliefs and practices of Jehovah's Witnesses, elders serving in the Service Department are ordained ministers and appointed congregation elders.

7.    Congregations of Jehovah's Witnesses are provided spiritual oversight by a small group of lay individuals who serve as appointed congregation elders (hereinafter "elders"). (Philippians 1:1; 1Timothy 4:14; Titus 1:5).  At all times relevant herein, before elders are appointed, they must meet the Scriptural qualifications outlined in the Bible and be recommended and approved by current elders, a circuit overseer, and elders in the Service Department at the U.S. Branch Office of Jehovah's Witnesses in New York.  (1Timothy 3:1-7; Titus 1:5-9).  Once an individual is approved and appointed to serve as a congregation elder, a letter from the Branch Office is read to the congregation and the individual is officially vested with authority as an ordained minister and appointed elder.  ("Questions from Readers—How Are Elders and Ministerial Servants Appointed in Each Congregation?" *The Watchtower* of

CAEKAERT/MAPLEY 007277

November 15, 2014, pp. 28-29; "Overseers and Ministerial Servants Theocratically Appointed," *The Watchtower* of January 15, 2001, p. 12). All elders of the Central English Dallas, Plano and Greenville congregations are and were at all times relevant to this case ordained ministers and spiritual shepherds of the congregation. Similarly, elders in the Service Department are also ordained ministers who provide spiritual assistance, guidance, and answer questions raised by elders in congregations of Jehovah's Witnesses who may call or write to the Service Department for help or encouragement.

8.  The congregation elders are responsible for the spiritual teaching of the members of the congregation as well as for pastoral care. (1 Peter 5:1-3; "Shepherds, Imitate the Greatest Shepherds," *The Watchtower* of November 15, 2013, p. 26; "'Shepherd the Flock of God in Your Care,'" *The Watchtower* of June 15, 2011, p. 20). Elders frequently provide spiritual counsel and advice to members of the congregation concerning confidential personal and spiritual matters. For example, congregation elders are authorized to hear confessions and other private, confidential communications and to provide spiritual guidance and counsel by virtue of the Holy Scriptures and the religious beliefs and practices of Jehovah's Witnesses. (Proverbs 28:13; Galatians 6:1; James 5:13-20). Congregation elders keep confessions and other confidential spiritual communications confidential. (Proverbs 10:19; 11:13; 25:9; see, e.g., "'An Overseer Must Be … Self-Controlled,'" *The Watchtower* of November 15, 1991, pp. 19, 23; "Overseers— Be Fine Examples to 'the Flock,'" *The Watchtower* of September 1, 1980, pp. 21, 24; "Where Can You Turn with Confidence?" *The Watchtower* of December 15, 1975, pp. 764, 766).

9.  Congregation elders regularly communicate with each other and occasionally communicate with elders in the Service Department matters of doctrine, spiritual counsel, pastoral care, and organizational procedure. (Proverbs 11:14; 15:22; "Congregation Elders—

3

Affidavit of A. Hernan Steele

'Preside in a Fine Way'!" *The Watchtower* of March 1, 1977, pp. 153, 154). All such spiritual communications are strictly confidential in accordance with the Scripturally-based beliefs and practices of Jehovah's Witnesses.

10.    Congregation elders also investigate reports and confessions of wrongdoing (sin) by congregation members.  In cases of serious wrongdoing, the body of elders will appoint a judicial committee, usually consisting of three elders, to provide pastoral counsel and to administer any needed spiritual discipline to the erring member.  ("Elders, Judge with Righteousness," *The Watchtower* of July 1, 1992, p. 14).  The purpose of such investigations and judicial action is to help those who have erred regain their spiritual health and repair their relationship with God and to ensure that the congregation remains spiritually and morally clean. The elders on a judicial committee will give the erring one spiritual counsel and will administer appropriate spiritual discipline based on Jehovah's Witnesses' understanding of the Bible. Jehovah's Witnesses believe that investigations by at least two elders and judicial committees of at least three elders provide better, more complete spiritual counsel and advice based on the greater experience and knowledge of multiple elders.  Pursuant to the beliefs and practices of Jehovah's Witnesses, all of these spiritually-based communications during investigations or judicial committee proceedings are considered private and are to be kept confidential by all present, including the accused congregant and elders.

11.    In cases of serious misconduct, elders on the judicial committee may privately or publicly reprove or disfellowship (expel) the erring one depending on the individual's repentance.  When a member is publicly reproved or disfellowshipped, an announcement is made to the congregation to the effect that "[name] has been reproved" or "[name] is no longer one of Jehovah's Witnesses."    When a congregation member is disfellowshipped, the judicial

4
Affidavit of A. Hernan Steele

committee elders notify elders in the Service Department of the disfellowshipping to ensure that their decision was supported by the Holy Scriptures and the religious beliefs and practices of Jehovah's Witnesses. The notice of disfellowshipping includes the name of the disfellowshipped person, the date the disfellowshipping was announced, and the Scriptural basis for disfellowshipping.

12. The confidentiality of spiritual communication between congregation members and congregation elders is a fundamental religious belief and practice of Jehovah's Witnesses. Jehovah's Witnesses accept the Bible's admonition to confess one's sins to God and believe there is a great benefit in speaking to congregation elders confidentially about spiritual matters. (James 5:14, 15) Accordingly, Jehovah's Witnesses encourage those who are distressed or spiritually weak to approach the congregation elders, confide in them, and receive spiritual assistance. Notes of judicial committees, including their application of the Scriptures to the facts and their evaluation of the erring one's repentance, are kept in a sealed envelope and under lock and key. On the outside of the envelope the names of the three members of the judicial committee are written and in usual circumstances only those three elders are allowed access to the contents of the envelope.[1]

13. Because open and free communication with congregation elders is essential to the spiritual welfare of congregation members, the importance of privacy and confidentiality is cannot be overstated. The confidentiality of spiritual communications has been discussed often in publications of Jehovah's Witnesses, such as those referred to in Paragraph 8 of this Affidavit. Congregants expect that spiritual communications with congregation elders will remain confidential. Moreover, if an elder were to be compelled to disclose confidential information,

---

[1] In case an elder moves away, is no longer serving as an elder, or dies, another elder would be appointed to take that one's place on the judicial committee.

5
Affidavit of A. Hernan Steele

CAEKAERT/MAPLEY 007280

his credibility and effectiveness as an elder and the credibility and effectiveness of all elders would be compromised.  Congregants would be hesitant to reveal their personal and spiritual problems to the elders if such private information could be disclosed in legal proceedings.

14.   On the basis of Scriptures such as those referred to in Paragraph 8 of this Declaration, Jehovah's Witnesses believe that the confidentiality of private spiritual communications with elders is not limited to confessions only.  All private communications of a spiritual nature, including those that take place in the course of an investigation or a judicial committee proceeding are confidential.  Additionally, based upon the Holy Scriptures and the religious beliefs and practices of Jehovah's Witnesses, such confidentiality extends to congregation files, notes, papers, reports, minutes or other documents prepared in conjunction with, or as a result of, private spiritual communications.  Any such files, notes, papers, reports, minutes or other documents of this nature are kept in sealed envelopes under lock and key, making them accessible only to those local elders who served on the judicial committee (and to elders in the Service Department as needed).  If the disclosure of such documents were to be compelled, the credibility and effectiveness of those entrusted with the spiritual welfare of the congregation would be compromised.

* * *

Executed this 6th day of March, 2015 at Patterson, New York.

_____
A. Hernan Steele

Subscribed and sworn to before me by A. Hernan Steele, known to me personally, this 6th day of March, 2015.

_____
Notary Public, State of New York

COREY R STEWART
NOTARY PUBLIC-STATE OF NEW YORK
No. 01ST6263503
Qualified in Putnam County
My Commission Expires June 11, 2016

6

Affidavit of A. Hernan Steele

CAUSE NO.  DC-14-12402

| | | |
|---|---|---|
| JOHN DOE I, et al., | § | IN THE DISTRICT COURT |
| | § | |
| VS. | § | |
| | § | |
| WATCHTOWER BIBLE AND TRACT | § | |
| SOCIETY OF NEW YORK, INC. | § | |
| (and/or d/b/a or a/k/a WATCHTOWER | § | |
| BIBLE AND TRACT SOCIETY OF | § | DALLAS COUNTY, TEXAS |
| PENNSYLVANIA, INC.), KINGDOM | § | |
| HALL JEHOVAH'S WITNESSES | § | |
| (CENTRAL ENGLISH) OF DALLAS, | § | |
| TEXAS, KINGDOM HALL | § | |
| JEHOVAH'S WITNESSES OF | § | |
| PLANO, TEXAS, KINGDOM HALL | § | |
| JEHOVAH'S WITNESSES OF | § | |
| GREENVILLE, TEXAS, AND | § | |
| REGINALD TYRONE JACKSON | § | 14TH JUDICIAL DISTRICT |

## AFFIDAVIT OF CUSTODIAN OF RECORDS

| | |
|---|---|
| STATE OF NEW YORK | § |
| | § |
| COUNTY OF PUTNAM | § |

Before me, the undersigned notary, on this day personally appeared Richard Ashe, Jr. After I administered an oath to him, upon his oath he said:

1.      My name is Richard Ashe, Jr.  I am over the age of eighteen and I am fully competent to make this Affidavit.

2.      All facts stated in this Affidavit are true and correct based on my personal knowledge.

3.      I am a custodian of records for the Service Department at the U.S. Branch Office of Jehovah's Witnesses in Patterson, New York.

4.      Attached to this Affidavit are 8 pages of records.  These records are kept by the Service Department in the regular course of business, and it was the regular course of business of

CAEKAERT/MAPLEY 007290

the Service Department for an agent or representative of the Service Department with knowledge of the act, event, condition, opinion, or diagnosis that was recorded, to make this record or to transmit the information to be included in this record.  The record was made at or near the time or reasonably soon after the act, event, condition, opinion, or diagnosis that was recorded.  The records attached to this affidavit are the originals or exact duplicates of the originals.

  FURTHER AFFIANT SAYETH NOT.

           **Cust·dian of Records**

  BEFORE ME, the undersigned authority, on this day personally appeared Richard Ashe, Jr. who, after being duly sworn, stated under oath that he has read the above affidavit and that every statement contained in the Affidavit is true and correct based upon his personal knowledge.

  Sworn to and subscribed before me by Richard Ashe, Jr. on the 26th day of June, 2015.

          Notary Public in and for the State of New York

[SEAL]

> A. HERNAN STEELE
> Notary Public, State of New York
> Registration #01ST6106293
> Qualified In Putnam County
> Commission Expires Mar. 1, 2016

---

AFFIDAVIT OF CUSTODIAN OF RECORDS         **Page 2**
1961629v.1

CAEKAERT/MAPLEY 007291

1  **THE McCABE LAW FIRM, APC**
   James M. McCabe SBN 51040
2  4817 Santa Monica Avenue
   San Diego, CA 92107
3  Telephone:  (619) 224-2848
   Facsimile:   (619) 224-0089
4
   Attorney for Watchtower Defendants
5

6              SUPERIOR COURT OF THE STATE OF CALIFORNIA
7                         COUNTY OF SAN DIEGO

8
   JOHN DORMAN, Individually, and JOEL
9  GAMBOA, Individually,
                                              Case No.: 37-2010-00092450-CU-PO-CTL
10       Plaintiffs,

11       v.                                   **EXHIBIT 1**

12 DEFENDANT DOE 1, La Jolla Church,          **AFFIDAVIT OF RICHARD ASHE, JR.**
   DEFENDANT DOE 2, Linda Vista Church,
13 and DEFENDANT DOE 3, Supervisory
   Organization, DEFENDANT DOE 4,
14 Perpetrator, and DOES 5 through 100,
   inclusive,
15
16       Defendants.

17

18       I, Richard Ashe, Jr., after being duly sworn, depose and state and if called to testify

19 would do so as follows:

20       1.      I am over 18 years of age, of sound mind, and competent to make this Affidavit.
21
   I have personal knowledge of the matters contained herein, and they are all true and correct.
22
23       2.      I reside in Patterson, New York and have served as an elder in the faith of

24 Jehovah's Witnesses since about 1984.

25       3.      Since November 1999, I have served in the Service Department at the U.S.
26
   Branch Offices of Jehovah's Witnesses in Patterson, New York.  I provide spiritual assistance to
27
   congregation elders who call or write the Service Department for help.  Prior to March 2001, the
28

                                    – 1 –
                         AFFIDAVIT OF RICHARD ASHE, JR.

CAEKAERT/MAPLEY 005033

1  spiritual assistance provided by the Service Department, along with the appointment of elders,

2  was communicated to congregations of Jehovah's Witnesses through the Watchtower Bible and

3  Tract Society of New York, Inc.  Since March 2001, this has been communicated through the

4  Christian Congregation of Jehovah's Witnesses.  Prior to November 1999, I served as a circuit

5  overseer from August 1990 until November 1999.

6        4.      My duties in the Service Department also include monitoring the functioning,

7  organization, and staffing of congregations of Jehovah's Witnesses, including reviewing the

8
9  qualifications for the appointment of elders to congregations of Jehovah's Witnesses in the

10 United States.

11                          **QUALIFICATIONS OF ELDERS**

12        5.      Jehovah's Witnesses are not automatically appointed to serve as congregation

13 elders.  Rather, they must first meet certain qualifications that are outlined in the Bible, as

14 follows:  Before a male member of the congregation can be considered for appointment as a

15
16 congregation elder, he must first be baptized as one of Jehovah's Witnesses.  Next the individual

17 must gain further knowledge of the Holy Scriptures and show a willingness to be used in a

18 further way to assist others in the congregation.  If he shows such a willingness, he must then

19 meet Scriptural qualifications set out in 1 Timothy 3:8-13.  Thereafter, he may qualify and be

20 appointed as a ministerial servant.  Although a ministerial servant would not provide spiritual

21 supervision in the congregation, he could be assigned certain tasks to assist the congregation

22
23 elders as they carry out their duties. After a period of time—perhaps many years—a ministerial

24 servant who has faithfully carried out his assignments and has gained more experience may

25 meet the qualifications of a congregation elder as outlined in 1 Timothy 3:1-7 and Titus 1:6-9.

26 When this occurs, the congregation elders will make this recommendation to the circuit overseer

27 (a representative of the Branch office who is also an experienced elder).  If the circuit overseer

28

—2—

AFFIDAVIT OF RICHARD ASHE, JR.

CAEKAERT/MAPLEY 005034

agrees with the recommendation, it will then be forwarded to the Branch office's Service Department. Approved elders in the Service Department will then review the recommendation in accord with the guidelines outlined in the Holy Scriptures, adopted by the Governing Body of Jehovah's Witnesses. The Branch office will then inform the local congregation's body of elders, in writing, of their determination with regards the recommendation.

6.    If an individual is appointed to serve as a congregation elder, the letter of appointment from the Branch office is read to the congregation. It is at this time that he is officially vested with ministerial authority. In other words, he is appointed as a congregation elder.

7.    Jehovah's Witnesses who serve as appointed elders are recognized as ordained ministers and congregation elders.

8.    Like Jesus and his apostles, congregation elders do not receive a salary for their ministerial work. Nonetheless, as ordained ministers and congregation elders, they are responsible for providing spiritual supervision to the congregations, which includes hearing confessions and other confidential spiritual communications made to them by members of the congregation who are seeking spiritual counsel, advice or comfort.

9.    Congregation elders are authorized to hear confessions and other confidential spiritual communications and to provide confidential spiritual counsel, advice, and comfort by virtue of the Holy Scriptures and the Governing Body of Jehovah's Witnesses.

10.    According to the religious beliefs and practices of Jehovah's Witnesses, congregation elders are expected to keep confession and other confidential spiritual communications confidential. An elder who reveals such a confession or other confidential spiritual communication, without the express permission of the one making the confession or confidential spiritual communication may be disqualified from serving as an elder.

-3-

AFFIDAVIT OF RICHARD ASHE, JR.

11.    All elders of local congregations of Jehovah's Witnesses, including the Linda Vista Spanish and Playa Pacifica Spanish congregations in San Diego, California, are and were at all times relevant to this case ordained ministers and the spiritual leaders of their respective congregations.

**DUTIES OF ELDERS**

12.    As with all congregations of Jehovah's Witnesses, the Linda Vista Spanish and Playa Pacifica Spanish elders frequently provide spiritual counsel, advice, and comfort to members of the congregation concerning highly confidential and personal matters of a spiritual nature.

13.    In addition, at all times relevant to this case, the Linda Vista Spanish and Playa Pacifica Spanish elders occasionally communicated with elders serving in the Branch Office's Service Department, as well as with elders serving as circuit or district overseers, in order to receive spiritual counsel and advice as to how to apply the religious doctrine and procedures of Jehovah's Witnesses to issues concerning the congregation and its members. As discussed more fully below, the religious beliefs of these elders also require that any confidential spiritual communications between elders serving in the Branch Office's Service Department, elders serving as circuit or district overseers, and congregation elders must be kept strictly confidential. The spiritual counsel and advice given by the elders serving in the Branch Office's Service Department, elders serving as circuit or district overseers, and congregation elders is based on Jehovah's Witnesses' understanding of the Bible.

14.    The elders of congregations of Jehovah's Witnesses are also responsible for conducting what is referred to as "judicial investigations" when a member of a congregation is accused of serious Scriptural wrongdoing. Judicial investigations are carried out by two elders selected by the congregation body of elders.

-4-

AFFIDAVIT OF RICHARD ASHE, JR.

CAEKAERT/MAPLEY 005036

15.    The goal of a judicial investigation is to make certain that the Christian congregation remains spiritually and morally clean.  (James 1:26)  In doing so, if the elders confirm that serious Scriptural wrongdoing has occurred, a judicial committee of at least three elders is selected by the congregation body of elders to endeavor to provide spiritual assistance to the congregant who may have sinned, with the hope of assisting them to regain their spirituality and relationship with God.  (Galatians 6:1, 2)  At times, a judicial committee will determine that an accused congregant should be spiritually disciplined internally, based on Jehovah's Witnesses' understanding of the Bible.

16.    Spiritual discipline administered by elders of Jehovah's Witnesses serving on a judicial committee is based solely on Jehovah's Witnesses' understanding of the Bible as applied to the facts of the matter. Where a serious sin is involved and the accused person is repentant, the judicial committee may recommend private or public reproof.  But if the person who committed a serious sin cannot be brought back to repentance, the individual will have to be disfellowshipped.   When a member is subject to public reproof or disfellowshipping, an announcement is made during a congregation meeting simply to the effect that "[name] has been reproved" or "[name] is no longer one of Jehovah's Witnesses."

17.    Jehovah's Witnesses recognize the Bible's admonition to confess ones sins to God.  1 John 1:8, 9 ("If we confess our sins, he is faithful and righteous so as to forgive us our sins and to cleanse us from all unrighteousness.").

18.    In addition Jehovah's Witnesses also believe that there can be much benefit from speaking to the congregation elders ("older men") regarding such confidential matters.  James 5:13-16 ("Is there anyone suffering evil among YOU? Let him carry on prayer.  Is there anyone in good spirits? Let him sing psalms.  Is there anyone sick among YOU? Let him call the older men of the congregation to [him], and let them pray over him, greasing [him] with oil in the

– 5 –
AFFIDAVIT OF RICHARD ASHE, JR.

CAEKAERT/MAPLEY 005037

name of Jehovah. And the prayer of faith will make the indisposed one well, and Jehovah will raise him up. Also, if he has committed sins, it will be forgiven him. Therefore openly confess YOUR sins to one another and pray for one another, that YOU may get healed."). Jehovah's Witnesses view confessions and other confidential and private communications of a spiritual nature between congregants and elders as communications that elders must keep confidential. Proverbs 25:9.

19. Jehovah's Witnesses do not believe that the confidentiality of spiritual communications they may have with the congregation elders is limited to confessions. Rather, as outlined in James 5:13-16, Jehovah's Witnesses are encouraged to seek the spiritual counsel and advice of the elders in a variety of life situations. Congregation elders are also encouraged to seek spiritual counsel and advice from elders serving in the Branch Office's Service Department, or from elders serving as circuit or district overseers, in order to receive spiritual counsel and advice as to how to apply the religious doctrine and procedures of Jehovah's Witnesses to issues concerning the congregation and its members, and on occasion congregation elders seek such spiritual counsel and advice. Such confidential spiritual communications from congregation elders are only handled by elders in the Branch Office Service Department. In addition, if a congregation member is disfellowshipped, the judicial committee elders forward a notice of disfellowshipping to Branch Office elders for their review to ensure that their decision was spiritually based and well founded. The notice of disfellowshipping has the name of the disfellowshipped person, the date of disfellowshipping, and the Scriptural basis for disfellowshipping. Jehovah's Witnesses view all such spiritual communications as confidential communications that must be kept strictly confidential.

20. Elders do not allow unnecessary third parties to be a party to a confidential communication. However, at times more than one elder may be a party to the conversation. For

1   instance, it is Jehovah's Witnesses religious belief and practice to have at least two elders

2   present during a judicial investigation and at least three elders present during a judicial

3   committee. (Deuteronomy 17:6; Deuteronomy 19:15; Matthew 18:15-17; 2 Corinthians 13:1; 1

4   Timothy 5:19)  Before one becomes one of Jehovah's Witnesses, he would be made aware of

5   this provision. *Your Word Is a Lamp To My Foot*, pages 176-79; *Organization for Kingdom-*

6   *Preaching and Disciple-Making*, pages 159-65; *Organized to Accomplish Our Ministry*, pages

7   145-47; *Organized To Do Jehovah's Will*, pages 151-2.  In addition, there may be instances

8   where a husband and wife, or a parent and child, may together seek or would be provided with

9
10   spiritual counsel, advice or comfort from the elders.  Jehovah's Witnesses believe that men are

11   imperfect and, therefore, three elders serving on a judicial committee can provide more full and

12   complete spiritual counsel and advice based on a broader range of experience and knowledge

13   than can a single elder alone. The elders and participants to these confidential and private

14   spiritual communications would view these communications as confidential and congregants

15
16   would expect the elders to keep such communications strictly confidential.

17          21.     In addition, the religious doctrine of Jehovah's Witnesses requires that all elders

18   keep these confidential and private spiritual communication strictly confidential.  *The*

19   *Watchtower*, April 1, 1971, pages 222-224; *Kingdom Ministry*, July 1975; *The Watchtower*,

20   December 15, 1975, pages 764-66; *The Watchtower*, September 1, 1983, pages 21-26; *The*

21   *Watchtower*, September 15, 1989, pages 10-15; *The Watchtower*, September 1, 1991, pages 22-

22
23   27; *The Watchtower*, November 15, 1991, pages 19-23.  Indeed, an elder who reveals the

24   contents of such a confidential communication may be subject to removal.

25          22.     In this case, Withheld Documents 1, 11, and 15-17, referenced in Plaintiffs' Ex

26   Parte Application Re Production of Withheld Documents and Plaintiffs' Notice of Motion and

27   Motion to Compel Further Documents From Defendants, were all received by or sent by elders

28

– 7 –

AFFIDAVIT OF RICHARD ASHE, JR.

CAEKAERT/MAPLEY 005039

1   serving in the Branch Office's Service Department and are the type of confidential

2   communications and documents described in paragraphs 13-21 above, which must be kept

3   strictly confidential. The undersigned therefore claims and does not waive the penitent privilege

4   as to any of the Withheld Documents.

5

6   SIGNED this the ___2___ day of May, 2011.

7   I declare under penalty of perjury under the laws of the State of New York that the foregoing is
8   true and correct to the best of my information, belief, and knowledge.

9

10                                                      Richard Ashe, Jr.

11  STATE OF NEW YORK          )

12  COUNTY OF PUTNAM           ) ss.:
                               )
13

14  SUBSCRIBED AND SWORN TO BEFORE ME on the _2_ day of May, 2011, to certify
    which witness my hand and official seal.

15

16                                                      Notary Public, State of New York

17                                                  ROBERT J. BUDRECKI
                                                   Notary Public, State Of New York
18                                                        No. 01BU6003185
                                                     Qualified In Putnam County
                                                 Commission Expires 02/23/20/4

19

20

21

22

23

24

25

26

27

28

– 8 –
AFFIDAVIT OF RICHARD ASHE, JR.

CAEKAERT/MAPLEY 005040

STATE OF OREGON
Marion County Circuit Courts

NOV 0 2 2006

**FILED**

STATE OF OREGON
Marion County Circuit Courts

NOV - 6 2006

**ENTERED**

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF MARION

| | |
|---|---|
| JARED GRAFMYER, | No. 06C15281 |
| Plaintiff, | **DECLARATION OF MERTON V. CAMPBELL** |
| v. | |
| WATCHTOWER BIBLE AND TRACT SOCIETY OF NEW YORK, INC., WATCHTOWER BIBLE AND TRACT SOCIETY OF PENNSYLVANIA, and LANCASTER CONGREGATION OF JEHOVAH'S WITNESSES, | |
| Defendants. | |

I, Merton V. Campbell, testify as follows:

1.      I am over 18 years of age, of sound mind, and am competent to make this Declaration.  I have personal knowledge of the matters contained herein, and they are all true and correct.

2.      I have served as an Elder in the Jehovah's Witnesses Church since 1972.

3.      Since 1952, I have served in the Service Department at the U.S. Branch Office of Jehovah's Witnesses in New York.  I provide spiritual assistance to congregation Elders who call or write the Service Department for help.  Prior to March 2001, the spiritual assistance provided by the Service Department, along with the appointment of Elders, was

Page 1–    **DECLARATION OF MERTON V. CAMPBELL**

Bullivant|Houser|Bailey PC

888 S.W. Fifth Avenue, Suite 300
Portland, Oregon  97204-2089
Telephone: 503.228.6351
Facsimile: 503.295.0915

CAEKAERT/MAPLEY 007325

1  communicated to congregations of Jehovah's Witnesses through the Watchtower Bible and

2  Tract Society of New York, Inc.  Since March 2001, this has been communicated through the

3  Christian Congregation of Jehovah's Witnesses.

4         4.     My duties in the Service Department also include monitoring the functioning,

5  organization, and staffing of congregations of Jehovah's Witnesses, including reviewing the

6  qualifications for the appointment of Elders to congregations of Jehovah's Witnesses in the

7  United States.

8         5.     Jehovah's Witnesses are not automatically appointed to serve as congregation

9  Elders.  Rather, they must first meet certain qualifications that are outlined in the Bible as

10  follows:  Before a male member of the congregation can be considered for appointment as a

11  congregation Elder, he must first be baptized as one of Jehovah's Witnesses.  Next, the

12  individual must gain further knowledge of the Holy Scriptures and show a willingness to be

13  used in a further way to assist others in the congregation.  If he shows such a willingness, he

14  must then meet Scriptural qualifications set out in 1 Timothy 3:8-13.  Thereafter, he may

15  qualify and be appointed as a ministerial servant.  Although a ministerial servant would not

16  provide spiritual supervision in the congregation, he could be assigned certain tasks to assist

17  the congregation Elders as they carry out their duties.  After a period of time—perhaps many

18  years—a ministerial servant who has faithfully carried out his assignments and has gained

19  more experience may meet the qualifications of a congregation Elder as outlined in 1

20  Timothy 3:1-7 and Titus 1:6-9.  When this occurs, the congregation Elders will make this

21  recommendation to the circuit overseer (a representative of the Branch Office).  If the circuit

22  overseer agrees with the recommendation, it will then be forwarded to the Branch Office's

23  Service Department.  Approved Elders in the Service Department will then review the

24  recommendation in accord with the guidelines outlined in the Holy Scriptures adopted by the

25  Governing Body of Jehovah's Witnesses.  The Branch office will then inform the local

26  congregation's body of Elders, in writing, of their determination with regards to the

Page 2–   **DECLARATION OF MERTON V. CAMPBELL**

Bullivant|Houser|Bailey PC

888 S.W. Fifth Avenue, Suite 300
Portland, Oregon  97204-2089
Telephone: 503.228.6351
Facsimile: 503.295.0915

CAEKAERT/MAPLEY 007326

1  recommendation.

2      6.      If an individual is appointed to serve as a congregation Elder, the letter of

3  appointment from the Branch Office is read to the congregation.  It is as this time that he is

4  officially vested with ministerial authority.  In other words, he is appointed as a congregation

5  Elder.

6      7.      Jehovah's Witnesses who serve as appointed Elders are recognized as ordained

7  ministers and congregation Elders.

8      8.      Like Jesus and his apostles, congregation Elders do not receive a salary for

9  their ministerial work.  Nonetheless, as ordained ministers and congregation Elders, they are

10  responsible for providing spiritual supervision to the congregations, which includes hearing

11  confessions and other confidential communications made to them by members of the

12  congregation who are seeking religious or spiritual advice or comfort.

13      9.      Congregation Elders are authorized to hear confessions and other private,

14  confidential communications and to provide confidential spiritual guidance and counsel by

15  virtue of the Holy Scriptures and the Governing Body of Jehovah's Witnesses.

16      10.      According to the religious beliefs and practices of Jehovah's Witnesses,

17  congregation Elders are expected to keep confession and other confidential communications

18  confidential.  An Elder who reveals such a confession or communication, without the express

19  permission of the one making the confession or communication, may be disqualified from

20  serving as an Elder.

21      11.      All Elders of the Lancaster congregation are now, and were at all times

22  relevant to this case, ordained ministers and the spiritual leaders of those congregations.

23      12.      As with all congregations of Jehovah's Witnesses, the Lancaster Elders

24  frequently provide spiritual counsel and advice to members of the congregation concerning

25  highly confidential personal and spiritual matters

26      13.      In addition, at all times relevant to this case, the Lancaster Elders occasionally

Page 3–    **DECLARATION OF MERTON V. CAMPBELL**

Bullivant|Houser|Bailey PC

888 S.W. Fifth Avenue, Suite 300
Portland, Oregon  97204-2089
Telephone: 503.228.6351
Facsimile: 503.295.0915

CAEKAERT/MAPLEY 007327

1  communicated with Elders serving in the Branch Office's Service Department in order to

2  receive spiritual guidance and advice as to how to apply the religious doctrine and

3  procedures of Jehovah's Witnesses to issues concerning the congregation and its members,

4  as well as Elders serving as circuit or district overseers.  As discussed more fully below, the

5  religious beliefs of these Elders also require that any confidential communications that they

6  have with congregation Elders must be kept strictly confidential.  The spiritual guidance and

7  advice given by the Elders serving in the Service Department is based on Jehovah's

8  Witnesses' understanding of the Bible.

9      14.    The elders of congregations of Jehovah's Witnesses are also responsible for

10  conducting what are referred to as "judicial investigations" when a member of a

11  congregation is accused of serious Scriptural wrongdoing.

12      15.    The goal of a judicial investigation is to make certain that the Christian

13  congregation remains spiritually and morally clean.  (James 1:26)  In doing so, the Elders

14  endeavor to provide vital assistance to those who may have erred, with the hope of assisting

15  them to regain their spirituality and relationship with God.  (Galatians 6:1, 2)  At times, a

16  judicial committee will determine that an accused person should be disciplined internally

17  based on Jehovah's Witnesses' understanding of the Bible.

18      16.    Judicial discipline administered by Elders of Jehovah's Witnesses is based

19  solely on Jehovah's Witnesses' understanding of the Bible as applied to the facts of the

20  matter.

21      17.    Jehovah's Witnesses recognize the Bible's admonition to confess one's sins to

22  God.  (1 John 1:8, 9 ("If we confess our sins, he is faithful and righteous so as to forgive us

23  our sins and to cleanse us from all unrighteousness.").)

24      18.    In addition, Jehovah's Witnesses believe that there can be much benefit from

25  speaking to the congregation Elders ("older men") regarding such confidential matters.

26  (James 5:13-16 ("Is there anyone suffering evil among YOU? Let him carry on prayer.  Is

Page 4—   **DECLARATION OF MERTON V. CAMPBELL**

Bullivant|Houser|Bailey PC

888 S.W. Fifth Avenue, Suite 300
Portland, Oregon  97204-2089
Telephone: 503.228.6351
Facsimile: 503.295.0915

CAEKAERT/MAPLEY 007328

there anyone in good spirits?  Let him sing psalms.  Is there anyone sick among YOU?  Let

him call the older men of the congregation to [him], and let them pray over him, greasing

[him] with oil in the name of Jehovah.  And the prayer of faith will make the indisposed one

well, and Jehovah will raise him up.  Also, if he has committed sins, it will be forgiven him.

Therefore openly confess YOUR sins to one another and pray for one another, that YOU

may get healed.").)  Jehovah's Witnesses view confessions as confidential communications.

(Proverbs 25:9.)

19.     Jehovah's Witnesses do not believe that the confidentiality of communications

they may have with the congregation Elders is limited to confessions.  Rather, as outlined in

James 5:13-16, Jehovah's Witnesses are encouraged to seek the spiritual assistance of the

elders in a variety of life situations.  Jehovah's Witnesses view all such discussions as

confidential communications.

20.     Elders do not allow extraneous third parties to be a party to a confidential

communication.  However, at times, more than one Elder may be a party to the conversation.

For instance, it is Jehovah's Witnesses' religious belief and practice to have at least three

Elders present during judicial committee hearings.  (Deuteronomy 17:6; Deuteronomy 19:15;

Matthew 18:15-17; 2 Corinthians 13:1; 1 Timothy 5:19)  Before one becomes one of

Jehovah's Witnesses, he is made aware of this provision.  *Your Word Is a Lamp To My Foot*,

pages 176-79; *Organization for Kingdom-Preaching and Disciple-Making*, pages 159-65;

*Organized to Accomplish Our Ministry*, pages 145-47; *Organized To Do Jehovah's Will*,

pages 151-2.  In addition, there may be instances where a husband and wife, or a parent and

child, may together seek or would be provided with spiritual advice or consolation from the

Elders.  All participants to these conversations also view these conversations as confidential.

21.     In addition, the religious doctrine of Jehovah's Witnesses requires that all

Elders keep these matters confidential. *The Watchtower*, April 1, 1971, pages 222-224;

*Kingdom Ministry*, July 1975; *The Watchtower*, December 15, 1975, pages 764-66; *The*

Page 5–    **DECLARATION OF MERTON V. CAMPBELL**

Bullivant|Houser|Bailey PC

888 S.W. Fifth Avenue, Suite 300
Portland, Oregon  97204-2089
Telephone: 503.228.6351
Facsimile: 503.295.0915

CAEKAERT/MAPLEY 007329

1  *Watchtower,* September 1, 1983, pages 21-26; *The Watchtower*, September 15, 1989, pages

2  10-15; *The Watchtower*, September 1, 1991, pages 22-27; *The Watchtower*, November 15,

3  1991, pages 19-23.  Indeed, an Elder who reveals the contents of a confidential

4  communication may be subject to removal.

5       I hereby declare that the above statement is true to the best of my knowledge and

6  belief, and that I understand it is made for use as evidence in court and is subject to penalty

7  for perjury.

8       DATED: _October 23_ , 2006.

9

10                      By _Merton V. Campbell_
                   Merton V. Campbell

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Page 6—   **DECLARATION OF MERTON V. CAMPBELL**

Bullivant|Houser|Bailey PC

888 S.W. Fifth Avenue, Suite 300
Portland, Oregon  97204-2089
Telephone: 503.228.6351
Facsimile: 503.295.0915

CAEKAERT/MAPLEY 007330

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF MARION

JARED GRAFMYER,

           Plaintiff,

    v.

WATCHTOWER BIBLE AND TRACT
SOCIETY OF NEW YORK, INC.,
WATCHTOWER BIBLE AND TRACT
SOCIETY OF PENNSYLVANIA, and
LANCASTER CONGREGATION OF
JEHOVAH'S WITNESSES,

           Defendants.

No. 06C15281

DECLARATION OF MURRAY
MORRIS

I, Murray Morris, testify as follows:

1.    I am over 18 years of age and reside in Salem, Oregon. I am of sound mind, and am competent to make this Declaration. I have personal knowledge of the matters contained herein, and they are all true and correct.

2.    I am a duly ordained minister and Elder of the Oak Park Congregation in Salem, Oregon, and was a duly ordained minister and Elder of the Lancaster Congregation in Salem, Oregon.

3.    I am thoroughly familiar with the religious beliefs, teachings, practices, and organization of Jehovah's Witnesses.

Page 1– DECLARATION OF MURRAY MORRIS

Bullivant|Houser|Bailey PC
888 S.W. Fifth Avenue, Suite 300
Portland, Oregon 97204-2089
Telephone 503.228.6351
Facsimile 503.295.0915

CAEKAERT/MAPLEY 007315

4.    Duly ordained ministers of Jehovah's Witnesses responsible for teaching and pastoral care of congregation members are called "Elders."

5.    It is a religious belief and practice of Jehovah's Witnesses based on God's Word, the Bible, that an Elder has a responsibility to provides spiritual counseling to those who seek it, and that any person who needs spiritual help should approach the congregation Elders and convey to them whatever information may be needed to provide this assistance. (Isaiah 32:2; James 5:14-16; Hebrews 13:17.)

6.    It is the religious belief and practice of Jehovah's Witnesses, based upon Scripture and tradition, that Elders must maintain in strict confidence any communications connected with spiritual counseling, and congregants expect their communications to Elders will remain confidential.  (Proverbs 15:22; 25:9, 10.)

7.    Revealing such confidential communications would call into question an Elder's qualifications and could result in his removal as an Elder in the congregation.

8.    If I or any other Elder is compelled to disclose such confidential information, my credibility and effectiveness as an Elder, as well as the credibility and effectiveness of the other Elders in the congregation, would be adversely affected and compromised since congregants will no longer be able to trust and rely that problems and confidential information they disclose to Elders will not be revealed through discovery and used in a court action.

9.    The requirement of keeping communications to Elders confidential is explained in the official publications of Jehovah's Witnesses as follows:

> In each congregation of Jehovah's witnesses there are mature ministers appointed to care for various assignments. (1 Tim. 3:2, 12) As they discharge their duties they often are told about confidential things, and it is essential that they respect this confidence.  For instance, James 5:13-16 shows that a member of the congregation who has some spiritual problem, perhaps even having committed a sin, should go to the spiritually older men for help.  Isaiah 32:2 prophetically pictured these men as places of comfort and protection.  What a fine thing it is to be able to explain one's problem and get balanced spiritual help,

Sullivan||Houser||Bailey PC
1201 S W 19th Avenue, Suite 200
Portland, Oregon 97204-2069
Telephone: 503 228.6351
Facsimile: 503 228.5915

CAEKAERT/MAPLEY 007316

1   and at the same time have full confidence that the matter will not become general knowledge in the congregation or
2   community.

3           Those mature ministers will not discuss even with their wives and close friends what they thus learn in confidence.
4   They know that if they did so it would undermine respect for their positions; it would make individuals hesitant to come to
5   them; yes, in time it might even make it impossible for them to fulfill their role as spiritual shepherds.

6

7   *The Watchtower*, April 1, 1971, p. 223.

8        10.    It is also the religious belief and practice of Jehovah's Witnesses, based upon

9   Scripture and church tradition, to keep confidential the congregation files, papers, reports,

10   minutes, and other documents prepared in conjunction with, or as a result of, the above-

11   described confidential communications.

12        11.    If any Elder is compelled to produce any papers, reports, minutes, or other

13   documents prepared in conjunction with or as a result of the above-described confidential

14   communications, the credibility and effectiveness of Elders in the congregation will be

15   adversely affected and compromised, and the confidentiality of the oral and written

16   communications will be rendered worthless.

17        12.    I was one of the three Elders who served on Jerry Crabb's judicial committee

18   in June 1991.

19        13.    When Jerry Crabb met with the judicial committee, no other person was

20   present other than the three Elders who comprised the judicial committee.

21        14.    Jerry Crabb did not appeal the decision of the judicial committee in his case.

22        I hereby declare that the above statement is true to the best of my knowledge and

23   belief, and that I understand it is made for use as evidence in court and is subject to penalty

24   for perjury.

25

26

Page 3-   **DECLARATION OF MURRAY MORRIS**

Bullivant|Houser|Bailey PC:

888 S.W. Fifth Avenue, Suite 300
Portland, Oregon 97204-2089
Telephone: 503 228.6351
Facsimile: 503.295.0915

CAEKAERT/MAPLEY 007317

DATED: 9|24|06, 2006.

By _Murray Morris_
Murray Morris

Page 4– DECLARATION OF MURRAY MORRIS

Bullivant|Houser|Bailey PC

888 S.W. Fifth Avenue, Suite 300
Portland, Oregon 97204-2089
Telephone: 503.228.6351

CAEKAERT/MAPLEY 007318

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF MARION

| | |
|---|---|
| JARED GRAFMYER,<br><br>         Plaintiff,<br><br>     v.<br><br>WATCHTOWER BIBLE AND TRACT<br>SOCIETY OF NEW YORK, INC.,<br>WATCHTOWER BIBLE AND TRACT<br>SOCIETY OF PENNSYLVANIA, and<br>LANCASTER CONGREGATION OF<br>JEHOVAH'S WITNESSES,<br><br>         Defendants. | No. 06C15281<br><br>**DECLARATION OF MERTON V.<br>CAMPBELL** |

I, Merton V. Campbell, testify as follows:

    1.    I am over 18 years of age, of sound mind, and am competent to make this Declaration. I have personal knowledge of the matters contained herein, and they are all true and correct.

    2.    I have served as an Elder in the Jehovah's Witnesses Church since 1972.

    3.    Since 1952, I have served in the Service Department at the U.S. Branch Office of Jehovah's Witnesses in New York. I provide spiritual assistance to congregation Elders who call or write the Service Department for help. Prior to March 2001, the spiritual assistance provided by the Service Department, along with the appointment of Elders, was

Page 1–  **DECLARATION OF MERTON V. CAMPBELL**

Bullivant|Houser|Bailey PC<br>888 S.W. Fifth Avenue, Suite 300<br>Portland, Oregon 97204-2089<br>Telephone: 503.228.6351<br>Facsimile: 503.295.0915

CAEKAERT/MAPLEY 007319

1   communicated to congregations of Jehovah's Witnesses through the Watchtower Bible and
2   Tract Society of New York, Inc.  Since March 2001, this has been communicated through the
3   Christian Congregation of Jehovah's Witnesses.
4        4.       My duties in the Service Department also include monitoring the functioning,
5   organization, and staffing of congregations of Jehovah's Witnesses, including reviewing the
6   qualifications for the appointment of Elders to congregations of Jehovah's Witnesses in the
7   United States.
8        5.       Jehovah's Witnesses are not automatically appointed to serve as congregation
9   Elders.  Rather, they must first meet certain qualifications that are outlined in the Bible as
10  follows:  Before a male member of the congregation can be considered for appointment as a
11  congregation Elder, he must first be baptized as one of Jehovah's Witnesses.  Next, the
12  individual must gain further knowledge of the Holy Scriptures and show a willingness to be
13  used in a further way to assist others in the congregation.  If he shows such a willingness, he
14  must then meet Scriptural qualifications set out in 1 Timothy 3:8-13.  Thereafter, he may
15  qualify and be appointed as a ministerial servant.  Although a ministerial servant would not
16  provide spiritual supervision in the congregation, he could be assigned certain tasks to assist
17  the congregation Elders as they carry out their duties.  After a period of time—perhaps many
18  years—a ministerial servant who has faithfully carried out his assignments and has gained
19  more experience may meet the qualifications of a congregation Elder as outlined in 1
20  Timothy 3:1-7 and Titus 1:6-9.  When this occurs, the congregation Elders will make this
21  recommendation to the circuit overseer (a representative of the Branch Office).  If the circuit
22  overseer agrees with the recommendation, it will then be forwarded to the Branch Office's
23  Service Department.  Approved Elders in the Service Department will then review the
24  recommendation in accord with the guidelines outlined in the Holy Scriptures adopted by the
25  Governing Body of Jehovah's Witnesses.  The Branch office will then inform the local
26  congregation's body of Elders, in writing, of their determination with regards to the

Page 2– **DECLARATION OF MERTON V. CAMPBELL**

1   recommendation.

2   6.      If an individual is appointed to serve as a congregation Elder, the letter of

3   appointment from the Branch Office is read to the congregation.  It is as this time that he is

4   officially vested with ministerial authority.  In other words, he is appointed as a congregation

5   Elder.

6   7.      Jehovah's Witnesses who serve as appointed Elders are recognized as ordained

7   ministers and congregation Elders.

8   8.      Like Jesus and his apostles, congregation Elders do not receive a salary for

9   their ministerial work.  Nonetheless, as ordained ministers and congregation Elders, they are

10  responsible for providing spiritual supervision to the congregations, which includes hearing

11  confessions and other confidential communications made to them by members of the

12  congregation who are seeking religious or spiritual advice or comfort.

13  9.      Congregation Elders are authorized to hear confessions and other private,

14  confidential communications and to provide confidential spiritual guidance and counsel by

15  virtue of the Holy Scriptures and the Governing Body of Jehovah's Witnesses.

16  10.     According to the religious beliefs and practices of Jehovah's Witnesses,

17  congregation Elders are expected to keep confession and other confidential communications

18  confidential.  An Elder who reveals such a confession or communication, without the express

19  permission of the one making the confession or communication, may be disqualified from

20  serving as an Elder.

21  11.     All Elders of the Lancaster congregation are now, and were at all times

22  relevant to this case, ordained ministers and the spiritual leaders of those congregations.

23  12.     As with all congregations of Jehovah's Witnesses, the Lancaster Elders

24  frequently provide spiritual counsel and advice to members of the congregation concerning

25  highly confidential personal and spiritual matters

26  13.     In addition, at all times relevant to this case, the Lancaster Elders occasionally

Page 3–    **DECLARATION OF MERTON V. CAMPBELL**

Bullivant|Houser|Bailey PC
888 S.W. Fifth Avenue, Suite 300
Portland, Oregon 97204-2089
Telephone: 503.228.6351
Facsimile: 503 295.0915

CAEKAERT/MAPLEY 007321

1  communicated with Elders serving in the Branch Office's Service Department in order to

2  receive spiritual guidance and advice as to how to apply the religious doctrine and

3  procedures of Jehovah's Witnesses to issues concerning the congregation and its members,

4  as well as Elders serving as circuit or district overseers.  As discussed more fully below, the

5  religious beliefs of these Elders also require that any confidential communications that they

6  have with congregation Elders must be kept strictly confidential.  The spiritual guidance and

7  advice given by the Elders serving in the Service Department is based on Jehovah's

8  Witnesses' understanding of the Bible.

9     14.    The elders of congregations of Jehovah's Witnesses are also responsible for

10  conducting what are referred to as "judicial investigations" when a member of a

11  congregation is accused of serious Scriptural wrongdoing.

12     15.    The goal of a judicial investigation is to make certain that the Christian

13  congregation remains spiritually and morally clean.  (James 1:26)  In doing so, the Elders

14  endeavor to provide vital assistance to those who may have erred, with the hope of assisting

15  them to regain their spirituality and relationship with God.  (Galatians 6:1, 2)  At times, a

16  judicial committee will determine that an accused person should be disciplined internally

17  based on Jehovah's Witnesses' understanding of the Bible.

18     16.    Judicial discipline administered by Elders of Jehovah's Witnesses is based

19  solely on Jehovah's Witnesses' understanding of the Bible as applied to the facts of the

20  matter.

21     17.    Jehovah's Witnesses recognize the Bible's admonition to confess one's sins to

22  God.  (1 John 1:8, 9 ("If we confess our sins, he is faithful and righteous so as to forgive us

23  our sins and to cleanse us from all unrighteousness.").)

24     18.    In addition, Jehovah's Witnesses believe that there can be much benefit from

25  speaking to the congregation Elders ("older men") regarding such confidential matters.

26  (James 5:13-16 ("Is there anyone suffering evil among YOU? Let him carry on prayer.  Is

Page 4–  **DECLARATION OF MERTON V. CAMPBELL**

Sullivan|Houser|Bailey PC
888 S.W. Fifth Avenue, Suite 700
Portland, Oregon 97204-2089
Telephone: 503.228.6351
Facsimile: 503.295.0915

CAEKAERT/MAPLEY 007322

1   there anyone in good spirits? Let him sing psalms. Is there anyone sick among YOU? Let

2   him call the older men of the congregation to [him], and let them pray over him, greasing

3   [him] with oil in the name of Jehovah. And the prayer of faith will make the indisposed one

4   well, and Jehovah will raise him up. Also, if he has committed sins, it will be forgiven him.

5   Therefore openly confess YOUR sins to one another and pray for one another, that YOU

6   may get healed.").) Jehovah's Witnesses view confessions as confidential communications.

7   (Proverbs 25:9.)

8       19.    Jehovah's Witnesses do not believe that the confidentiality of communications

9   they may have with the congregation Elders is limited to confessions. Rather, as outlined in

10  James 5:13-16, Jehovah's Witnesses are encouraged to seek the spiritual assistance of the

11  elders in a variety of life situations. Jehovah's Witnesses view all such discussions as

12  confidential communications.

13      20.    Elders do not allow extraneous third parties to be a party to a confidential

14  communication. However, at times, more than one Elder may be a party to the conversation.

15  For instance, it is Jehovah's Witnesses' religious belief and practice to have at least three

16  Elders present during judicial committee hearings. (Deuteronomy 17:6; Deuteronomy 19:15;

17  Matthew 18:15-17; 2 Corinthians 13:1; 1 Timothy 5:19) Before one becomes one of

18  Jehovah's Witnesses, he is made aware of this provision. *Your Word Is a Lamp To My Foot*,

19  pages 176-79; *Organization for Kingdom-Preaching and Disciple-Making*, pages 159-65;

20  *Organized to Accomplish Our Ministry*, pages 145-47; *Organized To Do Jehovah's Will*,

21  pages 151-2. In addition, there may be instances where a husband and wife, or a parent and

22  child, may together seek or would be provided with spiritual advice or consolation from the

23  Elders. All participants to these conversations also view these conversations as confidential.

24      21.    In addition, the religious doctrine of Jehovah's Witnesses requires that all

25  Elders keep these matters confidential. *The Watchtower*, April 1, 1971, pages 222-224;

26  *Kingdom Ministry*, July 1975; *The Watchtower*, December 15, 1975, pages 764-66; *The*

Page 5–   **DECLARATION OF MERTON V. CAMPBELL**

Bullivant|Houser|Bailey PC
888 S.W. Fifth Avenue, Suite 300
Portland, Oregon 97204-2089
Telephone: 503.224.4235
Facsimile: 503.295.0915

CAEKAERT/MAPLEY 007323

1   *Watchtower*, September 1, 1983, pages 21-26; *The Watchtower*, September 15, 1989, pages

2   10-15; *The Watchtower*, September 1, 1991, pages 22-27; *The Watchtower*, November 15,

3   1991, pages 19-23. Indeed, an Elder who reveals the contents of a confidential

4   communication may be subject to removal.

5       I hereby declare that the above statement is true to the best of my knowledge and

6   belief, and that I understand it is made for use as evidence in court and is subject to penalty

7   for perjury.

8       DATED: _October 23_, 2006.

9                      By _Merton V Campbell_

10                        Merton V. Campbell

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Page 6—   **DECLARATION OF MERTON V. CAMPBELL**

Bullivant|Houser|Bailey PC
888 S.W. Fifth Avenue, Suite 300
Portland, Oregon 97204-2089
Telephone: 503.228.6351
Facsimile: 503.295.0915

CAEKAERT/MAPLEY 007324

| | |
|---|---|
| LYNN HAGGAN AND TARAH BIRD<br><br>*Plaintiffs,*<br><br>vs.<br><br>WATCHTOWER BIBLE AND TRACT SOCIETY OF NEW YORK, INC., WATCHTOWER BIBLE AND TRACT SOCIETY OF PENNSYLVANIA, CHRISTIAN CONGREGATION OF JEHOVAH'S WITNESSES, INC. AND DONALD NICOLSON<br><br>*Defendants.* | SUPERIOR COURT OF NEW JERSEY LAW DIVISION HUNTERDON COUNTY<br><br>DOCKET NO.: HNT-L-000336-19<br><br><u>Civil Action</u><br><br>**CERTIFICATION OF THOMAS JEFFERSON, JR.** |

I, Thomas Jefferson, Jr., being of full age, hereby certify as follows:

     1.    I am the Assistant Secretary and Assistant Treasurer for defendant Christian Congregation of Jehovah's Witnesses ("CCJW").

     2.    In this role, I have direct knowledge of the information contained in this Certification.

     3.    CCJW is a non-profit religious corporation formed on August 21, 2000, under the laws of the State of New York.  See Exhibit 1.

     4.    CCJW has its own assets, liabilities, offices, Board of Directors, and officers, separate from every other entity used by Jehovah's Witnesses anywhere in the United States.

     5.    It is not the direct or indirect parent or subsidiary of any other corporation involved in this proceeding.

     6.    CCJW is not an affiliate of, or have any legal relationship to Defendant Watchtower Bible and Tract Society of New York or Watch Tower Bible and Tract Society of Pennsylvania (collectively, the "Watchtower Parties").

     7.    CCJW does not directly or indirectly own any shares of the Watchtower Parties.

CAEKAERT/MAPLEY 007300

8.      CCJW's purposes are religious, educational, and charitable.

9.      CCJW supports the religious worship of Jehovah's Witnesses in the United States and serves certain business needs of Jehovah's Witnesses, such as signing venue contracts for conventions and assemblies.

10.     CCJW provides humanitarian assistance to individuals suffering from natural and man-made disasters.

11.     CCJW has separate bank accounts, and a separate tax ID number from the Watchtower Parties.

12.     CCJW was formed as a separate and distinct legal entity from the Watchtower Parties and it is not a successor or continuation of the Watchtower Parties.

13.     The Watchtower Parties are still in existence.

14.     CCJW never acquired any assets or agreed to assume liabilities of the Watchtower Parties or any other entity.

I certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

_____
                    Thomas Jefferson, Jr.

Dated: September 20, 2019

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
IN AND FOR THE COUNTY OF PLACER

| | | |
|---|---|---|
| KEN L. | ) | CASE NO.: 52594 |
| | ) | |
| Plaintiff | ) | Judicial Council Coordination |
| | ) | Proceeding No. |
| v. | ) | |
| WATCHTOWER BIBLE AND TRACT | ) | Coordinated with Napa County |
| SOCIETY OF NEW YORK, INC., et al. | ) | Superior Court Case No. |
| | ) | |
| Defendants. | ) | DECLARATION OF |
| | ) | WILLIAM E. BLORE |
| | ) | |
| AND COORDINATED ACTIONS. | ) | |
| | ) | |

I, William E. Blore, after being duly sworn, depose and say:

1.     That I am over 21 years of age and reside in Chicago Park, California.

2.     That I am a duly ordained minister and elder of the West Congregation of Jehovah's Witnesses, Colfax, California.

3.     That I am thoroughly familiar with the religious beliefs, teachings, and practices of Jehovah's Witnesses.

4.     That duly ordained ministers of Jehovah's Witnesses responsible for teaching and pastoral care of congregation members are called "elders."

5.     That it is a religious belief and practice of Jehovah's Witnesses based on God's Word, the Bible, that an elder has a responsibility to provides spiritual counseling to those who seek it, and that any person who needs spiritual help or is aware of another in such need should approach the congregation elders and convey to them whatever information may be needed to provide spiritual assistance to the erring one. (Isaiah 32:2; James 5:14-16; Hebrews 13:17.) In

addition, for similar reasons, there are times when elders initiate discussions relating to the spiritual condition of congregation members.

6.      That it is the religious belief and practice of Jehovah's Witnesses, based upon Scripture and church tradition, that elders must maintain in strict confidence any church communications with congregants connected with the need for spiritual help or counseling, and congregants expect such communications to elders are and will remain confidential—regardless of who initiated the conversation.—Proverbs 15:22; 25:9, 10.

7.      That revealing such confidential communications would call into question an elder's qualifications and could result in his removal as an elder in the congregation.

8.      That if I or any elder is compelled to disclose such confidential information, our credibility and effectiveness as elders would be adversely affected and compromised, since congregants will no longer be able to trust and rely that problems and confidential information they disclose to elders will not be revealed through discovery and used against them in a court action.

9.      That the requirement of keeping communications to elders confidential is explained in the official publications of Jehovah's Witnesses as follows:

> In each congregation of Jehovah's witnesses there are mature ministers appointed to care for various assignments. (1 Tim. 3:2, 12) As they discharge their duties they often are told about confidential things, and it is essential that they respect this confidence. For instance, James 5:13-16 shows that a member of the congregation who has some spiritual problem, perhaps even having committed a sin, should go to the spiritually older men for help. Isaiah 32:2 prophetically pictured these men as places of comfort and protection. What a fine thing it is to be able to explain one's problem and get balanced spiritual help, and at the same time have full confidence that the matter will not become general knowledge in the congregation or community.
>
> Those mature ministers will not discuss even with their wives and close friends what they thus learn in confidence. They know that if they did so it would

11115555.tif - 9/29/2006 10:52:23 AM

3472

undermine respect for their positions; it would make individuals hesitant to come to them; yes, *in time it might even make it impossible for them to fulfill their role as spiritual shepherds.*

*The Watchtower*, April 1, 1971, p. 223.

10.     That it is also the religious belief and practice of Jehovah's Witnesses, based upon Scripture and church tradition, to keep congregation files, papers, reports, minutes or other documents prepared in conjunction with, or as a result of, the above-described confidential communications, confidential.

11.     That if I or any other elder is compelled to produce any papers, reports, minutes or other documents prepared in conjunction with or as a result of the above-described confidential communications, our credibility and effectiveness will be adversely affected and compromised, and the confidentiality of the oral communications will be rendered worthless.

12.     That I and other elders from the Colfax Congregation, California, met with Albert Harriman several times in mid to late 1987 so as to provide him with spiritual counsel and assistance.  There were no non-clergy or other third persons present during these confidential meetings with Mr. Harriman.  Because Albert Harriman was an appointed congregation elder at the time, a written and confidential report was sent by the elders who met with him to the elders in the United States Service Department for Jehovah's Witnesses, as required by church practice and procedure, for their review of Mr. Harriman's spiritual qualifications as an elder and for any additional spiritual counsel and assistance for Mr. Harriman or the three elders who met with him.  An additional confidential report was sent, as required by church practice and procedure, by the three elders who met with him when he was disfellowshipped in October 1987.

13.     I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct to the best of my information, belief, and knowledge.

Respectfully submitted,

William E. Blore

11115555.bf - 9/29/2006 10:52:23 AM

## DECLARATION OF DOUGLAS CHAPPEL

I, Douglas Chappel, declare as follows:

1.      I am over 21 years of age, of sound mind, and competent to make this Declaration. I have personal knowledge of the matters contained herein and they are all true and correct. If called to testify I could and would testify as follows:

2.      I reside in Patterson, New York, and have served as an elder in the faith of Jehovah's Witnesses since 1984.

3.      On January 29, 1975, I began serving at the U.S. branch offices of Jehovah's Witnesses in New York and I have been serving in the Service Department of the U.S. branch offices ("Service Department") since October 15, 1980. I, along with a few other qualified elders, provide spiritual assistance and guidance to elders in congregations of Jehovah's Witnesses across the United States who call or write to the Service Department. The elders in the Service Department also monitor the functioning and organization of congregations of Jehovah's Witnesses in the United States.

4.      In the Service Department I oversee the spiritual advice and counsel given to congregation elders who call or write to Service Department elders for assistance, including but not limited to assistance regarding persons who have been disfellowshipped (expelled) from congregations of Jehovah's Witnesses.

5.      I am thoroughly familiar with the religious beliefs, policies, and practices of Jehovah's Witnesses and with the Scriptural basis for those religious beliefs, policies, and practices

6.      In accord with the beliefs and practices of Jehovah's Witnesses, elders serving in the Service Department are ordained ministers and who have also been appointed as congregation elders.

7.      Local congregations of Jehovah's Witnesses receive spiritual oversight and pastoral care from a small group of ordained ministers who serve as appointed congregation elders (hereinafter referred to as "elders"). (Philippians 1:1; 1 Timothy 4:14; Titus 1:5.) Before being appointed as an elder, an individual must meet the qualifications for such service as outlined in the Bible, 1 Timothy 3:1-7; Titus 1:5-9, and must be recommended by the body of

elders in his congregation, and approved by the circuit overseer (i.e., traveling elder) serving his congregation. ("Questions from Readers—How Are Elders and Ministerial Servants Appointed in Each Congregation?" The Watchtower 28-29 (Nov. 15, 2014); "Overseers and Ministerial Servants Theocratically Appointed," *The Watchtower* 12 (Jan. 15, 2001).)   Once an individual has been appointed to serve as an elder, an announcement is made to the congregation and the individual is officially vested with ministerial authority as an elder.   All elders of the Bellows Falls Congregation, Vermont, are and were at all times relevant to this case ordained ministers and spiritual shepherds of the congregation.   Similarly, elders in the Service Department are ministers who provide spiritual assistance and guidance to and answer questions from elders throughout the United States. As of September 1, 2014, the Service Department no longer appoints elders; now, special overseers called "Circuit Overseers" make these appointments.

8.     Congregation elders care for spiritual welfare and instruction of congregation members. (1 Peter 5:1-3; "Shepherds, Imitate the Greatest Shepherds," The Watchtower 26 (Nov. 15, 2013); "'Shepherd the Flock of God in Your Care,'" The Watchtower 20 (June 15, 2011).)   In caring for their pastoral responsibilities, elders frequently provide spiritual counsel and advice to congregation members concerning highly confidential personal matters.   For example, elders hear confessions and receive other private, confidential communications so that they may provide appropriate guidance and counsel based on the Holy Scriptures. (Proverbs 28:13; Galatians 6:1; James 5:13-20.)   According to the beliefs and practices of Jehovah's Witnesses, congregation elders keep confessions and other confidential spiritual communications confidential. (Proverbs 10:19; 11:13; 25:9; "'An Overseer Must Be … Self-Controlled,'" *The Watchtower* 19, 23 (Nov. 15, 1991); "Overseers—Be Fine Examples to 'the Flock,'" The Watchtower 21, 24 (Sept. 1, 1980); "Where Can You Turn with Confidence?" The Watchtower 764, 766 (Dec. 15, 1975).)

9.     Congregation elders regularly communicate with each other and occasionally communicate with Branch Office elders on matters of doctrine, spiritual counsel, pastoral care, and organizational procedure. (Proverbs 11:14; 15:22; "Congregation Elders—'Preside in a Fine Way'!" *The Watchtower* 153, 154 (Mar. 1, 1977).)   All such spiritual communications are strictly confidential in accordance with the Scripturally-based beliefs and practices of Jehovah's Witnesses.

10.     According to longstanding policies, whenever a member of Jehovah's Witnesses moves from one congregation to another, a letter of introduction is sent from the former congregation elders to the new congregation elders. This letter allows the Body of Elders in the new congregation to assess the member's spiritual condition and possible need for pastoral care. Additionally, if the member served in an appointed position in the former congregation, the letter of introduction contains a recommendation whether the member should continue to serve in the new congregation.

11.     Congregation elders also investigate reports and confessions of wrongdoing (sin) by congregation members.  The investigations are handled by two elders and, in cases of serious wrongdoing, a judicial committee (usually of three elders) will provide pastoral counsel and administer any needed spiritual discipline to the erring one.     ("Elders, Judge with Righteousness," *The Watchtower* 14 (Jul. 1, 1992).)  The purpose of such investigations and judicial action is to help those who have erred regain their spiritual health and repair their relationship with God and to ensure that the congregation remains spiritually and morally clean. ("Appreciating the Purpose of Discipline," *The Watchtower* 20 (Oct. 1, 2003).)  The elders on a judicial committee will give the erring one spiritual counsel and appropriate spiritual discipline based on Jehovah's Witnesses' understanding of the Bible.  Jehovah's Witnesses believe that investigations by at least two elders and judicial committees of at least three elders provide better, more complete spiritual counsel and advice based on the greater experience and knowledge of multiple elders.  Pursuant to the beliefs and practices of Jehovah's Witnesses, all communications during investigations and judicial committee proceedings are considered private and are kept strictly confidential by all present, including the accused congregant and elders.

12.     When an investigation establishes that a serious sin has been committed, the elders on the judicial committee may decide to reprove privately or reprove and make a public announcement or disfellowship (expel) the erring one, depending on the facts and, most important, the individual's repentance.  If the erring one is reproved and it is decided that an announcement is to be made or the erring one is disfellowshipped, an announcement is made to the congregation that "[name] has been reproved" or "[name] is no longer one of Jehovah's Witnesses." (1 Timothy 5:20; "Always Accept Jehovah's Discipline," The Watchtower 26, 30 (Nov. 15, 2006); "Repentance Leading Back to God," *The Watchtower* 22, 26 (Sept. 1, 1981); "Giving Reproof 'Before All Onlookers,'" The Watchtower 731 (Dec. 1, 1977).)  In cases of

disfellowshipping, the judicial committee elders notify Branch Office elders to ensure that their decision was Scripturally-based and well-founded. The notice of disfellowshipping includes the name of the disfellowshipped person, the date the disfellowshipping was announced, and the Scriptural basis for disfellowshipping.

13.   The confidentiality of spiritual communication between congregation members and congregation elders is fundamental to the religious beliefs and teachings of Jehovah's Witnesses. Proverbs 20:19; Proverbs 25:9. Jehovah's Witnesses accept the Bible's admonition to confess one's sins to God (Psalm 32:5; James 5:16; 1 John 1:9) and they believe that there is a great benefit in speaking to congregation elders about confidential spiritual matters. Accordingly, Jehovah's Witnesses encourage those who are distressed or spiritually weak to approach the congregation elders, confide in them, and receive spiritual assistance.

14.   Because free and open communication between congregation members and elders is essential to the spiritual welfare of congregation members, the importance of privacy and confidentiality is hard to overstate. The confidentiality of spiritual communications has been discussed often in publications of Jehovah's Witnesses, such as those I referred to in Paragraph 8 above. Congregants expect that spiritual communications with congregation elders will remain confidential. If an elder were to be compelled to disclose confidential information, his credibility and effectiveness as an elder—and the credibility and effectiveness of all elders in the congregation—would be severely compromised. Congregants would be hesitant to reveal their personal, spiritual problems if such private information could be disclosed in legal proceedings.

15.   On the basis of Scriptures such as those referred to above, Jehovah's Witnesses believe that the confidentiality of private spiritual communications with elders is not limited to confessions only. All private communications of a spiritual nature, including those made in the course of investigations or judicial committee proceedings, are confidential. Additionally, based upon the Holy Scriptures and the religious beliefs and practices of Jehovah's Witnesses, such confidentiality extends to congregation files, notes, papers, reports, minutes or other documents prepared in conjunction with, or as a result of, private spiritual communications. If the disclosure of such documents were to be compelled, the credibility and effectiveness of those entrusted with the spiritual welfare of the congregation would be compromised.

16.   I have reviewed copies of Plaintiff's First Set of Requests for Production of Documents to Defendant Watchtower Bible and Tract Society of New York, Inc. ("Plaintiff's

RFP"), (collectively "Plaintiff's Requests"), including Request No. 65 seeking all documents received by Watchtower in response to the Body of Elders letter dated March 14, 1997 ("the March 1997 Letter") and No. 67 seeking all documents concerning any report of abuse of a child who is associated with a Jehovah's Witnesses congregation.

17.     Request No. 65 of Plaintiff's RFPs seeks confidential documents sent to Service Department elders by hundreds of the bodies of elders that serve in nearly 14,000 congregations of Jehovah's Witnesses in the United States.   A review of all congregation files would be required to respond to the request.

18.     The March 1997 Letter sought to ensure that the congregations of Jehovah's Witnesses in the United States were in compliance with the Holy Scriptures and with the Witnesses' religious beliefs and practices regarding matters pertaining to child sexual abuse.  In addition, the March 1997 Letter asked each body of elders to write a confidential letter to the Service Department elders reporting the details, if any, of anyone currently serving or who formerly served in a position of responsibility and authority in the congregation who was known to have committed child abuse.   These reports would allow Service Department elders to evaluate whether an individual, if he was then serving or might later be recommended to serve in a position of responsibility and authority, should be removed or not approved based on the facts and circumstances.   The March 1997 Letter also reminded congregation elders of the policy of the Jehovah's Witnesses to inform another body of elders when someone who had been determined to be guilty of child molestation moved to that congregation.

19.     The reports sent to the Service Department in response to the March 1997 Letter are kept in individual confidential files maintained by the Service Department for each of the nearly 14,000 congregations.  Each congregation file contains documents addressing a variety of spiritual matters including the functioning and organization of congregations of Jehovah's Witnesses and reviews of the qualifications of individuals recommended for appointment as elders and ministerial servants in congregations of Jehovah's Witnesses in the United States. Although a typical congregation Service Department file contains hundreds of pages of documents, the vast majority of the nearly 14,000 congregation Service Department files contain no documents related to the subject of child abuse.

20.     At present, a Watchtower Legal Department paralegal is physically examining each file to locate any correspondence in response to the March 1997 Letter or related to the

subject of child abuse. Although these files are in electronic as well as a hard-copy format, physical examination of each file has been found necessary because a search for the terms "child abuse" or "child sexual abuse" did not find all documents responsive to plaintiff's Requests. This is because the sin of child abuse is often described by elders by the Scriptural description of the specific sinful act, such as "porneia," "fornication," "loose conduct," or "uncleanness." In addition, a search for these Scriptural terms often used by the elders has pulled up documents unrelated to child abuse because "porneia," "fornication," "loose conduct," or "uncleanness" include consensual sexual conduct between adults or similar age teenagers. Furthermore, a search of the terms "child abuse" or "child sexual abuse" pulled up documents for individuals accused of child abuse who were never in an appointed congregation position and which therefore are not related to the March 1997 Letter or Plaintiff's request.

21.    I have reviewed many of the response letters to the Service Department from the local congregation bodies of elders and I am familiar with their content.

22.    Each letter is a confidential spiritual communication between Service Department elders and local elder bodies for the purpose of seeking spiritual advice and guidance in accordance with the Holy Scriptures. This correspondence was sent with the expectation that the content thereof would remain private in accordance with the religious beliefs and practices of Jehovah's Witnesses. Among other things, the letters contain identifying information about each of the accused, victims, reporting individuals and elders involved.

23.    Most of the responses to the March 1997 letter were received in 1997 and 1998. When anyone was reported as still serving in an appointed capacity, his situation was reviewed by elders in the Service Department to determine which men still serving were to be removed.

24.    The request for all documents pertaining to the abuse of any child associated with Jehovah's Witnesses since 1960 is practically impossible to fulfill. Each of the 100 branches of Jehovah's Witnesses around the world maintains its own files and the U.S. Branch Service Department does not have access to documents not in the U.S.

25.    The same privacy, confidentiality and privilege issues exist with any responsive documents as exist with the responses to the 1997 letter to all bodies of elders. Also, the same search constraints as described above exist for this inquiry. No specific search has been undertaken for such documents. I know of no one who has consented to his or her name or

Case 2:14-cv-00205-cr   Document 70-7   Filed 10/13/15   Page 7 of 7
Case 1:20-cv-00052-SPW   Document 366-2   Filed 04/19/24   Page 82 of 118

situation being disclosed to anyone outside his or her present or former religious organization, Jehovah's Witnesses.

I declare under penalty of perjury of the laws of the State of New York that the foregoing is true and correct.

Executed on October 12, 2015 at Patterson, New York.

A. HERNAN STEELE
Notary Public, State of New York
Registration #01ST6106293
Qualified In Putnam County
Commission Expires Mar. 1, 2016

_____
Douglas Chappel, Declarant

Subscribed and sworn to before me this _12_ day of October, 2015.

_____
Notary Public
Commission Expires:

## DECLARATION OF MATTHEW REIMANN

I, Matthew Reimann, declare as follows:

1.      I am over 21 years of age, of sound mind, and competent to make this Declaration. I have personal knowledge of the matters contained herein and they are all true and correct. If called to testify I could and would completely testify as follows:

2.      I reside in Saxtons River, Vermont, was baptized as one of Jehovah's Witnesses in 1968, and have served as an elder in the Bellows Falls Congregation since 1986.

3.      As an elder, I am responsible for the pastoral care and spiritual instruction of congregation members. I provide spiritual counsel and advice to congregation members concerning private, confidential personal and spiritual matters. In accord with the Holy Scriptures, I am authorized to hear confessions and other private, confidential communications and to provide spiritual guidance and counsel by virtue. And in accord with the religious beliefs and practices of Jehovah's Witnesses, I am expected to maintain the confidentiality of confessions and other private spiritual communications.

4.      I regularly communicate with other congregation elders and occasionally communicate with elders in other congregations and with Service Department elders on matters of spiritual counsel and application of the doctrines and procedures of Jehovah's Witnesses to issues concerning the congregation and its members. All such spiritual communications done in accord with the principles of Proverbs 11:14, and are kept confidential in accord with the tenets and teachings of Jehovah's Witnesses.

5.      I have personal knowledge of the documents at issue involving communications between the United States Branch Service Department and the Bellows Falls Congregation, as well as the communications between elders of the Bellows Falls Congregation and the Claremont Congregation, New Hampshire. Each of those documents and communications contains confidential spiritual information sent for the purpose of seeking or giving spiritual advice and/or guidance. All of them were sent with the expectation that their content would remain private and confidential in accord with the religious beliefs and practices of Jehovah's Witnesses.

6.      I also have personal knowledge of the handwritten notes of various Bellows Falls elders at issue.   These notes were taken during meetings in which private, penitential and confessional conversations were held between Keith Lewis and Bellows Falls elders.   These notes contain sensitive, private, potentially embarrassing information regarding not only Keith Lewis, but other third parties.

7.      I am familiar with when Norton true served as a ministerial servant in the Bellows Falls Congregation. He was appointed as a ministerial servant in 1976, and served as such until March of 1986. He did not serve again as ministerial servant until many years later.

8.      I am informed that Annessa Lewis claims that she was abused once during the summer of 1991 or 1992. Norton True was not serving in any appointed capacity in any congregation of Jehovah's Witnesses during those years.

9.      I am familiar with the claim by R. B., Norton True's step-grand-daughter, that Norton True touched her inappropriately. R.B. retracted her claim against Norton True shortly after she made it. To my knowledge and belief, no criminal prosecution was ever instituted against Norton True based upon the R. B. claim.

I declare under penalty of perjury of the laws of the State of Vermont that the foregoing is true and correct.

Executed on October, 14, 2015 at Bellows Falls, Vermont.

_____
Matthew Reimann, Declarant

Subscribed and sworn to before me this 14 day of October, 2015.

_____
Notary Public, State of Vermont

Commission expires: 2-10-2019

**BARBARA JOY**
Notary Public in the State of Vermont
WINDHAM COUNTY
Commission Expires Feb. 10, _____

IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

STATE OF HAWAIʻI

| | |
|---|---|
| N.D.,<br><br>      Plaintiff,<br><br>    vs.<br><br>MAKAHA, HAWAII CONGREGATION OF JEHOVAH'S WITNESSES, a Hawaii non-profit unincorporated religious organization, a.k.a. MAKAHA CONGREGATION OF JEHOVAH'S WITNESSES and KINGDOM HALL, MAKAHA CONGREGATION OF JEHOVAH'S WITNESSES; WATCHTOWER BIBLE AND TRACT SOCIETY OF NEW YORK, INC., a New York corporation; KENNETH L. APANA, Individually; and Does 1 through 100, inclusive,<br><br>      Defendants. | Civil No. 1CCV-20-0000390 DEO (OTHER NON-VEHICLE TORT)<br><br>**DECLARATION OF THOMAS JEFFERSON** |
| MAKAHA, HAWAII CONGREGATION OF JEHOVAH'S WITNESSES, a Hawaii non-profit unincorporated religious organization, a.k.a. MAKAHA CONGREGATION OF JEHOVAH'S WITNESSES and KINGDOM HALL, MAKAHA CONGREGATION OF JEHOVAH'S WITNESSES; and WATCHTOWER BIBLE AND TRACT SOCIETY OF NEW YORK, INC., a New York corporation,<br><br>    Crossclaimants,<br><br>    vs.<br><br>KENNETH L. APANA, Individually,<br><br>    Crossclaim Defendant. | |

CAEKAERT/MAPLEY 007375

## DECLARATION OF THOMAS JEFFERSON

I, THOMAS JEFFERSON, JR., declare under the penalty of perjury:

1.      I am over 21 years of age, of sound mind, and competent to make this declaration.

2.      I provide this declaration in support of the Opposition to Plaintiff's Motion to Compel the production of documents filed by Watchtower Bible and Tract Society of New York Inc. ("Watchtower").

3.      I am familiar with the operations of Watchtower have been authorized by its Boards of Directors to submit this declaration.

4.      Watchtower is a 501(c)(3) not-for-profit corporation organized under the religious corporation laws of the State of New York with offices in Patterson, New York.

5.      The corporate purpose of Watchtower includes supporting the faith of Jehovah's Witnesses as they carry out Jesus commands at Matthew 24:14 and Matthew 28:19-20, to preach the good news of God's Kingdom.

6.      Throughout the world, spiritual and organizational assistance is provided to Jehovah's Witnesses by some 87 branches (akin to regional/national offices). The United States branch is one of them. Each branch is under the oversight of a branch committee.  The United States Branch Committee (hereinafter "U.S. Branch Committee") provides spiritual and organizational assistance to over 13,000 congregations of Jehovah's Witnesses in the United States and a few surrounding islands (the "U.S. Branch Territory").   The U. S. Branch Committee is not incorporated.

## THE FAITH OF JEHOVAH'S WITNESSES

7.      As an elder in the faith of Jehovah's Witnesses since 1981, I am familiar with the Scriptural beliefs and practices of Jehovah's Witnesses and with the Scriptural precedent for those beliefs and practices.

CAEKAERT/MAPLEY 007376

8.      I have served in the U.S. branch since 1975, and I have worked in the Service Department since 2008.  My service involves providing spiritual guidance and assistance to elders in congregations of Jehovah's Witnesses in the United States.

9.      The basic beliefs of the faith of Jehovah's Witnesses explain why confession of sin is so essential to one's eternal salvation. (James 5:14-16, 19; Proverbs 28:13; 1 John 1:9; Ezra 10:11; Numbers 5:7; Joshua 7:19)  And understanding that fundamental principle explains why Jehovah's Witnesses place great value on confidentiality.

<div align="center">Organization of Congregations</div>

10.      Congregations of Jehovah's Witnesses are composed of individuals and families who gather together to worship in buildings called "Kingdom Halls."  Congregations in the United States are usually named after the city or town where they hold meetings, and typically have between 75 and 125 members.

11.      Congregations of Jehovah's Witnesses are small so that elders can assist each congregation member to keep his or her faith in Jehovah God strong.

12.      A rank-and-file congregation member is called a "publisher." Congregations usually have both baptized and unbaptized publishers but only a baptized publisher is considered a congregation member and one of Jehovah's Witnesses.  In accord with the beliefs and practices of Jehovah's Witnesses, any person baptized as one of Jehovah's Witnesses is considered an ordained minister of God (regardless of age or gender), in that they individually accept as a personal obligation Jesus' command to preach to others about God's Kingdom. —Matthew 28:19-20).

13.      Congregation members are not approved to represent the congregation or any corporation when they engage in their personal ministry.  Congregation members use personal time for their personal ministry and do not receive any compensation for their efforts.—1 Corinthians 9:16.

CAEKAERT/MAPLEY 007377

<u>Role of Elders</u>

14.     Each congregation has a group of men called a "body of elders" that oversees the spiritual activities of the congregation. Among other responsibilities, elders are authorized to hear confessions, render spiritual assistance to congregation members, and officiate at weddings and funerals.

15.     Elders offer their time in caring for all of their spiritual responsibilities and do not receive any compensation for their efforts.

16.     Before elders are appointed, they must meet the Scriptural qualifications outlined in the Bible. —1 Timothy 3:1-7; Titus 1:5-9

17.     Elders oversee congregation meetings that are held to strengthen the faith of congregation members and others in attendance.  (Acts 15:32.)  Elders also provide pastoral care for local congregation members.

18.     As discussed in greater detail below, in accord with the Scriptural beliefs and practices of Jehovah's Witnesses, elders frequently provide spiritual shepherding, which includes encouragement, counsel and guidance to congregation members concerning personal and spiritual matters.—Acts 20:28

19.     Similarly, as part of their responsibility to maintain the spiritual and moral cleanliness of the congregation, elders at times conduct what are referred to as ecclesiastical "investigations" when they receive information that a congregation member committed a gross sin and has thereby damaged his or her relationship with God.

CAEKAERT/MAPLEY 007378

## RELEVANT RELIGIOUS BELIEFS AND PRACTICES

### Spiritual Shepherding (Counseling)

20.     Jehovah's Witnesses believe in the universal principle of Christianity, that "all sorts of people" have the moral right and human need to turn to God and be saved by repenting from a past sinful course.  (James 4:17; 1 Timothy 2:3,4; Acts 3:19)  They believe that anything not in harmony with God's personality, standards, ways and will constitutes a sin, and that "there is no man who does not sin."  (1 Kings 8:46; 2 Chronicles 6:36)  But since many people want to improve their conduct and be approved by God, elders stand ready to help congregation members understand the application of Bible principles to their conduct.

21.     Jehovah's Witnesses believe that when a person is spiritually weak and has difficulty praying, elders can provide comfort by praying with that person and helping him or her see how Bible principles apply. (James 5:14, 15)  To obtain comfort and assistance in regaining spiritual health, congregation members commonly seek Scriptural counsel and disclose private information, some of it highly sensitive, that allows the elders make personalized petitions to God in prayer in their behalf.

22.     Because open and free communication between congregation members and elders is essential to providing spiritual encouragement, counsel and guidance, the religious beliefs and practices of Jehovah's Witnesses place an emphasis on privacy and confidentiality. (Proverbs 25:9) As promised to congregants in publications such as The Watchtower, "What you discuss with an elder will remain strictly confidential. Being trustworthy is one of his qualifications. —Compare Exodus 18:21; Nehemiah 7:2." (*The Watchtower*, March 1, 1997, page 28) With that promise, congregants willingly open themselves to reveal their innermost thoughts, feelings, and acts to trusted elders as they seek to mend their (or other congregants) relationship with Jehovah God and heal spiritually.

23.     The trust and confidence that congregation members have in elders arises from the sincerely held Scriptural belief that elders are spiritual shepherds who provide both comfort to them

CAEKAERT/MAPLEY 007379

during their distress and the Scriptural guidance needed to obtain God's Holy Spirit and blessing to successfully avoid or overcome sinful behavior.  (Acts 20:28)  According to the Scriptural beliefs and practices of Jehovah's Witnesses, information an elder receives from a congregation member who requests or needs spiritual encouragement, counsel and guidance is confidential.  (Proverbs 11:13; 25:9)  Elders do not unnecessarily discuss with others a congregation member's private requests for assistance in applying Bible principles, a congregation member's confession of sin, or any spiritual encouragement, counsel or guidance an elder believes the congregation member needs.

24.     From time to time, congregation elders communicate with experienced elders in the Service Department to receive spiritual counsel and guidance about the application of Bible principles to issues concerning the congregation and its members.  These communications are made to elders in the Service Department in the Service Department elders' capacity as spiritual advisors. Just as elders in congregations sent questions to the apostles and older men during the first century (see, e.g., Acts 15:2), congregation elders today, turn to experienced elders in the Service Department at the branch office to help them decide how to handle a spiritual matter.  All such spiritual communications must be kept private and strictly confidential in accordance with the Scriptural beliefs and practices of Jehovah's Witnesses.

25.     A congregation member's struggle to make needed changes in life in accordance with his understanding of Bible principles would be made more difficult or compromised altogether by the absence of such privacy and strict confidentiality needed for communication about troubling thoughts and feelings of guilt, a frank and open confession or discussion of sinful conduct.

## Counsel for Serious Sin

26.     Based on the religious beliefs and practices of Jehovah's Witnesses, *serious* sins are *gross* deviations from Bible standards.  A person may fall into the *practice* of serious sin.  See 2 Kings 17:16, 21; Isaiah 1:4; 1 Corinthians 6:16-18; and 1 John 3:4.

27.     Christianity stands for the Christ-like principle that anybody, including those who practice serious sin, can be helped to repent and find salvation.—1 Corinthians 6:9-11 ("sexually

CAEKAERT/MAPLEY 007380

immoral, idolaters, adulterers, … thieves, greedy people, drunkards, revilers, and extortioners, … is what some of you were.  But you have been washed clean."); 2 Corinthians 7:8-11 ("you were saddened into repenting … in a godly way … produc[ing] repentance leading to salvation … [and] righting of the wrong!").

28.     Thus, the ability to confidentially divulge serious sin, even the practice of such sin, to elders to begin the process of repentance and of regaining one's good standing before Almighty God, is crucial to such person's eternal salvation.

29.     Based on the Scriptural beliefs and practices of Jehovah's Witnesses, elders act as spiritual shepherds when they meet with congregation members who either confess or are alleged to have committed a "serious sin," as defined in the Bible.—James 5:14, 15 ("call the elders of the congregation [and] let them pray over him … if he has committed serious sins, he will be forgiven.");  See also Galatians 6:1 ("try to readjust such a man"); Proverbs 11:14 ("success through many advisers")

30.     Based on the religious beliefs and practices of Jehovah's Witnesses, at least two elders are needed to conduct an investigation involving a congregation member who is alleged to have committed a "serious sin" or to take and confirm a confession of such sin.  If those two elders confirm that the member has in fact committed a serious sin, the congregation's body of elders will appoint three or more elders to form a "judicial committee" for the purposes outlined below.—Deuteronomy 17:6; Deuteronomy 19:15; Matthew 18:15-17; 2 Corinthians 13:1; 1 Timothy 5:19

31.     Jehovah's Witnesses believe that investigations by at least two elders and judicial committees of at least three elders provide better, more complete spiritual counsel and guidance based on the collective experience, knowledge, and judgment of multiple elders, than would be provided by just one elder.  (Proverbs 11:14: "When there is no skillful direction, the people fall, but there is salvation in the multitude of counselors.")  Before an individual becomes one of Jehovah's Witnesses, he is made aware of these practices.  (*Organized to Accomplish Our Ministry* (1989), pages 145-48)

CAEKAERT/MAPLEY 007381

32.    Based on the Scriptural beliefs and practices of Jehovah's Witnesses, the elders who meet with a congregation member as a judicial committee hear the basic facts about the sinful conduct, determine its extent and whether there were any mitigating factors, and decide whether the sinner is repentant before God.  (Psalm 51:17; Psalm 86:5; Acts 26:20.)  In short, elders serving on a judicial committee try to help a person who has committed a serious sin begin the process of recovering spiritual health and help the congregation to remain spiritually and morally clean.—Jude 21-23.

33.    Based on the beliefs and practices of Jehovah's Witnesses, all spiritual communications taking place during an investigation or a judicial committee proceeding, or in furtherance of the congregation's ongoing spiritual assistance to a wrongdoer, are considered private and confidential.  The presence or participation of two or more elders in an investigation or judicial committee does not affect the elders' confidentiality obligations.  Furthermore, any records created in connection with these matters are kept under lock and key at the Kingdom Hall and are accessible to elders only, all of whom operate under the same duty to maintain confidentiality.

<div align="center">Spiritual Discipline</div>

34.    If a congregation member who has committed a serious sin repents, the elders on the judicial committee prayerfully determine what Bible-based instruction, restrictions, and spiritual discipline are appropriate.  They administer reproof either in private or in public "before onlookers" who have knowledge of the situation, to instill in the sinner and in any such onlookers a wholesome fear of displeasing God by continuing in a sinful course.  (2 Samuel 12:13; 1 Timothy 5:20.)  To serve as a reminder to the repentant sinner and to the congregation of the repentant sinner's ongoing process of regaining spiritual recovery, restrictions on the sinner's conduct in the congregation are imposed on such actions as commenting at meetings or participating in meeting parts. The elders help the wrongdoer to "keep making straight paths for [his] feet" thereafter.  (Hebrews 12:13.)  In due course, the judicial committee will lift the imposed restrictions if the individual's progress to spiritual recovery is manifest.

CAEKAERT/MAPLEY 007382

35.     If the elders conclude there is a need to do so, a simple announcement is made to the congregation so that members know that the wrongdoer committed a serious sin but has demonstrated a repentant attitude.   The type of serious sin committed is not divulged to the congregation or anyone else.

<u>Disfellowshipping Congregation Members</u>

36.     If a congregation member who committed a serious sin is unrepentant despite the elders' efforts to help the wrongdoer, the judicial committee prayerfully determines whether it is necessary to expel the unrepentant wrongdoer from the congregation in compliance with the Scriptures.   (1 Corinthians 5:11-13 ["stop keeping company…not even eating with such a man…Remove the wicked person from among yourselves."]; 1 Timothy 1:20 ["handed them over to Satan"]).   Based on the beliefs and practices of Jehovah's Witnesses, the decision to "disfellowship" is the strongest form of Scriptural discipline authorized by the Bible.

37.     In all cases of disfellowshipping (during the relevant time period of this Complaint), the elders on the judicial committee create a confidential spiritual record of their action and forward a notice of disfellowshipping (S-77) to Watchtower.   Watchtower would not open the notice of disfellowshipping; instead the sealed envelope would be delivered to an elder in the Service Department for confidential review.   Only elders authorized by the Branch Committee with a need to know (for religious reasons) have access to the notice.

38.     When a congregation member is disfellowshipped, an elder makes a simple announcement at a congregation meeting.   Based on the beliefs and practices of Jehovah's Witnesses, such an announcement puts congregation members on notice to stop any spiritual association with that person.   The type of wrongdoing committed by the disfellowshipped person is not divulged.

CAEKAERT/MAPLEY 007383

<u>Maintaining Confidentiality</u>

39.     The requirement that elders keep information and spiritual communications confidential is based on Scripture and has been explained in the official publications of Jehovah's Witnesses.—Proverbs 25:9; *The Watchtower*, April 1, 1971, pages 222-224; *Our Kingdom Ministry*, July 1975 page 3; *The Watchtower*, December 15, 1975, pages 764-66; *The Watchtower*, September 1, 1983, pages 21-26; *The Watchtower*, September 15, 1989, pages 10-15; *The Watchtower*, September 1, 1991, pages 22-27; *The Watchtower*, November 15, 1991, pages 19-23.

40.     Congregation members trust elders to keep all spiritual communications strictly confidential. This applies to all members, not just those accused of or confessing serious sin.

41.     Revealing confidential communications to those not entitled to hear them could call into question an elder's qualifications.

42.     While not every breach of confidentiality by an elder will result in his removal, each elder is accountable before God, the ultimate Judge, for his adherence to the Bible's command to maintain confidentiality.

43.     If an elder disclosed confidential information, his credibility and effectiveness as an elder would be compromised and it could have a chilling effect on the congregation members seeking spiritual encouragement, counsel and guidance from elders.  Because free and open communication between congregation members and their elders is essential to the spiritual welfare of the members and of the congregation as a whole, the importance of privacy and confidentiality is difficult to overstate.

44.     Because congregations are relatively small, each person in a congregation knows each other person in the congregation by name and family. An elder's disclosure of confidential information could readily embarrass a member, cause severe emotional distress, and even damage

CAEKAERT/MAPLEY 007384

the reputations of the member and others in the family. In turn, an elder's own relationship with God would be harmed by his causing embarrassment, distress or damage to a member. — Hebrews 13:17 ("those taking the lead among you … will render an account to God.")

I declare under penalty of perjury of the laws of the State of Hawaii that the foregoing is true and correct.

Executed on _____ January 10, 2022 in Wallkill, New York.

Thomas Jefferson, Jr. *Declarant*

CAEKAERT/MAPLEY 007385

## IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
## IN AND FOR THE COUNTY OF NAPA

| | | |
|---|---|---|
| CHARISSA W. and NICOLE D. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs.     . | ) | CASE NO.: 26-22191 |
| | ) | |
| Plaintiff | ) | Judicial Council Coordination |
| | ) | Proceeding No. 4374 |
| v. | ) | |
| WATCHTOWER BIBLE AND TRACT | ) | |
| SOCIETY OF NEW YORK, INC., et al. | ) | |
| | ) | |
| Defendants. | ) | **DECLARATION OF** |
| | ) | **ARVID W. KRON** |
| | ) | |
| AND COORDINATED ACTIONS. | ) | |
| | ) | |

I, Arvid W. Kron, after being duly sworn, depose and say:

1.    That I am over 21 years of age and reside in Napa, California.

2.    That I am a duly ordained minister and ministerial servant in the Oak Knoll Congregation of Jehovah's Witnesses, Napa, California, and that I served as an elder in the West Congregation, Napa, California, (River Park's former name) from approximately 1972 until 1991.

3.    That I am thoroughly familiar with the religious beliefs, teachings, and practices of Jehovah's Witnesses.

4.    That duly ordained ministers of Jehovah's Witnesses responsible for teaching and pastoral care of congregation members are called "elders."

5.      That it is a religious belief and practice of Jehovah's Witnesses based on God's Word, the Bible, that an elder has a responsibility to provides spiritual counseling to those who seek it, and that any person who needs spiritual help or is aware of another in such need should approach the congregation elders and convey to them whatever information may be needed to provide spiritual assistance to the erring one.  (Isaiah 32:2; James 5:14-16; Hebrews 13:17.)  In addition, for similar reasons, there are times when elders initiate discussions relating to the spiritual condition of congregation members.

6.      That it is the religious belief and practice of Jehovah's Witnesses, based upon Scripture and church tradition, that elders must maintain in strict confidence any church communications with congregants connected with the need for spiritual help or counseling, and congregants expect such communications to elders are and will remain confidential—regardless of who initiated the conversation.—Proverbs 15:22; 25:9, 10.

7.      That revealing such confidential communications would call into question an elder's qualifications and could result in his removal as an elder in the congregation.

8.      That if I or any elder is compelled to disclose such confidential information, our credibility and effectiveness as elders would be adversely affected and compromised, since congregants will no longer be able to trust and rely that problems and confidential information they disclose to elders will not be revealed through discovery and used against them in a court action.

9.      That the requirement of keeping communications to elders confidential is explained in the official publications of Jehovah's Witnesses as follows:

> In each congregation of Jehovah's witnesses there are mature ministers appointed to care for various assignments. (1 Tim. 3:2, 12) As they discharge their duties they often are told about confidential things, and it is essential that

2

they respect this confidence. For instance, James 5:13-16 shows that a member of the congregation who has some spiritual problem, perhaps even having committed a sin, should go to the spiritually older men for help. Isaiah 32:2 prophetically pictured these men as places of comfort and protection. What a fine thing it is to be able to explain one's problem and get balanced spiritual help, and at the same time have full confidence that the matter will not become general knowledge in the congregation or community.

Those mature ministers will not discuss even with their wives and close friends what they thus learn in confidence. They know that if they did so it would undermine respect for their positions; it would make individuals hesitant to come to them; yes, in time it might even make it impossible for them to fulfill their role as spiritual shepherds.

*The Watchtower*, April 1, 1971, p. 223.

10.     That it is also the religious belief and practice of Jehovah's Witnesses, based upon Scripture and church tradition, to keep congregation files, papers, reports, minutes or other documents prepared in conjunction with, or as a result of, the above-described confidential communications, confidential.

11.     That if I or any other elder is compelled to produce any papers, reports, minutes or other documents prepared in conjunction with or as a result of the above-described confidential communications, our credibility and effectiveness will be adversely affected and compromised, and the confidentiality of the oral communications will be rendered worthless.

12.     That I and two other elders from the West Congregation, Napa, California, met with Edward Villegas several times on or about January 1989 so as to provide him with spiritual counsel and assistance.  There were no non-clergy or other third persons present during these confidential meetings with Mr. Villegas.  Although a report relating to Mr. Villegas' disfellowshipping was sent by the three elders who met with him to the elders in the United States Service Department for Jehovah's Witnesses, as required by church practice and

09/29/2006 10:51 FAX                                                          ☒023

procedure, the specifics of the conversations that the three elders had with Mr. Villegas were not included in these two reports.

    13.    I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct to the best of my information, belief, and knowledge.

    Respectfully submitted,

    Arvid W. Kron

4

## IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
## IN AND FOR THE COUNTY OF NAPA

|  |  |
|---|---|
| CHARISSA W. and NICOLE D. ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| vs.   . ) | CASE NO.: 26-22191 |
| ) | |
| Plaintiff ) | Judicial Council Coordination |
| ) | Proceeding No. 4374 |
| v. ) | |
| WATCHTOWER BIBLE AND TRACT ) | |
| SOCIETY OF NEW YORK, INC., et al. ) | |
| ) | |
| Defendants. ) | **DECLARATION OF** |
| ──────────────────────── ) | **DAVID W. BECKER** |
| ) | |
| AND COORDINATED ACTIONS. ) | |
| ──────────────────────── ) | |

I, David W. Becker, after being duly sworn, depose and say:

1.      That I am over 21 years of age and reside in Napa, California.

2.      That I am a duly ordained minister and elder of the River Park Congregation of Jehovah's Witnesses, Napa, California.

3.      That I am thoroughly familiar with the religious beliefs, teachings, and practices of Jehovah's Witnesses.

4.      That duly ordained ministers of Jehovah's Witnesses responsible for teaching and pastoral care of congregation members are called "elders."

5.      That it is a religious belief and practice of Jehovah's Witnesses based on God's Word, the Bible, that an elder has a responsibility to provides spiritual counseling to those who seek it, and that any person who needs spiritual help or is aware of another in such need should

approach the congregation elders and convey to them whatever information may be needed to provide spiritual assistance to the erring one. (Isaiah 32:2; James 5:14-16; Hebrews 13:17.) In addition, for similar reasons, there are times when elders initiate discussions relating to the spiritual condition of congregation members.

6.      That it is the religious belief and practice of Jehovah's Witnesses, based upon Scripture and church tradition, that elders must maintain in strict confidence any church communications with congregants connected with the need for spiritual help or counseling, and congregants expect such communications to elders are and will remain confidential—regardless of who initiated the conversation.—Proverbs 15:22; 25:9, 10.

7.      That revealing such confidential communications would call into question an elder's qualifications and could result in his removal as an elder in the congregation.

8.      That if I or any elder is compelled to disclose such confidential information, our credibility and effectiveness as elders would be adversely affected and compromised, since congregants will no longer be able to trust and rely that problems and confidential information they disclose to elders will not be revealed through discovery and used against them in a court action.

9.      That the requirement of keeping communications to elders confidential is explained in the official publications of Jehovah's Witnesses as follows:

> In each congregation of Jehovah's witnesses there are mature ministers appointed to care for various assignments. (1 Tim. 3:2, 12) As they discharge their duties they often are told about confidential things, and it is essential that they respect this confidence. For instance, James 5:13-16 shows that a member of the congregation who has some spiritual problem, perhaps even having committed a sin, should go to the spiritually older men for help. Isaiah 32:2 prophetically pictured these men as places of comfort and protection. What a fine thing it is to be able to explain one's problem and get balanced spiritual help, and at the same time have full confidence that the matter will not become general knowl-

edge in the congregation or community.

Those mature ministers will not discuss even with their wives and close friends what they thus learn in confidence. They know that if they did so it would undermine respect for their positions; it would make individuals hesitant to come to them; yes, in time it might even make it impossible for them to fulfill their role as spiritual shepherds.

*The Watchtower*, April 1, 1971, p. 223.

10.    That it is also the religious belief and practice of Jehovah's Witnesses, based upon Scripture and church tradition, to keep congregation files, papers, reports, minutes or other documents prepared in conjunction with, or as a result of, the above-described confidential communications, confidential.

11.    That if I or any other elder is compelled to produce any papers, reports, minutes or other documents prepared in conjunction with or as a result of the above-described confidential communications, our credibility and effectiveness will be adversely affected and compromised, and the confidentiality of the oral communications will be rendered worthless.

12.    That I and two other elders from the River Park Congregation, Napa, California, met with Edward Villegas several times on or about January 1994 so as to provide him with spiritual counsel and assistance.  There were no non-clergy or other third persons present during these confidential meetings with Mr. Villegas.  Although a report relating to Mr. Villegas' disfellowshipping was sent by the three elders who met with him to the elders in the United States Service Department for Jehovah's Witnesses, as required by church practice and procedure, the specifics of the conversations that the three elders had with Mr. Villegas were not included in these two reports.

13.    I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct to the best of my information, belief, and knowledge.

☑019

Respectfully submitted,

David W. Becker

4

FILED

**JAN 2 7 2005**

THOMAS R. FALLQUIST
SPOKANE COUNTY CLERK

1

2  Donald G. Stone, WSBA #7547
   PAINE, HAMBLEN, COFFIN,
3    BROOKE & MILLER LLP
   717 W. Sprague Avenue, Suite 1200
4  Spokane, Washington 99201-3505
   Telephone:  (509) 455-6000
5  Facsimile:  (509) 838-0007
6

7  Attorney for Church Defendants

8          **IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON**
9              **IN AND FOR THE COUNTY OF SPOKANE**

10  AIMEY MERIE VIGUE, a single person;     )
    ROBERT SCOTT VIGUE and KAY            )
11  VIGUE, husband and wife,              )      No.  04-2-02451-4
                                          )
12              Plaintiffs                )      **AFFIDAVIT OF**
                                          )      **ALEXANDER W. REINMUELLER**
13  vs.                                   )
                                          )
14                                        )
    EDWARD NORMAN DAVIS and               )
15  CHERYLE DAVIS, husband & wife and     )
    husband & wife and marital community  )
16  thereof; WATCHTOWER BIBLE and         )
    TRACT SOCIETY OF NEW YORK, INC.;      )
17  WATCH TOWER BIBLE AND TRACT           )
    SOCIETY OF PENNSYLVANIA; CHRIS-       )
18  TIAN CONGREGATION OF JEHO-            )
    VAH'S WITNESSES; OPPORTUNITY          )
19  CONGREGATION OF JEHOVAH'S             )
20  WITNESSES,                            )
21
22              Defendants.
23  ─────────────────────────────
24  DEFENDANT WATCH TOWER BIBLE            *PAINE, HAMBLEN, COFFIN, BROOKE & MILLER LLP*
    AND TRACT SOCIETY OF PENN-                *717 WEST SPRAGUE AVENUE, SUITE 1200*
25  SYLVANIA'S MOTION TO DISMISS AN-          *SPOKANE, WA  99201 PHONE: (509) 455-6000*
26
27

CAEKAERT/MAPLEY 004984

## **AFFIDAVIT OF ALEXANDER W. REINMUELLER**

STATE OF NEW YORK )
                   ) ss.:
COUNTY OF KINGS    )

I, Alexander W. Reinmueller, after being duly sworn, depose and state as follows:

1.     I am over 18 years of age, of sound mind, and competent to make this Affidavit. I have personal knowledge of the matters contained herein, and they are all true and correct.

2.     I am the designated agent of Watch Tower Bible and Tract Society of Pennsylvania ("Watch Tower PA") for the purposes of this litigation.

3.     I am the overseer of the Treasurer's Office at the worldwide headquarters offices of Jehovah's Witnesses, which provides accounting, financial and risk management services to Watch Tower PA and other corporations used by Jehovah's Witnesses, and I thus have personal knowledge of the business activities and financial dealings of Watch Tower PA, including the matters contained herein.

4.     Watch Tower PA is a non-stock, non-profit corporation incorporated under the laws of the State of Pennsylvania in 1884. Its principal place of business is located at 25 Columbia Heights, Brooklyn, New York 11201-2483. Watch Tower PA is a tax exempt organization under Section 501(c)(3) of the Internal Revenue Code.

5.     Watch Tower PA does not have an office, mailing address, or telephone number in the State of Washington and has never maintained an office in the State of Washington. Watch Tower PA does not have employees, officers, or directors residing in the State of Washington. Further, Watch Tower PA does not and never has directed any type of commercial activity towards the State of Washington.

6.     Watch Tower PA is not required to maintain and has never maintained a place of business in Washington. Watch Tower PA has never been obligated to pay and never has paid taxes in Washington. Watch Tower PA has never maintained a bank account in Washington. Watch Tower PA has never held a Board of Directors, officers, or other meeting in Washington. Watch Tower PA has never held any conference or symposium in Washington.

DEFENDANT WATCH TOWER BIBLE
AND TRACT SOCIETY OF PENN-
SYLVANIA'S MOTION TO DISMISS AN-

*PAINE, HAMBLEN, COFFIN, BROOKE & MILLER LLP*
*717 WEST SPRAGUE AVENUE, SUITE 1200*
*SPOKANE, WA 99201 PHONE: (509) 455-6000*

CAEKAERT/MAPLEY 004985

7.   Watch Tower PA coordinates the worldwide activities of Jehovah's Witnesses by providing copyrighted literature (text and images for various publications) and financial support.  Historically, Watch Tower PA has also given powers of attorney to individuals in foreign countries to act on its behalf where the national laws require the appointment of a "chief" religious person.  Few, if any, foreign countries now have such requirements.

8.   In most countries where Jehovah's Witnesses are legally recognized, a local corporation has been formed to be legally responsible for the various appointments of individuals and is used to communicate with congregations in that country.

9.   Watch Tower PA has never acted in a supervisory capacity to any congregation in the United States, other than providing infrequent spiritual direction by mail.

10.  Watch Tower PA has never appointed congregation Elders in the United States, including Washington.

11.  Watch Tower PA is not responsible for any assemblies or conventions of Jehovah's Witnesses held in Washington or in the United States.

12.  Watch Tower PA, as a recognized charity, has received donations from individuals in Washington.  Some of these donations are in the form of real property.  In some cases, the individuals have deeded a part of their property to Watch Tower PA, but have retained a life estate in the property donated.

13.  Watch Tower PA administers a fund for the construction of church buildings entitled the Kingdom Hall Fund.  Through this fund, Watch Tower PA has provided financial assistance to congregations in the United States and around the world to build their places of worship known as Kingdom Halls and Assembly Halls.  In return for the financial assistance, the congregations have executed promissory notes and before 1988, mortgages, agreeing to pay back the loans.

14.  Watch Tower PA has lent money to congregations in Washington through its Kingdom Hall Fund to assist in the construction of places of worship and received promissory notes with mortgages prior to 1988 and since, without mortgages in return for the money lent.  However, these financing arrangements have been conducted exclusively through the mails and over the telephone.

15.  Watch Tower PA administers a fund named the Kingdom Hall Assistance Arrangement ("KHAA").  The KHAA is a fund created from voluntary donations

DEFENDANT WATCH TOWER BIBLE
AND TRACT SOCIETY OF PENN-
SYLVANIA'S MOTION TO DISMISS AN-

*PAINE, HAMBLEN, COFFIN, BROOKE & MILLER LLP*
*717 WEST SPRAGUE AVENUE, SUITE 1200*
*SPOKANE, WA 99201 PHONE: (509) 455-6000*

CAEKAERT/MAPLEY 004986

and used for the discretionary purposes of Watch Tower PA. These discretionary purposes include paying for uninsured property damage to Kingdom Halls as well as expenses and liability claims arising from accidents at Kingdom Halls. No premiums have ever been collected for the KHAA. Similarly, the KHAA does not guarantee payment to any person or legal entity that contributes to the fund. Finally, the KHAA has been used by Watch Tower PA in all 50 States in the United States and in many countries around the world. All correspondence concerning the KHAA fund has been conducted exclusively through the mails or over the telephone.

16. The Watchtower Bible School of Gilead ("School") has been owned and operated by Watchtower Bible and Tract Society of New York, Inc. ("WTNY") since its inception in 1942. The School does not have income, in the classical sense, because students do not pay tuition or other fees. WTNY underwrites all expenses for the School. All invitations to the School have been sent by WTNY to students in the United States and around the world since its inception.

17. Watch Tower PA maintains its own separate corporate meetings. Watch Tower PA maintains its own separate corporate books and records. Members of the Board of Directors and Officers of Watch Tower PA do not sit on any other corporations, including WTNY or Christian Congregation of Jehovah's Witnesses ("CCJW").

18. Watch Tower PA is not an agent of WTNY, CCJW, or any other corporation, entity, or unincorporated association.

19. Watch Tower PA prepares its own annual financial reports. These financial reports are prepared separately from all other corporations, including WTNY and CCJW.

20. Watch Tower PA maintains separate bank accounts from all other corporations. Watch Tower PA does not commingle funds with any other corporation.

21. Watch Tower PA has provided funds to other corporations, including WTNY and CCJW. These funds have been recorded as long-term receivables by Watch Tower PA and long-term payables by the other corporations. Watch Tower PA has also made gifts to other corporations and recorded them as such.

22. Watch Tower PA is not held out as liable for the debts of any other corporation, including WTNY or CCJW.

DEFENDANT WATCH TOWER BIBLE
AND TRACT SOCIETY OF PENN-
SYLVANIA'S MOTION TO DISMISS AN-

*PAINE, HAMBLEN, COFFIN, BROOKE & MILLER LLP*
*717 WEST SPRAGUE AVENUE, SUITE 1200*
*SPOKANE, WA  99201 PHONE: (509) 455-6000*

CAEKAERT/MAPLEY 004987

23.   Watch Tower PA occupies WTNY office space under a written lease.

24.   Watch Tower PA maintains all corporate formalities required by Pennsylvania law.  Watch Tower PA holds annual meetings of members and directors and documents all its meetings (annual, regular, or special), and all significant corporate actions.

SIGNED this the 30th day of December, 2004.

Alexander W. Reinmueller

SUBSCRIBED AND SWORN TO BEFORE ME on the 30th day of December, 2004, to certify which witness my hand and official seal.

Notary Public, State of New York

**MARIA J. DEL CARPIO**
Notary Public, State of New York
Reg. No. 01DE4937981
Qualified in Kings County
Commission Expires August 1, 2006

DEFENDANT WATCH TOWER BIBLE
AND TRACT SOCIETY OF PENN-
SYLVANIA'S MOTION TO DISMISS AN-

*PAINE, HAMBLEN, COFFIN, BROOKE & MILLER LLP*
*717 WEST SPRAGUE AVENUE, SUITE 1200*
*SPOKANE, WA  99201 PHONE: (509) 455-6000*

CAEKAERT/MAPLEY 004988

RECEIVED

OCT 2 8 2005

MILLER & PROTHERO
ATTORNEYS AT LAW

FILED

OCT 2 8 2005
THOMAS R. FALLQUIST
SPOKANE COUNTY CLERK

1   Donald G. Stone, WSBA #7547
2   Devra Sigle Hermosilla WSBA #31169
    PAINE, HAMBLEN, COFFIN,
3     BROOKE & MILLER LLP
    717 W. Sprague Avenue, Suite 1200
4   Spokane, Washington 99201-3505
5   Telephone:  (509) 455-6000
    Facsimile:  (509) 838-0007
6
7   Attorney for Church Defendants
8           IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
9              IN AND FOR THE COUNTY OF SPOKANE

10  AIMEY MERIE VIGUE, a single person;     )
    ROBERT SCOTT VIGUE and KAY             )
11  VIGUE, husband and wife,               )      No. 04-2-02451-4
                                           )
12              Plaintiffs                 )      AFFIDAVIT OF
                                           )      ALEXANDER W. REINMUELLER
13  vs.                                    )
                                           )
14                                         )
    EDWARD NORMAN DAVIS and                )
15  CHERYLE DAVIS, husband & wife and      )
16  marital community thereof; WATCH-      )
    TOWER BIBLE and TRACT SOCIETY          )
17  OF NEW YORK, INC.; WATCH TOWER         )
18  BIBLE AND TRACT SOCIETY OF             )
    PENNSYLVANIA; CHRISTIAN CON-           )
19  GREGATION OF JEHOVAH'S WIT-            )
20  NESSES; OPPORTUNITY CONGREGA-          )
    TION OF JEHOVAH'S WITNESSES,           )
21                                         )
22              Defendants.                )

23
    STATE OF NEW YORK  )
24                     )  ss.:
25  COUNTY OF KINGS    )
26
27      I, Alexander Reinmueller, being first duly sworn, declare as follows:

28  1.      I am over 18 years of age, of sound mind, and competent to make this Affidavit.  I have

    personal knowledge of the matters contained herein, and they are all true and correct.
29
30  AFFIDAVIT OF A. REINMUELLER - 1         *PAINE, HAMBLEN, COFFIN, BROOKE & MILLER LLP*
                                            *717 WEST SPRAGUE AVENUE, SUITE 1200*
                                            *SPOKANE, WA  99201 PHONE: (509) 455-6000*

CAEKAERT/MAPLEY 004990

2.      I am the designated agent of Watch Tower Bible and Tract Society of Pennsylvania (Watch Tower PA) for the purposes of this litigation.

3.      Watch Tower PA is incorporated in the State of Pennsylvania.

4.      Watch Tower PA ("Watch Tower" is two words) is a separate corporate entity from Watchtower Bible and Tract Society of New York, Inc. ("Watchtower" in "Watchtower NY" is one word).

5.      Watch Tower PA does not have agents, employees, officers, or directors, paid or otherwise, in the state of Washington.

6.      Watch Tower PA has never appointed elders or traveling overseers (i.e. circuit and district overseers) to serve in congregations of Jehovah's Witnesses in the United States.

7.      The appointment and spiritual supervision of elders and traveling overseers in the United States was communicated through Watchtower NY, not Watch Tower PA, until March 2002, after which such appointments and spiritual supervision have been communicated through Christian Congregation of Jehovah's Witnesses (CCJW).

8.      Although information concerning the Kingdom Hall Assistance Arrangement (KHAA) has at times been communicated to elders or traveling overseers on Watch Tower PA letterhead, and the donations for the KHAA are received by Watch Tower PA, the claims administration and risk management services are provided by the Risk Management Desk of the Treasurer's Office, which operates through Watchtower NY.  Furthermore, any insurance procured to cover elders or congregations in the United States was procured through the Treasurer's Office, which operates through Watchtower NY.

9.      Although, information concerning the Kingdom Hall Fund (KHF) has at times been communicated to elders or traveling overseers on Watch Tower PA letterhead, and the donations for the KHF are received by Watch Tower PA, the lending decisions for loans to congregations in the United States are jointly made by the U.S. Service Department, which operates through

AFFIDAVIT OF A. REINMUELLER - 2

PAINE, HAMBLEN, COFFIN, BROOKE & MILLER LLP
717 WEST SPRAGUE AVENUE, SUITE 1200
SPOKANE, WA  99201 PHONE: (509) 455-6000

CAEKAERT/MAPLEY 004991

1  Christian Congregation of Jehovah's Witnesses (CCJW) since March 2001 (previously operated
2  through Watchtower NY), and the Treasurer's Office, which operates through Watchtower NY.

3  10.    The administration of loans made through the KHF is under the direction of the Treas-
4  urer's Office, which operates through Watchtower NY.
5
6  11.    Watch Tower PA holds the copyright to literature (text and images) for various publica-
7  tions used to facilitate the activities of Jehovah's Witnesses worldwide, but it does not publish or
8  distribute such literature in the United States.  In the United States Watchtower NY publishes
9  and distributes such copyrighted literature.

10  12.    Although Watch Tower PA holds the copyright on numerous Bible-related publications
11  and information posted on the website known as www.watchtower.org, it does not publish, dis-
12  tribute, or operate such website.  The website is published, distributed, and operated by Watch-
13  tower NY.  The website itself states on its home page that Watchtower NY is the legal corpora-
14  tion used by Jehovah's Witnesses and has no reference to Watch Tower PA except for copyright.
15
16  13.    Watch Tower PA does not make any type of sales or otherwise participate in any com-
17  mercial activity in the State of Washington

18  14.    Further your affiant sayeth not.

19          I declare under penalty of perjury under the laws of the State of Washington that the
20  foregoing is true and correct upon my knowledge, information and belief.
21
22  SIGNED this the __8ᵗʰ__ day of __September__, 2005.
23
24
25  _____
26          Alexander W. Reinmueller
27
28
29
30  AFFIDAVIT OF A. REINMUELLER - 3          *PAINE, HAMBLEN, COFFIN, BROOKE & MILLER LLP*
                                            *717 WEST SPRAGUE AVENUE, SUITE 1200*
                                            *SPOKANE, WA  99201 PHONE: (509) 455-6000*

CAEKAERT/MAPLEY 004992

1   SUBSCRIBED AND SWORN TO BEFORE ME on the 8th ___ day of September, 2005, to certify
2   which witness my hand and official seal.

3

4

5   Notary Public, State of New York

6       MARIA J. DEL CARPIO
7       Notary Public, State of New York
        Reg. No. 01DE4937981
        Qualified in Kings County
8   Commission Expires August 1, 2006

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

29

30   AFFIDAVIT OF A. REINMUELLER - 4        *PAINE, HAMBLEN, COFFIN, BROOKE & MILLER LLP*
                                            *717 WEST SPRAGUE AVENUE, SUITE 1200*
                                            *SPOKANE, WA 99201 PHONE: (509) 455-6000*

CAEKAERT/MAPLEY 004993

| | |
|---|---|
| 1 | **CERTIFICATE OF SERVICE** |
| 2 | I HEREBY CERTIFY that on the _28th_ day of October, 2005, I caused to be served a |
| 3 | true and correct copy of the foregoing document to the following: |

4   David M. Miller                              ____ U.S. MAIL
5   MILLER & PROTHERO                         ☒   HAND DELIVERED
6   868 Paulsen Building                         ____ OVERNIGHT MAIL
    421 W. Riverside Avenue                       ____ TELECOPY (FAX)
7   Spokane, WA 99201

8       Attorneys for PLAINTIFFS

9
    Bevan J. Maxey                              ____ U.S. MAIL
10  MAXEY LAW OFFICES, P.S.                   ____ HAND DELIVERED
11  1835 West Broadway                          ____ OVERNIGHT MAIL
    Spokane, WA 99201                          ☒   TELECOPY (FAX)
12

13      Attorneys for DEFENDANT EDWARD
        DAVIS
14

15  Dean E. White                              ____ U.S. MAIL
    Attorney at Law                            ____ HAND DELIVERED
16  430 W. Indiana Avenue                       ____ OVERNIGHT MAIL
17  Spokane, WA 99205                          ☒   TELECOPY (FAX)

18      Attorneys for DEFENDANT CHERYLE
        RUSTAD
19

20

21

22                                       Andrew Mitchell

23

24

25

26

27

28  I:\Spodocs\30137\00002\plead\aff_decl\00344510.DOC

29

30  AFFIDAVIT OF A. REINMUELLER - 5        *PAINE, HAMBLEN, COFFIN, BROOKE & MILLER LLP*
                                            *717 WEST SPRAGUE AVENUE, SUITE 1200*
                                            *SPOKANE, WA 99201 PHONE: (509) 455-6000*

CAEKAERT/MAPLEY 004994

1
2
3                                          **FILED**

4                                        FEB 2 8 2007

5                                    THOMAS R. FALLOUIST
                                     SPOKANE COUNTY CLERK
6
7          IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
                    IN AND FOR THE COUNTY OF SPOKANE
8
9    AIMEY MERIE VIGUE, a single person;    )
10   ROBERT SCOTT VIGUE and KAY             )
     VIGUE, husband and wife,               )      No. 04-2-02451-4
11                                          )
12                Plaintiffs,               )      **DECLARATION OF GARY N.**
                                            )      **BREAUX**
13   vs.                                    )
                                            )
14                                          )
     EDWARD NORMAN DAVIS and                )
15   CHERYLE RUSTAD, husband and wife and   )
16   marital community thereof;             )
     WATCHTOWER BIBLE AND TRACT             )
17   SOCIETY OF NEW YORK, INC.; WATCH       )
18   TOWER BIBLE AND TRACT SOCIETY          )
     OF PENNSYLVANIA; CHRISTIAN             )
19   CONGREGATION OF JEHOVAH'S              )
     WITNESSES; OPPORTUNITY                 )
20   CONGREGATION OF JEHOVAH'S              )
21   WITNESSES,                             )
                                            )
22                Defendants.               )
23
24       I, Gary N. Breaux, am over 18 years of age, make this Declaration based on

25   personal knowledge, and am competent to testify herein.
26
27       1.      I have served as an elder since 1972.
28
29   DECLARATION OF GARY N.          *PAINE, HAMBLEN, COFFIN, BROOKE & MILLER LLP*
     BREAUX - 1                            *717 WEST SPRAGUE AVENUE, SUITE 1200*
30                                     *SPOKANE, WA 99201 PHONE: (509) 455-6000*

CAEKAERT/MAPLEY 004999

2.     I have been a voting member of Watch Tower Bible and Tract Society of Pennsylvania since January 21, 2002.  As a voting member, I attend all annual meetings of the corporation and am involved in all corporate decisions made by the voting members.

3.     Watch Tower Bible and Tract Society of Pennsylvania was incorporated in the State of Pennsylvania in 1884.  It has its principal place of business at 25 Columbia Heights, Brooklyn, New York.

4.     Watch Tower Bible and Tract Society of Pennsylvania ("Watch Tower" is two words) is a separate corporate entity from Watchtower Bible and Tract Society of New York, Inc. ("Watchtower" is one word).

5.     Watch Tower Bible and Tract Society of Pennsylvania ("WT-PA") has always maintained its own separate corporate records and observed all corporate formalities, and it has never had a parent or any subsidiary corporations, wholly-owned or otherwise.

6.     WT-PA holds the copyright to publications of Jehovah's Witnesses, makes funds donated worldwide available to local congregations of Jehovah's Witnesses to assist in the construction of Kingdom Halls (places of worship), and provides assistance to local congregations in obtaining insurance coverage.

7.     WT-PA has never exercised control over the personnel, accounting, management functions, or operational activities of any other corporation or entity.

8.     Since 1994, I have also served in the capacity of an elder in the Service Department at the U.S. Branch Offices of Jehovah's Witnesses in Patterson, New York.  I provide spiritual assistance to elders in the United States who call or write to the Service Department for spiritual help.  Prior to March 2001, the spiritual assistance provided by the

DECLARATION OF GARY N.
BREAUX - 2

PAINE, HAMBLEN, COFFIN, BROOKE & MILLER LLP
717 WEST SPRAGUE AVENUE, SUITE 1200
SPOKANE, WASHINGTON 99201-3505 PHONE (509) 455-6000

CAEKAERT/MAPLEY 005000

1   Service Department, along with the appointment of elders, was communicated to all
2   congregations of Jehovah's Witnesses through Watchtower Bible and Tract Society of New
3   York, Inc. ("WT-NY"). Since March 16, 2001, this communication, oversight, and control is
4   communicated through Christian Congregation of Jehovah's Witnesses ("CCJW").
5
6   9.      CCJW was incorporated on August 21, 2000. I am also a voting member of
7   CCJW and have served in that capacity since October 5, 2000. I can attest to the fact that
8   since March 16, 2001, all spiritual assistance, oversight, appointment, and control of the
9   congregations, including all elders of Jehovah's Witnesses in the United States, has been
10  communicated by the Service Department through CCJW.
11
12  10.     Since at least the 1960's, WT-PA has not been used to communicate spiritual
13  assistance, supervision, or advice to any congregation of Jehovah's Witnesses in the United
14  States.
15  11.     WT-PA has never appointed or supervised any elders in the Opportunity
16  Congregation in Spokane, Washington. It has never appointed or supervised defendant
17  Edward Davis as an elder in the Opportunity Congregation in Spokane, Washington.
18  12.     WT-PA has never been used to communicate spiritual supervision or direction
19  to any of the plaintiffs in the Opportunity Congregation, Spokane, Washington.
20
21  13.     Prior to October of 2002, WT-PA had no knowledge of any propensities of
22  defendant Edward Davis or that he might pose a danger to minors.
23
24
25
26
27  DECLARATION OF GARY N.
    BREAUX - 3
28

*PAINE, HAMBLEN, COFFIN, BROOKE & MILLER LLP*
717 WEST SPRAGUE AVENUE, SUITE 1200
SPOKANE, WASHINGTON 99201-3505 PHONE (509) 455-6000

CAEKAERT/MAPLEY 005001

1       I declare under penalty of perjury under the laws of the State of Washington that the

2  foregoing is true and correct upon my knowledge, information, and belief.

3       DATED this 3 day of October, 2006.

4

5                               GARY N. BREAUX

6

7  I:\Spodocs\30137\00002\plead\00445648.DOC

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27  DECLARATION OF GARY N.
BREAUX - 4

28

*PAINE, HAMBLEN, COFFIN, BROOKE & MILLER LLP*
717 WEST SPRAGUE AVENUE, SUITE 1200
SPOKANE, WASHINGTON 99201-3505 PHONE (509) 455-6000

CAEKAERT/MAPLEY 005002

1

### `CERTIFICATE OF SERVICE`

2      I HEREBY CERTIFY that on the 28ᵗʰ day of February, 2007, I caused to be
3   served a true and correct copy of the foregoing document to the following:

4
5   David M. Miller                          _____  U.S. MAIL
    MILLER & PROTHERO                        ___✓  HAND DELIVERED
6   868 Paulsen Building                     _____  OVERNIGHT MAIL
    421 W. Riverside Avenue                  _____  TELECOPY (FAX)
7   Spokane, WA  99201

8      Attorneys for PLAINTIFFS
9
10  Dustin Deissner                          _____  U.S. MAIL
    VAN CAMP & DEISSNER                      ___✓  HAND DELIVERED
11  1707 W. Broadway Avenue                  _____  OVERNIGHT MAIL
    Spokane, WA  99201                       _____  TELECOPY (FAX)
12
13     Attorneys for PLAINTIFFS

14  Bevan J. Maxey                           _____  U.S. MAIL
15  MAXEY LAW OFFICES, P.S.                  ___✓  HAND DELIVERED
    1835 West Broadway                       _____  OVERNIGHT MAIL
16  Spokane, WA  99201                       _____  TELECOPY (FAX)

17     Attorneys for DEFENDANT EDWARD
18     DAVIS

19  Dean E. White                            _____  U.S. MAIL
20  Attorney at Law                          ___✓  HAND DELIVERED
    921 N. Adams                             _____  OVERNIGHT MAIL
21  Spokane, WA  99201                       _____  TELECOPY (FAX)
22
23     Attorneys for DEFENDANT CHERYLE
       RUSTAD
24
25
26                          _____
27                                  Donald G. Stone
                                    Gerald Kobluk
28  I:\Spodocs\30137\00002\plead\00273741.DOC

29     DECLARATION OF GARY N.        *PAINE, HAMBLEN, COFFIN, BROOKE & MILLER LLP*
       BREAUX - 4                        *717 WEST SPRAGUE AVENUE, SUITE 1200*
30                                    *SPOKANE, WA  99201 PHONE: (509) 455-6000*

CAEKAERT/MAPLEY 005003