*Exhibit J*

```
 1   MONTANA TWENTIETH JUDICIAL DISTRICT COURT, SANDERS COUNTY

 2   CAUSE NUMBER: DV-16-84

 3   ALEX NUNEZ and HOLLY McGOWAN,      )
                                        )
 4           Plaintiffs,                )
                                        )
 5           vs.                        )   REPORTER'S TRANSCRIPT
                                        )      VOLUME I of III
 6   WATCHTOWER BIBLE AND TRACT         )
     SOCIETY OF NEW YORK, INC.;         )
 7   WATCHTOWER BIBLE AND TRACT         )
     SOCIETY OF PENNSYLVANIA, INC.;     )
 8   CHRISTIAN CONGREGATION OF          )
     JEHOVAH'S WITNESSES and            )
 9   THOMPSON FALLS CONGREGATION OF     )
     JEHOVAH'S WITNESSES,               )
10                                      )
             Defendants.                )
11   _____)
                                        )
12   WATCHTOWER BIBLE AND TRACT         )
     SOCIETY OF NEW YORK, INC,;         )
13   CHRISTIAN CONGREGATION OF          )
     JEHOVAH'S WITNESSES and            )
14   THOMPSON FALLS CONGREGATION        )
     OF JEHOVAH'S WITNESSES,            )
15                                      )
             Third-Party Plaintiffs,    )
16                                      )
             vs.                        )
17                                      )
     MAXIMO NAVA REYES, MARCO NUNEZ,    )
18   and IVY McGOWAN-CASTLEBERRY,       )
                                        )
19           Third-Party Defendants.    )
     _____)
20

21          Taken at the Sanders County Courthouse
                        1111 Main Street
22                   Thompson Falls, Montana
                   Monday, September 24, 2018
23                         9:30 a.m.

24

25          Honorable James A. Manley, presiding
```

1  testimony, right?  Is that correct?
2        A.  Yes.
3        Q.  Let's look at some of the policies that the
4  Jehovah's Witnesses have.  And I'll get my board up here.
5  First of all, I want to ask you about the two witness
6  policy.  Are you familiar with the two witness policy?
7        A.  Yes.
8        Q.  All right.  The two witness policy -- it's a
9  real thing, isn't it?
10       A.  As Jehovah's Witnesses we believe the Bible
11 principles and --
12       Q.  And we'll get into that, Mr. Chapel.  I don't
13 want to cut you off.  My question, just to the jury so
14 that they know, is the two-witness principle -- is it
15 something real?  Is it a real policy?
16       A.  There are two parts to this.  One is what we
17 heard earlier.  One is Biblical and the other has to do
18 with a crime.
19       Q.  Mr. Chapel --
20           MR. SMITH:  If I can, Judge, I'm just going
21 to --
22 BY MR. SMITH:
23       Q.  I want to go back to my question, which is
24 simply -- I'm not making this up, am I, the two witness
25 policy?  It's a real policy that the Jehovah's Witnesses

```
 1  have?
 2         A.  For our faith, yes, we have a two witness
 3  principle.
 4         Q.  And the two witness rule is used by the
 5  Jehovah's Witnesses and they apply it to the reporting of
 6  child abuse, don't they?
 7         A.  No.  They're two separate things.  If it's
 8  required --
 9             MR. SMITH:  Would you get Page 71.
10  BY MR. SMITH:
11         Q.  I just want to get that correct.  You're
12  telling me that the two witness rule is not applied by
13  the Jehovah's Witnesses to the reporting of child abuse?
14         A.  That is correct.  We will report an accusation
15  of child abuse by one accuser when it's required by law.
16         Q.  Okay.  We'll come back to that.
17             MR. SMITH:  It's from his first deposition.
18  BY MR. SMITH:
19         Q.  Mr. Chapel, I want to show you again more of
20  your sworn testimony that's in here.
21             MR. SMITH:  I need the page behind it, too.
22  BY MR. SMITH:
23         Q.  Let me hand you Page 71 of the sworn testimony
24  that you gave under oath.  All right.  Do you see where I
25  asked you, "Has the two witness principle changed over
```

```
 1  time as it applies to the reporting of child abuse?"  Do
 2  you see where I asked that?
 3          A.   No, I'm sorry, I don't see that on Page 71.
 4          Q.   Look at Page 71.
 5          A.   Uh-huh.
 6          Q.   Line 25 begins with, "Has the two witness
 7  principle" -- sir, Line 25.  I'm going to point to it.
 8  Do you see where it says, "Has the two witness principle
 9  changed over time?"  Do you see that?
10          A.   Yes.
11          Q.   It's on that page, isn't it?
12          A.   Yes, part of it.
13          Q.   You understand we're on Page 71 and you'll
14  need to flip to Page 72.
15          A.   Thank you.
16          Q.   Yes, sir.  Let me read my question.  I asked
17  you -- when you were under oath and I had a chance to
18  prepare this case for my clients to present to this jury
19  I asked, "Has the two witness principle changed over time
20  as it applies to the reporting of child abuse?"  Do you
21  see where I asked that?
22          A.   Yes.
23          Q.   Your answer was, "Like I mentioned, the need
24  for two or three witnesses goes back to Deuteronomy 17,
25  Verse 9 so that's quite a few thousand years."  And I
```

```
 1  asked, "So it has not changed?"  And you answered, "Not
 2  to my knowledge."
 3       A.  The two witness principle has not changed.
 4       Q.  It hasn't changed as it applies to the
 5  reporting of child abuse.  Isn't that my question, sir?
 6       A.  Yes.
 7       Q.  And you answered like I just read, didn't you?
 8       A.  Yes.
 9       Q.  All right.  Let's talk about how your religion
10  uses that rule in instances of child abuse.
11              MR. SMITH:  We're going to need Page 7.
12  BY MR. SMITH:
13       Q.  All right.  Would you agree with me that if
14  just one child reports abuse the church will not take
15  judicial action.
16       A.  What do you mean by "judicial action"?
17       Q.  Sir, is judicial action a term that your
18  religious faith uses?
19       A.  If it has to do with the Bible.
20       Q.  Is it a term that your religious faith uses?
21       A.  When it has to do with our religion, yes, but
22  by "judicial" are you referring to the law -- crime or
23  the sin?
24       Q.  Well, let me be very simple.  If just one
25  child says, "I'm being sexually assaulted" and there is
```

```
 1  only one witness, does your organization allow local
 2  Elders to form a judicial committee?
 3          A.   No.
 4          Q.   And they cannot take judicial action, can
 5  they?
 6          A.   No.
 7          Q.   And that is because of the two witness rule,
 8  right?
 9          A.   Because of the two witness principle.  You
10  need two witnesses to establish anything as fact.
11          Q.   Including child abuse?
12          A.   Any serious sin --
13          Q.   I understand.
14          A.   -- including child abuse.
15          Q.   Gotcha.  All right.  Let's talk about this
16  other policy about keeping things secret.  Do you know
17  what it means to keep something a secret?
18          A.   I do.
19          Q.   And would you agree with me that there are
20  policies that the Jehovah's Witnesses have that require
21  Elders to keep secrets?
22          A.   I do not agree with that.
23          Q.   All right.  Is it fair to say that Elders
24  within Jehovah's Witnesses have a confidentiality policy?
25          A.   Based on Proverbs -- a number of places in
```

```
 1  the information confidential.  This is also from your
 2  sworn testimony that the court reporter wrote down.  It's
 3  Page 150.
 4              MR. TAYLOR:  Your Honor, deposition one or
 5  two?
 6              MR. SMITH:  It's the second time he was
 7  under oath, number two.
 8  BY MR. SMITH:
 9       Q.  Line 7.  Follow along while I read my question
10  and your answer that you gave before the jury came in
11  here.  I said, "Well, wait a second, Mr. Chapel.  I'm
12  asking you about instances where the legal department
13  says you don't have to report it.  In that instance do
14  you teach Elders that they must keep the information
15  confidential"?  Now my first question to you is, did I
16  read my question exactly as it was written down?
17       A.  Yes, you did.
18       Q.  And tell me if I read your answer 100 percent
19  correct.  Your answer was, "Yes."
20       A.  Yes.
21       Q.  That's not your answer today, is it?
22       A.  It is.
23       Q.  So today and now so this jury knows, Jehovah's
24  Witnesses teach Elders if the legal department says you
25  don't have to report, they're expected to keep the
```

```
 1  information confidential?
 2        A.   Yes.
 3        Q.   Thank you, sir.  And that means that the
 4  Elders are told not to call the police even -- this is
 5  very important -- even when the child who's reporting it
 6  says to the Elders, "Please help.  I'm not coming to you
 7  in confidence"?
 8             MR. TAYLOR:  Objection, your Honor.  It
 9  assumes facts that are not in evidence.  That's not this
10  case.
11             THE COURT:  Overruled.
12  BY MR. SMITH:
13        Q.   Okay, let me get back and make sure this is
14  very clear because we are talking about what Jehovah's
15  Witnesses' Elders are taught, what the policies are.
16  They are taught that if the legal department says "you
17  don't have to report" -- do you follow me?
18        A.   Yes.
19        Q.   That the Elders are taught, "You must keep it
20  confidential."  Yes?
21        A.   Yes.
22        Q.   They must -- they're taught they must keep it
23  confidential.  Even if the child says, and I quote, "This
24  is not me asking for confidentiality," the Elders are
25  still instructed "You keep your mouth shut and you don't
```

```
 1  report it."  That's true, isn't it?
 2        A.  Yes.
 3        Q.  They even go -- Jehovah's Witnesses even go a
 4  step further and they tell these Elders, "If you tell
 5  Child Protective Services after legal tells you 'We don't
 6  think you have to report'" -- they tell the Elders
 7  "You're breaking our confidentiality policy"?
 8        A.  Yes.
 9        Q.  And the Elders are taught it is a bad thing to
10  report a known child molester to the police if legal
11  tells you not to report it?
12        A.  No.  We're told -- the legal department tells
13  them what the law is.
14        Q.  Sir, I'm looking at your first sworn
15  testimony, Page 141, Line 20.  First of all my question,
16  "Is it a bad thing that he reported to law enforcement?"
17  Your answer is, "Well, it wasn't required and so he knows
18  what the Bible says about confidentiality in Proverbs and
19  so if he decides to go ahead and report it, then that's
20  between him and Jehovah.  He knows what Jehovah requires
21  of him as an Elder and so if he decides to do something
22  different, then he has to answer to Jehovah for that."
23  That was your testimony, wasn't it?
24        A.  Yes.
25        Q.  That's the testimony you swore to under oath
```