# EXHIBIT 1

| | |
|---|---|
| Robert L. Stepans | Matthew L. Merrill (appearing *pro hac vice*) |
| Ryan R. Shaffer | 1401 Delgany St. #404 |
| James C. Murnion | Denver, CO 80202 |
| Victoria K.M. Gannon | Tel: (303) 947-4453 |
| Meyer, Shaffer & Stepans, PLLP | matthew@merrillwaterlaw.com |
| 430 Ryman Street | |
| Missoula, MT 59802 | |
| Tel: (406) 543-6929 | |
| Fax: (406) 721-1799 | |
| rob@mss-lawfirm.com | |
| ryan@mss-lawfirm.com | |
| james@mss-lawfirm.com | |
| katy@mss-lawfirm.com | |

*Attorneys for Plaintiffs*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MONTANA
# BILLINGS DIVISION

| | |
|---|---|
| TRACY CAEKAERT, and CAMILLIA MAPLEY, | ) ) ) |
| Plaintiffs, | ) Case No. CV-20-52-BLG-SPW ) ) |
| vs. | ) ) |
| WATCHTOWER BIBLE AND TRACT SOCIETY OF NEW YORK, INC., and WATCH TOWER BIBLE AND TRACT SOCIETY OF PENNSYLVANIA | ) ) ) ) ) |
| Defendants, | ) ) ) ) |

| | |
|---|---|
| ARIANE ROWLAND, and JAMIE SCHULZE </br></br> Plaintiff, </br></br> vs. </br></br> WATCHTOWER BIBLE AND TRACT SOCIETY OF NEW YORK, INC., and WATCH TOWER BIBLE AND TRACT SOCIETY OF PENNSYLVANIA, </br></br> Defendants. | Cause No. CV 20-59-BLG-SPW |

**NOTICE OF RULE 30(b)(6) DEPOSITION OF WATCHTOWER BIBLE AND TRACT SOCIETY OF NEW YORK, INC.**

**PLEASE TAKE NOTICE** that Pursuant to Federal Rule of Civil Procedure 30(b)(6), the Plaintiffs in the above-entitled actions will take the oral deposition of Defendant Watchtower Bible and Tract Society of New York, Inc. ("WTNY") on **Friday, March 8, 2024,** starting at **9:00 a.m. (EST)** and continuing thereafter until the same shall be completed. The deposition will take place at **Veritext Legal Solutions, 50 Main St., 3rd Floor, White Plains, NY 10606**. The deposition will be recorded by stenographic means before a duly qualified court reporter and recorded by audiovisual means.

The matters for examination are set out below. Pursuant to Fed. R. Civ. Pro. 30(b)(6), WTNY must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on its behalf; and it may

set out the matters on which each person designated will testify. The persons designated must testify about information known or reasonably available to the organization. Furthermore, WTNY has an affirmative duty to make available person(s) who will be able to give complete, knowledgeable, and binding answers on its behalf. *See e.g., Alvarado-Herrera v. Acuity*, 344 F.R.D. 103 (D. Nev. 2023); *Malone v. Eden*, 2017 WL 4539316 (D.N.M. Oct. 10, 2017) (*citing Reilly v. Natwest Markets Group Inc.*, 181 F.3d 253 (2d Cir. 1999).

## MATTERS FOR EXAMINATION

1. For the period 1970 to 1992, all details about the process for the application and approval of new Jehovah's Witnesses' congregations (including the process used for the approval of the Hardin Congregation), to include identification of who[1] the prospective congregation communicated with about the application and the physical location of all people who reviewed the application, including ownership of such physical location.

---

[1] Where these Matters for Examination seek identification people, and it is not possible for WTNY to identify specific individuals, please prepare to testify to general information about such people. For instance, as it pertains to this Matter of Examination, if WTNY cannot identify each specific person who communicated with prospective congregations regarding their applications, please prepare to describe the people who were responsible for such a task as specifically as possible, including identification of individuals who may have served in that role, any titles or designations those people would have had, the office that those people worked in, and who supervised those people.

2. For the period 1973 to 1992, all details about the process for the appointment, reappointment, and deletion of elders and ministerial servants, including elders in the Hardin Congregation, and including all levels of approval necessary for such appointments, reappointments, and deletions.

3. For the period 1973 to 1992, how elders, including those in the Hardin Congregation, were notified of, and instructed on, the tasks assigned to them as elders, including:

    a. Identification of all types of written material that discussed the tasks associated with serving as an elder, including but not limited to course books, Watchtower publications, All Bodies of Elders letters;

    b. How such written material would be delivered to local congregations;

    c. Description of the types of gatherings that were held to review and discuss the written material, including but not limited to Kingdom School Ministry Courses, Circuit Assemblies, and meetings with Circuit Overseers; and

    d. Identification of the people who would be invited or present at such gatherings, including whether Circuit Overseers and Bethelites would be present.

4. For the period 1973 to 1992, how ministerial servants, including those in the Hardin Congregation, were notified of, and instructed on, the tasks assigned to them as ministerial servants, including:

    a. Identification of all types of written material that discussed the tasks associated with serving as a ministerial servant, including but not limited to course books, Watchtower publications, All Bodies of Elders letters;

    b. How such written material would be delivered to local congregations;

    c. Describe the types of gatherings that were held to review and discuss the written material, including but not limited to Kingdom School Ministry Courses, Circuit Assemblies, and meetings with Circuit Overseers; and

    d. Identification of the people who would be invited or present at such gatherings, including whether Circuit Overseers and Bethelites would be present.

5. For the period 1973 to 1992, details of the process for the appointment and deletion of traveling overseers (Circuit and District), including those that visited the Hardin Congregation.

6. For the period 1973 to 1992, the frequency with which traveling overseers (District and Circuit) were expected to, and did in fact, visit local

congregations within their territory, including the Hardin Congregation, and how that expectation was communicated to them.

7. For the period 1973 to 1992, the details of how traveling overseers (Circuit and District), including those that visited the Hardin Congregation, were notified of, and instructed on, the tasks assigned to them as traveling overseers, including:

   a. Identification of all types of written material that included the tasks associated with serving as a traveling overseer;

   b. How the traveling overseer would receive such written material;

   c. Identification of all types of forms that the traveling overseers filled out and where those forms were sent;

   d. How the traveling overseer received such forms.

8. For the period 1973 to 1992, who reviewed reports sent in by traveling overseers (Circuit and District), the physical location where the reports were reviewed (and who owned such physical location), and who such overseers reported to at Bethel.

9. For the period of 1973 to 1992, details of how elders in the Service Department monitored the functioning and organization of congregations of Jehovah's Witnesses.

10. For the period 1973 to 1992, identification of who (including WTNY) held bank accounts that paid for the following expenses:

   a. Reimbursement to traveling overseers for costs that they incurred;

   b. Stipends or allowances provided to Bethelites;

   c. Service Department phone and utility bills;

   d. Legal Department phone and utility bills;

   e. Writing Department phone and utility bills;

   f. The expenses related to the printing of Jehovah's Witnesses' written materials, including Kingdom Ministry School Course books, Organization for Kingdom Preaching and Disciple Making books, Pay Attention to Yourselves and All of the Flock books, Awake! magazines, The Watchtower magazines, and the New World Translation of the Holy Scriptures;

   g. Expenses related to Gilead and Ministerial Training schools;

   h. Expenses related to holding annual conventions and circuit assemblies; and

   i. Expenses related to ownership or acquisition of real property in the United States used by Jehovah's Witnesses, including but not limited to taxes, acquisition costs, and leases.

11. For the period 1973 to 1992 identify the following about bank accounts used by WTNY:

    a. The approximate number of accounts;

    b. The sorts of expenditures that would be paid out of the accounts (this includes, but is not limited to expenses for printing, expenses related to property ownership, utilities, stipends/allowances, housing and food for Bethelites, Service Department expenses, Legal Department expenses, Writing Department expenses, expenditures approved by the Branch Committee); and

    c. Who had check writing authority for the accounts.

12. All consequences that could be or were imposed on elders and traveling overseers who failed to perform their respective tasks as expected or required.

13. For each of the publications listed below, the following: (1) the individuals who participated in the authorship, editing, and proofing, including but not limited to the process of determining what material was to be included; (2) what the publication was used for; (3) everyone who has ever owned a copyright in the publication; (4) how the copyright was transferred, if ever; and (5) everyone who has ever been the publisher:

    a. 1967 Your Word is a Lamp to My Foot

    b. 1972 Kingdom Ministry School Course

    c. 1972 Organization for Kingdom Preaching and Disciple Making

    d. 1977 Pay Attention to Yourselves and All of the Flock

    e. 1979 Pay Attention to Yourselves and All of the Flock

    f. 1983 Organized to Accomplish Our Ministry

    g. 1989 Organized to Accomplish Our Ministry

    h. 1991 Pay Attention to Yourselves and All of the Flock

    i. Awake! Magazines

    j. The Watchtower Magazines

14. For the period 1973 to 1992, whose money (including WTNY's) paid for costs associated with Kingdom Ministry Schools, including those held in Montana.

15. The location of the office for each WTNY Director during the period 1973 to 1992.

16. The location of the office for each WTNY Officer during the period 1973 to 1992.

17. For the period 1973 to 1992, whether WTNY had employees, and if so the approximate number over time, and the location of all offices where those employees worked.

18. For the period 1973 to 1992, if WTNY did not have any employees, who carried out tasks on behalf of WTNY, whether those people were Jehovah's Witnesses elders or ministerial servants, and the locations of their offices (or other locations) where they carried out their tasks on behalf of WTNY.

19. For the period 1973 to 1992, the location of all WTNY offices, the identification of the personnel (including approximate numbers of personnel) who worked or served in those offices, the identification of all expenses related to using, possession, acquiring, and operating those offices, and identification who paid those expenses.

20. For the period 1973 to 1992 the terms of all agreements regarding WTNY's use of buildings, utilities, phones, facilities, office spaces, and staffing, and whether any written documents memorializing such agreements exist or ever existed.

21. For the period 1973 to 1992, the terms of all agreements regarding anyone else's use of WTNY's buildings, utilities, offices, and properties owned or in the name of WTNY.

22. For the period of 1973 to 1992, identify and describe all document repositories (physical, digital, electronic) including file cabinets, databases, and any other document collections controlled by WTNY.

23. For each document repository responsive to the previous topic, where such documents went after 1992, including where they are today.

24. For the period of 1973 to the present, identify and describe all document repositories (physical, digital, electronic) including file cabinets, databases, and any other document collections at the U.S. Branch Office including any WTNY document repositories.

25. Details regarding the vow of poverty and obedience that members of the religious order of Jehovah's Witnesses take and accept, and whether it includes following policies dispensed by the religious order of Jehovah's Witnesses.

26. All details of what is commonly referred to as the two-witness rule, or two-witness principle, as it existed between 1973 and 1992, including:

    a. A general statement of the rule and any changes to it over time;

    b. How the rule and any changes to it were communicated to elders, including any and all written guidance provided to local congregations regarding application of the rule and whether that guidance was ever communicated on WTNY letterhead or contained in WTNY documents;

    c. How the rule would apply to the question of whether a judicial committee should be established in a situation where:

      i. elders receive a report that a young girl in a Jehovah's Witnesses' congregation was sexually abused by another member of the congregation; and

      ii. the alleged perpetrator denies the abuse; and

      iii. there are no other witnesses to the abuse.

27. All details of any rule, principle, or policy that requires Jehovah's Witnesses elders to keep certain information confidential during the period 1973 to 1992, including:

    a. A general statement of the rule, including what sorts of information are subject to the rule and any changes to the rule over time;

    b. Any components of the rule that permit confidential information to be shared with other Jehovah's Witnesses, including elders;

    c. How the rule and any changes to it were communicated to elders, including any and all written guidance provided to local congregations regarding application of the rule and whether that guidance was ever communicated on WTNY letterhead or contained in WTNY documents;

    d. The consequences to anyone who acts contrary to the rule; and

    e. How the rule was to be applied by Jehovah's Witnesses' elders who:

      i. learned that a young girl was sexually abused by a man in her congregation and the man confessed; or

      ii. learned of reports that a young girl was sexually abused by a man in her congregation, but the man did not confess.

28. All details of any policies regarding how Jehovah's Witnesses are instructed to interact, or not interact, with former members who have been disassociated or people who are considered to be apostates (also referred to as "shunning"), including how the rule was taught and applied during the period 1973 to 1992, and whether any of those policies have changed since

29. For the period 1973 to 1992, the details about how the amount of money that WTNY paid to WTPA for "printing privileges" or copies was calculated, including all details regarding the numbers of copies, journals, books, and the price per copy, journal, or book that was used to make such calculation.

30. For the period 1973 to 1992, the details about how royalties for Bibles and Magazines paid to WTPA were calculated.

31. For the period 1973 to 1992, the details about how the percentage of The Watchtower magazine sale revenues paid to WTNY versus the percentage paid to WTPA was determined.

32. For the period 1973 to 1992, the details about how the decision on the percentage of interest earned on conditional donations credited to WTNY versus those credited to WTPA was determined.

33. For the period 1973 to 1992, identify all property held and purchased by WTNY in the United States and describe what the property was used for, who was eligible to use the property, and how eligibility was determined, including identification of whether WTNY and/or WTPA Board Members received beneficial use of such properties.

34. For the period 1973 to 1992, the types/categories of loans (including mortgages), donations, gifts, or other monetary transfers made by WTNY to other Jehovah's Witnesses related entities.

35. For the period 1973 to 1992, the types/categories loans (including mortgages), donations, gifts, or other monetary transfers made by WTNY to congregations of Jehovah's Witnesses.

36. A detailed explanation as to why during fiscal years 1981 and 1982 WTNY changed from a fiscal year ending August to a fiscal year ending February 28.

37. For the period 1973 to 1992, a detailed explanation of the path of donations from local congregations to bank accounts held by Jehovah's Witnesses' entities (including WTNY).[2]

38. For the period 1973 to 1992, a detailed explanation of the path of sale revenues from literature and journals from the point of sale to bank accounts held by Jehovah's Witnesses' affiliated entities (including WTNY).

39. For the period 1973 to 1992, and where WTNY had a "Receivable" from WTPA in its annual financial statement, a detailed explanation as to how the receivable was calculated.  *See e.g.,* WTNY 000198.

40. For the period 1973 to 1992, an explanation of the amount of money that Bethelites paid for lodging and meals and identification of which Jehovah's Witnesses' entities received such amounts, including a description of where in the WTNY financial statements such amounts are reflected and any impact that these transactions had on assets, liabilities, and fund balances within the financial statements.

41. The WTNY comparative financial statements for fiscal years ended February 29, 1988 and 1987 denotes with an asterisk (*) on the 1987 column

---

[2]  This topic is intended to obtain testimony regarding the chain of custody for the subject funds, from the moment they were donated until the moment they were deposited into a Jehovah's Witnesses' affiliated bank account.

"The details of certain assets and fund balance accounts have been recast in order to be more properly comparable to present".  Please provide details, including calculations, substantiating the amount on the financial statements before and after recasting, as well as the Board of Directors and management discussions/decisions related to the recast amounts.

DATED this 1st day of February, 2024.

                                                MEYER, SHAFFER & STEPANS, PLLP

                                                /s/ Ryan Shaffer
                                                Ryan R. Shaffer

                                                *Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 1st day of February, 2024, a true and accurate copy of the foregoing was served on the following via email and U.S. Mail:

Jon A. Wilson
Brett C. Jensen
Michael P. Sarabia
Brown Law Firm, P.C.
315 North 24th Street
PO Drawer 849
Billings, MT 59103
jwilson@brownfirm.com
bjensen@brownfirm.com
msarabia@brownfirm.com

Joel M. Taylor, Esq. *pro hac vice*
Miller McNamara & Taylor LLP
412 Clock Tower Commons Dr.
Brewster, NY 10509
jtaylor@mmt-law.com

*Attorneys for Defendant Watchtower Bible and Tract Society of New York, Inc.*

Gerry P. Fagan
Christopher T. Sweeney
Jordan W. FitzGerald
27 North 27th Street, Suite 1900
P.O. Box 2559
Billings, MT 59103
gerry.fagan@moultonbellingham.com
christopher.sweeney@moultonbellingham.com
jordan.fitzgerald@moultonbellingham.com

*Attorneys for Defendant Watch Tower Bible and Tract Society of Pennsylvania*

/s/ Ryan Shaffer