Robert L. Stepans
Ryan R. Shaffer
James C. Murnion
Victoria K.M. Gannon
Meyer, Shaffer & Stepans, PLLP
430 Ryman Street
Missoula, MT  59802
Tel: (406) 543-6929
Fax: (406) 721-1799
rob@mss-lawfirm.com
ryan@mss-lawfirm.com
james@mss-lawfirm.com
katy@mss-lawfirm.com

*Attorneys for Plaintiffs*

Matthew L. Merrill (appearing *pro hac vice*)
Merrill Law, LLC
1401 Delgany Street, #404
Denver, CO  80202
Tel: (303) 947-4453
matthew@merrillwaterlaw.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## BILLINGS DIVISION

| | | |
|---|---|---|
| TRACY CAEKAERT, and CAMILLIA MAPLEY, | ) ) ) | Case No. CV-20-52-BLG-SPW |
| Plaintiffs, | ) ) | **PLAINTIFFS' BRIEF IN RESPONSE TO DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT (ECF NO. 346)** |
| vs. | ) ) ) | |
| WATCHTOWER BIBLE AND TRACT SOCIETY OF NEW YORK, INC., and WATCH TOWER BIBLE AND TRACT SOCIETY OF PENNSYLVANIA., | ) ) ) ) ) | |
| Defendants, | ) ) | |

///

///

///

# TABLE OF CONTENTS

SUMMARY OF RESPONSE.................................................................................1

SUMMARY JUDGMENT STANDARD ...................................................................2

SUMMARY OF RELEVANT FACTS ....................................................................3

  1.  Defendants operated as one to appoint, train, and control the Hardin elders....3

DEFENDANTS OWED DUTIES TO PLAINTIFFS ...............................................4

  1.  Defendants' Motion is Based on an Incomplete Recitation of Montana Law
     on the Legal Duty to Protect Third Persons from Harm. ..................................5

  2.  Defendants Affirmatively Undertook a Duty to Plaintiffs. .............................7

  3.  Statutory Duty......................................................................................10

  4.  Taking Charge of a Person Having Dangerous Propensities. .........................12

  5.  Fiduciary Duty .....................................................................................14

  6.  Duty to Hire, Train, Supervise Agents ...........................................................17

  7.  Defendants' Constitutional Argument...........................................................18

  8.  Defendants' Out of Jurisdiction Cases. ..........................................................21

PUNITIVE DAMAGES ......................................................................................23

CONCLUSION ...................................................................................................24

# TABLE OF AUTHORITIES

## Cases

*Albino v. Baca*,
 747 F.3d 1162 (9th Cir. 2014) ......................................................................2

*Anderson v. Liberty Lobby*,
 477 U.S. 242 (1986)........................................................................................2

*Davis v. Church of Jesus Christ of Latter Day Saints*,
 852 P.2d 640 (Mont. 1993) ............................................................ 6, 15, 20

*Deist v. Wacholz*,
 678 P.2d 188 (Mont. 1984) ..........................................................................6

*Doe v. Corporation of Catholic Bishop of Yakima*,
 957 F.Supp.2d 1225, 1232-35 (E.D. Wash. 2013)..................................23

*Doe v. Evans*,
 814 So.2d 370 (Fla. 2002) ..........................................................................22

*Doe v. Liberatore*,
 478 F. Supp. 2d 742 (M.D. Pa. 2007)......................................................20

*Fisher v. Swift Transp. Co., Inc.*,
 181 P.3d 601 (Mont. 2008)..........................................................................11

*Fortin v. The Roman Catholic Bishop of Portland*,
 871 A.2d 1208 (Maine 2005).......................................................................22

*Frlekin v. Apple, Inc.*,
 979 F.3d 639 (9th Cir. 2020) ........................................................................2

*Gliko v. Permann*,
 130 P.3d 155 (Mont. 2006)................................................... 5, 14, 15, 16

*In re Agric. Research and Tech. Group, Inc.*,
 916 F.2d 528 (9th Cir. 1990) ........................................................................2

*Langford v. Roman Catholic Diocese of Brooklyn*,
 677 N.Y.S.2d 436 (N.Y. Sup. Ct. 1998)....................................... 18, 20

*May Dept. Store v. Graphic Process Co.*,
  637 F.2d 1211 (9th Cir. 1980) .................................................................2

*Md. Cas. Co. v. Asbestos Claims Ct.*,
  460 P.3d 882 (Mont. 2020)............................................... 5, 6, 7, 10, 12

*Moses v. Diocese of Colorado,*
  863 P.2d 310 (Colo. 1993).................................................................23

*Nelson v. Driscoll*,
  983 P.2d 972 (Mont. 1999)................................................................13

*Peschel v. City of Missoula*,
  664 F.Supp.2d 1149 (D. Mont. 2009)................................................17

*Presbyterian Church v. Mary Elizabeth Blue Hull Memorial*
  *Presbyterian Church*,
  393 U.S. 440 (1969)...................................................................... 18, 19

*Prindel v. Ravalli County*,
  133 P.3d 165 (Mont. 2006)..............................................................6, 10

*Real v. Driscoll Strawberry Assocs.*,
  603 F.2d 748 (9th Cir. 1979) ...............................................................2

*Roman Catholic Bishop v. Super. Ct.*,
  50 Cal. Rptr. 2d 399 (Cal. App. 4th Dist. 1996)................................19

*Segal v. City of Bozeman*,
  No. CV 09-76-BU-DLC-RWA, 2013 WL 12344339
  (D. Mont. Nov. 18, 2013) ..............................................................7, 17

*Torcaso v. Watkins,*
  367 U.S. 488 (1961)...........................................................................19

*Vollmer v. Bramlette*,
  594 F.Supp. 243 (D. Mont. 1984)....................................................7, 17

## Statutes

Revised Codes of Montana § 10-1303....................................................11

Revised Codes of Montana § 10-1304 (1977).......................................11

**Plaintiffs' Response in Opposition to Defendants' Motion for Summary Judgment (ECF No. 346)**
*Caekaert and Mapley v. Watchtower Bible Tract of New York, Inc., et. al.*
iii

**Other Authorities**

Restatement (Second) of Torts §§ 314–20) ...........................................................6, 12

Restatement (Second) of Torts § 319............................................................. 6, 12, 13

Restatement (Second) of Torts § 874.......................................................................14

## SUMMARY OF RESPONSE

This case is about much more than "sexual violence that occurred in private homes . . ."  Defs.' Br. in Supp. at 5, ECF No. 347 (hereinafter "Defs.' Br."). Defendants' Motion conveniently omits their direct role in permitting Plaintiffs' abuse to occur and continue long after they could and should have stopped it:

➢ Years before Gunnar Hain ("Hain") sexually abused Plaintiffs, Defendants were told he was abusing young girls in the Hardin Congregation, and they failed to report it to secular authorities as required by Montana law or to take any other reasonable steps that would have prevented Hain from abusing Plaintiffs.

➢ After Hain and Bruce Mapley, Sr. ("Mapley") confessed to sexually abusing Tracy Caekaert, the Defendants' elder in Hardin stopped Plaintiffs' mother from reporting the abuse to secular authorities and instead kept the abuse a secret, which permitted it to continue unabated.

Plaintiffs' evidence establishes that Defendants' Hardin clergy kept Hain's and Mapley's child sexual abuse a secret because that is what Defendants instructed and trained them to do.  The Defendants had legal duties to protect the Plaintiffs from Hain and Mapley - and are subject to liability in this case - because they chose to insert themselves into what would have otherwise been private matters,

and they did so negligently, which was the cause of Hain's and Mapley's continued abuse.

## SUMMARY JUDGMENT STANDARD

"Summary judgment may properly be granted only when no genuine issue of material fact exists and the moving party is clearly entitled to prevail as a matter of law." *May Dept. Store v. Graphic Process Co.*, 637 F.2d 1211, 1214 (9th Cir. 1980) (citing *Real v. Driscoll Strawberry Assocs.*, 603 F.2d 748, 753 (9th Cir. 1979)). "[S]ummary judgment is an extreme remedy. It should not be granted unless the movant has established its right to judgment with such clarity as to leave no room for controversy. It must be found that the other party is not entitled to recover under any discernable circumstances." *Id.* "The evidence is viewed 'in the light most favorable to the non-moving party.'" *Frlekin v. Apple, Inc.*, 979 F.3d 639, 643 (9th Cir. 2020) (quoting *Albino v. Baca*, 747 F.3d 1162, 1168 (9th Cir. 2014) (en banc)). "All reasonable inferences from the evidence are drawn in favor of the non-moving party." *In re Agric. Research and Tech. Group, Inc.*, 916 F.2d 528, 534 (9th Cir. 1990) (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 252 (1986)).

///

///

///

## SUMMARY OF RELEVANT FACTS

### 1. Defendants operated as one to appoint, train, and control the Hardin elders.

Defendants WTNY and WTPA worked jointly to appoint, train, and control the Hardin elders.[1]  Pls.' Statement of Disp. Fact, ¶¶ 11–15a–h (hereinafter "SDF").  Defendants developed and jointly published a series of policies and procedures (the "Watchtower Protocols") that the Hardin elders and congregation members were required to follow, including a policy requiring congregation members to bring reports of child sexual abuse to the Hardin elders for investigation and resolution.  SDF, ¶¶ 16, 17.  As implemented by Defendants, through their Hardin clergy, the Watchtower Protocols were used to effectively supplant traditional secular processes for reporting, investigating, and resolving reports of child sexual abuse.  *Id*.  At all times relevant, Defendants' Hardin clergy were acting within the scope of their duties assigned by Defendants, including implementation of the Watchtower Protocols.  SDF, ¶ 42.

Between 1974 and 1976, Defendants' Hardin elders were notified that Hain was molesting young girls in the Hardin Congregation.  SDF, ¶¶ 21, 22.   In 1976, Hain's wife went to Presiding Overseer Martin Svenson ("Svenson") and Elder Harold Rimby ("Rimby") and notified them that Hain had sexually abused her

---

[1] The agency relationship between Defendants and the Hardin elders has recently been thoroughly briefed and is incorporated herein.  ECF Nos. 340, 351, 377.

daughter, C.K..  SDF, ¶ 23.  Svenson and Rimby came to the Hain home to investigate, and when told by Hain's wife that she wanted a divorce because of what he did, Svenson said no and instructed Hain to move into his home for a period of weeks.  SDF, ¶¶ 24–28.  C.K. understood that Defendants' Hardin clergy were taking care of Hain, however they did not report Hain's known child sexual abuse to secular authorities and told C.K. to keep it quiet.  SDF, ¶¶ 29, 31.

In 1977, Plaintiffs' mother went to the Hardin Congregation's Kingdom Hall and reported to Defendants' clergy that Mapley was sexually abusing Plaintiff Caekaert.  SDF, ¶¶ 34–39.  When Plaintiffs' mother expressed a desire to report the admitted abuse to secular authorities, Defendants' clergy said that they would "take care of it" but never made such a report.  SDF, ¶¶ 38, 39.

Plaintiffs and their mother relied on Defendants' Hardin clergy when he said he would "take care of it."  SDF, ¶ 46.  Despite knowing that Hain and Mapley were sexually abusing young girls in Hardin, including Plaintiffs, Defendants Hardin clergy kept the abuse secret and failed to take any steps to stop it from continuing.  SDF, ¶¶ 40–46.  As a result, both Hain and Mapley continued to sexually abuse Plaintiffs and other young girls in Hardin.

## DEFENDANTS OWED DUTIES TO PLAINTIFFS

Defendants ask the Court to hold that they did not have a duty of care to protect Plaintiffs.  While the existence of a legal duty is a question of law, it may

only be resolved on summary judgment "when no genuine issues of material fact remain." *Gliko v. Permann*, 130 P.3d 155, 161 (Mont. 2006). The circumstances bearing on the particular relationship between a plaintiff and defendant "are factual, and disputes over material facts will preclude summary judgment" on the question of duty. *Id.*

1. **Defendants' Motion is Based on an Incomplete Recitation of Montana Law on the Legal Duty to Protect Third Persons from Harm.**

Legal duties may arise from statutory or common law. *Md. Cas. Co. v. Asbestos Claims Ct.*, 460 P.3d 882, 895–97 (Mont. 2020). In general, one owes a common law duty to another "if the harm at issue is of a type reasonably foreseeable under the circumstances and, if so, imposition of such a duty comports with public policy under those circumstances." *Id.* at 894. "Thus, in the case of risks of harm to others directly caused by third parties beyond the control of the alleged tortfeasor, the threshold question of whether the alleged tortfeasor owed a common law duty of care in a particular case depends on whether: (1) a qualifying special relationship **or** affirmative undertaking exited or occurred under the circumstances at issue; (2) the harm at issue was of a type reasonably foreseeable under the circumstances; and (3) imposition of liability comports with public policy under the circumstances." *Id.* at 895 (emphasis added) (citing sources).

Montana law recognizes several situations where a defendant owes a duty to protect a plaintiff from harm by a third party:

➢ <u>Duty by Affirmative Undertaking</u>.  Montana law recognizes that a defendant who undertakes to perform a service or task that is necessary for the protection of a third person owes that person a duty to exercise reasonable care.  *Id.* at 895–97.

➢ <u>Statutory Duty</u>.  Montana law recognizes that a "duty may arise from a statutorily imposed obligation."  *Prindel v. Ravalli County*, 133 P.3d 165, 175 (Mont. 2006).

➢ <u>Duty of Those Who Take Charge of Person Having Dangerous Propensities</u>.  Montana recognizes Restatement (Second) of Torts Section 319, which provides that one who takes charge of a third person who is likely to cause bodily harm to others is under a duty to prevent future harm.  *Md. Cas. Co.*, 460 P.3d at 896 (citing Restatement (Second) of Torts §§ 314–20).

➢ <u>Fiduciary Duty of Those Who Choose to Act on the Trust and Confidence of Others</u>.  Montana recognizes that defendants in a special position of trust have a duty to act for the protection of the plaintiff.  *Deist v. Wacholz*, 678 P.2d 188, 193–94 (Mont. 1984); *Davis v. Church of Jesus Christ of Latter Day Saints*, 852 P.2d 640, 646 (Mont. 1993).

➢ <u>Duty to Properly Hire, Train and Supervise Agents</u>.  Montana recognizes that principals who appoint and delegate tasks to agents have a duty to

hire, train, and supervise those agents so that they are fit to perform the

duties delegated to them. *Segal v. City of Bozeman*, No. CV 09-76-BU-

DLC-RWA, 2013 WL 12344339, at *5 (D. Mont. Nov. 18, 2013) (citing

*Vollmer v. Bramlette*, 594 F.Supp. 243, 248 (D. Mont. 1984).

Defendants' Motion fails to acknowledge the full extent of Montana law as it

pertains to their legal duty to protect Plaintiffs from the known dangers posed by

Hain and Mapley. *See, e.g.,* Defs.' Br. at 9.

## 2. Defendants Affirmatively Undertook a Duty to Plaintiffs.

A person who affirmatively undertakes to perform a service or task that is

necessary for the protection of a third person has a duty to exercise reasonable care

in doing so. *Md. Cas. Co.*, 460 P.3d at 896–97.

Here, the Defendants affirmatively undertook to investigate and handle the

reports of child sexual abuse occurring within the Hardin Congregation of

Jehovah's Witnesses. Defendants established, published, and implemented the

Watchtower Protocols, which effectively required families in the Hardin

congregation to take reports and confessions of child sexual abuse to the Hardin

elders and then not disclose that information to anyone else. SDF, ¶¶ 16, 17. The

testimony from multiple Hardin congregation members and clergy establishes that

all congregation members were to bring any matter of serious sin, including child

sexual abuse, to the elders so that it could be handled confidentially within the church.  SDF, ¶¶ 17a, 18.

In or around 1976, Hain's wife went to the Hardin elders and reported that Hain had sexually abused his daughter, C.K..  SDF, ¶ 22.  According to C.K., Hardin elders Rimby and Svenson came to her house to investigate the allegations.  SDF, ¶ 24.  When Rimby and Svenson were told by CK's mom that she wanted to divorce Hain, they said she could not do so.  According to CK, the Hardin elders reported the abuse to "New York" to determine what discipline should be administered to Hain.  SDF, ¶ 25.  Svenson instructed Hain to move out of the family home for two weeks.  SDF, ¶ 26.   According to C.K., the Hardin elders did not report what they knew about Hain in 1976 to the police, or take any other reasonable steps to prevent him from continuing to abuse CK or other girls within the Hardin Congregation, including Plaintiffs.  SDF, ¶¶ 29, 43.  Instead, the elders told CK "not to talk about it."  SDF, ¶ 29.  Hain then went on to sexually abuse Plaintiffs a year later, in 1977.  SDF, ¶ 33.

In 1977, Plaintiffs' mom, Shirley Gibson, reported to Hardin elder Rimby that Hain and her husband, Mapley, had both confessed to sexually abusing her daughter, Tracy Caekaert.  SDF, ¶¶ 36, 37.  Like with C.K., Gibson testified that she called Rimby, who then came to her home where she disclosed what she had learned about Hain and Mapley.  SDF, ¶¶ 36, 37.  She then told Rimby that secular

authorities should be notified about the known child sexual abuse that Hain and Mapley had confessed to.  SDF, ¶ 39.  Rimby responded by stating, "I'll take care of it."  SDF, ¶ 39.  Like with Hain, Rimby did not "take care of it"; he did not report what he knew to secular authorities and he took no action to prevent further abuse of Plaintiffs by Mapley.  SDF, ¶ 44.  As a result, Mapley continued to sexually abuse Plaintiffs for at least three more years.  SDF, ¶¶ 34, 35, 44, 48

Plaintiffs' evidence establishes that Defendants set up a system of policies for fielding, investigating, and handling reports of child sexual abuse in the Hardin Congregation, i.e. the Watchtower Protocols.  Furthermore, the evidence is that the members of the Hardin Congregation understood that this process was their recourse in the event of wrongdoing.  If you learn that your daughter is being sexually abused, you take it to the elders who will handle it, and you don't tell anyone else about it.

Contrary to Defendants' argument, this case is not solely about sexual abuse in private homes.  It is a case about two corporations that establish, publish, and implement policies which reach deep into those homes and effectively require the people in those homes to keep reports of child sexual abuse quiet.  To be sure, the Defendants affirmatively undertook to handle the child sexual abuse at issue in this case, including child sexual abuse occurring in private homes.  Plaintiffs relied on the Defendants to undertake those tasks in a way that protected them from the

dangers posed by known child abusers, Hain and Mapley.  Defendants thereby took on a duty to protect Plaintiffs from further abuse.  *Md. Cas. Co.*, 460 P.3d at 896–97.

When C.K.'s mom reported that Hain had abused C.K. and she wanted to leave him, the Hardin clergy took control, moved Hain to the home of the Presiding Overseer (Svenson), and told C.K. to keep the abuse quiet.  Just the same, when Plaintiffs' mother went to the Hardin Congregation's Kingdom Hall and told Defendants' Hardin clergy that she wanted to report Mapley and Hain to the police, the elder stopped her by stating that he would "take care of it."  SDF, ¶ 39.  If Defendants did not want to insert themselves in what they now characterize as private matters occurring in private homes, they could have instituted policies that their appointed agents were not to handle reports of child sexual abuse and instead tell families it was a private matter outside their control.  While that is Defendants' litigation position today, the evidence establishes that Defendants affirmatively undertook a duty to protect Plaintiffs from further sexual abuse.  Accordingly, Defendants had a duty recognized by Montana law and their Motion should be denied.

### 3.  Statutory Duty

"Under Montana law, it is well established that a duty may arise from a statutorily imposed obligation.  *Prindel*, 133 P.3d at 175.  Where a duty is

established by statute, the Montana Supreme Court looks "to the class of people the statute was intended to protect to determine whether the plaintiff is a member of that class." *Fisher v. Swift Transp. Co., Inc.*, 181 P.3d 601, 607 (Mont. 2008). If so, the plaintiff is a "foreseeable plaintiff." *Id.* Recently, a Montana court denied Defendants' similar motion for summary judgment arguing they owed the plaintiffs/child sexual abuse victims no duty because the mandatory reporting statute created a duty. Ex. A, *Nunez* Ord. Denying Defs.' MPSJ, 1.[2]

Through October of 1979, Montana's mandatory reporting law required any person who had reason to believe that a minor was being sexually abused to report those reasons to the Montana department of social and rehabilitation services. R.C.M. § 10-1304 (1977). The purpose of this statute was to protect children whose "health and welfare are adversely affected and further threatened by the conduct of those responsible for their care and protection." R.C.M. § 10-1303. Plaintiffs, as children "threatened by the conduct of those responsible for their care and protection" certainly fall within the class of people the mandatory reporting law was intended to protect. *Id.* Accordingly, Plaintiffs are "foreseeable

---

[2] Defendants will likely point out that the Montana Supreme Court found in their favor in *Nunez.* 455 P.3d 829 (Mont. 2020). While this is true for the negligence per se claim, the plaintiffs in *Nunez* voluntarily dismissed their common law negligence claims before trial, leaving the court's ruling that the statute created a duty undisturbed. *Id.* at 831; Ex. A, *Nunez* Ord. Denying Defs.' MPSJ, 1; *see also* Ex. B, *Nunez* Pls.' Resp. to Defs.' MSJ, 2–3 (arguing the statute created a duty).

plaintiffs" to whom Defendants owed a statutory duty of care and Defendants'

Motion should be denied.

### 4. Taking Charge of a Person Having Dangerous Propensities.

"One who takes charge of a third person whom he knows or should know to

be likely to cause bodily harm to others if not controlled is under a duty to exercise

reasonable care to control the third person to prevent him from doing such harm."

Restatement (Second) of Torts § 319.  The Montana Supreme Court has referenced

Section 319 as a basis for a "special relationship" that creates a legal duty.  *Md.*

*Cas. Co.*, 460 P.3d at 896 (citing Restatement (Second) of Torts §§ 314–20).

According to C.K., after her mother informed Defendants' Hardin clergy

that Hain had sexually abused her, they removed Hain from the family home for

two or three weeks and he was required to live at the Presiding Overseer's

(Svenson) house:

> **Q. Okay. And my understanding from what
> you've just said is that you told your mom, and
> your mom either called the Elders or went to the
> Elders?**
> A. Yeah, she called them. They came over to
> the house.
> **Q. Okay.**
> A. I remember them coming there, because like
> I said, Gunnar was not happy. He was very upset
> with me.
> **Q. Do you remember what Elders came to the
> house?**
> A. Martin, Harold Rimby -- I don't remember
> who else was there at that time.

> **Q. Okay. And Martin --**
> A. Martin and Harold were the ones that my
> mom usually called when there were issues or when
> there was things going on. That was just who she
> went to.
> **Q. Okay. And is that Martin Svensen?**
> A. Yeah.
> **Q. Okay. And I also heard you say that**
> **they -- it sounds like -- did your mom want a**
> **divorce?**
> A. Yeah, she wanted him gone. They told her
> that she couldn't divorce him. Gunnar was blind,
> so it was kind of like they played -- you know,
> he -- they played on her as far as I'm concerned.
> But, yeah, he went and stayed with the Svensens for
> a while. Mom didn't talk to him for a couple days.
> We still went to meetings and everything, but --

SDF, ¶ 27.  Based on this evidence, the jury could find that Defendants' Hardin

clergy took charge of and exercised control over Hain as contemplated in

Restatement (Second) § 319.  *See also Nelson v. Driscoll*, 983 P.2d 972, 981

(Mont. 1999) (noting that the terms *custody* and *custodial* relationship require a

degree of control which results in restraint on one's liberty).

Similarly, in 1977, when Plaintiffs' mother stated that "We need to call the

authorities" the Defendants' Hardin clergy stopped her and stated that he would

"take care of it."  SDF, ¶ 39.  The choice by Defendants' clergy to intercede, stop

Plaintiffs' mother from calling the police, and to "take care of it" was the point in

time in which Defendants "took charge" of the investigation and response to

Mapley's sexual abuse of Plaintiffs and accepted a duty to protect the Plaintiffs from further abuse by him.

Plaintiffs' evidence establishes that Defendants - acting through their appointed Montana clergy - chose to intercede and take charge of both Hain and Mapley at points in time that could have prevented Hain's abuse and interrupted Mapley's abuse.  When determining whether Plaintiffs were "foreseeable plaintiffs", the question is whether they were within the "scope of risk" created by Hain's and Mapley's sexual abuse of young girls.  Here, once Defendants' Hardin clergy learned that Hain and Mapley were sexually abusing young girls, the Plaintiffs were clearly within the "scope of risk" of further abuse.  Accordingly, Plaintiffs' evidence establishes that Defendants had a duty to Plaintiffs and their Motion for Summary Judgment should be denied.

## 5. Fiduciary Duty

"A fiduciary relation exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." Restatement (Second) of Torts § 874.  Determining whether a fiduciary duty exists is a question of law, that depends upon satisfactory proof of a special relationship. *Gliko*, 130 P.3d at 161.  This can be resolved on summary judgment only when no genuine issues of material fact remain. *Id*.

Montana courts have considered several factors when determining whether a fiduciary duty exists between a church and a member such as: the totality of the role the church plays in all aspects of its members lives; contributions to the church made by the member; the principles and practices of the church and how they provide an extended family; as well as a support system for all problems to include emotional and financial difficulties, and whether due to these principles and practices, the church is aware of all personal and financial aspects of a members life. *Davis*, 852 P.2d at 646, *overruled on other grounds by Gliko*, 130 P.3d 155 (holding that a fiduciary relationship may exist where there is a relationship of "trust and confidence" between two parties).[3]

In this case, Plaintiffs' evidence establishes that Defendants' Watchtower Protocols were designed and implemented to govern nearly all aspects of the Hardin Congregation members' lives.  Members were required to take personal matters of concern to the elders for investigation and resolution.  In turn, the elders took charge of events happening in the Congregation members' private homes by

---

[3] The *Gliko* court's holding involved the narrow issue of when courts can resolve questions of legal duty on summary judgment and whether the Monana Supreme Court's prior decisions on that issue needed clarification.  130 P.3d at 159–62 ("[W]e now reaffirm that whether a fiduciary duty exists between two parties is a question of law, not fact, and it may be resolved on summary judgment **when no genuine issues of material fact remain**.") (emphasis added).  *Gliko* did not disturb the *Davis* court's conclusion that facts establishing a fiduciary relationship between a church and its parishioner precluded summary judgment on the question of legal duty.

asserting control over how Hain and Mapley's admitted child sexual abuse would be handled: Hain would go live with the Presiding Overseer (Svenson) for a few weeks, and Rimby would "take care of" Mapley.

Moreover, the fact that C.K.'s mother and Plaintiffs' mother both contacted the Defendants' clergy (instead of secular authorities) upon learning their daughters had been sexually abused, and then followed the directives of Defendants' clergy, is unequivocal evidence that a relationship of "trust and confidence" with Defendants existed.  In sum, Defendants' Watchtower Protocols were intended to supplant secular processes by investigating and handling reports of wrongdoing within the Congregation.  The Watchtower Protocols put the Defendants in charge of matters, like allegations of child sexual abuse, that would have otherwise been personal and handled by secular authorities.  The evidence is that members of the Hardin Congregation placed their "trust and confidence" in the Defendants to properly handle Hain and Mapley.

Plaintiffs' evidence is sufficient for a jury to conclude that Defendants' implementation of the Watchtower Protocols established a fiduciary relationship for the purpose of protecting Plaintiffs from sexual abusers, like Hain and Mapley. *See Gliko*, 130 P.3d at 161 ("The circumstances of the particular relationship are factual, and disputes over material facts will preclude summary judgment."). Accordingly, whether or not a fiduciary relationship existed between Plaintiffs and

Defendants is based on disputed facts that should be resolved by the jury and Defendants' Motion should be denied.

### 6. Duty to Hire, Train, Supervise Agents

Montana recognizes a negligence claim against the principal of an agent for negligently hiring, training, or supervising that agent. *Peschel v. City of Missoula*, 664 F.Supp.2d 1149, at 1168 (D. Mont. 2009); *see also Segal*, 2013 WL 12344339, at *5 (citing *Vollmer*, 594 F.Supp. at 248). Therefore, Defendants had a duty to Plaintiffs to hire, train, and supervise their Hardin clergy to handle the tasks delegated to that clergy.

Here, Defendants established a series of policies and procedures, by which members of the Hardin Congregation were required to comply (the Watchtower Protocols). These policies placed the investigation and resolution of reports about child sexual abuse, including child sexual abuse occurring in private residences, in the hands of Defendants' Hardin elders. As a result, Defendants had a duty to Plaintiffs to hire, train and supervise clergy to properly handle reports of child sexual abuse and protect Plaintiffs from the foreseeable risk of sexual abuse by admitted child molesters, Hain and Mapley. Accordingly, Defendants cannot establish that they did not have a duty to Plaintiffs and their Motion for Summary Judgment should be denied.

**7. Defendants' Constitutional Argument**

Defendants claim the First Amendment prohibits using their "teachings" in the duty analysis.  Def.'s Br. at 15–17.  Defendants are two corporations that appointed agents to voluntarily handle reports of childhood sexual abuse pursuant to their policies and procedures.  The Supreme Court has long recognized that "Civil controversies involving religious parties or institutions may be adjudicated without offending the First Amendment as long as neutral laws of general applicability are utilized in their resolution."  *Langford v. Roman Catholic Diocese of Brooklyn*, 677 N.Y.S.2d 436, 437 (N.Y. Sup. Ct. 1998) (citing *Presbyterian Church v. Mary Elizabeth Blue Hull Memorial Presbyterian Church*, 393 U.S. 440, 449 (1969)).  The "neutral principles" doctrine forbids courts from resolving "ecclesiastical questions" or disputes over religious doctrine.  *Presbyterian Church*, 393 U.S. at 449.

Here, Plaintiffs are asking that the neutral laws of Montana, cited throughout this brief, to be applied to Defendants' just as they would any other corporate entities.   On the other hand, Defendants are asking for special immunity from tort that is not supported by the First Amendment or the cases they cite.

In *Roman Catholic Bishop v. Super. Ct*., the plaintiff argued that the priest's vow of celibacy was relevant to duty because it "add[s] to their aura of spiritual power and authority, [under which] a child [parishioner] should suppose herself to

be safe from sexual abuse."  50 Cal. Rptr. 2d 399, 406 (Cal. App. 4th Dist.

1996).  The court cited *Torcaso v. Watkins* alone for the proposition that "Under

the free exercise clause of the First Amendment, the state may not compel

affirmation of a religious belief nor impose requirements based on belief in any

religion."  *Id.* (citing 367 U.S. 488, 495 (1961)).  *Torcaso* was a case that struck

down a Maryland law requiring public officials to profess their belief in God.  The

*Roman Catholic Bishop* court concluded, without any analysis or explanation how

*Torcaso* applied to a private negligence case, "the church had no greater civil duty

based upon its religious tenets."  *Id.*  This California court's unreasoned and

confused use of *Torcaso* is neither applicable nor binding.  Plaintiffs are not

arguing that Defendants have "greater civil duty based upon [their] religious

tenets" and Plaintiffs are not seeking to "compel affirmation of a religious belief

nor impose requirements based on belief in any religion."  Rather, Plaintiffs are

seeking to hold Defendants to the same, neutral rules of general applicability that

apply to all corporations.

In *Presbyterian Church*, the question presented was "whether the restraints

of the First Amendment, as applied to the States through the Fourteenth

Amendment, permit a civil court to award church property on the basis of the

interpretation and significance the civil court assigns to aspects of church

doctrine."  393 U.S. at 441.  The jury was asked to decide whether one party "had

departed from its tenets of faith and practice." *Id.* at 443. The Court decided such an inquiry violated the First Amendment but noted that "Civil courts do not inhibit free exercise of religion merely by opening their doors to disputes involving church property." *Id.* at 449.

In *Langford*, the plaintiff was ill and a priest visited her at home to heal her through his professed connection to God, while also sexually abusing her. 677 N.Y.S.2d at 437. The plaintiff alleged that her belief in his religious power to heal her and fear of losing God's favor by angering the priest created a fiduciary relationship. *Id.* The court rejected this argument, reasoning that the jury would have to weigh "the legitimacy of plaintiff's beliefs, the tenets of the faith insofar as they reflect upon a priest's ability to act as God's emissary and the nature of the healing powers of the church." *Id.* at 439. This New York holding is not applicable because Plaintiffs are not asking this Court or the jury to weigh the legitimacy of any Jehovah's Witnesses beliefs or the powers of Jehovah's Witnesses clergy. Moreover, other courts have rejected Defendants' suggestion that all fiduciary duty cases involving a religion are barred by the First Amendment. *See, e.g., Davis*, 852 P.2d at 646; *see also Doe v. Liberatore*, 478 F. Supp. 2d 742, 770 (M.D. Pa. 2007) (citing cases).

Plaintiffs' case does not involve the interpretation of religious doctrine, or a dispute over protected religious beliefs. Plaintiffs are not asking the Court or the

jury to decide whether Defendants' officials are capable of healing diseases through God or whether the belief in such is reasonable.  Instead, Plaintiffs' opposition to Defendants' Motion asks this Court to apply the neutral laws of Montana to their claims just like they would apply to anyone else.  Accordingly, Defendants had the same common law and statutory duties to protect Plaintiffs from the foreseeable dangers posed by Hain and Mapley that anyone in Montana would have under the same circumstances.  Defendants' First Amendment argument effectively asks this Court to immunize them from liability and should be rejected.

## 8.  Defendants' Out of Jurisdiction Cases.

Defendants cite a variety of out-of-state, nonbinding, and unapplicable cases to support their argument.  Defs.' Br. at 11–19.  Not only do these cases not apply Montana law, they are all factually distinct from this case.  The factual records in *Conti*, *Berry*, and *Bryan* did not include evidence that the local Jehovah's Witnesses clergy took custody or "charge" of the perpetrators, like they did Hain in this case.  Similarly, the record in those cases does not include evidence that the Jehovah's Witnesses clergy told the victim's families that they would "take care of it."  These are significant and meaningful factual distinctions that would have led to different outcomes in the cases cited by Defendants.  Additionally, none of the

cases cited by Defendants dealt with the same statutory based duty that existed in Montana through 1979 under Montana's mandatory reporting statute.

Furthermore, just as Defendants can cite out-of-jurisdiction cases that support their argument, so can Plaintiffs:

➢ In *Doe v. Evans*, the Florida Supreme Court "agree[d] with the reasoning of the courts that have determined the evaluation of whether a fiduciary relationship arose and whether a religious organization breached this duty does not require an adjudication of religious doctrine or beliefs."  814 So.2d 370, 376 (Fla. 2002).

➢ In *Fortin v. The Roman Catholic Bishop of Portland*, the Maine Supreme Court held that "If a religious organization knows or has reason to know that a member of its clergy has a propensity to sexually abuse children, the First Amendment . . . [is] not necessarily violated if the civil law imposes on the organization a duty to exercise due care to protect children with whom the organization has a fiduciary relationship."  871 A.2d 1208, 1231 (Maine 2005).

➢ In *Moses v. Diocese of Colorado* the Colorado Supreme Court noted that "Application of a secular standard to secular conduct that is tortious is not prohibited by the Constitution . . . the Supreme Court has not granted churches broad immunity against being sued in civil courts . . . civil actions

against clergy members and their superiors that involve claims of a breach of fiduciary duty, negligent hiring and supervision, and vicarious liability are actionable if they are supported by competent evidence."  863 P.2d 310, 320–21 (Colo. 1993).

➢ In *Doe v. Corporation of Catholic Bishop of Yakima* the court rejected the church defendant's argument that it did not owe a duty to the plaintiff because plaintiff proved that the defendant "should have been aware of the risk posed by the abuser."  957 F.Supp.2d 1225, 1232-35 (E.D. Wash. 2013).

## PUNITIVE DAMAGES

Defendants ask the Court to dismiss Plaintiffs' punitive damages claim on the sole premise that Plaintiffs' negligence and negligence per se claims should also be dismissed.  Defs. Br. at 26.  Defendants' Motion does not challenge the sufficiency of the evidence as it pertains to punitive damages.  Therefore, the only question before the Court is whether any of Plaintiffs' negligence and negligence *per se* claims survive summary judgment; if any one of those claims survives summary judgment, then Defendants' punitive damages argument fails as a matter of law.  Because Defendants have not met their burden on summary judgment for dismissal of Plaintiffs' negligence and negligence per se claims, their punitive damages argument should be denied.

## CONCLUSION

The evidence shows Defendants had legal duties to protect the Plaintiffs from Hain and Mapley - and are subject to liability in this case - because they chose to insert themselves into what would have otherwise been private matters, and they did so negligently, which was the cause of Hain's and Mapley's continued abuse.  Defendants Motion should accordingly be denied.

DATED this 9th day of May, 2024.

By: /s/ Ryan Shaffer
     Ryan R. Shaffer
     MEYER, SHAFFER & STEPANS PLLP

     *Attorneys for Plaintiffs*

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.3(d)(2), Plaintiff hereby certifies that this brief complies with the length requirement for briefs, and that this brief contains 5,485 words, excluding the caption, certificates of service, and compliance, table of contents, and authorities, and exhibit index.

By: /s/ Ryan Shaffer
      Ryan R. Shaffer
      MEYER, SHAFFER & STEPANS PLLP

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

Pursuant to Local Rule 1.4, this document has been served on all parties via electronic service through the Court's Case Management/Electronic Case Filing (CM/ECF) system.

By: /s/ Ryan Shaffer
      Ryan R. Shaffer
      MEYER, SHAFFER & STEPANS PLLP

*Attorneys for Plaintiffs*