*Exhibit B*

**Shirley Gibson**

```
 1            IN THE UNITED STATES DISTRICT COURT

 2                FOR THE DISTRICT OF MONTANA

 3                    BILLINGS DIVISION

 4   TRACY CAEKAERT, and

 5   CAMILLIA MAPLEY,

 6           Plaintiffs,        Case No. CV-20-52-BLG-SPW

 7       vs.

 8   WATCHTOWER BIBLE AND TRACT

 9   SOCIETY OF NEW YORK, INC.,

10   WATCH TOWER BIBLE AND

11   TRACT SOCIETY OF

12   PENNSYLVANIA, and BRUCE

13   MAPLEY SR.,

14           Defendants.

15   WATCHTOWER BIBLE AND TRACT

16   SOCIETY OF NEW YORK, INC.,

17           Cross Claimant,

18   BRUCE MAPLEY, SR.,

19           Cross Defendant.

20   _____

21   ARIANE ROWLAND, and JAMIE

22   SCHULZE                       Cause No. CV 20-59-BLG-SPW

23           Plaintiff,

24       vs.

25   WATCHTOWER BIBLE AND TRACT
```

1

1    SOCIETY OF NEW YORK, INC.

2    and WATCH TOWER BIBLE AND

3    TRACT SOCIETY OF

4    PENNSYLVANIA,

5            Defendants.

6

7

8    _____

9         VIDEOCONFERENCE/VIDEOTAPED DEPOSITION

10             UPON ORAL EXAMINATION OF

11                 SHIRLEY GIBSON

12    _____

13        BE IT REMEMBERED, that the

14    videoconference/videotaped deposition upon oral

15    examination of Shirley Gibson, appearing at the

16    instance of the Plaintiffs, was taken at 800 North

17    Last Chance Gulch, Suite 101, Helena, Montana, on

18    Thursday, April 14, 2022, beginning at the hour of

19    9:07 a.m., pursuant to the Federal Rules of Civil

20    Procedure, before Mary R. Sullivan, Registered

21    Merit Reporter, Certified Realtime Reporter, and

22    Notary Public.

23

24

25

2

**Shirley Gibson**

```
 1      A.    (Nods head.)

 2      Q.    And then Helena.

 3      A.    Yes.

 4      Q.    Which -- Which Kingdom Hall is in Helena?

 5      A.    I'm in Canyon Ferry congregation.

 6      Q.    Okay.  And have you been a member of

 7   other congregations in Helena?

 8      A.    No.

 9      Q.    Just that one?

10      A.    Just that one.

11      Q.    Okay.  And is that the full list of the

12   congregations where you've served as a member?

13      A.    All the -- All those places that I've

14   been.

15      Q.    Yeah.

16      A.    In Helena, this is the only one, yeah.

17      Q.    Okay.  All right.

18            Let's talk about paragraph 3 of your

19   affidavit.  The first sentence you state that

20   Bruce, Sr. was a pedophile who started molesting

21   Tracy when she was four.  And then you say [As

22   Read]: "This came out in 1977 when we learned that

23   another Ministerial Servant in the Hardin

24   congregation, Gunner Hain, had sexually molested

25   Tracy at his home."
```

60

**Shirley Gibson**

```
1        A.   Yes.
2        Q.   Why do you say 1977?  You fairly -- How
3    do you feel about that number, that year?  Pretty
4    certain about that?
5        A.   Yes.
6        Q.   Tell me why.
7        A.   Because it was brought to my attention
8    all this stuff had happened, and I --
9        Q.   How -- How was it brought your attention?
10       A.   Well, because of Gunner Hain, it came
11   out.  He was reproved, but they didn't do anything
12   to Bruce 'cause he -- Anyway.  I was told what had
13   happened, and then Bruce admitted he had too,
14   so -- but they didn't do anything with Bruce but
15   they did something -- they -- Gunner Hain was
16   reproved is all.
17       Q.   Who told you that?
18       A.   Harold Rimby.
19       Q.   And so when you say this came out in
20   1977, that -- that -- Harold Rimby told you
21   personally --
22       A.   Yes.
23       Q.   -- about Gunner Hain.
24       A.   And my ex-husband.
25       Q.   And your ex-husband molesting Gunner's
```

61

**Shirley Gibson**

1   stepdaughter.  Gunner had molested his

2   stepdaughter and Tracy.

3       A.   (Nods head.)

4       Q.   How did Mr. Rimby know that?

5            MR. SWEENEY:  Objection.  Speculation.

6       A.   Do I still answer?

7   BY MR. SHAFFER:

8       Q.   Yeah, go ahead.  Yeah.

9       A.   Well, because Gunner told Harold.

10      Q.   And then Harold told you.

11      A.   Yes.

12      Q.   Okay.  Sounds like Harold told you about

13  Gunner.  Did -- In -- In the same conversation he

14  told you that Bruce had done the same thing?

15      A.   Yes.

16      Q.   And do you know how Harold knew

17  that -- that Bruce had molested Tracy?

18           MR. SWEENEY:  Objection.  Speculation.

19  BY MR. SHAFFER:

20      Q.   Go ahead.  It's okay.

21      A.   Well, Bruce admitted to Harold that he

22  had.

23      Q.   Okay.  And then Harold told you.

24      A.   Yes.

25      Q.   Okay.  In 1977 -- Why do you say 1977 as

62

**Charles Fisher Court Reporting**
**442 East Mendenhall, Bozeman MT  59715, (406) 587-9016**

**Shirley Gibson**

1    opposed to 1978?

2        A.   Because it was the year after we were

3    baptized.

4        Q.   Okay.  So you feel -- you're certain

5    about that number, 1977.

6        A.   (Nods head.)

7        Q.   Yeah.  Where were you when you had this

8    conversation with Mr. Rimby?

9        A.   In our home at Fort Smith.

10       Q.   Who else was there?

11       A.   My ex-husband.

12       Q.   So just the three of you?

13       A.   Yeah.  Well, my children were there, too.

14       Q.   Okay.  And had Mr. Rimby announced he was

15   going to come over to have this conversation with

16   you or did he just show up, or how'd that happen?

17       A.   I guess just showed up.  I don't

18   remember.  We didn't make announcements; we just

19   came --

20       Q.   Okay.

21       A.   -- to each other's homes.

22       Q.   I take it it was a surprise.  It was

23   shocking.

24       A.   Yes.

25       Q.   Is that fair?

63

**Shirley Gibson**

```
 1       A.    And the first thing I said was "We need
 2   to call the authorities."
 3             And Harold said, "I'll take care of it."
 4       Q.    Okay.
 5       A.    So I assumed he would, but he didn't.
 6       Q.    Okay.
 7       A.    I mean, maybe he did.  He didn't call the
 8   authorities, though.  And that was my mistake.
 9       Q.    Was Harold an elder at that point?
10       A.    Yes.
11       Q.    And you're new to the church at that
12   point in time.
13       A.    Yes.
14       Q.    You understood that if Harold -- Harold
15   was essentially directing how to take care of this
16   situation.  Is that right?
17       A.    Yes.
18       Q.    And would there be a consequence to you
19   as a member if you did -- if you disobeyed
20   Mr. Rimby's command to not tell the authorities?
21       A.    No, there wouldn't have been a problem.
22   I just assumed he was going to do it.  He said he
23   was.
24       Q.    He said he was going to tell the
25   authorities or he was going to handle it?
```

**Shirley Gibson**

1    Q.   Okay.  Who -- Can you identify other

2   people who knew about it by name?

3    A.   Martin Svenson, James Rowland,

4   Joyce Hains, June Rimby.  All deceased now.

5    Q.   Mm-hmm.  Anyone else that you know that

6   knew about it?

7    A.   No.

8    Q.   Were you permitted to tell people about

9   it?

10    A.   I could have, but I didn't.

11    Q.   Okay.  So you understood that you could,

12   you could have gone to the authorities or you

13   could have told people about it, but you didn't.

14    A.   Yes.

15    Q.   You chose not to.

16    A.   I chose not to.

17    Q.   Okay.

18    A.   It was a mistake.

19    Q.   Sorry?

20    A.   Was a mistake.

21    Q.   Okay.  And had you ever been taught as a

22   member of the church that the elders direct how to

23   handle situations like wrongdoing within the

24   congregation?

25    A.   Yes.

66

**Shirley Gibson**

1    Q.   Okay.  Tell me about that.  When were you

2   taught that?

3    A.   I suppose during my studies.  I

4   don't -- I don't remember where I learned it.  I

5   mean, it's just something we do.

6    Q.   How was it supposed to work, then?  So

7   there's -- there's alleged wrongdoing in the

8   church.  How is it supposed to work?  What are --

9   What are you supposed to do with that information?

10    A.   Okay.  You go to the elders.

11    Q.   Okay.

12    A.   You have a sit-down with them, tell them

13   the situation, and they take care of it.

14    Q.   And they're in charge of handling that,

15   right, at that point?

16    A.   Yes.

17    Q.   It's out of your hands.

18    A.   Yes.

19    Q.   Okay.

20    A.   Well, I mean, unless they need more

21   information.

22    Q.   Okay.  And is there a process that the

23   elders are supposed to use to determine if

24   wrongdoing has occurred?

25    A.   I don't know how they handle it.  I know

67

**Shirley Gibson**

```
 1   they discuss it, and I don't -- I don't know.
 2       Q.   Yeah.  Right.  Is it a process, though,
 3   that as a member you've -- you come to trust this
 4   process, you're taught this process if there's
 5   wrongdoing, you take it to an elder and you trust
 6   it's going to be handled.  Right?
 7       A.   Yes.
 8       Q.   Okay.  And that's what you're taught as a
 9   member.
10       A.   Yes.
11       Q.   Okay.  Did you know Mr. Hain?
12       A.   Yes, I did.
13       Q.   And did he voluntarily go to Mr. Rimby
14   and the elders to say, "Hey," --
15       A.   I have no idea.
16       Q.   -- "I molested" --
17       A.   I never asked.
18       Q.   So you don't know how that came about.
19       A.   Hm-mmm.
20       Q.   And do you know what brought about
21   Bruce's decision to tell Mr. Rimby that he had
22   been molesting Tracy?
23       A.   I don't know what his reason was.
24   Probably because he'd molested other girls, too,
25   so -- I don't know that for sure, but...
```

68

**Shirley Gibson**

1     Q.   Okay.  And as I understand it, that

2  continued to happen after 1977, didn't it?

3     A.   That's what Tracy told me, yes.

4     Q.   How about Camie?

5     A.   Camie never talked about it; not with me.

6     Q.   Okay.  What is your understanding,

7  though?  Do you have an understanding that Bruce

8  also molested Camie?

9     A.   I'm -- I -- Well, as messed up as she is,

10  yes, I believe he had.

11     Q.   And that continued after 1977.  You -- It

12  would be fair, wouldn't it?

13     A.   Yes.

14     Q.   Okay.  Okay.  Paragraph 5 of your

15  affidavit.  "Shortly after this meeting."  When

16  you say "this meeting," you're talking about the

17  meeting in your home where Bruce confessed to the

18  family.  Right?

19     A.   Yes.

20     Q.   You say you spoke with Harold Rimby at

21  the Hardin congregation.

22     A.   Yes.

23     Q.   Does that mean you were at the

24  congregation when you -- when you spoke with them?

25     A.   I think they -- we were at the Kingdom

77

**Shirley Gibson**

1  Hall, I believe.

2      Q.   Okay.  "Shortly after," what does that

3  mean to you?  Is that days or weeks?  What do you

4  think?

5      A.   Shortly after.

6      Q.   [As Read]: "Shortly after the meeting."

7      A.   I'm not sure what I -- I mean, I don't

8  know the exact time.  I just know it was --

9      Q.   Yeah.

10     A.   I don't know if it was days or weeks or

11 hours.  It could have been after a congregation

12 meeting that I talked to him.  I can't remember.

13     Q.   Yeah.  Was it -- I should have asked a

14 better question; that was kind of a dumb question.

15          Was it relatively close in time to when

16 Bruce confessed to the family?

17     A.   Yes.

18     Q.   It would have been foremost in your mind

19 at that point in time, I assume?

20     A.   Yes.

21     Q.   Yeah.  And so soon after the -- Bruce's

22 confession to the family you have an opportunity

23 to speak with Mr. Rimby at the Kingdom Hall in

24 Hardin as I understand what you're saying here in

25 paragraph 5.  Is that right so far?

**Shirley Gibson**

```
 1      A.   Yes.
 2      Q.   Okay.  And you spoke with him about what
 3 Bruce had been doing to Tracy.
 4      A.   Yes.
 5      Q.   What did you talk about?  What did you
 6 tell him?
 7      A.   I don't remember the exact words, but it
 8 was due to the situation.
 9      Q.   Why did you choose to go to Mr. Rimby as
10 opposed to somebody else?
11      A.   Because we only had two elders, and he
12 was there.  He was the one there.
13      Q.   And how did you know to talk to an elder
14 about it?  Is that what you had been -- I think
15 we've talked about this earlier today, but that's
16 kind of what you were taught as a member, if
17 you've got an issue like this in your family, you
18 go to an elder.  Right?
19      A.   Yes.
20      Q.   So you were kind of doing -- you were
21 taking it to the person who you believed you were
22 supposed to take it to, this issue.
23      A.   Yeah.
24      Q.   Did Mr. Rimby take any notes, do you
25 know?
```
79

**Shirley Gibson**

```
1        A.    No.

2        Q.    Okay.  Was anyone else there?

3        A.    No.

4        Q.    You -- Do you remember -- Is it pretty

5   clear in your head?  These are the kinds of things

6   that might still be very clear in your head.

7        A.    Yes, he was -- him and I were alone.

8        Q.    Okay.

9        A.    In the library.

10       Q.    In the library, okay.  Sitting down?

11       A.    Yes.

12       Q.    And I assume you -- you sit down with him

13  one-on-one in the library 'cause you trust that

14  this is the best way to handle the situation.

15       A.    Yes.

16       Q.    The rest of this paragraph 5 you talk

17  about mentioning whether you should take this to

18  the authorities, you mention that to Mr. Rimby.

19  He says no, that the church will handle it

20  internally.  Do you see that?  Is that accurate?

21       A.    Yes.

22       Q.    Okay.  At the time you trusted that,

23  correct, that the church would handle it?

24       A.    Yes.

25       Q.    In your view, did the church handle it?
```

**Shirley Gibson**

```
 1        A.    So how could we control --

 2        Q.    Sure.

 3        A.    -- what he did?

 4        Q.    Sure.  Yeah.

 5        A.    I don't think the organization should be

 6   responsible for somebody's conduct.

 7        Q.    I understand, yeah.

 8              Do you know what Mr. Rimby did, if

 9   anything?

10        A.    No, I do not.

11        Q.    So you don't know if he did anything with

12   the information you gave him.

13        A.    No.

14        Q.    But you did trust that was the proper way

15   to handle it.  Correct?

16        A.    Yes.

17        Q.    Okay.  Tell me about that.  Why did you

18   trust that that was the proper way to handle it?

19        A.    Well, because Jehovah has an

20   organization.  He's appointed men to shepherd our

21   congregation, take care of us.

22        Q.    Those men being the elders.

23        A.    Yes.

24        Q.    In your experience with the church, have

25   you -- have you been able to observe how members
```

                                                        82

**Shirley Gibson**

1   like Gunner had.  Is that correct?

2       A.   Correct.

3       Q.   Okay.  And do you know why that is?

4       A.   No, I don't.

5       Q.   Do you have any -- any sort of guesses?

6   Is that -- Does that seem strange to you --

7            MR. SWEENEY:  I'll object --

8   BY MR. SHAFFER:

9       Q.   -- after what you've told Mr. Rimby?

10           MR. SWEENEY:  I'll object to the extent

11  it calls for speculation.

12  BY MR. SHAFFER:

13      Q.   I'm curious if you have any thoughts

14  about that.  Why -- You've told Mr. Rimby that two

15  people have molested Tracy, one of them was put on

16  reproof.  Why not the other one?

17      A.   I guess I believed it's 'cause we were

18  just so new in the truth.  I don't know.

19      Q.   Okay.  And then you state "6 to 8 months

20  later Gunner Hain was reinstated with full

21  privileges."

22           Is that also announced to the

23  congregation?

24      A.   Yes.

25      Q.   Is anything else announced with that

94

```
 1   or --
 2       A.   No.
 3       Q.   Just a simple statement.
 4       A.   (Nods head.)
 5       Q.   He's back.
 6       A.   Yes.
 7       Q.   Okay.  Traveling overseers, do you know
 8   what I'm referring to when I -- with that term?
 9       A.   Yes.
10       Q.   How would you describe a traveling
11   overseer?
12       A.   They have a circuit that they -- they
13   visit once a week.  We usually get visited by a
14   circuit overseer twice a year, and they review
15   everything that's going on in the congregation,
16   and see how things are going, and they're there to
17   encourage us.
18       Q.   And is the circuit overseer interacting
19   with all of the members?
20       A.   Yes.
21       Q.   And is there just -- you don't have
22   to -- there's, not, like, formal meetings set up,
23   they're just attending.  How's it work?
24       A.   Well, they meet every day during the
25   morning, we meet for field service, and we all go
```

95

**Shirley Gibson**

```
 1        Q.    Or you would have done something about it
 2    if you'd known.
 3        A.    I would have, yes.
 4        Q.    Yeah.  And it's fair to say you didn't
 5    know Gunner had abused -- molested Tracy until
 6    he -- until he confessed, right?
 7        A.    Yes.
 8        Q.    And so, then, it's also fair to say that
 9    there was sexual abuse happening in Hardin that
10    you weren't aware of until it had been confessed
11    to.  Is that fair?
12        A.    That's fair.
13        Q.    Okay.
14            MR. TAYLOR:  Objection to the form.
15    BY MR. SHAFFER:
16        Q.    And as I understand it, as soon as you
17    found out about the sex abuse happening in Hardin
18    specifically, Tracy, and to Ronda, your first
19    thought was to notify the elder of the church.  Is
20    that fair?
21        A.    Yes.
22        Q.    Your second thought was to ask that elder
23    about whether to report it to the authorities.  Is
24    that also fair?
25        A.    That's fair.
```

**Charles Fisher Court Reporting**
**442 East Mendenhall, Bozeman MT  59715, (406) 587-9016**

**Shirley Gibson**

```
 1        Q.    Okay.  And that elder said he'll handle
 2   it.
 3        A.    That's what he said.
 4        Q.    Okay.  The affidavit.  I -- I assume
 5   you've never drafted an affidavit before?
 6        A.    (Shakes head.)
 7        Q.    And --
 8        A.    No.
 9        Q.    And you haven't been trained in how to do
10   so.
11        A.    No.  I've never even been in a courtroom,
12   so --
13        Q.    Right.  And you would rely on other
14   people to draft a legal document like this since
15   you have not been trained in it and don't know how
16   to do it, right?
17        A.    Correct.
18        Q.    But you checked it for accuracy before
19   you signed it.
20        A.    Well, I thought I had, but...
21        Q.    Well, let's talk about it.  I want to
22   make sure -- I want to know what's -- we've talked
23   a lot about your affidavit today.  In fact, we
24   went through it paragraph by paragraph, and I
25   don't remember you saying to me, anyway, that any
```
                                                   175

Shirley Gibson

1   accurate.

2       Q.   Okay.  'Cause this is the opportunity

3   to -- to sort through that, and I don't want to

4   keep proceeding in this case if it's -- if there's

5   anything in here that's not accurate, and I don't

6   think anybody else does.

7           MR. SHAFFER:  I don't have any other

8   questions.

9                     EXAMINATION

10  BY MR. TAYLOR:

11      Q.   Ms. Gibson, this is Joel Taylor.

12  Paragraph 5 of your affidavit, it says that -- if

13  you look at the second sentence it says "During

14  that conversation I asked elder Howard Rimby if we

15  should report the matter to the authorities and he

16  said no."

17          Did Mr. Rimby ever tell you no, you

18  cannot report the abuse to the authorities?

19      A.   He did not say it that way, no.  He said

20  he would handle it.

21      Q.   He said he would handle it.  But the

22  affidavit says that he said no.  That's what the

23  affidavit says.  "If we should report the matter

24  to the authorities and he said, no."

25          That's not correct, is it?

                                                    177

**Shirley Gibson**

```
 1          MR. SHAFFER:  Object to form.  Vague;
 2   ambiguous; compound.
 3      A.   He said, "No, I will handle it."
 4   BY MR. TAYLOR:
 5      Q.   So did anybody tell you no, you can't
 6   report to the authorities?
 7      A.   No, nobody told me.  It was my mistake
 8   not to have.
 9      Q.   Okay.  And do you know if Mr. Rimby
10   reported it to the authorities?
11      A.   Not to my knowledge.  If they did, both
12   guys would have been in prison.
13      Q.   Okay.  So I just want to be clear.  You
14   don't know if Mr. Rimby reported it or not; is
15   that correct?
16      A.   Correct.
17      Q.   Okay.
18          MR. TAYLOR:  I have no further questions.
19          MR. SWEENEY:  I don't have any either.
20          THE VIDEOGRAPHER:  Okay.  That will
21   conclude today's deposition.  The time is 2:20.
22          (Deposition concluded at 2:20 p.m.
23   Deponent excused; signature reserved.)
24
25
                                                   178
```