*Exhibit K*

```
           IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MONTANA
                    BILLINGS DIVISION
_____

 TRACY CAEKAERT, and            Case No.
 CAMILLIA MAPLEY,               CV-20-52-BLG-SPW

         Plaintiffs,

    vs.

 WATCHTOWER BIBLE AND
 TRACT SOCIETY OF
 NEW YORK, INC.,
 WATCH TOWER BIBLE AND
 TRACT SOCIETY OF
 PENNSYLVANIA, and BRUCE
 MAPLEY, SR.,                   VIDEOTAPED DEPOSITION
                                UPON ORAL EXAMINATION
         Defendants.            OF JAMES ROWLAND

 WATCHTOWER BIBLE AND
 TRACT SOCIETY OF
 NEW YORK, INC.,

         Cross Claimant,

 BRUCE MAPLEY, SR.,

         Cross Defendant.


 ARIANE ROWLAND, and            Cause No.
 JAMIE SCHULZE,                 CV 20-59-BLG-SPW

         Plaintiffs,

    vs.

 WATCHTOWER BIBLE AND
 TRACT SOCIETY OF
 NEW YORK, INC., and
 WATCH TOWER BIBLE AND
 TRACT SOCIETY OF
 PENNSYLVANIA,

         Defendants.
_____
```

James Rowland

```
 1   somebody, even though it was just that one person,
 2   no investigation.
 3          You have to do something.  They can just
 4   say, "Oh, you're lying," or "Well, maybe you'll
 5   have a better day next day," or "Maybe he won't
 6   throw you down anymore and stick his tongue in
 7   you."
 8          You've got to investigate it, and because
 9   it's written right there.
10       Q.   Yeah.
11       A.   Otherwise, it wouldn't be in there.  If it
12   was me, I would have taken it right to the legal
13   department and got a determination.  Otherwise, you
14   wind up like this, getting sued.
15       Q.   Would you have gone to the police if you
16   felt like you could have?
17       A.   I would have went outside of the
18   organization.  But, see, I believed totally in the
19   footsteps of Jesus Christ.  And on the one hand, I
20   didn't want to drag Jehovah's name in, because I
21   knew there was a process for handling this.
22       Q.   The process in this book here, Exhibit 2?
23       A.   Yeah.
24       Q.   Yeah.
25       A.   And secondly, I knew that if I did, and
```

130

```
 1   they did it to me anyhow, I'd have been like an
 2   apostate.  But as it was, I was removed from
 3   responsibility and kicked out of the congregation
 4   anyway, without a hearing, without "Boo."  The
 5   circuit overseers came out there, and
 6   Brother Miller, "You have to sign this.  They
 7   decided against you."
 8        Q.   It was when you were disfellowshipped?
 9        A.   Kicked out of the congregation and my
10   responsibilities taken.
11        Q.   Yeah.
12        A.   It was the exact opposite of what I was
13   trying to do, protect these kids.  And a lot of
14   them are hurt.
15             We've got ex-Witnesses out there in
16   Lame Deer that are a case in point.  One -- both of
17   them are drug addicts.  One was like a whore, and
18   the other one's in and out of treatment, brother
19   and sister.
20             The people that abused these kids, they
21   don't know why it's called death of the soul.  It's
22   because those -- and even my family, they broke us
23   all up.  We had to recover from it.  We're still
24   recovering.  They don't know that.  Plus they
25   probably don't give a damn, you know, the
```

131

```
 1        A.    Yes.
 2        Q.    Okay.  And during those phone calls, were
 3   you just honestly and truthfully telling
 4   Mr. Bontecou what you knew and what had happened?
 5        A.    Yes.
 6        Q.    Okay.
 7        A.    It was a brief kind of a summary.
 8        Q.    Okay.  And is it possible that based on
 9   those conversations with Mr. Bontecou, that he
10   prepared this affidavit?
11        A.    Yeah, it -- I think that I did.  Maybe
12   Ariane.  Mr. Bontecou wanted it, and I prepared it
13   and had it notarized and everything.
14        Q.    And I assume that you reviewed it before
15   you signed it.  Looks like you signed it on --
16   well, just a little over a year ago, April 14th,
17   2020.
18        A.    Uh-huh.
19        Q.    Did you look at it carefully before you
20   signed it?
21        A.    Did I -- yeah.
22        Q.    And is everything here accurate to the
23   best of your memory?
24        A.    To the best of my memory.
25        Q.    Yeah, okay.  So if we look at paragraph 3,
```

```
 1  it says around 1974 you first started hearing
 2  rumors that Gunner Haines, who was a member of the
 3  congregation, was sexually abusing girls.
 4           What do you mean when you say you heard
 5  rumors?  What did you hear?
 6      A.   I heard that from my family that Gunner
 7  had games that he played with them.
 8      Q.   Okay.
 9      A.   And it was hide-and-seek.  And when he'd
10  find whoever, he'd molest them.
11      Q.   And how sure are you in this 1974 date
12  you've got here on paragraph 3?
13      A.   Yeah, I'd start hearing different things
14  about then, but it could have even been a little
15  later than that.
16      Q.   Okay.
17      A.   And '74 was a date that I was appointed as
18  an elder, and people started coming and telling me
19  things, you know.
20      Q.   I see.
21      A.   Because they trusted me, I guess.
22      Q.   Yeah.  Okay.
23      A.   And I don't know if they went to any of
24  the -- any other elders, but they would tell me,
25  and then on the occasion where I have written up
```
151

```
 1   their -- at elders' meetings, I would bring this
 2   up, and it didn't go anywhere.
 3        Q.   You say on paragraph 3 -- and I think
 4   everybody understands, just so you know, that it's
 5   so long ago that we're not going to hold you to
 6   specific dates, you know, right?  It could be '75
 7   perhaps.  Who knows.
 8        A.   Right.
 9        Q.   You say here again on paragraph 3 that you
10   brought the subject up with the elders.  What you
11   heard about Gunner Haines, you brought that up with
12   the elders sometime around 1974.
13        A.   Uh-huh.
14        Q.   Does that seem right to you as you sit
15   here today?  Does that seem accurate?
16        A.   Seemed pretty accurate.
17        Q.   And what did you tell the elders,
18   specifically, if you can recall, at that time in
19   1974?
20        A.   What did I tell the elders?
21        Q.   What did you tell them?
22        A.   It was probably sometime after that.  And
23   I knew Ariane wasn't lying to me.  And when she
24   told me about that, we discontinued going there to
25   their house and discontinued any babysitting
```

152

```
 1  guardian of your children?
 2       A.   No.
 3       Q.   You've always continuously from age --
 4  from birth to age 18 been their legal guardian?
 5       A.   Yes.
 6       Q.   And how would your children get to the
 7  Svensen home?  Would you take them?  Would your
 8  wife take -- how would they get there?
 9       A.   What children?
10       Q.   Your children, Jamie and Ariane.
11       A.   Oh, yeah, I and my wife took care of them.
12       Q.   And would you transport them over to the
13  Svensens' house for babysitting?
14       A.   We both did.  And sometimes my oldest
15  daughter would help out.
16       Q.   Before we go further in the complaint,
17  when did you first become aware that Bruce Mapley
18  had been accused of misconduct involving children?
19       A.   It was probably in the late seventies.
20       Q.   In the late seventies.  Okay.
21            And when did you first become aware that
22  Harold Rimby had been abusing children?  Was that
23  also in the late seventies?
24       A.   Yes.
25       Q.   Let me ask you some basic questions,
```

185