*Exhibit L*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

BILLINGS DIVISION

TRACY CAEKAERT, and
CAMILLIA Mapely,

     Plaintiffs,
vs.                                    Case No. CV-20-52-BLG-SPW

WATCHTOWER BIBLE AND
TRACT SOCIETY OF NEW YORK,
INC., and WATCH TOWER BIBLE
AND TRACT SOCIETY OF
PENNSYLVANIA.

     Defendants,
_____)


Expert Videotaped Deposition

In Person/Zoom Videoconference

Bradley Lovett

August 11, 2023


Reported By: Gidgette Nieves, CSR No. 10142
WORDS COURT REPORTING SERVICES, INC.
(844) 289-WORD(9673)
www.WordsCourtReporting.com

10:41:25  1        Q     Branch Organization?

10:41:27  2        A     Yeah, we never -- we didn't follow -- we

10:41:30  3  weren't involved with that.  It may be things from

10:41:33  4  it, may be repeated in other places.  But none of

10:41:37  5  those were ever handed out to anybody that I know

10:41:40  6  of.

10:41:41  7        Q     How about a circuit overseer.  Did you

10:41:43  8  ever see that document, the Branch organization

10:41:50  9  Manual?

10:41:51  10       A     No, we didn't get any of that.

10:41:54  11       Q     Okay.  Do you know who used that book, the

10:41:57  12  Branch Organization Manual?

10:42:00  13       A     No.

10:42:03  14       Q     Okay.  I think we're probably done with

10:42:05  15  Exhibit 2 then.

10:42:39  16             MR. SHAFFER:  Let's look at Tab 5, mark

10:42:43  17  Exhibit 5.

10:42:44  18             (Exhibit 5 marked for identification.)

10:42:44  19  BY MR. SHAFFER:

10:42:44  20       Q     All right.  This is a book I've mentioned

10:42:47  21  "Pay Attention to Yourself and all the Flock."  Flip

10:42:51  22  to the third page.  There you go.  It says "Kingdom

10:43:01  23  Ministry School Textbook."  Do you see that, Mr.

10:43:06  24  Lovett?

10:43:07  25       A     Yes.

10:43:07  1       Q    Is that in reference to the fact that this

10:43:10  2  is a sort of a book you have in an elder ministry

10:43:14  3  school?

10:43:15  4       A    Yes.

10:43:16  5       Q    Okay, in general.  And go to the next

10:43:19  6  page.  It says "Published by Watch Tower Bible and

10:43:23  7  Tract Society.  This one is of New York, September

10:43:26  8  1977.  I assume the fact that this one is from New

10:43:35  9  York and the previous one was published and

10:43:37 10  distributed by Watch Tower Bible and Tract Society

10:43:41 11  Pennsylvania.  I -- I assume that didn't effect your

10:43:44 12  job at all as a circuit overseer teaching this

10:43:47 13  stuff, did it?

10:43:48 14       A    I don't -- no, I don't believe so.

10:43:55 15       Q    All right.  So if we can look at this

10:43:59 16  page.  You got there.  Thank you.  Bate's number

10:44:00 17  229, this is WTNY229.  The top there's "To the

10:44:08 18  student."  Who would the student be in this

10:44:12 19  course?

10:44:13 20       A    Probably the elders I would think.

10:44:15 21       Q    Okay.  Pay Attention to Yourselves and All

10:44:18 22  the Flock is a continuation of the Kingdom of

10:44:23 23  Ministry school course.  So it looks like this is

10:44:26 24  kind of an addition to, and you've kind of mentioned

10:44:29 25  this, this morning.  You have abridgements or

10:44:31  1   additions to the Kingdom of School -- Kingdom

10:44:34  2   Ministry School coursebook.  This would be one of

10:44:37  3   those -- looks like this would be one of those

10:44:40  4   additions to it; is that right?

10:44:42  5        A    I don't know as you would say it's an

10:44:44  6   addition, but it would explain many things that have

10:44:49  7   already been taught or they would go back and deal

10:44:52  8   with that.

10:44:52  9        Q    Okay.  Is this a document, sir, that you

10:45:02  10  became familiar with as an elder and a circuit

10:45:05  11  overseer?

10:45:06  12       A    Well you tried, uh-huh.

10:45:08  13       Q    Okay.  That's what the Watch Tower Society

10:45:11  14  wanted you to do, correct?

10:45:15  15       A    Yes.

10:45:39  16            MR. SHAFFER:  Okay.  Number 6.  Document

10:45:40  17  number 6.

10:45:43  18            (Exhibit Number 6 marked for identification.)

10:45:43  19  BY MR. SHAFFER:

10:45:43  20       Q    Again, bottom right corner on the cover

10:45:45  21  page, Kingdom Ministry School Textbook, and it says

10:45:48  22  KS81.  The next page Published by Watch Tower Bible

10:45:53  23  and Tract Society of New York.  This one is 1981.  I

10:46:04  24  forgot to mention that.  This one starts -- if you

10:46:09  25  look at the table of content, sir, Bate's document

| | | |
|---|---|---|
| 12:29:11 | 1 | specifically.  The elders would write about some |
| 12:29:15 | 2 | specifics and everything else and send that into the |
| 12:29:18 | 3 | Society. |
| 12:29:25 | 4 | Q    And you said at some point in time |
| 12:29:28 | 5 | specific procedures for handling child sex abuse |
| 12:29:32 | 6 | came down from the branch of the Society, right? |
| 12:29:35 | 7 | A    Yeah.  Well, you -- yes, you'd see it. |
| 12:29:37 | 8 | Q    Do you know why that was.  Do you know why |
| 12:29:39 | 9 | specific procedures were handed down for child sex |
| 12:29:42 | 10 | abuse? |
| 12:29:43 | 11 | A    Well I would assume to kind of standardize |
| 12:29:45 | 12 | it and give them some good guidance on what to do. |
| 12:29:52 | 13 | I don't know the first time it ever came up.  There |
| 12:29:54 | 14 | was many of them.  And it really wasn't established. |
| 12:29:58 | 15 | But we -- we couldn't find a lot on it.  But we knew |
| 12:30:01 | 16 | that it was wicked and wrong.  And you'd act on it |
| 12:30:08 | 17 | if you could and you'd use the scriptures you had. |
| 12:30:10 | 18 | And usually they were -- they were sufficient at |
| 12:30:14 | 19 | that time. |
| 12:30:15 | 20 | Q    And you're talking the time before |
| 12:30:17 | 21 | specific procedures were handed out? |
| 12:30:20 | 22 | A    Yeah.  In the, oh, the 70s these things |
| 12:30:26 | 23 | kind of come out.  As needed, they come out in these |
| 12:30:29 | 24 | letters.  But usually it was to address a |
| 12:30:32 | 25 | specific. |

12:35:24  1        Q    Sure.  That's part of the role of the
12:35:27  2    elder, isn't it, to check in on the flock like
12:35:29  3    that?
12:35:30  4        A    Uh-huh.
12:35:31  5        Q    That's a yes?
12:35:32  6        A    Without -- yeah, without overdoing it and
12:35:36  7    just giving your best answer off the top of your
12:35:39  8    head.  You want to have some basis for whatever you
12:35:45  9    -- you're saying, if at all possible.
12:35:48  10            MR. MCCABE:  Excuse me.  I'm just going to
12:35:50  11   stick my head out and ask for more air.  I think
12:36:16  12   we're going to die in here pretty soon.
12:36:16  13            MR. SHAFFER:  Sure.
12:36:16  14            MR. SWEENEY:  The air conditioning works
12:36:19  15   pretty well in here.
12:36:19  16            MR. SHAFFER:  Yeah, if we have AC that's
12:36:19  17   fine.
12:36:19  18   BY MR. SHAFFER:
12:36:19  19        Q    And tell me as an elder what do you
12:36:21  20   have -- if someone comes to you and you're talking
12:36:23  21   to that person about their problem, you're maybe
12:36:27  22   reading some scripture to them.  I assume it's
12:36:31  23   pretty important to keep that stuff confidential?
12:36:34  24        A    Yes.
12:36:35  25        Q    Okay.  Do you tell anybody about it?  Do

14:06:59  1        Q    No.  The reporting.  I think we're talking
14:07:01  2   about the reporting now?
14:07:02  3        A    Oh, the reporting.  I'm not sure when that
14:07:06  4   took place.
14:07:07  5        Q    Okay.
14:07:08  6        A    But I know it came up and maybe it was one
14:07:11  7   of our schools or something.
14:07:13  8        Q    All right.  Are you aware that, I'm sure
14:07:16  9   you are, that Jehovah's Witness church has a
14:07:22  10  confidentiality policy?
14:07:23  11       A    Uh-huh.
14:07:24  12       Q    Comes from scripture?
14:07:27  13       A    Huh.
14:07:27  14       Q    Is that right?
14:07:28  15       A    Yes.  I don't know what you -- what you
14:07:30  16  mean as far as -- as far as that goes.
14:07:33  17       Q    You don't talk about --
14:07:34  18       A    Explain it to me.
14:07:35  19       Q    Yeah.  You don't talk about things that
14:07:37  20  you've learned about other people, right?
14:07:40  21       A    True.
14:07:41  22       Q    That's important?
14:07:42  23       A    Pardon.
14:07:43  24       Q    That's important to not talk about things
14:07:46  25  you've learned about other people, you agree?

14:07:48  1        A     That's true.

14:07:49  2        Q     And that's a policy that comes right from

14:07:51  3   scripture?

14:07:52  4        A     Yes.  You're not gossiping about them or

14:07:55  5   telling things that are untrue.

14:08:10  6        Q     Has that been the policy ever since you've

14:08:14  7   been a part of the church?

14:08:17  8              MR. MCCABE:  What policy, I'm sorry?

14:08:19  9   BY MR. SHAFFER:

14:08:19  10       Q     Confidentiality policy of not talking

14:08:22  11  about what you learn about other people?

14:08:23  12             MR. TAYLOR:  Just object to the form

14:08:24  13  of term -- form of the question, and the term

14:08:25  14  "policy."  If it's a principle found in the Bible,

14:08:29  15  they might follow it.

14:08:31  16  BY MR. SHAFFER:

14:08:31  17       Q     Has that been the same throughout your

14:08:34  18  experience in Jehovah's Witness church,

14:08:36  19  Mr. Lovett?

14:08:38  20       A     Yes.

14:08:45  21       Q     Okay.  And like any sin I assume that's --

14:08:47  22  you  have to answer to God if you were to violate

14:08:49  23  that policy, that rule, that scripture --

14:08:53  24       A     Uh-huh.

14:08:53  25       Q     --  is that fair?

14:08:55  1        A    Up to us to make -- to retain

14:09:00  2   confidentiality.

14:09:01  3        Q    And if you don't do that you have to

14:09:02  4   answer to got at some point in time; is that fair?

14:09:05  5        A    Well, he would be aware of what -- what

14:09:09  6   you've done if you've done that sort of thing and

14:09:12  7   that's all.

14:09:13  8        Q    And so if you've learned that a person has

14:09:16  9   been sexually abused or that a person has sexually

14:09:20 10   abused a young girl, let's put it that way.  You've

14:09:22 11   learned that a member sexually abused a young girl,

14:09:25 12   you've got an obligation to keep that confidential,

14:09:28 13   what that person has done?

14:09:30 14             MR. TAYLOR:   Objection to the form of the

14:09:32 15   question.  Poses an incomplete hypothetical for

14:09:35 16   which this individual has already said he's never

14:09:38 17   participated in any type of hearing about that.

14:09:40 18   BY MR. SHAFFER:

14:09:40 19        Q    Talking about the application of the

14:09:42 20   confidentiality policy that you said has been the

14:09:44 21   same throughout your --

14:09:47 22        A    Well, we've always been talking to keep it

14:09:49 23   confident, and we don't discuss it with anyone.

14:09:53 24        Q    So someone -- you learned that somebody

14:09:54 25   steals a car, a member of the church steals a car.

| | | |
|---|---|---|
| 14:09:58 | 1 | You have an obligation to keep that confidential, |
| 14:10:01 | 2 | right? |
| 14:10:02 | 3 |     A    Yes -- |
| 14:10:04 | 4 |         MR. TAYLOR:   Objection.  Objection again |
| 14:10:04 | 5 | to the form of the question.  If he learns of this |
| 14:10:07 | 6 | communication in a confidential setting in a |
| 14:10:10 | 7 | judicial committee, he might have certain |
| 14:10:13 | 8 | obligations.  If he observed someone as a witness |
| 14:10:16 | 9 | stealing a car, just as a particular person, he |
| 14:10:19 | 10 | might have different obligations.  The hypothetical |
| 14:10:23 | 11 | is incomplete. |
| 14:10:26 | 12 | BY MR. SHAFFER: |
| 14:10:26 | 13 |     Q   You learned that so and so steals a car in |
| 14:10:29 | 14 | your role as an elder, you're not supposed to gossip |
| 14:10:33 | 15 | about that, are you? |
| 14:10:35 | 16 |     A   No. |
| 14:10:35 | 17 |         MR. MCCABE:  Objection as to the |
| 14:10:37 | 18 | incomplete hypothetical.  So and so member of the |
| 14:10:41 | 19 | congregation or are they just a passerby? |
| 14:10:44 | 20 | BY MR. SHAFFER: |
| 14:10:44 | 21 |     Q   Okay.  You learn that a member of the |
| 14:10:46 | 22 | congregation hurts his wife, physical abuse, you're |
| 14:10:50 | 23 | not supposed to gossip about that, are you? |
| 14:10:54 | 24 |     A   Well, depending on the situation.  We |
| 14:10:56 | 25 | would take it to the elders and depending on how |

14:11:01  1  extreme it was and whatever sometimes it's -- these

14:11:06  2  are misunderstanding or it's not a judicial

14:11:10  3  matter.

14:11:11  4      Q   So the elders might discuss it amongst

14:11:14  5  themselves?

14:11:16  6      A   Well on these issues where you're trying

14:11:18  7  to form a committee or trying to help them in some

14:11:22  8  way that would, they can do that, they can discuss

14:11:23  9  it, but they have to keep it among themselves.

14:11:27  10      Q   The elders do?

14:11:28  11      A   Yeah.  They can't spread it around.

14:11:31  12      Q   And so the elders would be held to that

14:11:34  13  confidentiality policy on that subject matter?

14:11:39  14      A   Yes, yes.

14:11:52  15      Q   Same rule applies to -- let's say you

14:11:55  16  learned that again as your time as an elder you

14:11:59  17  learned that somebody sexually abused a young girl,

14:12:02  18  a member of the congregation has abused a young

14:12:06  19  girl, confidentiality policy would require you to

14:12:10  20  keep that confidential, correct?

14:12:12  21          MR. MCCABE:  Objection; incomplete

14:12:15  22  hypothetical; asked and answered.

14:12:17  23  BY MR. SHAFFER:

14:12:17  24      Q   You can share it with other elders if you

14:12:20  25  learn that a -- let's say you learned that an elder

14:12:22  1    has sexually abused a girl in the congregation.  Who

14:12:28  2    could you share that information without violating

14:12:29  3    the confidentiality policy?

14:12:33  4        A    The elders themselves would -- would hear

14:12:36  5    of it and do it and then try to determine the

14:12:36  6    legitimacy.  And then if they need to form a

14:12:40  7    committee that's fine.  If they need to tell the

14:12:44  8    officials, they -- they have to do that too.

14:12:46  9        Q    If sharing outside of the elders, that

14:12:48  10   would be prohibited by the confidentiality policy,

14:12:53  11   correct?

14:12:55  12            MR. MCCABE:  Objection; incomplete

14:12:58  13   hypothetical.  Vague as to time.

14:12:59  14   BY MR. SHAFFER:

14:12:59  15       Q    Go ahead.  You can answer.

14:13:00  16            The elders themselves can discuss it but

14:13:02  17   they couldn't share it outside the group of elders,

14:13:05  18   correct?

14:13:05  19            MR. MCCABE:  Objection; same objection;

14:13:07  20   it's an incomplete hypothetical; it's vague as to

14:13:10  21   time.

14:13:13  22   BY MR. SHAFFER:

14:13:13  23       Q    Go ahead, Mr. Lovett.

14:13:14  24       A    I'm just trying to calculate this.  But

14:13:19  25   normally we don't talk to anyone outside.  Let's

14:13:22  1  say, you do -- it becomes a judicial matter, you

14:13:26  2  don't tell even the other -- the other elders.  It's

14:13:30  3  kept between yourself --

14:13:32  4      Q    Right.

14:13:34  5      A    -- and the other -- other two guys.

14:13:35  6      Q    And you certainly wouldn't tell the other

14:13:38  7  publishers in the congregation?

14:13:39  8      A    No.

14:13:40  9      Q    And so you wouldn't tell the rest of the

14:13:42  10 congregation that maybe there's an admitted child

14:13:46  11 molester in the congregation, would you?

14:13:50  12         MR. MCCABE:  Objection; incomplete

14:13:52  13 hypothetical; it's vague as to time.  You're asking

14:13:54  14 him to speculate.  He's never dealt with such a

14:13:58  15 thing.

14:13:59  16 BY MR. SHAFFER:

14:13:59  17     Q    Go ahead, Mr. Lovett.

14:14:00  18     A    Ditto.  There's -- as I've said, I have

14:14:05  19 not dealt with anything with that in particular.

14:14:08  20     Q    Right.  I'm asking you to apply the

14:14:11  21 confidentiality policy just like you said.  You said

14:14:14  22 even -- even served elders in a congregation

14:14:15  23 wouldn't know what the results of a judicial

14:14:20  24 committee was, correct?

14:14:21  25     A    Yeah.  Well, it isn't even that.  The --

14:14:29  1  when it's reported, then the brothers would try to

14:14:34  2  determine how serious it was, especially on a matter

14:14:37  3  like that.  And -- and then they form their

14:14:43  4  committee.  But you don't go talking about it --

14:14:46  5        Q    Right.

14:14:47  6        A    -- with anybody.  And of course you inform

14:14:50  7  the Society.  And then you -- they'll determine if

14:14:55  8  they're going to be able to do anything about it or

14:14:58  9  if there's enough evidence, that sort of thing.

14:15:01  10       Q    You were talking about, and this is your

14:15:03  11  testimony, is that if there's a committee that's

14:15:05  12  form and they come to a conclusion about something

14:15:07  13  or a member confesses to a committee about an act of

14:15:12  14  wrongdoing, I think your testimony is that only --

14:15:14  15  only the elders in that committee would know about

14:15:17  16  that, correct?

14:15:18  17       A    Uh-huh, that's correct.

14:15:19  18            MR. MCCABE:  Objection; incomplete

14:15:22  19  hypothetical; and misstate his testimony.

14:15:23  20  BY MR. SHAFFER:

14:15:23  21       Q    Did I misstate your testimony at all, Mr.

14:15:26  22  Lovett?

14:15:27  23       A    Run it back.

14:15:27  24       Q    Yeah.  There's a judicial committee forum

14:15:28  25  that determines somebody acted wrong.  Only the

14:15:31  1  elders in that committee would know about that,

14:15:33  2  correct?

14:15:34  3      A    That's the -- that-- that's the normal

14:15:37  4  procedure.

14:15:37  5      Q    Okay.  Nobody else would --

14:15:38  6      A    I'm just acting from my own experience

14:15:40  7  from what I've seen.

14:15:41  8      Q    I understand, that's all I'm asking.  All

14:15:43  9  I want you to do is give me your testimony based on

14:15:45 10  your experience.  Which is like 30 years as a

14:15:49 11  circuit overseer, correct?

14:15:52 12      A    Yes.

14:15:53 13      Q    All right.  Are you -- as a circuit

14:15:58 14  overseer are you an elder -- or excuse me.  Are you

14:16:02 15  a member of the clergy?

14:16:04 16      A    No.

14:16:04 17      Q    Do they consider circuit overseers

14:16:08 18  elders?

14:16:08 19      A    Yes.

14:16:09 20      Q    So you've been an elder, your an elder

14:16:12 21  today?

14:16:13 22      A    Yes.

14:16:14 23      Q    All right.  That's all I'm asking.  Is

14:16:20 24  your experience based as an elder -- as an elder

14:16:23 25  for, and then I might be wrong here, over 40 years

```
14:16:27   1   is that right?
14:16:28   2        A    Yeah, an elder, yeah.
14:16:30   3        Q    All right.  That's a lot of experience as
14:16:32   4   an elder in the Jehovah's Witness church, isn't
14:16:37   5   it?
14:16:37   6        A    Well it is.  There are so many of these
14:16:41   7   things you don't deal with on a regular basis and
14:16:45   8   sometimes never.
14:16:47   9        Q    Confidentiality you deal with that
14:16:48  10   probably quite often?
14:16:51  11        A    Uh-huh.  Yes.
14:17:15  12        Q    In your 40 or 50 years as an elder, are
14:17:19  13   you ever aware of a situation where a judicial
14:17:22  14   committee comes to a conclusion that someone has
14:17:26  15   committed a wrong and that that was announced -- the
14:17:29  16   specifics of what that person did was announced to
14:17:33  17   the congregation?
14:17:35  18        A    No.  I'm thinking.  I can't recall anyone
14:17:44  19   ever getting explicit.
14:17:46  20        Q    It's usually pretty vague.  Like so and so
14:17:50  21   didn't take care of his family appropriately.  Or
14:17:53  22   got too acquainted with a -- with a young girl, or
14:17:57  23   something like that, right?
14:17:58  24        A    You don't -- you don't use that
14:17:59  25   description either.  They've been reproved or
```

14:18:04   1  something like that, but you don't get into

14:18:06   2  details.

14:18:07   3      Q    Okay.  The details are confidential,

14:18:10   4  right?

14:18:12   5      A    Suppose to be, yeah.

14:18:15   6          MR. SHAFFER:  Okay.  I think I'm almost

14:18:18   7  done so let's take five minutes.

14:18:23   8          VIDEOGRAPHER:  We're now going off the

14:18:24   9  record.  The time is 2:18 p.m.

14:39:18  10          (Recess taken.)

14:39:18  11          VIDEOGRAPHER:  We are now going back on

14:39:20  12  the record.  The time is 2:39 p.m.

14:39:25  13  BY MR. SHAFFER:

14:39:25  14      Q    Mr. Lovett, we've talked a little bit

14:39:28  15  about situations that can result in a judicial

14:39:31  16  committee about a confession --

14:39:48  17          MR. TAYLOR:  Is it possible to turn the

14:39:48  18  Zoom video back on?

14:39:48  19          COURT REPORTER:  Oh, I thought I did.

14:39:48  20          All right.  Here you go.

14:39:48  21          MR. TAYLOR:  Thank you kindly.

14:39:48  22  BY MR. SHAFFER:

14:39:48  23      Q    Confession is one circumstance where a

14:39:50  24  judicial committee would be formed, two or more

14:39:53  25  witnesses, correct?

14:39:55  1        A     Uh-huh, yes.

14:39:56  2        Q     Okay.  And we've talked a little bit about

14:39:58  3  situations where one might not be formed where you

14:40:02  4  just have one witness or you've got a young girl

14:40:06  5  who's a witness, that might not be as credible as

14:40:10  6  adult witness, correct?

14:40:12  7        A     Yes.

14:40:14  8        Q     Okay.  What about where -- and I know this

14:40:16  9  is maybe going to back to the '70s and '80s.  But in

14:40:21  10  the '70s and '80s my understanding was that an

14:40:22  11  accuser of wrongdoing is part of the process should

14:40:29  12  confront the person they've accused of a wrongdoing.

14:40:34  13  Do you recall that?

14:40:35  14        A     Uh-huh, Yes.

14:40:36  15        Q     And if you don't do that, if you're an

14:40:38  16  accuser and you don't confront the accused is that a

14:40:42  17  situation where that might not be as credible of a

14:40:46  18  report when the accuser is not willing to confront

14:40:49  19  the accused?

14:40:51  20            MR. MCCABE:  Are you talking in general or

14:40:53  21  you just specifically about child abuse cases?

14:40:56  22            MR. SHAFFER:  I'm talking about wrongdoing

14:40:57  23  in general --

14:40:59  24            MR. MCCABE:  Okay, thank you.

14:41:00  25  BY MR. SHAFFER:

14:41:00  1      Q    -- in the 70s and 80s.  I see a bunch of
14:41:02  2  documents from the Hardin congregation talking about
14:41:07  3  some of the sex abuse that was happening.  And they
14:41:07  4  say, well so and so wouldn't -- wouldn't confront
14:41:09  5  their -- the person they accused of it.
14:41:11  6      A    Uh-huh.
14:41:11  7      Q    And they're supposed to, right.
14:41:14  8      A    Sure.
14:41:14  9      Q    They're supposed to confront the person
14:41:17 10  they're accusing of wrongdoing?
14:41:20 11      A    They, yes, but not in the case of child
14:41:22 12  abuse and things like that.
14:41:24 13      Q    Then I know sometime in 2000 that changed
14:41:28 14  and there's a policy now where victims of child sex
14:41:31 15  abuse are not supposed to confront the person that
14:41:33 16  did it, right?
14:41:35 17      A    Uh-huh, yes.
14:41:36 18      Q    But prior to that 70s, if the victim of --
14:41:39 19  let's just say it's theft.  If the person who says
14:41:42 20  that Jack stole from me, if they don't confront Jack
14:41:46 21  that suggests that that report might not be
14:41:49 22  credible, correct?
14:41:50 23      A    I don't know about that as to what they --
14:41:54 24  what they would think.  It depends on -- on what it
14:41:57 25  is.

| | | |
|---|---|---|
| 14:41:58 | 1 | Q    Okay.  You've been on judicial committees |
| 14:42:03 | 2 | and you're an elder.  Did you understand accusers |
| 14:42:06 | 3 | are supposed to confront the accused? |
| 14:42:10 | 4 | A    Well, you would in many circumstances. |
| 14:42:11 | 5 | Q    Okay.  What are the circumstances where |
| 14:42:14 | 6 | you wouldn't? |
| 14:42:16 | 7 | A    Well if it was a -- |
| 14:42:17 | 8 | Q    I'm talking about the 1970s. |
| 14:42:20 | 9 | A    Uh-huh, I'm trying to think back on what |
| 14:42:24 | 10 | the -- the situation was.  When it -- when it comes |
| 14:42:28 | 11 | to normal -- when I say normal crimes, you know, et |
| 14:42:36 | 12 | cetera, et cetera, there had been -- there been some |
| 14:42:38 | 13 | changes on that but I can't remember. |
| 14:42:40 | 14 | Q    I'm not asking about changes.  I'm asking |
| 14:42:43 | 15 | in the 1970s, 1980s, can you identify a situation |
| 14:42:48 | 16 | where the accuser was not supposed to confront the |
| 14:42:51 | 17 | person who's accused? |
| 14:42:54 | 18 | A    On the case of -- of course with the |
| 14:43:00 | 19 | children.  But I'm trying to think -- I know what I |
| 14:43:04 | 20 | want to say, I can't think of the -- of the word. |
| 14:43:09 | 21 | They have situations where they had committed |
| 14:43:14 | 22 | fornication and then you -- you don't send the girl |
| 14:43:19 | 23 | to go back and talk to the guy that may have raped |
| 14:43:25 | 24 | her or something like that.  And that didn't workout |
| 14:43:31 | 25 | too good. |

14:43:32  1      Q    Okay.  Was that in the 1970s where you

14:43:36  2   wouldn't have?  1980s?  When was that?

14:43:39  3      A    Well, I'm justify relating it to the 70s

14:43:42  4   but that's -- and --

14:43:45  5      Q    Okay.

14:43:48  6      A    I know right now I think that's --

14:43:57  7           You want me to wear that or not?

14:44:44  8           COURT REPORTER:  Fix it.

14:44:44  9   BY MR. SHAFFER:

14:44:44  10     Q    Are you saying in the 1970s there wasn't a

14:44:47  11  -- I don't know if it's a policy or a rule where the

14:44:49  12  accused should confront -- excuse me -- the accuser

14:44:53  13  should confront the accused?

14:44:55  14     A    On, yeah, on certain things --

14:44:57  15     Q    Okay.

14:44:58  16     A    -- you were supposed to and you pretty

14:45:01  17  much had to, but --

14:45:03  18     Q    And what things were -- in the 1970s, what

14:45:06  19  things were excluded from that policy of confronting

14:45:12  20  the person who is accused?

14:45:14  21     A    Sexual things.

14:45:15  22     Q    That's in the '70s?

14:45:17  23     A    Yeah.

14:45:19  24     Q    Okay.

14:45:22  25     A    And some of that, you know, you don't know

15:05:28   1   people that weren't involved in that.  But, I guess,

15:05:32   2   time -- time must have proved that to be a fact or

15:05:38   3   whatever.  But I knew nothing about it.

15:05:45   4        Q    So other than a lack of sinning, being a

15:05:48   5   nice person, what are the qualifications for being

15:05:52   6   an elder?

15:05:53   7        A    Well, they're -- they're set forth in the

15:05:55   8   -- in the scriptures there.

15:05:56   9        Q    I'm not asking what the scriptures say.

15:05:58   10  I'm asking you to tell me your understanding of what

15:06:02   11  qualifies --

15:06:02   12            MR. TAYLOR:   Objection.

15:06:03   13            MR. MCKAY:  Objection.  He just stated

15:06:04   14  what his basis is for understanding the

15:06:06   15  qualifications of an elder laid out in the

15:06:08   16  scriptures.  It's -- it's been asked and answered.

15:06:10   17            I'm going to instruct you to stick to the

15:06:12   18  Bible.

15:06:13   19  BY MR. SHAFFER:

15:06:13   20       Q    Mr. Lovett, I just want your personal

15:06:15   21  position.  Don't want to reference the scripture,

15:06:17   22  tell me in your words.

15:06:19   23       A    But that is where it's found.

15:06:21   24       Q    That's fine.  Tell me what the scripture

15:06:25   25  says about it then?

15:06:27  1              MR. MCCABE:  Objection.

15:06:28  2     BY MR. SHAFFER:

15:06:28  3          Q    If you know.

15:06:28  4              MR. MCCABE:  This isn't a memory test.  If

15:06:28  5     you know, you can tell him.  If you're not, you can

15:06:30  6     use your Bible.

15:06:31  7     BY MR. SHAFFER:

15:06:31  8          Q    Yeah.  Can you tell me in your view as a

15:06:33  9     circuit overseer for over 40 years, what makes

15:06:35 10     somebody a good elder?

15:06:41 11          A    Well they have duties, they have

15:06:43 12     sherpheding, and other things.  And like I say there

15:06:47 13     was no accusation or shortcoming that I knew of with

15:06:51 14     regard to him.  But I wasn't --

15:06:53 15              MR. MCCABE:  We're not talking about him.

15:06:55 16     We're asking for general elders qualifications.  He

15:06:59 17     asked you what makes a good elder.

15:07:02 18              THE WITNESS:  Uh-huh.  What makes a good

15:07:04 19     elder.

15:07:05 20              MR. MCCABE:  If you know, tell him.  If

15:07:07 21     you don't know, you don't know.

15:07:11 22              THE WITNESS:  That's a way broader

15:07:13 23     question.  Just leave it at that.  And scriptures

15:07:19 24     just lay it out and he has to meet those things and

15:07:23 25     be a participant in the congregation and be helpful

15:07:26  1    and do whatever job he's assigned to do, that's part

15:07:29  2    of it.

15:07:33  3    BY MR. SHAFFER:

15:07:33  4        Q    Anything else that you need to do to be a

15:07:35  5    good elder?

15:07:36  6        A    Just if you look at these scriptures you

15:07:40  7    can see it.  And -- but other than that --

15:07:45  8        Q    Okay.  So as a circuit overseer how many

15:07:49  9    times have you recommended somebody for an

15:07:52  10   appointment as an elder?

15:07:54  11       A    I don't know.

15:07:56  12       Q    Hundreds?

15:07:57  13       A    I truly don't know.  That might -- might

15:07:59  14   been the case, you know.

15:08:03  15       Q    And as part of your job as a circuit

15:08:06  16   overseer, right, is to send the S2 form -- I believe

15:08:09  17   that's what it is -- whatever form it is, where

15:08:12  18   there's an appointment or a deletion of elders.  You

15:08:15  19   send that to the branch office?

15:08:18  20       A    Uh-huh.

15:08:19  21       Q    Right.  That's part of your job?

15:08:21  22       A    Uh-huh.

15:08:22  23       Q    That's a yes?

15:08:24  24       A    Yes.

15:08:24  25       Q    You've been a circuit overseer for --

```
15:08:26   1                MR. MCCABE:  I think you're badgering the
15:08:28   2   witness, Counsel.
15:08:29   3   BY MR. SHAFFER:
15:08:29   4        Q    -- 30 years or so?  How many times do you
15:08:30   5   estimate that you've recommended somebody to be an
15:08:33   6   elder?
15:08:33   7        A    I don't know.
15:08:35   8        Q    Okay.
15:08:35   9        A    There were many times, you know.
15:08:37  10        Q    Okay.  That's what I want to know.  Many.
15:08:38  11   Like you think over ten?
15:08:39  12        A    Well they -- yes, way more than that.
15:08:43  13        Q    Okay.
15:08:43  14        A    But the local -- the local brothers
15:08:46  15   basically are the ones that are acquainted with
15:08:49  16   those things.  So when you discuss them they will
15:08:52  17   chime in on that, you know, yes, he -- So they --
15:08:53  18   and then they'll all vote everyone will -- will do
15:08:56  19   that.  And they have some pretty thorough
15:08:59  20   discussions about many, many, aspects of the work.
15:09:04  21   I mean, they'll spend hours on -- on the possible
15:09:09  22   qualifications, you know, discussing them as elders.
15:09:12  23   And I just -- I sit there and I listen to what they
15:09:14  24   have to say.  And then if I -- if everybody agrees,
15:09:18  25   then we type the name in and then they sign it and
```

15:09:23  1  then I sign it.

15:09:26  2       Q    So these discussions that you've just

15:09:29  3  testified that you were a part of what -- well

15:09:33  4  there's hours apparently of vetting these elders.

15:09:36  5  What are the qualifications that these elders are

15:09:39  6  talking about in those meetings?  What are they

15:09:41  7  talking about brother so and so.  He does this

15:09:44  8  excellent he should be -- he should be an elder?

15:09:46  9       A    They're brought up one at a time.  And

15:09:49 10  then they talk about -- if they qualify, you know,

15:09:52 11  they -- they discuss that.

15:09:53 12       Q    But I want to know what -- these meetings

15:09:55 13  you say you were a part of where they're spending

15:09:58 14  hours talking about whether so and so -- whether

15:10:01 15  brother so and so should be an elder.  What are the

15:10:04 16  things they're talking about?  What -- what are the

15:10:06 17  qualities of these individuals that matter?

15:10:07 18       A    They go in -- into the scripture

15:10:10 19  qualities, you know, as what you would read in 2nd

15:10:11 20  Timothy. So -- but -- and they discuss them

15:10:14 21  thoroughly.

15:10:15 22       Q    I don't have a Bible in front of me.  Can

15:10:17 23  you tell me what -- what are the qualities of 2nd

15:10:20 24  Timothy that matter for an elder?

15:10:22 25            (Intermittent talking.)

15:10:22  1        A     I -- I don't have a Bible here either, but

15:10:24  2   I can tell you -- and then they also in our --

15:10:26  3        Q     Hold on.  Hold on, sorry.

15:10:30  4              You don't have a Bible.  But you've been a

15:10:33  5   circuit overseer for 4 (phonetic) years and you

15:10:36  6   can't tell me what qualities you look for in an

15:10:39  7   elder?

15:10:40  8        A     I actually --

15:10:40  9              MR. MCCABE:  Objection; you're badgering

15:10:42 10   the witness.  He's asked -- you've asked him the

15:10:43 11   question.  He's answered the question.  He's a 78

15:10:44 12   year old man sitting here after a long day of

15:10:46 13   deposition.  He's got a wife with dementia.  And

15:10:48 14   he's not slept in two weeks.

15:10:50 15              MR. SHAFFER:  Yeah.

15:10:50 16              MR. MCKAY:  And I think we're -- we're

15:10:52 17   getting to the point where you're really pushing the

15:10:54 18   buttons here.

15:10:56 19   BY MR. SHAFFER:

15:10:56 20        Q     So I just want to know if you can tell me,

15:10:58 21   based on your experience, what specific qualities

15:11:00 22   you look for when you're recommending an elder?

15:11:05 23        A     When we do that, we generally read the

15:11:08 24   qualifications.  And then we also look into the

15:11:10 25   publications that have expanded on it.  And then if

15:11:13   1  they measure up, then they vote on it.

15:11:17   2       Q    If they measure up to what?

15:11:19   3       A    To what the scriptures say.

15:11:21   4       Q    Okay.  And I understand it's been a long

15:11:23   5  day and you -- I appreciate you being here for as

15:11:27   6  long as you have.  But it sounds like based on

15:11:31   7  what -- what this gentleman next to you is saying is

15:11:32   8  that you can't tell me what the scripture actually

15:11:35   9  says?

15:11:35  10            MR. MCCABE:  Objection; characterizing

15:11:36  11  what I said is that he couldn't say what the

15:11:39  12  qualities are.  I just said it's been a long day and

15:11:43  13  you're badgering the witness.

15:11:45  14  BY MR. SHAFFER:

15:11:45  15       Q    So you don't know what the scripture

15:11:47  16  says?

15:11:48  17       A    Well, I know what the scripture say.

15:11:49  18       Q    Tell me.  That's all I'm asking.

15:11:51  19            (Intermittent talking.)

15:11:51  20       A    I've just -- I've got of kind of go back

15:11:52  21  through it.  Mentally I didn't want to leave --

15:11:55  22  leave things out.

15:11:56  23       Q    Yeah.

15:11:57  24       A    And --

15:11:57  25       Q    Tell me what comes to mind?

15:12:00  1        A    What -- well, obviously you have to be,
15:12:02  2   you know, truthful, you can't be a liar, you can't
15:12:06  3   be doing those things.  You look at these
15:12:11  4   qualifications that are laid right out there for
15:12:13  5   you.  And then if the Society is expanded on it then
15:12:20  6   you might, you might work those things into
15:12:24  7   discussion.  Many times it's pretty obvious the --
15:12:28  8   that certain things, you know, are met.
15:12:32  9        Q    How do you determine if someone is
15:12:33  10  truthful or a liar when you're deciding whether to
15:12:38  11  recommend that person as an elder?
15:12:40  12       A    Well, if they're telling the truth.  You
15:12:44  13  know, you can't know if a person is -- is lying
15:12:46  14  about many things.  Except you have their word, you
15:12:50  15  have their actions.
15:12:51  16       Q    Do you talk to people around them and say,
15:12:53  17  hey, do you think this person be a good elder, has
15:12:57  18  this person been honest, has this person showed up
15:13:01  19  to their job on time, things like that?
15:13:04  20       A    Well, generally you'll hear about
15:13:07  21  deficiencies.
15:13:08  22       Q    Okay.
15:13:09  23       A    And -- and just in general discussions.
15:13:11  24  But, you don't sit them down and grill them and all
15:13:15  25  that.  They just have to measure these things.  And

15:13:18  1 | then if there's a question, you bring it up, and
15:13:20  2 | then they respond with that.
15:13:24  3 |     Q    Any more particulars you can offer me?
15:13:37  4 |          Anymore particulars on the qualifications
15:13:38  5 | other than whether they are a liar or not and what's
15:13:41  6 | in the scripture?
15:13:42  7 |     A    No.  I -- if we have a Bible, we could
15:13:46  8 | just read them.
15:13:50  9 |     Q    Okay.  We don't.  Not off the top of my
15:13:52 10 | head.  Okay.
15:13:54 11 |          Sir, I don't feel like I'm badgering.  Do
15:13:56 12 | you feel like I'm badgering you?
15:14:39 13 |          MR. MCCABE:  Question.  You hear the
15:14:39 14 | question.
15:14:39 15 |          THE WITNESS:  Well, just a second.  I got
15:14:39 16 | to get this thing to shut off, flashlight.
15:14:39 17 |          MR. MCCABE:  You tell Serie (sic) to shut
15:14:39 18 | it off.
15:14:39 19 |          THE WITNESS:  I don't think she speaks
15:14:39 20 | English.
15:14:39 21 |          (Question read.)
15:14:39 22 |     A    Well, possibly sort of, you know.
15:14:43 23 |     Q    Well I apologize, that's not my intention
15:14:47 24 | I'm just trying to understand what the
15:14:51 25 | qualifications for elders are?