Rebuttal to the Expert Report of
Benjamin F. Yonce
Report Date: January 4, 2024

Prepared by
Lela C. Lawless
Report Date: February 29, 2024

Tracy Caekaert, and Camilla Mapley,
Plaintiffs
vs.
Watchtower Bible and Tract Society of New York, Inc.,
Watch Tower Bible and Tract
Society of Pennsylvania, and Bruce Mapley Sr.,
Defendants
_____

Watchtower Bible and Tract
Society of New York, Inc. and Watch Tower Bible and Tract
Society of Pennsylvania
Cross-Claimants,
vs.
Bruce Mapley Sr.,
Cross-Defendant

_____

Ariane Rowland, and Jamie Schulze
Plaintiff
vs.
Watchtower Bible and Tract Society of New Yori, Inc., and
Watch Tower Bible and Tract Society of Pennsylvania,
Defendants

eidebailly.com



**Exhibit 3**

# Table of Contents

# Table of Contents

I. Introduction ..................................................................................................................... 1

II. Professional Qualifications ............................................................................................ 1

III. Background Information ............................................................................................... 1

IV. Scope of Engagement ................................................................................................... 2

V. Analysis of the Yonce Report ........................................................................................ 2

    A.    Yonce's Inadequate Financial Statement Analysis ............................................. 2

    B.    Yonce's Unfounded Assumption that WTNY and WTPA are Required to Follow GAAP .......... 5

    C.    Yonce's Numerous Misstatements Regarding Materiality ................................ 6

    D.    Yonce's Baseless Conclusions Regarding Disclosures of Intercompany Transactions ........... 7

    E.    Yonce's Unfounded Opinions ............................................................................ 9

    F.    Yonce's Irrelevant Item of Interest .................................................................. 10

VI. Conclusion .................................................................................................................. 10

Exhibits ............................................................................................................................. 12

Appendix A – Statement of Qualifications ...................................................................... 15

Appendix B – Documents Reviewed ............................................................................... 16

# I. Introduction

I, Lela C. Lawless, was retained by Watchtower Bible and Tract Society of New York, Inc. and Watch Tower Bible and Tract Society of Pennsylvania to rebut the opinions set forth in the Expert Report of Benjamin F. Yonce ("Yonce" or the "Yonce Report"), dated January 8, 2024, as they relate to the matters of Tracy Caekaert and Camillia Mapley ("Plaintiffs") vs. Watchtower Bible and Tract Society of New York, Inc. and Bruce Mapley Sr., ("Defendants" or "Cross-Claimants/Cross-Defendant") Case No. CV-20-00052-SPW-TJC, and Ariane Rowland, and Jamie Schulze ("Plaintiff") vs. Watchtower Bible and Tract Society of New York, Inc. and Watch Tower Bible and Tract Society of Pennsylvania ("Defendants") Case No. CV-20-59-BLG-SPW-TJC, in the United States Court for the District of Montana, Billing Division.

The work I performed, and my observations and conclusions are set forth in this rebuttal report. My report is based on information that has been provided and reviewed to date and is subject to change, modification and/or addition, if and when additional facts and information become available.

# II. Professional Qualifications

I am a Director at Eide Bailly, LLP ("Eide Bailly") in Phoenix, Arizona. I am a Certified Public Accountant ("CPA") in the state of Arizona and specialize in providing accounting, tax, financial, economic and project management services to clients, including consulting with parties involved in litigation matters. I am a member of the Eide Bailly Specialty Services team that provides services to all Eide Bailly offices.

I have extensive experience in performing data and records analysis and have prepared, analyzed, and evaluated numerous claims for damages. I have also conducted large-scale, fact-finding investigations into financial transactions, including tracing significant flows of funds between accounts and entities. I am Certified in Financial Forensics ("CFF") and Accredited in Business Valuation ("ABV") through the American Institute of Certified Public Accountants ("AICPA"). I am also a Certified Valuation Analyst ("CVA") through the National Association of Certified Valuators and Analysts ("NACVA"). My curriculum vitae is attached as **Appendix A** to this report. Eide Bailly, LLP is compensated at the rate of $425 per hour for my time in this matter.

# III. Background Information[1]

Defendant Watchtower Bible and Tract Society of New York, Inc. ("WTNY") is a non-profit religious membership corporation formed in the State of New York. Defendant Watchtower Bible and Tract Society of Pennsylvania, Inc. ("WTPA"), is non-profit religious membership corporation formed in the State of Pennsylvania.

The corporate purposes of WTNY and WTPA are religious, educational, and charitable to support the Jehovah's Witness Church (the "Church"). WTNY functions as the head of Church operations while WTPA holds copyrights for religious books, magazines, songs, and videos. WTNY owns the printing and binding machines that produce the Church's copyrighted materials.

Literature and religious items were offered by the Church to individuals on a donation basis in the United States until 1990. After 1990, literature and religious items were offered on a voluntary donation basis. The donations were collected at local congregations and remitted to WTNY to offset the cost of production, materials, and shipping of the religious items. WTNY also paid WTPA for printing privileges associated with the copyrights held by WTPA. Beginning in June 1977, WTNY paid WTPA $.02 for each printed copy of the *New World Translation of the Holy Scriptures*, and 2.0% of the receipts from the distribution of *The Watchtower*. WTPA also provided funds to WTNY to cover the cost of supplies and equipment used to print and produce the literature.

Plaintiffs in this matter allege they were abused by Defendants resulting in claims of negligence among other claims. Plaintiffs further assert they have suffered damages as result of the alleged actions of Defendants. As part of this litigation, Plaintiffs retained Yonce to evaluate the financial business relationship between WTNY and WTPA.

---

[1] Defendant Watch Tower Bible and Tract Society of Pennsylvania's Responses to Plaintiffs' Fourth Set of Combine Discovery.

## IV. Scope of Engagement

I was retained by WTNY and WTPA to review and evaluate the opinions presented in the Yonce Report. I provide my comments in this rebuttal report regarding the underlying assumptions, analysis and documentation used by Yonce to arrive at his opinions.

In performing my work, I reviewed and relied upon various documents including legal pleadings, financial information, company records and other documentation. My analysis was prepared based on the information available to me. I expressly reserve the right to update this rebuttal report if and when additional information relevant to my analysis becomes available. The scope of my work to date in this matter includes review of the documents listed in **Appendix B**.

This report has been prepared in connection with the above-captioned litigation matters and is to be used only for the specific purposes of the litigation. This report is not to be used for any other purpose without the express written consent of Eide Bailly. If called upon to testify in these matters, I intend to provide testimony regarding my analyses and conclusions consistent with this rebuttal report. I offer no opinions regarding liability issues in this litigation.

## V. Analysis of the Yonce Report

I reviewed the Yonce Report and related analysis and opinions. Yonce states he was requested to provide a professional opinion regarding the "financial business relationship" between WTNY and WTPA during the period 1973 to 1992."[2] Yonce offers the following opinion:

> It is our opinion that Defendants' financial statements and disclosures did not disclose material intercompany transactions in a manner consistent with generally accepted accounting principles designed to provide financial statement users with sufficient information to demonstrate that WTNY and WTPA functioned as separate and distinct entities.

Yonce also states his analysis indicates:

- Cash disbursements from WTPA to WTNY were a material item of annual cash flow with respect to WTPA and should have been disclosed on the Statement of Changes in Fund Balances.
- Cash received by WTNY from WTPA was a material item of annual cash flow with respect to WTNY and should have been disclosed on the Statement of Changes in Fund Balances.

However, the Yonce Report contains numerous misstatements, inaccuracies, and inappropriate assumptions throughout, as well as unwarranted conclusions. The Yonce Report is flawed, unsupported and lacks credibility, as described in the report sections below.

### A.  Yonce's Inadequate Financial Statement Analysis

Yonce's analysis is focused on intercompany payments made from WTPA to WTNY for various printing and binding costs incurred to produce religious items from 1973 to 1992 (the "Relevant Period"). WTNY incurred the manufacturing and production costs for printing and binding activities and recorded these amounts as cash disbursements or expenditures in its financial statements. WTNY also paid WTPA for the use of copyrights to produce the printed materials and recorded these payments as cash disbursements for royalties and printing privileges. WTPA then transferred funds to WTNY to cover the costs incurred for supplies, materials, and equipment to produce the religious items.

The production and payment process between WTNY and WTPA for the religious materials is summarized below:

---

[2] The Yonce Report, p. 1.



Yonce provides a general description of the types of financial statements and other information provided by both WTNY and WTPA over the Relevant Period and states "identification of some intercompany transactions was possible by the reader of the financial statements."[3]

*Payments or Cash Disbursements from WTPA to WTNY*

Yonce notes that beginning on August 31, 1987, WTPA changed its annual financial reporting from a Statement of Cash Receipts and Disbursements to a Combined Statement of Revenues and Changes in Fund Balances. Yonce states the Combined Statement of Revenues and Changes in Fund Balances "omitted the line item representing payments to WTNY" from WTPA.[4]

Yonce calculates the percentage of cash disbursements from WTPA to WTNY to total disbursements for August 31, 1986, as 31.5% and 1985 as 37.02% respectively. Prior to 1985, Yonce calculates cash disbursements from WTPA to WTNY ranging from 22.07% to 54.16% of total cash disbursements.[5] Based on his calculations, Yonce concludes, cash disbursements from WTPA to WTNY were a material item of annual cash flow with respect to WTPA and should have been disclosed on the Statement of Changes in Fund Balances."[6]

However, my examination of the Combined Statement of Revenues and Changes in Fund Balances provided indicates for August 31, 1987, through August 31, 1992, WTPA, in fact, reported the payments made to WTNY as expenditures titled Branch Subsidies with a description provided in Note L to the statements as the "cost of literature, magazines, equipment, supplies etc., sent to branches." WTPA simply changed the financial reporting format but continued to reflect the payments made by WTPA to WTNY in every year reported.

An example of the Combined Statement of Revenues and Changes in Fund Balances for 1989 and 1988 demonstrating the Branch Subsidies category and Note L are shown below:[7]

---

[3] The Yonce Report, p. 4.
[4] The Yonce Report, p. 4.
[5] The Yonce Report, p. 4.
[6] The Yonce Report, p. 4.
[7] WTPA066738, WTPA066745.

3

```
EXPENDITURES:
  General Fund
    Branch, Investments (Note K)           17,953,990.00      11,976,076.74
    Branch, Subsidies (Note L)             13,575,016.19      11,369,710.54
    Insurance, Premiums                     1,970,064.44       3,165,572.40
    Insurance, Self-Insurance (Note H)        385,323.14         216,158.84
    Administrative                             91,956.26         203,042.94
    Interest (Note M)                                .00         426,015.11
      Total Expenditures, General Fund     33,976,350.03      27,356,576.57
```

```
Note L - Branch Subsidies

    Cost of literature, magazines, equipment, supplies, etc.  sent to
branches and subsidized by the Pennsylvania Corporation.
```

The payments made by WTPA to WTNY from August 31, 1975, to August 31, 1992, are summarized in **Exhibit 1**. Clearly, Yonce's statement that material payments to WTNY were omitted from the Statement of Changes in Fund Balances is unfounded and not supported by the documentary evidence.

Additionally, in March 1990, WTPA no longer advanced funds to WTNY to cover the costs of supplies and materials to produce literature and payments substantially decline also shown in **Exhibit 1**.[8]

*Payments or Cash Received by WTNY from WTPA*

Yonce states, "Starting with its fiscal year ended February 28, 1982, WTNY changed to report the financial results of operations to a Statement of Activity" that "omitted the line item representing cash receipts from WTPA."[9] Yonce calculates the percentage of cash received by WTNY from WTPA to total cash received by WTNY prior to February 28, 1982, in the range of 17.02% to 28.40% or an average of 25.89%.[10] Yonce concludes his calculations indicate "cash received by WTNY from WTPA was a material item of annual cash flow with respect to WTNY and should have been disclosed on the Statement of Changes in Fund Balances."[11] (The Statement of Changes in Fund Balances was prepared beginning in 1984.)

However, Yonce ignores that although a Statement of Activity was prepared beginning in 1982, a Report of Cash Receipts and Disbursements was also prepared for February 28, 1982, reflecting the cash received by WTNY from WTPA.[12] The Report of Cash Receipts and Disbursements was provided for February 28, 1982, and 1983 and a Report of Cash Revenue and Expenditures was provided for February 28, 1984.[13] These reports demonstrate that payments received by WTNY from WTPY continued to be reported and disclosed in the financial statements.

Financial statements were not provided for WTNY for 1985 through 1989. However, a Statement of Receipts and Expenditures was provided for February 18, 1990, reflecting cash "Received from PA Corp. (Note A)" indicating that WTNY continued to report and disclose payments received from WTPA.[14] Note A to the February 28, 1990 financial statements further discloses the amount transferred to WTNY from WTPA includes the cost of branch expenditures or printing and an amount used to purchase real property as shown below:[15]

---

[8] WTPA066783, Note N – Branch Subsidies.
[9] The Yonce Report, p. 4.
[10] The Yonce Report, p. 4.
[11] The Yonce Report, p. 4.
[12] WTNY000130.
[13] WTNY000130, WTNY111150, WTNY111162.
[14] WTNY000185.
[15] WTNY000201.

4

> Note A – Received from PA Corporation
>
>     During the year, the PA Corporation forwarded $10,900,839.12 to the NY Corporation to assist with the cost of branch expenditures. The additional amount of $6,322,626.70 involved the purchase of 67 Livingston St.
>
> Note B – Property
>
>     Property purchases – 67 Livingston St (4/89), additional Florida acreage (7/89), 67 Remsen St (8/89), 131 York St (10/89)

Payments received by WTNY from WTPY as reflected in the various financial statements provided are summarized in **Exhibit 2**.

Based on the analysis above, Yonce's assertions that cash payments to WTNY from WTPA were not disclosed in the financial statements of either entity are not supported by the evidence. Cash payments between the entities were disclosed and reported in every set of financial statements provided for both WTNY and WTPA for the Relevant Period.

**B. Yonce's Unfounded Assumption that WTNY and WTPA are Required to Follow GAAP**

After Yonce's unfounded conclusions that payments from WTPA to WTNY were not properly disclosed, Yonce further compounds the errors in his report by stating generally accepted accounting principles ("GAAP") are "required by companies in preparing their financial statements" and "Defendants were obligated to prepare their financial statements using GAAP" when no such requirement or obligation exists.[16] GAAP is not universally required for all companies and all companies are not compelled to adhere to GAAP. Yonce's statements are false and inaccurate.

GAAP refers to a set of accounting standards, principles, and procedures that are widely accepted and used for financial reporting. These principles provide a common framework for businesses to prepare and present their financial statements, making it easier for investors, creditors, and other stakeholders to understand and compare financial information. Typically, companies whose equity and debt securities are traded on U.S. public markets are required to file financial reports that conform to GAAP. However, GAAP is not law, not legally mandated, and is not a requirement or obligation for all companies as Yonce mistakenly assumes. Alternatives to GAAP exist and include cash basis accounting, tax basis accounting, accounting for specific industries, and modified versions of GAAP to meet an organization's specific needs. Ministries such as WTNY and WTPA often utilize cash basis accounting driven by the large volume of cash receipts and donations and expenses paid from available cash.

Yonce provides a brief history of the development of professional accounting standards by the Accounting Principles Board ("APB") beginning in 1959 and the creation of the Financial Accounting Standards Board ("FASB") in 1973, an independent non-governmental body responsible for establishing and updating GAAP. Yonce lists the "relevant standards for accurately reporting" summarized below:[17]

- A statement of financial condition or balance sheet (GAAP adopted and expanded by APB and FASB),
- A statement of changes in net assets or income statement (APB Opinion 09 - December 1966; adopted and expanded by FASB),
- A statement reporting the changes in financial position or statement of cash flow (APB Opinion 19 - March 1971; adopted and expanded by FASB),

---

[16] The Yonce Report, p. 5.
[17] The Yonce Report, p. 5.

- Footnote disclosures clearly describing accounting policies, major customer and vendor relationships, related party transactions, and restatements (APB Opinion 22, adopted and expanded by FASB),
- Materiality as a guide to the requirement to disclose certain financial items on the face of the financial statement, within the footnotes of the financial statements, or both.

Yonce proclaims, "Pursuant to authoritative guidance provide by the APB and FASB at all times relevant to this case, management including the Boards of Directors, were responsible for the fair and accurate presentation of financial activities of WTNY and WTPA."[18] However, Yonce fails to recognize the users of the WTNY and WTPA financial statements are the Boards of Directors and management of these organizations who are responsible only to WTNY and WTPA. WTNY and WTPA management were free to utilize a basis of accounting to accommodate their needs, purposes, and goals. The Boards of Directors were not responsible to follow the "authoritative guidance" from the APB or FASB listed by Yonce above.

GAAP was developed primarily to meet the needs of users of financial statements who are outside or external to the management of an organization. No evidence was presented by Yonce that any external user such as a lender, financial institution or third-party entity required WTNY and WTPA to issue GAAP financial statements. Financials statements were prepared internally for the use of the Boards of Directors and management of WTNY and WTPA. Furthermore, no indication exists that a formal financial statement audit occurred in any year in the Relevant Period. Thus, WTNY and WTPA were not obligated to follow recommendations and guidance provided by the APB or FASB.

Yonce further proclaims "It is our opinion that Defendants did not prepare financial statements that met authoritative standards."[19] However, Yonce's overreaching opinion is meaningless and has no merit. As discussed above, GAAP is not compulsory or obligatory. GAAP is elective and a choice available to organizations who choose to utilize GAAP. Since WTNY and WTPA and their Boards of Directors were not mandated, required, or compelled to follow GAAP, Yonce's opinion is irrelevant and pointless.

Furthermore, Yonce fails to identify and consider other relevant accounting guidance and pronouncements issued during the Relevant Period specifically related to non-profit organizations such as WTNY and WTPA. In 1978, during the Relevant Period, the American Institute of Certified Public Accountants' Accounting Standards Executive Committee issued the Statement of Position 78-10 ("SOP 78-10") Accounting and Reporting Practices for Certain Nonprofit Organizations. SOP 78-10 was prepared primarily to meet the needs of users of financial statements who are outside or external to the management of the organization.

The Statement of Financial Accounting Concepts No. 4, Objectives of Financial Reporting by Nonbusiness Organizations ("Concepts No. 4") was issued by the FASB in December 1980 during the Relevant Period. Concepts No. 4 "establishes the objectives of general purpose external financial reporting by nonbusiness organizations."

SOP 78-10 and Concepts No. 4 further demonstrate that authoritative nonprofit accounting standards that existed during the Relevant Period relate to external financial reporting guidance only. Therefore, WTPA and WTNY were not obligated or required to follow recommendations in SOP 78-10 or Concepts No. 4.

### C. Yonce's Numerous Misstatements Regarding Materiality

Yonce devotes almost three pages of his report to a discussion of the concept of materiality. Yonce states that material related party transaction disclosures are required under authoritative guidance provided by the APB and FASB "to inform users of financial statements regarding the specific dollar amounts of transactions, the type of intercompany pricing that was in place, [and]the amounts and terms of intercompany receivables and payables."[20] Yonce further states the material intercompany items should be shown as specific line items in both the balance sheet and income

---

[18] The Yonce Report, p. 5.
[19] The Yonce Report, p. 5.
[20] The Yonce Report, p. 6.

statement and should also be reported in a footnote to the financial statements.[21] Once again, Yonce's statements related to reporting requirements under GAAP are irrelevant and do not apply to WTPA and WTNY.

Yonce states, "Pursuant to Generally Accepted Accounting Principles (GAAP), materiality is defined by a five percent (5%) rule which holds that a reasonable investor would not be influenced in their investment decisions by [a] fluctuation in net assets or net income of 5% or less."[22] Yet, Yonce provides no evidence to support this definition or where a 5% rule appears in any accounting standards, principles, or pronouncements. Moreover, WTNY and WTPA have no investors, stakeholders or other external users relying on the financial statements for investment decisions that could be influenced by materiality.

In 1980, during the Relevant Period, the FASB provided the following definition of materiality:[23]

> The magnitude of an omission or misstatement of accounting information that, in the light of surrounding circumstances, makes it probable that the judgment of a reasonable person relying on the information would have been changed or influenced by the omission or misstatement."

The definition above focuses on the magnitude of a misstatement and the probable or reasonable impact on the judgment of financial statement users, in this case, the Boards of Directors and management of WTNY and WTPA.

The FASB issued the Statement of Financial Accounting Concepts 2, Qualitative Characteristics of Accounting Information in May 1980 ("Statement of Concepts 2") during the Relevant Period. The purpose of the Statement of Concepts 2 "is to examine the characteristics that make accounting information useful." The Statement of Concepts 2 states the following related to materiality:

> Materiality is a pervasive concept that relates to the qualitative characteristics, especially relevance and reliability. Materiality and relevance are both defined in terms of what influences or makes a difference to a decision maker, but the two terms can be distinguished. A decision not to disclose certain information may be made, say, because investors have no need for that kind of information (it is not relevant) or because the amounts involved are too small to make a difference (they are not material). Magnitude by itself, without regard to the nature of the item and the circumstances in which the judgment has to be made, will not generally be a sufficient basis for a materiality judgment. The Board's present position is that no general standards of materiality can be formulated to take into account all the considerations that enter into an experienced human judgment. Quantitative materiality criteria may be given by the Board in specific standards in the future, as in the past, as appropriate.

As shown above, the FASB position is that no general standards of materiality can be formulated to account for the considerations that enter into human judgment. A decision not to disclose information may be made because users have no need for that information. Thus Yonce's 5% rule does not exist in GAAP and is not defined by GAAP. Furthermore, Yonce's opinions regarding materiality requirements and GAAP disclosures have no relevance. WTNY and WTPA never prepared or presented GAAP financial statements and were never required to utilize or adhere to GAAP in any financial statement or report.

**D.  Yonce's Baseless Conclusions Regarding Disclosures of Intercompany Transactions**

Yonce discusses the Reports of the Treasurer of WTNY and intercompany amounts due to and due from WTPA noted in these reports over the Relevant Period. Yonce notes the first disclosure on the face of the balance sheet of WTNY occurs in 1986 when a receivable from WTPA for $24.0 million is reported.[24] Yonce states, "Given the materiality of the balance in the intercompany account, there should have also been a disclosure on the balance sheet in all years prior to 1986" and the "financial statements should have included a footnote disclosure describing terms

---

[21] The Yonce Report, p. 6.
[22] The Yonce Report, p. 6.
[23] https://www.researchgate.net/publication/271966596_A_review_on_the_evolution _of_the_definitions_of_materiality.
[24] The Yonce Report, p. 7.

related to an extension of payment of intercompany credit."[25] However, Yonce provides no GAAP rule or standard that existed in 1986 that mandates disclosures of related party transactions "on the face of the balance sheet." Currently, GAAP does not require separate disclosure of related party transactions on the face of the financial statements.[26]

Next, Yonce provides the conclusion that, "Without full disclosure of the terms of these intercompany transactions it appears that WTNY and WTPA did not act independently of each other with respect to their cash flow needs." However, financial statements are essentially numerical representations of transactions and events. Financial statements and disclosures do not convey the subjective aspects of management's actions and whether or not management acted independently related to cash flow needs. Yonce's assumptions are speculative and lack substantiating evidence to support his claims. Additionally, once again, Yonce's statements regarding disclosures are meaningless since WTNY and WTPA were not required to utilize GAAP in their financial reporting. WTNY and WTPA were only required to prepare internal financial statements to meet the informational needs of the Boards of Directors of WTNY and WTPA.

Yonce offers yet another speculative conclusion and states, "there does not appear to be any repayment terms or expectation of repayment placed on the intercompany receivable payable accounting between WTNY and WTPA to indicate that these transactions are at an arm's length." Again, Yonce simply assumes with no verification or factual support for his comments. Yonce also states, "The price paid by WTPA was determined by a financial pricing structure."[27] Yet, Yonce provides no further detail or analysis of any such structure as it relates to arm's length transactions.

An arm's length transaction refers to setting the price of goods and services between related parties so that profits and costs are allocated appropriately as if the parties were independent. GAAP does not provide a specific definition for an arm's length transaction. However, in the context of nonprofit entities, GAAP does emphasize the importance of transactions being conducted at fair value in accordance with the economic substance of the transaction.[28]

The transactions resulting in the accounts receivable/payable between WTNY and WTPA primarily arise due to the cost of materials, supplies and other equipment incurred to produce the religious literature. The costs are incurred by WTNY and charged to WTPA. WTPA then transfers funds to WTNY to cover the costs. Donations to cover costs are also suggested by the Church branches and are voluntary. Neither WTNY nor WTPA are engaged in commercial transactions or sales of religious materials for profit. The substance of the transactions between WTNY and WTPA relates to WTPA advancing funds to WTNY to cover production costs of the printed materials.

*Yonce's Additional Inaccurate Statements*

Yonce presents a number of additional statements in his report, all predicated on his baseless theory the financial statements for WTNY and WTPY must comply with GAAP and contain GAAP disclosures. Yonce states the following:

- *Failure to disclose all intercompany transactions regardless of materiality is considered a departure from GAAP.*[29]

As stated, numerous times throughout this rebuttal report, WTNY and WTPA were not required to follow GAAP and prepare GAAP financial statements. Any alleged departures from GAAP simply do not apply to the WTNY and WTPA financial statements.

- *If undisclosed amounts related to intercompany transactions are also pervasive and of a material amount then a user of the financial statements could be poorly informed and make poor business decisions, or not be aware of instances of fraudulent transactions.*[30]

---

[25] The Yonce Report, p. 7.
[26] https://kpmg.com/us/en/articles/2023/related-party-disclosures.html.
[27] The Yonce Report, p. 3.
[28] Statement of Position 78-10, Accounting Principles and Reporting Practices for Certain Nonprofit Organizations.
[29] The Yonce Report, p. 7.
[30] The Yonce Report, p. 7.

The users of the financial statements were the governing bodies of WTNY and WTPA. The financial statements were prepared for internal use based on the informational needs of the WTPA and WTNY Boards of Directors and management. The financial statements were not provided to or relied upon by external third-party users for business decisions. Moreover, Yonce's assumption that lack of disclosures would cause a user to "not be aware" of instances of fraud is speculative and overreaching.

- *Additionally, an auditor of the financial statements would issue an adverse opinion signifying that the financial statements may not be relied upon by financial statement users.[31]*

Yonce's statement is shear speculation. WTPA and WTNY financial statements were never prepared on a GAAP basis, audited by an independent accounting firm, or relied upon by external users. Yonce has no way of knowing that a hypothetical auditor would issue an adverse opinion since there has never been any need for an audit or GAAP compliant statements.

Yonce continues his discussion of intercompany transactions and provides additional misstatements:

- *Given the materiality of intercompany transactions and WTNY's reliance on additional cash from WTPA to maintain its operations represents a requirement that WTPA disclose these intercompany transactions during all of the years relevant to this case.[32]*

No such disclosure requirement exists for WTPA and WTNY for any years during the Relevant Period.

- *With respect to the financial activities of WTPA there does not appear to be any terms placed on the intercompany receivable payable accounting between WTNY and WTPA that indicate that these transactions are at an arm's length.[33]*

Yonce assumes transactions between the parties are not arm's length and are not based on market terms. As stated above, Yonce presents no sufficient documentary evidence or analysis of intercompany transactions to verify his statements. Moreover, an arm's length transaction relates to pricing between related parties that generate profits. WTNY and WTPA are nonprofit entities with no commercial operations.

**E.   Yonce's Unfounded Opinions**

Yonce offers the following confusing opinions:

> Based on the materiality of the intercompany transactions, WTNY's reliance on WTPA for cash flow needs without arm's length terms, and the lack of disclosure regarding these intercompany transactions it is our opinion that Defendant's financial statements and disclosures did not clearly disclose material intercompany transactions in a manner consistent with generally accepted accounting standards designed to provide financial statement users with sufficient information to demonstrate that WTNY and WTPA functioned as separate and distinct entities.

Yonce bases his opinions on the following:

➢ Materiality of intercompany transactions.

➢ WTNY's reliance on WTPA for cash flow needs without arm's length terms.

➢ Lack of disclosure regarding intercompany transactions.

---

[31] The Yonce Report, p. 7.
[32] The Yonce Report, p. 7.
[33] The Yonce Report, p. 8.

As discussed above, the determination of materiality is a matter of professional judgment affected by the financial informational needs of the users of the financial statements, in this case, the Boards of Directors of WTNY and WTPA. An arm's length transaction refers to setting the price of goods and services between related parties to appropriately allocate profits and costs. However, WTNY and WTPA never sold goods or services for profit. WTPA transferred funds to WTNY to cover the costs of producing religious literature. The Boards of WTNY and WTPA were not required disclose any additional information regarding intercompany transactions other than what was provided to meet their needs. Therefore, the basis for Yonce's opinions are his own unsupported assumptions.

The Yonce opinion can be broken down into elements for further clarification.

- ➢ Financial statements prepared using GAAP are designed to provide users with sufficient information.
- ➢ Defendants' financial statements were not prepared in a manner consistent with GAAP.
- ➢ Defendants' financial statements clearly did not disclose material intercompany transactions in a manner consistent with GAAP.
- ➢ Defendants lack of GAAP disclosures resulted in insufficient information to demonstrate that WTNY and WTPA functioned as separate and distinct entities.

Yonce is correct that GAAP financial statements are designed to provide users with sufficient information. However, as described throughout this report, Defendants did not prepare financial statements on a GAAP basis, were never required to disclose alleged material intercompany transactions to comply with GAAP and were never required to adhere to GAAP for any external use or purpose. WTNY and WTPA prepared internal financial statements that included information for their own purposes. Yonce's opinions regarding GAAP consistency and GAAP disclosures are pointless and without merit.

Next, Yonce leaps to the speculative conclusion that lack of GAAP disclosures results in insufficient information to demonstrate WTNY and WTPA acted as separate and distinct entities. However, with or without GAAP disclosures, an accounting method or basis does not demonstrate whether a company functions separately or not, nor does an accounting method demonstrate the rationale for management's actions and decisions. Furthermore, the purpose of GAAP, when applied, is to provide financial statements within a common and consistent reporting framework. GAAP is not designed for the specific purpose to demonstrate the separate and distinct functions of entities as Yonce states. Yonce's opinion is inaccurate and lacks reasoning.

### F. Yonce's Irrelevant Item of Interest

Yonce provides additional unfounded opinions that, "Given the materiality of intercompany transactions and common control between WTNY and WTPA it would generally be considered unusual for both entities to use fiscal year-ends that are different from one another …there is no indication within the financial data available to us that demonstrates a business purpose for changing the year end data…WTNY should have provided more complete disclosure"[34]

Once again, Yonce interjects his own assumptions regarding materiality, "unusual" differing year-ends and business purposes of WTNY and WTPA with no factual basis. Changing the year-end for reporting purposes can be driven by a number of reasons including business cycle, operational efficiency, seasonal variations, or any other reason determined by the governing body of an organization. Furthermore, businesses are not required to disclose the business purpose or any reasons for changing year-ends, including under GAAP standards. Yonce's inclusion of this additional item of interest is irrelevant to his opinions.

# VI. Conclusion

Based upon the analysis as described in this rebuttal report, it is my opinion, the Yonce Report is flawed, inaccurate and lacks credibility. The majority of the Yonce report is based on the misguided theory that financial statements for WTNY and WTPY must comply with GAAP and contain GAAP disclosures, when no such requirements exist. Furthermore, the purpose of GAAP is not to demonstrate the separate and distinct functions of entities.

---

[34] The Yonce Report, p. 9.

10

Yonce begins his report with a deficient analysis of the WTNY and WTPA financial statements. Yonce states the Combined Statement of Revenues and Changes in Fund Balances omitted the line item representing payments to WTNY from WTPA beginning in August 31, 1987. Yonce states beginning with fiscal year ended February 28, 1982, the WTNY Statement of Activity" omitted the line item representing cash receipts from WTPA. However, cash payments between the entities were disclosed and reported in every set of financial statements provided for both WTNY and WTPA for the Relevant Period.

Yonce's opinion that Defendants did not prepare financial statements that met authoritative standards is meaningless. GAAP is not required for all companies and the Boards of Directors were not responsible to follow guidance provided by the APB and FASB. No evidence was presented by Yonce that an external user such as a lender, financial institution or third-party entity required WTNY and WTPA to issue GAAP financial statements. Financials statements were prepared internally for the use of the Boards of Directors and management of WTNY and WTPA.

SOP 78-10 and Concepts No. 4 further demonstrate that authoritative nonprofit accounting standards that existed during the Relevant Period relate to external financial reporting guidance only. Therefore, WTPA and WTNY were never obligated or required to follow recommendations in SOP 78-10 or Concepts No. 4.

Yonce's opinions regarding materiality and required GAAP disclosures are pointless. WTNY and WTPA never prepared or presented GAAP financial statements and were never required to utilize or adhere to GAAP in any financial statement or report. Yonce's 5% materiality rule does not exist in GAAP standards and is not defined by GAAP.

Yonce assumes WTNY and WTPA did not act independently with respect to cash flow needs based on the lack of intercompany disclosures in the financial statements required by GAAP. Yonce's assumptions are speculative and lack substantiating evidence. Yonce presents no cash flow analysis or any analysis of the actions of WTNY and WTPA management to support his claims. Additionally, Yonce's statements regarding disclosures are meaningless since WTNY and WTPA were not required to utilize GAAP in their financial reporting.

Yonce assumes account receivable/payable transactions between WTNY and WTPA are not arm's length based on the lack of stated repayment terms or expectation of repayment. Yonce fails to recognize that amounts transferred by WTPA primarily cover the production costs of religious materials. Neither WTNY nor WTPA are engaged in for profit operations.

Yonce presents a number of additional statements, all predicated on his baseless theory the financial statements for WTPA and WTNY must comply with GAAP. Overall, the Yonce Report is inaccurate, unsupported and has no merit.

This report is based on information currently available. I reserve the right to supplement this rebuttal report if and when new information becomes available relevant to my analysis.

*Lela Lawless*

Lela C. Lawless, CPA/ABV/CFF, CVA

EIDE BAILLY LLP
Phoenix, Arizona
February 29, 2024

## Exhibits

**Exhibit 1**
**Caekaert and Mapley v. WTNY, et al. and Rowland and Schulze v. WTNY, et. Al.**
**Payments or Cash Disbursements from WTPA to WTNY**

| Date | Cash Disbursements Total | Bates No. | Cash Disbursed to WTNY | Bates No. | % to Total | Statement Description |
|---|---|---|---|---|---|---|
| 8/31/1975 | $ 25,334,653.48 | WTPA066601 | $ 9,080,332.46 | WTPA066601 | 35.84% | Statement of Cash Receipts and Disbursements |
| 8/31/1976 | 24,348,626.08 | WTPA066610 | 8,905,163.83 | WTPA066610 | 36.57% | Statement of Cash Receipts and Disbursements |
| 8/31/1977 | 22,737,841.24 | WTPA066621 | 6,757,540.02 | WTPA066621 | 29.72% | Statement of Cash Receipts and Disbursements |
| 8/31/1978 | 26,970,328.01 | WTPA066633 | 8,568,032.04 | WTPA066633 | 31.77% | Statement of Cash Receipts and Disbursements |
| 8/31/1979 | 29,230,846.60 | WTPA066643 | 6,542,269.65 | WTPA066643 | 22.38% | Statement of Cash Receipts and Disbursements |
| 8/31/1980 | 28,952,326.61 | WTPA066651 | 13,924,160.59 | WTPA066651 | 48.09% | Statement of Cash Receipts and Disbursements |
| 8/31/1981 | 25,863,024.59 | WTPA066664 | 8,844,276.43 | WTPA066664 | 34.20% | Statement of Cash Receipts and Disbursements |
| 8/31/1982 | 26,671,177.00 | WTPA066664 | 12,970,960.17 | WTPA066664 | 48.63% | Statement of Cash Receipts and Disbursements |
| 8/31/1983 | 32,696,141.10 | WTPA066680 | 17,706,542.56 | WTPA066679 | 54.15% | Statement of Cash Receipts and Disbursements |
| 8/31/1984 | 33,908,080.37 | WTPA066680 | 17,301,134.00 | WTPA066679 | 51.02% | Statement of Cash Receipts and Disbursements |
| 8/31/1985 | 19,233,581.82 | WTPA066695 | 7,120,742.58 | WTPA066695 | 37.02% | Statement of Cash Receipts and Disbursements |
| 8/31/1986 | 31,965,716.81 | WTPA066695 | 10,065,251.00 | WTPA066695 | 31.49% | Statement of Cash Receipts and Disbursements |
| Total | $ 327,912,343.71 | | $ 127,786,405.33 | | 38.97% | |

| Date | Total Expenditures | Bates No. | Branch Subsidies | Bates No. | % to Total | Statement Description |
|---|---|---|---|---|---|---|
| 8/31/1987 | $ 15,261,949.41 | WTPA066723 | $ 14,543,289.78 | WTPA066723 | 95.29% | Combined Statement of Revenues and Fund Balances |
| 8/31/1988 | 27,381,465.46 | WTPA066738 | 11,369,710.54 | WTPA066738 | 41.52% | Combined Statement of Revenues and Fund Balances |
| 8/31/1989 | 34,097,839.78 | WTPA066738 | 13,575,016.19 | WTPA066738 | 39.81% | Combined Statement of Revenues and Fund Balances |
| 8/31/1990 | 23,376,979.86 | WTPA066758 | 10,564,557.95 | WTPA066758 | 45.19% | Combined Statement of Revenues and Fund Balances |
| 8/31/1991 | 19,596,333.19 | WTPA066796 | 975,320.20 | WTPA066796 | 4.98% | Combined Statement of Revenues and Fund Balances |
| 8/31/1992 | 14,148,344.30 | WTPA066796 | 601,105.25 | WTPA066796 | 4.25% | Combined Statement of Revenues and Fund Balances |
| Total | $ 133,862,912.00 | | $ 51,628,999.91 | | 38.57% | |

**Exhibit 2**
**Caekaert and Mapley v. WTNY, et al. and Rowland and Schulze v. WTNY, et. Al.**
**Payments or Cash Disbursements Received by WTNY from WTPA**

| Date | Cash Receipts Total | Bates No. | Cash Received from WTPA | Bates No. | % to Total | Statement Description |
|---|---|---|---|---|---|---|
| 8/31/1973 | 19,812,385.30 | WTNY000093 | 4,141,782.85 | WTNY000092 | 20.9% | Report of Cash Receipts and Disbursements |
| 8/31/1974 | 29,078,769.01 | WTNY000101 | 8,187,922.12 | WTNY000100 | 28.2% | Report of Cash Receipts and Disbursements |
| 8/31/1975 | 38,951,650.34 | WTNY000109 | 9,080,332.46 | WTNY000109 | 23.3% | Report of Cash Receipts and Disbursements |
| 8/31/1976 | 29,509,110.00 | WTNY000114 | 8,905,163.80 | WTNY000114 | 30.2% | Cash Receipts and Disbursements |
| 8/31/1977 | 23,796,739.38 | WTNY000120 | 6,757,540.02 | WTNY000120 | 28.4% | Cash Receipts and Disbursements |
| 8/31/1978 | 29,419,733.60 | WTNY000125 | 8,568,032.00 | WTNY000125 | 29.1% | Cash Receipts and Disbursements |
| 8/31/1979 | *Not Provided* | | | | | |
| 8/31/1980 | 52,517,262.81 | WTNY000143 | 13,924,145.59 | WTNY000143 | 26.5% | Comparative Statement of Receipts and Disbursements |
| 8/31/1981 | 45,626,968.12 | WTNY000138 | 8,961,281.67 | WTNY000138 | 19.6% | Cash Receipts and Disbursements |
| 2/28/1982 | 26,842,866.70 | WTNY000130 | 5,500,000.00 | WTNY000130 | 20.5% | Report of Cash Receipts and Disbursements |
| 2/28/1983 | 87,170,286.72 | WTNY000150 | 24,111,000.00 | WTNY000150 | 27.7% | Report of Cash Receipts and Disbursements |
| 2/28/1984 | 84,933,813.11 | WTNY000162 | 15,487,042.59 | WTNY111162 | 18.2% | Report of Cash Revenue and Expenditures |
| | *Not Provided* | | | | | |
| 2/28/1990 | 117,796,686.82 | WTNY000185 | 17,223,465.82 | WTNY000185 | 14.6% | Statement of Receipts and Expenditures |
| | $585,456,271.91 | | $ 130,847,708.92 | | | |

Page 1 of 1

## Appendix A – Statement of Qualifications

**Lela C. Lawless**, CPA/ABV/CFF, CVA
602-264-8641 | llawless@eidebailly.com

**Professional Designations**

- Certified Public Accountant (CPA)**,** State of Arizona
- Accredited in Business Valuation (ABV), American Institute of Certified Public Accountants
- Certified in Financial Forensics (CFF), American Institute of Certified Public Accountants
- Certified Valuation Analyst (CVA), National Association of Certified Valuators and Analysts

**Professional Affiliations**

- Member, American Institute of Certified Public Accountants (AICPA)
- Past Member AICPA Business Valuation Committee, Appointed 2013
- Member, AICPA Forensics and Valuation Services Section
- Member, Arizona Society of Certified Public Accountants (ASCPA)
- Member, ASCPA Forensics and Valuation Services Section
- Member National Association of Certified Valuators and Analysts (NACVA)

**Education and Training**

- University of Arizona, Bachelor of Science
- University of Arizona, Master's in Business Administration (MBA), Accounting Emphasis

**Professional Experience**

Ms. Lawless has over twenty-five years of public accounting experience managing complex litigation support, business valuation, forensic accounting, fraud detection, analyzing claims and calculating economic damages related to lost profits, fraud schemes, accounting malpractice claims, securities litigation, bankruptcy, employment, contract disputes, post-acquisition disputes, and other business disputes. Ms. Lawless has prepared numerous expert reports, supporting schedules, analysis and exhibits used in all phases of commercial litigation and has provided expert testimony in both deposition and trial. Ms. Lawless has acted as a Court Appointed Accounting Special Master and Family Law Master. Additionally, Ms. Lawless has worked in both audit and tax departments of a "Big Four" accounting firm.

**Employment History**

- Senior Manager, Eide Bailly, LLP - Present
- Lela C. Lawless, CPA, PLLC
- Manager, EppsCPA Consulting, PLLC
- Manager, Sarvas, King and Coleman, P. C., Phoenix, Arizona
- Manager, Navigant Consulting, Phoenix, Arizona
- Deloitte, Phoenix, Arizona

# Appendix B – Documents Reviewed

- 2022.03.16 WTPA's Resp to Ps' 1 Disc Reqs - Caekaert.pdf
- 2022.03.28 Caekaert - WTPA's Amended Resp to Ps' 1 Disc.pdf
- 2023.12.06 WTPA's Resps to Ps' 6 Disc Reqs.pdf
- A Review of the Evolution of the Definitions of Materiality, H. Gin Chong, College of Business, Prairie View A & M University, International Journal of Economics and Accounting, Vol 6, No. 1, 2015.
- Affidavit of James Rowland dated April 14, 2020
- Affidavit of Mark O'Donnell dated April 15, 2020
- Affidavit of Shirley Gibson dated March 26, 2020
- Def WTPA's 1st Amended & Supp. Responses (12-14-22) to Pltfs' 4th Discovery Requests.pdf
- Def WTPA's 1st Supplemental Responses to Pltfs' 1st Set of General Discovery.pdf
- Def WTPA's Responses to Pltfs' 3rd Set of Combined Discovery.pdf
- Def WTPA's Responses to Pltfs' 4th Set of Combined Discovery.pdf
- Def WTPA's Responses to Pltfs' 5th Set of Combined Discovery.pdf
- First Amended Complaint and Jury Demand
- Related Party Disclosures: IFRS Standards vs US GAAP; https://kpmg.com/us/en/articles/2023/related-party-disclosures.
- Revised Codes of Montana Volume 1 Part 1 1974 Cumulative Pocket Supplement
- Second Amended Complaint and Jury Demand
- Statement of Financial Accounting Concepts No. 2, Qualitative Characteristics of Accounting Information, Financial Accounting Standards Board, May 1980.
- Statement of Financial Accounting Concepts No. 4, Objective of Financial Reporting by Nonbusiness Organizations, Financial Accounting Standards Board, December 1980.
- Statement of Position 78-10, Accounting Principles and Reporting Practices for Certain Nonprofit Organizations.
- WTNY 1-13.pdf
- WTNY 14-83 RFP 6 Confidential.marks.Protective.Order.pdf
- WTNY 196 - 210 Confidential.Marks.Protective.Order.Notes to Financial Statements WTNY 00196 - WTNY 000210.pdf
- WTNY 84-91.pdf
- WTNY 92 - 195 WTNY Financials Bates Confidential.pdf
- WTNY001084-WTNY001150.pdf
- WTPA066586-WTPA066804.pdf
- WTPA066970-WTPA066992.pdf
- WTPA's Responses to Pltfs' 2nd Set of Combined Discovery Requests with Signed Verification.pdf