Jon A. Wilson
Brett C. Jensen
Michael P. Sarabia
BROWN LAW FIRM, P.C.
315 North 24th Street
P.O. Drawer 849
Billings, MT 59103-0849
Tel. (406) 248-2611

Joel M. Taylor, Esq. (*pro hac vice*)
MILLER MCNAMARA & TAYLOR LLP
100 South Bedford Road, Suite 340
Mount Kisco, New York 10549
Tel./E-Fax (845) 288-0844

*Attorneys for Defendant Watchtower Bible and Tract Society of New York, Inc.*

Gerry P. Fagan
Christopher T. Sweeney
Jordan W. FitzGerald
MOULTON BELLINGHAM PC
27 North 27th Street, Suite 1900
P. O. Box 2559
Billings, Montana 59103-2559
Telephone: (406) 248-7731
Fax: (406) 248-7889

*Attorneys for Defendant Watch Tower Bible and Tract Society of Pennsylvania*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| TRACY CAEKAERT and CAMILLIA MAPLEY,<br><br>Plaintiffs,<br><br>-vs-<br><br>WATCHTOWER BIBLE AND TRACT SOCIETY OF NEW YORK, INC., and WATCH TOWER BIBLE AND TRACT SOCIETY OF PENNSYLVANIA,<br><br>Defendants. | Cause No. CV 20-52-BLG-SPW<br><br>**DEFENDANTS WATCHTOWER BIBLE AND TRACT SOCIETY OF NEW YORK, INC. AND WATCH TOWER BIBLE AND TRACT SOCIETY OF PENNSYLVANIA'S REPLY BRIEF IN SUPPORT OF JOINT MOTION FOR SUMMARY JUDGMENT** |

# INTRODUCTION

Defendants Watchtower Bible and Tract Society of New York, Inc. ("WTNY") and Watch Tower Bible and Tract Society of Pennsylvania ("WTPA") (collectively "Defendants") hereby submit their Reply Brief in Support of Defendants' Joint Motion for Summary Judgment.

First, Plaintiffs argue two theories that they've failed to plead: (1) negligent undertaking, and (2) fiduciary relationship. As this Court has recognized, failure to plead claims prevents a party from raising those claims in summary judgment briefing. *Elk Petroleum, Inc. v. Rocky Mountain Regional Director*, 163 F. Supp. 3d 809, 815 (D. Mont. 2016). Here, Plaintiffs' First Amended Complaint simply fails to state allegations necessary to state these two claims. *See, generally*, Doc. 22. *See also Maryland Cas. Co. v. Asbestos Claims Ct.*, 460 P.3d 882, 904 (Mont. 2020) (discussing elements of negligent undertaking); and *Gliko v. Permann*, 130 P.3d 155, 159-162 (Mont. 2006) (discussing requirements for fiduciary relationship). For that reason alone, the Court should reject Plaintiffs' arguments relating to these two un-pleaded claims.

# ARGUMENT

**I.   THERE ARE NO DISPUTED ISSUES OF MATERIAL FACT.**

Plaintiffs admit their father began abusing them long before Plaintiffs' family associated with Jehovah's Witnesses and that the abuse had nothing to do with

2

Jehovah's Witnesses.  (Doc. 383, ¶ 5.)  Plaintiffs admit Gunnar Hain abused each of them a single time in his own home, also under circumstances that had nothing to do with Jehovah's Witnesses.  (*Id*., ¶ 6.)  Plaintiffs admit no abuse occurred while they or the alleged perpetrators were in Defendants' custody or under Defendants' control—*i.e.,* no special relationship existed.  (*Id*., ¶¶ 5-6, 9-10.)   In short, the material facts are undisputed.

## II.  PLAINTIFFS TRY TO BASE CIVIL LIABILITY ON RELIGIOUS TEACHINGS, WHICH THE FIRST AMENDMENT PROHIBITS.

Because the abuse occurred under circumstances that had nothing to do with Jehovah's Witnesses, Plaintiffs grasp for a link by turning to religious beliefs. Plaintiffs call these beliefs the "Watchtower Protocols" and argue Defendants had a duty to protect them because Jehovah's Witnesses believe (according to Plaintiffs) you should report abuse to the elders and *not* to civil authorities, and that the elders and victims should not discuss it with anyone else.

That is not what Jehovah's Witnesses believe.  Plaintiffs' own mother testified:

> Q.  So did anybody tell you no, you can't report to the authorities?
>
> A.  No, nobody told me.  It was my mistake not to have.

(Doc. 383-2 at 177:11-178:8.)

James Rowland testified:

3

> Q.  Have you ever read a publication by [Defendants] that has said you could not report abuse to the authorities?
>
> A.  Not that I know of.

(Depo. James Rowland 193:15-20 (Apr. 23, 2021), excerpts attached as Exhibit A.)

Jehovah's Witnesses believe *elders*—like clergy in most religious denominations—have a duty of confidentiality.  (Doc. 383-7.)  "The need for elders to maintain strict confidentiality has been repeatedly stressed."  (Doc. 383-10.)

Plaintiffs' reliance on religious beliefs as the source of the alleged duty owed by Defendants creates two constitutional prohibitions against their claims.  First, the parties disagree about Jehovah's Witnesses' beliefs, and the Court cannot resolve that dispute.  Courts must "decide disputes involving religious organizations 'without resolving underlying controversies over religious doctrine.'"  *Puri v. Khalsa*, 844 F.3d 1152, 1164 (9th Cir. 2017) (internal citation omitted).  Second, even if Plaintiffs had correctly characterized what Jehovah's Witnesses believe, "religious belief … does not create a civil duty."  *Roman Catholic Bishop v. Superior Court*, 42 Cal. App. 4th 1556, 1568 (1996).

The First Amendment's prohibition against holding churches liable in suits by their own parishioners for what they believe and teach is based, in part, on the notion that those parishioners join in and consent to such beliefs.  *See Jones v. Wolf*, 443 U.S. 595, 617-18 (1979).

When Plaintiffs' mother went to Hardin Congregation elders to complain about her husband, she did so voluntarily and knew they would handle the matter in accordance with Jehovah's Witnesses' beliefs. Plaintiffs' mother admitted the voluntary nature of her relationship with Jehovah's Witnesses. (Depo. Shirley Gibson 161:17-162:2 (Apr. 14, 2022), excerpts attached as Exhibit B.)

Plaintiffs must recognize that voluntary religious beliefs do not create secular duties, so they repeatedly assert that the so-called Watchtower Protocols "require" this or "require" that of Jehovah's Witnesses. "[C]ongregation members were *required* to … bring reports of child sexual abuse to the Hardin elders for investigation and resolution" and to "not disclose that information to anyone else." (Doc. 382 at 3, 7 (emphasis added).) "Members were *required* to take personal matters of concern to the elders for investigation and resolution." (*Id*. at 15 (emphasis added).) In other words, Plaintiffs claim their mother had no choice, which is contrary to their mother's own testimony.

Adjudicating such allegations would require the Court to decide if she is right about what Jehovah's Witnesses teach and believe—*i.e.,* to "engage in the forbidden process of interpreting and weighing church doctrine" which is "unconstitutional." *Puri*, 844 F.3d at 1164. Courts can adjudicate claims against a religious organization only by using "a purely secular inquiry." *Elvig v. Calvin Presbyterian Church*, 375 F.3d 951, 959 (9th Cir. 2004). Thus, "[a] court [may] interpret provisions of religious

5

documents involving … nondoctrinal matters as long as the analysis can be done in purely secular terms." *Id*. at 963 n.6.

Jehovah's Witnesses' beliefs are spiritual standards based on Bible teachings, not secular risk management policies. Weighing and interpreting spiritual teachings "can play no role in any … judicial proceedings" because it unconstitutionally "inject[s] the civil courts into substantive ecclesiastical matters." *Presbyterian Church v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 450-51 (1969). Plaintiffs attempt to create secular duties and impose liability based on their interpretation of Jehovah's Witnesses' beliefs is directly prohibited by the First Amendment.

## III. DEFENDANTS DID NOT OWE PLAINTIFFS A DUTY OF CARE.

Plaintiffs argue five different theories of duty. None have merit.

### A. Defendants did not voluntarily assume a duty to protect Plaintiffs from their father or from Hain.

Absent a special relationship, a bystander who fails to rescue someone in peril faces no liability "even when the aid can be rendered without danger or inconvenience to the potential rescuer." *State ex rel. Kuntz v. Thirteenth Jud. Dist.*, 995 P.2d 951, 955(Mont. 2000). If, however, the bystander attempts a rescue, he must use reasonable care. *See Maryland Cas.*, 460 P.3d at 896.

### 1. Plaintiffs fail to show a negligent undertaking.

6

As noted, Plaintiffs did not plead this theory, but it nonetheless fails on the merits.

There must be an "actual rescue" attempt for this doctrine to apply. *Gonzales v. City of Bozeman*, 217 P.3d 487, 499 (Mont. 2009). While Plaintiffs point to the Watchtower Protocols, their own pleading states these protocols are the opposite of a rescue effort: "The Watchtower Protocols fail[ ] to take any reasonable steps to protect its members and members of the public, including Plaintiffs, from child sexual abuse." (Doc. 22, ¶ 30.) Without a rescue attempt, there can be no negligent undertaking.

In any case, mere policies do not create a duty under the negligent undertaking doctrine. In *Doe v. The Citadel*, 805 S.E.2d 578, 582 (S.C. App. 2017), the "policies and procedures" of a military college relating to investigating sexual abuse of minor cadets were not a "voluntary undertaking." *See id.* at 582-583.

A duty is created only when the bystander "affirmatively render[s] aid or services directly to" the person in peril. *Maryland Cas.*, 460 P.3d at 897. Plaintiffs present no such evidence here.

Plaintiffs were each abused a single time by Hain in his home. Plaintiffs suggest the affirmative undertaking to protect them from Hain began a year earlier when Hain's wife allegedly reported to Hardin Congregation elders that Hain had abused his daughter. (Doc. 382 at 8.) This had nothing to do with Plaintiffs, and

7

Defendants did not affirmatively render aid or services in relation to this abuse. Therefore, this theory fails as it applies to Hain's abuse of Plaintiffs.

As for abuse by their father, Plaintiffs allege that when their mother reported to Harold Rimby, a Hardin Congregation elder, that their father had molested them, "their mother relied on [him] when he said he would 'take care of it.'" (Doc. 382 at 4.) Plaintiffs' mother testified that she didn't know what Rimby meant:

> Q. He said he was going to tell the authorities or he was going to handle it?
>
> A. He was going to handle it.
>
> Q. Okay. So he didn't say he was going to tell the authorities.
>
> A. No, but I thought that's what he would do.

(Ex. B at 64:24-65:5.) She had no idea whether he called the authorities.

> Q. Okay. So I just want to be clear. You don't know if Mr. Rimby reported it or not; is that correct?
>
> A. Correct.

(Doc. 383-2 at 177:11-178:16.)

The ambiguous assertion by Rimby that he would "take care of it" is not an undertaking. Further, Plaintiffs must also establish that Rimby undertook "to render services … which he … recognized as necessary for the protection of the other's person or things …." *Maryland. Cas.*, 460 P.3d at 896. Plaintiffs present no

evidence that, whatever Rimby meant, he was undertaking to do something necessary to protect Plaintiffs from further abuse.

Finally, Plaintiffs must establish that Rimby was *negligent* in performing whatever task he undertook in his attempt to rescue Plaintiffs. That specific task undertaken determines the "scope of any assumed duty …." *Delgado v. Trax Bar & Grill*, 36 Cal. 4th 224, 249 (2005) (applying rules reflected in Restatement (Second) of Torts). Plaintiffs cannot identify the specific task Rimby undertook, and therefore cannot present any evidence that he performed that undertaking negligently. Accordingly, this theory also fails as applied to the abuse by Plaintiffs' father.

### 2. Plaintiffs present no evidence of "increased risk" from an undertaking.

The rescue effort must cause "an actual change in preexisting conditions, thereby increasing the risk of harm at issue beyond the preexisting risk created by or resulting from the third party's conduct …." *Maryland Cas.*, 460 P.3d at 902. Failure "to protect others from harm caused by a third party is insufficient alone to show that the first party increased the preexisting risk of harm." *Id*. Plaintiffs cannot point to any "particular affirmative action" by Defendants that made their situation worse. *Id*. Plaintiffs present no evidence that they would not have been abused, or the abuse would have ended sooner, but for negligence in some unidentified rescue effort.

### 3. Plaintiffs present no evidence of harm caused by reliance on a negligent rescue effort.

Alternatively, Plaintiffs must show they were harmed by reasonable reliance on a rescue attempt. Plaintiffs must have been "aware of the undertaking," which must have "induced or caused the[m] … to forgo other precautionary or remedial measures …." *Id*. at 903.

Plaintiffs were unaware that Hain's wife reported Hain's molestation of his daughter to Hardin Congregation elders, so they could not have relied on any response to that report to protect them. And Plaintiffs' mother testified she did not rely on Rimby to protect her daughters from their father. She did nothing to protect her daughters because she believed their father when he said he would never molest them again. (*See* Ex. B at 81:18-82:6.)

Moreover, this theory requires proof that Plaintiffs *reasonably* relied upon the volunteer's undertaking. *Maryland,* 460 P.3d at 903-904. Plaintiffs' mother testified that she did not know what Rimby did, if anything, with the information she gave him. (*See* Ex. B at 81:18-82:6.) She did know her husband was not arrested or removed from the home. Not knowing what Rimby did, but knowing that her husband still had access to his daughters, she could not have been *reasonably* relying on Rimby to protect her daughters.

Cases in similar contexts have rejected liability. In *Conti v. Watchtower Bible & Tract Soc'y of N.Y., Inc.*, 235 Cal. App. 4th 1214 (2015), Congregation elders

knew Congregation member Kendrick had been molested. The elders "voluntarily undertook to watch Kendrick and, if necessary," they would "warn individual parents about him …." *Id*. at 1231. The plaintiff said this voluntary undertaking created a duty. The court concluded that the plaintiff did not rely on this undertaking and it did not increase any risk she already faced, rather "it only failed to reduce that risk." *Id*.

In *Stocker v. State*, 264 A.3d 435 (Vt. 2021), the court said the Department for Children and Families did not increase the risk of harm by failing to adequately investigate reports of abuse by a stepfather. The plaintiffs argued "that DCF undertook to protect [them] from abuse and [was] negligent in carrying out that undertaking by failing to adhere to statutory requirements and DCF policies." *Id*. at 451. *Stocker* rejected that argument, stating "plaintiffs must identify sins of commissions rather than omission," and stated the standard of comparison is "the risk of harm that would be present if defendant had never undertaken to render services." *Id*. at 452.

Thus, plaintiffs' claim failed because they had "not presented evidence that DCF's undertaking to protect them put them at greater risk than if DCF had taken no steps at all." *Id*. The court rejected the argument that DCF increased the risk by "send[ing] a message to the perpetrator that he could act with impunity." *Id*.

"[A]llowing a risk of harm to continue unabated, without affirmatively making it worse, is insufficient to support" the increased-risk requirement. *Id*.

In short, Plaintiffs cannot satisfy any of the elements of the negligent-undertaking doctrine.

### B. Duty based on reporting statute.

Plaintiffs argue Defendants had a statutory duty to report. This argument is addressed in Defendants' Motion for Partial Summary Judgment as to Plaintiffs' negligence per se claim, which is incorporated herein by reference. (Doc. 302.)

### C. Defendants did not "take charge" of Gunnar Hain.

Per Restatement (Second) of Torts § 319, a defendant can assume a duty by "taking charge" of a known dangerous person. This section applies, for example, when police take a dangerous person into custody. *See LaTray v. City of Havre*, 999 P.2d 1010, 1015 (Mont. 2000), *overruled on other grounds by Samson v. State*, 2003 MT 133, ¶ 26, 316 Mont. 90, 69 P.3d 1154. It has no application here.

Allegedly, when Hain's wife reported to Hardin Congregation elders that Hain had molested his daughter, Hain moved out and lived with the Svensons for a few weeks. (Doc. 382 at 12-13.) "Based on this evidence," Plaintiffs argue, "the jury could find that Defendants' Hardin clergy took charge of and exercised control over Hain as contemplated in Restatement (Second) § 319." (*Id*. at 13.) No reasonable jury could reach that conclusion.

12

In *Nelson v. Driscoll*, 983 P.2d 972, 981 (Mont. 1999), the Montana Supreme Court explained that the control necessary to create a duty is "akin to possession, or a degree of control which results in a physical or legal restraint of one's liberty." In short, "imposition of a duty under Sec. 319 depends on an ability to control the third person." *LaTray,* 999 P.2d at 1015 (internal citation omitted).

Defendants did not "take charge" of Hain. He lived with the Svensons voluntarily and was free to come and go as he pleased. *See*, *e.g.*, *Hoehn v. United States*, 217 F. Supp. 2d 39, 47, 48 (D.D.C. 2002) (hospital had no duty to control "voluntary outpatient" because hospital "had no right or ability to control her").

Even if Hain's temporary living arrangement with the Svensons somehow put him under Defendants' control, he was no longer living with the Svensons when he molested Plaintiffs.

D.     **Defendants did not owe a fiduciary duty to Plaintiffs.**

Plaintiffs argue, without having pleaded, that Defendants owed them a fiduciary duty. (Doc. 382 at 14-16.) Whether a fiduciary duty exists is a question of law. *See Gliko, supra*. No court has recognized a general fiduciary relationship between a church and its parishioners. "Courts frequently reject fiduciary duty claims against churches … for non-constitutional reasons." Mark E. Chopko & Michael F. Moses, *Freedom to be a Church: Confronting Challenges to the Right of Church Autonomy*, 3 Geo. J. of L. & Pub. Pol'y 387, 428 (2005). *See also Bouchard*

*v. New York Archdiocese*, 2006 WL 1375232, * 6 (S.D.N.Y. May 18, 2006) (the general relationship "between a church or religious body and a congregant" does not establish a fiduciary duty); *Lindeman v. The Corp. of the President of the Church of Jesus Christ of Latter-day Saints*, 43 F. Supp. 3d 1197, 1212 (D. Colo. 2014) ("attending church … does not create a fiduciary relationship").

Courts have also repeatedly rejected fiduciary duty claims against churches on First Amendment grounds. *See, e.g.*, *Amato v. Greenquist*, 679 N.E.2d 446, 454 (Ill. App. 1997). Here, the relationship between Plaintiffs and Defendants is entirely religious. Thus, it would be impossible to define what duty the elders owed them "without resort to religious facts." *Langford v. Roman Catholic Diocese of Brooklyn*, 677 N.Y.S.2d 439 (Sup. Ct. 1998). *See also Petrell v. Shaw*, 902 N.E.2d 401, 407 (Mass. 2009).

Plaintiffs *invite* the court to resort to religious facts by asserting that Jehovah's Witnesses beliefs "were designed and implemented to govern nearly all aspects of the Hardin Congregation members' lives." (Doc. 382 at 15.) Plaintiffs assert that the religious submission required by such beliefs creates a fiduciary duty. (*Id*. at 15-16.) Imposing a fiduciary duty based on religious beliefs would cause courts to become unconstitutionally "entangled in essentially religious controversies." *Davis v. The Church of Jesus Christ of Latter Day Saints*, 852 P.2d 640, 648 (1993) (overruled on other grounds by *Gliko*). The First Amendment "clearly forbid[s]"

14

creating a fiduciary duty based on "religious authority." *Maffei v. Roman Catholic Archbishop of Boston*, 867 N.E.2d 300, 310 (Mass. 2007).

Plaintiffs cite cases where courts have recognized the possibility of a cleric having a fiduciary duty based on a quasi-professional counselor-counselee relationship. These cases hold that a member of the clergy "who holds himself out as being trained and capable of conducting marital counseling" can be held liable for engaging in a sexual relationship with an adult who comes to him for such counseling. *Destefano v. Grabrian*, 763 P.2d 275, 283 (Colo. App. 1988). Plaintiffs identify nothing of that sort here. The Hardin Congregation elders did not hold themselves out as having any kind of professional training to provide secular counseling. The relationship was purely spiritual and based entirely on principles set forth in the Bible. Plaintiffs' claim for breach of fiduciary duty has no merit.

### E. Defendants' duty to exercise reasonable care in hiring, training, and supervising their agents does not create a duty to protect Plaintiffs from their father or from Hain.

Plaintiffs assert "Montana recognizes a negligence claim against the principal of an agent for negligently hiring, training, or supervising that agent." (Doc. 382 at 17.) Plaintiffs thus argue Defendants had a duty to "hire, train and supervise clergy to properly handle reports of child sexual abuse and protect Plaintiffs from the foreseeable risk" of abuse. (*Id.*) In essence, Plaintiffs are asking the Court to craft a secular standard for religious training, which would unconstitutionally inject civil

courts into ecclesiastical matters. *See Presbyterian Church, supra*, 393 U.S. at 450-51.

Additionally, for an employer to be liable for negligently hiring, training, or supervising an agent, that agent must first commit an actionable tort. And that comes back to the question of whether Defendants owed Plaintiffs a duty. Thus, Plaintiffs' claim for negligent hiring, training, and supervision has no merit.

## CONCLUSION

As shown herein, all of Plaintiffs' arguments fail and the Court should grant Defendants' Motion for Summary Judgment.

**DATED** this 23rd day of May, 2024.

BROWN LAW FIRM, P.C.


By: */s/ Jon A. Wilson*
    JON A. WILSON
    BRETT C. JENSEN
    MICHAEL P. SARABIA
*Attorneys for Defendant Watchtower Bible and Tract Society of New York, Inc.*


MOULTON BELLINGHAM PC


By: */s/ Jordan W. FitzGerald*
    GERRY P. FAGAN
    CHRISTOPHER T. SWEENEY
    JORDAN W. FITZGERALD
*Attorneys for Defendant Watch Tower Bible and Tract Society of Pennsylvania*

16

## **CERTIFICATE OF COMPLIANCE**

Pursuant to L.R. 7.1(d)(2)(E), the undersigned hereby certify this brief is printed with a proportionately spaced Times New Roman text typeface of 14 points; is double-spaced, with left, right, top, and bottom margins of one inch; and that the word count calculated by Microsoft Word is 3,243 words, excluding the Caption, Signature Block, and Certificate of Compliance.

**DATED** this 23rd day of May, 2024.

                BROWN LAW FIRM, P.C.

                By: */s/ Jon A. Wilson*
                      JON A. WILSON
                      BRETT C. JENSEN
                      MICHAEL P. SARABIA
                *Attorneys for Defendant Watchtower Bible and Tract Society of New York, Inc.*

                MOULTON BELLINGHAM PC

                By: */s/ Jordan W. FitzGerald*
                      GERRY P. FAGAN
                      CHRISTOPHER T. SWEENEY
                      JORDAN W. FITZGERALD
                *Attorneys for Defendant Watch Tower Bible and Tract Society of Pennsylvania*