*Tracy Caekaert and Camillia Mapley v*
*Watchtower Bible and Tract Society of New York, Inc.*

*Shirley Gibson*
*April 14, 2022*

*Charles Fisher Court Reporting*
*442 East Mendenhall*
*Bozeman, MT  59715*
*(406) 587-9016*
*maindesk@fishercourtreporting.com*

Min-U-Script® with Word Index

**Exhibit B**

Page 1

```
 1      IN THE UNITED STATES DISTRICT COURT
 2         FOR THE DISTRICT OF MONTANA
 3              BILLINGS DIVISION
 4  TRACY CAEKAERT, and
 5  CAMILLIA MAPLEY,
 6       Plaintiffs,      Case No. CV-20-52-BLG-SPW
 7     vs.
 8  WATCHTOWER BIBLE AND TRACT
 9  SOCIETY OF NEW YORK, INC.,
10  WATCH TOWER BIBLE AND
11  TRACT SOCIETY OF
12  PENNSYLVANIA, and BRUCE
13  MAPLEY SR.,
14       Defendants.
15  WATCHTOWER BIBLE AND TRACT
16  SOCIETY OF NEW YORK, INC.,
17       Cross Claimant,
18  BRUCE MAPLEY, SR.,
19       Cross Defendant.
20  _____
21  ARIANE ROWLAND, and JAMIE
22  SCHULZE                   Cause No. CV 20-59-BLG-SPW
23       Plaintiff,
24     vs.
25  WATCHTOWER BIBLE AND TRACT
```

Page 2

```
 1  SOCIETY OF NEW YORK, INC.
 2  and WATCH TOWER BIBLE AND
 3  TRACT SOCIETY OF
 4  PENNSYLVANIA,
 5       Defendants.
 6
 7
 8  _____
 9     VIDEOCONFERENCE/VIDEOTAPED DEPOSITION
10        UPON ORAL EXAMINATION OF
11            SHIRLEY GIBSON
12  _____
13     BE IT REMEMBERED, that the
14  videoconference/videotaped deposition upon oral
15  examination of Shirley Gibson, appearing at the
16  instance of the Plaintiffs, was taken at 800 North
17  Last Chance Gulch, Suite 101, Helena, Montana, on
18  Thursday, April 14, 2022, beginning at the hour of
19  9:07 a.m., pursuant to the Federal Rules of Civil
20  Procedure, before Mary R. Sullivan, Registered
21  Merit Reporter, Certified Realtime Reporter, and
22  Notary Public.
23
24
25
```

Page 3

```
 1              A P P E A R A N C E S
 2
 3  For the Plaintiffs:
 4      RYAN R. SHAFFER, Esq.
 5      JAMES C. MURNION, Esq. (Via Zoom)
 6      Meyer, Shaffer & Stepans, PLLP
 7      430 Ryman
 8      Missoula, Montana 59802
 9      ryan@mss-lawfirm.com
10      james@mss-lawfirm.com
11
12  For the Defendant and Cross Claimant Watchtower
13  Bible and Tract Society of New York, Inc.:
14      JOEL M. TAYLOR, Esq. (Via Zoom)
15      Miller McNamara & Taylor LLP
16      100 South Bedford Road, Suite 340
17      Mount Kisco, New York 10549
18      jtaylor@mmt-law.com
19      and
20      BRETT C. JENSEN, Esq.
21      Brown Law Firm, P.C.
22      315 North 24th Street
23      P.O. Drawer 849
24      Billings, Montana 59103
25      bjensen@brownfirm.com
```

Page 4

```
 1              A P P E A R A N C E S
 2
 3  For the Defendant Watch Tower Bible and Tract
 4  Society of Pennsylvania:
 5      CHRISTOPHER T. SWEENEY, Esq.
 6      JORDAN W. FITZGERALD, Esq. (Via Zoom)
 7      Moulton Bellingham, P.C.
 8      27 North 27th Street, Suite 1900
 9      Billings, Montana 59103
10      christopher.sweeney@moultonbellingham.com
11      jordan.fitzgerald@moultonbellingham.com
12
13
14  ALSO PRESENT: Jessica Yuhas (Via Zoom)
15       Jordan Brannen (Via Zoom)
16       Carisa Fisher, Videographer
17
```

Page 5

```
                    I N D E X
DEPONENT:                                      PAGE:
SHIRLEY GIBSON
     Examination by Mr. Shaffer.................   8
     Examination by Mr. Taylor...................  139
     Examination by Mr. Sweeney..................  162
     Examination by Mr. Shaffer..................  173
     Examination by Mr. Taylor...................  177


EXHIBITS:
 Exhibit 5   "AFFIDAVIT OF SHIRLEY GIBSON"......   51
 Exhibit 6   Handwritten note...................  108
 Exhibit 7   "JM Transcription of Doc. 4 from
             Hardin Congregation Subpoena"......  108
 Exhibit 8   February 22, 1992 document that
             was produced by the Hardin
             congregation in response to the
             subpoena...........................  133
 Exhibit 9   January 26, 1991 document that was
             produced by the Hardin
             congregation in response to the
             subpoena...........................  135
```

Page 6

           S T I P U L A T I O N S

     It was stipulated by and between counsel for the respective parties that the deposition be taken by Mary R. Sullivan, Freelance Court Reporter and Notary Public for the State of Montana, residing in Missoula, Montana.

     It was further stipulated and agreed by and between counsel for the respective parties that the deposition be taken in accordance with the Federal Rules of Civil Procedure.

     It was further stipulated and agreed by and between counsel for the respective parties and the deponent that the reading and signing of the deposition would be expressly reserved.

Page 7

1       THURSDAY, APRIL 14, 2022
2       **THE VIDEOGRAPHER:** This is the video-recorded and videoconference deposition of Shirley Gibson taken in the United States District Court for the District of Montana, Billings Division, Cause No. CV-20-52-BLG-SPW, Tracy Caekaert and Camillia Mapley vs. Watchtower Bible and Tract Society of New York, Inc., et al., and Cause No. CV-20-59-BLG-SPW, Ariane Rowland, and Jamie Schulze vs. Watchtower Bible and Tract Society of New York, Inc., et al.
        Today is April 14th, 2022. The time is 9:08 a.m. Mountain Time.
        We are present at the offices of Fisher Court Reporting at 800 North Last Chance Gulch, Suite 101, in Helena, Montana.
        The court reporter is Mary Sullivan, and the video operator is Carisa Fisher of Fisher Court Reporting.
        The deposition is being taken pursuant to notice.
        I would now ask the attorneys to identify themselves, who they represent, and whoever else is present. Also for the remote attorney, where you are appearing from.

Page 8

**MR. SHAFFER:** This is Ryan Shaffer on behalf of the plaintiffs in both cases.
        Did we get both cases on the record?
**THE VIDEOGRAPHER:** Yes.
**MR. SHAFFER:** Thank you. I believe paralegal Jessica Yuhas is logged in, and potentially attorneys James Murnion and Rob Stepans also on behalf of all the plaintiffs.
**MR. JENSEN:** Brett Jensen appearing on behalf of Watchtower Bible and Tract Society of New York, Inc. Also appearing remotely is our pro hac vice counsel Joel Taylor.
**MR. SWEENEY:** Chris Sweeney for Watch Tower Bible and Tract Society of Pennsylvania. Jordan Fitzgerald of Moulton Bellingham is also attending remotely. He is in Billings.
Thereupon,
        SHIRLEY GIBSON,
a witness of lawful age, having been sworn to tell the truth, the whole truth, and nothing but the truth, testified as follows:
                EXAMINATION
BY MR. SHAFFER:
    Q.  Good morning, Ms. Gibson.
    A.  You can call me Mapley. I --

Page 61

1   A.  Yes.
2   Q.  Why do you say 1977?  You fairly -- How
3   do you feel about that number, that year?  Pretty
4   certain about that?
5   A.  Yes.
6   Q.  Tell me why.
7   A.  Because it was brought to my attention
8   all this stuff had happened, and I --
9   Q.  How -- How was it brought your attention?
10  A.  Well, because of Gunner Hain, it came
11  out.  He was reproved, but they didn't do anything
12  to Bruce 'cause he -- Anyway.  I was told what had
13  happened, and then Bruce admitted he had too,
14  so -- but they didn't do anything with Bruce but
15  they did something -- they -- Gunner Hain was
16  reproved is all.
17  Q.  Who told you that?
18  A.  Harold Rimby.
19  Q.  And so when you say this came out in
20  1977, that -- that -- Harold Rimby told you
21  personally --
22  A.  Yes.
23  Q.  -- about Gunner Hain.
24  A.  And my ex-husband.
25  Q.  And your ex-husband molesting Gunner's

Page 62

1   stepdaughter.  Gunner had molested his
2   stepdaughter and Tracy.
3   A.  (Nods head.)
4   Q.  How did Mr. Rimby know that?
5       MR. SWEENEY:  Objection.  Speculation.
6   A.  Do I still answer?
7   BY MR. SHAFFER:
8   Q.  Yeah, go ahead.  Yeah.
9   A.  Well, because Gunner told Harold.
10  Q.  And then Harold told you.
11  A.  Yes.
12  Q.  Okay.  Sounds like Harold told you about
13  Gunner.  Did -- In -- In the same conversation he
14  told you that Bruce had done the same thing?
15  A.  Yes.
16  Q.  And do you know how Harold knew
17  that -- that Bruce had molested Tracy?
18      MR. SWEENEY:  Objection.  Speculation.
19  BY MR. SHAFFER:
20  Q.  Go ahead.  It's okay.
21  A.  Well, Bruce admitted to Harold that he
22  had.
23  Q.  Okay.  And then Harold told you.
24  A.  Yes.
25  Q.  Okay.  In 1977 -- Why do you say 1977 as

Page 63

1   opposed to 1978?
2   A.  Because it was the year after we were
3   baptized.
4   Q.  Okay.  So you feel -- you're certain
5   about that number, 1977.
6   A.  (Nods head.)
7   Q.  Yeah.  Where were you when you had this
8   conversation with Mr. Rimby?
9   A.  In our home at Fort Smith.
10  Q.  Who else was there?
11  A.  My ex-husband.
12  Q.  So just the three of you?
13  A.  Yeah.  Well, my children were there, too.
14  Q.  Okay.  And had Mr. Rimby announced he was
15  going to come over to have this conversation with
16  you or did he just show up, or how'd that happen?
17  A.  I guess just showed up.  I don't
18  remember.  We didn't make announcements; we just
19  came --
20  Q.  Okay.
21  A.  -- to each other's homes.
22  Q.  I take it it was a surprise.  It was
23  shocking.
24  A.  Yes.
25  Q.  Is that fair?

Page 64

1   A.  And the first thing I said was "We need
2   to call the authorities."
3       And Harold said, "I'll take care of it."
4   Q.  Okay.
5   A.  So I assumed he would, but he didn't.
6   Q.  Okay.
7   A.  I mean, maybe he did.  He didn't call the
8   authorities, though.  And that was my mistake.
9   Q.  Was Harold an elder at that point?
10  A.  Yes.
11  Q.  And you're new to the church at that
12  point in time.
13  A.  Yes.
14  Q.  You understood that if Harold -- Harold
15  was essentially directing how to take care of this
16  situation.  Is that right?
17  A.  Yes.
18  Q.  And would there be a consequence to you
19  as a member if you did -- if you disobeyed
20  Mr. Rimby's command to not tell the authorities?
21  A.  No, there wouldn't have been a problem.
22  I just assumed he was going to do it.  He said he
23  was.
24  Q.  He said he was going to tell the
25  authorities or he was going to handle it?

Page 65

1  A. He was going to handle it.
2  Q. Okay. So he didn't say he was going to
3  tell the authorities.
4  A. No, but I thought that's what he would
5  do.
6  Q. I see. And if he had done -- Let's say
7  he -- Let's say he told you not to, did you
8  understand you could go to the authorities if you
9  wanted to?
10 A. Yeah. He didn't tell me I couldn't, but
11 I assumed he was going to take care of it.
12 Q. Okay.
13 A. And I should have done it.
14 Q. When did you -- When did you follow up
15 with him on that?
16 A. I never had any contact with -- I mean, I
17 never had any more conversations with him or
18 anybody else about it after that.
19 Q. Okay. Did other people in the
20 congregation know that Gunner had molested Tracy
21 and Ronda?
22 A. Yes.
23 Q. How did they find out about it?
24 A. Same way I did, I guess. I never asked
25 them.

Page 66

1  Q. Okay. Who -- Can you identify other
2  people who knew about it by name?
3  A. Martin Svenson, James Rowland,
4  Joyce Hains, June Rimby. All deceased now.
5  Q. Mm-hmm. Anyone else that you know that
6  knew about it?
7  A. No.
8  Q. Were you permitted to tell people about
9  it?
10 A. I could have, but I didn't.
11 Q. Okay. So you understood that you could,
12 you could have gone to the authorities or you
13 could have told people about it, but you didn't.
14 A. Yes.
15 Q. You chose not to.
16 A. I chose not to.
17 Q. Okay.
18 A. It was a mistake.
19 Q. Sorry?
20 A. Was a mistake.
21 Q. Okay. And had you ever been taught as a
22 member of the church that the elders direct how to
23 handle situations like wrongdoing within the
24 congregation?
25 A. Yes.

Page 67

1  Q. Okay. Tell me about that. When were you
2  taught that?
3  A. I suppose during my studies. I
4  don't -- I don't remember where I learned it. I
5  mean, it's just something we do.
6  Q. How was it supposed to work, then? So
7  there's -- there's alleged wrongdoing in the
8  church. How is it supposed to work? What are --
9  What are you supposed to do with that information?
10 A. Okay. You go to the elders.
11 Q. Okay.
12 A. You have a sit-down with them, tell them
13 the situation, and they take care of it.
14 Q. And they're in charge of handling that,
15 right, at that point?
16 A. Yes.
17 Q. It's out of your hands.
18 A. Yes.
19 Q. Okay.
20 A. Well, I mean, unless they need more
21 information.
22 Q. Okay. And is there a process that the
23 elders are supposed to use to determine if
24 wrongdoing has occurred?
25 A. I don't know how they handle it. I know

Page 68

1  they discuss it, and I don't -- I don't know.
2  Q. Yeah. Right. Is it a process, though,
3  that as a member you've -- you come to trust this
4  process, you're taught this process if there's
5  wrongdoing, you take it to an elder and you trust
6  it's going to be handled. Right?
7  A. Yes.
8  Q. Okay. And that's what you're taught as a
9  member.
10 A. Yes.
11 Q. Okay. Did you know Mr. Hain?
12 A. Yes, I did.
13 Q. And did he voluntarily go to Mr. Rimby
14 and the elders to say, "Hey," --
15 A. I have no idea.
16 Q. -- "I molested" --
17 A. I never asked.
18 Q. So you don't know how that came about.
19 A. Hm-mmm.
20 Q. And do you know what brought about
21 Bruce's decision to tell Mr. Rimby that he had
22 been molesting Tracy?
23 A. I don't know what his reason was.
24 Probably because he'd molested other girls, too,
25 so -- I don't know that for sure, but...

Page 81

1  A. I assumed they had because Gunner was
2  publicly reproved, and, of course, nothing was
3  done to Bruce 'cause he'd just been baptized so, I
4  mean, he was still a publisher, but I -- I guess
5  that's -- I don't know. I'm really getting
6  confused.
7  Q. Well, as you sit here today, did -- did
8  the church prevent Bruce from continuing to molest
9  Camie or Tracy?
10  A. Well, if they didn't know, how could they
11  do anything?
12  Q. Mr. Rimby knew, didn't he?
13  A. Mr. Rimby did, but apparently he did not
14  contact the organization in New York.
15  Q. Do you know that? Do you know who
16  Mr. Rimby told?
17  A. No.
18  Q. Okay. Mr. Rimby told you he was handling
19  it. Did he handle it appropriately? Did he
20  resolve the problem of Bruce molesting Tracy?
21  A. You know, that's a hard question because
22  people lie to each other, and if Bruce said he
23  wasn't going to do it again, maybe Harold did what
24  I did, believed it.
25  Q. Yeah. Right. Right.

Page 82

1  A. So how could we control --
2  Q. Sure.
3  A. -- what he did?
4  Q. Sure. Yeah.
5  A. I don't think the organization should be
6  responsible for somebody's conduct.
7  Q. I understand, yeah.
8     Do you know what Mr. Rimby did, if
9  anything?
10  A. No, I do not.
11  Q. So you don't know if he did anything with
12  the information you gave him.
13  A. No.
14  Q. But you did trust that was the proper way
15  to handle it. Correct?
16  A. Yes.
17  Q. Okay. Tell me about that. Why did you
18  trust that that was the proper way to handle it?
19  A. Well, because Jehovah has an
20  organization. He's appointed men to shepherd our
21  congregation, take care of us.
22  Q. Those men being the elders.
23  A. Yes.
24  Q. In your experience with the church, have
25  you -- have you been able to observe how members

Page 83

1  who admit to wrongdoing are -- are -- I don't want
2  to say punished, but maybe that's the right word,
3  I don't know. Is that -- I'll use the word
4  "punished." Have you been able to observe how
5  members of the church are punished if they've done
6  something wrong?
7  A. Yes, I've seen that. I mean --
8  Q. Yeah.
9  A. -- yeah.
10  Q. What does that look like? Tell me about
11  it. How do you know if somebody's being punished?
12  A. Well, they're either put on reproof or
13  disfellowshipped, and we -- they lose their
14  privileges of answering at the congregation,
15  reading, you know, different one. It depends on
16  the degree of what they've done and how repentant
17  they are.
18  Q. That makes sense. What's a reproof?
19  A. You know, just like when you tell your
20  son or daughter to do something, they don't do it,
21  and what do you do? What punishment do you give
22  them? No TV for a day, whatever, you know.
23  Q. I take their iPad away for a day.
24  A. That's a new one, yes.
25  Q. But I don't know what a reproof is.

Page 84

1  That's a new word to me.
2  A. Well, maybe I'm using the wrong word now,
3  but I don't know.
4  Q. Well, tell me -- I mean, that was your
5  word. I assume you had -- it's got a meaning in
6  your head. I just want to try to understand it a
7  little bit. Does it mean you pay --
8  A. Well, that person --
9  Q. Sorry, I'm talking over you.
10  A. Okay. So I -- it's never happened to me
11  so I don't know, but what I've seen with what
12  happened to my ex-husband, the elders discuss the
13  situation, they talk to the brothers in New York
14  or somebody in, you know, a committee. Then they
15  decide what punishment will be given to the
16  person. And then -- then the congregation is
17  announced that this person has been reproved or
18  disfellowshipped. They don't use disfellowshipped
19  anymore. They're just no longer part of the
20  congregation of Jehovah's Witnesses.
21  Q. Okay. So it sounds like the word
22  "reproof" is kind of a word that can encompass a
23  lot of things. It's basically when somebody's
24  either been determined to have committed a
25  wrongdoing or confessed to a wrongdoing in the

Page 161

1  work, so he was going to find another one.  He
2  said he would call and talk to them.
3    Q.  And -- And was it because you had
4  received some legal paperwork?  What was the
5  reason why you wanted to call?
6    A.  I had been served with the deposition, so
7  I --
8    Q.  Aha.
9    A.  -- called and talked to him.
10   Q.  Okay.  So you got -- you got this notice
11 to appear here today, and you wanted to knew what
12 to do with it.
13   A.  Yes.
14   Q.  And you never heard back from anyone at
15 Watchtower.
16   A.  Not from there or Ray Sewell.
17   Q.  Okay.  As -- As one of Jehovah's
18 Witnesses, is there any aspect of your worship
19 that is not voluntary?
20   A.  No.
21   Q.  Is all of it voluntary?
22   A.  Yes.
23   Q.  Can the elders stop you from doing
24 something?
25   A.  No.

Page 162

1    Q.  Can the elders make you do something?
2    A.  No.
3    Q.  I have no further questions.  I want to
4  defer to Chris.  Thank you so much.
5       MR. SWEENEY:  I only have a -- We'll take
6  a break.
7       THE VIDEOGRAPHER:  Let's go off the
8  record.  It's 1:54.
9       (Recess taken from 1:54 p.m. to
10 1:59 p.m.)
11      THE VIDEOGRAPHER:  We're back on the
12 record now.  It's 1:59 p.m.
13            EXAMINATION
14 BY MR. SWEENEY:
15   Q.  Shirley, my name is Chris Sweeney.  I
16 represent the other defendant in this matter, the
17 Watch Tower Bible and Tract Society of
18 Pennsylvania, and I just have a few questions for
19 you.  I wanted to start by looking at your
20 affidavit again and talking to you about how this
21 came about.
22      I understand that this affidavit was
23 requested by the investigator Todd.  Do I have
24 that right?
25   A.  Yes.  Yes.

Page 163

1    Q.  Did either -- Did any of your children
2  ever contact you and ask you to prepare this
3  affidavit?
4    A.  No.
5    Q.  And I think you said that you prepared
6  this three years ago, but it looks like it's dated
7  March 26th, 2020, or at least that's the date you
8  signed it.
9       So my first question is, how many times
10 have you spoken to Todd?
11      MR. SHAFFER:  I'm objecting to form to
12 the extent it misstates her testimony.
13      Go ahead.
14   A.  Oh, probably three times.
15 BY MR. SWEENEY:
16   Q.  When was the first time?
17   A.  I don't remember what year it was.
18   Q.  It looks like this affidavit was signed
19 in March of 2020.  Does that jog your memory at
20 all as to when you first talked to Todd?
21   A.  Might have been.  He called me on the
22 phone.  I was out in field service that day, so I
23 had to leave field service to visit with him.
24   Q.  And do you remember what was discussed?
25   A.  He just asked me to tell the -- what I

Page 164

1  knew, and I did.
2    Q.  At -- You believe you had three
3  phone -- or three conversations with Todd?
4    A.  I believe it was three.
5    Q.  Were they all on the phone?
6    A.  Yes.
7    Q.  Was it always just you and him or were
8  there others involved in any of those
9  conversations?
10   A.  Just him and I.
11   Q.  And did those all take place before you
12 signed the affidavit?
13   A.  Yes.
14   Q.  Have you talked to Todd since you've
15 signed the affidavit?
16   A.  No.  He left me a voicemail to tell me
17 that the subpoena would be in the -- so I haven't
18 talked to him, but he left a voicemail that there
19 was a subpoena coming.
20   Q.  Okay.  So the first time he called you
21 were in the middle of field service and you spoke
22 to him.  Tell me the details of what was
23 discussed.
24   A.  I just told him exactly what I told in
25 this whole thing.  What happened from '77 on.