*Exhibit B*

# EXPERT REPORT

Caekaert and Mapley v. WTNY., et. al. (Cause No. CV-20-52-BLG-SPW)

Rowland and Schulze v. WTNY., et. al. (Cause No. CV-20-59-BLG-SPW)

Prepared by:

**LANGEL, YONCE & ASSOCIATES, P C.**
Benjamin F. Yonce, CPA, CVA
January 8, 2024

**LANGEL YONCE & ASSOCIATES, P.C.**
*Certified Public Accountants*
*3819 Stephens Avenue*
*Missoula, Montana 59801*
*(406) 728-8858*
*Fax (406) 721-6816*

January 8, 2024

Mr. Robert L. Stepans
Mr. Ryan R. Shaffer
Mr. James C. Murnion
Meyer, Shaffer & Stepans, PLLC
430 Ryman Street
Missoula, Montana 59802

RE:  *Caekaert and Mapley (Plaintiffs) v. WTNY., et. al. (Defendants)*
     *(Cause No. CV-20-52-BLG-SPW)*
     *Rowland and Schulze (Plaintiffs) v. WTNY., et. al. (Defendants)*
     *(Cause No. CV-20-59-BLG-SPW)*

Dear Mr. Stepans, Shaffer, and Murnion:

You have requested that we provide you with our opinion concerning certain issues in regard to the matter referenced above. You requested our professional opinion regarding financial business relationship between Watchtower Bible and Tract Society of New York, Inc. (WTNY) and Watchtower Bible and Tract Society of Pennsylvania, Inc. (WTPA) (collectively, Defendants) during the period 1973 to 1992.

## OPINION

> **It is our opinion that Defendant's financial statements and disclosures did not disclose material intercompany transactions in a manner consistent with generally accepted accounting principles designed to provide financial statement users with sufficient information to demonstrate that WTNY and WTPA functioned as separate and distinct entities.**

## ASSUMPTIONS AND LIMITING CONDITIONS

In developing our opinion, we relied on information provided by your office. We express no opinion and accept no responsibility for the accuracy and completeness of the information or other data provided to us. We assume that the information or data provided to us is accurate and complete; we have relied upon this information and data in forming our opinion.

Meyer, Shaffer & Stepans, PLLP
Caekaert and Mapley v. WTNY., et. al. (Cause No. CV-20-52-BLG-SPW)
Rowland and Schulze v. WTNY., et. al. (Cause No. CV-20-59-BLG-SPW)
January 8, 2024
Page Two (2 of 10)

## FACTUAL BACKGROUND AND BASIS FOR OPINION

We have been provided with the following financial data[1]:

1. Financial Statements of WTNY for fiscal years 1973 through 1992 (no footnotes included with 1985 and 1988 financial statements).
2. Financial Statements of WTPA for fiscal years 1975, 1977 through 1980, 1982, and 1984 through 1992.
3. Report of the Treasurer of WTNY for fiscal years 1973 through 1992 (no Report of the Treasurer for 1983, 1984, and 1985).
4. Minutes of Annual Meetings of WTNY and WTPA for fiscal years 1973 through 1992.
5. Articles of Incorporation, Charter Documents, and By-Laws produced by WTNY.
6. Articles of Incorporation, Change of Registered Office, and Revision to Charter documents produced by WTPA.
7. Summary of Plaintiff's relevant Discovery to WTNY and WTPA with a copy of served Discover Answers and Responses.
8. Copyright/Publisher Comparison Index with supporting documents produced in Discovery.

At all times relevant to this case, WTNY is and was a New York corporation with its principal place of business in New York, New York. At all times relevant to this case, WTPA is and was a Pennsylvania corporation with its principal place of business in New York, New York. WTNY and WTPA are not subsidiary entities.

At all times relevant to this case, WTNY and WTPA conducted business with each other in various transactions related to the printing, publication, and distribution of printed literature of the Church. WTPA is and was the legal owner of publishing rights of various materials including but not limited to bibles, various magazines including but not limited to The Watchtower, tracts, brochures, books, and pamphlets. WTNY is and was the legal owner and operator of printing and binding machinery used to generate various materials including but not limited to bibles various magazines including but not limited to The Watchtower, tracts, brochures, books, and pamphlets. Generally, it is our understanding that WTPA paid WTNY for printing services and that WTPA would then distribute printed

---

*(1) Financial data provided does not include items that would normally be expected such as Federal and State Income Tax Returns, Reports of the Treasurer from WTPA, footnotes included and attached to each set of financial statements of WTNY referred to in Item 1 above, financial statements and footnotes of WTPA for all years referred to in Item 2 above, and more thorough descriptions and disclosures including amounts and terms related to intercompany transactions.*

Meyer, Shaffer & Stepans, PLLP
Caekaert and Mapley v. WTNY., et. al. (Cause No. CV-20-52-BLG-SPW)
Rowland and Schulze v. WTNY., et. al. (Cause No. CV-20-59-BLG-SPW)
January 8, 2024
Page Three (3 of 10)

literature to local congregations and members. The price paid by WTPA was determined by a financial pricing structure. WTPA would either sell or give printed literature to local congregations and members based on their ability to pay. It is unclear whether WTNY also sold or gave printed literature to local congregations and members based on ability to pay.

At all times relevant to this case, both WTNY and WTPA prepared annual financial statements including Statement of Condition, and Statement of Revenues and Disbursements. During times relevant to this case, the names of financial statements changed, but generally were descriptive and accurately reflected the general financial information that a reader would expect to see on the annual financial statements. The provided WTNY financial statements were accompanied by Reports of the Treasurer. WTNY financial statements were accompanied by Notes to Financial Statements for the fiscal years ended February 28, 1986, February 28, 1989, February 28, 1991, February 29, 1992, and February 28, 1993. The provided WTPA financial statements were accompanied by Minutes of Board Meetings. WTPA financial statements were accompanied by Notes to Financial Statements for fiscal years ended August 31, 1988 through 1992.

At all times relevant to this case, both WTNY and WTPA maintained their office in New York, New York.

At all times relevant to this case, WTNY and WTPA maintained Boards of Directors. With the exception of 1975, the Boards of Directors of WTNY and WTPA were comprised of the same individuals. The Boards of Directors in 1975 were comprised primarily of the same individuals with the exception of J.O. Groh, who was a member of the WTPA Board of Directors but was not a member of the WTNY Board of Directors. In years previous to 1975, J.O. Groh was a member of both WTNY and WTPA Boards of Directors. In years subsequent to 1975, J.O. Groh was no longer a member either Board of Directors. In all years relevant to this case, most members of the Boards of Directors were not only the same for WTNY and WTPA, but they were also primarily the same members from year to year.

For years relevant to this case, WTNY reported its annual financial statements based on a fiscal year ended August 31 until August 31, 1981. At that time WTNY changed its fiscal year end from August 31 to the last day of February. We were not provided with footnotes to financial statements at the time of conversion from an August 31 fiscal year end to a last day of February fiscal year end. The Report of the Treasurer dated May 14, 1981 (Bates WTNY001149 through WTNY001150) notes that the Board of Directors of WTNY changed the entity's fiscal year end from August 31 to the last day of February

Meyer, Shaffer & Stepans, PLLP
Caekaert and Mapley v. WTNY., et. al. (Cause No. CV-20-52-BLG-SPW)
Rowland and Schulze v. WTNY., et. al. (Cause No CV-20-59-BLG-SPW)
January 8, 2024
Page Four (4 of 10)

No discussion regarding the purpose or benefit to the organization or the users of the financial statements is included in the Report of the Treasurer dated May 14, 1981. For all years relevant to this case, WTPA reported its annual financial statements based on a fiscal year ended August 31.

For most years relevant to this case, the financial data, account descriptions, and general format included on the financial statements of WTNY and WTPA were relatively consistent with each other, such that identification of some intercompany transactions was possible by a reader of financial statements. Fiscal years prior August 31, 1987 included a Statement of Cash Receipts and Disbursements. However, starting with its fiscal year ended August 31, 1987 WTPA changed to report the financial results of operations to a Combined Statement of Revenues and Changes in Fund Balances. The Statement of Revenues and Changes in Fund Balances omitted the line item representing payments to WTNY. For the fiscal years ended August 31, 1986 and 1985 cash disbursements to WTNY represented 31.50% and 37.02%, respectively, of total cash disbursements. For fiscal years prior to August 31, 1985 cash disbursements from WTPA to WTNY represented a range of 22.07% to 54.16% with an annual average of 38.12% indicating that cash disbursements from WTPA to WTNY were a material item of annual cash flow with respect to WTPA and should have been disclosed on the Statement of Changes in Fund Balances. Starting with its fiscal year ended February 28, 1982 WTNY changed to report the financial results of operations to a Statement of Activity. The Statement of Activity omitted the line item representing cash receipts from WTPA. For fiscal years prior to February 28, 1982 cash receipts to WTNY from WTPA represented a range of 17.02% to 28.40% with an annual average of 25.89% indicating that cash received by WTNY from WTPA was a material item of annual cash flow with respect to WTNY and should have been disclosed on the Statement of Changes in Fund Balances.

## PROFESSIONAL STANDARDS AND EXPERT OPINION

From 1959 through 1973 the Accounting Principles Board (APB) issued authoritative pronouncements about accounting theory and the practical application of accounting principles. The APB was organized and overseen by the American Institute of Public Accountants. During its fourteen years, the APB issued thirty-one opinions and four statements. While the output of opinions and statements was relatively small in number, the qualitative aspects of these works were influential in shaping future accounting standards and some of the opinions remain partially in force today. The Financial Accounting Standards Board (FASB) was the successor to the APB. Formed in 1973, the FASB develops accounting standards for use within the GAAP framework.

Meyer, Shaffer & Stepans, PLLP
Caekaert and Mapley v. WTNY., et. al. (Cause No. CV-20-52-BLG-SPW)
Rowland and Schulze v. WTNY., et. al. (Cause No. CV-20-59-BLG-SPW)
January 8, 2024
Page Five (5 of 10)

Of particular importance throughout the years relevant to this case, and still relevant today, are opinions issued by the APB which were expanded upon by the FASB to deal with the content and structure of financial statements which govern the manner in which non-governmental businesses present information within their financial statements.

These standards are crucial for ensuring that financial information is presented in a consistent manner. GAAP developed by the FASB (1973 to present), including opinions adopted from the APB (1959 through 1973), are required to be followed by companies in preparing their financial statements. The Defendants were obligated to prepare their financial statements using GAAP rules developed by the APB and FASB. While too extensive to reproduce for purposes of this expert report, the opinions of the APB included relevant standards for accurately reporting the following within a company's financial statements:

1. A statement of financial condition or balance sheet showing the assets, liabilities, and net assets on the historical cost basis as of a specific date (i.e., the last day of a fiscal year) (GAAP adopted and expanded by APB and FASB),
2. A statement of changes in net assets or income statement showing revenues and expenses from operations, as well as items of other income and expense, with a resulting disclosure of the net income for a relevant period of time (i.e., for the twelve months ended on the last day of a fiscal year) (APB Opinion 09 – December 1966; adopted and expanded by FASB),
3. A statement reporting the changes in financial position or statement of cash flow for a relevant period of time (i.e., for the twelve months ended on the last day of a fiscal year) (APB Opinion 19 – March 1971; adopted and expanded by FASB),
4. Footnote disclosures clearly describing accounting policies, major customer relationships, major vendor relationships, related party transactions, restatements of prior year financial statements (APB Opinion 22, adopted and expanded by FASB),
5. Materiality as a guide to the requirement to disclose certain financial items on the face of the financial statement, within the footnotes of the financial statements, or both.

As described in the preceding Factual Background and Basis for Opinion section of this report, WTNY and WTPA prepared annual financial statements. Pursuant to authoritative guidance provided by the APB and FASB at all times relevant to this case, management, including the Boards of Directors, were responsible for the fair and accurate presentation of financial activities of WTNY and WTPA. It is our opinion that Defendants did not prepare financial statements that met authoritative standards.

Meyer, Shaffer & Stepans, PLLP
Caekaert and Mapley v. WTNY., et. al. (Cause No. CV-20-52-BLG-SPW)
Rowland and Schulze v. WTNY., et. al. (Cause No. CV-20-59-BLG-SPW)
January 8, 2024
Page Six (6 of 10)

An overriding concept within accounting theory is that of materiality wherein activities that are considered material in substance and in form are to be clearly disclosed within the financial statements, either as specific line items and dollar amounts on the face of the financial statements or as a footnote attached to the financial statements. As previously discussed WTNY and WTPA had significant related party transactions representing an average of 25.89% of WTNY's annual cash flow and an average of 38.12% of WTPA's annual cash flow. Additionally, Boards of Directors of both organizations consisted of the same individuals demonstrating common control between WTNY and WTPA. Authoritative guidance provided by the APB and the FASB would not require that WTNY and WTPA consolidated their financial statements based on the material substance and form of related party transactions and common control, however, related party disclosures would be required to inform users of financial statements regarding the specific dollar amounts of transactions, the type of intercompany pricing that was in place, the amounts and terms of intercompany receivables and payables. The disclosures of material related party balance sheet items such as intercompany receivables and payables would not only need to be shown as a specific line item at their current balances as of the balance sheet date, but also reported in a footnote to the financial statements explaining the type of intercompany receivable or payable, the terms of the receivable or payable (including stated fair market interest rates), and a schedule showing future expected payments pursuant to stated terms. The disclosures of material related party items of income and expenses would not only need to be shown as a specific line item in the amount recognized during the time period covered by the statement of income, but also reported in a footnote to the financial statements explaining the items of intercompany income or expense.

Pursuant to Generally Accepted Accounting Principles (GAAP), materiality is defined by a five percent (5%) rule which holds that a reasonable investor would not be influenced in their investment decisions by fluctuation in net assets or net income of 5% or less. The percentages are intended to be an initial guide to determining whether a financial statement item is significant enough to warrant disclosure on the face of the financial statement or in a note to the financial statement, or if the item is the result of an error that should be corrected or if not corrected, considered a material misstatement to the financial statements, which could lead to a qualified opinion by an independent auditor of an entity's financial statements.

The Reports of the Treasurer of WTNY commonly included a paragraph describing limited data with respect to monies received from WTPA for the printed of materials described above. Also of significant importance, the Reports of the Treasurer notes amounts of monies received from WTPA in excess of the monies received for printing services rendered by WTNY and the accounting application of funds received as an offset to a

Meyer, Shaffer & Stepans, PLLP
Caekaert and Mapley v. WTNY., et. al. (Cause No. CV-20-52-BLG-SPW)
Rowland and Schulze v. WTNY., et. al. (Cause No. CV-20-59-BLG-SPW)
January 8, 2024
Page Seven (7 of 10)

related party receivable from WTPA. The Reports of the Treasurer note regarding intercompany amounts receivable and/or payable between WTNY and WTPA indicate significant dollar amounts (in excess of $14 million noted in the 1978 Report of the Treasurer – Bates WTNY001141). The first disclosure on the face of the balance sheets of WTNY was in 1986 reporting a receivable from WTPA in the amount of $24,039,264.72 (Bates – WTNY000168). Given the materiality of the balance in the intercompany account, there should have also been a disclosure on the balance sheet in all years prior to 1986. Additionally, the financial statements should have included a footnote disclosure describing terms related to the extension or payment of intercompany credit. Without full disclosure of the terms of these intercompany transactions it appears that WTNY and WTPA did not act independently of each other with respect to their cash flow needs.

Additionally, a meeting of the Board of Directors of WTNY included a corporate resolution to indefinitely change the pricing for printing services rendered to help WTNY improve its cash flow (Bates WTNY001131 and WTNY001132). With respect to the financial activities of WTNY there does not appear to be any repayment terms or expectation of repayment (Bates WTPA066721) placed on the intercompany receivable payable accounting between WTNY and WTPA to indicate that these transactions are at an arm's length.

Failure to disclose all intercompany transactions regardless of materiality is considered a departure from GAAP. If undisclosed amounts related to intercompany transactions are also pervasive and of a material amount then a user of the financial statements could be poorly informed and make poor business decisions, or not be aware of instances of fraudulent transactions. Additionally, an auditor of the financial statements would issue an adverse opinion signifying that the financial statements may not be relied upon by financial statement users.

Based on financial information of WTNY, the reader of WTPA Reports of the Treasurer, Minutes of Board Meetings, and financial statements would reasonably expect to see reporting of the intercompany transactions that is consistent with that of WTNY. A receivable (an asset) from WTPA on the books of WTNY would show itself as a payable (a liability) from WTPA to WTNY. From 1973 through 1985 WTPA makes no mention of its intercompany relationship with WTNY nor does WTPA include any notes regarding the cash flow struggles of WTNY which led to the resolution to change the pricing for printing services rendered in 1977. Given the materiality of intercompany transactions and WTNY's reliance on additional cash from WTPA to maintain its operations represents a requirement that WTPA disclose these intercompany transactions during all of the years relevant to this case. In 1986, WTPA begins disclosing the amount payable to WTNY on the face of the WTPA balance sheet and also includes a footnote disclosure. The footnote

Meyer, Shaffer & Stepans, PLLP
Caekaert and Mapley v. WTNY., et. al. (Cause No. CV-20-52-BLG-SPW)
Rowland and Schulze v. WTNY., et. al. (Cause No. CV-20-59-BLG-SPW)
January 8, 2024
Page Eight (8 of 10)

disclosures commonly note that WTNY does not receive enough cash from revenue sources to cover its expenditures and therefore needs additional funds from WTPA. For example, 1989 Footnote C (Bates WTNY000198), 1990 Footnote A (Bates WTNY000201), and 1992 Footnote F (Bates WTPA066801) states that WTNY needed $6,000,000, $10,900,839, and $30,000,000, respectively to help cover its expenditures. With respect to the financial activities of WTPA there does not appear to be any terms placed on the intercompany receivable payable accounting between WTNY and WTPA that indicate that these transactions are at an arm's length.

Common control which leads to related party relationships and intercompany transactions are a normal part of business, however the existence of a related party relationship may expose a reporting entity to risks or provide opportunities which would not have existed in the absence of the relationship. Related party relationships may therefore have a material effect on the financial performance, financial position and financing and investing of a reporting enterprise because related parties may enter into transactions, which unrelated parties would not enter into. Also, transactions between related parties may not be made pursuant to the same terms and conditions as between unrelated parties. The operating results and financial position of an enterprise may be affected by a related party relationship even if related party transactions do not occur. The mere existence of the relationship may be sufficient to affect the transactions of the reporting enterprise with other parties. At all times relevant to this case common control of the Boards of Directors of WTNY and WTPA created the existence of a related party relationship and the intercompany transactions between WTNY and WTPA were of material amounts.

Based on the materiality of the intercompany transactions, WTNY's reliance on WTPA for cash flow needs without arm's length terms, and the lack of disclosure regarding these intercompany transactions it is our opinion that Defendant's financial statements and disclosures did not clearly disclose material intercompany transactions in a manner consistent with generally accepted accounting standards designed to provide financial statement users with sufficient information to demonstrate that WTNY and WTPA functioned as separate and distinct entities.

*ADDITIONAL ITEM OF INTEREST:*

As previously mentioned in this report, both WTNY and WTPA reported results of financial activity on a fiscal year-end basis with a fiscal year-end of August 31. WTPA has continued to use the fiscal year-end of Augst 31 through all years relevant to this case. WTNY, on the other hand, changed its fiscal year-end from August 31 to the last day of February during the 1981/1982 fiscal years by reporting on the short year of September 1, 1981 through February 28, 1982. For all future years WTNY has used the last day of

Meyer, Shaffer & Stepans, PLLP
Caekaert and Mapley v. WTNY., et. al. (Cause No. CV-20-52-BLG-SPW)
Rowland and Schulze v. WTNY., et. al. (Cause No. CV-20-59-BLG-SPW)
January 8, 2024
Page Nine (9 of 10)

February as its fiscal year-end. Given the materiality of intercompany transactions and common control between WTNY and WTPA it would generally be considered unusual for both entities to use fiscal year-ends that are different from one another. There is no indication within the financial data available to us that demonstrates a business purpose for changing the fiscal year end of WTNY. Additionally, an entity will only change its fiscal Year-end when there is a business purpose for doing so, such as a date that more accurately reflects the entities annual business cycle. WTNY should have provided more complete disclosure regarding its decision to change its fiscal year-end, especially in light of the fact that WTPA, WTNY's source of intercompany cash flow, did not change its fiscal year-end to be consistent with WTNY. We highlight this additional item of interest because these two entities reporting on different fiscal year ends with no apparent business purpose for doing so poses difficulty for management to properly analyze intercompany transactions where fiscal year balances can only be compared to interim balances, which do not appear to have been provided to management and were not included in the data that was provided to us.

## PROFESSIONAL QUALIFICATIONS OF BENJAMIN F. YONCE, CPA, CVA

Please see attached *curriculum vitae* summarizing Benjamin F. Yonce's professional history and qualifications.

## COMPENSATION FOR BENJAMIN F. YONCE, CPA, CVA

Langel, Yonce & Associates, P.C. charges hourly for all work performed in connection with this matter. The current hourly rate for Mr. Yonce is $285 per hour for report preparation and $325 per hour for testimony in deposition or trial.

## HISTORY OF TESTIMONY AND DEPOSITIONS

Please see the attached exhibit listing of Mr. Yonce's expert witness testimony including hearings, depositions, and trials. In addition, Mr. Yonce has assisted other experts, previously acted as an expert, and is currently acting as an expert in multiple proceedings without being required to provide testimony either in court or deposition.

## HISTORY OF PUBLICATIONS OR PAPERS WRITTEN

Mr. Yonce has not authored any papers or been published in any publications in the preceding ten years.

Meyer, Shaffer & Stepans, PLLP
Caekaert and Mapley v. WTNY., et. al. (Cause No. CV-20-52-BLG-SPW)
Rowland and Schulze v. WTNY., et. al. (Cause No. CV-20-59-BLG-SPW)
January 8, 2024
Page Ten (10 of 10)

## DATA CONSIDERED IN FORMING THE OPINION EXPRESSED

In addition to the knowledge gained from our professional, educational, and business experience used in forming the opinion expressed, we have reviewed certain information provided by you.

This report provides our opinion financial business relationship between Watchtower Bible and Tract Society of New York, Inc. (WTNY) and Watchtower Bible and Tract Society of Pennsylvania, Inc. (WTPA) (collectively, Defendants). Our opinion was formed based on our investigation, research, and the information and documents that have been provided as of the date of this report, as well as our professional, educational, and business experience. We reserve the right to revise or supplement the opinions and conclusions expressed in this report if more information or documentation becomes available.

Please contact our office if you have any questions or comments regarding this report.

Sincerely,

LANGEL, YONCE & ASSOCIATES, P.C.
Certified Public Accountants

Benjamin F. Yonce, CPA, CVA

/bfy



**LANGEL YONCE & ASSOCIATES, P.C.**
*Certified Public Accountants*
*3819 Stephens Avenue*
*Missoula, Montana 59801*
*(406) 728-8858*
*Fax (406) 721-6816*

# BENJAMIN F. YONCE, CPA, CVA
ben@langel.com

## EDUCATION

Graduated 1992 – University of Montana, Missoula
Bachelor of Science in Accounting

## PROFESSIONAL EXPERIENCE

1995 to Present – Langel Yonce & Associates, P.C. (Shareholder since 2006)

Langel Yonce & Associates, P.C. is a regional accounting firm offering services in the areas of compiled and reviewed financial statements, tax consulting and compliance, bookkeeping and payroll administration, accounting system setup and consulting, management consulting, business valuations, litigation support, and estate and succession planning. We serve a variety of clients around the country ranging in size from self-employed individuals to companies with over 1,000 employees.

## PROFESSIONAL ASSOCIATIONS AND MEMBERSHIPS

Montana Society of Certified Public Accountants

National Association of Certified Valuators and Analysts

## CONTINUING EDUCATION – *Selected list of relevant courses completed*

Annual Update in Valuations (2014, 2017, 2020, 2023)
Case Analysis – NACVA Recertification (2014, 2017, 2020, 2023)
1040 Tax In Depth (2021, 2022)
Business Tax Update (2022)
Financial Statement Analysis (2015, 2018, 2021)
Estate Planning (2015)
Tax Practitioner Institute (1995 – 2009, 2011 – 2019)
Valuation of Small Business – Be Efficient and Deal with Key Issues (2012)
How to Write a Business Valuation Report for the IRS (2012)
Business Valuations: Fundamentals, Techniques and Theory, NACVA (2010)
Third Party Sales and the M&A Process (2016)
Family Business Succession Planning (2016)
Advanced S-Corporation Issues (2010)
Section 1031 Exchanges (2009)
Accounting Best Practices (2008)
Intangible Assets, Goodwill and Impairments (2005)

# BENJAMIN F. YONCE, CPA, CVA

## List of Expert Testimony

| Depositions | | | |
|---|---|---|---|
| *Date* | *Case* | *Attorney and Law Firm* | *Represented* |
| August 2013 | Dale E. Schafer v. Ocwen Loan Servicing, LLC | Jenny M. Jourdonnais, *Garlington, Lohn & Robinson, PLLP* | Defendant |
| July 2014 | Double Arrow Ranch Landowners Association, Inc. v. John A. Richards, et al | Dennis E. Lind & Kyle Ryan, *Datsopoulos, MacDonald & Lind, PC* | Defendant |
| December 2018 | Lincoln Properties, LLC v. American Equities Exchange, Inc | KD Feeback & Lin Deola, *Morrison, Sherwood, Wilson & Deola, PLLP* | Plaintiff |
| September 2019 | Gannon v. Gannon Marital Dissolution | Dustin M. Chouinard, *Marquette & Chouinard, PC* | Represented the Wife |
| May 2020 | Sutey Oil v. Monroe High Country Travel Plaza | David Bjornson, *Bjornson Jones Mungas PLLC* | Plaintiff |
| October 2020 | Dinnwiddie v. United States of America | Martin Martelle, *Martelle Law Offices* | Plaintiff |
| November 2022 | Crystal River Investments LLC v. Mountain High Life Management LLC | Katherine DeLong, *Goetz, Geddes, & Gardner, PC* | Defendant |

# BENJAMIN F. YONCE, CPA, CVA

## List of Expert Testimony – continued

**Trials**

| Date | Case | Attorney and Law Firm | Represented |
|---|---|---|---|
| May 2013 | Edwards v. Edwards Marital Dissolution | Dennis E. Lind, *Datsopoulos, MacDonald & Lind, PC* | Represented the Wife |
| October 2016 | Konopatzke v. Konopatzke Marital Dissolution | P. Mars Scott, *P. Mars Scott Law Offices* | Represented the Wife |
| May 2017 | Tracy v. Tracy Marital Dissolution | Gail H. Goheen, *Gail H. Goheen, PC* | Represented the Wife |
| October 2019 | Gannon v. Gannon Marital Dissolution | Dustin M. Chouinard, *Marquette & Chouinard, PC* | Represented the Wife |
| August 2020 | Sutey Oil v. Monroe High Country Travel Plaza (Arbitration) | David Bjornson, *Bjornson Jones Mungas PLLC* | Plaintiff |
| June 2022 | Frost v. Frost Marital Dissolution | David B. Cotner, *Cotner Ryan Law, PLLC* | Represented the Husband |
| May 2023 | Martin v. Jergens | Jenny M. Jourdanais, *Hansberry & Jourdannais, PLLC* | Plaintiff |