# TRENT C. HOLMBERG, M.D.
## ADULT AND FORENSIC PSYCHIATRY

**INDEPENDENT PSYCHIATRIC EXAMINATION REPORT**
*Tracy Caekaert and Camillia Mapley v. Watchtower Bible and Tract Society of New York, Inc., Watchtower Bible and Tract Society of Pennsylvania, and Bruce Mapley, Sr.*

| | |
|---|---|
| **Examinee's Name:** | Tracy Lynn Caekaert |
| **Date of Birth:** | May 21, 1966 |
| **Case No:** | 1:20-cv-00052-SPW-TJC |
| **Nature of Alleged Injury:** | Psychiatric |
| **Date(s) of Alleged Injury:** | 1967-1984 (dates are approximate) |
| **Date of Examination:** | January 7, 2022 |
| **Date of Report:** | January 4, 2024 |

The following report is a summary of a psychiatric evaluation requested by Robert Stepans and Ryan Shaffer of Meyer, Shaffer & Stepans, PLLP, the attorneys representing Ms. Caekaert in this case. Prior to commencing the examination, the nature of the examination was explained to the examinee. She verbalized that she understood that no treatment relationship existed or was being established between her and me as a result of this examination. She also verbalized an understanding of the confidentiality limitations inherent in this type of evaluation. The findings and opinions noted below are based upon my examination, my observations of the examinee, and upon the sources of information listed below. If other information were to become available, it is possible that information could materially alter the opinions I have expressed in this report. My opinions are based on the information available to me as listed below and are given with a reasonable degree of medical certainty.

*[Note: Julian Thorne, M.D., a psychiatry resident at the University of Utah, participated in this evaluation with Dr. Holmberg. He reviewed the records listed below, participated in the evaluation, and assisted in the preparation of this report.]*

## SOURCES OF INFORMATION:

<u>Affidavits, Interviews, Reports & Statements</u>
1. Handwritten statement of Jamie Rowland, dated 8/1/1993, <u>Bates-Stamped 000710-000711</u>
2. Report of BIIA Interview of Jamie Rowland conducted 9/20/1993, <u>Bates-Stamped 000669-000672</u>
3. Law Enforcement Memorandum re: Interview of Dawn Spang (Rowland) conducted 1/26/1994, <u>Bates-Stamped 000675-000676</u>
4. Affidavit of Alethea Littlebird, dated 1/3/1997, <u>Bates-Stamped 000712</u>
5. Handwritten statement of Alethea Littlebird, dated 1/3/1997, <u>Bates-Stamped 000713</u>

*Tracy Lynn Caekaert*
*DOB:  May 21, 1966*

seemed to bring her in contact with "demonic things" at home, and a traumatic colonoscopy prep during which she "almost died."  Ms. Caekaert also experienced the fear-based teachings of her church (e.g., being "disfellowshipped" and "losing" her "salvation") as traumatic.  She struggled with religious-based guilt and only left the church after many years of active participation.

Ms. Caekaert discussed the suicide of her stepdaughter at 19 years of age in February 2021.  She said she was aware of her stepdaughter's struggles with her mental health and understandably had significant difficulty talking about this.  Ms. Caekaert notes that her stepdaughter left a "nice" suicide note and that this has been helpful to her in her grieving process.  Ms. Caekaert notes a worsening of many of her depressive symptoms following her stepdaughter's death and cites this as one of the main reasons she began to pursue therapy again in March 2021 *[she had been in therapy for other issues in early to mid-2020 – see record review section].*

**SUBSTANCE USE HISTORY:**

Ms. Caekaert described episodes at home starting at age eight where her father exposed Ms. Caekaert and her siblings to second-hand marijuana smoke in an effort to "get us high."  Ms. Caekaert did not describe any voluntary use of cannabis until after her first marriage.  At that time, she joined her husband in smoking marijuana "off and on" for a period of three weeks.  In late 2021, Ms. Caekaert obtained a medical marijuana card based on her issues with seizure-like activity and insomnia.

Ms. Caekaert reports that she first used alcohol at age eight, but the use was "accidental."  Her first voluntary use was at age 16, when she took "two swigs" of beer.  She went through a period of regular drinking during her first marriage because her husband was an "alcoholic" and she wanted to "fit in" with his lifestyle.  Her drinking was generally "social," but she "sometimes" did get "very drunk."  She reported one alcohol use-related blackout that occurred when she was in Mexico.

**FAMILY HISTORY:**

Ms. Caekaert reports that she is not aware of any family history of schizophrenia, anxiety, Bipolar Disorder, dementia/Alzheimer's Disease, suicide attempts, or completed suicide.  She did report a family history of depression, alcoholism, and drug abuse.  Her oldest half-sister was in "intense therapy" for years.  She described her father as a sex addict with a history of alcohol abuse, drug addiction, and pedophilia.  She added that her father has also been diagnosed in recent years as a sociopath.  She stated that there may be other psychiatric disorders in family members, but they may not have been diagnosed as family members have generally avoided mental health treatment.

**RELEVANT PAST MEDICAL HISTORY:**

Ms. Caekaert notes that approximately 4-5 years ago, while living in Arizona, she had an episode of syncope (fainting) that she originally thought was a seizure.  She reports she underwent an extensive neurological work up that did not identify any definitive cause of this episode.  She reports that this episode came at a time of stress.  She notes that she is unsure if this was diagnosed as PNES (psychogenic non-epileptiform seizures).  She notes that she has been diagnosed with fibromyalgia, which causes significant pain for her and makes it difficult for

*Tracy Lynn Caekaert*
*DOB: May 21, 1966*

patterns and intrusive thoughts may occur. Thought content is likely negativistic and this respondent probably views the world through a pessimistic lens.

This respondent endorsed significant experience of general anxiety to include feeling tense frequently; having difficulty relaxing; experiencing intruding anxious thoughts; and tending to be startled easily. Individuals with similar anxious experience are prone to experiencing somatic complaints in response to stress.

Findings from this administration also reflect the experience of post-traumatic stress. Specifically, individuals who respond similarly have disturbed sleep to include insomnia and nightmares. Flashbacks related to a traumatic event are common as is the tendency for the person to avoid stimuli associated with a traumatic experience. Hypervigilance and/or exaggerated startle response are common as well. Individuals with a history of trauma can also experience some degree of turbulence in mood to include feelings of anger, which can be projected outward onto those around them.

Sincerely,

_____
Jonathan Bone, PsyD
Licensed Psychologist
Utah 6314549-2501


**DISCUSSION REGARDING SEXUAL ABUSE ALLEGATIONS WITHIN THE JW RELIGION:**

In 2015, the Royal Commission into Institutional Responses to Child Sexual Abuse, in Case Study 54, disclosed that the Australia Branch of Jehovah's Witnesses had records of 1,006 alleged perpetrators of child sexual abuse (including 579 cases in which the alleged perpetrator confessed) relating to more than 1,800 victims since 1950, none of which were reported to police by the group. The Royal Commission found that the Jehovah's Witnesses did not respond adequately to child sexual abuse and did not adequately protect children from the risk of sexual abuse. In particular, the Royal Commission reported, "The organisation does not have a practice of reporting child sexual abuse to police or any other [secular/outside] authority."[1]

The United Kingdom's Independent Inquiry into Child Sexual Abuse (IICSA) was particularly critical of a biblical rule applied by the Jehovah's Witnesses religion requiring two witnesses before an allegation of abuse is considered by elders. The Jehovah's Witnesses gave evidence that it also has policies requiring allegations to be reported to the police when there is a legal duty do so. However, the UK has no such "mandatory reporting law". IICSA strongly criticized the "two witness rule" ["The Bible says that there must be two or three witnesses before [church] judicial action can be taken"][2], saying it was likely to increase the suffering of victims, and failed to reflect the reality that "child sexual abuse is most often perpetrated in the absence of

---

[1] "Australia Royal Commission into Child Sexual Abuse - Submissions of Senior Counsel". *Child Abuse Royal Commission*. March 2017.
[2] The Watchtower – November 1, 1995

*Tracy Lynn Caekaert*
*DOB: May 21, 1966*

witnesses". The IICSA noted that the organization disclosed that in their England and Wales congregations, consisting of 131,700 members, allegations concerning 67 individuals had been reported to the Jehovah's Witnesses' branch office within a 10-year period.[3]

Regarding the JW religion's approach to confessed child molesters, "If they find the individual genuinely repentant they will provide spiritual counsel and reproof to help avoid recurrence of the sin and may restrict the individual from full participation in meetings (*Acts 26:20; Watchtower 1976, 1 December 1981, 15 September 1994, 15 July 2007*). There may be an announcement to the congregation during a regular scheduled meeting that the individual has been "reproved", but the sin itself should not be mentioned (*Shepherd the Flock of God p.98; Watchtower 1 December 1976*). If the reproved individual is an elder or ministerial servant, he will be "deleted", that is removed, from that position and an announcement of the deletion should also be made to the congregation at a meeting (*Shepherd the Flock of God p.42; Watchtower 1 December 1976*). If the judicial committee finds an individual is not repentant, he or she may be "disfellowshipped", that is excommunicated, from the congregation. In that case, an announcement should be made to the congregation that the individual is no longer one of the Jehovah's Witnesses, but again the sin itself would not be mentioned (*Shepherd for The Flock of God p.101*). The information received by and the deliberations of a judicial committee are supposed to remain confidential (*Proverbs 25:9*)."[4]

Regarding the question of why the four individuals I evaluated and their parents did not confront their religious leaders directly (as is apparently expected in church policy[5]) and did not report the alleged abuse to authorities ("If there is a confession, the two elders can handle matters further in accordance with Scriptural principles")[6], it is my understanding that such action is implicitly (and possibly sometimes explicitly) discouraged within the JW religion. For example, a church publication reads, "What if the one accused – though denying the wrongdoing – is really guilty? Does he 'get away with it' as it were? Certainly not! The question of his guilt or innocence can be safely left in Jehovah's hands."[7]

It appears to be a commonly and strongly held belief within the JW religion that accusing a church leader of sinning will bring reproach on the good name of Jehovah. In a May 2004 letter, the Hardin congregation elders, when discussing Jamie and Ariane Rowland, wrote, "The Jim Rowland family—two of his children were the accusers, stated to one of our elders that they did not want to bring reproach on Jehovah's name by taking the matter to court." Sociological studies of totalistic groups (such as the Jehovah's Witnesses) underscore the outsized influence of these organizations in shaping the behavior of their believers. Leaders tend to be charismatic and to be thought of as having relative or absolute authority. An expectation of obedience to direction from local leaders is often explicitly and painstakingly cultivated.[8] This concept would suggest that the parents in this case would have been more likely to defer to church leaders, rather than taking matters into their own hands, with respect to the decision of whether or not to report alleged sexual abuse of their children to the secular authorities. In fact, in her affidavit, the mother of Tracy Caekaert and Camillia Mapley testified, "I asked Elder Harold Rimby [in

---

[3] Religious groups in UK failing children over sex abuse, report says *BBC*, September 2, 2021.
[4] [2015] EWHC 1722 (QB). URL: http://www.bailii.org/ew/cases/EWHC/QB/2015/1722.html
[5] The Watchtower – November 1, 1995
[6] Ibid.
[7] Ibid.
[8] Comprehending Cults: The Sociology of New Religious Movements, 2nd Edition. Lorne L. Dawson. Oxford University Press, 2006.

*Tracy Lynn Caekaert*
*DOB: May 21, 1966*

approximately 1977] if we should report the matter to the authorities and he said no, that the church will handle the matter internally.  I was new to the congregation so I did what I was told and didn't question Harold Rimby's decision."

In multiple letters written by the Hardin elders and other JW leaders that I reviewed for this case, reporting abuse to the secular authorities is rarely if ever mentioned.  The allegations are repeatedly dismissed as "repressed" memories, or minimized by commenting that the accusers would not formally confront their alleged abusers in a church-mediated meeting.  For example, in a letter written by the Hardin congregation elders in 2004, "the accusers would not meet with and confront Brother Svensen."  In a letter written by the Hardin congregation elders in 1997, regarding the "known pedophile" Gunnar Hain, "several brothers and sisters…feel the elders have done nothing…and that there has been a cover up…There is only so much we can do without two witnesses to a matter and while trying to maintain confidentiality."

In summary, it would appear that allegations of sexual misconduct within the JW religion have traditionally been rarely reported to secular legal authorities and have not been considered actionable unless there was at least one additional witness to the abuse.  In cases of confessed sexual misconduct, if the religious leader involved is considered repentant, he may be reproved but is allowed to continue to participate in religious activities, including those that would give him access to prior or potential future victims.  In these cases, the congregation will not know the nature of the confessed sin/crime.

## FALSE ALLEGATIONS OF CHILD SEXUAL ABUSE:

The rate of false allegations of child sexual abuse has been a topic of research dating back 50 years.  A recent review of this research resulted in the conclusion that "the vast majority of allegations are true."[9]

## DSM-5 DIAGNOSES:

| | |
|---|---|
| 309.81 (F43.10) | **Posttraumatic Stress Disorder (PTSD)** |
| 296.22 (F32.1) | **Major Depressive Disorder (MDD), Single episode, Moderate** |
| 300.82 (F45.9) | **Unspecified Somatic Symptom and Related Disorder** |

## DIAGNOSTIC DISCUSSION:

As evidenced in this report, Mrs. Caekaert meets the DSM-5 diagnostic criteria B-E for PTSD. She also meets diagnostic criteria F-H, which relate to the duration of symptoms, the impairment caused by the symptoms and a requirement that the symptoms are not caused by a substance or a medical condition.  Criterion A for PTSD relates to actual trauma exposure. According to DSM-5, this criterion requires:

---

[9] William O'Donohue, Caroline Cummings & Brendan Willis (2018) The Frequency of False Allegations of Child Sexual Abuse: A Critical Review, Journal of Child Sexual Abuse, 27:5, 459-475, DOI: 10.1080/10538712.2018.1477224.

*Tracy Lynn Caekaert*
*DOB: May 21, 1966*

symptoms, and psychosomatic symptoms) and the well-documented correlation of PTSD, depression, and psychosomatic conditions with sexual assault, it reasonable to assume that if Ms. Caekaert's abuse occurred, it likely played a large role in the development of both MDD and her somatic symptom disorder.

Regarding whether Ms. Caekaert is exaggerating or "faking" her symptoms, it is my opinion that she is not. The possibility of exaggeration of cognitive and somatic (physical) symptoms should always be examined in evaluations of this nature, but there are no indicators of potential exaggeration of psychological symptoms, either in the records or in the psychiatric and psychological testing results. She easily passed a malingering screening instrument and multiple embedded validity measures that specifically screen for symptom over-reporting. Although malingering (exaggerating or producing symptoms for secondary gain) can be difficult to identify, the course and presentation of malingered symptoms are atypical and/or functionally not ascribed to any known psychiatric disorder. In this specific case, Ms. Caekaert's symptomatology and course follows what would be clinically expected given her trauma memories and the resultant dysfunction. Additionally, she has shown a willingness to engage in evidence-based treatment for her dysfunction and has subsequently shown some benefit as would be expected given her presumed diagnoses. Thus, Ms. Caekaert's reported symptoms, clinical course, response to additional stressors, and response to treatment are internally consistent with the diagnoses of MDD and PTSD which significantly decreases any suspicion of malingering.

Ms. Caekaert's severe psychopathology has resulted in significant interpersonal dysfunction. Her memories of childhood abuse have greatly affected her family life, social life, and nearly incapacitated her with respect to romantic and other close interpersonal relationships. Although there could also be contributing factors that are not abuse-related, Ms. Caekaert has been fully disabled for some time. Overall, she is only marginally functional at the present time due to her psychological issues.

In my opinion, Ms. Caekaert's childhood trauma experience has greatly impacted her psychologically and led to identifiable harm. The relative contribution of the various acts of abuse that are alleged to have occurred (e.g., childhood abuse vs. adult abuse, physical abuse vs. sexual abuse, abuse perpetrated by family members vs. perpetrated by church priesthood leaders) is difficult to apportion, but abuse perpetrated by individuals in a position of trust and/or authority is generally more difficult to recover from than abuse perpetrated by people who are not in such a position. In particular, religious clergy, by virtue of their position within the religion, are implicitly deemed trustworthy and are expected to set an example of moral/righteous behavior. Members are taught to look to clergy when in need of spiritual guidance or to confess their sins. Clergy are often allowed special access to children because the child's parents view such interactions as safe and even sanctioned directly by God. When this trust is betrayed, there is a potential for a harm of greater magnitude than that of a stranger or individual who is not religious clergy. In one study, it was noted, "For children, clergy-perpetrated sexual abuse can catastrophically alter the trajectory of psychosocial, sexual, and spiritual development."[10]

In general, the known harms associated with childhood abuse include medical complications (accelerated aging, sexually transmitted infections, higher risk of physical injuries, increased risk

---

[10] Fogler JM, Shipherd JC, Clarke S, Jensen J, Rowe E. The impact of clergy-perpetrated sexual abuse: the role of gender, development, and posttraumatic stress. J Child Sex Abus. 2008;17(3-4):329-58. doi: 10.1080/10538710802329940. PMID: 19042605.

*Tracy Lynn Caekaert*
*DOB: May 21, 1966*

be reasonable to space these sessions out to biweekly or perhaps monthly.  It is likely that weekly therapy sessions will be required for at least two years.

It should be noted that psychiatric evaluation with subsequent medication management is indicated and appropriate for Ms. Caekaert.  In our discussion, this is something that Ms. Caekaert indicated she would be open to and a treatment option she has not previously engaged in to a significant degree.  She would likely benefit from medication management, to include an antidepressant/anti-anxiety medication, a mood stabilizer with anti-aggression properties, and an as-needed medication for insomnia, and an as-needed medication for the anxiety/panic attacks that occur in specific situations.  If she participates in psychiatric medication management, I would recommend monthly sessions for the first six months, followed by visits every three months thereafter for as long as she remains on medication.

In terms of prognosis, if Ms. Caekaert avails herself of all available treatment, as she indicated is her intention, she will likely improve and function better.  If she continues along her current path, I would expect minimal to no improvement from her current level of functioning.

If further information regarding this evaluation is needed, I may be reached at the number below or by email at trent@trentholmbergmd.com.

Respectfully Submitted,

_____
Trent C. Holmberg, M.D., DFAPA
Vice President, American Academy of Psychiatry and the Law
Past President, Utah Psychiatric Association
Adjunct Assistant Professor of Psychiatry
University of Utah School of Medicine
Board Certified, Adult Psychiatry
Board Certified, Forensic Psychiatry